**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONNECTU LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, CHRISTOPHER HUGHES, and THEFACEBOOK, INC.,<br><br>        Defendants.<br><br>MARK ZUCKERBERG, and THEFACEBOOK, INC.,<br><br>        Counterclaimants,<br><br>  v.<br><br>CONNECTU LLC,<br><br>        Counterdefendant,<br><br>  and<br><br>CAMERON WINKLEVOSS, TYLER WINKLEVOSS, and DIVYA NARENDRA,<br><br>  Additional Counterdefendants. | CIVIL ACTION NO. 1:04-cv-11923 |

**Memorandum in Support of Plaintiff's Motion
to Compel the Production of Mirror Images of Defendants'
Hard Drives and Other Electronic Memory Devices
<u>and Documents Created After May 21, 2004</u>**

The Certification required by L.R. 7.1 (A)(2) and 37.1(B) is set forth in the accompanying motion.

## I.     Relevant Facts

In December 2002, the founders of Plaintiff ConnectU LLC, Divya Narendra and Tyler and Cameron Winklevoss (the "Founders") came up with a great idea: to bring the concept of a social and professional directory, networking, and dating website to the college level, starting with Harvard University, where they were juniors at the time. The Founders weren't computer programmers, so they hired fellow students to program the website, which at that time was to be known as Harvard Connection. Harvard Connection was to have two basic parts, the "dating" side, which would connect students for dating, and the "connect" side, which would connect students with similar goals and personal and professional interests. The programmers hired by the Founders essentially completed the dating side of the website, but before they could finish the connect side and launch the website, they were forced by their studies to curtail their efforts. In early November 2003, the Founders found Defendant Mark Zuckerberg and asked him to join with them to complete the connect side and launch and market the site as quickly as possible (see Counterclaim ¶9, Docket No. ("D.N.") 14; Ex. 23). Mr. Zuckerberg enthusiastically agreed, and dove into completing the connect side, or so he told the Founders.

Beginning around mid-November 2003, Mr. Zuckerberg sent Cameron Winklevoss a series of emails saying he had essentially completed the professional side and offering suggestions for the connect side. On November 22, 2003, Mr. Zuckerberg wrote: "I have most of the coding done, and I think that once I get the graphics we'll be able to launch this thing…. it seems like everything is working". (Ex. 1) Yet every time the Founders tried to meet with him to see his progress on the connect side, he stalled. Getting a meeting was a struggle; Mr. Zuckerberg continually put them off (see Ex. 2). Though the Founders met with Mr. Zuckerberg three times between November 26, 2003

and January 14, 2004 regarding his work on the site, he never showed them his work, yet continued to assure them that he was working diligently to complete the connect side.[1]

The last meeting was January 14, 2004, during which Mr. Zuckerberg continued to lead the Founders to believe he was still on board and was working to complete the connect side (Ex. 6). What he didn't tell them at that meeting, or at any other time, was that three days earlier, on January 11, 2004, he registered the domain name "thefacebook.com". (Ex. 7) The morning of the meeting, he told the Founders he was working on another project with some other people. (Ex. 8) On February 4, 2004, the nature of that project became clear: Mr. Zuckerberg launched a website called thefacebook.com, which is a social networking and dating site for college students, which serves exactly the same purpose as the Founders planned for the Harvard Connection website. In its first 15 months of operation, thefacebook.com went from zero users to a reported 2.6 million registered users, operating at 640 of 1400 U.S. colleges and universities, with 50% to 90% market penetration at such schools. (Ex. 9) The average user visits thefacebook.com six times per day. (*Id.*) To date, thefacebook.com web pages have been viewed a reported **3 billion** times. (*Id.*) In mid-April, 2005, venture capitalists promised to pump **$13 million** in capital into Thefacebook, Inc., giving it a value of at least $40-$60 million (Ex. 10, 9) The facebook.com's current advertisers, which are its primary revenue source, include Apple, Victoria's Secret, and Paramount Pictures. (Ex. 9) On February 7, 2005, thefacebook.com launched at the first European colleges. (Ex. 21)

---

[1] Mr. Zuckerberg wrote: November 30, 2003: "everything will be ready for testing by Monday". (Ex. 3) December 1, 2003: "I have everything working on my system now." (Ex. 4) January 8, 2004: "I've made some of the changes, although not all of them, and they seem to be working on my computer." (Ex. 5)

