# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, CHRISTOPHER HUGHES, and THEFACEBOOK, INC.,<br><br>               Defendants. | CIVIL ACTION NO. 1:04-cv-11923 (DPW)<br><br>District Judge Douglas P. Woodlock<br><br>Magistrate Judge Robert B. Collings |
| MARK ZUCKERBERG and THEFACEBOOK, INC.,<br><br>               Counterclaimants,<br><br>    v.<br><br>CONNECTU LLC,<br><br>               Counterdefendant,<br><br>    and<br><br>CAMERON WINKLEVOSS, TYLER WINKLEVOSS, and DIVYA NARENDRA,<br><br>           Additional Counterdefendants. | |

**PLAINTIFF'S OPPOSITION TO THE FACEBOOK DEFENDANTS' MOTION TO COMPEL PARTICULARIZED IDENTIFICATION OF TRADE SECRETS IN RESPONSE TO THE FACEBOOK DEFENDANTS' INTERROGATORY NO. 2**

I.    **Introduction**

The Facebook Defendants' ("TFDs") spin on Plaintiff ConnectU's trade secret obscures it, stating that "ConnectU claims that the Facebook Defendants used confidential information and trade secrets …"  In fact, Plaintiff claims that Mr. Zuckerberg worked on its secret project to develop a social networking website for college students, Mr. Zuckerberg then stole the idea, leaving Plaintiff high and dry, and TFDs then launched their own college social networking website, thefacebook.com.

One year into the lawsuit and many months into discovery, Defendants refuse to conduct further discovery on any of Plaintiff's claims, or on Defendants' counterclaims and defenses.  Using the trade secret identification issue to halt discovery, TFDs filed the present motion and a cross-motion for protective order, which effectively seek identical relief, even though Plaintiff has sufficiently identified its trade secret combination.[1]

The present motion is based on several fundamental flaws:

- This is not solely a trade secret case and the trade secret claims are not driving the other claims (see Motion at 2 and § III.A, *infra*).

- TFDs ignored the fact that Plaintiff's trade secret in suit is a combination, and therefore dissection is improper (see § III.C, *infra*).

- TFDs misstate the law governing Plaintiff's obligation to identify its trade secret combination (see § III.B.1, *infra*).

- Plaintiff need not separate its trade secret combination from information in the public domain, under applicable law, and therefore TFDs' arguments that some aspects of Plaintiff's trade secret combination may have been in

---

[1] On September 6, 2005, Defendant Saverin filed a Notice of Joining Cross-Motion, requesting that any benefit of the motion for protective order also run to Saverin.

the public domain at relevant times are wholly irrelevant to this motion (see § III.B.2 and III.D, *infra*).

- Even if the public availability of some of the elements of Plaintiff's trade secret combination were relevant to this motion, which it is not, TFDs present no evidence that they were guided by the public domain, and did not instead misappropriate Plaintiff's secret combination (see § III.C and D, *infra*).

Contrary to the Facebook Defendants' arguments, Plaintiff adequately identified its trade secret combination (under any possible standard) and has also complied with other possible legal requirements of this Court (see § III.B.1 and III.C, *infra*).  Although TFDs seem to believe their motion to compel is really a motion for summary judgment, Plaintiff's burden at this stage of the litigation, and to jumpstart discovery, is much lower than TFDs pretend. Nevertheless, Plaintiff addresses more substance of its trade secret claim than is required to defeat the TFDs' present motion (see § III.C and D, *infra*).

As Plaintiff mentioned in its Motion to Compel the Production of Documents in Response to Production Request. Nos. 42, 44-46, 70-71, 85-96, 98-105, 107-110, 113, and 169 (Docket No. ("D.N.") 68), filed September 9, 2005, fact and expert discovery is scheduled to close on December 15, 2005.  Plaintiff's expert reports are due November 1, 2005.  Defendants' late-conceived strategy of refusing discovery until Plaintiff provides a trade secret identification that satisfies them may prevent Plaintiff from completing its expert reports by November 1, and from completing discovery by December 15.  To date, Plaintiff has been unable to take any depositions because Defendants are withholding so many documents and interrogatory answers.  Thus, Plaintiff respectfully urges the Court to break the discovery deadlock as quickly as possible.

## II.    **Facts**

### A.    Pre-Suit Facts

The following is an updated version of the facts set forth in Plaintiff's previously filed motions to compel.

In December 2002, the founders of Plaintiff ConnectU LLC, Divya Narendra and Tyler and Cameron Winklevoss (the "Founders") came up with a great idea:  to bring the concept of a social and professional directory, networking, and dating website to the college level, starting with Harvard University, where they were juniors at the time.  In early November 2003, the Founders found Defendant Mark Zuckerberg and asked him to join with them to complete the Harvard Connection site (as it was then called), which was started by other programmers, and launch and market it as quickly as possible (see Counterclaim ¶9, D.N. 14; Ex. 1).  Mr. Zuckerberg enthusiastically agreed to join them, and dove into completing the "connect" side of the site, or so he told the Founders.[2]

