# EXHIBIT 4



Not Reported in N.E.2d                                                                                          Page 1
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

Superior Court of Massachusetts.
L-3 COMMUNICATIONS CORPORATION et al.
[FN1]

> FN1. L-3 Communications Security and
> Detections Systems Corporation California;
> and L-3 Communications Security and
> Detection Systems Corporation Delaware.
> By an amended complaint, the sole
> remaining plaintiff became L-3
> Communications Security and Detection
> Systems Corporation Delaware.

v.

REVEAL IMAGING TECHNOLOGIES, INC. et
al. [FN2]

> FN2. Michael Ellenbogen ("Ellenbogen"),
> Richard Bijjani ("Bijjani"), James Buckley
> ("Buckley"), Bruce Lee ("Lee"), John
> Sanders ("Sanders") and Elan Scheinman
> ("Scheinman").

**No. 035810BLS.**

Dec. 2, 2004.

MEMORANDUM AND ORDERS ON VARIOUS
MOTIONS AND RELATED MATTERS

ALLAN VAN GESTEL, Justice.

**\*1** This matter is before the Court on a variety of
motions, the most significant of which are, in their
order of filing: the Reveal Parties' Motion for
Protective Order (Paper # 23); the Reveal Parties'
Motion for Partial Summary Judgment on Plaintiffs'
Contract-Based Claims (Paper # 26); L-3 Delaware's
Motion Under Mass .R.Civ.P. 56(f) (Paper # 41); L-3
Delaware's Motion to Require Escrow of Defendants'
Patent Applications (Paper # 74); L-3 Delaware's
Motion for Partial Summary Judgment on Ownership
of Patent Applications (Paper # 75); the Reveal
Parties' Motion for Partial Summary Judgment on the
Ownership of Patent Applications and Trade Secret
Misappropriations (Paper # 145); another L-3
Delaware Motion for Partial Summary Judgment on
the Ownership of Patent Applications (Paper # 159);
and the usual array of motions to impound papers and
motions to strike affidavits. [FN3]

> FN3. The stack of papers involved in these
> several interrelated motions is included in
> four overflowing bankers boxes. The oral
> arguments on these motions lasted for nearly
> six hours, beginning on November 8, 2004,
> at about 2:30 p.m., running until about 4:15
> p.m., resuming the next morning at about
> 9:20 a.m. and concluding at about 1:10 p.m.
> The Appeals Court and the Supreme Judicial
> Court limit parties to 15 minutes per side.
> See M.R.A.P. 22(b). The docket for this
> case, which is today exactly one year old,
> contains 204 entries. This apparently is the
> parties' idea of how to comply with the
> mandate of Mass.R.Civ.P. Rule 1 "to secure
> the just, speedy and inexpensive
> determination of every action."

There are three basic clusters of motions. First are
motions relating to the employment of the individual
defendants and any agreements containing restrictive
covenants that they may have had in their various
employment relationships. Second are patent-related
motions. And third are trade secret and confidential
information-related motions. The Court will deal with
the background and the discussion of these various
motions in the same clusters.

The sole remaining plaintiff, L-3 Communications
Security and Detection Systems Corporation
Delaware, will hereafter be called "L-3 Delaware."
Except where greater specificity is required, the
defendants collectively will be called the "Reveal
Parties."

BACKGROUND
The original complaint, filed on December 2, 2003,
contained 12 counts, charging the defendants with:
breach of contract (disclosure of trade secrets);
breach of contract (duty of loyalty); (breach by
Ellenbogen of obligation not to hire L-3 employees);
breach of contract, assignment of inventions and
copyrights; breach of non-competition covenant by
Sanders; inducing breach of contract; common-law
misappropriation of trade secrets; misappropriation of
trade secrets, G.L.c. 93, Sec. 42; trade secret
conversion, G.L.c. 93, Sec. 42A; breach of common-
law duty of loyalty; common-law unfair competition;
and violation of G.L.c. 93A, Sec. 11.

An amended complaint was filed, with permission of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 2
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

the Court, on May 19, 2004. This amended complaint differs from the original in the following respects: only one of the three original plaintiffs remains, L-3 Communications Security and Detection Systems Corporation Delaware; the fifth count added Ellenbogen, Bijjani and Lee to Sanders in breach of non-competition covenants; a new count was added for breach of a common-law duty to assign; and a count was added for declaratory judgment.

*Facts relating to the motions based on the employment of the individual defendants and any agreements that they may have had in their employment relationships.*

The Reveal Parties' Superior Court Rule 9A(b)(5) statement of claimed undisputed facts on the employment-related issues includes 56 paragraphs covering most of 17 pages. L-3 Delaware admits some parts, or all, of 36 of the Reveal Parties' statement; "does not deny" some parts, or all, of another 7; and denies the rest. L-3 Delaware also adds another 46 of its own alleged undisputed facts. It is from this somewhat ungainly mass that this Court will attempt to set forth those undisputed facts that apply to the Reveal Parties' partial summary judgment motion on employment issues.

