# EXHIBIT 7
# (PART 1 OF 2)

## A: <u>MISCONDUCT BY THE WITNESS</u>

**1) Defendants should not have to play "pin the tail on the donkey"**
Courts interpreting the requirements of Rule 30(b)(6) have specifically rejected tactics like the answers below, in which the responding corporation uses unprepared witnesses to "engage in a game of 'pin the tail on the donkey' with defendants," wherein the deposing party must "try and guess what information they should ask about with regard to the claimed losses." *FDIC v. Butcher*, 116 F.R.D. 196, 200 (E.D. Tenn. 1986).

(where noted, **ConnectU designee is unprepared to provide information that could easily have been researched to determine the company's knowledge, as 30(b)(6) requires)**
Rule 30(b)(6) "'requires persons to review all matters known or reasonably available to it [the corporation] in preparation for the 30(b)(6) deposition. .... [P]reparing for a Rule 30(b)(6) deposition can be burdensome. However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business.'" *Calzaturficio S.C.A.R.P.A. S.C.A. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36 (D. Mass. 2001) (citations omitted).

| Citation | Text of deposition | Comments |
|---|---|---|
| 41:12-24 | Q.   And so these are the only ones that you can remember?  You can't remember any other ones, right?<br>        MR. HORNICK:  Objection.  It's not a question of remembering, it's a question of asking follow-up questions.<br>A.   Right.  I mean, if you want to prompt me and ask me if, you know, this part of the site was proprietary and this part wasn't, or if you want to be more specific, I can certainly help out, but I think I've given you a pretty good bone to pick on, you know, that. | Deposing attorney is entitled to ask the corporation its position about what its trade secrets are and to ask for a complete answer.  ConnectU tries to recast the witness's lack of preparation as a failure by the deposing attorney to "ask[] follow-up questions."<br><br>Topic 2 (confidential information and trade secrets). |
| 92:23-94:18 | Q.   And what was the state of development at the time Sanjay Mavinkurve left?<br>A.   I can't say specifically, again, because I'm not a programmer and I wasn't diving into the code, but I believe at that time Sanjay had done more front-end work and had not linked in so much of the back end or created the database.<br>Q.   So he had created the user interface?<br>A.   I believe he created -- a lot of his contribution was based around the user interface.<br>Q.   Are you claiming that the user interface was a trade secret of ConnectU? | Lack of preparation for topic 5 (conception design and development of the HarvardConnection and ConnectU websites). |

| | |
|---|---|
| MR. HORNICK:  Object to the extent it calls for a legal conclusion, but you can answer.<br><br>A.   Certainly these -- well, if you look at -- to take an example, you know, Amazon has one-click ordering, and that's a trade secret, you know, and that is a layout situation, you know, two clicks versus one click.  I would say that our layout could have had proprietary stuff with it.  It's possible. | Testimony evasive and evinces lack of preparation for topics 2 and 10 (content and ownership of asserted trade secrets). |
| Q.  Do you remember anything specific about the user interface that Sanjay Mavinkurve created that you would claim is a trade secret?<br><br>A.   To the extent that a user registers for the website, can log in and out, I think that -- you know, I'm not an expert, again, and I don't know exactly what constitutes user interface trade secrets, but there could very well have been trade secrets on that site in terms of the user interface. | Testimony evasive and evinces lack of 30(b)(6) preparation ("I'm not an expert and I don't know exactly what constitutes user interface trade secrets"). |
| Q.  But you don't remember anything specifically?<br><br>A.   Well, as my counsel said, I'm not really qualified to say what is and what isn't.  So it's not really a matter of remembering, it's a matter of knowing. | Does not answer the question. |
| Q.  So --<br>A.   So if you ask me a specific question, again, with the interface, I can give you an answer yes or no. | Topics 2, 3, 5, 10. |

**2) ConnectU designee does not answer the factual question posed** (in many cases stating a belief or supposition admittedly not based on his or ConnectU's knowledge)
ConnectU must "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought … and to prepare those persons **in order that they can answer fully, completely, unevasively, the questions posed** … as to the relevant subject matters," *Calzaturficio S.C.A.R.P.A S.P.A. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 36-37 (D. Mass. 2001) (emphasis added).

(where noted, **ConnectU designee is** also **unprepared to provide information that could easily have been researched to determine the company's knowledge, as 30(b)(6) requires)**

| Citation | Text of deposition | Comments |
|---|---|---|
| 43:7-23 | Q. And where – did you ever discuss that with Mark Zuckerberg?<br>A. Discuss what?<br>Q. That HarvardConnection was a social network with these ties and nodes?<br>A. Well, let me just step back a second and refresh your – perhaps you're aware or unaware that Mark happens to be a computer science major, as well as a psychology major. So he's fully versed the area of social networking. So he would absolutely be able to identify and know what a social network is in that respect.<br>    In terms of we – our second meeting we talked about the website Friendster and bookmarked it as a good benchmark for potential future functionality. | The witness does not refer to any facts responsive to the question.<br><br>Topics 2, 4 and 5. |
| 47:20-49:7 | Q. Was there any expression, written or verbally, that this initial idea, this creative virtual community that could serve Harvard and then be rolled out to other universities, any expression to Mr. Mavinkurve that he shouldn't tell other people about it?<br>A. Clearly it was understood.<br>Q. Was it stated?<br>A. Was it stated by Mr. Narendra? I'm sure that Mr. Narendra would have communicated to him that it was a proprietary idea and that, A, it should be completed in a timely manner, and B, that it was our project and that it was not -- shouldn't– effectively broadcast to other people. | The witness asserts that it was understood, but refuses to say what was communicated or how it was communicated, which are what the questions request. |

DOCSSV1:428065.3

| | | |
|---|---|---|
| | Q. And so when you say you're sure, what's your basis for believing that?<br>A. Okay. What's my basis -<br>        MR. HORNICK: Well, this witness is speaking on behalf of the company, so he's giving you company knowledge.<br>Q. Well, I want to know what was actually done.<br>A. Other than an understood and a communicated sort of desire to keep the project going in a, you know, secure fashion, I think that that's all I can really testify to.<br>Q. And so just so I'm clear, Mr. Narendra told Mr. Mavinkurve that he shouldn't tell anyone else about this idea?<br>A. I'm not sure I can answer that specifically for Mr. Narendra. What I can say is that I believe that Mr. Mavinkurve understood that this was not a project to the extent that this project should not be broadcast or made public to that extent. Exactly in which manner Mr. Narendra communicated that, I cannot say. | Reflects lack of preparation regarding topics 2 and 4.<br><br>Evasive. |
| 49:23-<br>51:4 | Q. Okay. You've testified that Mr. Mavinkurve understood that he shouldn't tell other people. And what I'm trying to understand is what did the ConnectU people do to make sure he understood that?<br>        MR. HORNICK: Objection to the form of the question. You can answer.<br>A. Again, I said I can't -- I don't know specifically how Divya communicated it to him, but I'm fairly certain I can say that Mr. Mavinkurve was aware that it was a proprietary idea. And simply the fact that we put a lot of effort into it and that we always met in a secure closed area and made efforts not to broadcast it or speak of it or, in fact, outline the project to other people would certainly convey those aspects.<br>Q. And when you say that Mr. Mavinkurve was aware that it was a proprietary issue, I'm trying to understand why you think he was aware of that?<br>        MR. HORNICK: Objection, asked and answered I think three times now.<br>A. Again, it -- how was -- the question was, | Evasive.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Reflects lack of preparation |

