**EXHIBIT 7
(PART 2 OF 2)**

be equal or, in other words, 25 percent
ownership by each of the partners; is that
your testimony, sir?

A.   My answer is that it was -- I mean, as I
said before, equal, equal to the
contribution that each person brought to the
table.

Q.   Oh, okay.  Well, I thought you meant equal
that everybody would have an equal share,
but let's --

A.   Well, no.

Q.   -- explore that.
     So you had a conversation with Mr.
Zuckerberg in which you told him that you
wanted him to be a partner and that his
partnership interest in this
HarvardConnection partnership would be equal
to his contribution; is that correct?

A.   Sure.  He had -- I mean, you are -- Mr.
Zuckerberg in his e-mail discourse has
indicated that he expected to be part of the
development of the project and control.
Now, we all brought different contributions
to the table.  They were all relatively
critical in terms of the development of the
site.  And we all treated each other as
equals, acted as equals.

    Again, we're college students, and
this is a project that's going to launch.
It was premature to talk about specific
equity stake at that point with respect to
percentages.

Q.   Sir, my question was about a conversation
that you had or didn't have with Mr.
Zuckerberg.  The answer you just gave had
nothing to do with any conversation that you
had --

    MR. HORNICK:  Robert, you cut off
his answer.

Q.   -- or didn't have with Mr. Zuckerberg.

    MR. HORNICK:  You cut off his
answer, and you sit there and you shake his
head -- you shake your head while he's
talking, and you laugh and you smile while
he's talking, and that is improper.  You
should sit there quietly, without shaking

Non-responsive.

The witness again changes his
testimony from above on
whether a "specific equity
stake" was discussed.

your head, without smiling and without laughing while the witness finishes his answer, and then you can ask another question.

MR. HAWK:  Well, thank you for your advice.  Let me ask the question again because I don't think I got an answer to it, in all fairness.

BY MR. HAWK:

Q.  Did you ever have a conversation with Mr. Zuckerberg in which you communicated to him that he would receive an equal partnership share in HarvardConnection and that his share would be equal to his contribution?

A.  I think it was clear in our second meeting that he would -- as I mentioned before earlier, I mean, we've gone over this question multiple times, and I'm starting to believe that it's not because my answer is not correct, but that the answer is -- you guys don't want to seem to take my answer. And the answer is simple.  Mr. Zuckerberg was invited to become part of a team.  He became -- he agreed to become part of that team.

It was an equal opportunity partnership.  Each person had respective contributions, and down the road as those contributions increased or decreased we would certainly have attached what you call, you know, more of a specific allocation, okay?  At that time it was an equal allocation, okay?  You're at the starting gate of a race.  You can't predict who's going to be the winner, who's going to pull the most.

So -- and I would go so far as to say that actually his compensation was initially perhaps larger than ours because we made it very clear to him that we wanted him to be the center point in the Crimson article at the launch of the site and that he would be sort of reinventing his character, which we would not be a part of.  So from some accounts you could say that it was skewed in his favor.

| | |
|---|---|
| | Non-responsive to what was asked (what he communicated to Mr. Zuckerberg). |
| | The witness offers legal conclusion regarding the nature of his relationship with Mr. Zuckerberg but persists in saying nothing about what was communicated, as the pending question asked. |

| | |
|---|---|
| Q.   Okay. | |
| A.   But -- | |
| Q.   Are you finished? | |
| A.   -- to the extent, that, again, we're college students and this is a team, a project, Mr. Zuckerberg has reapportioned shares and aspects of this company multiple times. | Non-responsive. |
| Q.   All right.  I -- you know, I've reached the point where I'm not going to, at your counsel's suggestion, ask you the question again unless -- unless you tell me that you actually intend to answer it the next time. | |
|       MR. HORNICK:  Objection. | |
| Q.   The question -- | |
|       MR. HAWK:  Just let me finish this. | |
| Q.   The question that I ask had to do with conversations that you either had or didn't have with Mr. Zuckerberg.  I think I've asked that question at least three times now, and I don't -- I don't believe, in all fairness, that I've gotten an answer to the question.  If you want to take another shot at answering the question, then I'll re ask it.  If you believe or you're not going to give me anything other than another answer like the one that you just gave me, I'll move on, and then I'll go to the Court and I'll try and seek an order that you be ordered to answer the questions that are asked in the deposition. | |
|       So I'm going to put it out there one more time. | |
|       MR. HORNICK:  And I'll say that I believe the witness has answered the questions to the best of his ability.  You just don't like his answers. | |
|       MR. HAWK:  Okay.  All right.  I understand your position.  You can argue that to the Court based on this record, all right? | |
| BY MR. HAWK: | |
| Q.   My question to you, sir, is did you ever have any conversation with Mr. Zuckerberg in which you said to him that he would be getting an equal partnership share in the -- in the HarvardConnection team? | |

DOCSSV1:428065.3

| | |
|---|---|
| MR. HORNICK:  Objection.  You've asked a question that he can answer because he's already said that he didn't use the word "partner."  So your question's unfair. | Coaching. |
| Q.  All right.  Let me rephrase.  Let me rephrase.  Let me don't use -- because in all fairness, you have said that you didn't say "partner."  You didn't say "partner."<br><br>Did you ever tell or discuss with Mr. Zuckerberg that he would be getting an equal share of HarvardConnection? | |
| A.  Well, I think your question should be did he -- did you have a discussion for Mr. Zuckerberg to get a share of the partnership, okay? | Non-responsive.  Instead witness tells counsel he should have asked a different question. |
| Q.  Well, I wanted to ask my question, Mr. Winklevoss.  I ask you the question. | |
| A.  No, you asked me -- | |
| Q.  I don't want you -- | |
| A.  -- did he say -- | |
| Q.  -- to reformulate my question. | |
| A.  You know, equal partnership with respect to a partnership based on equality, meaning people's contributions would be weighed accurately and you would divvy out equity based on contribution in an equal manner, yes, we had an equal partnership by that definition, to answer your question. | Non-responsive (about whether he had discussions of a certain nature with Mr. Zuckerberg), but instead offers a non-responsive legal conclusion about an alleged partnership. |
| Q.  Okay.  Now, my question was not about the kind of partnership you had.  My question was about whether you ever had any discussion along the lines of -- | |
| A.  Yeah. | |
| Q.  -- you just testified -- let me finish.<br><br>Did you ever have that discussion with Mr. Zuckerberg? | |
| A.  Yes, as I said before, we -- in the second meeting we discussed people's respective roles.  Everybody was on an equal playing field.  That's why I'm referring to it as an equal partnership, if you will, okay, or equal team, based on contributions.  If contributions six months down the road were unequal, then the partnership, you know, would certainly change in scope.  But everybody was equal in terms of what they | Evasive.  Witness never directly answers the question, which was whether the witness ever told or discussed with Mr. Zuckerberg "that he would be getting an equal share".  Various vague terms ("equal playing field," "equal team," "equal in terms of what |