3

The Founders were shocked at Mr. Zuckerberg's duplicity and thievery, and sent him a cease and desist letter on February 10, 2004 (Ex. 11).  Mr. Zuckerberg responded, saying he did not start working on thefacebook.com website until after the January 14, 2004 meeting, and denying any wrongdoing.  (Ex. 12)  The media reported that Mr. Zuckerberg said he coded the entire thefacebook.com website in one week's time (a superhuman feat), supposedly in late January and early February 2004 (Ex.13).  Exasperated, the Founders complained to the Harvard Administrative Board that Mr. Zuckerberg had violated the school's honor code.  The Ad Board chose not to discipline Mr. Zuckerberg, so the Founders sought the advice of counsel.  Counsel's June 24, 2004 letter to Mr. Zuckerberg (Ex. 14) drew a response from Mr. Zuckerberg's lawyer, dated July 1, 2004, again denying any wrongdoing but representing that Mr. Zuckerberg completed the Harvard Connection coding he agreed to do (Ex. 15).  Counsel also acknowledged Mr. Zuckerberg's recognition that the Founders intended to expand their "connection" website beyond Harvard.  (*Id.*)  Plaintiff filed suit September 2, 2004.

After the facebook.com website launched on February 4, 2004, the Founders knew they had lost the crucial jump on the market that Mr. Zuckerberg had snatched away.  Harvard Connection still wasn't ready to launch.  They had none of the coding Mr. Zuckerberg said he wrote, and again they were without a programmer to complete the connect side of the site and help them launch it.  In early March 2004, the Founders located and hired a professional website development company, which rewrote the computer code needed to run the site.  Balancing their desires to work as quickly as possible on one hand and to launch a professional-level website on the other, the Founders and their web developer were finally able to launch the site, renamed "connectu.com", on May 21, 2004.  Unfortunately, by this time thefacebook.com had a reported 150,000 users at 30 colleges across the U.S. (Ex. 13, 10), and school was ending for the summer.  Connectu.com launched, but there were few students to use it because it was summer vacation.  Compared to thefacebook.com's reported 2.6 million

4

users today (Ex. 9), connectu.com has only about 67,000.  Adding insult to irreparable injury, Thefacebook, Inc. and Mr. Zuckerberg have had the audacity to counterclaim for defamation, alleging essentially that the very allegations on which the First Amended Complaint is based have injured them.  Not only haven't either of them been injured, but investors are virtually throwing money and perks at them (Ex. 16).

In early April, 2005, the parties exchanged their first discovery requests.  Plaintiff propounded 170 production requests.  This may seem like a lot, but Plaintiff chose to break out many of its requests for each of the six Defendants.  After a voluntary extension, the parties exchanged their first production on May 31, 2005.  Then counsels' representation of the Defendants split, with only Mr. Saverin staying with Defendants' counsel that first appeared in the case.  The five other Defendants engaged new counsel, and seven new attorneys have appeared so far on their behalf.

Plaintiff's discovery strategy is not to withhold any documents requested to date by Defendants.  After analyzing Defendants' discovery responses, however, it became clear that Defendants were not nearly as forthcoming as Plaintiff.  Plaintiff then requested a meet and confer, the first of which was held by teleconference on July 13, 2005.  In total, counsel have met and conferred now for about seven hours, but were unable to reach agreement on the production requests covered by this motion, as well as other requests covered by another motion(s) Plaintiff may file shortly.

**II.     Defendants Should Be Compelled to Produce
         <u>Images of All Electronic Memory Devices</u>**

    A.     Plaintiff Needs Such Images Because
         <u>Key Evidence Allegedly Does Not Exist</u>

Request Nos. 116-118 seek images of Mark Zuckerberg's hard drives and other electronic memory devices.

**Request for Production No. 116**

An electronic image of the entire computer hard drive(s) or other computer memory devices controlled and used by Mark Zuckerberg for email from October 2003 to the present.

5

**Response to Request for Production No. 116**

Defendants object to this request as overbroad in seeking, among other things, one or more entire computer hard drives. Defendants also object to this request as seeking irrelevant documents not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request to the extent that it invades Defendants' privacy and calls for confidential and privileged information. Without waiving the general objections set forth above and subject to the specific objection stated herein, Defendants respond as follows: Defendants refer Plaintiff to Defendants' Response to Request for Production Nos. 1-4, 7-9, 15-21, 23-24, 30-32, 36, 47, 51, 55-58, 61-63, 67, 72, 77, 82, 83-84, 104-105, 115.[2]

**Request for Production No. 117**

An electronic image of the entire computer hard drive(s) or other computer memory devices controlled and used by Mark Zuckerberg for working on the computer program coding for the website to be known as Harvard Connection, and/or for working on the website itself.