As the Facebook Defendants admit, the Founders shared certain information with Mr. Zuckerberg.  (Motion at 4)  Mr. Zuckerberg knew the project was secret and proprietary.  (See Ex. 2, Plaintiff's response to Defendants' Interrogatory Nos. 3, 9)  The TFDs state that Divya Narendra pointed several third parties to a public version of the Harvard Connection website that was online in 2003 (the transcript pages cited by TFDs say nothing like this; see Ex. 7 to Motion at pages 174-175, 177-179), but fail to mention that a person who did not have a password could only access two pages of the site -- a front page, and one other page.  The user could not log in, could not perform searches, could not visualize the functionality of the site, and could not get access to the source code.  (Ex. 3, 386:15-390:15)

Beginning around mid-November 2003, Mr. Zuckerberg sent Cameron Winklevoss a series of emails saying he had essentially completed the connect side and

---

[2]  TFDs imply that Cameron and Tyler Winklevoss are not gainfully employed.  In fact, they run the struggling ConnectU and train for the 2008 Summer Olympics in rowing.

offering suggestions for the dating side of the site.  On November 22, 2003, Mr.
Zuckerberg wrote:  "I have most of the coding done, and I think that once I get the
graphics we'll be able to launch this thing…. it seems like everything is working".  (Ex. 4)
Yet every time the Founders tried to meet with him to see his progress, he stalled.
Getting a meeting was a struggle; Mr. Zuckerberg continually put them off (see Ex. 5).
Though the Founders met with Mr. Zuckerberg three times between November 26, 2003
and January 14, 2004 regarding his work on the site, he never showed them his work,
yet continued to assure them that he was working diligently to complete the connect
side of the site.[3]

The last meeting was January 14, 2004, during which Mr. Zuckerberg continued
to lead the Founders to believe he was still on board and was working to complete the
connect side (Ex. 9).  What he didn't tell them at that meeting, or at any other time, was
that 3 days earlier, on January 11, 2004, he registered the domain name
"thefacebook.com".  (Ex. 10)  The morning of the meeting, he told the Founders he was
working on another project with some other people.  (Ex. 11)  On February 4, 2004, the
nature of that project became clear:  Mr. Zuckerberg and the other individual
Defendants launched a website called thefacebook.com, which is a social networking
and dating site for college students that stole the Founders' idea for the Harvard
Connection website.

As of April 2005, after its first 15 months of operation, thefacebook.com (which
the individual Defendants ran as an unincorporated proprietorship for the first six
months of its operation) went from zero users to a reported 2.6 million registered users,
operating at 640 of 1400 U.S. colleges and universities, with 50% to 90% market
penetration at such schools.  (Ex. 12)  Today thefacebook.com has a reported 3.5

---

[3] Mr. Zuckerberg wrote:  November 30, 2003:  "everything will be ready for testing by Monday."
(Ex. 6)  December 1, 2003:  "I have everything working on my system now."  (Ex. 7)  January 8, 2004:
"I've made some of the changes, although not all of them, and they seem to be working on my computer."
(Ex. 8)

million users at more than 800 U.S. colleges and universities.  (Ex. 13)

Thefacebook.com is now one of the top 20 websites in the country, with traffic nearly 80

times that of all college newspapers combined.  (Ex. 14)  The average user visits

thefacebook.com an amazing six times per day.  (Ex. 12)  As of May 2005,

thefacebook.com web pages were viewed a reported **3 billion** times. (Ex. 12)  In mid-

April, 2005, venture capitalists promised to pump **$13 million** in capital into

Thefacebook, Inc., giving it a value of at least $40-$60 million at that time.  (Ex. 15, 12)

Recent estimates put its value at close to $100 million.  (Ex. 16)  Thefacebook.com's

current advertisers, which are its primary revenue source, include Apple, Victoria's

Secret, and Paramount Pictures.  (Ex. 12)  On February 7, 2005, thefacebook.com

launched at the first European colleges.  (Ex. 17)  On September 2, 2005,

thefacebook.com expanded to high schools.  (Ex. 16)

 The Founders were shocked at Mr. Zuckerberg's duplicity and thievery, and sent

him a cease and desist letter on February 10, 2004 (Ex. 18).  Mr. Zuckerberg

responded, saying he did not start working on thefacebook.com website until after the

January 14, 2004 meeting, and denying any wrongdoing.  (Ex. 19)  The media reported

that Mr. Zuckerberg said he coded the entire thefacebook.com website in one week's

time (a superhuman feat), supposedly in late January and early February 2004 (Ex. 20).

Mr. Zuckerberg confirmed the accuracy of such statement.  (Ex. 21, Supplemental

Response to Plaintiff's Interrogatory No. 4, CONFIDENTIAL) (first entry in chart)  In fact,

Mr. Zuckerberg started working on thefacebook.com at least as early as January 12,

2004 (see Confidential Ex. 16 to Plaintiff's Motion to Compel Answers to Interrogatories,

D.N. 54), and has admitted in the media to conceiving thefacebook.com around

Christmas 2003.  (Ex. 22)

 After thefacebook.com website launched on February 4, 2004, the Founders

knew they had lost the crucial jump on the market that Mr. Zuckerberg and the other

individual Defendants had snatched away.  Harvard Connection still wasn't ready to

launch. They had none of the coding Mr. Zuckerberg said he wrote, and again they were without a programmer to complete the connect side of the site and help them launch it. In early March 2004, the Founders located and hired a professional website development company, which rewrote the computer code needed to run the site. The Founders and their web developer were finally able to launch the site, renamed "connectu.com", on May 21, 2004. Unfortunately, by this time thefacebook.com had a reported 150,000 users at 30 colleges across the U.S. (Ex. 20, 15), and school was ending for the summer. Connectu.com launched, but there were few students to use it because it was summer vacation. Compared to thefacebook.com's reported 3.5 million users today (Ex. 13), connectu.com has only about 67,000.