**\*2** The original lead plaintiff, L-3 Communications Corporation, is a Delaware corporation, based in New York City. Sixty-five percent of its work is defense-related, and its annual sales exceed $2.5 billion. In 1996 it entered into the explosive detection system ("EDS") field after receiving a grant from the Federal Aviation Administration ("FAA").

The other two original plaintiffs are wholly owned subsidiaries of L-3 Communications Corporation: one is a California corporation, based in Cypress, California; and the other, and now the sole plaintiff, L-3 Delaware, is a Delaware corporation based in Woburn, Massachusetts.

The defendant Reveal Imaging Technologies, Inc. ("Reveal") is a Delaware corporation with a place of business in Bedford, Massachusetts.

The remaining defendants--Ellenbogen, Bijjani, Buckley, Lee, Sanders and Scheinman--are all currently employed by Reveal.

Hologic, Inc. ("Hologic"), a non-party to this action, is a company that researches and develops products that apply dual x-ray technology in the medical diagnostic field. In January 1990, Lee began working

for Hologic. In connection with his employment, Lee signed a Hologic Employee Intellectual Property Rights Agreement and Non-Competition Agreement (the "Hologic Agreement"). The non-competition part of the Hologic Agreement provides:

> *Noncompetition.* During the first two (2) years after I cease to be employed by Company, I will not, directly or indirectly, either by myself or in conjunction with others be engaged in or interested in, or affiliated with, or organize ... any business then currently competitive with Company ...

The Hologic Agreement defines "Company" as Hologic and, "to the extent applicable, any other business entity that is either controlled by, controls, or under common control with" Hologic. Hologic's benefits under the agreement "inure to the benefit of the Company and its successors and assigns."

In January 1991, Lee resigned from Hologic and began working for a separate company called Vivid Technologies, Inc. ("Vivid"). Vivid was always a separate company from Hologic. Hologic is a publicly traded company on the New York Stock Exchange, under the symbol HOLX. Hologic is not related to or owned by Vivid, PerkinElmer, Inc. or L-3 Delaware, or any entity related to these companies.

Vivid, as a corporation, has gone through two name changes as the ownership of its stock has changed. The first change occurred in 2000 when Vivid's stock was acquired by, and it became a wholly-owned subsidiary of, PerkinElmer, Inc. It was then called PerkinElmer Detection Systems, Inc. ("PKI Delaware"). The second, was at the time of the acquisition of PKI Delaware's stock from PerkinElmer, Inc. by L-3 Communications Corporation. PKI Delaware then became L-3 Communications Security and Detection Systems Corporation Delaware, here called L-3 Delaware.

Lee was employed by Vivid in January of 1991; Ellenbogen and Sanders, in October of 1994; Bijjani, in April of 1997; and Buckley, in January of 1998. Each of Ellenbogen, Bijjani and Sanders signed Vivid Employee Intellectual Property Rights Agreements and Non-Competition Ageements (the "Vivid Agreements"). Among other things, the Vivid Agreements provided for two-year, post-employment restrictive covenants.

**\*3** On October 4, 1999, Vivid signed an agreement with PerkinElmer, Inc. for its acquisition and announced to its employees that the transaction would formally close on January 14, 2000. At that time Vivid would become a wholly owned subsidiary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
(Cite as: 2004 WL 2915743 (Mass.Super.))

Page 3

of PerkinElmer, Inc.

In conjunction with the anticipated acquisition by PerkinElmer, Inc. of all of the stock of Vivid, PerkinElmer, Inc. offered incentive agreements to certain employees, including Ellenbogen. These agreements were memorialized in KCIP Agreements with the particular employees involved. The KCIP offered to Ellenbogen bears a date of December 22, 1999; however, it may not actually have been signed until the date of the closing in January. The KCIP states that it is being offered "[I]n order to retain our key contributors during this crucial time." It goes on to state that "for the purposes of this Agreement, Vivid, PerkinElmer and its affiliates collectively will be referred to as the 'Company.' "

The KCIP contains a non-hire provision reading:
    Because the purpose of this agreement is to preserve the PerkinElmer workforce, you agree that, should you leave the Company during, at the end of or after the end of the incentive period, you will not hire, or assist anyone else to hire, any employee of the Company for a period of two years from the date you leave.
Ellenbogen's KCIP Agreement states that it "sets forth our entire understanding" and that "[n]o amendment to this Agreement shall be effective unless it is in writing and signed by both you and the Company."

The KCIP also includes a dispute resolution provision, as follows.
    Should any dispute arise between you and the Company about the meaning of this agreement ... you agree that the dispute will be resolved by PerkinElmer's Senior Vice President of Human Resources ... [whose decision] will be final and binding. You hereby acknowledge that the Company would not agree to your participation in this agreement if there were a different method to resolve disputes.
Ellenbogen, Bijjani, Lee, Buckley and Sanders each executed new Patent and Proprietary Information Utilization Agreements (the "PerkinElmer Agreements") on the following dates: Sanders, on December 22, 1999; Bijjani and Buckley, on January 6, 2000; Ellenbogen, on January 7, 2000; and Lee, on January 10, 2000. Scheinman came to work for PerkinElmer, Inc. in 2001, and he signed a PerkinElmer Agreement on April 23, 2001.