-4-

| | | |
|---|---|---|
| | how was he made aware of it? And I said that I don't know specifically how Divya communicated it to him, but I'm certain that Mr. Mavinkurve being in the CS realm and taking a job with Google, you know, in the following months would be fully aware that this was a propriety issue. That's all I can really say to that. | regarding for topics 2 and 4. |
| 52:12-53:23 | Q. Did Divya say to you or your brother or did you say to him, "Don't tell anyone about this idea"?<br>A. Absolutely, sure. We were very concerned the whole time about the -- you know, letting the cat out of the bag. As I said before, this was a novel idea, and it was not -- you know, we did not want to make it a public domain.<br>Q. So do you have a recollection of who said, "We shouldn't tell anybody about this"?<br>A. I think we all came to the conclusion ourselves. I don't think we had to -- you know, when you join a team and someone says, "Hey, this is a good idea," and you have an interest in the team from the team's aspect and an individual aspect, it's understood that ideas that are not public and are -- potentially have a large potential for success are proprietary.<br>Q. So the term "understood" is something that is confusing me, quite frankly. What I'm wondering is, what were the express statements about keeping the information confidential that were made in that initial meeting?<br>A. The express statements would have been, "This is a great idea. We need to get this out first because, to our knowledge, nobody else has this, and we need to basically do everything we can" -- and we communicated this multiple times to Mr. Zuckerberg that it's very important to get this to market first. And the whole -- our preoccupation with the idea and the necessity of getting it to market first would certainly, I think, point to the fact that it's proprietary. | The witness contradicts initial testimony that someone said "Don't tell anyone about this idea," then admits this was false, in that everyone "came to the conclusion ourselves." |
| 56:24- | Q. Was there anything discussed with you and | |

| | | |
|---|---|---|
| 58:12 | Mr. Zuckerberg about establishing a connection beyond just giving an e-mail address?<br>A.  Again, it's all about -- the functionality is all the same.  You know, you add -- when you open up a connection, when you create a connection between a user, that's a connection, that's a tie between the nodes.  How you want to exactly implement that tie or what you want to call it could vary.  We had discussed a matchmaker connection where, you know, you would be -- a third party would make a connection between two users.<br>Q.  And if that connection was accepted by the people who had received the requests, was that stored on the website that way?<br>A.  That had not been coded into the website.  As I said, we talked about that.<br>Q.  But you talked about storing --<br>A.  We talked about making a matchmaker function, and the implementation, that's to some extent up to a coder's -- up to their sort of decision to exactly how to store it and whatnot.  But we talked about a matchmaker function, which would have effectively opened -- allowed a third party to create a connection or illustrate to two people that they thought that they should connect.<br>    And just to further iterate on that, the -- you know, a connection can also be user defined.  What you might define it on a site, such as our connect side of the website, could be used for any number of processes.  You put in a functionality, you put in an infrastructure, and then it's up to the user to define how they want to use it or what they want to use it for. | Non-responsive.<br><br>Topics 2, 5. |
| 59:25-<br>60:18 | Q.  So did Mr. Mavinkurve attend the strategy meetings?<br>A.  Well, to the extent that he knew -- he knew that, as I mentioned before, that he understood that there was a propriety project and he would put an input where he saw fit.<br>Q.  Were there any strategy meetings after Mr. | Failure to answer simple question.<br><br><br>Counsel tries again. |

| | | |
|---|---|---|
| | Mavinkurve was hired that he wasn't present at? <br> A.  Again, all the meetings were pretty much all, you know, with the two or three of us. <br> Q.  And Mr. Mavinkurve was always at those meetings? <br> A.  Yeah.  He would be present or aware of anything that -- you know, there's -- any kind of decision he would be fully aware of because he would be the one implementing it or coding it. | The second response qualified by "pretty much." <br><br> The third response avoids answering. <br><br> Topics 2, 5 and 10. |
| 63:23-68:3 | Q.  Was there any discussion about what share of the partnership he would have? <br> A.  With respect to dot-com companies, they're generally started as projects and sort of a small group of people with an idea, and it's sometimes unclear exactly where, you know, two months from that -- the start point or six months from that start point where exactly the equity will lay.  Mr. Zuckerberg himself has reapportioned equity multiple times. <br>       So to the extent of talking about equity shares at that point, it was premature.  However, everything was an equal partner.  Everybody did contribute. <br> Q.  So I want to make sure this is clear.  So was there any discussion about what share of the partnership Mr. Zuckerberg would have? <br> A.  The specific share, it was premature to speak about that at that time. <br> Q.  So is the answer to my question no? <br> A.  The answer is that it was premature to speak about specific shares.  Was it understood by Mr. Zuckerberg that he would get a share? Yes. <br> Q.  Okay.  Did you tell Mr. Zuckerberg how much of a share of the partnership he would have? <br> A.  Well, there is more -- <br> Q.  Please just answer the question.  It's a yes or no. <br>       MR. HORNICK:  The witness can answer the question however he wants. <br> A.  Yeah, I mean, you're -- I'm assuming you're talking about equity share, the multiple benefits to a project, which could include | Topic 1. |

prestige, equity. There's multiple levels.
And at that point we had no revenue source,
and the product was far from completion. We
stressed to him multiple times that one of
his major benefits would be a sort of a
reinventing of himself in terms of his
reputation post the Facemash debacle. In
fact, he would be the center point of the
launch, not us, even though it was our idea.

So we did not have specific talks
about equity share, but as I said, he was an
equal partner. Whatever you might want to
infer from the equal partner, be it a
quarter, a quarter, a quarter, that's fine.

Q. Did you tell Mr. Zuckerberg that he would be
an equal partner?

A. I told Mr. Zuckerberg that he was -- we
conveyed to Mr. Zuckerberg that he would be
a part of the HarvardConnection team --

Q. And --

A. -- okay, not a contract programmer.

Q. And did you convey to him what his share of
the partnership would be?

MR. HORNICK: Objection, asked and
answered.

A. As I said before, we did not speak about
specific equity stakes at that point. It
was premature. If, you know -- I might
point out at that time that Mr. Zuckerberg
had yet to make a contribution. So,
generally speaking, you know, in any law
firm, particularly -- you know, I'm sure
your firm works this way -- you work for
seven, eight, ten years and then become a
partner. People don't hand out partnership.
You know, you don't give out equity.

So everybody was aware that they were
on a team, they'd make contributions, and
that depending on the size of the
contribution after a certain time period,
they would be given equity.

Q. Was there ever any discussion at any point
with Mr. Zuckerberg about what his share of
the partnership would be?

A. Other than the fact that he was an equal
partner on ConnectU and given full creative

| | | |
|---|---|---|
| | control and full input into what the product could and should be, there was not a specific discussion about specific amounts of equity at that time.<br><br>Q.   Was there ever discussions stating that he was an equal partner?<br><br>A.   As I said, we invited him to be part of the team.  We invited him to contribute.  He agreed to contribute, end of story.<br><br>Q.   And where I'm focusing now is the word "equal."<br><br>A.   Uh-huh.<br><br>Q.   So did you ever tell Mr. Zuckerberg he would be an equal partner?<br><br>A.   Well, I think the fact that we gave him our whole source code, gave him creative control, gave him full, you know -- asked him for multiple input would certainly lend to the word "equal."  There was no one-way dialogue.  In fact, if anything, it was skewed in his favor.  And so he had more than enough reason to believe that it was going to be on equal terms, his terms, and that's as far as really I can comment on that. | |
| 68:4-69:19 | Q.   Did he ever tell you that he wanted to be an equal partner?<br><br>A.   He never asked for monetary compensation, and all -- I can't -- what he essentially agreed to was to contribute to the coding that he said he would contribute to.<br><br>Q.   Did he ever agree to take some equity?<br><br>A.   Again, he agreed to complete a portion of the website and become part of the team.<br><br>Q.   And -- but my question is, did he ever agree to any specific allocation of equity in the partnership?<br><br>A.   He did not say, "I need X amount of equity or amount," no, he didn't say that.<br><br>Q.   And were there any discussions about allocation of equity during your relationship with Mr. Zuckerberg?<br><br>A.   As I said before, it was premature to talk about allocation.  This was a contribution basis where, you know, you join a team, you contribute, and you can reallocate | Failure to answer the question.<br><br><br>Failure to answer the question.<br><br><br><br><br><br>Failure to answer the question. |