-38-

| | | |
|---|---|---|
| | brought to the table, what they can contribute.  So to answer your question, yes, we did have a discussion about equal partnership.<br>Q.   Okay.  And you had that discussion with --<br>A.   Not using the word "partner."<br>Q.   Okay.  But you had the discussion about equal shares of HarvardConnection based on contribution, you had that discussion with Mr. Zuckerberg in your second meeting with him, correct?<br>A.   Yes.  We --<br>Q.   Okay.<br>A.   -- went through the fact that he would reap in an equal manner any and all benefits that came along with the site, okay? | they brought to the table"). |
| 369:9-<br>373:7 | Q.   Okay.  All right.  Fine.  And did anyone -- did Mr. Narendra ever tell you at any time that he had obtained assurances from Mr. Zuckerberg that Mr. Zuckerberg would respect confidentiality of HarvardConnection information?<br>A.   You know, as I said earlier, both Mr. Narendra and Mr. Gao, specifically Mr. Gao, explained to Mr. Zuckerberg the proprietary and confidential nature of the --<br>Q.   That wasn't my question, sir.  My question was, did Mr. Narendra ever tell you that Mr. Zuckerberg had committed to him to respect the confidentiality of HarvardConnection information?<br>A.   I'm not sure.  I don't -- I believe that in the second meeting when we were all present we made it very clear the proprietary nature of the site.  Making something clear that it's proprietary is not -- is the same effect of telling someone "Don't tell them," you know?<br>Q.   Not my question.<br>A.   Because Mr. Zuckerberg understands what proprietary information is.<br>Q.   I'm not asking about what Mr. Zuckerberg understood.  My question was very specific, and I'll ask it for the third time --<br>       MR. HORNICK:  And I'll object that he's answered it many times today and that | Non-responsive.<br><br><br><br>Non-responsive.<br><br><br><br>Non-responsive.<br><br>The witness clearly has not answered the question. |

DOCSSV1:428065.3

you're now badgering the witness again.

    MR. HAWK:  Okay.  All right.  Let's just have it again.  If he doesn't want to answer the question again, he doesn't -- you know, I can't make him.

    MR. HORNICK:  And otherwise, it's asking him personally.  You're asking a personal question here, not a 30(b)(6) question.

    MR. HAWK:  Yeah, okay.  Whatever.

BY MR. HAWK:

Q.  Did Mr. Narendra ever tell you that Mr. Zuckerberg had committed in his presence to respect the confidentiality of HarvardConnection information?

A.  Let's just say -- I would say that --

Q.  Did he ever -- yes or no, did he ever tell you that?

    MR. HORNICK:  Let him finish his answer, Robert.

A.  Mr. Zuckerberg agreeing to become part of the team, and to answer any questions that you might have like -- let's not talk about micro this, that, words, phrases, okay?

Q.  No, that's not what my question was.

    MR. HORNICK:  Robert, let him finish his answer.

    MR. HAWK:  I want him to answer my question.

A.  His agreement to complete that side of the code and become part of the team was understanding and accepting of the fact that it's proprietary information, and as I pointed out on C4 -- 46 -- whatever that document was, the fact that Mr. Zuckerberg didn't use our code proves that he was fully aware of it.  So, you know, you're asking -- I can't recall every instance and every personal sentence that was said to Mr. Zuckerberg and if he said yes, like, you know, specifically in the way that you're describing to this person that he understood.  What I'm saying is that by becoming part of the team he effectively and directly knew that it was proprietary and confidential information.

---

The witness again does not answer the question, which is about what Mr. Narendra told him.

Non-responsive.  The witness instead opines conclusorily about Mr. Zuckerberg's "understanding."

The witness's comments reveals a failure to prepare for topics 1, 2 and 10, in this case by asking Mr. Narendra for his recollections.

| | | |
|---|---|---|
| | Q.  Right.  But do you understand, sir, that you haven't answered my question?<br><br>MR. HORNICK:  Object.  He has answered your question, and again you sit there and you shake your head while he's talking and you keep cutting him off.  It's oppressive.<br><br>MR. HAWK:  Well, I think the Judge is going to shake his head, and I --<br><br>MR. HORNICK:  The Judge can't see your behavior.<br><br>MR. HAWK:  Well, we'll put it before the Judge because this witness is not answering my question.<br><br>MR. HORNICK:  I think if you go back and read the transcript calmly, you'll realize that he has answered all your questions today, you just don't like the answers.<br><br>MR. HAWK:  Okay.  All right.<br><br>MR. CHATTERJEE:  I think he doesn't like the questions, but...<br><br>MR. HAWK:  Yeah.  Yeah. | The witness clearly has not answered the question. |
| 376:8-20 | Q.  Did you do any specific research, let's say, prior to February 4, 2004 to determine if anyone out there was working on or doing what you were proposing to do with HarvardConnection?<br><br>A.  We did look -- I mean, as I said, we looked at those various sites.  We did not come across the sites that I said we didn't come across in the previous set of questioning.  And as I've also said in this set of questioning that it's to my knowledge that today at that -- prior to February 4th there was nothing like HarvardConnection. | Vague and non-responsive, conclusory assertion. |
| 378:14-381:7 | Q.  Okay.  When did Mr. Moskovitz first become aware of HarvardConnection?<br><br>A.  As I said, I can't specifically say when he became aware of HarvardConnection.<br><br>Q.  Did Mr. Moskovitz ever see any Web page for any version of the HarvardConnection website?<br><br>A.  I cannot say that specifically.<br><br>Q.  You don't know?<br><br>MR. HORNICK:  The witness can't | Coaching the witness to say |

answer this question without seeing confidential information.

A.   Yeah, I can't say that.

     MR. HAWK:  No, I want to know if he knows or not.

     MR. HORNICK:  I told you he can't answer this question without seeing confidential information.

     MR. HAWK:  I appreciate your testimony, but I'm asking for his, and I just want to know if he knows the answer to the question.

BY MR. HAWK:

Q.   Sir, do you know, did Mr. Moskovitz ever see any Web page or any version of the HarvardConnection website?

A.   I cannot say other than what I've stated before, which is that I believe, based on evidence, that he was involved in the creation of Thefacebook, which I believe was a derivative work of HarvardConnection.

Q.   Yeah, but that's not my question.  My question is, did Mr. Moskovitz ever see any Web page --

A.   I don't --

Q.   -- for any version of the HarvardConnection website?

A.   I don't know.

Q.   Okay.

A.   I don't know.

Q.   That was easy, wasn't it?  Did Mr. Moskovitz ever see any line of source code for HarvardConnection?

A.   Again, it's my belief; however, I don't know.

Q.   You don't know?

A.   But my belief, based on evidence --

Q.   I didn't ask for your belief.  Remember the little lecture that I gave at the beginning?

     MR. HORNICK:  He's entitled to give his answer, Robert.

     MR. HAWK:  Okay.  And I'm entitled to cross-examine the witness.

     MR. HORNICK:  And you're --

Q.   Did Mr. --

     MR. HORNICK:  I'm not going to let

---

that he can't answer the question.

Coaching.

Non-responsive.  Expresses his conclusory "belief" as to different question that was not posed.

The witness qualifies his answer with a statement of his admittedly unfounded "belief."

| | | |
|---|---|---|
| | you trap him in a corner. | |
| | Q.  Did Mr. Moskovitz ever see any line of source code for HarvardConnection? | |
| | A.  It's my belief that he did. | Witness repeats his "belief" a third time. |
| | Q.  Okay.  Do you know if Mr. Moskovitz ever saw any line of source code for HarvardConnection?  I'm not asking for your belief.  Do you know whether he ever saw any line of source code? | |
| | A.  If by that have I seen him, I would say no, I do not know -- | |
| | Q.  Fine. | Witness repeats his "belief" a fourth time. |
| | A.  -- I believe. | |
| 384:9-15 | Q.  Did Mr. Hughes ever see any Web page for any version of the HarvardConnection website? | |
| | A.   It's my belief that he did – | Witness testifies to his "belief" rather than knowledge. |
| | Q.  No, I'm not asking about your belief, sir.  Did Mr. Hughes ever see any Web page for any version of the HarvardConnection website? | |
| | A.  I do not know. | |