**Request for Production No. 118**

An electronic image of the entire computer hard drive(s) or other computer memory devices controlled and used by Mark Zuckerberg from October 2003 to the present.

**Response to Request for Production Nos. 117 and 118**

Defendants object to this request as overbroad in seeking, among other things, the entire computer hard drive. Defendants also object to this request as seeking irrelevant documents not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request to the extent that it invades Defendants' privacy and calls for confidential and privileged information. Without waiving the general objections set forth above and subject to the specific objection stated herein, Defendants respond as follows: Defendants refer Plaintiff to Defendants' Response to Request for Production Nos. 1-4, 7-9, 15-21, 23-24, 30-32, 36, 47, 51, 55-58, 61-63, 67, 72, 77, 82, 83-84, 104-105, 115.

Request Nos. 119-123 seek images of the hard drives and other electronic memory devices of Thefacebook, Inc. and the remaining individual Defendants.

**Request for Production No. 119-122**

An electronic image of the entire computer hard drive(s) or other computer memory devices controlled and used by [No. 119: Eduardo Saverin; No. 120: Dustin Moskovitz; No. 121: Andrew McCollum; No. 122: Christopher Hughes] from October 2003 to the present.

---

[2] Defendants' complete responses (with confidential information redacted from p. 49) to Plaintiff's production requests are Ex. 17.

**Request for Production No. 123**

An electronic image of the computer entire hard drive(s) or other computer memory devices used for the thefacebook.com website from October 2003 to the present.

**Response to Request for Production Nos. 119-123**

Defendants object to this request as overbroad in seeking, among other things, the entire computer hard drive.  Defendants also object to this request as seeking irrelevant documents not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object to this request to the extent that it invades Defendants' privacy and calls for confidential and privileged information.

Defendants have refused to produce such mirror images.  Defendants should be compelled to allow Plaintiff's expert to create a mirror image of the hard drives and other electronic memory devices used by Defendants from and including October 2003.  The expert can then perform forensic analyses on such mirror images to attempt to find and recover the computer programming code (including database definitions) and other documents discussed below, and to determine if any such code or other documents were deleted (and the ascertainable details of such deletions).[3]

Obtaining such mirror images is necessary because Defendants claim that key evidence either does not exist or exists only in corrupted form.  Despite their obligation to preserve evidence, Defendants claim that the Harvard Connection website code given to Mr. Zuckerberg in November 2003 (which he admitted receiving, Answer ¶ 14, and had on his own computer, Ex. 3-5) (Request Nos. 48-49) and the Harvard Connection code he said he created (Ex. 1, 3-5) (Request Nos. 52-54), conveniently do not exist.  Defendants also claim that thefacebook.com website code from the time of the launch and up to October 2004 (which was one month after suit was filed) (Request

---

[3]    "A 'mirror image' is a copy of a hard drive, created by either installing a second hard drive on the computer and running a disk cloning program, or by removing the hard drive from the computer temporarily and cloning it on another computer.  This gives a data recovery expert more time to analyze the data and to minimize the amount of time that the computer is placed out of commission, as well as to avoid damage or modification of the original disk." Adam I. Cohen & David J. Lender, *Electronic Discovery: Law and Practice* § 10.02[A], at 10-5 n.17 (Supp. 2005).

Nos. 66 and 68), exists only in corrupted form (which means it may be useless), and that thefacebook.com code as it existed prior to launch (Request Nos. 64-65) does not exist at all.  Defendants will not say why such code does not exist.

Such code is the best evidence of whether or not Mr. Zuckerberg performed the work he said he performed on the Harvard Connection code from mid-November 2003 through mid-January 2004.  Such code is also the best evidence of Mr. Zuckerberg's development of thefacebook.com website simultaneously with his work on the Harvard Connection website, as well as of the basic purpose and the features and functionality of thefacebook.com when it launched on February 4, 2004.  The thefacebook.com code (in all of its versions, and its database definitions) is also relevant to whether Mr. Zuckerberg used anything he learned from the Harvard Connection code (or the Founders or their original programmers) in designing thefacebook.com website or in writing its code.  These issues are at the heart of all of Plaintiff's claims.  Plaintiff expects to find this missing evidence on the mirror images sought by this motion.