**B.    Discovery-Related Facts**

Plaintiff filed suit September 2, 2004. The Scheduling Order issued March 29, 2005. Plaintiff served production requests and interrogatories April 7, 2005, and the parties agreed to do a first document exchange on May 31, 2005. Since that time, Plaintiff has spent much of its time trying to obtain document discovery from Defendants. During five meet and confer conferences between July 13 and August 22, 2005, Plaintiff spent over seven hours attempting to convince Defendants to supplement their production. Although Defendants agreed on July 26, 2005 to produce certain documents, they have since refused to produce the agreed upon documents until Plaintiff identifies its trade secrets with particularity and either the Court approves it or Defendants deem it adequate.[4] Plaintiff attempted to convince Defendants to produce the documents they promised, citing the identification of trade secrets provided by Plaintiff's Rule 30(b)(6) witness during the August 9, 2005 deposition and the response to Defendants' Interrogatory No. 2, served on August 22, 2005, its due date.[5]

---

[4]  Defendants did produce 27 pages of financial documents on September 12, 2005.

[5]  In its brief, TFDs state that ConnectU refused during the meet and confer to identify its trade secrets. (Motion at 5) ConnectU never refused to identify its trade secrets, always said that it would do so in a timely manner, and in fact did so when its response to Interrogatory No. 2 was due on August 22,

Defendants again refused and Plaintiff was forced to file a motion to compel the production of the agreed-up documents on September 9, 2005.

Also, in response to a motion to compel the imaging of electronic memory devices and documents created after May 21, 2004, Defendants filed a cross-motion for protective order, blocking further discovery until Plaintiff identifies its trade secrets in suit to their satisfaction.  However, instead of insisting on receiving an identification of trade secrets before providing any discovery, Defendants engaged in discovery, produced documents, obtained all known documents requested from Plaintiff (i.e., over 11,000 pages of documents and numerous CD ROMs containing Harvard Connection and ConnectU source code), obtained ConnectU's interrogatory answers, and conducted a Rule 30(b)(6) deposition of ConnectU, **then** cutoff discovery, filed their cross-motion for protective order, and then filed the present motion.

Thus, Defendants' strategy got them all of Plaintiff's documents, and allowed them to withhold documents to which Plaintiff is legitimately entitled.  Now, in addition to Defendants' earlier cross-motion for protective order, the Facebook Defendants have filed the present motion.  The effect of the present motion, which essentially duplicates the motion for protective order, is that Defendants are able to delay the resumption of discovery even longer, while this motion is briefed, argued, and decided.

III.    **Arguments**

    A.    **Plaintiff's Trade Secret Claim is Not Driving Any Other Claims**

Contrary to the Facebook Defendants' argument (Motion at 2), Plaintiff's case is not solely a trade secret case.  It is a case of copyright infringement, unjust enrichment, unfair competition and trade, fraud, breach of implied covenant of good faith and fair dealing, breach of contract, breach of fiduciary duty, and intentional interference with

---

2005.  In fact, Defendants stated elsewhere that Plaintiff said on July 28, 2005 that it would specify its trade secrets "at a later time" (see TFDs' cross motion (D.N. 43) at 9).

prospective contractual and advantageous business relations.  Such claims do not

depend on the trade secret claim, either as pleaded or under Massachusetts law.

One way Defendants' wrongful acts manifested themselves here was through

trade secret misappropriation.  However, if Mr. Zuckerberg used Harvard Connection

code in thefacebook.com code, such use is copyright infringement regardless of the

secrecy of the Harvard Connection project or code.[6]  Mr. Zuckerberg also agreed to

write the code to complete the Harvard Connection website and enable it to launch

quickly.  He breached that agreement.  Whether or not the Harvard Connection project

or source code was secret is irrelevant to such claim.  Defendants also have been

unjustly enriched at Plaintiff's expense.  Mr. Zuckerberg's behavior in stealing the

Harvard Connection idea, and Defendants' launch of thefacebook.com website, also

constitutes unfair competition and unfair trade under Mass. Gen. Law ch. 93(A).  Such

claims do not depend on Plaintiff's trade secret claim.  *See Mass. Eye & Ear Infirmary v.

QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005).  Similarly, whether or

not Plaintiff succeeds on its trade secret claim will have no effect on the viability of its

claims for fraud, breach of implied covenant of good faith and fair dealing, breach of

fiduciary duty, and intentional interference with prospective contractual and

advantageous business relations.  Mr. Zuckerberg's conduct establishes the first three

of such claims, and Defendants' conduct together establishes the fourth of such claims,

regardless of whether the Harvard Connection project or code was secret.  TFDs even

recognize Plaintiff's claim that Mr. Zuckerberg had more than secrecy obligations to the

Founders.  (Motion at 5)

---

[6]  The Defendants still have not produced thefacebook.com code prior to October 2004, or
provided any explanation for their failure to do so, and therefore Plaintiff seeks to recover such code from
the individual defendants' and Thefacebook, Inc.'s (and its server providers') electronic memory devices.
Plaintiff also seeks Defendants' documents created after May 21, 2005, which are likely to show efforts to
cleanse thefacebook.com code of infringement.  See Plaintiff's Motion to Compel the Production of Mirror
Images of Defendants' Hard Drives and Other Electronic Memory Devices and Documents Created After
May 21, 2004 (D.N. 37).