In the PerkinElmer Agreements there is a limited non-competition provision which reads:
    During my employment with the Company, I will devote my best efforts to promote the interests and business of the Company. I acknowledge that I owe a duty of loyalty to the Company and agree not to engage in, or contract with others to engage in, directly or indirectly, any business or other activity which is in competition with or may reasonably result in competition with the Company.
The PerkinElmer Agreements also state that "[t]his Agreement supercedes and is hereby substituted for all existing agreements which I have entered into with the Company relating to the same subject matter."

*4 Sanders terminated his employment with PerkinElmer, Inc. in March of 2001, and never became employed by any L-3 entity.

In July of 2001, Ellenbogen, Lee, Bijjani, Buckley and Scheinman received a "Divestiture Letter" from the President of PerkinElmer, Inc. The Divestiture Letter announced that PerkinElmer, Inc. had made the strategic decision to divest itself of its detection systems business, referred to above as PKI Delaware. The Divestiture Letter offered a special retention payment that for most of the employees involved was equal to their then yearly base salary, which was to be paid 50% on the closing of the divestiture to a new owner and then 50% ninety days later so long as certain financial operating milestones were met and the employee did not voluntarily resign his employment or was not fired by the acquiring company for cause during the post-closing ninety-day period.

Following, and as a result of, the September 11, 2001, terrorist attacks in New York and the District of Columbia, Congress held hearings related to flaws in aviation security, including the existing technology for screening airplane baggage for explosives. Ultimately, Congress passed the Aviation and Transportation Security Act of 2001 (the "ATSA"), Pub.L. 107-71, 115 Stat. 597. This legislation addressed some of the flaws and was designed to prevent another similar attack.

During the Congressional hearings on the new legislation, the Inspector General gave the following report.
    There are currently two manufacturers--InVision Technologies and L-3 Communications--whose FAA-certified machines are being deployed ... In an effort to promote competition, FAA's Fiscal Year 2001 appropriation contained language requiring it to purchase equal amounts of bulk explosive detection equipment from both certified

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
                                                    Page 4
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

sources. This required FAA to purchase one L-3 Examiner 6000 machine for every InVision Technologies CTX purchased. However, there have been problems with L-3 Communications' equipment, so the air carriers have been reluctant to accept these machines. As a result, nine machines are currently being warehoused by L-3 until the problems with the machines can be resolved.

Also at the hearings, Representative Inslee of Washington, who co-authored the baggage screening component of the ATSA, testified:

> [W]e need to very quickly evaluate the screening devices for various types of technology to make sure that we use the most effective, the fastest, the most efficient, the most cost-effective means of screening this baggage ... We want the FAA to be very open in its assessment so we have the fair opportunity to assess all of the technologies, and there are several types of machines that use several types of technology to determine whether there is an explosive device in a bag ... In doing that, we are going to be very insistent that we fully mobilize the industrialized base of the United States.

Additionally, Representative Lipinski, a member of the House Subcommittee on Aviation, said:

> *5 These EDS machines, while they are made by InVision, by L-3 Communications or by any other company, are very important in the effort to insure that terrorists do not have a big opening in our security system through which to destroy our planes. Therefore, it is very disconcerting to me that we are not using the technology currently available to us. I urge all parties ... and the EDS companies to work together in an expedited manner to fix whatever has delayed the full utilization of these vital machines ... In addition, we should build on our current technology and find a way to make these machines better, smaller, and cheaper so that we can outfit them in every airport in the country.

The President of L-3 Delaware also spoke at the hearings. Among other things, he said:

> Few would argue that competition is vital to achieving better products and customer value regardless of the line of business. In fact, we are hopeful that in the succeeding fiscal year, FAA will move to a competitive buy between certified EDS manufacturers, acquiring the greater percentage of systems from the best value vendor.

In light of the testimony, as well as Congressional findings, the role of EDS developers figured prominently in the final version of the ATSA. First, and foremost, Congress recognized the national public interest in maintaining and enhancing aviation safety and security. See 49 U.S.C. Sec. 40101(a)(1)

and (d)(1). The ATSA provided that the Under Secretary of Transportation shall ensure that all baggage screening must be performed using EDS systems certified by the Transportation Security Administration ("TSA") and that those EDS units should be in airports by December 31, 2002. The ATSA also required the establishment of a scientific advisory panel to advise Congress on, among other things, the development and testing of effective EDS systems. Further, Congress authorized the TSA to make grants for the acceleration of research, development, testing, and evaluation of explosives detection technology that is fast, more cost-effective, and more accurate.

In December 2001, PerkinElmer, Inc. announced that it had reached a deal to sell PKI Delaware to L-3 Communications Corporation. The closing of the transaction was scheduled to take place approximately six months later, in June 2002.

After L-3 Communications Corporation acquired the stock of PKI Delaware, it renamed it as L-3 Communications Security and Detection Systems Corporation Delaware, here L-3 Delaware.

Following L-3 Communications Corporation's acquisition of PerkinElmer's detection systems business, PerkinElmer, Inc. continued as a separate corporate entity, wholly unconnected to L-3 Communications Corporation except for certain rights and obligations in the agreement relating to the acquisition.