| | | |
|---|---|---|
| | partnerships. With myself and Tyler and Divya Narendra we didn't allocate partnership until later on because it was unclear what our respective contributions would be. <br><br> Q. So that actually raises another issue. Prior to joining with Mr. Zuckerberg, were there any discussions between Mr. Tyler Winklevoss, you, Divya Narendra about how the equity would be divided? <br><br> A. We, again, as I said before, were -- we operated on an equality basis, and so we had four individuals with Mark Zuckerberg. When Mark Zuckerberg decided to -- or effectively launched Thefacebook, there was three individuals. At that point there's three equal partners in the company. Over time that has clearly changed in terms of the contributions that individuals have put into the company. | Not responsive to question. <br><br> Topic 1. |
| 72:6-73:4 | Q. Did you ever tell her that her understanding was wrong? <br><br> A. Yes. In fact, I believe I told her over the phone absolutely, but, again, this is my mother's opinion. And my mother sends me e-mails all the time that I disagree with. And to keep up with, you know, replying to such e-mails is -- can be quite laborious, so... <br><br> Q. So describe these conversations you had with your mother where you told her she was wrong. <br><br> A. I simply said he actually was a partner and that, you know, the fact that he was a partner does necessarily -- you know, it's clear, though, regardless of that that he wasn't part of the initial idea and that, you know, that that was about it, exactly what I just told you. <br><br> Q. And what was her response? <br><br> A. I mean, I don't recall at the time, but it doesn't really -- it's not really relevant what her -- you know, again, it's her opinion. And it's -- it was inaccurate. | The first two questions and answers are context for the third. <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Failure to answer the question by stating that the witness doesn't recall what his mother said, but that it was inaccurate. <br><br> Topic 1. |

| | | |
|---|---|---|
| 74:9-<br>75:11 | Q.  So let me give you an example.  If, for example, you and I were both participants on the HarvardConnection, and I sent you a request and then you responded affirmatively, would that -- would that connection that we've just established be stored through HarvardConnection in any way?<br>A.  As I said before, we visualized connections that you made and connections that were requested of you through the website.  We did not visualize those on the user's profile.  But that doesn't -- you know, that's irrelevant to the question of what you're saying is did we sustain those relationships?  From a virtual standpoint we recorded, yes, I would say we sustained them to that extent.<br>　　　Let's be careful not to get confused here, though.  You know, social network is -- I'm assuming that you're getting at what sort of constitutes a social network.  And a social network by definition, as I mentioned before, constitutes tools that allow people to connect, okay?  What form those tools might take, you know, is a different aspect.  So in qualifying a social network, it is tools that allow people to connect. | The witness does not answer the question. |
| 81:20-<br>82:14 | Q.  Did you ever terminate his partnership?<br>A.  Well, I think a better question is, did he ever fulfill the contribution level that he agreed to?  And he was -- to our knowledge, we have yet to receive that contribution.<br>Q.  And that's not my question.  Did you ever terminate the partnership with him?<br>A.  Well, I think the -- you know --<br>　　　MR. HORNICK:  I think you're putting words into the witness's mouth.<br>A.  Yeah.  Again, the question might better be phrased as, did he complete the sort of contribution he agreed to that would have suggested him being an equal partner?  And absolutely not.  He -- or maybe he did complete it, but we don't have it.<br>Q.  Okay.  Mr. Winklevoss, you're not answering my question. | The witness refuses to answer the question and proposes a "better question."<br><br>Counsel re-poses the simple question.<br><br>ConnectU's counsel interjects. The witness refuses to answer the question and proposes an alternative question. |

DOCSSV1:428065.3

| | | |
|---|---|---|
| | MR. HORNICK:  You're giving him an unfair question, that's why. | ConnectU's counsel indicates that the witness not to answer.<br><br>Topic 1. |
| 87:23-91:19 | Q.  Did you ever tell Mr. Jackson he should keep the information confidential and not share it with others?<br>A.  It was clear that he was on a contract basis and that he should complete his portion, and Victor -- were it not I, Victor would have certainly told him this is a project that should not be talked about. | Fails to answer question posed. |
| | Q.  Did you ever tell him that?<br>A.  I don't recall if I told him, but Victor I think most certainly would have.<br>Q.  And did Victor tell you, Tyler Winklevoss or Cameron -- or Divya Narendra that he informed Mr. Jackson of his confidentiality obligations?<br>A.  I don't recall.  I don't know.  I can't say specifically if -- to my recollection, Mr. Gao would probably be a better individual to ask on that term, but I think it was fairly understood, and just like Victor brought Mark up to speed in terms of proprietary information, he would have done so with Joe as well. | The witness denies knowledge, referring the questioner to another individual, indicating lack of preparation (that he did not ask that individual for this information).<br><br>Speculation. |
| | Q.  So is it ConnectU's testimony that Mr. Jackson was or was not told?<br>A.  I believe that he understood that it was proprietary information, is ConnectU's position. | Does not answer the question about what ConnectU told Jackson; speculates as to what Jackson "understood." |
| | Q.  The term "understood" is a confusing thing to me.  Was he told --<br>MR. HORNICK:  Well, it's not a confusing word.  Don't say that.<br>A.  How so?<br>MR. HORNICK:  Just ask your question.<br>Q.  Well, did somebody tell him that he shouldn't share it with other people?<br>A.  Well, "understood" sort of implies that either -- you can read it, you can hear it, you can understand it.  It's ConnectU's position that he understood it.  And how he understood it, I can't tell you exactly what | Deposing counsel asks the question for the fifth time.  The witness still does not answer the question about what was *told* by ConnectU rather than what he believes was *understood* by Johnson. |

neurons were firing in his brain that day
that, you know, specifically gave him the
inclination.

Again, Victor was present at a lot of
those meetings.  Victor was absolutely aware
of the proprietary information, and he would
have made Joe Jackson aware of that, just
like he made Mr. Zuckerberg aware of that.

Q.  So let me just ask it again.  Does ConnectU
know if Mr. Jackson was told to keep the
information confidential?

A.  It's ConnectU's position that Mr. Jackson
understood that it was proprietary
information.

Q.  Okay.  But you don't know if he was actually
told?

A.  It's our position.  Again, how he got that
understanding, I don't -- you know, it's not
for me to sort of speculate on, but it's our
position that he's -- he had that
understanding.

Q.  That he had that understanding, but you
don't know whether he was told or he just
knew it or what?

A.  I would assume that he was told, but, again,
that -- you know, who he got that
understanding -- you know, a lot of
programmers get understanding when you give
them a block of code and you say, "This is
code that I own, and this is a project that
we're launching," and, you know, that alone
for many people is a threshold for IP.

You know, programmers don't -- you
know, especially people like Mr. Zuckerberg
who are involved in an academic programming
environment where they have to do
programming problem sets, I don't think
their teachers have to tell them that what
you write is their code and that you
shouldn't take code from a classmate or
that, you know, you shouldn't copy, just
like you don't copy a term paper.  It's an
understood thing in the academic community.
Teachers don't have to say that.  It's sort
of a bylaw of any kind of coding.

There's open source, and then there's

Speculation on what someone
else "would have" done
without knowledge of what
they did, reflecting a failure to
prepare for the deposition.

Counsel asks the question
again, for the sixth time.
The witness repeats his non-
responsive answer.

Counsel asks the question for
the seventh time.
The witness repeats his non-
responsive answer.

Counsel asks the question for
the eighth time.