DOCSSV1:428065.3

**3) ConnectU's witness refuses to answer in the proper form or to follow the basic rules of a deposition.**

| Citation | Text of deposition | Comments |
|---|---|---|
| 313:20-25 | Q.  -- in front of you, please.  Exhibit 15 is an e-mail that you wrote to Victor Gao on January 25, 2004, correct?<br>A.  Uh-huh.<br>Q.  Yes?<br>A.  (No verbal response.) | The witness refuses to give a affirmative answer, despite having been instructed at the beginning of the deposition, and agreeing, that he would answer questions "yes" or "no." |
| 382:14-383:6 | Q.  Do you know or -- let me just ask you this: Did Mr. McCollum ever see any Web page for any version of the HarvardConnection website?<br>A.  It is my belief that he did.  I do not know if he did.<br>Q.  Okay.  And did Mr. McCollum ever see any line of source code for HarvardConnection?<br>A.  Again, it's my belief, based on evidence, that he did.  I do not know if he did.<br>Q.  All right.  You know what?  I'm just going to make it easy for you.  I'm not asking about your belief, I'm asking about your knowledge, and I have been for the last 20 questions, all right?<br>    MR. HORNICK:  Objection, argumentative.  And there's no question pending so just ask another question. | The witness tacks on his "belief" not based on the facts.<br><br>The witness does this again. |

DOCSSV1:428065.3

## B: MISCONDUCT BY CONNECTU'S COUNSEL

| | **1) Counsel for ConnectU makes legally baseless objections.** | |
|---|---|---|
| Citation | Text of testimony | Comments |
| 22:10-23:22 | Q.  Didn't Victor Gao tell you at some point that he had written some code?<br>A.  Victor Gao said that what he -- to his -- the best of his knowledge, his extent, that Mark Zuckerberg had gone into the code, looked at it on the server and duplicated files from the, I believe, the date side and effectively renamed them.  But in terms of Mark indicated that most -- a lot of the work that he had done was done on his local system, so it was never on the server.<br>Q.  Okay.  So it's your position that --<br>    MR. HORNICK:  You know, I'd like to prevent you from saying "it's your position," because the witness isn't here to give contention testimony.  You can ask for facts, you can say the facts that, that kind of thing, but in terms of saying "it's your position," I don't think that's proper.<br>    MR. CHATTERJEE:  Well, you can object.  I can ask the questions however I want, and you can say "Object to the form."<br>    MR. HORNICK:  Well, I can actually prevent you from taking contention testimony.  There's cases that support that, so let's not make an issue of it.  Why don't you just ask your questions in an unobjectionable way.<br>    MR. CHATTERJEE:  Counsel, you can make your objections, and the opposing -- or the witness can answer them, and should you want to seek a protective order, you can contact the Court.<br>    MR. HORNICK:  I'm just asking you to conduct your deposition properly.<br>    MR. CHATTERJEE:  And, counsel, I will do so.<br>    MR. HORNICK:  Okay.  Thank you. | Counsel's objection to "is it your position that" on the ground that it is "contention testimony" is improper.  The corporation is "bound" by the 30(b)(6) testimony of the designee. |
| 231:19-232:1 | Q.  And is there a separate signature line for HarvardConnection or for ConnectU, the | |

-45-

| | | |
|---|---|---|
| | uninincorporated proprietorship?<br>A.  Well, I mean, as I said before --<br>       MR. HORNICK:  Objection, this<br>question calls for legal expertise, which<br>the witness doesn't have.  You can try to<br>answer it. | The question did not call for legal expertise, but a factual answer, which the witness could provide by looking at the document. |
| 253:17-<br>254:15 | A.  As I said before, he became involved with Thefacebook prior to the coding of the site.  Now, if you go by Mr. Zuckerberg's time line, that would be one week from launch.  We have reason to believe that that's humanly impossible and that, in fact, we have -- there are news articles specifically that say that the concept was derived in the end of September -- excuse me, December by Mr. Zuckerberg.  And given the fact that Mr. Zuckerberg approached Mr. Saverin prior to coding, we would assume that it would be well into, you know -- well, before February 4th that he was involved.<br>Q.  Why -- what's the basis for your testimony that Mr. Saverin was involved with Thefacebook prior to coding?<br>       MR. HORNICK:  Objection, asked and answered.  You can say it again.<br>A.  Mr. Saverin says in the FM article dated February 9th, 2005 that Mark Zuckerberg was a close friend of him and approached him prior to coding of Thefacebook.  That is my reason for belief. | ConnectU's counsel's "asked and answered" objection was improper.  The witness had not answered the question yet, and provided an answer that was not redundant with previous answers. |
| 256:4-<br>20 | Q.  When did Mr. Saverin first become aware of HarvardConnection?<br>A.  Again, my -- our belief is that --<br>Q.  I don't want your belief.  If you don't know the answer to my question, I want you to tell me that.  What I don't want is your belief.  When did Mr. Saverin first become -- I'm sorry, when did he first become aware of HarvardConnection?<br>A.  He -- I don't know.  I do not know.<br>       MR. HORNICK:  I'll object.  That's not 30(b)(6) testimony.<br>       MR. HAWK:  Oh, that's incredibly 30(b)(6) testimony.<br>       MR. HORNICK:  I'm not sure how he | ConnectU's counsel's objection is improper.  ConnectU has made allegations in its complaint regarding Mr. Saverin's use of Harvard Connection's alleged confidential information.  Counsel for Mr. Saverin is trying to determine what ConnectU knows that relates to its allegations.  This is covered by topics 3, 4 and 6 and allegation 21 in the complaint. |

-46-

| | | |
|---|---|---|
| | can know what was in Mr. Saverin's mind, so I don't think that's 30(b)(6) testimony. | |
| 257:5-21 | Q. Did Mr. Zuckerberg in January 2004 ever discuss or otherwise communicate with Mr. Saverin about HarvardConnection?<br><br>MR. HORNICK: Objection. This is all not 30(b)(6) testimony. None of this line of questioning is 30(b)(6) testimony. You can ask this witness --<br><br>MR. HAWK: We disagree.<br><br>MR. HORNICK: -- as an individual.<br><br>MR. HAWK: I'm asking the questions. If you want to instruct him not to answer, go ahead.<br><br>MR. HORNICK: No, no, no, go ahead, but it's not 30(b)(6) testimony.<br><br>MR. HAWK: Well, we disagree.<br><br>BY MR. HAWK:<br>Q. I'm sorry, let me put the question -- | ConnectU's counsel's objection is improper. ConnectU has made allegations in its complaint regarding Mr. Saverin's use of Harvard Connection's alleged confidential information. Counsel for Mr. Saverin is trying to determine what ConnectU knows that relates to its allegations. This is covered by topics 3, 4 and 6 and allegation 21 in the complaint. |
| 259:20-260:14 | Q. And what HarvardConnection trade secrets have been used in TheFacebook website?<br><br>MR. HORNICK: Objection, asked and answered. You can answer it again.<br><br>MR. HAWK: No, it wasn't asked and answered --<br><br>MR. HORNICK: Not by you.<br><br>MR. HAWK: -- but I don't want to argue with you. No, it wasn't asked and answered.<br><br>MR. HORNICK: Yes, it was today.<br><br>BY MR. HAWK:<br>Q. I want you to listen to the question. I won't argue with your counsel, but this question hasn't been asked and answered. What HarvardConnection trade secrets have been used in the TheFacebook website based on your review of TheFacebook website?<br><br>MR. HORNICK: Asked and answered. You can answer it again. | This question had not been asked and answered. The witness had not previously testified as to which alleged trade secrets had been used in TheFaceBook website. |
| 281:9-283:24 | MR. HORNICK: You can't mislead the witness.<br><br>MR. HAWK: Fine. All right.<br>A. To answer your question, when we asked Mr. Gao for the code, I asked him for -- we specifically asked him for code that did not include Mark Zuckerberg's code when filing | |

with the copyright office, okay?