   B. <u>One of Mr. Zuckerberg's Memory Devices Allegedly Crashed</u>

A clue to why the Harvard Connection code and pre-launch thefacebook.com code allegedly do not exist is Defendants' response to Plaintiff's Request No. 30, which seeks the code for a website Mr. Zuckerberg launched Halloween weekend of 2003 (only a few days before he was first contacted by the Founders), which he called "facemash".  On the facemash website, Mr. Zuckerberg juxtaposed two photos of various students and asked website visitors to judge which was better looking.  He obtained the photos by hacking into Harvard's computers.  (Ex. 18)  Accused of breaching security and violating copyrights and individual privacy, Mr. Zuckerberg was also called before the Harvard Ad Board for this escapade.  (Ex. 22)  Plaintiff requested facemash-related documents, including an online journal Mr. Zuckerberg kept of the facemash saga (Request Nos. 30 and 35, Ex. 17), because they relate to Mr. Zuckerberg's credibility and character (which issues are directly relevant to Plaintiff's

breach of implied covenant of good faith and fair dealing, Mass. G.L. 93A, breach of fiduciary duty, unjust enrichment, and fraud claims, and possibly others) and alleged ability to program websites faster than humanly possible.  Defendants also placed facemash in issue.  (Ex. 15; Counterclaim ¶8, D.N. 14)  Defendants agreed to produce related correspondence, but said the facemash code does not exist because the computer hard drive on which it was stored crashed (Ex. 17, Response No. 30), but they won't say when.  The facemash online journal also allegedly does not exist (Response No. 35), but Defendants won't say why.  Because Mr. Zuckerberg launched the facemash website only a few days before he was first contacted by the Founders, and only about three weeks before he said he first worked on the Harvard Connection code (Ex. 1), it is highly likely that he used the same computer for both projects.  Thus, Plaintiff has also requested a mirror image of the crashed hard drive on which the facemash code was stored.  Plaintiff's expert should be able to recover the facemash code and online journal, as well as the early thefacebook.com code, from the crashed hard drive.

        C.       That Key Evidence Allegedly Does Not Exist Is Inconsistent With Defendants' Agreement to Produce Certain Other Documents

It is impossible to believe that the Harvard Connection code as provided to Mr. Zuckerberg, the Harvard Connection code that Mr. Zuckerberg said he wrote, thefacebook.com code prior to launch, uncorrupted thefacebook.com code up to October 2004, and the facemash code and online journal do not exist.  Aside from the fact that their unexplained nonexistence, coupled with a duty to preserve evidence, supports an adverse inference as to what their contents would prove if they existed, *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 217-18 (1st Cir. 1982); *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1158 (1st Cir. 1996),[4]  Defendants'

---

[4] Plaintiff intends to seek the Court's ruling regarding such an adverse inference if the missing code cannot be found in uncorrupted form.  For example, one obvious adverse inference from the nonexistence of the Harvard Connection code that Mr. Zuckerberg said he

9

allegations that the code and journal do not exist are belied by other contemporaneous electronic evidence that does exist. For example, Defendants agreed to produce email between Mr. Zuckerberg and the Founders and one of the Founders' original programmers relating to Harvard Connection (Request Nos. 1-4), and relating to thefacebook.com (Request Nos. 15-16), which email presumably was sent and received on the same computer he used to work on the Harvard Connection Code and facemash. Defendants also agreed to produce documents relating to Harvard Connection provided by Mr. Zuckerberg to the Founders and their original programmers, such as designs, screen shots, suggestions for features, plans for the website, and other documents (Request No. 47), as well as other documents relating to Mr. Zuckerberg's alleged work on the Harvard Connection website (including portions of the website visible to users, design notes, flow charts, libraries of code, and testware) (Request Nos. 57-58). How can Mr. Zuckerberg have such electronic documents, but not the Harvard Connection code?

      Plaintiff also requested certain of Mr. Zuckerberg's homework assignments because he used them as an excuse to delay meetings with the Founders during the time period that he was supposedly working on Harvard Connection (Request No. 51 and Ex. C to Plaintiff's First Production Requests). Mr. Zuckerberg was a computer science major, and his assignments were computer programming "problem sets". Defendants have agreed to produce such problem sets, but strangely all the contemporaneous Harvard Connection code, pre-launch thefacebook.com code, and the facemash code supposedly do not exist.