Defendants have also asserted 24 affirmative defenses and Mr. Zuckerberg and Thefacebook, Inc. have asserted counterclaims.  Defendants have halted discovery on their defenses and counterclaims as well.

Thus, Plaintiff is entitled to discovery on its other claims, and on Defendants' defenses and counterclaims, regardless of the outcome of this motion or Defendants' motion for protective order.  Even the court in the unpublished *Staffbridge* case, on which Defendants so heavily rely (and discussed *infra*), was willing to allow the parties to conduct discovery on the plaintiff's breach of contract and breach of fiduciary duty claims independently of discovery on plaintiff's trade secret claim. *Staffbridge, Inc. v. Gary D. Nelson Assocs.*, No. 024912BLS, 2004 WL 1429935 at *2 and *4-5 (Mass. Super. June 11, 2004).

**B.    The Facebook Defendants Misstate the Law on Plaintiff's Burden**

TFDs state an incorrect standard of specificity for Plaintiff's trade secret identification and improperly import a substantive requirement of trade secret law into a discovery motion.  Contrary to their arguments, Plaintiff need not separate its trade secret combination from information in the public domain.

**1.    The Law Requires Only Reasonable Particularity**

Citing the unpublished *Staffbridge* decision, TFDs argue that Plaintiff must identify its trade secrets with "rigorous and focused particularity."  Although Plaintiff meets this standard (discussed *infra)*, it is the wrong standard.

TFDs cite the *Staffbridge* ruling, then state that "[o]ther Courts, including those within this District, have applied a similar rule.  *See L-3 Comms. Corp. v. Reveal Imaging Techs., Inc.*, No. 035810BLS, 2004 WL 2915743, at *13 (Mass. Super. Dec. 2, 2004); *Microwave Research Corp. v. Sanders Associates, Inc.*, 110 F.R.D. 669, 673 (D. Mass. 1986)." (Motion at 6-7)  In *Staffbridge,* Judge Gestel required specificity of "rigorous and focused particularity."  2004 WL 1429935 at *4.  This appears to be because the case was on the eve of trial and the court was giving the plaintiff one last

9

chance to identify its trade secrets. *Id.* at *1, 4.  *L-3 Communications* and *Microwave Research* each applies a different standard and are more instructive.

      In *L-3 Communcations,* the court quoted *Engelhard Corp. v. Savin*, 505 A.2d 30, 33 (Del. Ch. 1986), to the effect that "the plaintiff will normally be required to first identify with **<u>reasonable particularity</u>** the matter which it claims constitutes a trade secret before it will be allowed . . . to compel discovery of its adversary's trade secrets" (emphasis added).  The *L-3 Communications* court also cited *Cambridge Internet Solutions v. Avicon Group*, No. 99-1841, 1999 WL 959673, at *2 (Mass. Super. Sept. 21, 1999), *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998); and *Xerox Corp. v. Int'l Business Machines Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974). *Cambridge*, which applies Massachusetts law to a motion to dismiss, cites Your Honor's *Microwave Research* decision, discussed below, and required the plaintiff to "demonstrate a factual basis for their claim and, where possible, identify their alleged trade secrets with some specificity."  1999 WL 959673 at *2.  The court required greater specificity with respect to aspects of the trade secrets more susceptible to greater specificity.  In *Imax*, which applied California law, the court required identification "with sufficient particularity,"  152 F.3d at 1164-65, and "reasonable specificity,"  *Id.* at 1167, which is consistent with California statutory law, which requires "reasonable particularity."[7]  *Xerox*, which appears to apply New York law, required the plaintiff to "identify in detail".  64 F.R.D. at 372.

      In *Microwave Research*, Your Honor did not directly address the issue of the degree of specificity needed in a trade secret identification, but cited *Xerox* and its "specify in detail" standard.  110 F.R.D. at 673.  Instead of defining a standard of specificity, this Court held that when a plaintiff cannot specify the trade secrets it claims

---

[7]  See Cal. Code Civ. Proc. §2019(d), which reads in pertinent part as follows: "before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any [protective] orders."

were misappropriated, the test for whether or not such a plaintiff is entitled to discovery on such claim is whether there is a substantial basis for plaintiff's claim that defendant misappropriated its trade secrets. *Id.* at 674. In such a case, the plaintiff must "show that other evidence which it has gathered through discovery provides a substantial factual basis for its claim." Here, ConnectU specified its trade secrets AND provided a substantial factual basis for its claims. (See Facts, § II.A, *supra,* and § III.C and D, *infra*).

Other decisions in this District are consistent with a "reasonable particularity" standard. In *Bonacorso Construction Co. v. Master Builders, Inc.*, 20 U.S.P.Q.2d 1215, 1218-19 (D. Mass. 1991), on summary judgment, the court stated that:

> [A]s elaborated below, the defendant is entitled to summary judgment on this count because the plaintiff has not demonstrated that there is a material and genuine issue of fact as to whether any of the equipment, processes or information depicted in brochures constituted a trade secret. The Plaintiff's Complaint does not specify with particularity the aspects of its operation that it considers to be a trade secret.