Lee, Bijjani, Buckley and Scheinman continued their employment with L-3 Delaware beyond 90 days after the closing of the acquisition.

Prior to the closing of the acquisition, Melissa Madden ("Madden") was the Director of Human Resources at PKI Delaware. After the acquisition, Madden became Director of Human Resources for L-3 Delaware. In that latter capacity, Madden advised the president of L-3 Delaware that L-3 Delaware had not entered into any sort of employment agreements with restrictive covenants with the former PerkinElmer employees. In her affidavit, Madden says that the L-3 Delaware president "informed [her] that he did not have time to discuss these issues with [her]."

*6 A short time thereafter, L-3 Delaware asked Ellenbogen, Lee, Bijjani, Buckley and Scheinman to sign additional agreements that contained provisions that were different from, and in some instances more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                          Page 5
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
(Cite as: 2004 WL 2915743 (Mass.Super.))

protective of L-3 Delaware's interests than, the provisions in their employment agreements with PerkinElmer, Inc. None of Ellenbogen, Lee, Bijjani, Buckley and Scheinman signed these new agreements.

Ellenbogen, upon his refusal to sign the new L-3 Delaware agreement, was terminated on August 15, 2002, "as a result of [his] resignation." Because he was not terminated for cause, PerkinElmer, Inc. paid Ellenbogen his second 50% of the divestiture bonus on September 17, 2002.

Scheinman left L-3 Delaware on September 20, 2002; Lee, on October 25, 2002; Bijjani, on October 4, 2002; and Buckley, on December 20, 2002.

On October 18, 2004, the President signed H.R. 4567, making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2005. Included are provisions for the purchase of EDS systems like those in issue in this case. The managers on the part of the House and Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to H.R. 4567 had the following to say in explanation insofar as it relates to the appropriations for EDS systems:

  The conferees agree to provide $180,000,000 instead of $170,000,000 as proposed by the House and $210,000,000 as proposed by the Senate. The conferees continue to encourage competition among the vendors so that multiple Explosive Detection Systems (EDS) technologies are available to TSA and airports. The conferees are aware of next-generation in-line EDS machines that are currently being tested, certified, and piloted. Within the $180,000,000 provided, the conferees direct that not less than $30,000,000 be used to install these next-generation explosive detection systems, particularly at medium and small airports, to permit more efficient handling of checked bags and reduce dependence on baggage screeners. These next-generation EDS systems are far smaller and less expensive than the current generation of screening units. The conferees believe that the expeditious deployment of these systems is essential for developing inline solutions that do not require the costly, large-scale redesign and construction of baggage conveyor systems. Furthermore, although these next-generation machines have immediate application to checked-baggage screening, they also have potential to cost-effectively enhance security at passenger checkpoints, transit stations, and other key

facilities ... The installation of in-line systems to screen checked baggage at our Nation's airports is a critical step in combating the terrorist threat against aviation. The use of in-line EDS is not only more effective than explosive trace detection (ETD) and stand-alone systems, but is considerably less costly to operate. Accordingly, it has been widely recognized that a high priority should be given to the installation of in-line baggage screening systems. Most recently, the 9/11 Commission recognized this need in its recommendations, urging TSA to expedite the installation of such systems.

*Facts relating to the motions on patent-related issues.*

  *7 The term "Explosive Detection System" has been defined by the FAA as "an automated device, or combination of devices, which has the ability to detect in passenger checked baggage, the amounts, types, and configurations of explosive materials as specified by the FAA." 63 Fed.Reg. 18104, 18106 (April 13, 1998). "EDS" has become a universally recognized term within the aviation security industry, describing a system that automatically detects explosives in baggage and has passed the FAA EDS Certification criteria.

  Generally, the EDS systems scan a bag by sending x-rays through the bag, where the x-rays interact with the various metals and other materials contained in the bag. Detectors then measure the x-rays that pass through the bag, thereby collecting data about the shape and material of objects in the bag. Computer algorithms process the detected data to reconstruct an image of the contents in the scanned bag. The reconstructed image is then analyzed by further computer algorithms and, if necessary, by human review of the reconstructed image on the computer display, to evaluate whether the bag contains a "threat."

  EDS machines use a Computed Tomography ("CT") scanner, usually mounted on a gantry that rotates around the bag being scanned. This latter method results in data being collected from multiple angles around the bag. L-3 Delaware has an "Argus" VCT 30 model which uses a single x-ray scanner and a CT scanner mounted on a rotating gantry. ("VCT 30" stands for *V* ivid *CT* with a gantry that rotates at 30 rpm.)

  While working at PKI Delaware, Bijjani was one of the chief architects of the VCT 30, and was the principal investigator on the government "Argus"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                          Page 6
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

grant for the VCT 30's development. Bijjani ceased working on any aspects of the airport integration or productization of the VCT 30 in approximately May 2002.