The witness refuses to answer,
enumerating different ways
that Jackson might have come
to know that the allegedly
confidential information was
confidential.

Topics 2, 10.

-13-

| | | |
|---|---|---|
| | closed source. And closed source is proprietary information. And closed source is anything that's not made public purposely or -- you know, for that matter.<br><br>So we're talking about sort of nuances and this and that, but the fact of the matter is these are programming individuals, and they understood that it was proprietary information. That's our position. | |
| 98:15-<br>103:19 | Q. Other than these categories that are identified here, are you aware of any other categories that would be -- that ConnectU would consider is confidential information?<br><br>MR. HORNICK: Object to "categories." You can answer.<br><br>A. I think that I've gone over some of the main core things. My -- you know, I don't have a photographic memory. There might be some other content that I, you know, left out or can't quite recall right now.<br><br>Q. And as you sit here today, you've said everything that you recall as far as --<br><br>A. Yeah, as best as I can recall, that type of content would have been very relative to this type of website.<br><br>Q. Okay. Now, if you look at the following sentence, it says, "Zuckerberg understood that this business management information and procedures were secret and agreed to keep them confidential."<br><br>Do you see that?<br><br>A. Uh-huh.<br><br>Q. Could you explain to me how he understood that?<br><br>MR. HORNICK: Objection, asked and answered. You can answer it again.<br><br>A. Yeah, I mean, we went over this sort of with the whole code tangent, but it's actually -- your client has, himself, acknowledged his agreement and understanding of our business model, the ability to go to -- the idea of starting at one school and branching out to other schools. He's acknowledged that, and he's also acknowledged the importance of first-mover advantage. So as far as I know, it's really -- he's already acknowledged the | Lack of preparation.<br>Evasive.<br><br><br><br><br>Evasive.<br><br><br><br><br><br><br><br><br><br>Non-responsive; offers ConnectU's legal conclusion instead. |

-14-

| | |
|---|---|
| understanding.<br>Q.  So what were the conversations between ConnectU or HarvardConnection and Mark Zuckerberg about confidentiality?<br>A.  I think we've already gone over this. Again, I can further highlight -- we have multiple e-mails where we're stressing to get it out in a timely manner, we need to launch, we need to get it first to market, illustrating that -- you know, the advantage of a first-mover advantage in terms of getting the site out.  And he was fully aware of that, and he acknowledged that. And we already talked about his understanding of what proprietary information is and what it -- what was and what wasn't.<br>Q.  Okay.  I'm asking a really simple question.<br>A.  Uh-huh.<br>Q.  What were the discussions between ConnectU or HarvardConnection principals, you, Divya Narendra and Tyler Winklevoss, and Mr. Zuckerberg about confidentiality of the information?<br>        MR. HORNICK:  Objection, asked and answered.  You can answer it again.<br>A.  Yeah, I mean, I think he understood that, you know, in our meetings and through our stressing of the fact that it, you know, it's a -- and Victor Gao would have also stressed it multiple times to him as well, that this is not a concept that is in the public domain, it has yet to be done before, we invested time and money into this code, and that it's proprietary, and --<br>Q.  Did you ever tell him that?<br>A.  Did I specifically say -- what do you mean? Tell him what?<br>Q.  Did you specifically tell Mark Zuckerberg, "Don't tell anyone about this information or about this business model"?<br>A.  Well, I think the question should be did ConnectU tell him?<br>Q.  Well, I'm going to break it down to the various people who own ConnectU.<br>A.  Well, is ConnectU being deposed, or is | Refers to non-responsive documents.<br><br><br><br><br>Non-responsive.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Starts to provide facts that could lead to an answer.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Returns to arguing, refusing to |

| | |
|---|---|
| Cameron Winklevoss being deposed? | answer, and suggesting a |
| Q.  I'm asking you.  He can object that it's | different question. |
| outside the scope.  I'm asking, did you? | |
| A.  Did I personally?  In various e-mails I | |
| stressed the necessity of this site needing | |
| to get out before market, before other | |
| sites, and that it would be confidential, | |
| yes. | |
| Q.  Isn't it true that in no e-mail that was | |
| ever exchanged between you and Mark | |
| Zuckerberg was it stated, "Don't tell anyone | |
| else about this information"? | |
|     MR. HORNICK:  Objection to the form | |
| of the question.  Did it say those exact | Coaching. |
| words?  Is that your question? | |
|     MR. CHATTERJEE:  Yes. | |
| A.  There is a collage of e-mails and | |
| correspondence that absolutely point to an | |
| understanding and a forceful imparting of | Answers by reference to a |
| the idea of confidential information.  And | "collage" of documents whose |
| as I said before, Victor Gao had a two-hour | contents witness has earlier |
| tutorial with Mr. Zuckerberg, two-hour | admitted he doesn't know. |
| tutorial at the computer, you know, with | |
| him, explaining to him the whole concept and | |
| the whole idea behind HarvardConnection. | |
|     So if you want to break it down, well, | |
| did -- was it -- there a specific e-mail or | Admits he cannot reference |
| versus the whole, you know, conversation | any specific document to |
| aspect and the whole collage, you're taking | provide an answer, indicating |
| a snippet out of one situation. | a lack of preparation as to |
| Q.  Well, I'm trying to -- okay.  So in the | topics 1, 2, and 10. |
| e-mails was there any statement, "Don't tell | |
| anyone about this," that exact statement? | |
| A.  The exact statement, "Don't tell anyone | |
| about this"?  The exact words "Don't tell | |
| anyone about this," I don't believe there | |
| were those exact words in an e-mail. | |
| Q.  Anything like that? | |
| A.  As I said -- | |
|     MR. HORNICK:  Object to the form of | |
| the question. | |
| A.  -- there's a collage of stressed importance | |
| towards launching the site first, towards | |
| the fact that source code is proprietary, | |
| the fact that he's a partner of a group. | |
| There's any -- there's innumerable accounts of it. | Again witness will refer only |

| | | |
|---|---|---|
| | | to a "collage" of documents, reflecting a lack of preparation.<br><br>Topics 1, 2, and 10. |
| 108:12-111:24 | Q.  And anything else you can identify?<br>A.  I think I've answered the question.<br>Q.  Well, other than that one statement, is there anything else you can identify in what I've marked as Exhibit 4?<br>A.  If you want me to go through these and sort of look a little bit more thoroughly, that's the first thing that popped out.  I think it sufficiently answers the question.<br>Q.  Sure.  Why don't you look through it more thoroughly and see if there's anything else.<br>A.  To really, you know, more thoroughly sort of hammer it home, Victor Gao, again, in multiple conversation -- you know, a two-hour conversation imparted to Mark the sort of the proprietary nature of the website.  So I really don't think it's necessary.<br>        MR. HORNICK:  I'll say that your question is reaching the oppressive level under the Federal Rules.<br>        MR. CHATTERJEE:  You can seek a protective order if you think it's oppressive.  I'm just asking --<br>        MR. HORNICK:  I can stop it under that basis, if you read the rule.<br>        MR. CHATTERJEE:  If you want to stop it, stop it.<br>        MR. HORNICK:  I don't want to, no.  I want to give you your full day.<br>A.  And I'd like you to be --<br>        MR. HORNICK:  I suggest you move on.  The witness has answered your question, many times.<br>        MR. CHATTERJEE:  I actually asked him to identify everywhere in these documents --<br>        MR. HORNICK:  And he told you the whole set of documents, and I told you the set of document documents is incomplete, so your questioning is unfair and oppressive. | The witness contests whether he's required to answer.<br><br><br><br><br><br>The question, posed for the third time, seeks identification of any other evidence. Non-responsive. |