Q.  Why did you do that?

A.  Because we wouldn't file Mark Zuckerberg's code with the copyright office.  We filed the code that we wrote.

Q.  I thought you said there was only one version of the code.  So there are two versions of the code, right?

A.  No, no, no.  There's one version of the code.  Mark -- as I said, Mark didn't upload any of his stuff into the server.

Q.  Well, let me ask you this:  You said you instructed Mr. Gao to give you code that did not contain any contributions by Mark Zuckerberg.  Is that what you told Mr. Gao?

A.  Yes, but there were no contributions from Mr. Zuckerberg in the code, is what I'm getting at.

Q.  Well, did Mr. Gao confirm to you that he did not strip out anything from the code that -- before he gave it to you?

A.  I believe that Mr. Gao told me that there was no code in there, that Mark Zuckerberg wrote when he file -- when he gave us the code to file with the copyright office.

Q.  Okay.  So that's your testimony; Mr. Gao told you that there was no code written by Mr. Zuckerberg, no code whatsoever in the HarvardConnection code that he found and that he gave to you?

A.  My testimony is that the code that was filed with the copyright office did not contain Mark Zuckerberg's code.  Now, in addition to that, I am under the impression that Mr. Gao said that there was no contribution from Mark on the server, aside from him poking around in files and duplicating code that Mr. Gao had already written.

    Now, if you want to call that a version, I'm not sure what you mean by a version.  You're talking about multiple versions of the code.

Q.  Well, you're not answering my question.

    MR. HORNICK:  Yes, he has answered your question.

Q.  Let me ask you this.  Let me ask you this.

---

Evasive ("I believe") and reflects lack of preparation as 30(b)(6) designee on topics 3 and 10, inasmuch as witness could have prepared by talking to Mr. Gao.

Evasive answer includes qualifier "I am under the impression," a non-responsive assertion about what was filed with the Copyright office, and a gratuitous argument about a previous answer.

Te witness has not been responsive.

| | | |
|---|---|---|
| | MR. HORNICK:  You showed him the code -- <br> MR. CHATTERJEE:  Counsel, lodge an objection.  You don't need to instruct the witness, and you don't need to argue. <br> MR. HORNICK:  I'm not instructing the witness. <br> MR. HAWK:  Yeah, you're -- <br> MR. HORNICK:  You're asking unfair questions. <br> MR. CHATTERJEE:  I'm looking forward to bringing this in front of the Court. | Cues the witness with substantive testimony. <br><br><br><br><br> Not a proper objection. |
| 292:14-23 | Q.   And when did you give the Victor Gao written code to ConnectU?  When did that happen? <br> MR. HORNICK:  Objection, calls for a legal conclusion, legal expertise, and this is a waste of time, but other than that, you can answer. <br> A.   Well, I would say, you know, when we formed the entity ConnectU in March 26th '04, that's when I would have given it, because I formed the entity. | Baseless objection. <br><br> Topic 10. |
| 322:21-323:4 | Q.   Okay.  I want to ask you now, not about your belief, but your knowledge of facts.  In the period from November 2003 to February 4, 2004, you're not aware of any evidence that Mr. Saverin knowingly used confidential -- confidential business information of HarvardConnection, correct? <br> MR. HORNICK:  Objection, mischaracterizes. | The pending question does not characterize anything. |
| 365:17-366:22 | Q.   Okay.  Let's just start with you.  Other than Mr. Lentz, did you have an oral agreement with anyone else to respect confidentiality of HarvardConnection information? <br> MR. HORNICK:  You're asking him personally now, not as a 30(b)(6) witness, correct? <br> A.   Yeah, ConnectU or -- <br> MR. HORNICK:  Hold on, Cameron. It's important.  You asked him did you, so it's not 30(b)(6) testimony. <br> MR. HAWK:  Just listen to the question.  If you have an objection, just | Given that the witness was and is a principal of HarvardConnection and ConnectU, the question is clearly within the scope of topic 1.  Whether any particular question has elicited 30(b)(6) testimony, as opposed to personal |

| | | |
|---|---|---|
| | make it.  You're being silly here --<br>    MR. HORNICK:  No, I'm not being --<br>    MR. HAWK:  -- the last few minutes.<br>BY MR. HAWK:<br>Q.  Okay.  Look, you don't understand, and I'm<br>    sorry.  Let me pose my question, okay?  My<br>    question to you as a 30(b)(6) witness is,<br>    did you personally have any conversations<br>    with anyone else prior to February 4, 2004,<br>    aside from Mr. Lentz, about respecting the<br>    confidentiality of HarvardConnection<br>    information?<br>    MR. HORNICK:  And I object, this is<br>    not 30(b)(6) testimony.  You can answer as a<br>    personal witness.<br>A.  I believe that I personally did not have an<br>    oral agreement with those programmers. | testimony, will be determined<br>later. |
| 369:9-<br>373:7 | Q.  Okay.  All right.  Fine.  And did anyone --<br>    did Mr. Narendra ever tell you at any time<br>    that he had obtained assurances from Mr.<br>    Zuckerberg that Mr. Zuckerberg would respect<br>    confidentiality of HarvardConnection<br>    information?<br>A.  You know, as I said earlier, both Mr.<br>    Narendra and Mr. Gao, specifically Mr. Gao,<br>    explained to Mr. Zuckerberg the proprietary<br>    and confidential nature of the --<br>Q.  That wasn't my question, sir.  My question<br>    was, did Mr. Narendra ever tell you that Mr.<br>    Zuckerberg had committed to him to respect<br>    the confidentiality of HarvardConnection<br>    information?<br>A.  I'm not sure.  I don't -- I believe that in<br>    the second meeting when we were all present<br>    we made it very clear the proprietary nature<br>    of the site.  Making something clear that<br>    it's proprietary is not -- is the same<br>    effect of telling someone "Don't tell them,"<br>    you know?<br>Q.  Not my question.<br>A.  Because Mr. Zuckerberg understands what<br>    proprietary information is.<br>Q.  I'm not asking about what Mr. Zuckerberg<br>    understood.  My question was very specific,<br>    and I'll ask it for the third time --<br>    MR. HORNICK:  And I'll object that | Non-responsive.<br><br><br><br>Non-responsive.<br><br><br><br>Non-responsive.<br><br><br>The witness has not answered |

he's answered it many times today and that you're now badgering the witness again.

    MR. HAWK: Okay. All right. Let's just have it again. If he doesn't want to answer the question again, he doesn't -- you know, I can't make him.

    MR. HORNICK: And otherwise, it's asking him personally. You're asking a personal question here, not a 30(b)(6) question.

    MR. HAWK: Yeah, okay. Whatever.

BY MR. HAWK:

Q. Did Mr. Narendra ever tell you that Mr. Zuckerberg had committed in his presence to respect the confidentiality of HarvardConnection information?

A. Let's just say -- I would say that --

Q. Did he ever -- yes or no, did he ever tell you that?

    MR. HORNICK: Let him finish his answer, Robert.

A. Mr. Zuckerberg agreeing to become part of the team, and to answer any questions that you might have like -- let's not talk about micro this, that, words, phrases, okay?

Q. No, that's not what my question was.

    MR. HORNICK: Robert, let him finish his answer.

    MR. HAWK: I want him to answer my question.

A. His agreement to complete that side of the code and become part of the team was understanding and accepting of the fact that it's proprietary information, and as I pointed out on C4 -- 46 -- whatever that document was, the fact that Mr. Zuckerberg didn't use our code proves that he was fully aware of it. So, you know, you're asking -- I can't recall every instance and every personal sentence that was said to Mr. Zuckerberg and if he said yes, like, you know, specifically in the way that you're describing to this person that he understood. What I'm saying is that by becoming part of the team he effectively and directly knew that it was proprietary and

---

the question.