      On January 14, 2004, Mr. Zuckerberg said he couldn't meet with the Founders for very long because he would be taking time from "a project I'm working on with some

---

wrote is that he never wrote it, and simply led the Founders down the primrose path while he prepared to launch his own website that copied the Founders' idea.

other people that needs to be finished by tomorrow night." (Ex. 8) Because this was only 3 days after Mr. Zuckerberg registered the thefacebook.com domain name (Ex. 7) and only 21 days before thefacebook.com website launched, Plaintiff requested documents sufficient to identify such project, and relating to such project, as it existed on January 14, 2004. Defendants agreed to produce such documents, but yet the Harvard Connection and pre-launch thefacebook.com code supposedly do not exist.

      Plaintiff also requested documents relating to another Zuckerberg creation called coursematch (Request No. 36), which Mr. Zuckerberg says he used to create part of thefacebook.com. (Ex. 13) Unlike their response to Plaintiff's request for facemash documents (which would include such code), Defendants did not claim that the coursematch code does not exist, and agreed to produce responsive documents, yet Mr. Zuckerberg created coursematch before he created facemash. This obviously means that Mr. Zuckerberg has more than one computer memory device and therefore the alleged crash of one of Mr. Zuckerberg's hard drives does not account for the missing evidence.

      Defendants also agreed to produce documents sufficient to identify, and relating to, the date on which Mr. Zuckerberg first began to develop thefacebook.com website (Request No. 61). Defendants also agreed to produce documents relating to Mr. Zuckerberg's January 11, 2004 domain name application and registration for thefacebook.com. Domain names are registered electronically over the Internet, using a computer, yet Mr. Zuckerberg apparently has these documents but not thefacebook.com code from its inception.

      Thus, Defendants appear to be claiming that evidence does not exist, or is corrupted, when it might be harmful to their case (and in fact relates to the heart of Plaintiff's case), and are producing other documents they deem innocuous.[5]

---

[5] Note that Plaintiff is not accusing Defendants' counsel of withholding such documents.

D. <u>The Code is Surely Backed Up Somewhere</u>

Mr. Zuckerberg surely has the expertise to preserve and backup website code, and it is highly likely that he would have done so at least with respect to thefacebook.com code from the beginning. Surely he would not have spent the time and effort to develop and launch thefacebook.com website (supposedly in seven days of intensive work) and put the entire business at risk by failing to back it up. Surely the Harvard computer science department taught him better than that.

One easy way for Mr. Zuckerberg to have preserved the code, in uncorrupted form, would have been to email copies of the code to the other co-Defendants, or otherwise to backup the code on the individual Defendants' or company computers or other memory devices. Mr. Moskovitz's memory devices are prime candidates, as Mr. Zuckerberg said that thefacebook.com is as much Moskovitz's project as his own. (Ex. 16) Another way would have been to backup the code on a different computer, server, or electronic memory device. It is not credible that Mr. Zuckerberg failed to use such backup methods, especially before launch.

Moreover, Mr. Zuckerberg did not run thefacebook.com website from his own computer after launch. Ex. 20 appears to be an agreement between Thefacebook, Inc. and a website hosting company called Equinix. Although it is almost illegible, the legend in the lower left corner of each page indicates that the document dates from around February 10, 2004, six days after thefacebook.com launched. The Harvard Crimson reported that thefacebook.com was running on one server for $85/month when it launched and that the site was running on five servers for $450/month by March 31, 2004. On April 14, 2004, thefacebook.com moved to a server hosting service near Mr. Zuckerberg's hometown. (Ex. 21) Defendants also created a separate copy of the code for each college. (Ex. 25, FAQ: My school is not on thefacebook network) Defendants' website operated at 30 colleges by late May 2004, and 640 colleges today. (Ex. 13, 10, 9) Hundreds of backup copies of thefacebook.com code simply must be

available on some or all such computers and servers in uncorrupted form. Any professional web hosting company would have backed up thefacebook.com's early and intermediate versions of the code. Their potential liability for not doing so, as a standard operating procedure for all clients, would be astronomical. Even if such code was deleted, it may be recoverable by a forensic expert. Thus, Plaintiff should be able to obtain such code from server backups made in the ordinary course of business by companies that have hosted thefacebook.com website since launch. If any of the code (or the facemash online journal) does in fact exist despite Defendants' representations that it does not, for example, in its web hosting companies' server backups, Defendants should produce it and this motion also seeks it, as covered by Request Nos. 30, 35, 36, 48, 49, 52-54, 64-66, and 68, discussed *supra*.

Similarly, Mr. Zuckerberg should have known better than to fail to back up the work that he allegedly performed on the Harvard Connection code. It should still be on some electronic memory device he controls, or recoverable from such device.