In *Data General Corp. v. Grumman Systems Support Corp.*, 825 F. Supp. 340, 357-58 (D. Mass. 1993), where Data General claimed that Grumman misappropriated Data General's trade secrets, the court found that the evidence produced at trial amply identified the trade secrets and supported the jury's verdict in Data General's favor, and that there was no detailed identification requirement for trade secrets.

Thus, the standard this Court should apply is reasonable particularity, if it requires identification at all. However, Plaintiff has met both this standard and the unpublished *Staffbridge* standard, discussed *infra.*

### 2. Plaintiff Need Not Distinguish Its Trade Secret Combination From the Public Domain

TFDs argue that specifying Plaintiff's trade secrets with particularity means "with sufficient detail to separate the trade secrets from matters of general knowledge in the trade," or to "distinguish the information from that which was widely available in the public domain," or distinguishing them "from matters of common knowledge" before

thefacebook.com launched.  (Motion at 2, 8, 10, 11, 18)  There is no such requirement in Massachusetts at the discovery stage, or as part of Plaintiff's trade secret identification, and TFDs cite no law for such a requirement.  If such were the law, every motion seeking the identification of a plaintiff's trade secret would become a summary judgment motion.

In *Staffbridge,* Judge Gestel required the plaintiff to separate its trade secret from the "vast body" of its own source code, <u>not</u> from matters of general knowledge in the trade or information in the public domain.  2004 WL 1429935 at *3.  Thus, the court ordered that plaintiff's "designation must, with clarity that can be understood by a lay person, make clear and distinguish what is protectable from that which is not."  *Id.* at *4.  Although *Staffbridge* paraphrases defendants' expert's opinion on whether "those claimed trade secrets are in fact generally known in the trade," the court's order contains no such requirement.  *Id.* at *3.  In the order, the court stated that after a second trade secret designation is served and accepted for adequacy, the defendants would have the right to challenge the trade secret nature of what was designated.  *Id.* at *4.

In *L-3 Communications,* which was also decided by Judge Gestel, the court did not require the plaintiff to separate its trade secrets from what was known in the trade or in the public domain.  *Microwave Research* also contains no such requirement.

Simply put, none of the cases cited by TFDs (or any Massachusetts or District of Massachusetts case of which Plaintiff is aware) dealing with trade secret identification in the discovery context requires the plaintiff to distinguish the trade secrets from information generally known in the trade, or in the public domain, in order to obtain trade secret discovery.[8]

---

[8]  Such a requirement arises in substantive proceedings, such as summary judgment motions and at trial, but does not mean what TFDs think it means.  *Prescott v. Morton Int'l, Inc.,* 769 F. Supp. 404, 409 (D. Mass. 1990) (on summary judgment, a trade secret "must possess at least that modicum of originality which will separate it from everyday knowledge"), *quoting Dynamics Research Corp. v. Analytic Sciences Corp.,* 400 N.E.2d 1274, 1284 (Mass. App. Ct. 1980) (affirming judgment).

While TFDs cite general case law that trade secret protection is unavailable for information that is not actually secret (Motion at 6), this is an issue for another day, not for a discovery motion.[9]  The legal issue of secrecy is irrelevant in the discovery context and is not a requirement of the cases addressing trade secret identification as a prerequisite to discovery on trade secret claims.   TFDs are simply wrong that such substantive, outcome determinative issues can be decided in a discovery motion.

### C.    Plaintiff Has Adequately Identified Its Trade Secrets

On August 22, 2005, Plaintiff timely served its response to Defendants' Interrogatory No. 2, which asked Plaintiff to "[i]dentify with precision and specificity each and every alleged trade secret ConnectU contends was misappropriated by Defendants."  Plaintiff's detailed response identifies its trade secret combination, under either the standard of reasonable particularity or rigorous and focused particularity.[10]

---

[9]  After citing such cases, TFDs state "Thus, Massachusetts Courts have crafted a prudential rule that plaintiffs … must specify their trade secrets … in order to proceed with discovery."  (Motion at 6). Defendants are wrong about the reason for the rule.  The reason courts require trade secret identification with reasonable particularity is not to assure that trade secrets are indeed secret.  The cases don't say so and the cases cited by TFDs for such a rationale were not discovery-stage cases and did not involve the issue of trade secret identification as a prerequisite to discovery.  TFDs stated the correct reason for the rule elsewhere in their motion (at 7):  the rule was established so that a trade secret plaintiff would not be able to obtain discovery and then later claim that items found in defendants' product were plaintiff's own trade secrets.  There is no danger of that here, as thefacebook.com website – which embodies Plaintiff's trade secret combination, heart and soul -- was made public in February 2004, and Plaintiff has identified its trade secret combination.  Moreover, as stated in Plaintiff's counsel's article cited by TFDs (Motion at 7), "[s]ituations may exist in which this rule should not apply, such as where both the plaintiff and defendant already know the nature of the plaintiff's alleged secrets."  John F. Hornick & Margaret Esquenet, *Trade Secret Identification: The Importance of Timing in Discovery* (Feb. 2005), Ex. B to TFD's Notice of Newly Filed Authority, filed August 24, 2005, (D.N. 47).  Here, Defendants know full well the sum and substance of Plaintiff's trade secret combination.  Plaintiff has produced the Harvard Connection website, which was secret before Defendants launched thefacebook.com and code, and Plaintiff has produced the Harvard Connection code, which is still secret today.