Ellenbogen and Bijjani each entered into agreements with PerkinElmer, Inc. under which they agreed:

5. I assign to the Company, will hold for the Company's exclusive benefit, and will confirm assignment thereof in writing without compensation in addition to my salary, my entire right, title and interest in any inventions, discoveries, techniques, processes, devices, improvements, refinements or modifications conceived, made or reduced to practice by me, either solely or jointly with others, and whether patentable or not ("Inventions"), during my employment with the Company and which fall within the Company's or any affiliate's ... actual or anticipated business or research and development, whether made within or outside of my usual work hours, and whether on or off Company premises. I will make prompt and full disclosure thereof to the Company and maintain records of creative or inventive activities and deliver such records to the Company at termination of employment or as requested by the Company.

6. During and after my employment with the Company, I will assist the Company, at the Company's expense and without cost to me, in obtaining, maintaining and enforcing patents in any and all countries on Inventions assigned by me to the Company, or which I am bound to assign to the Company, and for that purpose, I will sign all documents which the Company may deem necessary or desirable ...

**\*8** 10. An affiliate of the Company shall have the same rights as the Company under this Agreement and my obligations owed to the Company under this Agreement shall be owed to the affiliate in the same manner as they are owed to the Company. Affiliates of the Company are (1) any subsidiary of the Company ...

Ellenbogen and Bijjani are the named inventors on two patent applications for a "Folded Array CT Baggage Scanner," U.S. Patent Application No. 10/677,976 (the "976 Utility Application") and PCT/Us Application No. 03/3 1718 (the "PCT Application") (collectively the "Folded Array Applications"), which claim priority to U.S. Provisional Patent Application No. 60/415,381 (the "Provisional Application") that Ellenbogen filed on October 2, 2002.

L-3 Delaware and the Reveal Parties are in marked

disagreement over whether certain of the claims, designated 27-31, in the Reveal Folded Array CT Scanner Applications are the same as concepts that were worked on in Ellenbogen's and Bijjani's prior employment and, therefore, properly belong to L-3 Delaware. Indeed, there is even a dispute as to whether claims 27-31 are patentable at all because of conflicts with prior art.

At the time of the oral argument, the United States Patent and Trademark Office ("PTO") had issued an Office Action rejecting claims 27-31 and claim 1. This is not, however, a final action by the PTO, and the applicants have an opportunity to make additional filings in support of those claims within a time limit of three to six months from September 21, 2004, the date of the PTO Office Action.

Further, claims 27-31 notwithstanding, the Reveal Parties assert that what they are now seeking to patent is different from the claims challenged and is a very different concept from that being considered earlier.

*Facts relating to the motions concerning trade secret issues.*

In the original complaint, in Paragraph 25, the then plaintiffs alleged that the Reveal Parties, in designing and developing a Reveal product known as CT80, improperly "used L-3's trade secrets and other proprietary information, including inventions and trade secrets the defendants themselves had invented and developed while they were employed as high-level executives at L-3 and its predecessors-in-interest." It is there claimed that the CT80 product "contains L-3 proprietary information ...

In the amended complaint, the allegations regarding misappropriation of trade secrets is asserted in a somewhat different way. The "contains" allegation is no longer there, and language suggesting that trade secrets "have been or may be misappropriated" now appears. In notice pleading this may be of no significance. It was "noticed" however.

The trade secrets in issue are not specifically spelled out and, therefore, not readily knowable. This is what has prompted the Reveal Parties' first motion for a protective order, better called an order to define the trade secrets.

### DISCUSSION

**\*9** Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 7
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

*Opara v. Massachusetts Life Insurance Company,* 441 Mass. 539, 544 (2004); *Lindsay v. Romano,* 427 Mass. 771, 773 (1998); *Hakim v. Massachusetts Insurers' Insolvency Fund,* 424 Mass. 275, 283 (1997); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Mass.R.Civ.P. 56(c).* The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989).

In order to prevail on its requests for a preliminary injunctive relief, L-3 Delaware bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the relief sought is not granted; and that its harm, without the relief, outweighs any harm to the Reveal Parties from being enjoined. *GTE Products Corp. v. Stewart,* 414 Mass. 721, 722-23 (1993); *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-17 (1980). The Court must "also consider[ ] whether the relief sought will adversely affect the public." *Tri-Nel Management, Inc. v. Board of Health of Barnstable,* 433 Mass. 217, 219 (2001). See also *Commonwealth v. Mass. CRINC,* 392 Mass. 443, 447 (1983); *Biotti v. Board of Selectmen of Manchester,* 25 Mass.App.Ct. 637, 640 (1988).

*The public interest.*

Injunctive relief is sought, along with a similar mandatory order relating to the escrowing of the patent applications. Because of the significant public interest factor, the Court first will consider those issues. The situation here has a public interest component of vastly greater significance than any yet seen by this Court.

The statements quoted above in the congressional hearings related to the Aviation and Transportation Security Act of 2001, Pub.L. 107-71, 115 Stat. 597, and by the managers on the part of the House and Senate at the conference on the disagreeing votes on the amendment by the Senate to H.R. 4567, as well as those by others noted below, squarely present the issue.