| | |
|---|---|
| A.   You actually asked me to point to one instance, and I did do that. | |
| Q.   Okay.  Can you point to any other instances? | |
| A.   I pointed to several before the e-mails about the verbal conversation between Mr. Gao -- | Evasive. |
| Q.   Well, we'll get to the verbal conversations.  I'm focusing on the e-mails at the moment. | |
| A.   Well, we've actually already gone over the verbal conversations.  That was the first line of questioning before the e-mail questioning, so... | Evasive. |
| Q.   Please answer my question with respect to these documents. | |
| A.   So that's the -- I think that that's the most illustrative point, and I don't think that it's -- as I said before, it's the collage of e-mails.  And I don't think that I -- you know, I think that's the most relevant point, and I think that that's the most worthwhile point to answer that question with. | Evasive and non-responsive. |
| Q.   So you're just saying it's the entire collection?  There's nothing specifically in any individual -- | |
| A.   I just showed you a specific instance.  That was the fact that he didn't use our code and functionality in a site indicates an understanding, as I've said before, of the proprietary nature of the code, the functionality and the business ideas surrounding the site. | Witness refuses to answer the pending question and restates ConnectU's legal position. |
| Q.   Okay.  And Mr. Winklevoss, other than that one instance, are there any other specific instances where you can say that, or are you just saying it's all of the e-mails kind of together? | Counsel poses the unanswered question for the eighth time. |
| A.   I'm saying it's a collage.  I'm saying that Mr. Gao imparted the proprietary nature of the site to him and that, yeah, I think that's -- you have multiple instances there.  And, again, there might be more instances that I can't recall off the top of my head right now. | Witness will answer the question only by reference to documents.

Evasive. |
| Q.   Okay. | Topics 1, 2 and 10. |
| A.   Okay?  That does not exclude what I can't recall. | Lack of preparation. |

| | | |
|---|---|---|
| 112:10-<br>113:6 | Q.   Now, you said that Mr. Gao and Mr. Zuckerberg had a conversation about confidentiality?<br>A.   He -- no.  They had -- as I said, they had a tutorial regarding the code, the site and the ideas behind the site.  And Mr. Gao would have imparted to him the understanding that there was -- that this is -- this is proprietary information.  Now, Mr. Gao and Mr. Zuckerberg are also classmates in CS at Harvard, and they understand the problem sets and code that you write in class is proprietary information, and unless you give written consent or sort of the ability to rebroadcast or republish that code, you have no right to do that.<br>     So, again, we're talking about educating people who this is their bread and butter.  You know, we're talking about this type of, you know, you're telling -- you know, you're preaching to the choir basically, is what I'm getting at. | Speculative and evasive. Reflects a failure to prepare as 30(b)(6) designee (topics 1, 2 and 10). |
| 120:11-<br>122: 9 | Q.   And when did this discussion occur?<br>A.   Again, you're -- you know, we already went over this.  In an e-mail dated January 8th your client says that -- he refers to the project as "we," using many operative words, "we."  In the February 12th e-mail from your client, aside from proving the proprietary nature of our code and software and functionality, your client also acknowledges that he expected to be part of the overall development and control, "control" being a very important word there --<br>Q.   Well, I'm not asking what my client said.  What I'm asking is, at the beginning of the relationship you've outlined a number of terms.<br>A.   Okay.<br>Q.   Was there a discussion about that?<br>A.   There was an expectation from your client that those terms were the terms.<br>Q.   Okay.  And why do you say that at the very beginning of the relationship?<br>A.   Well, I'll -- again, I'll refer to 4630.  4630, C4630.  Let's see, "I worked with the | Witness does not answer the question.  The witness makes non-responsive assertions about what Zuckerberg's emails show he "understood."<br><br><br><br>Counsel clarifies. |

-19-

| | | |
|---|---|---|
| | expectation" -- okay -- "with the expectation that I would be included in overall development and control of the project."<br><br>So that would -- I mean, I would assume that he would get that expectation at the beginning. I don't think --<br>Q.  Did you have discussion about it?<br>A.  Certainly we had meetings. As I said, we talked in meetings about the timely nature to get this site to launch, the first issue with us needing to get it out and launched. His expectations are built on, again, for lack of, you know, a more concrete example in the -- with regard to business dealings, you can't hang one business relationship on one e-mail. You can't hang a partnership on one sentence. It's a collage, okay? We have a collage of e-mails, a collage of discussions, and, you know, your client somehow managed in that whole collage to decipher and pick out the most meaningful aspect in that he expected to be part of the overall development and control and part of -- and that he acknowledged an agreement. | Witness refuses to answer the question.<br><br><br><br><br><br>Counsel again poses the unanswered question.<br><br><br><br><br>Evasive and non-responsive.<br><br>Lack of preparation regarding topic 1. |
| 135:2-9 | Q.  Okay. So from that second meeting previously did you ever -- did anyone at ConnectU or HarvardConnection ever discuss with Mr. Zuckerberg what he would get out of it, out of doing this work?<br>A.  Well, so, as I said, his remuneration, you know, we took him on as a member of the team -- | Vague and evasive answer. |
| 138:25-144:5 | Q.  Now, what other issues --<br>A.  Okay.<br>Q.  -- did you discuss about what he would get out of it?<br>A.  And then we also discussed and Victor discussed with him prior to this second meeting that it was -- there's a very large advertising potential. And Mr. Zuckerberg was fully aware of how sites work and hits and how that correlates to money. And we -- he was certainly aware of --<br>Q.  Hold on. My question is, what did you tell him, not what you think he understood. What | Does not answer the question.<br><br><br><br><br>Question posed for the second time. |

did ConnectU or HarvardConnection tell Mr. Zuckerberg about what he would get out of the deal?

A.   That he --

Q.   I got the reputation thing.

A.   Yeah.

Q.   What else did you tell him?

A.   That he would reap any and all benefits that would come along with being a part of the HarvardConnection team, whether it be monetary, money, prestige, fame, whatever it is, he would get any and all.  It was completely explicit there.

Q.   And who said that?

A.   As I said, we talked about the potential for the site.  He was -- we talked about the respective roles in the partnership --

Q.   No.  My question's very simple.  Who told him about the fact that he would be entitled to revenues from the partnership?

A.   Well, I think -- okay.  I think by telling him that he's part of the team, okay, by telling him that he's a partner and that he's entitled to any types of remuneration, I think "any and all" applies specifically and non-exclusively to monetary benefits.

Q.   So there was no express statement to him that he be entitled to remuneration?

A.   See, what I'm saying is we didn't actually talk about -- we didn't spend a lot of time talking about advertising revenue at that meeting because that site wasn't even up, okay?  What we talked about was getting the project done and getting it launched, and the most salient remuneration at that point was the benefit to his reputation.  But that did not -- that was not exclusive or -- you know, to the fact that advertising money would certainly be equally distributed, were and when it were to come in.  So to answer your question, any and all remuneration based on the Web side, even if it was --

Q.   Okay.

A.   -- you know --

Q.   Finish your question -- finish your answer.

A.   So I'm saying while we didn't harp on the

---

Evasive.

Counsel repeats the question for the third time.

Counsel tries a fourth time. The witness evades answering the question – "was there an express statement?"

This testimony is about what the witness asserts "would" have happened, and not whether there was "an express statement."

The witness does not answer.

|  | advertising or the revenue potential, it was certainly understood that any benefit from the site, specifically because he was a coder and involved with that aspect of it and was part of the time, would be his. | Instead, witness testifies non-responsively about what he believes Zuckerberg understood, not about his own knowledge. |
|---|---|---|

advertising or the revenue potential, it was certainly understood that any benefit from the site, specifically because he was a coder and involved with that aspect of it and was part of the time, would be his.

Q. Okay. So did you tell him specifically that any benefit from the site he would be able to have a piece of?

Counsel asks the question for the fifth time.

A. Okay. Any benefit from the site he would have a piece of, yes, being a partner of our team, yes.

Q. And you told him that specific statement?

Counsel asks a sixth time. Vague and evasive. The witness contradicts previous answer.