The witness again does not answer the question, which is about what Narendra told him.

The witness again answers non-responsively, saying nothing about what Mr. Narendra said. The witness instead opines conclusorily about Mr. Zuckerberg's "understanding."

The witness's comments ("I can't recall every instance and every personal sentence…") reveals a failure to prepare for 30(b)(6) Topics 1, 2 and 10, in this case by asking Mr. Narendra for his recollections.

| | confidential information. | |
| | Q.  Right.  But do you understand, sir, that you haven't answered my question? | |
| |     MR. HORNICK:  Object.  He has answered your question, and again you sit there and you shake your head while he's talking and you keep cutting him off.  It's oppressive. | The witness has not answered the question. |
| |     MR. HAWK:  Well, I think the Judge is going to shake his head, and I -- | |
| |     MR. HORNICK:  The Judge can't see your behavior. | |
| |     MR. HAWK:  Well, we'll put it before the Judge because this witness is not answering my question. | |
| |     MR. HORNICK:  I think if you go back and read the transcript calmly, you'll realize that he has answered all your questions today, you just don't like the answers. | |
| |     MR. HAWK:  Okay.  All right. | |
| |     MR. CHATTERJEE:  I think he doesn't like the questions, but... | |
| |     MR. HAWK:  Yeah.  Yeah. | |

DOCSSV1:428065.3

**2) Counsel for ConnectU coaches the witness.**

Rule 30(d)(1) provides that "[a]ny objection to evidence during a deposition shall be stated concisely and in a non-argumentative and non-suggestive manner." "Speaking objections and coaching objections are simply not permitted in depositions in federal cases." *McDonough v. Keniston*, 188 F.R.D. 22, 24 (D. N.H. 1998).

| Citation | Text of deposition | Comments |
|---|---|---|
| 41:12-24 | Q. And so these are the only ones that you can remember? You can't remember any other ones, right?<br><br>　　MR. HORNICK: Objection. It's not a question of remembering, it's a question of asking follow-up questions.<br>A. Right. I mean, if you want to prompt me and ask me if, you know, this part of the site was proprietary and this part wasn't, or if you want to be more specific, I can certainly help out, but I think I've given you a pretty good bone to pick on, you know, that. | The objection coaches the witness, who parrots the lawyer's answer. |
| 102:6-12. | Q. Isn't it true that in no e-mail that was ever exchanged between you and Mark Zuckerberg was it stated, "Don't tell anyone else about this information"?<br><br>　　MR. HORNICK: Objection to the form of the question. Did it say those exact words? Is that your question? | Counsel for ConnectU improperly objects to the form of the question, which is perfectly permissible. ConnectU's counsel then coaches the witness by rewording the question. |
| 248:7-250:16 | Q. Thank you.<br>　　Now, would you look at Topic No. 6. Topic No. 6 is "The alleged role of Eduardo Saverin, Dustin Moskovitz, Andrew McCollum, and Christopher Hughes in the acts alleged in the Amended Complaint."<br>　　Are you the most knowledgeable person at ConnectU regarding that topic?<br>A. Yes.<br><br>　　MR. HORNICK: Just for the record, this witness isn't capable of testifying on those topics to the extent it would require him to have any access to the defendants' confidential information.<br>　　MR. HAWK: You know what? I don't know why you're saying that. I'm asking questions to establish what is known by the plaintiff in this case, who has brought this | Counsel simply directs the witness's attention to the noticed topics.<br><br><br>Before a question has even been asked, ConnectU's counsel objects in a way that coaches the witness to claim a lack of knowledge.<br><br>Moreover, the objection is improper inasmuch as the topic derives directly from the |

| | | |
|---|---|---|
| | lawsuit. And I don't even see what relevance your statement has, but I don't want to argue with you about it. I don't know if it's a coaching statement. I don't know what the point of it is, but I'm going to go forward.<br><br>    MR. HORNICK: Okay. Good.<br><br>    MR. HAWK: All right. Fair enough.<br><br>BY MR. HAWK:<br><br>Q.  What was Eduardo Saverin's role with Thefacebook in January 2004?<br><br>A.  Well, to the extent of my knowledge he was involved with Thefacebook prior to the coding and was involved in the development. What specifically, I haven't looked at the documents, but that's what I know.<br><br>Q.  You say he was involved in the development and in the coding of Thefacebook in January --<br><br>A.  Not the coding. Not the coding.<br><br>Q.  -- 2004. No, let me finish my question.<br><br>A.  I didn't say that.<br><br>Q.  Okay. Well, then let me finish the question, and then you can say, "No, I didn't say that."<br><br>    MR. HORNICK: Why don't you let him finish his answer.<br><br>    MR. HAWK: No, I want him to let me finish my question. I'm going to let him finish his answer, all right? But --<br><br>    MR. HORNICK: All right. Let him finish his answer.<br><br>    MR. HAWK: Yeah, but he's got to let me finish my question.<br><br>    MR. HORNICK: Well, he was answering your question from before, and you interrupted him.<br><br>    MR. HAWK: All right. You don't interrupt me, okay?<br><br>BY MR. HAWK:<br><br>Q.  Now, let me put a question --<br><br>A.  Sure. | complaint and seeks to discover ConnectU's knowledge as to its own allegations.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>The witness has interrupted and prevented Defendants' counsel from finishing his question.<br><br>Topic 6. |
| 276:21-<br>277:16 | Q.  Mr. Gao had the full code. Where did he have it?<br><br>A.  I believe he downloaded the full code in February of 2004, post-facebook launch from the | |

| | | |
|---|---|---|
| | server and had it on his hard drive.<br>Q. And that is the code that was printed out and that you gave to your attorneys to be deposited with the copyright office, correct?<br>A.      Yes.<br>Q.      All right.  Did you -- are you aware that any deletions or omissions were made from what Mr. Gao provided as the HarvardConnection code before it was deposited with the copyright office?<br>A.      No.  We asked him for the complete code.<br>**MR. HORNICK:  *But I should say that the witness might not be aware of deletions that were made.***<br>A.      To my knowledge, there were no deletions made. | Coaching. |
| 279:14-<br>281:6 | Q.  But -- all right.  But -- fair enough.  But my question was different.  My question was, you don't know that -- you don't know -- first of all, I think you've already testified -- let me make sure -- you don't know how many lines of code that Mr. Zuckerberg contributed to the HarvardConnection code that has been filed with the copyright office, correct?<br>A.  That --<br>      MR. HORNICK:  Objection.  That -- no Zuckerberg code that I know of has been published --<br>      MR. HAWK:  Hey, you're not testifying here.  If you have an objection, you just go ahead, buddy, but look, don't interfere.<br>      MR. HORNICK:  You're asking a question --<br>      MR. HAWK:  Don't coach your -- don't coach your witness.<br>      MR. HORNICK:  -- he can't answer.<br>      MR. HAWK:  Don't coach the witness.<br>      MR. HORNICK:  And it wasn't a true question.  When we --<br>      MR. HAWK:  If you have an objection, just -- you're interfering with the deposition.<br>      MR. HORNICK:  Ask your question.<br>      MR. HAWK:  I -- well, if you would stop interrupting, I would ask the question.<br>      MR. HORNICK:  I can't stop inter -- | ConnectU's counsel coaches the witness with his own factual testimony (that "no Zuckerberg code ... has been published" instead of simply objecting "mischaracterizes" or "lacks foundation."<br><br><br><br>ConnectU's counsel further coaches the witness by characterizing the question as "not true."<br><br>When his interference with the conduct of the deposition is pointed out, ConnectU's counsel continues to argue |

| | | |
|---|---|---|
| | you've got to be -- you've got to --<br>    MR. HAWK:  No, I don't have to do anything --<br>    MR. HORNICK:  -- ask questions, Robert.<br>    MR. HAWK:  -- except conduct an examination --<br>    MR. HORNICK:  You can't mislead the witness.<br>    MR. HAWK:  -- and you're interfering. | with Defendants' counsel, further delaying and disrupting the deposition. |
| 359:23-360:8 | Q.  Did Mr. Saverin say anything that he had any knowledge that the allegations that you were making against Mr. Zuckerberg were correct?<br>    MR. HORNICK:  Objection.  The complaint hadn't been filed at that point, so do you want to rephrase your question?<br>    MR. HAWK:  No, I don't want to rephrase the question.<br>A.  He apologized for our -- what we believed was a wrongdoing, and this was -- that was about all he said, I believe. | ConnectU's counsel intervenes to interpret the question as referring specifically to the Complaint, which by its language it need not, and suggests that the question makes no sense, thereby coaching the witness to be non-responsive. The witness answers properly, showing that he understood the question. |