It is fishy indeed, if not impossible, that the Harvard Connection code, the pre-launch thefacebook.com code, and the facemash code supposedly do not exist, and that only corrupted code exists for thefacebook.com from launch until October 2004. Plaintiff expects to recover such code (including database definitions) and the facemash online journal by having its expert forensically make and examine mirror images of the hard drives and other electronic memory devices (including backup disks, CDs, DVDs, tapes, flash memory cards, USB drives, zip drives, etc.) used by any of the Defendants since October 2003.[6]

---

[6] Defendants are likely to argue that exposing the entire contents of such memory devices to Plaintiff may violate Defendants' attorney-client privilege, privacy, and confidentiality regarding information irrelevant to this lawsuit. A Stipulated Protective Order ("SPO") has been entered in this case and Plaintiff's expert has signed it. The SPO should be sufficient to allay such concerns. *See* ¶¶ 13, 14 of the SPO and *Rowe Entm't v. William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002). Plaintiff is also willing to stipulate (a) that its expert will search only for website code or other code that could be reasonably related to the Harvard Connection, thefacebook.com, facemash, or coursematch websites, and the facemash on-line journal, (b)

E.  The Case Law Supports Imaging and Forensic Recovery of Evidence

"[I]t is black letter law that computerized data is discoverable if relevant." *Anti-Monopoly, Inc. v. Hasbro, Inc*, 1995 U.S. Dist. LEXIS 16355, *4, 94 Civ. No. 2121 (S.D.N.Y. Nov. 3, 1995). In *Simon Prop. Group L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 640 (S.D. Ind. 2000), the plaintiff moved to compel four of the defendant's employees to make home and work computers, computer servers, and electronic recording devices available for inspection for the purpose of recovering deleted files. The court first found that "computer records, including records that have been 'deleted,' are documents discoverable under Fed. R. Civ. P. 34." *Id.* The court granted the plaintiffs' request because there, as here, proof of "troubling discrepancies with respect to defendant's document production" existed, and allowed the plaintiff to select an expert (which the court then appointed as its own expert) to make a "mirror image" of the hard drives and undertake the task (at Plaintiff's expense) of attempting to recover the deleted files. *Id.* at 641. For the complete protocol, see Ex. 19 at 10-25 (from Cohen & Lender, Electronic Discovery: Law and Practice, note 3, *supra*).[7]

In *Antioch Co. v. Scrapbook Borders, Inc.,* 210 F.R.D. 645, 650-51 (D. Minn. 2002), a copyright infringement case, the plaintiff moved to compel the production of computer equipment so that a court-appointed computer forensics expert could recover

---

that Plaintiff's counsel will have access only to any such code and journal and will produce copies to Defendants' counsel, and (c) Plaintiff's counsel will not have access to the electronic memory devices or any other contents of the mirror images. Plaintiff is amenable to other similar safeguards, and to making the images at times that minimize Defendants' or their web hosts' inconvenience. For example, some courts have appointed their own expert to serve as their officer, make the mirror images, and attempt to recover the lost evidence. *See, e.g., Simon Prop. Group L.P. v. mySimon, Inc., 194 F.R.D. 639* (S.D. Ind. 2000); *Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 650-51 (D. Minn. 2002).

[7]  Defendants may argue that any documents recovered by Plaintiff's expert should be provided to Defendants' counsel for vetting (for privilege and relevance) before being produced to Plaintiff. This is not necessary here because the expert will search for and recover only code and the facemash online journal, which are certainly relevant and would not be privileged.

deleted data. Attempting to compel immediate discovery, the plaintiff presented a computer forensics expert's affidavit in support of the theory that deleted data is retained on a hard drive, but constantly overwritten by new data. Finding that "the Defendants may have relevant information" on their computer that could be lost through normal usage, the court concluded that "Antioch should be able to attempt to resurrect data which has been deleted from the Defendants' computer equipment, and therefore, we grant its Motion to Compel." *Id.* at 652. For the complete protocol, see Ex. 19 at 10-29.

*In re Triton Energy Ltd.,* 2002 U.S. Dist. LEXIS 4326, *13 (E.D. Tex. Mar. 7, 2002), involved plaintiffs seeking access to Triton's computer storage systems to determine what documents and e-mails might have been deleted. The court appointed a computer specialist to extract information, and a special master "to review and determine what documents or electronic data, if any, were destroyed which bear significantly on this litigation." *Id.* at *15-16. The court held that Triton's right to privacy was not compromised because those conducting the investigations would be court-appointed, as opposed to the plaintiff having "unfettered access" to the computer hard drives. *Id.* at *19.