[10]  TFDs argue that Plaintiff's objections to Interrogatory No. 2 (such as reserving the right to supplement its response) should be overruled.  (Motion at 8 n.4)  But TFDs have misread the Interrogatory and are wrong about the level of specificity Plaintiff must provide.  Interrogatory No. 2 does not ask what Plaintiff's trade secrets are, but instead asks for each and every alleged trade secret that was misappropriated.  Plaintiff's response to Interrogatory No. 2 identifies its trade secret combination with reasonable particularity, and all of the aspects of Plaintiff's trade secret identification that can be seen in the public thefacebook.com website were misappropriated from such combination.  Plaintiff cannot fully answer as to whether aspects of the combination that cannot be seen in the public thefacebook.com website (such as the Harvard Connection code) were misappropriated because

For a trade secret of this type, which was a secret concept and the project to implement it, Plaintiff has described exactly what Mr. Zuckerberg stole. (See Confidential Ex. 16 to Motion, Int. No. 2) Plaintiff's response to Interrogatory No. 2 identifies Plaintiff's trade secret combination. The Founders' idea of bringing a social networking site with such elements to the college level was secret, their project and enterprise of developing the website was secret, their plan to launch it before anyone else did was secret,[11] and their plan eventually to make money on it was secret. Before it launched, what its screens would look like was secret. Before it launched, the features it would have were secret. Before it launched, all of the functionality it would have was secret. *Prescott*, 769 F. Supp. at 409 (products in prelaunch may be a secret). Its source code is secret today. Its underlying functionality (that users can't see) is secret today. Everything about Harvard Connection was secret before Defendants launched thefacebook.com. Plaintiff listed those elements, plus more detail.[12]

Moreover, Mr. Zuckerberg had the Harvard Connection code in his possession and Defendants obtained it in discovery. It is secret. *See Dickerman Assoc., Inc. v.*

---

Defendants are withholding from production (or have failed to preserve) their website code predating October 2004, post-May 21 documents (which would show what they changed after ConnectU launched), and many other documents covered by Plaintiff's two motions to compel documents.

[11] "[T]he essence of a trade secret is market advantage." *Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004). Contrary to TFDs' argument (Motion at 18), choice of launching time can be a trade secret. *Editions Play Bac v. Western Publishing Co.*, Inc., 31 U.S.P.Q.2d 1338, 1342 (S.D.N.Y. 1993).

[12] On page 9 of their Motion, TFDs argue that "various user-defined purposes" and "user-defined ways" should be further defined. Because the functionality enables the user to define the purposes and ways that the function can be used, it makes no sense to argue that Plaintiff must further define such functionality. TFDs also argue that Plaintiff should further define "social network" (Motion at 9), yet admit on page 14 that Plaintiff defined such term as consisting of nodes (i.e., users) and ties (i.e., connections between users). On page 20, TFDs also argue that the terms "underlying functionality" and "surface functionality" should be clarified. These terms are clear. Anything a user can see ("surface functionality"), such as the ability to perform a search, would only have been a secret, as part of the secret development effort, until launch. After that, all the functionality that the user can't see (i.e., the underlying code and the methodology for accomplishing what the user can see) would still remain secret because the user can't see it.

*Tiverton Bottled Gas Co.*, 594 F. Supp. 30, 35 (D. Mass. 1984) (computer program can be a trade secret); *Touchpoint Solutions*, 345 F. Supp. 2d at 28 (source code, implementation, and overall software design sufficiently identifies trade secret). They can look at it and the website it renders and see its features, functions, information fields, layouts, interface, and webpages, which were all part of Plaintiff's secret website in development, before Mr. Zuckerberg stole the idea and Defendants launched thefacebook.com, which incorporates such features and functions. The Harvard Connection source code and the website it renders are a roadmap for Plaintiff's secret business model. *Cambridge*, 1999 WL 959673, at *2 (identifying a business plan document sufficiently identifies trade secrets in it). Plaintiff could print and produce such website and list its features and functions, but they would tell Defendants no more than they can see for themselves.

Printing the website and listing its features and functionality would also obscure the fact that what Mr. Zuckerberg stole was mainly a secret concept, or as TFDs state, Plaintiff's "business model" (TFDs' Opposition to Plaintiff's Motion to Compel Answers to Interrogatory Nos. 6, 9-14, 16, and 18, at 4, D.N. 71). If this set of facts were exported to secret prelaunch projects to develop services and products in other industries, a trade secret specification of creating a nationwide overnight air delivery service would have adequately identified the essence of the Fed Ex idea before it launched; or to create a website for consumer product auctions would have adequately identified the essence of the ebay idea before it launched; or to create a portable personal stereo device would have adequately disclosed the essence of the Sony WALKMAN idea before it was first offered by sale. A person working on such a secret project to launch such products or services, who learned the essence of these ideas, would have all he needed to develop and launch the idea himself. Plaintiff provided substantially more details of its trade secret combination in response to Interrogatory No. 2. Plaintiff has provided sufficient detail to permit Defendants "to ascertain at least the boundaries

within which the secret lies," and has "provide[d] reasonable notice of the issues which must be met at the time of trial," which Defendants argued Plaintiff must do in their cross motion for protective order (at 8), *citing Computer Economics, Inc. v. Gartner, Inc.*, 50 F. Supp. 2d 980, 984 (S.D. Cal. 1999).  Plaintiff made these points in opposition to Defendants' cross motion for protective order, but Defendants did not attempt to counter them in their reply.