The installation of in-line systems to screen checked baggage at our Nation's airports is a critical step in combating the terrorist threat against aviation. The use of in-line EDS is not only more effective than explosive trace detection (ETD) and stand-alone systems, but is considerably less costly to operate. Accordingly, it has been widely recognized that a high priority should be given to the installation of in-line baggage screening

systems. Most recently, the 9/11 Commission recognized this need in its recommendations, urging TSA to expedite the installation of such systems.

The statements of the managers on the part of the House and Senate at the conference on the disagreeing votes.

Few would argue that competition is vital to achieving a better product and customer value regardless of the line of business. In fact, we are hopeful that in succeeding fiscal years, FAA will move to a competitive buy between certified EDS manufacturers, acquiring the greater percentage of systems from the best value vendor. This will maximize value for the taxpayers, while still preserving dual manufacturing sources.

**\*10** Testimony of Joseph S. Paresi, President of L-3 Delaware, before the House Transportation and Infrastructure Aviation Subcommittee, October 11, 2001.

(1) The safety and security of the civil air transportation system is critical to the United States' security and national defense.

(2) A safe and secure United States civil air transportation system is essential to the basic freedom of Americans to move in intrastate, interstate, and international transportation.

The first two findings of the Congress in the Aviation Security Act, proposed on October 10, 2001.

It is well-established that courts will not enforce contracts that violate public policy. *Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc.,* 422 Mass. 318, 320-21 (1996); *Commonwealth v. Henry's Drywall Co.,* 366 Mass. 539, 543, (1974); *Exxon Corp. v. Esso Workers' Union, Inc.,* 118 F.3d 841, 844-45 (1st Cir.1997). While courts are hesitant to invalidate contracts on these public policy grounds, the public interest in freedom of contract is sometimes outweighed by other public policy considerations; in those cases the contract will not be enforced. *Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., supra.* To determine public policy, we look to the expressions of the Legislature and to those of this court. *Capazzoli v. Holzwasser,* 397 Mass. 158, 160 (1986).

*A.Z. v. B.Z.,* 431 Mass. 150, 160-61 (2000).

It would be difficult to conceive of a greater public interest than that presented by the underlying situation here. Thus, this Court must not-- regardless of the economic consequences to the litigating parties--issue any order that disturbs or is harmful to that public interest.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                              Page 8
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

*The motions based on the employment of the individual defendants and any agreements that they may have had in their employment relationships.*

The Court begins with the significant observation that none of the individual defendants ever executed an agreement containing trade secret protection, or non-competition or non-disclosure covenants with L-3 Delaware. The Court must, therefore, search to see if there are any other agreements that L-3 Delaware has a right to enforce against any of the individual defendants.

Going back to the earliest date presented, the Court will examine, briefly, the status of each agreement proffered by L-3 Delaware. It begins with Lee's Hologic Agreement. This agreement was entered into in 1990, with an entity that is not shown to be a predecessor-in-interest or otherwise related to L-3 Delaware. That should be enough.

Further, the Hologic Agreement only prohibits competition during the first two years that Lee ceases to be employed by Hologic. Lee left Hologic in 1991. This was five years before L-3 even entered the EDS business in any form.

The Hologic Agreement does not have any role predicated on its prohibitions in enabling L-3 to obtain injunctive relief against Lee.

The Court turns next to the agreements signed by the defendants Ellenbogen, Bijjani and Sanders with Vivid Technologies, Inc., the Vivid Agreements. These agreements also provided a two-year non-competition covenant running from the time that each employee ceased to be employed by Vivid.

*11 Vivid, however, was acquired on January 14, 2000, by PerkinElmer, Inc. In contemplation of that acquisition, and before its closing, PerkinElmer, Inc. entered into new non-competition and proprietary information agreements with Ellenbogen, Bijjani, Lee, Buckley and Sanders. Scheinman, who joined PerkinElmer, Inc. in the spring of 2001, also signed a PerkinElmer, Inc. agreement identical to that of the others. These agreements were "in consideration of [their] employment and continued employment with PerkinElmer, Inc." Those agreements significantly also provided that: "This Agreement supercedes and is hereby substituted for all existing agreements which [they] have entered into with the Company relating generally to the same subject matter." The PerkinElmer, Inc. agreements cover the same subject matter as the Vivid agreements.

The non-competition aspect of the PerkinElmer, Inc. agreements applied solely to the period of employment and did not include restrictions after the employment with PerkinElmer, Inc. ceased.

The PerkinElmer, Inc. agreements were clearly substituted for the prior Vivid Agreements and operated as discharges thereof. *Poskus v. Braemoor Nursing Home, Inc.,* 6 Mass.App.Ct. 896, 897 (1978). See *Puretest Ice Cream, Inc. v. Kraft, Inc.,* 806 F.2d 323, 325 (1st Cir.1986); *Adams v. Herbert,* 345 Mass. 588, 590-91 (1963); *Tuttle v. Metz,* 229 Mass. 272, 275 (1918); 6 Corbin, Contracts, Sec. 1293 (1962).