A. That specific word by word? It was probably a fair -- it was probably different than that. It was probably more to the extent, "Look, you're on the HarvardConnection team. This is going to be great for your reputation. We're all in this together. This is an equal partnership. And also, think of the enormous advertising potential this thing has."

Q. And so you told him it was an equal partnership?

A. Again, at that time, as I mentioned before, we didn't -- you know, he was brought on with -- he had the expectation that, you know, he was going to be part of the overall development and the control of the site and that at that point we divvied up the contributions and it was premature to talk about specific equity.

The witness does not answer the question asked.

Q. Why didn't you just hire him as a contractor like everyone else?

A. Because we -- ultimately when you're looking for -- equity's a very good way of getting really the most out of a situation and people. And I think that, you know, Victor, to take Victor for example, we did want him as a partner, but he felt personally that he could not undertake the responsibility of being that, so he wanted to be contracted piecemeal. But ultimately you want a partner in the situation because they put, you know, effort in. They go that extra mile.

Q. Now, when you were -- did you ever tell Mr.

| | | |
|---|---|---|
| | Zuckerberg that he couldn't work on any competitive websites that were under development?<br><br>A.  Well, I think that -- I think certainly if there is a project.  I mean, when you undertake a partnership, specifically did we say don't work on, you know, the exact same thing, well, I think that being part of the team and the partnership, you know, is proprietary.  So he could not use a proprietary code or functionality to work on another similar website that had the same proprietary functionality and code.  So that absolutely would be understood there, okay?<br><br>Q.  But was it stated?<br><br>A.  Was it specifically stated that I say, "You cannot work on another project exactly like this"?  No, I did not say that.<br><br>Q.  Okay.<br><br>A.  However --<br><br>Q.  Go ahead.<br><br>A.  However, as I said before, he was unable and not allowed to use the same proprietary information and functionality and business models and everything that we conveyed to him for another project like that. | Non-responsive and speculative about what he believes Mr. Zuckerberg "understood." |
| 204:22-208:8 | Q.  Do you see that?  Beneath that, did you disclose anything that ConnectU or HarvardConnection says this is confidential information?<br><br>    MR. HORNICK:  And read it carefully, Cameron.<br><br>    THE WITNESS:  Yeah.<br><br>    (Witness reviews document.)<br><br>A.  This -- yeah, this may, in fact, be proprietary information, but I will point out that myself and Mr. Lentz were engaged in business activities at this point.  And he had a company called Greenwave Wireless, which --<br><br>Q.  I understand.  My question's very, very simple.  It's -- and I'll restate it --<br><br>    MR. HORNICK:  Object.<br><br>Q.  -- in case it was unclear.<br><br>    MR. HORNICK:  Well, actually, the witness answered the question. | Counsel poses a straightfor-ward question about the contents of a document.<br><br><br><br>Non-responsive.<br><br><br><br><br><br><br>ConnectU's counsel asserts that witness' non-responsive answer was adequate. |

MR. HAWK:  No, he didn't.  He said this may be or something like that.

MR. HORNICK:  That was his answer.

MR. CHATTERJEE:  Well, let's not argue about it.  I'm going to ask the witness a question.  He's going to answer it, and, you know, if he's non-responsive, we'll go to court on it.

MR. HAWK:  We don't want something like may be.  We want an answer to the question.

BY MR. CHATTERJEE:

Q.  What is --

MR. HORNICK:  He gave his answer.

Q.  What is the confidential ConnectU/ HarvardConnection information that is disclosed in this e-mail?

A.  This -- the concept of a portal with controllable sort of content is a proprietary information; however, I believe at this time I had a nondisclosure with Mr. Lentz as well an oral agreement and understanding that this was completely confidential and proprietary.  So that answers your question.

Q.  So did you have a written agreement with him?

A.  I would have to check.  I'm not sure.  But I'm certain that Mr. Lentz -- we had an oral agreement.

Q.  Have you talked with Mr. Lentz about this litigation at all?

A.  He's aware that we're in a lawsuit.  I have not really talked to him since we spoke in December, and then we didn't really -- about this specific litigation other than, you know, Are you suing them, yes, no, not really, no, I don't believe so.

Q.  Is there anything in the content of this e-mail that indicates that it's confidential?

MR. HORNICK:  Which e-mail are you talking about?

MR. CHATTERJEE:  This string.

MR. HORNICK:  The whole thing?

MR. CHATTERJEE:  The entire

-24-

| | | |
|---|---|---|
| | document. <br>     MR. HORNICK:  Read through it, Cameron. <br> Q.  Take your time. <br> A.  Okay. <br>     (Witness reviews document.) <br> A.  I think, as I said before, the portal concept and the multiple schools is a proprietary piece of information, but as I also said, we were discussing here a potential business synergy and relationship, and we would have been covered and would have -- it would have all been protectable information.  This is not someone that I'm just spilling something to. <br>     MR. CHATTERJEE:  Could you please read my question back. <br>     (Record read.) <br> A.  Oh, okay.  Excuse me.  I don't believe there's anything in these e-mails that indicate it's confidential, no. | The witness revises his previous answer and indicates that he is uncertain, reflecting a lack of preparation on 30(b)(6) topics 2, 5 and 10. <br><br> Non-responsive. |
| 208:13-<br>209:22 | Q.  And before these e-mails were exchanged, did you have any conversations with Mr. Lentz? <br> A.  Yeah.  And Mr. Lentz -- before or -- sorry, was the question before? <br> Q.  Before this e-mail exchange occurred. <br> A.  We may have talked on the phone.  I would assume that we would have talked on the phone. <br> Q.  And so you're not sure?  You don't remember? <br> A.  I don't know the -- like if it started as an e-mail -- I mean, if it started as an e-mail dialogue, then we would be reading that.  So I'm assuming that -- in fact, no, I remember that we spoke in person.  Initially he mentioned he had a wireless business.  And I said, "Oh, that sounds interesting."  And then I think we may have talked and tried to set up some sort of discussion. <br> Q.  And so prior to sending this e-mail, it's your testimony that you had an agreement with him that all the information that you're talking about -- <br> A.  Right. <br> Q.  -- was confidential? <br> A.  An oral agreement that is confidential | Vague ("may have"). <br><br><br><br><br><br><br> Vague ("may have"). |

| | | |
|---|---|---|
| | between the co-parties, absolutely, yeah.<br>Q.  So the two of you had that agreement --<br>A.  Uh-huh.<br>Q.  -- before any e-mails were exchanged?<br>A.  Sure, yeah.  I mean, as I said, he has a<br>business, a wireless business.  He sent over<br>a lot of information, a lot of material.  He<br>had a partner, and it was -- you know, he<br>had a lot of protectable information on the<br>table, too. | The witness undercuts the previous answer by answering vaguely and saying merely that Mr. Lentz had "protectable information" without responding directly to the question.<br><br>Topic 2. |
| 210:5-16 | Q.  Did you ever sign a nondisclosure agreement<br>with them?<br>A.  I believe -- I'm not sure.  I don't recall<br>if we signed -- I don't think we -- we<br>signed a contract with them, and they<br>agreed -- and perhaps in the contract there<br>was confidential -- a confidentiality at<br>that point.  But, again, this is post<br>February 4th.  So the ideas that I, you<br>know, have stated that were proprietary and<br>private in terms of knowledge had been made<br>public at that point. | The witness's response is vague and reflects a lack of preparation as to 30(b)(6) topics 2, 5, and 10. |
| 243:12-24 | Q.  So when you were saying being an active part<br>of the team, it had a different meaning here<br>than it did in conversations you had with<br>other people?<br>A.  What I'm saying is that Victor's active part<br>in the team would have been a monetary<br>active part and that Mark Zuckerberg's and<br>other people's may have been an equity stake<br>such as Mark Zuckerberg's active part of the<br>team.  Whenever Victor was active, he was a<br>monetary active part of the team.<br>Q.  You mean he was paid money?<br>A.  He was a contracted active part. | Evasive.<br><br><br><br><br><br><br><br><br>Does not answer the question. |
| 281:9-287:21 |      MR. HORNICK:  You can't mislead the<br>witness.<br>     MR. HAWK:  Fine.  All right.<br>A.  To answer your question, when we asked Mr.<br>Gao for the code, I asked him for -- we<br>specifically asked him for code that did not<br>include Mark Zuckerberg's code when filing<br>with the copyright office, okay?<br>Q.  Why did you do that? | |

A.   Because we wouldn't file Mark Zuckerberg's
code with the copyright office.  We filed
the code that we wrote.

Q.   I thought you said there was only one
version of the code.  So there are two
versions of the code, right?

A.   No, no, no.  There's one version of the
code.  Mark -- as I said, Mark didn't upload
any of his stuff into the server.