**3) Counsel for ConnectU encourages the witness to flout his obligations under the Federal Rules of Civil Procedure to give candid and factual answers**

| Citation | Text of deposition | Comments |
|---|---|---|
| 63:23-68:3 | Q.  Was there any discussion about what share of the partnership he would have?<br>A.  With respect to dot-com companies, they're generally started as projects and sort of a small group of people with an idea, and it's sometimes unclear exactly where, you know, two months from that -- the start point or six months from that start point where exactly the equity will lay.  Mr. Zuckerberg himself has reapportioned equity multiple times.<br>    So to the extent of talking about equity shares at that point, it was premature.  However, everything was an equal partner.  Everybody did contribute.<br>Q.  So I want to make sure this is clear.  So was there any discussion about what share of the partnership Mr. Zuckerberg would have?<br>A.  The specific share, it was premature to speak about that at that time.<br>Q.  So is the answer to my question no?<br>A.  The answer is that it was premature to speak about specific shares.  Was it understood by Mr. Zuckerberg that he would get a share?  Yes.<br>Q.  Okay.  Did you tell Mr. Zuckerberg how much of a share of the partnership he would have?<br>A.  Well, there is more --<br>Q.  Please just answer the question.  It's a yes or no.<br>    MR. HORNICK:  The witness can answer the question however he wants.<br>A.  Yeah, I mean, you're -- I'm assuming you're talking about equity share, the multiple benefits to a project, which could include prestige, equity.  There's multiple levels.  And at that point we had no revenue source, and the product was far from completion.  We stressed to him multiple times that one of his major benefits would be a sort of a reinventing of himself in terms of his | |

reputation post the Facemash debacle.  In
fact, he would be the center point of the
launch, not us, even though it was our idea.

    So we did not have specific talks
about equity share, but as I said, he was an
equal partner.  Whatever you might want to
infer from the equal partner, be it a
quarter, a quarter, a quarter, that's fine.

Q.  Did you tell Mr. Zuckerberg that he would be
an equal partner?

A.  I told Mr. Zuckerberg that he was -- we
conveyed to Mr. Zuckerberg that he would be
a part of the HarvardConnection team --

Q.  And --

A.  -- okay, not a contract programmer.

Q.  And did you convey to him what his share of
the partnership would be?

    MR. HORNICK:  Objection, asked and
answered.

A.  As I said before, we did not speak about
specific equity stakes at that point.  It
was premature.  If, you know -- I might
point out at that time that Mr. Zuckerberg
had yet to make a contribution.  So,
generally speaking, you know, in any law
firm, particularly -- you know, I'm sure
your firm works this way -- you work for
seven, eight, ten years and then become a
partner.  People don't hand out partnership.
You know, you don't give out equity.

    So everybody was aware that they were
on a team, they'd make contributions, and
that depending on the size of the
contribution after a certain time period,
they would be given equity.

Q.  Was there ever any discussion at any point
with Mr. Zuckerberg about what his share of
the partnership would be?

A.  Other than the fact that he was an equal
partner on ConnectU and given full creative
control and full input into what the product
could and should be, there was not a
specific discussion about specific amounts
of equity at that time.

Q.  Was there ever discussions stating that he
was an equal partner?

DOCSSV1:428065.3

| | | |
|---|---|---|
| | A. As I said, we invited him to be part of the team. We invited him to contribute. He agreed to contribute, end of story.<br>Q. And where I'm focusing now is the word "equal."<br>A. Uh-huh.<br>Q. So did you ever tell Mr. Zuckerberg he would be an equal partner?<br>A. Well, I think the fact that we gave him our whole source code, gave him creative control, gave him full, you know -- asked him for multiple input would certainly lend to the word "equal." There was no one-way dialogue. In fact, if anything, it was skewed in his favor. And so he had more than enough reason to believe that it was going to be on equal terms, his terms, and that's as far as really I can comment on that. | |
| 81:20-<br>82:14 | Q. Did you ever terminate his partnership?<br>A. Well, I think a better question is, did he ever fulfill the contribution level that he agreed to? And he was -- to our knowledge, we have yet to receive that contribution.<br>Q. And that's not my question. Did you ever terminate the partnership with him?<br>A. Well, I think the -- you know --<br>    MR. HORNICK: I think you're putting words into the witness's mouth.<br>A. Yeah. Again, the question might better be phrased as, did he complete the sort of contribution he agreed to that would have suggested him being an equal partner? And absolutely not. He -- or maybe he did complete it, but we don't have it.<br>Q. Okay. Mr. Winklevoss, you're not answering my question.<br>    MR. HORNICK: You're giving him an unfair question, that's why. | The witness refuses to answer the question and proposes a "better question."<br><br>Counsel poses the very simple factual question again.<br><br>ConnectU's counsel makes an coaching objection. Again the witness refuses to answer the question and proposes an alternative question.<br><br><br>ConnectU's counsel again coaches the witness not to answer the question asked. |
| 87:23-<br>91:19 | Q. Did you ever tell Mr. Jackson he should keep the information confidential and not share it with others?<br>A. It was clear that he was on a contract basis and that he should complete his portion, and Victor -- were it not I, Victor would have certainly told him this is a project that | Non-responsive. |

-59-

| | |
|---|---|
| should not be talked about.<br>Q.  Did you ever tell him that?<br>A.  I don't recall if I told him, but Victor I think most certainly would have.<br>Q.  And did Victor tell you, Tyler Winklevoss or Cameron -- or Divya Narendra that he informed Mr. Jackson of his confidentiality obligations?<br>A.  I don't recall.  I don't know.  I can't say specifically if -- to my recollection, Mr. Gao would probably be a better individual to ask on that term, but I think it was fairly understood, and just like Victor brought Mark up to speed in terms of proprietary information, he would have done so with Joe as well.<br>Q.  So is it ConnectU's testimony that Mr. Jackson was or was not told?<br>A.  I believe that he understood that it was proprietary information, is ConnectU's position.<br>Q.  The term "understood" is a confusing thing to me.  Was he told --<br>　　　　MR. HORNICK:  Well, it's not a confusing word.  Don't say that.<br>A.  How so?<br>　　　　MR. HORNICK:  Just ask your question.<br>Q.  Well, did somebody tell him that he shouldn't share it with other people?<br>A.  Well, "understood" sort of implies that either -- you can read it, you can hear it, you can understand it.  It's ConnectU's position that he understood it.  And how he understood it, I can't tell you exactly what neurons were firing in his brain that day that, you know, specifically gave him the inclination.<br>　　Again, Victor was present at a lot of those meetings.  Victor was absolutely aware of the proprietary information, and he would have made Joe Jackson aware of that, just like he made Mr. Zuckerberg aware of that.<br>Q.  So let me just ask it again.  Does ConnectU know if Mr. Jackson was told to keep the information confidential? | Lack of preparation, referring the questioner to another individual.<br><br><br><br><br><br><br>Speculation.<br><br><br><br><br><br><br><br><br><br>Non-responsive, speculation as to what Jackson "understood."<br><br><br>Coaches witness to continue his conduct.<br><br><br><br>Deposing counsel asks the question for the fifth time.<br><br>The witness still does not answer the question about what was told by ConnectU rather than what he believes was understood by Johnson.<br><br><br><br>Speculation without knowledge of what they did, indicating a lack of preparation.<br><br>Counsel asks the question again, for the sixth time. |

A.   It's ConnectU's position that Mr. Jackson understood that it was proprietary information.

Q.   Okay.  But you don't know if he was actually told?

A.   It's our position.  Again, how he got that understanding, I don't -- you know, it's not for me to sort of speculate on, but it's our position that he's -- he had that understanding.