In *Northwest Airlines, Inc. v. Local 2000, Int'l Bhd. of Teamsters*, 2000 U.S. Dist. LEXIS 22638, Civ. No. 00-08 (D. Minn. Feb. 2, 2000), the court appointed Plaintiff's expert as its own neutral information collector and ordered all of the named defendants (i.e., the union, more than twelve union officials, and two employees) to allow the expert to create mirror images of the hard drives of their office and home computers. For the complete protocol, see Ex. 19 at 10-26.

In *Playboy Enters. v. Welles*, 60 F. Supp. 2d 1050, 1051-52 (S.D. Cal. 1999), the court granted plaintiffs' motion to make a mirror image of defendant's personal computer and to attempt to recover deleted files relating to alleged trademark infringement, stating that the "need for the requested information outweighs the burden

15

on Defendant." *Id.* at 1051-52. For the complete protocol, see Ex. 19 at 10-25. In granting the motion, the court balanced "the needs of the case, the amount in controversy, the importance of the issues at stake, the potential for finding relevant material and the importance of the proposed discovery in resolving the issues" *Id.* at 1054. Here, the missing or corrupted evidence goes to the heart of the case, Plaintiff's damages are in at least the tens of millions of dollars, and it seems likely that the evidence can be found, unless Mr. Zuckerberg, a self-proclaimed computer whiz-kid (Ex. 13) and "Enemy of the State" (Ex. 24, 23), has taken steps to assure that such evidence will never be found.[8]

### III.   Defendants Should Be Compelled to Produce Documents Created On or After ConnectU.com's Launch Date

Another result of counsels' meet and confer is that Defendants will produce no documents responsive to the following requests that were created on or after May 21, 2004, which was the launch date of Plaintiff's connectu.com website.

**Request for Production No. 63**

All documents relating in any way to the development of the thefacebook.com website.

**Response to Request for Production No. 63**

Defendants object to this request as overbroad, including as to time period, as unduly burdensome, and as seeking irrelevant documents not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to this request to the extent that it calls for Defendants' confidential, proprietary, commercially sensitive, and/or trade secret information. Without waiving the general objections set forth above and subject to the specific objections stated herein, Defendants respond as follows: Defendants will produce non-privileged responsive documents relating to thefacebook.com website, created on or before May 21, 2004, to the extent such documents exist in their possession and are located by a reasonable search.

---

[8]   Defendants may argue that *Fennell v. First Stepdesigns, Ltd.*, 83 F.3d 526 (1st Cir. 1996), supports the denial of this motion. But *Fennell* involved Rule 56(f) discovery and Plaintiff here has shown a plausible basis for believing that certain evidence susceptible of collection within a reasonable time frame probably exists. *Id.* at 533.

**Request for Production No. 67**

All documents constituting and/or relating to Mark Zuckerberg's development of computer program coding for the website to be known as thefacebook.com, and/or relating to the development of the website itself, including but not limited to design notes, flow charts, libraries of code, testware etc.

**Response to Request for Production No. 67**

Defendants object to this request as overbroad, including as to time period and as seeking documents not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to this request as argumentative and vague in its use of the terms "website to be known as thefacebook.com," "development of computer program coding" and "testware." Defendants further object to this request to the extent that it calls for Defendants' confidential, proprietary, commercially sensitive, and/or trade secret information. Without waiving the general objections set forth above and subject to the specific objection stated herein, Defendants respond as follows: Defendants refer Plaintiff to Defendants' Response to Request for Production No. 63.

**Request for Production Nos. 129-132**

All documents in the possession, custody, or control of [No. 129: Eduardo Saverin; No. 130: Dustin Moskovitz; No. 131: Andrew McCollum; No. 132: Christopher Hughes] provided to him by Mark Zuckerberg relating in any way to the subject matter of this lawsuit.

**Request for Production Nos. 133-134**

All documents in the possession, custody, or control of [No. 133: Mark Zuckerberg; No. 134: Thefacebook, Inc.] relating in any way to the subject matter of this lawsuit.

**Request for Production No. 135-139**

All documents in the possession, custody, or control of [No. 135: Eduardo Saverin; No. 136: Dustin Moskovitz; No. 137: Andrew McCollum; No. 138: Christopher Hughes; No. 139: Mark Zuckerberg] provided to him by any other person relating in any way to the subject matter of this lawsuit.