TFDs make much of the fact that the individual elements of Plaintiff's combination appear to be uncomplicated or known.  Plaintiff is aware of no cases that require trade secrets to be complicated.  Moreover, combinations of known elements can be trade secrets.  *Peggy Lawton Kitchens, Inc. v. Hogan*, 466 N.E.2d 138, 140 (Mass. App. Ct. 1984) ("the combination in which the [chocolate chip cookie] ingredients are used, the diameter and thickness of the cookie, and the degree to which it is baked" would be a trade secret even though the basic ingredients are widely known);  *Editions Play Bac*, 31 U.S.P.Q.2d at 1341 (game concept and combination of ideas and the reasons behind them); and *Jet Spray Cooler, Inc. v. Crampton*, 385 N.E. 2d 1349, 1356 (Mass. 1979) (that a process is the combination and adaptation of old principles to new purposes does not prevent the combination from being a trade secret if it gives the holder a competitive advantage due to its own ingenuity, research, and development), are but three examples of cases holding that combinations of known elements can be trade secrets.   Also, a trade secret need not have the novelty of a patent; it need only confer a competitive advantage on its owner.  *Touchpoint*, 345 F. Supp. 2d at 29; *Jet Spray*, 385 N.E.2d at 1355, 1356 n.9.

As discussed *infra*, TFDs ignored the fact that Plaintiff's trade secret is a combination.  They mentioned "combination" only twice (Motion at 9 and 14), and pretended not to understand that Plaintiff is claiming a trade secret combination.  TFDs completely fail to argue that the combination can't be a secret, or that the combination was known in the trade or could be found in the public domain before thefacebook.com

launched, or was known by Mr. Zuckerberg at that time.  Noticeably absent from the motion is any evidence that any third party websites or other sources embodied Plaintiff's entire trade secret combination before thefacebook.com launched.

In response to Defendants' Interrogatory Nos. 10 and 14, Plaintiff said the combination had not been done before Defendants launched thefacebook.com and Defendants have not argued otherwise.  In fact, Defendants admitted this first mover advantage.  (Answer, D.N. 14, ¶ 16)  The uniqueness of Plaintiff's combination is evidenced by thefacebook.com's "instant success."  (Motion at 4)  By analogy, before ebay, there were consumer product auctions and websites, but no consumer product auction websites.  Before Fed Ex, there were courier services and airplanes, but no nationwide overnight air delivery services.  Before the WALKMAN, there were stereos, transistor radios, and cassette tape players, but no portable stereo transistor radio/cassette players.  TFDs would not seriously argue that such unique combinations of known ideas could not have been trade secrets in themselves while they were in development.  Plaintiff also made this point in opposition to Defendants' cross motion for protective order, but Defendants did not attempt to counter it in their reply.

### D.    Dissection of Plaintiff's Combination is Improper and Irrelevant

The Facebook Defendants spend 13 pages arguing that certain elements listed in the Plaintiff's response to Interrogatory No. 2 were known in the trade or were in the public domain.  That TFDs could write so much is a testament to the adequacy of Plaintiff's trade secret identification.  But TFDs assume that the elements of Plaintiff's trade secret combination stand alone, and can be analyzed apart from the combination. (See Motion at 5, 8-20)  Because the law contains no requirement that Plaintiff separate the secret combination (or its elements) from information known in the trade or in the public domain, and because Plaintiff's trade secret is a combination, Defendants' hearsay arguments regarding the alleged public availability of such elements are

irrelevant to this motion and Plaintiff therefore sees no need to address them one by one.

TFDs wish to trivialize Plaintiff's trade secret combination -- as well as the fact that Mr. Zuckerberg stole Plaintiffs unique concept -- by dissecting it, but the only relevant inquiry (for trial, but not for a discovery motion) is whether the combination was sufficiently secret.  Absolute secrecy is not required for trade secret protection.  *USM Corp. v. Marson Fastener Corp.*, 393 N.E.2d 895, 902 (Mass. 1979) ("We do not require the possessor of a trade secret to take heroic measures to preserve its secrecy"); *Touchpoint*, 345 F. Supp. 2d at 30 ("the standard is reasonableness, not perfection"); *Milgrim on Trade Secrets*, § 1.07 (2005).[13]  When the substantive question of whether Plaintiff's secret was in fact secret before Mr. Zuckerberg stole it is eventually addressed, the relevant inquiry will be whether the combination was a secret, not the