The acquisition from PerkinElmer, Inc. of what became L-3 Delaware by L-3 Communications Corporation did not include the PerkinElmer, Inc. agreements. Those agreements are clear that they apply only to the "Company." The "Company" is PerkinElmer, Inc. and "an affiliate of the Company." "Affiliates of the Company are (1) any subsidiary of the Company, (2) any other entity a majority of whose voting shares are controlled by the Company and (3) any successor entity which controls a majority of the voting shares of the Company."

PerkinElmer, Inc. continued to exist after the acquisition of its EDS business by L-3 Communications Corporation, and it still exists to this day. L-3 Delaware has not become the "Company" for purposes of having a right to enforce the PerkinElmer, Inc. agreements. Nor is L-3 Delaware currently an affiliate of PerkinElmer, Inc. Upon its acquisition by L-3 Communications Corporation, L-3 Delaware became an affiliate of L-3 Communications Corporation. Thus, it has no rights to enforce the PerkinElmer, Inc. agreements against the defendants here.

The remaining agreement to be considered is Ellenbogen's KCIP Agreement with PerkinElmer, Inc. L-3 Delaware argues that Ellenbogen breached the KCIP Agreement by hiring former L-3 Delaware employees to work for Reveal.

L-3 Delaware cannot enforce the PerkinElmer, Inc. KCIP Agreement. The KCIP Agreement is between PerkinElmer, Inc. and Ellenbogen. L-3 Delaware is not a successor-in-interest to PerkinElmer, Inc. The KCIP Agreement was not assignable, and was not assigned. And lastly, the KCIP Agreement only prevents Ellenbogen from hiring any employees while they were working for PerkinElmer, Inc., which he did not do.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
(Cite as: 2004 WL 2915743 (Mass.Super.))

Page 9

**\*12** Included in its response to the Reveal Parties' motion on contract issues, L-3 Delaware has submitted a motion pursuant to Mass.R.Civ.P. Rule 56(f) seeking certain discovery. It argues that it needs discovery on: the extent to which Hologic may have controlled Vivid; when Ellenbogen hired the Reveal employees; and whether Reveal itself has non-competition agreements with its employees. This Court, however, sees nothing in these issues that would cause a different result.

Regardless of what control--and there appears to be none--Hologic may have had over Vivid, it will do nothing to resurrect an agreement the two-year restraint of which was triggered 11 or 12 years ago. Similarly, when Ellenbogen hired L-3 Delaware employees away for Reveal, if ever, is a matter fully within the knowledge of L-3 Delaware, and is not something that otherwise needs to be discovered. And even if Reveal itself has non-competition covenants in its employment agreements, Reveal also would be barred by the special public interest from enforcing those agreements by injunctive means.

Thus, the public interest prevents L-3 Delaware from obtaining any injunctive relief relating to the activities of the Reveal Parties, and the law prevents L-3 Delaware from the right to enforce any of the Hologic Agreement, the Vivid Agreements, the PerkinElmer, Inc. agreements or the PerkinElmer, Inc. KCIP Agreement with Ellenbogen. The various counts in the amended complaint seeking such relief must be dismissed.

*The motions concerning trade secret and confidential information issues.*

Because of the foregoing resolution of the contract claims, the Court turns next to the trade secret and confidential document issues. L-3 Delaware contends that the Reveal Parties, when they left their employ by L-3 Delaware, PKI Delaware and Vivid Technologies, Inc., misappropriated confidential documents, information and trade secrets developed while in the employ of those three companies.

There are three significant impediments to the preliminary injunctive relief sought by L-3 Delaware on theses claims.

First is the public interest component discussed above. As this Court said earlier, "regardless of the economic consequences to the litigating parties-- [ ] any order that disturbs or is harmful to that public interest" should not be the subject of a preliminary injunction.

Second is whether the information for which protection is sought is a trade secret, or is confidential and protectable, which depends on many facts that are clearly in dispute at this time. L-3 Delaware, as the moving party, bears the burden of affirmatively demonstrating that there are no triable issues of fact. Pederson, supra, 404 Mass. at 17. On the present record, this Court cannot determine with sufficient certainty that L-3 Delaware has carried its burden. The same may also be said about the Reveal Parties' opposing request for summary judgment in their favor on the trade secret and related claims.

**\*13** Third is that, particularly with regard to the alleged trade secrets, neither this Court, nor, it appears, the Reveal Parties, yet knows what those secrets are with sufficient definition to determine whether they are secrets, or if they have been taken and are being used in any way by the Reveal Parties. This leads directly to the Reveal Parties' motion for a protective order.

No preliminary injunctive relief will be granted at this time on the trade secret and confidential information claims by L-3 Delaware.

The first of the several motions to be filed is the Reveal Parties' Motion for Protective Order, (Paper # 26). The protection sought, among others, is an order that L-3 Delaware be required to serve on the defendants a statement specifically identifying those trade secrets that form the basis of their trade secret misappropriations claims before any discovery may be had on those claims.

Massachusetts law, and the law elsewhere, supports such an order. See, e.g., Cambridge Internet Solutions v. Avion Group, 10 Mass. L. Rptr. 539, 1999 WL 959673, \*2 (Mass. Superior Court, September 21, 1999). See also Imax Corp. v. Cinema Technologies, Inc., 152 F.3d 1161, 1164-65 (9th Cir.1998); Xerox Corp. v. International Business Machines Corp., 64 F.R.D. 367, 371 (S.D.N.Y. 1974).