Q.   Well, let me ask you this:  You said you
instructed Mr. Gao to give you code that did
not contain any contributions by Mark
Zuckerberg.  Is that what you told Mr. Gao?

A.   Yes, but there were no contributions from
Mr. Zuckerberg in the code, is what I'm
getting at.

Q.   Well, did Mr. Gao confirm to you that he did
not strip out anything from the code that --
before he gave it to you?

A.   I believe that Mr. Gao told me that there
was no code in there, that Mark Zuckerberg
wrote when he file -- when he gave us the
code to file with the copyright office.

Q.   Okay.  So that's your testimony; Mr. Gao
told you that there was no code written by
Mr. Zuckerberg, no code whatsoever in the
HarvardConnection code that he found and
that he gave to you?

A.   My testimony is that the code that was filed
with the copyright office did not contain
Mark Zuckerberg's code.  Now, in addition to
that, I am under the impression that Mr. Gao
said that there was no contribution from
Mark on the server, aside from him poking
around in files and duplicating code that
Mr. Gao had already written.

Now, if you want to call that a
version, I'm not sure what you mean by a
version.  You're talking about multiple
versions of the code.

Q.   Well, you're not answering my question.

MR. HORNICK:  Yes, he has answered
your question.

Q.   Let me ask you this.  Let me ask you this.

MR. HORNICK:  You showed him the
code --

---

Evasive ("I believe") and
reflects lack of preparation as
30(b)(6) designee on topics 3
and 10, inasmuch as witness
could have prepared by talking
to Mr. Gao.


Evasive and non-responsive
answer.  Vague ("I am under
the impression").

|  |  |
|---|---|
| MR. CHATTERJEE: Counsel, lodge an objection. You don't need to instruct the witness, and you don't need to argue. | |
| MR. HORNICK: I'm not instructing the witness. | |
| MR. HAWK: Yeah, you're -- | |
| MR. HORNICK: You're asking unfair questions. | ConnectU's counsel, without making a proper objection, accuses Defendants' counsel of "asking unfair questions." |
| MR. CHATTERJEE: I'm looking forward to bringing this in front of the Court. | |
| BY MR. HAWK: | |
| Q. Did Mr. Gao strip out any code from the version that he gave you which you gave to your lawyers to deposit with the copyright office? | |
| A. I am -- I can't answer that. I don't know the answer to that. I know that the code given to the copyright office has none of Mark Zuckerberg's code. | The witness answers that he doesn't know what Mr. Gao did, but adds an non-responsive conclusory qualifier. |
| Q. And how do you know that? Is that because Mr. Gao told you that? | |
| A. Because we wouldn't have filed code that he written -- wrote for copyright because it's not our code. | Witness repeats his assertion based not on his knowledge. |
| Q. Right. And I know you didn't intend to do that, but you've made an unequivocal statement that you did not file code with the copyright office that contained contributions by Mr. Zuckerberg. Now, hold on, let me finish the question. And so I want to know what is your factual basis for that statement, not what you intended to do, but what your factual basis for that statement is? | |
| A. Simply based on the fact that it was not -- you know, it would not be our intent to file such code. | Witness repeats the same assertion again, with the same lack of a factual basis. |
| Q. Okay. Did you ever have any discussion with Mr. Gao about whether or not he stripped out any code that was done by Mr. Zuckerberg? | |
| A. To be quite honest, I don't remember if -- I remember that the contribution -- Mark's contribution was nil, okay? He went onto the server, and there was no contribution. | Witness does not answer the question posed. |
| Q. That wasn't my question. My question was, | |

did you ever have any conversation with Mr. Gao about whether he stripped out any code?

A.   I believe that I asked Mr. Gao at the time, is there any code -- is any of Mr. Zuckerberg's code in this?  And his response was that -- I believe that there was no code from Mr. Zuckerberg in that piece of code.

Q.   And that there never had been?

A.   Well, see, the thing is, like, you know, if you want to contin -- if you want to -- I'm not a programmer, I'm not an expert, but are you -- would you consider -- you know, are you considering code that Mark Zuckerberg copied and renamed from -- that Victor Gao wrote?  Because that code is Victor Gao's code.  Do you see what I'm getting at?  And that's what Mark Zuckerberg did.

Q.   But you know what?  My question -- the problem that I'm having is that you're not answering my question.  My question went simply to your conversations with Mr. Gao, and you're like two or three steps ahead of me --

A.   Okay.

Q.   -- about, you know, whether code if it's copied over.  I'm asking you about a specific question about your conversation with Mr. Gao, and that's what I'd like you to answer.

      Did you ever discuss with Mr. Gao, No. 1, whether he stripped out any code that was written by Mark Zuckerberg?

A.   Okay.  I -- to the best of my recollection, I asked Mr. Gao, "Is any of Mark Zuckerberg's code -- like, we need code -- we need the HarvardConnection without Mark Zuckerberg's code," okay?  And I don't remember if Mr. Gao had to take something out.  It's my assumption that --

Q.   I don't want your assumption.

A.   Okay.  I believe that Mr. Gao -- well, assumption, belief, same thing.

Q.   I know, that's what I'm saying.  I don't want that.  I want your recollections of conversations --

A.   Okay.

---

Witness does not answer the question posed, which was about stripping out code, not about whether there was code.

Witness avoids answering the question and again reflects his lack of preparation as 30(b)(6) designee on topics 3 and 10.

The witness again reveals his lack of preparation for 30(b)(6) topics 3 and 10, inasmuch as he does not know what Mr. Gao said regarding the stripping out of Mr. Zuckerberg's code.

DOCSSV1:428065.3

| | | |
|---|---|---|
| | Q. -- with Mr. Gao.<br>A. Okay. I asked -- okay. If we're talking about recollections, my recollection was "Give me the HarvardConnection code that everybody contributed to without Mark Zuckerberg," okay? He gave that to me.<br><br>Q. Okay. And you know he gave that to you because he said, "Here's the code you asked for" --<br><br>A. Yes.<br><br>Q. -- correct? All right. Did you ever discuss with Mr. Gao whether or not he had stripped out any code that was attributable to Mr. Zuckerberg?<br><br>A. I don't believe we had that discussion. | |
| 322:12-324:18 | Q. Meaning that he knew that some information that he had relating to Thefacebook came from HarvardConnection?<br>A. I said that I was not -- okay. I said I was not sure. I did not say at that time that he knowingly used it. However, based upon the outcome of Thefacebook, which he was a co-creator at that time, it is my belief that he used it.<br>Q. Okay. I want to ask you now, not about your belief, but your knowledge of facts. In the period from November 2003 to February 4, 2004, you're not aware of any evidence that Mr. Saverin knowingly used confidential -- confidential business information of HarvardConnection, correct?<br>　　MR. HORNICK: Objection, mischaracterizes.<br>Q. Correct?<br>A. I think you're conflating the issue. Knowing something and believing something are two different things. I can't knowingly say he used it. I believe he used it.<br>Q. Okay.<br>A. And I think we went over why I believe he used it. So --<br>Q. Right. But let me try this again.<br>A. All right.<br>Q. I don't think we're quite communicating. I don't want to know what evidence you have, if any. I don't want to -- this is another one of those questions I don't want to know | Witness testifies that he is not sure but insists on offering his "belief" admittedly not based on personal knowledge.<br><br><br><br><br><br><br><br><br><br><br>Testimony not based on knowledge. |