Q.   That he had that understanding, but you don't know whether he was told or he just knew it or what?

A.   I would assume that he was told, but, again, that -- you know, who he got that understanding -- you know, a lot of programmers get understanding when you give them a block of code and you say, "This is code that I own, and this is a project that we're launching," and, you know, that alone for many people is a threshold for IP.

   You know, programmers don't -- you know, especially people like Mr. Zuckerberg who are involved in an academic programming environment where they have to do programming problem sets, I don't think their teachers have to tell them that what you write is their code and that you shouldn't take code from a classmate or that, you know, you shouldn't copy, just like you don't copy a term paper.  It's an understood thing in the academic community.  Teachers don't have to say that.  It's sort of a bylaw of any kind of coding.

   There's open source, and then there's closed source.  And closed source is proprietary information.  And closed source is anything that's not made public purposely or -- you know, for that matter.

   So we're talking about sort of nuances and this and that, but the fact of the matter is these are programming individuals, and they understood that it was proprietary information.  That's our position.

| | |
|---|---|
| 204:22-206:5 | Q.   Do you see that?  Beneath that, did you disclose anything that ConnectU or |

Non-responsive.

Counsel asks the question for the seventh time.

The witness repeats again his non-responsive answer and admits that to answer would be to "speculate."

Counsel asks the question for the eighth time.

Again the witness refuses to answer, speculates, and repeats ConnectU's legal position.

Topics 2, 10.

Counsel poses a straightfor-ward question about the

| | | |
|---|---|---|
| | HarvardConnection says this is confidential information?<br>    MR. HORNICK:  And read it carefully, Cameron.<br>    THE WITNESS:  Yeah.<br>    (Witness reviews document.)<br>A.  This -- yeah, this may, in fact, be proprietary information, but I will point out that myself and Mr. Lentz were engaged in business activities at this point.  And he had a company called Greenwave Wireless, which --<br>Q.  I understand.  My question's very, very simple.  It's -- and I'll restate it --<br>    MR. HORNICK:  Object.<br>Q.  -- in case it was unclear.<br>    MR. HORNICK:  Well, actually, the witness answered the question.<br>    MR. HAWK:  No, he didn't.  He said this may be or something like that.<br>    MR. HORNICK:  That was his answer.<br>    MR. CHATTERJEE:  Well, let's not argue about it.  I'm going to ask the witness a question.  He's going to answer it, and, you know, if he's non-responsive, we'll go to court on it.<br>    MR. HAWK:  We don't want something like may be.  We want an answer to the question.<br>BY MR. CHATTERJEE:<br>Q.  What is --<br>    MR. HORNICK:  He gave his answer. | contents of a document.<br><br><br><br>Non-responsive. |
| 302:18-<br>303:22 | Q.  Okay.  So it is correct that in November of 2003 when you engaged, allegedly, Mr. Zuckerberg, you believed that 10 to 15 hours were all that was necessary to complete the website, correct?<br>A.  Yes.  And in addition, Mr. Zuckerberg said that he had completed the website as of a couple days after our first meeting, so that would lend it to be true, I would think.<br>Q.  Well, I'll object.  I'm going to move to strike your last answer --<br>A.  Okay.<br>Q.  -- you know?  And let me ask the question again.  Sometimes it -- | |

| | | |
|---|---|---|
| | A.  I'm just telling you --<br>Q.  Well, you know, the problem is I ask specific questions, and I am entitled to answers --<br>A.  Sure.<br>Q.  -- to those questions without a bunch of other --<br>A.  Right.<br>Q.  -- stuff tacked on.<br>　　MR. HORNICK:  No, that's not true. He can answer --<br>　　MR. HAWK:  It's absolutely true --<br>　　MR. HORNICK:  -- the question however he wants.<br>　　MR. HAWK:  -- and we're not going to argue about it. | Regarding non-responsive and evasive. |
| 378:14-381:7 | Q.  Okay.  When did Mr. Moskovitz first become aware of HarvardConnection?<br>A.  As I said, I can't specifically say when he became aware of HarvardConnection.<br>Q.  Did Mr. Moskovitz ever see any Web page for any version of the HarvardConnection website?<br>A.  I cannot say that specifically.<br>Q.  You don't know?<br>　　MR. HORNICK:  The witness can't answer this question without seeing confidential information.<br>A.  Yeah, I can't say that.<br>　　MR. HAWK:  No, I want to know if he knows or not.<br>　　MR. HORNICK:  I told you he can't answer this question without seeing confidential information.<br>　　MR. HAWK:  I appreciate your testimony, but I'm asking for his, and I just want to know if he knows the answer to the question.<br>BY MR. HAWK:<br>Q.  Sir, do you know, did Mr. Moskovitz ever see any Web page or any version of the HarvardConnection website?<br>A.  I cannot say other than what I've stated before, which is that I believe, based on evidence, that he was involved in the creation of Thefacebook, which I believe was | Coaches the witness to say that he can't answer the question.<br><br><br><br><br><br><br><br><br><br><br><br>The witness expresses his conclusory "belief" as to different question that was not posed. |

| | | |
|---|---|---|
| | a derivative work of HarvardConnection.<br>Q.  Yeah, but that's not my question.  My<br>question is, did Mr. Moskovitz ever see any<br>Web page --<br>A.  I don't --<br>Q.  -- for any version of the HarvardConnection<br>website?<br>A.  I don't know.<br>Q.  Okay.<br>A.  I don't know.<br>Q.  That was easy, wasn't it?  Did Mr. Moskovitz<br>ever see any line of source code for<br>HarvardConnection?<br>A.  Again, it's my belief; however, I don't<br>know.<br>Q.  You don't know?<br>A.  But my belief, based on evidence --<br>Q.  I didn't ask for your belief.  Remember the<br>little lecture that I gave at the beginning?<br>     MR. HORNICK:  He's entitled to give<br>his answer, Robert.<br>     MR. HAWK:  Okay.  And I'm entitled<br>to cross-examine the witness.<br>     MR. HORNICK:  And you're --<br>Q.  Did Mr. --<br>     MR. HORNICK:  I'm not going to let<br>you trap him in a corner.<br>Q.  Did Mr. Moskovitz ever see any line of<br>source code for HarvardConnection?<br>A.  It's my belief that he did.<br>Q.  Okay.  Do you know if Mr. Moskovitz ever saw<br>any line of source code for<br>HarvardConnection?  I'm not asking for your<br>belief.  Do you know whether he ever saw any<br>line of source code?<br>A.  If by that have I seen him, I would say no,<br>I do not know --<br>Q.  Fine.<br>A.  -- I believe. | The witness qualifies his<br>answer with unfounded<br>"belief." |
| 382:14-<br>383:6 | Q.  Do you know or -- let me just ask you this:<br>Did Mr. McCollum ever see any Web page for<br>any version of the HarvardConnection<br>website?<br>A.  It is my belief that he did.  I do not know<br>if he did.<br>Q.  Okay.  And did Mr. McCollum ever see any | The witness testifies as to his<br>"belief" not based on the facts<br>that are known to him or to |