**Response to Request for Production Nos. 129-139**

Defendants object to this request as vague and overbroad, including as to time period. Defendants also object to this request to the extent it seeks documents protected by the attorney client privilege and/or attorney work product doctrine. Without waiving the general objections set forth above and subject to the specific objections stated herein, Defendants respond as follows: Defendants refer Plaintiff to Defendants' Response to Request for Production Nos.:[9]

---

[9] In response to Request Nos. 18-29, which Defendants cross-referenced in response to the requests covered by this motion, Defendants also cutoff production on May 21, 2004. Plaintiff has not included such requests in this motion because the requests covered by this motion should encompass such documents.

17

      No. 129: 10, 18, 23, and 25.
      No. 130: 11, 19, 23 and 26.
      No. 131: 12, 20, 23 and 27.
      No. 132: 13, 21, 23 and 28.
      No. 133: 1-4, 7-9, 15-21, 23-24, 30-32, 36, 47, 51, 55-58, 61-63, 67, 72, 77, 82, 83-84, 105, 115, and 116.
      No. 134: 14, 29, 82, 90-95, 97, and 102.
      No. 135: 10, 25, 73, and 78.
      No. 136: 11, 26, 74, and 79.
      No. 137: 12, 27, 75, and 80.
      No. 138: 13, 28, 76, and 81.
      No. 139: 133.

These production requests are not limited in any way to documents created on or before May 21, 2004. Documents created on or after May 21, 2004 are relevant to both ConnectU's claims and the Defendants' affirmative defenses and counterclaims. Defendants have stated no cogent rationale for arbitrarily cutting off production of relevant responsive documents as of connectu.com's launch date, and insisted instead that Plaintiff should somehow narrow its requests and provide a list of the trade secrets in suit. That Defendants agreed to produce pre-May 21, 2004 documents responsive to these requests shows they are already sufficiently narrow. Plaintiff is just as entitled to responsive documents created on or after May 21, 2004 as it is to documents created before that date. And although Plaintiff expects to identify its trade secrets at some point, Plaintiff would be entitled to documents covered by these requests and created on or after May 21, 2004 regardless of what such identification may say.

Acts and omissions of Defendants, communications by or between Defendants, and communications between Defendants and third parties, occurring on or after May 21, 2004 and relating to thefacebook.com website certainly are relevant to the claims or defenses in this action. For example, after that date, Mr. Zuckerberg may have made use of Harvard Connection code or ideas he learned from Harvard Connection, his meetings with the Founders, or his communications with Harvard Connection's original programmers. After that date, Defendants may have changed thefacebook.com website or code to be less like connectu.com or the Harvard Connection code. After that date, Defendants may have exchanged nonprivileged communications with each

other or with third parties about the operative facts underlying this action, such as the similarities of connectu.com and thefacebook.com in purpose, features, or functionality. After that date, users of the thefacebook.com website may have expressed opinions in emails addressed to Defendants (or forwarded or copied to Defendants) about the subjects of the operative facts underlying this action, such as the similarities of the websites.  After that date, Defendants have communicated with the media about the operative facts underlying this action.  Documents created on or after May 21, 2004 could be relevant for myriad other reasons and Defendants are improperly withholding them.

## IV.     Conclusion

Defendants claim key evidence does not exist or is corrupted, but won't explain why.  Their claim seems fishy, and may entitle Plaintiff to an adverse evidentiary inference.  That will be decided another day.  For now, Plaintiff seeks an order allowing its expert to make mirror images of all hard drives and other electronic memory devices used by Defendants from and including October 2003, and production of the crashed hard drive, so Plaintiff's expert can attempt to recover evidence that Defendants should have preserved.  If the code and online journal Defendants allege do not exist do in fact exist in uncorrupted form, Plaintiff also asks the Court to compel their production. Plaintiff also seeks Defendants' documents created on or after May 21, 2004 that are responsive to Plaintiff's production requests and relate to this action.  Thus, Plaintiff respectfully urges the Court to grant this motion to compel, and requests a hearing on this motion.

DATED:  July 28, 2005                    /s/ Jonathan M. Gelchinsky

Lawrence R. Robins (BBO# 632610)
Jonathan M. Gelchinsky (BBO# 656282)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA  02142
Telephone:  (617) 452-1600
Facsimile:   (617) 452-1666
larry.robins@finnegan.com
jon.gelchinsky@finnegan.com

John F. Hornick (*pro hac vice*)
Margaret A. Esquenet (*pro hac vice*)
Troy E. Grabow (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue N.W.
Washington, DC  20001
Telephone:  (202) 408-4000
Facsimile:   (202) 408-4400

Attorneys for Plaintiff and Counterclaim Defendants