---

[13]  TFDs improperly import other substantive issues into this discovery motion, such as their arguments that (1) Mr. Zuckerberg had no obligations of any kind to the Founders because he signed no confidentiality agreement, (2) the Founders made certain limited disclosures to computer programmers and others without any verifiable expectation of confidentiality, (3) Mr. Zuckerberg was not a Harvard Connection partner because he was not paid, and (4) thefacebook.com was similar to other websites Mr. Zuckerberg created.  (Motion at 4)   Although these arguments are irrelevant here, Plaintiff responds briefly.  Argument 1: Mr. Zuckerberg knew the Harvard Connection project was secret, at least for the reasons set forth in Plaintiff's response to Defendants' Interrogatory Nos. 3, 9 (Ex. 2)  Also, employees working on a project may be presumed to know the project is secret, and a confidentiality obligation can arise without a written agreement.  *Knapp Schenck & Co. Insurance Agency, Inc. v. Lancer Insurance Co.*, No. 02-12118-DPW, 2004 WL 57086, at *7 (D. Mass. Jan. 13, 2004) (Woodlock, J.) ("a confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered"); *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985) (confidential relationship implied between employers and employees); *Jet Spray*, 385 N.E.2d at 1354*; Prescott*, 769 F.Supp. at 409 (quoting *Milgrim* § 5.03[4], at 5-108); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974).  Because Mr. Zuckerberg was a Harvard Connection partner, such law applies *a fortiori* to him.  Argument 2:  Absolute secrecy is not required (see § III.D, *infra*), and there is no reason why the Founders' expectations of confidentiality cannot be verified in depositions taken by Defendants or Plaintiff.  There is also no evidence that the secret combination was disclosed to persons other than the Harvard Connection programmers, and the law presumes they knew the project was secret.  (See cases cited above.)  Argument 3:  Mr. Zuckerberg volunteered his time, as did his Harvard Connection partners.  (Motion at 4)  Argument 4:  Defendants have produced no such "other websites" and stated in response to Plaintiff's Interrogatory No. 1 that the only pre-existing programs that Mr. Zuckerberg used in thefacebook.com were from a previously created visualization tool (Ex. 21, CONFIDENTIAL), which also has not been produced.

indivisible elements.  The combination here was a secret and had not been done before.[14]

Although this issue is irrelevant to this motion, TFDs also presented no evidence that the Founders or Mr. Zuckerberg were aware of the existence of any of the third party websites or sources they discuss in their Motion, before Defendants launched thefacebook.com.  Plaintiff's Rule 30(b)(6) witness testified that the Founders were unaware of such websites, and that Mr. Zuckerberg never mentioned being aware of them.  (Ex. 3, 165:13-174:2).

Moreover, the law is clear that the public availability of information that the plaintiff claims as a secret is not a defense to actual misappropriation of that information.  *Prescott*, 769 F.Supp. at 409; *Analogic Corp. v. Data Translation, Inc.*, 358 N.E.2d 804, 807 (Mass. 1976); Milgrim § 7.02[1][b](n4)(n. footnote 3).  Even if elements of Plaintiff's trade secret combination (or the combination as a whole) theoretically could have been obtained from public sources, this is not a valid defense to actual misappropriation.  There is no evidence that Mr. Zuckerberg or the other Facebook Defendants derived any ideas for thefacebook.com from any of the sources identified in the present motion.

TFDs identify third party websites that they assert are similar to one or more elements of Plaintiff's trade secret combination.  If Club Nexus existed in 2003, as Defendants allege, there is no evidence that the Founders, Mr. Zuckerberg, or the individual Facebook Defendants knew of it, or of the June 2003 article about it.[15] Classmates.com appears to be a post-high school and post-military directory for

---

[14]  TFDs may now try to show in a reply brief that the Plaintiff's combination was known.  In addition to being irrelevant to this motion, such sandbagging would be unfair.  Plaintiff's responses to Interrogatory Nos. 2, 10, and 14 are clear that Plaintiff is claiming a trade secret combination, and TFDs therefore should have made their argument, if it were relevant here (which it is not) in their opening brief.

[15]  The Facebook Defendants wrongly stated that Plaintiff's Rule 30(b)(6) witness "could only cite the fact that [Club Nexus] was limited to Stanford students, . .  as a distinction."  (Motion at 9)  In fact, the witness said he had not seen Club Nexus and believes it is no longer operating.  (Ex. 3, 166:12-24)

reuniting former high schoolers and soldiers (Ex. 16 to Motion).  There is no evidence that it is a social networking site, or that the Founders, Mr. Zuckerberg, or the individual Facebook Defendants knew about it.  MIT-Match-Up ran for one day (Valentine's Day) in 2003 as a matchmaking site, and relaunched in 2004 after the Facebook.com (Ex. 18 to Motion).  CollegeLuv.com is a matchmaking site (Ex. 19 to Motion).  There is no evidence that the Founders, Mr. Zuckerberg, or the individual Facebook Defendants knew of them.

Furthermore, Exhibits 11-19 to TFDs' motion are not authenticated evidence, yet TFDs want to use them to obtain a legal determination, in a discovery motion, that all of the elements of Plaintiff's trade secret combination are in the public domain.

**VI.    <u>Conclusion</u>**

For the reasons set forth herein, the Facebook Defendants' motion to compel an additional identification of Plaintiff's trade secrets should be denied.  However, Plaintiff is entitled to discovery on its other claims, and on Defendants' defenses and counterclaims, regardless of the outcome of this motion.

Respectfully submitted,

/s/ Troy E. Grabow
Lawrence R. Robins (BBO# 632610)
Jonathan M. Gelchinsky (BBO# 656282)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA  02142
Telephone:  (617) 452-1600
Facsimile:   (617) 452-1666
larry.robins@finnegan.com
jon.gelchinsky@finnegan.com

John F. Hornick (*pro hac vice*)
Margaret A. Esquenet (*pro hac vice*)
Troy E. Grabow (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue N.W.
Washington, DC  20001
Telephone:  (202) 408-4000
Facsimile:   (202) 408-4400

Attorneys for Plaintiff and Counterclaim
Defendants

DATED:  September 22, 2005