Where, as here, a plaintiff in a trade secret case seeks to discover the trade secrets and confidential proprietary information of its adversary, the plaintiff will normally be required to first identify with reasonable particularity the matter which it claims constitutes a trade secret before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets. Engelhard Corp. v. Savin Corp., 505 A.2d 30, 33

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 10
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

(Del.Ch.1986).

While admittedly arriving under a different circumstance, this Court takes to heart Justice Dreben's admonition in *O'Connor v. City Manager of Medford,* 7 Mass.App.Ct. 615, 619 (1979):

> Our judicial system is not "a mere game of skill or chance" in which the judge is merely an "umpire." *In re Barnett,* 124 F.2d at 1010-11. We will not permit the rules to subvert a just result ...

As this Court said itself in *Staffbridge, Inc. v. Gary D. Nelson Associates, Inc.,* Suffolk Superior Court No. 02-4912 BLS:

> Both for the defendants to respond to the charges against them, and for the Court to make appropriate findings and rulings on the case, there must be a clear designation that distinguishes unique or proprietary material from the vast body of [information alluded to in the amended complaint], and apprises a person what trade secrets [of L-3 Delaware] the plaintiff[ ] claim[s] are to be found in [any Reveal product]. That cannot be done on the present record.

For the foregoing reason, an appropriate order will issue on the Reveal Parties' motion.

*The motions on patent-related issues.*

Perhaps the most complex of the issues presented to this Court are those related to patents. L-3 Delaware claims ownership in patent applications of the Reveal Parties, or at least in some of the claims therein. The Reveal Parties assert that what are now the claims in the applications are quite different from anything that L-3 Delaware ever conceivably had an interest in, and, further, that what L-3 Delaware asserts to be its patentable property--claims 27-31--is not patentable because of prior art. [FN4]

> FN4. On November 30, 2004, the Reveal Parties filed a Motion for Appointment of a Technical Advisor (Paper # 204), with an accompanying opposition by L-3 Delaware.

**\*14** Thus far, although probably not with any knowledge of or interest in this case, the Patent Office seems to be siding with the Reveal Parties, at least on the patentability of claims 27-31. In any event, this is not an issue that can be resolved by this Court on the present motions for summary judgment. [FN5]

> FN5. Whether this Court ultimately should conduct some form of *Markman* hearing on these aspects of this matter, and whether there is a need for any special technical

advisor to assist the Court, see, e.g., *MediaCom Corporation v. Rates Technology, Inc.,* 4 F.Sup.2d 17, 25-26 (D.Mass.1998), remains for consideration at a later time.

Undoubtedly realizing this, what is most strongly pressed by L-3 Delaware is its request that this Court order the Reveal Parties to put their patent applications in some form of escrow arrangement and to appoint an independent patent law expert to conduct all appropriate actions before the U.S. Patent Office. By so doing, L-3 Delaware contends, all parties' rights will be protected.

The Court was advised at oral argument, however, that L-3 Delaware itself has filed a patent application, or perhaps two, asserting the same claims as appear in claims 27-31 of the Reveal Parties' applications. Thus, L-3 Delaware would seem already to have its own vehicle to protect any interests in the patentability of any of claims 27-31.

Again with a nod to the public interest, this Court is not of the belief that the best way to prosecute a patent is for two contending parties to each be attempting to call the shots, or to have a third party, however expert, with no deep interest in the outcome and overseen by a Superior Court Judge, be in charge. Given the procedural history in this case thus far, the potential for diversionary litigation is immense.

The Reveal Parties have a huge incentive to bring their applications to a successful conclusion before the U.S. Patent Office. If they do succeed, and if L-3 Delaware has any rights in what is the ultimate product, there are mechanisms for protecting those rights without interfering in the public interest.

ORDERS

For the foregoing reasons, the Court issues these orders:

The following motions are *ALLOWED:* the Reveal Parties' Motion for Protective Order (Paper # 23), as to which a separate order will issue; and the Reveal Parties' Motion for Partial Summary Judgment on Plaintiffs' Contract-Based Claims (Paper # 26).

The following motions are *DENIED:* L-3 Delaware's Motion Under Mass.R.Civ.P. 56(f) (Paper # 41); L-3 Delaware's Motion to Require Escrow of Defendants' Patent Applications (Paper # 74); L-3 Delaware's Motion for Partial Summary Judgment on Ownership

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)
**(Cite as: 2004 WL 2915743 (Mass.Super.))**

of Patent Applications (Paper # 75); the Reveal Parties' Motion for Partial Summary Judgment on the Ownership of Patent Applications and Trade Secret Misappropriations (Paper # 145); another L-3 Delaware Motion for Partial Summary Judgment on the Ownership of Patent Applications (Paper # 159); and the Reveal Parties' Motion for Appointment of a Technical Advisor (Paper # 204). The last motion's denial is without prejudice.

Not Reported in N.E.2d, 18 Mass.L.Rptr. 512, 2004 WL 2915743 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.