-30-

| | | |
|---|---|---|
| | about your belief --<br>A.   Okay.<br>Q.   -- right now.  I want to know if you have<br>any evidence that my client, Mr. Saverin,<br>knowingly used confidential information of<br>HarvardConnection during the period November<br>2003 up until February 4, 2004 when Facebook<br>was launched?<br>A.   My evidence, which I've stated and on which<br>I've formed my belief, however, the evidence<br>is that Thefacebook.com website of which he<br>was a co-creator during that time period<br>utilized traits and misappropriated trade<br>secrets and business information from<br>HarvardConnection.<br>Q.   Okay.<br>A.   That's my evidence.<br>Q.   Is there any other evidence?<br>A.   No.  That would be -- that would -- I would<br>say that that, to the best of my knowledge,<br>would be the main evidence.<br>Q.   It's the main evidence.  Is there any other<br>evidence, sir?<br>A.   The evidence my weak, untrained legal mind<br>can think of, that's -- yeah.  Yeah. | Testimony not based on<br>knowledge. |
| 342:18-<br>357:1 | Q.   Well, let's talk about the word "partner."<br>A.   Okay.<br>Q.   Did Mr. Zuckerberg ever say to you, "I<br>understand I'm a partner in this<br>HarvardConnection venture"?  Did he ever say<br>the word "partner"?<br>A.   No, he did not use the word "partner."  No.<br>Q.   And did you, you personally, ever use the<br>word "partner" to Mr. Zuckerberg?<br>A.   No, and I don't believe I had to.  I --<br>Q.   But I didn't ask you about what you had to<br>do.<br>           MR. HORNICK:  He can give a<br>complete answer.<br>A.   I used the word "part," which is part --<br>which assumes a partner is a part of a slice<br>of the pie, you know, if you want to go down<br>to the semantics level.  But, no, we did not<br>use the word "partner."  We're college<br>students.  You know, we are on a project,<br>and it's a team.  That's what we called it. | |

-31-

Q.   Okay.  So just to be clear, you never told
     Mr. Zuckerberg that he was going to be a
     partner --
A.   I never --
Q.   -- quote, "partner" in the venture, correct?
A.   Quote, "partner" -- quote, "partner," no, I
     did not use the word, quote, "partner."
Q.   Okay.  Fine.  And just to be clear again,
     there was never any written -- oral or
     written agreement with Mr. Zuckerberg that
     he would have some specific percentage
     ownership in HarvardConnection, correct?
A.   Specific ownership, yes.  Specific as in
     specific equity stakes, yes, there was --
     that conversation never happened.
Q.   Listen to my question again.
          MR. HORNICK:  Listen to his answer.
     Did you hear it?
          MR. CHATTERJEE:  Robert, let's have
     the court reporter read that answer back.
          MR. HAWK:  Okay.  Let's have the
     answer back, question and answer, if you
     wouldn't mind.
       (Record read.)
A.   So, well, I was --
          MR. HORNICK:  Wait, wait.  There's
     no question pending.
Q.   Right.  So let me -- I'm a little unclear, I
     will say, after the last question and
     answer, so let me try if I can re ask it --
A.   It was supposed to be --
Q.   -- and clear it up.
A.   Yeah, I mean, if you want to re ask that same
     question --
Q.   Yeah --
A.   -- sure.
Q.   -- let me re ask the question, okay?
          Isn't it correct that there was never
     any written or oral agreement with Mr.
     Zuckerberg that he would have a specific
     percentage ownership in HarvardConnection?
A.   Specific percentage ownership, as I said
     before, we did not talk about because it was
     premature --
Q.   Okay.  Fine.
A.   -- okay?

Rather than answer regarding
whether there was an
agreement, he answers
regarding what was "talked
about."  This prompts counsel

Q.  All right.  All right.  You never talked about it with Mr. Zuckerberg, correct?

A.  Specific percentage ownership.  Outside of what I said earlier, which was that it was an equal -- an equal partnership based on contribution, no.

Q.  See, that's the problem I'm having here.

A.  Why is that so hard?

MR. HORNICK:  Robert, listen.  You don't like his answers, and you keep getting him to try to change them.  He has given you his answer.  He gave it this morning.  He's been consistent all day.  I think you should stop badgering the witness.

MR. CHATTERJEE:  Mr. Hornick, what federal rule of evidence are you citing to at this point?  Because badgering with counsel has nothing to do with the deposition.

MR. HORNICK:  He is badgering the witness.  He keeps asking the same question that's been asked all day.  He keeps answering it.

MR. HAWK:  We'll put this record before the Judge, okay?

MR. HORNICK:  You're getting your answers.

MR. HAWK:  We'll put the record -- we'll put the record before the Judge, and we'll --

MR. HORNICK:  Go ahead.  You're getting your answers.

MR. HAWK:  All right.  Let's turn it down a notch.  We're almost done today.  Let me try and put another question.  I was just trying to explain to the witness why I keep going back to the same thing.

BY MR. HAWK:

Q.  And the reason that I keep going back is because you're giving an argumentative answer.

MR. HORNICK:  No, I disagree.

MR. HAWK:  Hold it.  Hold it. Don't interrupt me, okay?

MR. HORNICK:  No, I will interrupt you if you misstate to the witness.  You

to ask whether it was "talked about"  Witness then obfuscates further by stating a non-responsive legal conclusion that contradicts his prior testimony.

ConnectU's counsel objects to Defendants' counsel's admonition not to give

| | |
|---|---|
| don't have the right to advise him of how he has to answer a question.<br>     MR. HAWK: I have a right to conduct a deposition. I will try and do it.<br>     MR. HORNICK: Go ahead. Do it properly.<br>BY MR. HAWK:<br>Q. Here's my -- here's my question: There was never any written or oral agreement with Mr. Zuckerberg that he would have a specific percentage ownership in HarvardConnection; isn't that correct?<br>A. Can you define "specific percentage ownership"?<br>Q. Is there something that's unclear --<br>A. Yeah, there is.<br>Q. -- about specific percentage ownership? All right. I'll give you an example. You could have said, "Mark, you're going to have a 25 percent ownership in this venture," or you could have said, "Mark, you're going to have a 10 percent ownership," okay? That's what I have in mind when I say the words "specific percentage ownership." Now that I've given you that example, do you understand what I --<br>A. Right.<br>Q. Okay. All right. Now let me re ask the question. Isn't it correct, sir, that there was never any written or oral agreement with Mr. Zuckerberg that he would have a specific percentage ownership in HarvardConnection?<br>A. Specific percentage ownership, well, you know, with respect to an equal ownership, yes, there was that oral agreement. There was that oral discussion. There was no written; however, there was an oral.<br>    If you want to go by a specific percentage and we use my barometer, which I've said multiple times is that it was an equal team, an equal partnership based on the contributions at that time and that it was premature to go any further than that, there was an oral agreement to that extent, yes.<br>Q. There was an oral agreement that there would | argumentative answers.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>The witness contradicts what he said just above (that they did not talk about "specific percentage ownership," now alleging that there was an "oral agreement" to "equal partnership," not based on knowledge or facts. |

DOCSSV1:428065.3