DOCSSV1:428065.3

| | | |
|---|---|---|
| | line of source code for HarvardConnection?<br>A.   Again, it's my belief, based on evidence, that he did.  I do not know if he did.<br>Q.   All right.  You know what?  I'm just going to make it easy for you.  I'm not asking about your belief, I'm asking about your knowledge, and I have been for the last 20 questions, all right?<br>        MR. HORNICK:  Objection, argumentative.  And there's no question pending so just ask another question. | ConnectU. |

DOCSSV1:428065.3

**4) Counsel for ConnectU improperly obstructs Defendants' counsel's proper conduct of the deposition.**

| Citation | Text of deposition | Comments |
|---|---|---|
| 80:2-19 | Q.   So it was not a tool that was specifically directed towards helping employers find students that they might want to hire --<br>A.   It could be used by employers, and it could be used by students, but it --<br>Q.   Let me finish my question.<br>       MR. HORNICK:  Well, let him finish his answer.<br>Q.   Okay.  Go ahead and finish.<br>A.   It could be.  As I said before, it's a user-defined -- these are user-defined sites to a large extent.  So it could be used in that case, but it also could be used student to student, alumni to alumni, alumni to student, student to alumni, employer to student.  You know, you can draw a matrix and probably come up with 10 different relationships or uses of the site. | The witness interrupted counsel while he was posing a question. |
| 108:12-110:2 | Q.   And anything else you can identify?<br>A.   I think I've answered the question.<br>Q.   Well, other than that one statement, is there anything else you can identify in what I've marked as Exhibit 4?<br>A.   If you want me to go through these and sort of look a little bit more thoroughly, that's the first thing that popped out.  I think it sufficiently answers the question.<br>Q.   Sure.  Why don't you look through it more thoroughly and see if there's anything else.<br>A.   To really, you know, more thoroughly sort of hammer it home, Victor Gao, again, in multiple conversation -- you know, a two-hour conversation imparted to Mark the sort of the proprietary nature of the website.  So I really don't think it's necessary.<br>       MR. HORNICK:  I'll say that your question is reaching the oppressive level under the Federal Rules.<br>       MR. CHATTERJEE:  You can seek a protective order if you think it's | The witness contests whether he's required to answer the question posed.<br><br><br>The question, now posed for the third time, seeks identification of any other evidence of which the witness is aware.  Again the witness states that because he has identified one piece of evidence, he need not answer the question. |

-66-

| | | |
|---|---|---|
| | oppressive. I'm just asking --<br>        MR. HORNICK: I can stop it under that basis, if you read the rule.<br>        MR. CHATTERJEE: If you want to stop it, stop it.<br>        MR. HORNICK: I don't want to, no. I want to give you your full day.<br>A.  And I'd like you to be --<br>        MR. HORNICK: I suggest you move on. The witness has answered your question, many times.<br>        MR. CHATTERJEE: I actually asked him to identify everywhere in these documents --<br>        MR. HORNICK: And he told you the whole set of documents, and I told you the set of document documents is incomplete, so your questioning is unfair and oppressive. | ConnectU's counsel threatens to stop the deposition.<br><br><br><br><br><br><br>ConnectU's counsel improperly defends his client's answering by reference to an entire mass of documents. |
| 267:13-<br>269:25 | Q.  So in and of itself, asking for dating preferences, that was not a trade secret of HarvardConnection at any time, correct? That had been done by a lot of other websites, right?<br>A.  Asking for dating preferences is not -- yeah, that would not be proprietary.<br>Q.  That's not a trade secret, right?<br>A.  Yes.<br>Q.  And asking for a person's house at Harvard that they live in or their major or their thesis, those are not trade secrets on a college website, to ask that kind of information on a college website? Would you agree with me?<br>        MR. HORNICK: Objection, mischaracterizes.<br>A.  I --<br>Q.  In and of -- in and of themselves?<br>        MR. HORNICK: Objection. What kind of a question that?<br>        MR. HAWK: It's a good one.<br>        MR. HORNICK: In and of themselves is a question?<br>        MR. HAWK: You know what?<br>        MR. HORNICK: He's already given you an answer. | ConnectU gives a clear and direct admission that a particular aspect of the HarvardConnection website is not a trade secret.<br><br><br><br><br><br><br>Baseless objection.<br><br><br><br>ConnectU's counsel makes an improper objection: "What kind of question is that?"<br><br><br>ConnectU's counsel further delaying and disrupting the questioning. |

-67-

| | | |
|---|---|---|
| | MR. HAWK:  You're interfering with the deposition, okay?<br><br>MR. HORNICK:  He's already given you an answer.<br><br>MR. HAWK:  Just make your objection, all right?  If you have an objection, just make it, but let me cross-examine the witness, all right?  You'll --<br><br>MR. HORNICK:  I asked you if that was a question.<br><br>MR. HAWK:  Yeah, but that's not an objection.  You can object to my questions.  I don't want to get into banter like this back and forth.  If you have an objection, just state it.  Otherwise, I'm going to conduct the examination of the witness.<br><br>MR. HORNICK:  And if you ask questions like, I'll ask you if that's really --<br><br>MR. HAWK:  All right.  Well, that's improper.  You're interfering with the deposition.<br><br>MR. HORNICK:  Ask proper questions, Robert.  You'll be fine.<br><br>MR. HAWK:  No, John, I'm not going to -- I'm not going to get into this with you.  We'll -- you know, if we're going to have to have motion practice to keep you from interfering with the deposition, we'll do it.<br><br>MR. HORNICK:  Go ahead and ask your questions.<br><br>MR. HAWK:  Yea, I'm going to go ahead and ask my question, if I can remember what it was after all that. | ConnectU's counsel repeats his false objection that the question was already answered.<br><br><br>ConnectU's counsel repeats his disruptive comment, which is not a proper objection.<br><br><br><br>ConnectU's counsel asserts his right to comment on Defendants' counsel's questions during the deposition regardless of whether a proper objection is being made. |
| 304:3-<br>305:17 | Q.  Let me re ask the question --<br>A.  Okay.<br>Q.  -- okay?  In November 2003 when you allegedly engaged Mr. Zuckerberg, your belief was that 10 to 15 hours was required to finish the HarvardConnection website?<br>A.   My belief, based on the fact that Mr. Zuckerberg said that he completed the code shortly after he began work on it, would lead to -- and this is my belief.  And I'm | ConnectU's counsel objects to a simple request to have the question read back. |

DOCSSV1:428065.3

giving you the facts as to why I'm basing my belief -- beliefs are based on sort of a set of facts that are, you know, in your repertoire, and my belief is that based on the expedient nature in which he said he completed the website, it was approximately 10 to 15 hours' worth of work.

Q.  Sir, but I --

MR. CHATTERJEE:  I'm sorry, could the court reporter read your question back, please.

THE WITNESS:  I heard the question.

MR. HORNICK:  Yeah, I don't think --

MR. CHATTERJEE:  Could you read it back, please?

MR. HORNICK:  I don't think -- I think you're harassing the witness.

MR. CHATTERJEE:  I'm just trying to hear what the question was.

MR. HAWK:  Well, let's have the question read back.

MR. CHATTERJEE:  I just -- I want to hear what it was.

MR. HAWK:  Let's have the question read back.

(Record read.)

MR. CHATTERJEE:  Okay, "engaged." Okay.  Thank you.

BY MR. HAWK:

DOCSSV1:428065.3