# EXHIBIT 10
# (PART 1 OF 3)

Page 3

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS
3
4   CONNECTU LLC,
5          Plaintiff,
6     v.        C.A. No. 04-1923(DPW)
7   MARK ZUCKERBERG, EDUARDO SAVERIN,
    DUSTIN MOSKOVITZ, ANDREW McCOLLUM,
8   CHRISTOPHER HUGHES and THE FACEBOOK,
    INC.,
9
          Defendants.
10
11
12   _____
13          VOLUME I
14   VIDEOTAPED DEPOSITION OF CONNECTU LLC
15      BY CAMERON H. WINKLEVOSS
16        Boston, Massachusetts
17        Tuesday, August 9, 2005
18        9:44 a.m. to 6:27 p.m.
19
20
21   Reported by:
     Jessica L. Williamson, RMR, RPR, CRR
22   Notary Public, CSR No. 138795
23   JOB NO. 36599
24
25

Page 2

1        VIDEOTAPED DEPOSITION OF CONNECTU LLC
2    by CAMERON H. WINKLEVOSS, a witness called
3    on behalf of the Defendant Mark Zuckerberg,
4    Dustin Moskovitz, Andrew McCollum,
5    Christopher Hughes and The Facebook, Inc.,
6    pursuant to Rule 30(b)(6) of the Federal
7    Rules of Civil Procedure, before Jessica L.
8    Williamson, Registered Merit Reporter,
9    Certified Realtime Reporter and Notary
10   Public in and for the Commonwealth of
11   Massachusetts, at the Offices of Proskauer
12   Rose, LLP, One International Place, Boston,
13   Massachusetts, on Tuesday, August 9, 2005,
14   commencing at 9:44 a.m.
15
16   A P P E A R A N C E S
17   FINNEGAN HENDERSON FARABOW GARRETT & DUNNER
18   LLP
19    (By John F. Hornick, Esq.
20    and Troy E. Grabow, Esq.)
21    901 New York Avenue, NW
22    Washington, D.C. 20001-4413
23    (202) 408-4000
24    john.hornick@finnegan.com
25    Counsel for the Plaintiff

Page 3 (continued)

1     A P P E A R A N C E S, Continued
2
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
4    (By I. Neel Chatterjee, Esq.
5    and Joshua H. Walker, Esq.)
6    1000 Marsh Road
7    Menlo Park, California 94025
8    (650) 614-7356
9    nchatterjee@orrick.com
10   Counsel for the Defendants Mark
11   Zuckerberg, Dustin Moskovitz, Andrew
12   McCollum, Christopher Hughes and The
13   Facebook, Inc.
14
15   HELLER EHRMAN LLP
16    (By Robert B. Hawk, Esq.)
17    275 Middlefield Road
18    Menlo Park, California 94025-3506
19    (650) 324-7000
20    robert.hawk@hellerehrman.com
21    Counsel for the Defendant Eduardo Saverin
22
23   ALSO PRESENT:
24
25    George Dobrentey, Videographer

Page 4

1          I N D E X
2   DEPONENT            PAGE
3   CAMERON H. WINKLEVOSS
4   Examination By Mr. Chatterjee      7
5   Examination By Mr. Hawk         244
6
7         E X H I B I T S
8   NO.              PAGE
9   1 Amended Notice of Deposition    44
      of Plaintiff and
10    Counterdefendant ConnectU
      Pursuant to Fed.R.Civ.P.
11    30(b)(6)
12  2 First Amended Complaint      62
13  3 E-mail dated May 4, 2004,      71
      Bates Nos. C003165 - 3166
14
15  4 E-mails, Bates Nos. C004577 -   103
      4631
16  5 Certificate of Registration,   152
      Bates Nos. C004842 - 4845
17
18  6 E-mail string, Bates Nos.     159
      C004792 - 4793
19  7 E-mail, Bates No. C004791     162
20  8 E-mail, Bates No. C004810     176
21  9 E-mail, Bates No. C004820     182
22  10 E-mail, Bates No. C003852     188
23  11 E-mail, Bates No. C004841     192
24  12 E-mail, Bates No. C009556     197
25

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Page 7

| | |
|---|---|
| 1 | E X H I B I T S |
| 2 | NO.                                    PAGE |
| 3 | 13  E-mail string, Bates Nos.      200<br>     C006955 - 6959 |
| 4 | 14  E-mail with attachment, Bates  211<br>     Nos. C003587 - 3603 |
| 5 | |
| 6 | 15  E-mail, Bates Nos. C003850     242<br>     -3851 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | Note:  Original Exhibits 1 - 15 were |
| 18 | retained by the court reporter and forwarded |
| 19 | to Sarnoff Court Reporting for distribution. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 7 (right column)**

```
09:44:59  1        MR. HORNICK:  John Hornick and Troy
09:45:01  2    Grabow for the plaintiff, ConnectU.
          3
          4        CAMERON H. WINKLEVOSS,
          5    a witness called on behalf of the Defendants
          6    Mark Zuckerberg, Dustin Moskovitz, Andrew
          7    McCollum, Christopher Hughes and The
          8    Facebook, Inc., having first been duly
          9    sworn, was deposed and testifies as follows:
          10
          11             DIRECT EXAMINATION
          12
          13    BY MR. CHATTERJEE:
09:45:10  14   Q.  Mr. Winklevoss, thank you for coming today.
09:45:14  15       Do you understand that your deposition today
09:45:16  16       is you're testifying on behalf of ConnectU
09:45:19  17       LLC?
09:45:19  18   A.  Yes.
09:45:19  19   Q.  Have you ever had your deposition taken
09:45:21  20       before?
09:45:21  21   A.  No.
09:45:22  22   Q.  I'm going to go over some ground rules with
09:45:26  23       you, and I'm just going to ask you to make
09:45:29  24       sure you understand them.  You may have gone
09:45:31  25       over them with your counsel before.
```

Page 6

```
09:43:59  1         P R O C E E D I N G S
09:43:59  2         THE VIDEOGRAPHER:  We are recording
09:44:01  3    and are now on the record.  Today's date is
09:44:04  4    August the 9th, 2005, and the time is 9:44
09:44:07  5    a.m.  My name is George Dobrentey.  I'm a
09:44:10  6    legal videographer for G & M Court
09:44:14  7    Reporters, Ltd.  Our business address is 42
09:44:15  8    Chauncy Street, Suite 1A, Boston,
09:44:17  9    Massachusetts 02111.
09:44:18  10        This is the deposition of Cameron
09:44:23  11   Winklevoss in the matter of ConnectU vs.
09:44:27  12   Zuckerberg in the United States District
09:44:28  13   Court for the District of Massachusetts,
09:44:30  14   Civil Action No. 04-1923(DPW).
09:44:33  15        This deposition is being taken at One
09:44:37  16   International Place in Boston,
09:44:37  17   Massachusetts, on behalf of the defendant.
09:44:38  18   The court reporter is Jessica Williamson.
09:44:41  19   Counsel will state their appearances, and
09:44:42  20   the court reporter will administer the oath.
09:44:45  21        MR. CHATTERJEE:  Neel Chatterjee
09:44:47  22   and Joshua Walker for all of the defendants
09:44:49  23   except for Eduardo Saverin.
09:44:54  24        MR. WALKER:  Robert Hawk from
09:44:56  25   Heller Ehrman for Defendant Saverin.
```

Page 8

```
09:45:33  1    A.  Uh-huh.
09:45:33  2    Q.  The first thing is I generally -- when I
09:45:36  3        take depositions, I go for about an hour and
09:45:38  4        I take a break.  If you find yourself
09:45:41  5        getting tired or having to -- getting
09:45:45  6        confused, please feel free to take a break,
09:45:48  7        the only time I'll insist we continue is if
09:45:51  8        there's a question pending.  Do you
09:45:52  9        understand that?
09:45:53  10   A.  Uh-huh.
09:45:54  11   Q.  The second thing actually is important.
09:45:56  12       It's important that you answer questions
09:45:58  13       with a yes or a no, not an uh-huh --
09:46:00  14   A.  Okay.
09:46:00  15   Q.  -- or a sound.  The reason for that is this
09:46:03  16       is all being transcribed, and it's very
09:46:05  17       important that the record be accurate.  So
09:46:07  18       nods of the head and sounds often give an
09:46:10  19       ambiguity as to what the correct answer is.
09:46:13  20       Do you understand that?
09:46:13  21   A.  Yes.
09:46:13  22   Q.  Okay.  Thank you.
09:46:14  23       If you don't understand a question
09:46:16  24       that I'm asking, please let me know.  If you
09:46:20  25       don't ask me or tell me that you don't
```

2 (Pages 5 to 8)

09:46:22  1    understand the question, I'm going to assume
09:46:24  2    that you understand the question.  Do you
09:46:25  3    understand that?
09:46:25  4    A.  Yes.
09:46:28  5    Q.  Is there anything -- any reason that you
09:46:31  6    would not be capable to testify truthfully
09:46:33  7    and accurately today?
09:46:34  8    A.  No.
09:46:35  9    Q.  Okay.  And is there anything that would
09:46:38 10    impede your ability to testify competently
09:46:41 11    today, such as are you on any medications or
09:46:43 12    anything like that?
09:46:43 13    A.  No.
09:46:47 14    Q.  And, excuse me, from time to time your
09:46:53 15    attorney may lodge an objection to a
09:46:55 16    question that I make.  Unless he instructs
09:46:57 17    you not to answer, if you understand the
09:46:59 18    question, you need to answer it.  His
09:47:02 19    objections and Mr. Hawk's objections are
09:47:04 20    just to preserve the record.  This testimony
09:47:07 21    is if you were testifying at trial.  So
09:47:09 22    they're preserving the objections because we
09:47:11 23    don't have a judge here.  Do you understand
09:47:12 24    that?
09:47:13 25    A.  Yes.

Page 10

09:47:14  1    Q.  Okay.  What did you do to prepare for your
09:47:18  2    deposition today?
09:47:20  3        MR. HORNICK:  And, Cameron, before
09:47:21  4    you answer that, just you can tell him
09:47:23  5    generally, but don't tell him anything that
09:47:25  6    we might have discussed.
09:47:26  7    A.  We -- or I basically went over sort of --
09:47:33  8    you know, went through the course of events,
09:47:36  9    tried to reconstruct them in my mind and
09:47:40 10    refresh my memory and just sort of be on top
09:47:43 11    of the material.
09:47:45 12    Q.  What do you mean by "be on top of the
09:47:47 13    material"?
09:47:48 14    A.  Well, as you guys are fully aware, that this
09:47:51 15    situation happened -- began in 2003, so
09:47:55 16    that's approximately two years ago.  So I
09:47:58 17    went over anything, you know, e-mails and
09:48:02 18    anything else that might relate to it.
09:48:05 19    Q.  So did you review any specific documents to
09:48:07 20    refresh your recollection?
09:48:09 21    A.  No.  I pretty much went over the whole --
09:48:14 22    the whole opus or whatever you call it, went
09:48:20 23    through some e-mails, tried to think of
09:48:23 24    interactions that we had, meetings and
9:48:27 25    whatnot.  And that's about it.

09:48:28  1    Q.  And what e-mails are you referring to?
09:48:30  2    A.  Basically any and all discourse between
09:48:35  3    myself, Mr. Zuckerberg.
09:48:38  4    Q.  Did you talk to anyone other than your
09:48:41  5    lawyers to prepare for your deposition
09:48:42  6    today?
09:48:43  7    A.  No.
09:48:44  8    Q.  So you did not talk to Divya Narendra?
09:48:47  9    A.  Not in terms of the preparation for the
09:48:51 10    deposition, no, absolutely not.
09:48:54 11    Q.  And you didn't talk to Tyler Winklevoss?
09:48:55 12    A.  No.
09:48:56 13    Q.  And you didn't talk to Howard Winklevoss?
09:48:57 14    A.  About this specific deposition, we -- in
09:49:02 15    terms of the preparation yesterday, no.
09:49:04 16    Q.  Other than your preparation yesterday, did
09:49:06 17    you do anything to prepare for this
09:49:07 18    deposition before your preparation
09:49:09 19    yesterday?
09:49:09 20    A.  No, not really.  That was -- yesterday was
09:49:14 21    the day where we sort of sat down and did
09:49:18 22    that with counsel.
09:49:20 23    Q.  So to prepare for your deposition today, you
09:49:23 24    met with counsel?
09:49:24 25    A.  Uh-huh.

Page 12

09:49:24  1    Q.  And how long -- is that a yes or a no?
09:49:27  2    A.  That's a yes, yes.
09:49:28  3    Q.  And how long was that meeting?
09:49:29  4    A.  We met in the morning and the afternoon, so
09:49:35  5    I would guesstimate six hours or so, six or
09:49:40  6    seven hours.
09:49:40  7    Q.  Six or seven hours.
09:49:41  8        And who was present at those meetings?
09:49:44  9    A.  John Hornick and Troy Grabow.
09:49:46 10    Q.  Anyone else?
09:49:47 11    A.  No, just myself.
09:49:48 12    Q.  And could you state what your current
09:49:51 13    address is?
09:49:51 14    A.  Current address is -- well, I have a dual
09:49:55 15    address right now, dual residences.  One of
09:49:59 16    which is in Connecticut, 10 Khakum Wood
09:50:02 17    Road, Greenwich, Connecticut, and the other
09:50:05 18    which is in Cambridge, 8 Museum Way,
09:50:09 19    Cambridge, Massachusetts.  And the reason I
09:50:15 20    have dual residency is because I have -- I
09:50:18 21    spent a lot of time in Connecticut over the
09:50:19 22    last year, so I've been going back and
09:50:21 23    forth.
09:50:22 24    Q.  And could you spell Khakum Wood?
09:50:24 25    A.  K-H-A --

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Page 15

09:50:26 1   Q. K-H-A.
09:50:27 2   A. -- K-U-M Wood Road.
09:50:32 3   Q. Okay. Does ConnectU have a business
9:50:37 4       address?
09:50:37 5   A. Yes. It's 500 West Putnam Avenue,
09:50:42 6       Greenwich, Connecticut 06830.
09:50:46 7   Q. And is that an office building?
09:50:48 8   A. Yes, it is.
09:50:49 9   Q. And how long has it been there?
09:50:52 10  A. Since the inception of -- all bills are sent
09:50:57 11     to that address. Any of -- you know, any
09:51:00 12     invoices and corporate documents and whatnot
09:51:03 13     have been sent there, so since the
09:51:04 14     beginning.
09:51:04 15  Q. And tell me what you think the beginning is?
09:51:08 16  A. I would -- okay. Let me recorrect myself.
09:51:15 17     Since the beginning any kind of mailed
09:51:17 18     invoice or any kind of bill has always gone
09:51:20 19     to 500 West Putnam Avenue. In the start of
09:51:23 20     the project there were not bills up to a
09:51:26 21     certain point, so I would not use that as
09:51:28 22     sort of the start point. I would use it as
09:51:31 23     the invoices and accounting and whatnot.
09:51:33 24  Q. Okay. So let's break this down a little
09:51:35 25     bit. When was the first time that an

Page 14

09:51:37 1      invoice was sent to ConnectU?
09:51:38 2   A. I would -- ConnectU would be probably -- let
09:51:45 3      me think for a second. I would say our
09:51:52 4      first development bill from iMarc, that
09:51:58 5      would be the first.
09:51:59 6   Q. And can you tell me about when that was?
09:52:00 7   A. Approximately -- we approached -- I would
09:52:08 8      say early March of 2004.
09:52:11 9   Q. Do you know who that invoice was addressed
09:52:12 10     to?
09:52:12 11  A. I believe it was addressed to the business
09:52:18 12     entity.
09:52:18 13  Q. To ConnectU?
09:52:19 14  A. Yeah.
09:52:20 15  Q. Is it possible that it would be addressed to
09:52:24 16     Winklevoss Consultants?
09:52:24 17     MR. HORNICK: Don't speculate if
09:52:25 18     you don't know.
09:52:26 19  A. I couldn't speculate.
09:52:28 20  Q. Are you speculating when you think it was
09:52:31 21     addressed to ConnectU?
09:52:33 22  A. No, not with respect to the fact that -- if
09:52:38 23     the question is -- there is no reason to
09:52:44 24     believe -- they were fully aware that our
09:52:47 25     business entity was called ConnectU, so it

Page 15

09:52:49 1      would -- by all accounts I would assume that
09:52:52 2      they would have no reason to believe -- to
09:52:55 3      label the invoice anything other than
09:52:57 4      ConnectU.
09:52:57 5   Q. So do you -- as you sit here today, do you
09:52:59 6      have any recollection as to who that first
09:53:02 7      invoice was sent to?
09:53:04 8      MR. HORNICK: Asked and answered.
09:53:05 9      You can answer it again.
09:53:06 10  A. Yes. I believe that the first invoice was
09:53:09 11     sent to ConnectU.
09:53:10 12  Q. Okay. At this 500 --
09:53:13 13  A. 500 West Putnam Avenue.
09:53:14 14  Q. Okay. Before the first invoice was sent did
09:53:23 15     ConnectU have a different address?
09:53:24 16  A. No.
09:53:27 17  Q. So it was never at any location other than
09:53:29 18     500 West Putnam Avenue in Greenwich,
09:53:32 19     Connecticut?
09:53:33 20  A. ConnectU was at no other location other than
09:53:36 21     500 West Putnam Avenue.
09:53:38 22  Q. And when was ConnectU formed?
09:53:41 23     MR. HORNICK: Objection to the word
09:53:42 24     "formed."
09:53:43 25  A. Could you sort of specify a little bit more

Page 16

09:53:47 1      as to what you mean by "formed"?
09:53:50 2   Q. As a business entity.
09:53:52 3   A. Registered -- ConnectU was first registered,
09:53:55 4      I believe, in May -- I believe May 26th of
09:54:05 5      2004.
09:54:08 6   Q. And when you say "registered," what do you
09:54:11 7      mean?
09:54:11 8   A. Excuse me, registered as an LLC corporation.
09:54:16 9   Q. Did ConnectU have any other business form
09:54:19 10     other than an LLC prior to May 26th, 2004?
09:54:24 11  A. No, I don't believe so.
09:54:24 12  Q. So it was -- was it just a name?
09:54:27 13  A. What do you mean by that?
09:54:28 14  Q. Well, what was ConnectU prior to May 26th,
09:54:30 15     2004?
09:54:32 16     MR. HORNICK: Well, I'll object to
09:54:34 17     the extent that this calls for legal
09:54:36 18     knowledge of what constitutes a corporation
09:54:38 19     or proprietorship or anything else, but you
09:54:40 20     can answer to the best of your ability.
09:54:42 21  A. Okay. Could you please rephrase the
09:54:44 22     question or --
09:54:44 23  Q. Okay. Prior to --
09:54:44 24  A. -- repeat it, please?
09:54:45 25  Q. Sure. Prior to May 26th, 2004, was -- what

4 (Pages 13 to 16)

Page 19

09:54:49 1  was ConnectU?
09:54:50 2  A. ConnectU was -- let me think about that for
09:54:59 3  a second. It was essentially an understood
09:55:04 4  partnership between individuals who are
09:55:07 5  working on a project first titled
09:55:10 6  HarvardConnection, later to be called
09:55:13 7  ConnectU.
09:55:15 8  Q. So if I understand you correctly, your
09:55:18 9  position is HarvardConnection and ConnectU
09:55:19 10  are one and the same thing?
09:55:20 11  A. Yes.
09:55:21 12  Q. And before May 26th, 2004, it was a
09:55:25 13  partnership between some people?
09:55:29 14  A. Before May 26th, 2004, it was a partnership
09:55:32 15  between people, yes.
09:55:34 16  Q. Okay. And who were those people?
09:55:36 17  A. Well, initially it was myself, Tyler
09:55:42 18  Winklevoss and Divya Narendra. And then in
09:55:46 19  approximately November, late November 2003
09:55:49 20  we invited Mr. Zuckerberg to become a
09:55:52 21  partner of this entity.
09:56:02 22  Q. Did he -- did Mr. Zuckerberg accept that
09:56:04 23  obligation or accept the opportunity to
09:56:07 24  become a partner?
09:56:08 25  A. Yes, he did.

Page 18

09:56:12 1  Q. And how did he do that?
09:56:13 2  A. Mr. Zuckerberg has stated in various e-mails
09:56:20 3  that he agreed to finish a portion of our
09:56:25 4  website and has gone so far as to say he did
09:56:30 5  complete that portion of the website. In
09:56:32 6  various e-mails he's used the operative word
09:56:35 7  "we" to describe the HarvardConnection/
09:56:40 8  ConnectU team. You can reference January
09:56:44 9  8th, 2004. And he also describes a
09:56:51 10  situation where he expected to have -- be
09:56:53 11  involved in the overall development and
09:56:56 12  control of the project. You can reference
09:56:59 13  February 12th, 2004.
09:57:02 14  And he as well -- excuse me, I'm
09:57:11 15  sorry, let me think. He also -- I'm sorry,
09:57:21 16  let me think for one second. Yeah, so
09:57:32 17  basically those are some of the, you know,
09:57:34 18  aspects -- oh, as well as expressing concern
09:57:36 19  multiple times that, you know, with
09:57:39 20  situations of the business entity such as
09:57:40 21  the promotion and marketing involved with it
09:57:42 22  and other aspects such as graphics, which
09:57:47 23  were not sort of part of his forte, so to
09:57:51 24  speak, and hardware issues and whatnot.
9:57:55 25  So I guess what I'm getting at is

Page 19

09:58:01 1  that, you know, he had a -- people who
09:58:03 2  express those concerns and act like that
09:58:06 3  have a vested interest in the company.
09:58:09 4  Q. So it's your testimony, as you sit here
09:58:11 5  today, that he behaved in a way that he
09:58:15 6  participated in the management of
09:58:17 7  HarvardConnection?
09:58:19 8  MR. HORNICK: Objection to the form
09:58:20 9  of the question. You can answer it if you
09:58:22 10  can.
09:58:22 11  A. He acted as someone who acts -- who has a
09:58:32 12  vested stake or sort of benefit -- would
09:58:35 13  benefit from the direction of the company.
09:58:38 14  Q. And your belief is that that meant that he
09:58:46 15  was a partner, that he had accepted that
09:58:48 16  obligation?
09:58:49 17  A. Well, let's step back a second. I mean, as
09:58:50 18  I said earlier in the statement, he
09:58:54 19  explicitly acknowledged an agreement between
09:58:56 20  the parties. So his actions aside, which
09:59:00 21  clearly lend to the belief that he was a
09:59:03 22  partner, irrespective of his actions, he
09:59:09 23  explicitly acknowledges an agreement between
09:59:11 24  the two parties.
09:59:11 25  Q. And you acknowledge that agreement that he

Page 20

09:59:14 1  was a partner?
09:59:14 2  A. Absolutely.
09:59:15 3  Q. Okay. So is he a principal of ConnectU LLC?
09:59:20 4  A. Right now?
09:59:21 5  Q. Right.
09:59:21 6  A. He is not a principal of ConnectU LLC.
09:59:24 7  Q. Okay. Does he have an interest in ConnectU
09:59:26 8  LLC?
09:59:26 9  A. Right now, no, he does not.
09:59:28 10  Q. So is there any difference between the
09:59:30 11  business partnership of ConnectU, the
09:59:32 12  partnership, and ConnectU LLC?
09:59:37 13  MR. HORNICK: Objection to the form
09:59:38 14  of the question.
09:59:38 15  A. Yeah, I don't -- you're referring to a
09:59:40 16  partnership versus an LLC. Could you please
09:59:42 17  specify a little bit more?
09:59:43 18  Q. Is there a difference between the two and
09:59:47 19  what they own?
09:59:49 20  MR. HORNICK: Objection to the form
09:59:50 21  of the question. I don't know what you're
09:59:51 22  talking about.
09:59:52 23  A. Yeah, I mean...
09:59:54 24  Q. Okay. Other than the corporate structure of
10:00:00 25  ConnectU LLC and ConnectU the partnership,

5 (Pages 17 to 20)

Page 23

| | |
|---|---|
| 10:00:02 1 | is there any other difference between the |
| 10:00:03 2 | company, such as the types of things that it |
| 10:00:05 3 | owns? |
| 10:00:06 4 | MR. HORNICK: I still object to the |
| 10:00:07 5 | form of the question, but you can try to |
| 10:00:08 6 | answer if you understand it. |
| 10:00:10 7 | A. In terms of -- I think what you're asking |
| 10:00:17 8 | is, does ConnectU -- is the partnership |
| 10:00:19 9 | different than the LLC? |
| 10:00:21 10 | Q. Yes. |
| 10:00:22 11 | A. Okay. For all intents and purposes, the |
| 10:00:26 12 | partnership effectively is basically -- I'm |
| 10:00:31 13 | not a legal expert, but I would assume is |
| 10:00:34 14 | reinforced by the LLC. It's -- they own -- |
| 10:00:37 15 | they're one and the same, I believe. |
| 10:00:39 16 | Q. And did you ever seek Mark Zuckerberg's |
| 10:00:42 17 | agreement to transfer any assets to the LLC? |
| 10:00:46 18 | A. No. No, we did not. |
| 10:00:48 19 | Q. And why did you not do that? |
| 10:00:51 20 | A. One of the reasons was because we never saw |
| 10:00:55 21 | an asset. He has yet to produce any asset |
| 10:00:58 22 | for us. Despite saying that he has and |
| 10:01:01 23 | would, he has never produced an asset. So, |
| 10:01:06 24 | to our knowledge, we, you know -- he never |
| 10:01:11 25 | gave us an asset that we had in our hands |

Page 22

| | |
|---|---|
| 10:01:13 1 | that we could say, hey, you know -- that |
| 10:01:17 2 | doesn't mean that he doesn't have an asset, |
| 10:01:19 3 | but he never actually gave us an asset. So |
| 10:01:22 4 | we have not -- we have not specifically |
| 10:01:26 5 | asked him for the asset. |
| 10:01:27 6 | Q. Did he write any code for the |
| 10:01:32 7 | HarvardConnection? |
| 10:01:35 8 | A. Again, his e-mails indicate that he has, but |
| 10:01:39 9 | we have not seen the code. |
| 10:01:43 10 | Q. Didn't Victor Gao tell you at some point |
| 10:01:45 11 | that he had written some code? |
| 10:01:47 12 | A. Victor Gao said that what he -- to his -- |
| 10:01:50 13 | the best of his knowledge, his extent, that |
| 10:01:53 14 | Mark Zuckerberg had gone into the code, |
| 10:01:54 15 | looked at it on the server and duplicated |
| 10:01:58 16 | files from the, I believe, the date side and |
| 10:02:03 17 | effectively renamed them. But in terms of |
| 10:02:09 18 | Mark indicated that most -- a lot of the |
| 10:02:10 19 | work that he had done was done on his local |
| 10:02:13 20 | system, so it was never on the server. |
| 10:02:14 21 | Q. Okay. So it's your position that -- |
| 10:02:21 22 | MR. HORNICK: You know, I'd like to |
| 10:02:22 23 | prevent you from saying "it's your |
| 10:02:25 24 | position," because the witness isn't here to |
| 10:02:27 25 | give contention testimony. You can ask for |

Page 23

| | |
|---|---|
| 10:02:28 1 | facts, you can say the facts that, that kind |
| 10:02:29 2 | of thing, but in terms of saying "it's your |
| 10:02:31 3 | position," I don't think that's proper. |
| 10:02:33 4 | MR. CHATTERJEE: Well, you can |
| 10:02:34 5 | object. I can ask the questions however I |
| 10:02:36 6 | want, and you can say "Object to the form." |
| 10:02:38 7 | MR. HORNICK: Well, I can actually |
| 10:02:39 8 | prevent you from taking contention |
| 10:02:41 9 | testimony. There's cases that support that, |
| 10:02:42 10 | so let's not make an issue of it. Why don't |
| 10:02:45 11 | you just ask your questions in an |
| 10:02:46 12 | unobjectionable way. |
| 10:02:47 13 | MR. CHATTERJEE: Counsel, you can |
| 10:02:48 14 | make your objections, and the opposing -- or |
| 10:02:50 15 | the witness can answer them, and should you |
| 10:02:52 16 | want to seek a protective order, you can |
| 10:02:55 17 | contact the Court. |
| 10:02:56 18 | MR. HORNICK: I'm just asking you |
| 10:02:57 19 | to conduct your deposition properly. |
| 10:02:58 20 | MR. CHATTERJEE: And, counsel, I |
| 10:02:59 21 | will do so. |
| 10:03:01 22 | MR. HORNICK: Okay. Thank you. |
| 10:03:01 23 | BY MR. CHATTERJEE: |
| 10:03:01 24 | Q. So, Mr. Winklevoss -- |
| 10:03:05 25 | MR. CHATTERJEE: Could I have the |

Page 24

| | |
|---|---|
| 10:03:05 1 | question that I was starting back, please. |
| 10:03:06 2 | (Record read.) |
| 10:03:20 3 | Q. Okay. I lost my train of thought, so I'll |
| 10:03:22 4 | just go back to -- was there anyone else |
| 10:03:24 5 | that was brought in as a partner to ConnectU |
| 10:03:28 6 | LLC -- or to ConnectU the partnership? |
| 10:03:30 7 | MR. HORNICK: Objection to the form |
| 10:03:30 8 | of the question. |
| 10:03:30 9 | A. Can you state sort of a time frame? |
| 10:03:32 10 | Q. Prior to May 26th, 2004. |
| 10:03:35 11 | A. Prior to May 26th, 2004. No. |
| 10:03:38 12 | Q. After May 26th, 2004, did anyone join |
| 10:03:44 13 | ConnectU LLC? |
| 10:03:45 14 | A. Yes, my father, Howard Winklevoss. |
| 10:03:48 15 | Q. And what were the circumstances surrounding |
| 10:03:51 16 | his joining the business? |
| 10:03:51 17 | MR. HORNICK: And, Cameron, I'll |
| 10:03:53 18 | caution you not to reveal any communications |
| 10:03:56 19 | that you had with counsel on that subject, |
| 10:03:57 20 | but otherwise, you can answer the question. |
| 10:04:00 21 | THE WITNESS: Okay. |
| 10:04:00 22 | A. The circumstances were simply that he |
| 10:04:07 23 | essentially is an investor, I guess you |
| 10:04:13 24 | could say, in ConnectU. |
| 10:04:14 25 | Q. And what is the nature of his investment? |

6 (Pages 21 to 24)

Page 25

| | | |
|---|---|---|
| 10:04:16 | 1 | A. It's monetary, money. |
| 10:04:20 | 2 | Q. And how much -- |
| 10:04:21 | 3 | A. Funding. |
| 10:04:22 | 4 | Q. And what kind of funding has he provided? |
| 10:04:24 | 5 | A. I'm not sure if -- in terms of like |
| 10:04:27 | 6 | disclosures in terms of amounts? |
| 10:04:34 | 7 | Q. Yes. |
| 10:04:34 | 8 | A. He's paid for development costs and legal |
| 10:04:36 | 9 | costs which I don't know off the top of my |
| 10:04:38 | 10 | head, but I'm sure you guys probably have |
| 10:04:40 | 11 | them. |
| 10:04:41 | 12 | Q. So I don't want you to guess, but do you |
| 10:04:43 | 13 | have an estimate? |
| 10:04:44 | 14 | MR. HORNICK: I'm going to object |
| 10:04:45 | 15 | to this. I think it's outside the scope of |
| 10:04:47 | 16 | your 30(b)(6). |
| 10:04:48 | 17 | MR. CHATTERJEE: It goes directly |
| 10:04:48 | 18 | to the issue of ownership and the formation |
| 10:04:52 | 19 | of the LLC. |
| 10:04:56 | 20 | MR. HORNICK: Where is that in your |
| 10:04:57 | 21 | topics? |
| 10:04:57 | 22 | MR. CHATTERJEE: It's the very last |
| 10:04:59 | 23 | topic. |
| 10:04:59 | 24 | MR. HORNICK: Ownership of IP and |
| 10:05:00 | 25 | transfer of rights by you, by |

Page 27

| | | |
|---|---|---|
| 10:05:38 | 1 | You're asking about an investor's money that |
| 10:05:40 | 2 | he's putting in and how much. I don't see |
| 10:05:42 | 3 | where that comes in. |
| 10:05:43 | 4 | THE WITNESS: Yeah, that -- I don't |
| 10:05:44 | 5 | really see -- |
| 10:05:46 | 6 | MR. CHATTERJEE: Well, he just said |
| 10:05:47 | 7 | that Howard Winklevoss joined the company by |
| 10:05:49 | 8 | putting money in. |
| 10:05:50 | 9 | MR. HORNICK: You can ask about the |
| 10:05:51 | 10 | LLC agreement if you like. |
| 10:05:53 | 11 | MR. CHATTERJEE: Well, are you |
| 10:05:54 | 12 | instructing him not to answer, counsel? |
| 10:05:56 | 13 | MR. HORNICK: No, but I am |
| 10:05:58 | 14 | objecting to you asking questions outside |
| 10:06:00 | 15 | the scope. |
| 10:06:00 | 16 | MR. CHATTERJEE: Fine. You can |
| 10:06:01 | 17 | make your objection. |
| 10:06:02 | 18 | BY MR. CHATTERJEE: |
| 10:06:02 | 19 | Q. Please answer the question. |
| 10:06:04 | 20 | A. So the question, again, is -- the question, |
| 10:06:07 | 21 | again, is, did he become a member of |
| 10:06:09 | 22 | ConnectU through investment? And my answer |
| 10:06:11 | 23 | is yes. |
| 10:06:12 | 24 | Q. And the following questions is, how much did |
| 10:06:16 | 25 | he invest? |

Page 26

| | | |
|---|---|---|
| 10:05:04 | 1 | HarvardConnection or any counterdefendants. |
| 10:05:07 | 2 | See, I don't think that's within the scope |
| 10:05:08 | 3 | of those topics that you -- |
| 10:05:09 | 4 | MR. CHATTERJEE: Well, you may |
| 10:05:11 | 5 | disagree, but I disagree with you. |
| 10:05:12 | 6 | MR. HORNICK: Can you explain to me |
| 10:05:13 | 7 | how it is? |
| 10:05:13 | 8 | MR. CHATTERJEE: Yes. I mean, |
| 10:05:14 | 9 | there is a formation document. In the |
| 10:05:16 | 10 | formation document, it goes to -- it's |
| 10:05:18 | 11 | directly about the transfer of rights. |
| 10:05:20 | 12 | There are provisions -- |
| 10:05:20 | 13 | MR. HORNICK: It doesn't say |
| 10:05:22 | 14 | anything about formation. It just talks |
| 10:05:24 | 15 | about transfer of IP. |
| 10:05:25 | 16 | MR. CHATTERJEE: Yeah. And the way |
| 10:05:26 | 17 | the IP was transferred, according to the |
| 10:05:29 | 18 | witness's testimony, was -- |
| 10:05:31 | 19 | A. IP or -- |
| 10:05:32 | 20 | MR. CHATTERJEE: It was into the |
| 10:05:32 | 21 | LLC. That makes the entire agreement |
| 10:05:34 | 22 | relevant. |
| 10:05:34 | 23 | MR. HORNICK: You can talk about |
| 10:05:36 | 24 | the agreement, but you're asking right now |
| 10:05:37 | 25 | about something that is not the agreement. |

Page 28

**Confidential
Redacted**

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855**

**Confidential**
**Redacted**

10:07:44 16    MR. CHATTERJEE: Okay. Fine.
10:07:47 17    Q. Are you familiar with someone by the name of
10:07:50 18    Wayne Chang?
10:07:51 19    A. Yes.
10:07:51 20    Q. And who is he?
10:07:52 21    A. Wayne Chang is a University of -- Amherst
10:07:58 22    UMass student, and he operates an
10:08:02 23    organization called I2hub organization.
10:08:07 24    Q. Did ConnectU LLC ever merge with I2hub?
10:08:11 25    A. No.

10:08:12 1    MR. HORNICK: Objection, calls for
10:08:13 2    a legal conclusion. Give me a chance to
10:08:14 3    object --
10:08:15 4    THE WITNESS: Sure. Sorry.
10:08:16 5    MR. HORNICK: -- before you answer.
10:08:16 6    Q. So I'm sorry, what was your answer?
10:08:19 7    A. The answer -- I'm not a lawyer, but in terms
10:08:24 8    of my understanding of a merger, no.
10:08:26 9    Q. Could you describe the business relationship
10:08:27 10    between I2hub and ConnectU LLC?
10:08:32 11    A. Again, I'm not a lawyer. I can try to
10:08:36 12    describe it, and I think that we had an
10:08:39 13    understanding there might be some sort of
10:08:43 14    synergy between the products. We -- and
10:08:46 15    that's about it, but there's no formal
10:08:49 16    relationship.
10:08:50 17    Q. Well, is there an entity called Social
10:08:53 18    Butterfly that is owned by ConnectU LLC?
10:08:56 19    A. There is no entity called Social Butterfly.
10:08:59 20    Q. What is Social Butterfly?
10:09:00 21    A. Social Butterfly is a project that Wayne --
10:09:05 22    Wayne and I worked on.
10:09:06 23    Q. And what is that?
9:09:07 24    A. Social Butterfly is effectively -- it allows
.0:09:11 25    users to easily place their profile

10:09:16 1    information into a social network.
10:09:18 2    MR. HORNICK: I'm going to object
10:09:19 3    that this is all outside the scope, too, and
10:09:21 4    not 30(b)(6) testimony.
10:09:22 5    MR. CHATTERJEE: Okay.
10:09:23 6    Q. And was there anything unique about Social
10:09:29 7    Butterfly that differentiated it from other
10:09:32 8    social networks?
10:09:32 9    A. Social Butterfly is not a social network.
10:09:36 10    Q. What is it?
10:09:36 11    A. As I stated before, it's a tool that
10:09:40 12    facilitates users' ability to add content to
10:09:44 13    their social network profile.
10:09:46 14    Q. And what kind of content?
10:09:48 15    A. Profile content that they may have put on
10:09:52 16    another social network.
10:09:53 17    Q. Such as -- such as what? Can you give me
10:09:55 18    some examples?
10:09:56 19    A. Any social network. We supported up to four
10:09:59 20    or five, so that could be Myspace, that
10:10:01 21    could be Hi5, Friendster, you name it.
10:10:04 22    Q. Is Social Butterfly still an active website?
10:10:07 23    A. Social Butterfly is not active right now.
10:10:14 24    Q. And was that Social Butterfly, was that
10:10:16 25    owned by ConnectU or Wayne Chang?

10:10:18 1    A. It's actually -- let's think about that for
10:10:21 2    a second.
10:10:22 3    MR. HORNICK: Objection to the
10:10:22 4    extent that it calls for a legal conclusion,
10:10:24 5    but you can try to answer.
10:10:25 6    A. Yeah, well, Wayne Chang put the majority of
10:10:34 7    time and effort into it, and we actually
10:10:36 8    haven't discussed the ownership of that. He
10:10:39 9    has all the code, I believe. We have not
10:10:42 10    really discussed ownership of the project,
10:10:44 11    so I can't say right now.
10:10:47 12    Q. Is there a dispute between --
10:10:49 13    A. No, it's just --
10:10:50 14    Q. -- ConnectU -- I'm sorry, let me finish the
10:10:53 15    question. Let's try --
10:10:53 16    A. Sorry.
10:10:54 17    Q. -- not to speak --
10:10:54 18    A. Yeah.
10:10:55 19    Q. -- over each other. Mr. Hornick and I
10:10:58 20    haven't done a very good job in not speaking
10:11:00 21    over each other, and I'm going to try and do
10:11:02 22    better on that, but also, if you and I don't
10:11:02 23    speak over each other --
10:11:24 24    A. Sure.
10:11:03 25    Q. -- it'll make for a clearer record.

8 (Pages 29 to 32)

Page 35

```
10:11:05  1        Is there a dispute between you and
10:11:06  2     Wayne Chang or I2hub?
10:11:08  3   A.  As I said -- as I was trying to say is that
10:11:12  4     Social Butterfly is no longer active, so
10:11:14  5     it's not really -- it hasn't been a
10:11:16  6     situation that we've talked about in terms
10:11:18  7     of ownership.  It just hasn't been a thought
10:11:21  8     on either of our minds really, to be quite
10:11:23  9     honest.  So in that respect we haven't
10:11:27 10     really talked about the ownership.
10:11:32 11   Q.  Did ConnectU LLC ever loan I2hub money?
10:11:35 12   A.  We did.  Well, what do you mean by "loan"?
10:11:39 13     As in repayable or did we sort of sponsor or
10:11:42 14     support?
10:11:42 15   Q.  Did it ever give I2hub money for any reason?
10:11:46 16   A.  We have given I2hub money.
10:11:48 17   Q.  And how much money?
10:11:49 18   A.  Again, I don't know fully off the top of my
10:11:52 19     head, but it would be in the ballpark of
10:11:55 20     probably around 10, $10,000 or more.
10:11:58 21   Q.  And what was -- what were the terms?  Why
10:12:02 22     did you give them the money?
10:12:03 23   A.  The terms, basically we supported an office
10:12:08 24     for I2hub and paid for some of their sort of
10:12:11 25     technical aspects because they were
```

Page 34

```
10:12:12  1     struggling at the time.  I2hub was operating
10:12:17  2     at debt, and we just helped support.
10:12:22  3   Q.  Are you currently employed?
10:12:23  4   A.  Other than ConnectU LLC, no.
10:12:27  5   Q.  Are you getting a salary from ConnectU LLC?
10:12:29  6   A.  Right now all my remuneration is in equity.
10:12:35  7   Q.  Does any -- detect ConnectU LLC have any
10:12:38  8     employees?
10:12:38  9   A.  Aside from -- ConnectU LLC has three --
10:12:45 10     excuse me, four sort of equity stakeholders
10:12:49 11     and two managers, one of which is not an
10:12:53 12     equity holder.  So I -- if that falls under
10:12:55 13     the umbrella of employee, perhaps.
10:12:59 14   Q.  Maybe I can go about this in a little bit
10:13:01 15     simpler way.  Is anyone paid money by
10:13:04 16     ConnectU --
10:13:04 17   A.  No.
10:13:05 18   Q.  -- LLC?
10:13:05 19   A.  Oh, excuse me, sorry.  Like in terms of
10:13:10 20     development and stuff like that?
10:13:14 21   Q.  For any reason.
10:13:15 22   A.  We do pay software developers.
10:13:17 23        MR. HORNICK:  Okay.  Just for the
10:13:18 24     record, I think maybe now we're back into
0:13:20  25     30(b)(6) testimony.
```

```
10:13:22  1   Q.  And what do you -- and who are the
10:13:25  2     developers you pay?
10:13:27  3   A.  Currently we employ a fellow by the name of
10:13:30  4     Winston Williams in Seattle.
10:13:32  5   Q.  And is he at Pacific Northwest Software?
10:13:36  6   A.  Yes.  Well, yes, he's part of Pacific
10:13:41  7     Northwest and -- yeah, he's part of that
10:13:46  8     group.
10:13:46  9   Q.  Okay.  And what is he doing?
10:13:47 10   A.  He does a variety of tasks.  I mean, it
10:13:49 11     depends what needs to be done on the site
10:13:51 12     and whatnot.
10:13:58 13   Q.  Anyone else?
10:13:59 14   A.  Currently, no.
10:14:01 15   Q.  And is Winston Williams being paid on the
10:14:04 16     hour?
10:14:04 17   A.  Right now Winston Williams is being paid on
10:14:09 18     an hour, yes.
10:14:11 19   Q.  And what's his hourly rate?
10:14:12 20   A.  I believe it is $60 an hour.
10:14:18 21   Q.  Now, you said that there is a non-equity
10:14:21 22     manager with ConnectU LLC.  Who is that?
10:14:23 23   A.  Maria Antonelli.
10:14:27 24   Q.  And what is her role?
10:14:29 25   A.  She takes care of all of the basically just
```

Page 36

```
10:14:32  1     files, invoices and whatnot.
10:14:34  2   Q.  And does she charge ConnectU LLC for --
10:14:36  3   A.  No.
10:14:36  4   Q.  -- her time?
10:14:37  5   A.  No.
10:14:37  6   Q.  Who does she work for?
10:14:39  7        MR. HORNICK:  I think we're out of
10:14:42  8     30(b)(6) again, for the record.
10:14:44  9   A.  So who is she employed by?  She's employed
10:14:47 10     by Winklevoss Consultants.
10:14:48 11   Q.  Are you a part of Winklevoss Consultants?
10:14:54 12   A.  No.
10:14:58 13   Q.  Have you ever taken any computer science
10:15:00 14     courses?
10:15:00 15   A.  No.
10:15:01 16   Q.  Are you able to program in any computer
10:15:07 17     language?
10:15:08 18   A.  I know basic HTML.  I can sort of decipher
10:15:13 19     it, understand it, but no.  In terms of
10:15:16 20     language literally, no.
10:15:18 21   Q.  Okay.  Can you describe for me the trade
10:15:26 22     secrets that were shared with Mark
10:15:31 23     Zuckerberg by ConnectU LLC or any of its
10:15:34 24     predecessors?
10:15:34 25        MR. HORNICK:  I think we're back
```

9 (Pages 33 to 36)

Page 37

| | | |
|---|---|---|
| 10:15:35 | 1 | into 30(b)(6). I'll object to the extent it |
| 10:15:37 | 2 | calls for a legal conclusion, but you can |
| 10:15:39 | 3 | try to answer the question. |
| 0:15:40 | 4 | A. In terms of the trade secrets, I would |
| 10:15:46 | 5 | say -- sorry, the question is, what trade |
| 10:15:50 | 6 | secrets -- can you repeat the question? |
| 10:15:52 | 7 | Q. Yeah. What are the trade secrets that were |
| 10:15:54 | 8 | shared with Mark Zuckerberg -- |
| 10:15:58 | 9 | A. Okay. |
| 10:15:58 | 10 | Q. -- by ConnectU LLC or its predecessors? |
| 10:16:00 | 11 | A. Well, Mark Zuckerberg has acknowledged that |
| 10:16:06 | 12 | one of our trade secrets would have been -- |
| 10:16:08 | 13 | or is, rather, to the extent that we were |
| 10:16:14 | 14 | going to launch at Harvard University an |
| 10:16:16 | 15 | on-line community and then look to launch at |
| 10:16:24 | 16 | schools across -- other college |
| 10:16:26 | 17 | universities -- colleges or universities and |
| 10:16:28 | 18 | basically link the sites together. |
| 10:16:32 | 19 | Q. Anything else? |
| 10:16:32 | 20 | A. As I said, the idea of creating an on-line |
| 10:16:43 | 21 | college community at -- or, rather, a |
| 10:16:47 | 22 | network at the college level, focusing that |
| 10:16:50 | 23 | down, and basically the implementation of |
| 10:16:56 | 24 | that, be it fields, be it whatever is |
| 10:16:58 | 25 | necessary to tailor that to a specific niche |

Page 38

| | | |
|---|---|---|
| 10:17:02 | 1 | community, as well as, you know, stuff such |
| 10:17:07 | 2 | as how do you secure such a network and let |
| 10:17:10 | 3 | people into this network using a dot-edu |
| 10:17:14 | 4 | address, et cetera. |
| 10:17:23 | 5 | Q. Anything else? |
| 10:17:23 | 6 | A. I mean, off the top of my head, those are -- |
| 10:17:29 | 7 | that's sort of the core ideas right there. |
| 10:17:33 | 8 | There could be ones running in between the |
| 10:17:35 | 9 | lines, but I would say that those -- that |
| 10:17:38 | 10 | that embodies essentially the core, the core |
| 10:17:41 | 11 | of it. |
| 10:17:41 | 12 | Q. Okay. So as you sit here today, you can't |
| 10:17:46 | 13 | recall anything else about what your trade |
| 10:17:47 | 14 | secrets are other than these, I'll say |
| 10:17:50 | 15 | roughly four -- |
| 10:17:50 | 16 | MR. HORNICK: Well, that wasn't |
| 10:17:52 | 17 | four. That was much broader than four. |
| | 18 | A. Yeah. |
| | 19 | MR. HORNICK: You can ask him -- |
| | 20 | A. I mean, I can -- |
| | 21 | MR. HORNICK: -- questions if you'd |
| | 22 | like, but -- |
| 10:17:55 | 23 | THE REPORTER: Wait a minute. |
| 10:17:55 | 24 | Q. Other than what you just described, you |
| 10:17:57 | 25 | can't remember anything else? |

Page 39

| | | |
|---|---|---|
| 10:17:58 | 1 | A. In terms of the broad picture, the broad |
| 10:18:00 | 2 | spectrum of the situation, taking a -- |
| 10:18:04 | 3 | creating an on-line niche community for a |
| 10:18:07 | 4 | university and then looking to farm that out |
| 10:18:08 | 5 | to other respective colleges and linking |
| 10:18:10 | 6 | them together, that was the core idea. |
| 10:18:17 | 7 | Now, the implementation, as I |
| 10:18:19 | 8 | mentioned before, could have any number of |
| 10:18:22 | 9 | trade secrets in it. And I'm sure you're |
| 10:18:24 | 10 | fully aware of them, and inverse sort of |
| 10:18:28 | 11 | with the implementation such as, you know, |
| 10:18:31 | 12 | educational fields, house fields, fields |
| 10:18:34 | 13 | relating to a college environment, anything |
| 10:18:36 | 14 | relating to that environment would certainly |
| 10:18:39 | 15 | be -- like fall under the umbrella of trade |
| 10:18:43 | 16 | secrets. |
| 10:18:44 | 17 | Q. Anything else you can remember that you |
| 10:18:46 | 18 | would consider to be a trade secret of |
| 10:18:48 | 19 | ConnectU or its predecessors? |
| 10:18:53 | 20 | MR. HORNICK: Objection to -- |
| 10:19:01 | 21 | assumes facts not in evidence. |
| 10:19:05 | 22 | A. I believe that those are -- as I said |
| 10:19:07 | 23 | before, that's sort of the broad scope of |
| 10:19:09 | 24 | it, yes. |
| 10:19:10 | 25 | Q. Okay. Well, the issue I'm having is with |

Page 40

| | | |
|---|---|---|
| 10:19:12 | 1 | the term "broad scope." Is there anything |
| 10:19:15 | 2 | more focused that you would say was -- |
| 10:19:18 | 3 | A. Well, I think I gave you a couple of |
| 10:19:21 | 4 | examples. The concept of using an e-mail |
| 10:19:23 | 5 | address to gain access to a community on a |
| 10:19:26 | 6 | college level, you know, we -- that is one |
| 10:19:31 | 7 | aspect of it. You know, there's lots of |
| 10:19:34 | 8 | pieces to the puzzle. I can't necessarily |
| 10:19:37 | 9 | say that I've said every piece of the |
| 10:19:39 | 10 | puzzle. I think I've said a couple that are |
| 10:19:41 | 11 | certainly viable and understandable. |
| 10:19:44 | 12 | Q. Anything else that you can remember other |
| 10:19:47 | 13 | than the information that you've said so |
| 10:19:51 | 14 | far? |
| 10:19:52 | 15 | A. I believe that that -- |
| 10:19:56 | 16 | MR. HORNICK: Objection. That's |
| 10:19:57 | 17 | not a matter of remembering, it's a matter |
| 10:19:58 | 18 | of asking the proper question, so -- but you |
| 10:20:01 | 19 | can answer. |
| 10:20:01 | 20 | A. I think that if -- you know, if there is a |
| 10:20:04 | 21 | secret that I'm not remembering right now, |
| 10:20:05 | 22 | it doesn't nullify the fact that it was a |
| 10:20:07 | 23 | trade secret. Off -- my recollection right |
| 10:20:11 | 24 | now is that those are the prime trade secret |
| 10:20:13 | 25 | issues. |

10 (Pages 37 to 40)

Page 43

```
10:20:14  1    Q.  Well, you understand that you're testifying
10:20:18  2        in a --
10:20:18  3    A.  Yes.
10:20:18  4    Q.  -- binding deposition for the company,
10:20:20  5        right?
10:20:21  6    A.  Right.
10:20:21  7    Q.  And I assume that you prepared for this
10:20:24  8        deposition to --
10:20:24  9    A.  I did.
10:20:24  10   Q.  -- to know what your trade secrets were?
10:20:27  11   A.  Uh-huh.
10:20:27  12   Q.  And so these are the only ones that you can
10:20:30  13       remember?  You can't remember any other
10:20:33  14       ones, right?
10:20:34  15            MR. HORNICK:  Objection.  It's not
10:20:36  16       a question of remembering, it's a question
10:20:37  17       of asking follow-up questions.
10:20:39  18   A.  Right.  I mean, if you want to prompt me and
10:20:40  19       ask me if, you know, this part of the site
10:20:42  20       was proprietary and this part wasn't, or if
10:20:45  21       you want to be more specific, I can
10:20:47  22       certainly help out, but I think I've given
10:20:49  23       you a pretty good bone to pick on, you know,
10:20:51  24       that.
10:20:54  25   Q.  So if I were to show you the website, you
```

Page 42

```
.0:20:56  1        might be able to identify additional trade
10:20:58  2        secrets?
10:20:58  3    A.  I mean, I'm not sure you have to even go
10:21:02  4        that far.  If you ask me, well, is an
10:21:04  5        individual who signs up with a Harvard
10:21:06  6        dot-edu e-mail address and, you know, taking
10:21:09  7        that e-mail address and placing them into
10:21:10  8        this part of the network, if that's a
10:21:13  9        proprietary trade secret, you know, my
10:21:16  10       answer would be yes.  If you ask me, is a
10:21:18  11       social network a trade secret, I would say
10:21:20  12       no.  So if you can follow up with more
10:21:23  13       specific questions, I would be happy to
10:21:24  14       answer yes or no.
10:21:25  15   Q.  Did you view HarvardConnection as a social
10:21:29  16       network?
10:21:29  17   A.  What do you -- what exactly do you mean by
10:21:31  18       "a social network"?
10:21:33  19   Q.  Well, you just used that term, so --
10:21:34  20   A.  I know I did.
10:21:36  21   Q.  So what did you understand that to mean?
10:21:38  22   A.  I view a social network as having
10:21:40  23       effectively two aspects.  You have ties and
10:21:44  24       nodes.  And the ties -- excuse me, nodes and
0:21:47   25       ties.  And the nodes are individuals, and a
```

Page 44

```
10:21:50  1        tie refers to any kind of connection that
10:21:53  2        you would facilitate between individuals.
10:21:56  3    Q.  Okay.  And did you view -- under that
10:22:00  4        definition, did you view HarvardConnection
10:22:03  5        as a social network?
10:22:04  6    A.  Yes.
10:22:04  7    Q.  And where -- did you ever discuss that with
10:22:11  8        Mark Zuckerberg?
10:22:12  9    A.  Discuss what?
10:22:13  10   Q.  That HarvardConnection was a social network
10:22:17  11       with these ties and nodes?
10:22:18  12   A.  Well, let me just step back a second and
10:22:23  13       refresh your -- perhaps you're aware or
10:22:27  14       unaware that Mark happens to be a computer
10:22:30  15       science major, as well as a psychology
10:22:32  16       major.  So he's fully versed the area of
10:22:35  17       social networking.  So he would absolutely
10:22:39  18       be able to identify and know what a social
10:22:41  19       network is in that respect.
10:22:43  20            In terms of we -- our second meeting
10:22:47  21       we talked about the website Friendster and
10:22:49  22       bookmarked it as a good benchmark for
10:22:53  23       potential future functionality.
10:23:16  24            MR. CHATTERJEE:  I'm going to do a
10:23:17  25       quick piece of housekeeping.  Let's mark
```

Page 44

```
10:23:24  1        this as Exhibit 1, Defendants' Exhibit 1.
10:23:27  2            (Exhibit No. 1, Amended Notice of
10:23:27  3        Deposition of Plaintiff and Counterdefendant
10:23:27  4        ConnectU Pursuant to Fed.R.Civ.P. 30(b)(6),
10:23:45  5        marked for identification.)
10:23:51  6    Q.  Mr. Winklevoss, this is the -- what's been
10:23:54  7        marked as Defendants' Exhibit No. 1, this is
10:23:57  8        the amended notice of deposition that was
10:23:59  9        served on ConnectU through this litigation.
10:24:04  10       If you can look on Page 4, there are a list
10:24:08  11       of topics.  And I understand your counsel's
10:24:12  12       raised objections to certain ones of these,
10:24:14  13       but you understand that at least as to some
10:24:19  14       of these topics you've been designated to
10:24:19  15       testify on behalf of ConnectU LLC --
10:24:19  16   A.  Yes.
10:24:21  17   Q.  -- today?
10:24:21  18            Make sure you wait so I can finish --
10:24:25  19   A.  Sure.
10:24:25  20   Q.  -- my question.
10:24:34  21            Were there any particular
10:24:36  22       functionalities on the Friendster website
10:24:40  23       that you and Mr. Zuckerberg talked about
10:24:42  24       that you wanted him to pay particular
10:24:44  25       attention to?
```

11 (Pages 41 to 44)

10:24:44 1    A.  I believe that we -- again, we talked about
10:24:48 2    the site as a whole.  And we talked about --
10:24:54 3    well, let me back up a second.  I think that
0:24:57 4    we had an hour meeting, and I believe that
10:25:00 5    he had to go somewhere, and we bookmarked
10:25:03 6    it, and we said that it's a good -- we like
10:25:06 7    this site, it's a good idea.  There's a lot
10:25:07 8    of good material on it.
10:25:10 9       But let me remind you that at that
10:25:13 10   point we still had a lot of basic key parts
10:25:16 11   of our site that had yet to be finished.  So
10:25:18 12   you don't put a roof on a house before the,
10:25:25 13   basically, the foundation's put in.  And
10:25:27 14   stuff like the registration pages, which he
10:25:30 15   said that he was tying up, had not even been
10:25:33 16   touched yet.
10:25:33 17      So, you know, discussion was basically
10:25:37 18   this is a good site, there are good things
10:25:39 19   on this site, let's look to incorporate
10:25:42 20   them, but you don't jump the gun, so to
10:25:45 21   speak.
10:25:47 22   Q.  So let's start from kind of Square 1.
10:25:50 23   A.  Uh-huh.
10:25:51 24   Q.  When did you first come up with the idea of
10:25:53 25   the HarvardConnection website?

10:25:54 1    A.  Okay.  I did not -- I was not the first
10:25:58 2    originator of the idea.  Divya Narendra was
10:26:01 3    the first originator of the idea.  And he
10:26:03 4    came to us with the idea in approximately
10:26:07 5    December 2002, early 2003.
10:26:14 6    Q.  And what was the idea at that point?
10:26:16 7    A.  The idea was basically, as I said before, to
10:26:20 8    create a community for a virtual on-line
10:26:24 9    community that could serve multiple purposes
10:26:28 10   for the Harvard Community and then
10:26:32 11   essentially -- and necessarily we would
10:26:39 12   create other communities for other
10:26:41 13   universities as well and link them together.
10:26:46 14   Q.  And was there any specific -- let me strike
10:26:52 15   that.
10:26:53 16      Was there anything more specific about
10:26:56 17   that virtual community like what was it
10:27:00 18   supposed to do?
10:27:01 19   A.  Well, again, you're talking about the
10:27:03 20   inception of the idea.  You know, ideas
10:27:06 21   generally start sort of on a higher level.
10:27:09 22   Then, of course, as you go to implement
10:27:11 23   them, they get sort of more specific.  At
10:27:14 24   that point it was a broad idea of bringing a
10:27:16 25   community, virtual community, that could

10:27:19 1    serve multiple purposes to the Harvard
10:27:22 2    Community, effectively in the words of Mr.
10:27:24 3    Zuckerberg "a unique utility."
10:27:28 4    Q.  Did Mr. Narendra talk to anyone else other
10:27:32 5    than you about this idea?
10:27:33 6    A.  That I -- the only other people that he
10:27:37 7    would have spoken to the idea about at that
10:27:42 8    point would have been people that he
10:27:43 9    approached for programming, programming
10:27:45 10   needs, and I believe that Sanjay Mavinkurve
10:27:49 11   was the only individual.
10:27:54 12   Q.  Anyone else that he approached, any other
10:27:57 13   programmers?
10:27:58 14   A.  At the -- in around the 2003 time period, I
10:28:03 15   believe that Sanjay was the main programmer
10:28:05 16   that -- I mean, I think he went to Sanjay
10:28:08 17   and Sanjay accepted and said, yes, I can
10:28:11 18   help you with this, and I believe it stopped
10:28:14 19   there.
10:28:15 20   Q.  Was there any expression, written or
10:28:17 21   verbally, that this initial idea, this
10:28:22 22   creative virtual community that could serve
10:28:26 23   Harvard and then be rolled out to other
10:28:28 24   universities, any expression to Mr.
10:28:32 25   Mavinkurve that he shouldn't tell other

10:28:34 1    people about it?
10:28:35 2    A.  Clearly it was understood.
10:28:37 3    Q.  Was it stated?
10:28:38 4    A.  Was it stated by Mr. Narendra?  I'm sure
10:28:42 5    that Mr. Narendra would have communicated to
10:28:49 6    him that it was a proprietary idea and that,
10:28:56 7    A, it should be completed in a timely
10:28:59 8    manner, and B, that it was our project and
10:29:01 9    that it was not -- shouldn't be effectively
10:29:05 10   broadcast to other people.
10:29:06 11   Q.  And so when you say you're sure, what's your
10:29:10 12   basis for believing that?
10:29:12 13   A.  Okay.  What's my basis --
10:29:15 14      MR. HORNICK:  Well, this witness is
10:29:16 15   speaking on behalf of the company, so he's
10:29:18 16   giving you company knowledge.
10:29:20 17   Q.  Well, I want to know what was actually done.
10:29:21 18   A.  Other than an understood and a communicated
10:29:25 19   sort of desire to keep the project going in
10:29:30 20   a, you know, secure fashion, I think that
10:29:32 21   that's all I can really testify to.
10:29:35 22   Q.  And so just so I'm clear, Mr. Narendra told
10:29:42 23   Mr. Mavinkurve that he shouldn't tell anyone
10:29:47 24   else about this idea?
10:29:48 25   A.  I'm not sure I can answer that specifically

12 (Pages 45 to 48)

10:29:55 1 for Mr. Narendra. What I can say is that I
10:29:58 2 believe that Mr. Mavinkurve understood that
10:30:01 3 this was not a project to the extent that
10:30:06 4 this project should not be broadcast or made
10:30:09 5 public to that extent. Exactly in which
10:30:13 6 manner Mr. Narendra communicated that, I
10:30:16 7 cannot say.
10:30:16 8 Q. And why do you -- how did he understand that
10:30:20 9 he shouldn't tell other people?
10:30:22 10 MR. HORNICK: Well, objection. Now
10:30:23 11 you're asking for --
10:30:24 12 A. Again, I can't --
10:30:25 13 MR. HORNICK: Excuse me, let me
10:30:26 14 finish my objection.
10:30:27 15 THE WITNESS: Sorry.
10:30:28 16 MR. HORNICK: Now you're asking for
10:30:29 17 the impressions -- thoughts and impressions
10:30:31 18 of Mr. Mavinkurve. I don't think a 30(b)(6)
10:30:34 19 witness can give you that.
10:30:35 20 Q. Go ahead and answer the question.
10:30:36 21 A. So the question is -- can you repeat it,
10:30:38 22 please?
10:30:39 23 Q. Okay. You've testified that Mr. Mavinkurve
10:30:41 24 understood that he shouldn't tell other
10:30:43 25 people. And what I'm trying to understand

10:32:09 1 taking a job with Google, you know, in the
10:32:14 2 following months would be fully aware that
10:32:16 3 this was a propriety issue. That's all I
10:32:20 4 can really say to that.
10:32:21 5 Q. Okay. Now you're referring to a secure,
10:32:24 6 closed area. Do you know where the meetings
10:32:26 7 with Sanjay Mavinkurve were?
10:32:29 8 A. They were in his dorm room.
10:32:32 9 Q. Did meetings happen anywhere else?
10:32:35 10 A. Not that I can recall. I believe they were
10:32:37 11 all in his dorm room.
10:32:53 12 Q. Now, so Divya comes to you in December 2002
10:32:55 13 to early 2003 with this idea, right?
10:33:02 14 A. Uh-huh.
10:33:02 15 Q. Is that a yes?
10:33:02 16 A. In 2002/2003, yes.
10:33:06 17 Q. Okay. And could you describe to me that
10:33:08 18 initial discussion?
10:33:12 19 A. As I stated before, he came to us, and we --
10:33:18 20 effectively he had conceived of an idea to
10:33:21 21 bring a localized community to the college
10:33:24 22 level virtually that could serve multiple
10:33:29 23 purposes.
10:33:30 24 Q. And when you say "us," who's the "us"?
10:33:33 25 A. "Us" being myself, Tyler, Divya.

10:30:45 1 is what did the ConnectU people do to make
10:30:49 2 sure he understood that?
10:30:50 3 MR. HORNICK: Objection to the form
10:30:51 4 of the question. You can answer.
10:30:55 5 A. Again, I said I can't -- I don't know
10:30:57 6 specifically how Divya communicated it to
10:30:59 7 him, but I'm fairly certain I can say that
10:31:03 8 Mr. Mavinkurve was aware that it was a
10:31:07 9 proprietary idea. And simply the fact that
10:31:11 10 we put a lot of effort into it and that we
10:31:15 11 always met in a secure closed area and made
10:31:19 12 efforts not to broadcast it or speak of it
10:31:23 13 or, in fact, outline the project to other
10:31:26 14 people would certainly convey those aspects.
10:31:29 15 Q. And when you say that Mr. Mavinkurve was
10:31:35 16 aware that it was a proprietary issue, I'm
10:31:43 17 trying to understand why you think he was
10:31:45 18 aware of that?
10:31:47 19 MR. HORNICK: Objection, asked and
10:31:48 20 answered I think three times now.
10:31:48 21 A. Again, it -- how was -- the question was,
10:31:58 22 how was he made aware of it? And I said
10:32:01 23 that I don't know specifically how Divya
10:32:03 24 communicated it to him, but I'm certain that
10:32:06 25 Mr. Mavinkurve being in the CS realm and

10:33:38 1 Q. And was there anything said either to you or
10:33:43 2 by you that no one else should know about
10:33:47 3 this?
10:33:47 4 A. Well, I think the fact that it had not been
10:33:50 5 done before and to the extent where you
10:33:56 6 would actually link multiple universities
10:33:59 7 together, it was not an idea in the public
10:34:01 8 domain.
10:34:03 9 Q. Okay. But my question's a little simpler
10:34:05 10 than that.
10:34:06 11 A. Okay.
10:34:06 12 Q. Did Divya say to you or your brother or did
10:34:10 13 you say to him, "Don't tell anyone about
10:34:15 14 this idea"?
10:34:18 15 A. Absolutely, sure. We were very concerned
10:34:20 16 the whole time about the -- you know,
10:34:24 17 letting the cat out of the bag. As I said
10:34:26 18 before, this was a novel idea, and it was
10:34:30 19 not -- you know, we did not want to make it
10:34:33 20 a public domain.
10:34:41 21 Q. So do you have a recollection of who said,
10:34:45 22 "We shouldn't tell anybody about this"?
10:34:48 23 A. I think we all came to the conclusion
10:34:50 24 ourselves. I don't think we had to -- you
10:34:53 25 know, when you join a team and someone says,

13 (Pages 49 to 52)

Page 53

| | |
|---|---|
| 10:34:56 1 | "Hey, this is a good idea," and you have an |
| 10:34:59 2 | interest in the team from the team's aspect |
| 10:35:02 3 | and an individual aspect, it's understood |
| 0:35:04 4 | that ideas that are not public and are -- |
| 10:35:08 5 | potentially have a large potential for |
| 10:35:11 6 | success are proprietary. |
| 10:35:14 7 | Q.   So the term "understood" is something that |
| 10:35:18 8 | is confusing me, quite frankly.  What I'm |
| 10:35:21 9 | wondering is, what were the express |
| 10:35:24 10 | statements about keeping the information |
| 10:35:27 11 | confidential that were made in that initial |
| 10:35:29 12 | meeting? |
| 10:35:30 13 | A.   The express statements would have been, |
| 10:35:33 14 | "This is a great idea.  We need to get this |
| 10:35:37 15 | out first because, to our knowledge, nobody |
| 10:35:41 16 | else has this, and we need to basically do |
| 10:35:44 17 | everything we can" -- and we communicated |
| 10:35:48 18 | this multiple times to Mr. Zuckerberg that |
| 10:35:50 19 | it's very important to get this to market |
| 10:35:52 20 | first.  And the whole -- our preoccupation |
| 10:35:56 21 | with the idea and the necessity of getting |
| 10:35:59 22 | it to market first would certainly, I think, |
| 10:36:03 23 | point to the fact that it's proprietary. |
| 10:36:06 24 | Q.   And that it shouldn't be told to others? |
| 10:36:08 25 | A.   Absolutely, yeah. |

Page 54

| | |
|---|---|
| 10:36:10 1 | Q.   So after that first meeting, describe to me |
| 10:36:15 2 | what the follow-on meetings were, the |
| 10:36:18 3 | genesis of the HarvardConnection website. |
| 10:36:22 4 | A.   Well, the HarvardConnection -- basically we |
| 10:36:27 5 | brought -- you know, Sanjay Mavinkurve |
| 10:36:30 6 | agreed to help with the coding, and we |
| 10:36:32 7 | started, you know, creating various pages |
| 10:36:35 8 | such as a registration page, how, you know, |
| 10:36:39 9 | you would determine if a user was from |
| 10:36:42 10 | Harvard, if they were allowed to gain |
| 10:36:46 11 | access, basic log-in features, and then sort |
| 10:36:50 12 | of basically trying to build profiles for |
| 10:36:53 13 | users and tying that with a search together |
| 10:36:58 14 | and tying the front end to the back end. |
| 10:37:03 15 | Q.   What do you mean "tie the front end to the |
| 10:37:05 16 | back end." |
| 10:37:06 17 | A.   Well, with the website there's front-end |
| 10:37:09 18 | coding, which is more of like what you see |
| 10:37:10 19 | that -- to the eye, and then there's the |
| 10:37:11 20 | back-end database encoding, and those need |
| 10:37:15 21 | to basically be linked together so they can |
| 10:37:19 22 | work. |
| 10:37:19 23 | Q.   At what point did the idea of the tie -- I |
| 10:37:21 24 | think that was the term that you used |
| 10:37:22 25 | before, the ties and the nodes -- at what |

Page 55

| | |
|---|---|
| 10:37:24 1 | point was the concept of the tie introduced? |
| 10:37:28 2 | A.   Well, I mean, that's a critical aspect. |
| 10:37:31 3 | That would have been part of the original -- |
| 10:37:33 4 | the original idea, again, to create a |
| 10:37:35 5 | community, to create a, what I have defined |
| 10:37:36 6 | as a social network, you need connections. |
| 10:37:40 7 | And the whole genesis of this idea was |
| 10:37:43 8 | connecting the students; hence, the name |
| 10:37:46 9 | HarvardConnection. |
| 10:37:48 10 | It was a very important word and |
| 10:37:50 11 | aspect of the site, you know, allowing |
| 10:37:53 12 | students not only to connect to each other |
| 10:37:55 13 | in their community, but to other |
| 10:37:57 14 | communities. |
| 10:38:00 15 | Q.   And those were established ties that would |
| 10:38:04 16 | be stored at a database somewhere? |
| 10:38:07 17 | A.   Yeah, in the form -- you know, you would |
| 10:38:14 18 | make a request of some sort, and they would |
| 10:38:14 19 | be -- you would be able -- the user at that |
| 10:38:16 20 | current time at HarvardConnection in 2003, |
| 10:38:19 21 | November, when Mr. Zuckerberg saw the site |
| 10:38:22 22 | and was given access to the code, there |
| 10:38:25 23 | would have been a visualization to the user |
| 10:38:27 24 | of requests that they had made, requests |
| 10:38:29 25 | that had been made for them, and they would |

Page 56

| | |
|---|---|
| 10:38:31 1 | have that own visualization of the type of |
| 10:38:34 2 | connections that they were trying to open up |
| 10:38:36 3 | on the site. |
| 10:38:36 4 | Q.   What do you mean, "requests that had been |
| 10:38:38 5 | made for them"? |
| 10:38:38 6 | A.   Well, you know, somebody makes -- there's |
| 10:38:41 7 | two ends to the request.  So if I request to |
| 10:38:44 8 | User B, User B can also make a request to |
| 10:38:48 9 | me.  So I'm going to have requests, and I'm |
| 10:38:49 10 | also going to make requests. |
| 10:38:51 11 | Q.   Okay.  Now, what happened if you accepted a |
| 10:38:53 12 | request? |
| 10:38:53 13 | A.   You would then in terms of -- |
| 10:38:57 14 | MR. HORNICK:  Object to -- what |
| 10:38:59 15 | point in time are we talking about right |
| 10:39:01 16 | now? |
| 10:39:01 17 | MR. CHATTERJEE:  Actually, I'll say |
| 10:39:03 18 | at any point in time prior to January 2004. |
| 10:39:05 19 | A.   Prior to January 2004.  At that current time |
| 10:39:09 20 | you would then -- in the current model of |
| 10:39:11 21 | the site, that would allow you to |
| 10:39:13 22 | communicate -- get that person's e-mail |
| 10:39:16 23 | address and communicate with them. |
| 10:39:17 24 | Q.   Was there anything discussed with you and |
| 10:39:20 25 | Mr. Zuckerberg about establishing a |

14 (Pages 53 to 56)

Page 59

connection beyond just giving an e-mail
address?

A.   Again, it's all about -- the functionality
is all the same.  You know, you add -- when
you open up a connection, when you create a
connection between a user, that's a
connection, that's a tie between the nodes.
How you want to exactly implement that tie
or what you want to call it could vary.  We
had discussed a matchmaker connection where,
you know, you would be -- a third party
would make a connection between two users.

Q.   And if that connection was accepted by the
people who had received the requests, was
that stored on the website that way?

A.   That had not been coded into the website.
As I said, we talked about that.

Q.   But you talked about storing --

A.   We talked about making a matchmaker
function, and the implementation, that's to
some extent up to a coder's -- up to their
sort of decision to exactly how to store it
and whatnot.  But we talked about a
matchmaker function, which would have
effectively opened -- allowed a third party

of us was present.

Q.   And how many meetings were there with
Sanjay?

A.   Again, I don't recall -- it would be
somewhat speculative to give you an exact
number, but I would say more than five
meetings.

Q.   And how long did these meetings last,
roughly?

A.   Generally -- they could be anywhere from an
hour to two hours.

Q.   And they would always be in his dorm room?

A.   A lot -- yes, and a lot of the -- I mean, a
lot of it was sort of the -- I hate to use
the word baby-sitting, but basically us
sitting over his shoulder looking at how he
set something up and saying, I like how that
looks, I don't like how that looks.  A lot
of it was sort of hands-on, you know,
implementation of just sort of graphics and
whatnot.
     So there wasn't -- every meeting was
not necessarily a strategy-oriented meeting
is what I'm getting at.

Q.   So did Mr. Mavinkurve attend the strategy

Page 58

to create a connection or illustrate to two
people that they thought that they should
connect.
     And just to further iterate on that,
the -- you know, a connection can also be
user defined.  What you might define it on a
site, such as our connect side of the
website, could be used for any number of
processes.  You put in a functionality, you
put in an infrastructure, and then it's up
to the user to define how they want to use
it or what they want to use it for.

Q.   So let's go back to, you have your first
meeting in late December -- or in December/
early 2003 with Divya Narendra, you and
Tyler Winklevoss.  Was there a subsequent
meeting?

A.   Between the three of us?

Q.   Okay.

A.   Well, every time we met with Sanjay it was
almost always generally one to two of us, if
not all three.  Sometimes I met with Sanjay
personally, but there was always -- most of
the times when I met with Sanjay and Sanjay
sort of put pen to paper, so to speak, one

Page 60

meetings?

A.   Well, to the extent that he knew -- he knew
that, as I mentioned before, that he
understood that there was a propriety
project and he would put an input where he
saw fit.

Q.   Were there any strategy meetings after Mr.
Mavinkurve was hired that he wasn't present
at?

A.   Again, all the meetings were pretty much
all, you know, with the two or three of us.

Q.   And Mr. Mavinkurve was always at those
meetings?

A.   Yeah.  He would be present or aware of
anything that -- you know, there's -- any
kind of decision he would be fully aware of
because he would be the one implementing it
or coding it.

Q.   And was he paid for his time?

A.   He was not paid.

Q.   And what, if anything, did Mr. Mavinkurve
get out of this?

A.   Well, I can't answer sort of specifically
what he might have -- sort of what
fulfillment he might have personally felt

15 (Pages 57 to 60)

Page 61

10:44:04 1 from the project, but towards the summer of
10:44:08 2 2003 he gracefully bowed out and made it
10:44:12 3 pretty clear that he was unable to continue
10:44:15 4 working on the site because of his job.
10:44:20 5 Q. I'm sorry, was that summer 2003?
10:44:21 6 A. Yes, that would have been summer 2003.
10:44:33 7 Q. Since filing this lawsuit have you had any
10:44:35 8 conversations with Mr. Mavinkurve?
10:44:36 9 A. Let me see. I believe -- I believe we may
10:44:43 10 have -- we may have talked once or twice,
10:44:45 11 but I can't recall. I just -- I think we
10:44:47 12 have communicated once or twice, yes.
10:44:49 13 Q. And since you made your complaint, not the
10:44:55 14 lawsuit, but your e-mails to Mark Zuckerberg
10:44:59 15 about your beliefs related to this case,
10:45:03 16 have you had conversations with Mr.
10:45:05 17 Mavinkurve?
10:45:05 18 A. Nothing -- with respect to the lawsuit?
10:45:11 19 Q. Or with respect to the issues in the
10:45:13 20 lawsuit, like a little broader than just the
10:45:17 21 lawsuit.
10:45:17 22 A. We really haven't discussed anything at
10:45:21 23 length. Mr. Mavinkurve is a little -- you
10:45:22 24 know, he just -- he's very busy with his
10:45:24 25 work, and we just haven't really -- hasn't

Page 62

10:45:28 1 been much of an issue.
10:45:29 2      MR. CHATTERJEE: Let me mark this
10:45:30 3 as Defendants' Exhibit 2.
10:45:46 4      (Exhibit No. 2, First Amended
10:45:48 5 Complaint, marked for identification.)
10:45:48 6 Q. I'm going to ask you one question about
10:45:50 7 this --
10:45:50 8 A. Sure.
10:45:50 9 Q. -- and then we'll take a break. If you'd go
10:45:53 10 to Paragraph 14.
10:45:55 11      MR. HORNICK: I'll object that this
10:45:56 12 is outside the scope. You can answer. It's
10:45:59 13 not 30(b)(6) testimony.
10:46:03 14 Q. If you can read that paragraph and let me
10:46:05 15 know when you're done.
10:46:07 16 A. Uh-huh.
10:46:07 17      (Witness reviews document.)
10:46:28 18 A. Uh-huh.
10:46:28 19 Q. Okay. If you look in the second sentence,
10:46:31 20 it says, "After the first programmer hired
10:46:33 21 by Plaintiff graduated," that first
10:46:36 22 programmer was Sanjay Mavinkurve?
10:46:38 23 A. Sanjay Mavinkurve was the first programmer
10:46:40 24 of HarvardConnection or -- yes, yes.
10:46:44 25      MR. CHATTERJEE: Okay. Why don't

Page 63

10:46:44 1 we take a break for a few minutes, like 10
10:46:47 2 minutes.
10:46:48 3      MR. HORNICK: All right.
10:46:49 4      THE VIDEOGRAPHER: The time is
10:46:50 5 10:46. This is the end of Tape 1, and we
10:46:53 6 are off the record.
10:46:54 7      (Recess taken.)
10:57:34 8      THE VIDEOGRAPHER: The time is
10:57:39 9 10:57. This is the beginning of Tape 2, and
10:57:42 10 we are back on the record.
10:57:43 11 BY MR. CHATTERJEE:
10:57:43 12 Q. Mr. Winklevoss, we're back from a break. I
10:57:52 13 want to ask a couple follow-up questions
10:57:55 14 from the previous hour. You had mentioned
10:57:57 15 that Mr. Zuckerberg agreed to be part of a
10:58:00 16 partnership. Do you remember that
10:58:02 17 testimony?
10:58:03 18 A. I believe I said that -- yes, I do remember
10:58:08 19 the testimony where you asked me that, and I
10:58:11 20 said that Mr. Zuckerberg had acknowledged an
10:58:13 21 agreement between the parties where he
10:58:16 22 would -- yes, he acknowledged the agreement.
10:58:19 23 Q. Was there any discussion about what share of
10:58:21 24 the partnership he would have?
10:58:23 25 A. With respect to dot-com companies, they're

Page 64

10:58:29 1 generally started as projects and sort of a
10:58:32 2 small group of people with an idea, and it's
10:58:38 3 sometimes unclear exactly where, you know,
10:58:41 4 two months from that -- the start point or
10:58:43 5 six months from that start point where
10:58:46 6 exactly the equity will lay. Mr. Zuckerberg
10:58:49 7 himself has reapportioned equity multiple
10:58:52 8 times.
10:58:53 9      So to the extent of talking about
10:58:57 10 equity shares at that point, it was
10:59:00 11 premature. However, everything was an equal
10:59:05 12 partner. Everybody did contribute.
10:59:07 13 Q. So I want to make sure this is clear. So
10:59:12 14 was there any discussion about what share of
10:59:14 15 the partnership Mr. Zuckerberg would have?
10:59:17 16 A. The specific share, it was premature to
10:59:21 17 speak about that at that time.
10:59:22 18 Q. So is the answer to my question no?
10:59:24 19 A. The answer is that it was premature to speak
10:59:26 20 about specific shares. Was it understood by
10:59:31 21 Mr. Zuckerberg that he would get a share?
10:59:33 22 Yes.
10:59:34 23 Q. Okay. Did you tell Mr. Zuckerberg how much
10:59:38 24 of a share of the partnership he would have?
10:59:41 25 A. Well, there is more --

16 (Pages 61 to 64)

Page 65

10:59:43 1   Q.  Please just answer the question. It's a yes
10:59:47 2   or no.
10:59:47 3       MR. HORNICK:  The witness can
10:59:48 4   answer the question however he wants.
10:59:49 5   A.  Yeah, I mean, you're -- I'm assuming you're
10:59:53 6   talking about equity share, the multiple
10:59:55 7   benefits to a project, which could include
10:59:57 8   prestige, equity. There's multiple levels.
11:00:01 9   And at that point we had no revenue source,
11:00:03 10  and the product was far from completion. We
11:00:06 11  stressed to him multiple times that one of
11:00:08 12  his major benefits would be a sort of a
11:00:12 13  reinventing of himself in terms of his
11:00:14 14  reputation post the Facemash debacle. In
11:00:20 15  fact, he would be the center point of the
11:00:21 16  launch, not us, even though it was our idea.
11:00:23 17      So we did not have specific talks
11:00:25 18  about equity share, but as I said, he was an
11:00:28 19  equal partner. Whatever you might want to
11:00:33 20  infer from the equal partner, be it a
11:00:35 21  quarter, a quarter, a quarter, that's fine.
11:00:36 22  Q.  Did you tell Mr. Zuckerberg that he would be
11:00:38 23  an equal partner?
11:00:39 24  A.  I told Mr. Zuckerberg that he was -- we
11:00:42 25  conveyed to Mr. Zuckerberg that he would be

Page 66

1:00:44 1   a part of the HarvardConnection team --
11:00:46 2   Q.  And --
11:00:48 3   A.  -- okay, not a contract programmer.
11:00:50 4   Q.  And did you convey to him what his share of
11:00:53 5   the partnership would be?
11:00:54 6       MR. HORNICK:  Objection, asked and
11:00:55 7   answered.
11:00:55 8   A.  As I said before, we did not speak about
11:00:59 9   specific equity stakes at that point. It
11:01:01 10  was premature. If, you know -- I might
11:01:05 11  point out at that time that Mr. Zuckerberg
11:01:10 12  had yet to make a contribution. So,
11:01:13 13  generally speaking, you know, in any law
11:01:14 14  firm, particularly -- you know, I'm sure
11:01:16 15  your firm works this way -- you work for
11:01:18 16  seven, eight, ten years and then become a
11:01:20 17  partner. People don't hand out partnership.
11:01:22 18  You know, you don't give out equity.
11:01:25 19      So everybody was aware that they were
11:01:26 20  on a team, they'd make contributions, and
11:01:28 21  that depending on the size of the
11:01:30 22  contribution after a certain time period,
11:01:33 23  they would be given equity.
11:01:34 24  Q.  Was there ever any discussion at any point
1:01:38 25  with Mr. Zuckerberg about what his share of

Page 67

11:01:42 1   the partnership would be?
11:01:43 2   A.  Other than the fact that he was an equal
11:01:46 3   partner on ConnectU and given full creative
11:01:49 4   control and full input into what the product
11:01:52 5   could and should be, there was not a
11:01:55 6   specific discussion about specific amounts
11:01:57 7   of equity at that time.
11:01:59 8   Q.  Was there ever discussions stating that he
11:02:01 9   was an equal partner?
11:02:02 10  A.  As I said, we invited him to be part of the
11:02:07 11  team. We invited him to contribute. He
11:02:09 12  agreed to contribute, end of story.
11:02:13 13  Q.  And where I'm focusing now is the word
11:02:15 14  "equal."
11:02:16 15  A.  Uh-huh.
11:02:17 16  Q.  So did you ever tell Mr. Zuckerberg he would
11:02:19 17  be an equal partner?
11:02:20 18  A.  Well, I think the fact that we gave him our
11:02:24 19  whole source code, gave him creative
11:02:27 20  control, gave him full, you know -- asked
11:02:30 21  him for multiple input would certainly lend
11:02:32 22  to the word "equal." There was no one-way
11:02:35 23  dialogue. In fact, if anything, it was
11:02:37 24  skewed in his favor. And so he had more
11:02:40 25  than enough reason to believe that it was

Page 68

11:02:42 1   going to be on equal terms, his terms, and
11:02:46 2   that's as far as really I can comment on
11:02:49 3   that.
11:02:49 4   Q.  Did he ever tell you that he wanted to be an
11:02:51 5   equal partner?
11:02:52 6   A.  He never asked for monetary compensation,
11:02:56 7   and all -- I can't -- what he essentially
11:03:00 8   agreed to was to contribute to the coding
11:03:04 9   that he said he would contribute to.
11:03:06 10  Q.  Did he ever agree to take some equity?
11:03:10 11  A.  Again, he agreed to complete a portion of
11:03:14 12  the website and become part of the team.
11:03:16 13  Q.  And -- but my question is, did he ever agree
11:03:19 14  to any specific allocation of equity in the
11:03:21 15  partnership?
11:03:21 16  A.  He did not say, "I need X amount of equity
11:03:28 17  or amount," no, he didn't say that.
11:03:30 18  Q.  And were there any discussions about
11:03:31 19  allocation of equity during your
11:03:33 20  relationship with Mr. Zuckerberg?
11:03:34 21  A.  As I said before, it was premature to talk
11:03:37 22  about allocation. This was a contribution
11:03:38 23  basis where, you know, you join a team, you
11:03:40 24  contribute, and you can reallocate
11:03:43 25  partnerships. With myself and Tyler and

11:03:46  1   Divya Narendra we didn't allocate
11:03:48  2   partnership until later on because it was
11:03:50  3   unclear what our respective contributions
'11:03:53  4   would be.
11:03:54  5   Q.  So that actually raises another issue.
11:03:56  6   Prior to joining with Mr. Zuckerberg, were
11:04:01  7   there any discussions between Mr. Tyler
11:04:04  8   Winklevoss, you, Divya Narendra about how
11:04:08  9   the equity would be divided?
11:04:10 10   A.  We, again, as I said before, were -- we
11:04:15 11   operated on an equality basis, and so we had
11:04:18 12   four individuals with Mark Zuckerberg.  When
11:04:22 13   Mark Zuckerberg decided to -- or effectively
11:04:25 14   launched Thefacebook, there was three
11:04:28 15   individuals.  At that point there's three
11:04:30 16   equal partners in the company.  Over time
11:04:32 17   that has clearly changed in terms of the
11:04:36 18   contributions that individuals have put into
11:04:37 19   the company.
11:04:41 20   Q.  And with respect to the other programmers
11:04:43 21   that you had, did you ever discuss giving
11:04:46 22   them any equity?
11:04:46 23   A.  So Victor Gao was a contract-based
11:04:51 24   programmer, so he was not interested in
11:04:53 25   equity.  We had offered it.  We had

Page 70

'11:04:55  1   offered -- you know, we said, "What do you
11:04:58  2   need to get this done?"  And he took money.
11:05:01  3   That was his deal.
11:05:02  4       Sanjay was part of the team, as I
11:05:05  5   said.  He contributed, but it became very
11:05:10  6   evident after a while that he could no
11:05:12  7   longer contribute.  He did not ask to become
11:05:13  8   a partner.  And I think that it was very
11:05:16  9   clear from both sides and both people's
11:05:19 10   standpoint that -- we were thankful for the
11:05:22 11   work that he did, but he wasn't a partner at
11:05:25 12   that point.
11:05:25 13   Q.  And both of them had access, both Victor Gao
11:05:29 14   and Sanjay Mavinkurve had access to the
11:05:32 15   source code, right?
11:05:35 16   A.  Yes, they did, but, you know, the term -- as
11:05:38 17   I mentioned before, Victor had access on a
11:05:41 18   contract basis, and Sanjay was on a
11:05:42 19   contributing basis and gracefully bowed out
11:05:46 20   and decided that, you know, he couldn't
11:05:48 21   complete it and that he did not want to be a
11:05:53 22   partner of the situation.
11:05:56 23       MR. CHATTERJEE:  So let's mark this
'11:05:57 24   as Exhibit No. 3.
.11:06:00 25

Page 72

11:06:00  1       (Exhibit No. 3, E-mail dated May 4,
11:06:00  2   2004, Bates Nos. C003165 - 3166, marked for
11:06:16  3   identification.)
11:06:16  4   Q.  Mr. Winklevoss, I've handed you a document
11:06:20  5   that's been marked as C003165 and C003166.
11:06:31  6   Do you recognize this document?
11:06:32  7   A.  Yes, I do.
11:06:32  8   Q.  And what is this document?
11:06:33  9   A.  This is my mom's incorrect, inaccurate
11:06:38 10   interpretation of events -- or, rather, the
11:06:40 11   relationship between ourselves and Mr.
11:06:42 12   Zuckerberg.
11:06:42 13   Q.  And when you say it's incorrect, what do you
11:06:47 14   mean?
11:06:47 15   A.  Well, incorrect to the extent that I believe
11:06:51 16   she misinterpreted it.  You know, you can
11:06:55 17   read yourself with respect to the
11:07:02 18   relationship between us.
11:07:03 19   Q.  And in the re: line it says, "Took a first
11:07:07 20   pass:  do not suggest he was a partner."
11:07:13 21       What's that all about?
11:07:14 22   A.  She was under the impression, it was her
11:07:17 23   belief that he shouldn't have been a partner
11:07:19 24   and that he was not really part of the
11:07:24 25   original idea, which is the fact he was not

11:07:28  1   originally part of the idea.  And she was
11:07:30  2   incorrect to assume that he was not a
11:07:31  3   partner.  I think she did not like the
11:07:34  4   symbolic connotation that that word had,
11:07:37  5   however accurate it may have been.
11:07:39  6   Q.  Did you ever tell her that her understanding
11:07:41  7   was wrong?
11:07:42  8   A.  Yes.  In fact, I believe I told her over the
11:07:47  9   phone absolutely, but, again, this is my
11:07:50 10   mother's opinion.  And my mother sends me
11:07:54 11   e-mails all the time that I disagree with.
11:07:56 12   And to keep up with, you know, replying to
11:07:59 13   such e-mails is -- can be quite laborious,
11:08:02 14   so...
11:08:02 15   Q.  So describe these conversations you had with
11:08:04 16   your mother where you told her she was
11:08:06 17   wrong.
11:08:07 18   A.  I simply said he actually was a partner and
11:08:10 19   that, you know, the fact that he was a
11:08:12 20   partner does necessarily -- you know, it's
11:08:15 21   clear, though, regardless of that that he
11:08:17 22   wasn't part of the initial idea and that,
11:08:19 23   you know, that that was about it, exactly
11:08:21 24   what I just told you.
11:08:22 25   Q.  And what was her response?

18 (Pages 69 to 72)

Page 75

11:08:23 1    A.  I mean, I don't recall at the time, but it
11:08:27 2        doesn't really -- it's not really relevant
11:08:29 3        what her -- you know, again, it's her
11:08:31 4        opinion.  And it's -- it was inaccurate.
11:08:35 5    Q.  Did she discuss with you at any point why
11:08:38 6        she believed Mark Zuckerberg was not a
11:08:41 7        partner?
11:08:41 8    A.  No.  As I said before, she simply did not
11:08:44 9        believe in the symbolic connotation of the
11:08:46 10       word "partner."  She felt that that meant
11:08:49 11       perhaps that he had been actually at the
11:08:51 12       inception of the idea which -- so that's
11:08:55 13       what I said, yeah.
11:08:56 14   Q.  Do you know if Mark Zuckerberg ever produced
11:09:14 15       any code for the HarvardConnection?
11:09:15 16   A.  I think I answered this question somewhat
11:09:16 17       before?  To our knowledge -- and I'm not a
11:09:20 18       programmer.  To my knowledge, that has been
11:09:23 19       imparted to me through Victor Gao, Mr.
11:09:27 20       Zuckerberg duplicated pieces of code on the
11:09:30 21       date side, renamed them, you know, the
11:09:34 22       appropriate connect side name -- connect
11:09:37 23       names, went through the code, looked at it.
11:09:42 24       Other than that, I don't believe that we
11:09:45 25       have any -- in our possession any other code

Page 74

.1:09:47 1        that he would have written.  I believe if it
11:09:49 2        was written, as he stated in his e-mails, I
11:09:53 3        would like to believe that they're on his --
11:09:55 4        that they were on his computer, as he said,
11:09:57 5        that he was preparing them on his computer.
11:10:04 6    Q.  Was the HarvardConnection able to establish
11:10:08 7        sustained links between two separate users?
11:10:11 8    A.  Sustained, in what reference to --
11:10:16 9    Q.  So let me give you an example.  If, for
11:10:19 10       example, you and I were both participants on
11:10:23 11       the HarvardConnection, and I sent you a
11:10:28 12       request and then you responded
11:10:32 13       affirmatively, would that -- would that
11:10:34 14       connection that we've just established be
11:10:36 15       stored through HarvardConnection in any way?
11:10:38 16   A.  As I said before, we visualized connections
11:10:42 17       that you made and connections that were
11:10:44 18       requested of you through the website.  We
11:10:47 19       did not visualize those on the user's
11:10:50 20       profile.  But that doesn't -- you know,
11:10:51 21       that's irrelevant to the question of what
11:10:54 22       you're saying is did we sustain those
11:10:56 23       relationships?  From a virtual standpoint we
11:11:00 24       recorded, yes, I would say we sustained them
.1:11:04 25       to that extent.

Page 76

11:11:05 1        Let's be careful not to get confused
11:11:07 2        here, though.  You know, social network
11:11:11 3        is -- I'm assuming that you're getting at
11:11:14 4        what sort of constitutes a social network.
11:11:16 5        And a social network by definition, as I
11:11:18 6        mentioned before, constitutes tools that
11:11:21 7        allow people to connect, okay?  What form
11:11:23 8        those tools might take, you know, is a
11:11:26 9        different aspect.  So in qualifying a social
11:11:29 10       network, it is tools that allow people to
11:11:32 11       connect.
11:11:32 12   Q.  Right.  And what I'm getting at is what did
11:11:35 13       you envision as being the mechanism by which
11:11:40 14       HarvardConnection users would connect?
11:11:43 15   A.  Victor Gao will tell you that the -- I guess
11:11:46 16       the underlying code, he described it as a
11:11:49 17       handshake.  And as I said, we open up a
11:11:54 18       connection and users had the requests, and
11:11:58 19       what was -- you know, who made requests to
11:12:01 20       them visualized to them.
11:12:03 21   Q.  And what do you mean by "visualized"?
11:12:05 22   A.  Visualized to the extent that there's a
11:12:10 23       section of the website set out to show you
11:12:13 24       who made a request and who you made a
11:12:15 25       request to.

Page 76

11:12:16 1    Q.  And when the request was accepted, was there
11:12:19 2        anything on the paper that would indicate
11:12:23 3        that Person A and Person B are now connected
11:12:27 4        to each other?
11:12:28 5    A.  Yeah.  I believe that when you accepted it,
11:12:30 6        it would tell you that the person accepted
11:12:32 7        it and that it would show, you know,
11:12:35 8        accepted, you know, friend request.
11:12:38 9    Q.  And that would be stored, and every time
11:12:44 10       someone pulled up their profile it would say
11:12:47 11       that?
11:12:47 12   A.  I believe so.  That's the way we envisioned
11:12:51 13       it to stay there.  I can't -- Victor -- you
11:12:53 14       know, I can't recall off the top of my head
11:12:54 15       exactly if that had been implemented yet,
11:12:55 16       but that was certainly the intent.
11:12:58 17   Q.  And that was -- that was the intent before
11:13:00 18       Mark Zuckerberg ever started working with
11:13:01 19       you?
11:13:02 20   A.  Well, yeah.  I mean, if you think about --
11:13:04 21       the date side was theoretically more of a
11:13:08 22       complete connection, so, yes, that should
11:13:10 23       have -- that intent should have been in
11:13:12 24       there.  And he would have been aware of
11:13:13 25       that, you know, if not through us, then

11:13:17 1     through our tutorial that Victor Gao
11:13:22 2     imparted to him.
11:13:22 3   Q. Now, you've used this term "date side," and
1:13:25 4     what was the other side called?
11:13:26 5   A. Right at -- at that point we labeled sort of
11:13:30 6     the two different -- we -- at that point in
11:13:32 7     the development we had those two different
11:13:34 8     labels for that functionality of connecting.
11:13:38 9     There's effectively what was labeled a date
11:13:42 10    and connect side.
11:13:44 11   Q. Okay. And was that division, a date side
11:13:47 12    and a professional side, is that
11:13:48 13    something --
11:13:48 14   A. No, I didn't say professional.
11:13:50 15       MR. HORNICK: Objection to the
11:13:51 16    form.
11:13:51 17   Q. Oh, I'm sorry.
11:13:51 18       MR. HORNICK: You missed that
11:13:52 19    characterization.
11:13:52 20   Q. The date side and the connect side, were
11:13:54 21     those -- was that division a trade secret of
11:13:59 22    ConnectU?
11:14:00 23       MR. HORNICK: Object that it calls
11:14:01 24    for a legal conclusion, but you can answer.
11:14:03 25   A. Again, I don't -- you know, that division

11:15:26 1     compartmentalized what we thought users
11:15:28 2     might be using those functionalities for at
11:15:31 3     that time.
11:15:31 4   Q. So the connect side -- describe what the
11:15:33 5     connect side functionality was supposed to
11:15:36 6     be?
11:15:36 7   A. Well, as I said, the connect side, part of
11:15:39 8     it is user defined. We give them a search.
11:15:42 9     We give them the ability to connect. And
11:15:44 10    what premise they want to connect up is
11:15:46 11    entirely up to them, really. You know, if
11:15:49 12    you take your clients' website, there is
11:15:53 13    multiple different levels. There's a whole
11:15:55 14    section on a profile that refers to dating.
11:15:59 15   Q. And I'm not talking about my client's
11:16:00 16    website.
11:16:01 17   A. Okay.
11:16:01 18   Q. I'm talking about your concept.
11:16:03 19   A. Connect side is a, it's open to
11:16:09 20    interpretation by the user. We might -- you
11:16:11 21    know, the user can do whatever premise they
11:16:13 22    want to connect to people on, be it the
11:16:15 23    fields, the academic ones than we had.
11:16:18 24    Potentially it could be a thesis.
11:16:19 25    Potentially it could be a major, a house,

11:14:06 1     was -- at that period in time we were trying
11:14:11 2     to compartmentalize basically the user --
11:14:16 3     how the users would interpret and use that
11:14:19 4     function of making a connection. So if that
11:14:25 5     falls under a trade secret, then perhaps at
11:14:30 6     the time.
11:14:30 7   Q. Was it something you were telling other
11:14:33 8    people about?
11:14:33 9   A. We didn't really tell people much about
11:14:37 10    anything, really. We didn't -- I mean,
11:14:39 11    other than the fact that we were hard at
11:14:41 12    work in someone's dorm room, there was no
11:14:44 13    real -- no.
11:14:45 14   Q. And what was the date side supposed to do?
11:14:48 15   A. The date side was -- well, again, those were
11:14:52 16    labels used to describe the connecting
11:14:55 17    function, and we at that period in time felt
11:14:59 18    that users would probably most likely use
11:15:01 19    the site to either effectively connect on a
11:15:07 20    social dating-type level and connect on more
11:15:10 21    of a perhaps -- and then connect more on a
11:15:13 22    casual either -- whether -- be it a casual
11:15:17 23    and/or an interest-based level or an
11:15:19 24    academic level or a professional level.
11:15:21 25     So that's how we ourselves

11:16:22 1     you name it.
11:16:24 2   Q. So it was not a tool that was specifically
11:16:26 3     directed towards helping employers find
11:16:28 4     students that they might want to hire --
11:16:30 5   A. It could be used by employers, and it could
11:16:32 6     be used by students, but it --
11:16:33 7   Q. Let me finish my question.
11:16:34 8       MR. HORNICK: Well, let him finish
11:16:35 9    his answer.
11:16:36 10   Q. Okay. Go ahead and finish.
11:16:37 11   A. It could be. As I said before, it's a user-
11:16:39 12    defined -- these are user-defined sites to a
11:16:42 13    large extent. So it could be used in that
11:16:44 14    case, but it also could be used student to
11:16:47 15    student, alumni to alumni, alumni to
11:16:50 16    student, student to alumni, employer to
11:16:53 17    student. You know, you can draw a matrix
11:16:55 18    and probably come up with 10 different
11:16:57 19    relationships or uses of the site.
11:16:58 20   Q. Right. Okay. So my question was, it wasn't
11:17:03 21    exclusively for the purpose of connecting
11:17:05 22    employers and students?
11:17:06 23   A. No, it would not have been exclusively.
11:17:09 24    There wouldn't have been any indication in
11:17:10 25    the coding, in the setup -- you know, the

20 (Pages 77 to 80)

Page 83

11:17:13 1    profile. If you look at the profile
11:17:15 2    attributes, there was one profile. And, you
11:17:17 3    know, if you -- to answer your question, a
11:17:19 4    student -- you know, whoever set up that
11:17:22 5    profile could look at another connect
11:17:24 6    profile, and what they want to make of that
11:17:26 7    information on some level is entirely up to
11:17:28 8    them. We can -- we can determine what
11:17:31 9    information is on that profile, but after
11:17:33 10   that it's out of our hands.
11:17:35 11   Q.  How long was Mark Zuckerberg a partner with
11:17:38 12   the HarvardConnection?
11:17:39 13   A.  We invited him to become part of the
11:17:44 14   project, I believe, November 2003, and
11:17:50 15   effectively he never terminated his sort
11:17:53 16   of -- he never terminated. So we are -- I
11:17:59 17   would say the launch of Thefacebook is
11:18:01 18   probably the turning point, you know, I
11:18:03 19   would think.
11:18:03 20   Q.  Did you ever terminate his partnership?
11:18:05 21   A.  Well, I think a better question is, did he
11:18:10 22   ever fulfill the contribution level that he
11:18:13 23   agreed to? And he was -- to our knowledge,
11:18:15 24   we have yet to receive that contribution.
11:18:17 25   Q.  And that's not my question. Did you ever

Page 82

1:18:19 1     terminate the partnership with him?
11:18:21 2    A.  Well, I think the -- you know --
11:18:24 3         MR. HORNICK: I think you're
11:18:25 4    putting words into the witness's mouth.
11:18:27 5    A.  Yeah. Again, the question might better be
11:18:30 6    phrased as, did he complete the sort of
11:18:34 7    contribution he agreed to that would have
11:18:36 8    suggested him being an equal partner? And
11:18:38 9    absolutely not. He -- or maybe he did
11:18:40 10   complete it, but we don't have it.
11:18:42 11   Q.  Okay. Mr. Winklevoss, you're not answering
11:18:44 12   my question.
11:18:45 13        MR. HORNICK: You're giving him an
11:18:47 14   unfair question, that's why.
11:18:48 15        MR. CHATTERJEE: Well, and he can
11:18:49 16   tell me it's an unfair question.
11:18:51 17   A.  So what is the question again? I'm sorry.
11:18:53 18   Q.  Did you ever throw Mr. Zuckerberg out of the
11:18:56 19   partnership?
11:18:56 20   A.  Well --
11:18:57 21   Q.  Did you ever tell him that?
11:18:58 22   A.  I think the cease and desist letter would
11:19:00 23   make that pretty evident that he -- you
11:19:03 24   know, when a partner misappropriates trade
:19:05 25    secrets and ideas and stuff, I think that's

Page 83

11:19:09 1    grounds for -- I don't think there's a
11:19:10 2    relationship there anymore, if that's what
11:19:14 3    you're asking.
11:19:15 4    Q.  Okay. So that's your answer. The cease and
11:19:18 5    desist letter effectively threw him out of
11:19:20 6    the partnership?
11:19:21 7         MR. HORNICK: Well, I --
11:19:22 8    A.  I think his actions threw him out of the
11:19:25 9    partnership, and I think the cease and
11:19:26 10   desist letter illustrated and outlined what
11:19:28 11   the actions were that he did that would have
11:19:29 12   effectively thrown him out of the
11:19:31 13   partnership, yes.
11:19:32 14   Q.  Okay. Was there ever a discussion with you,
11:19:35 15   Tyler Winklevoss, and Divya Narendra to
11:19:37 16   throw him out of the partnership?
11:19:38 17   A.  As I said before, you know, I think, his
11:19:43 18   actions, and we had a discussion about the
11:19:45 19   actions. We wrote these after the cease and
11:19:50 20   desist letter, and that effectively -- you
11:19:51 21   know, I think that that effectively ended
11:19:54 22   any kind of partnership relationship there.
11:19:57 23   Q.  And who drafted that cease and desist
11:19:59 24   letter?
11:19:59 25   A.  I primarily drafted it.

Page 84

11:20:02 1    Q.  Did you get input from Mr. Narendra?
11:20:04 2    A.  No. He's not a lawyer. He's not -- he has
11:20:07 3    no legal training.
11:20:09 4    Q.  When you say you primarily drafted it --
11:20:12 5    A.  I wrote it.
11:20:12 6    Q.  Did anyone else look at it or give you
11:20:14 7    feedback?
11:20:14 8    A.  The only other people would have been
11:20:16 9    counsel, and I can't really divulge what
11:20:20 10   their feedback would have been.
11:20:25 11   Q.  Right, okay. So you had conversations with
11:20:26 12   counsel about your letter? I'm not going to
11:20:28 13   go any deeper than that. I just want to
11:20:31 14   know if you did.
11:20:32 15        MR. HORNICK: Well, "conversations"
11:20:32 16   is -- I have to object to the form of the
11:20:34 17   question.
11:20:34 18   Q.  Did you meet with counsel to discuss your
11:20:36 19   letter?
11:20:36 20   A.  There was discourse between the counsel and
11:20:39 21   some sort of communication line that would
11:20:40 22   have helped me draft the letter, but I don't
11:20:43 23   have legal --
11:20:44 24   Q.  Was it the Finnegan Henderson firm or
11:20:47 25   someone else?

21 (Pages 81 to 84)

Page 85

11:20:47 1    A. It was another counsel.
11:20:48 2    Q. And who was that?
11:20:49 3    A. Rodney Vessels.
11:20:51 4    Q. And where is Mr. Vessels?
11:20:52 5    A. In terms of -- what do you mean "where"?
11:20:56 6    Q. Where is he located?
11:20:57 7    A. He's located in Connecticut, Greenwich,
11:21:01 8    Connecticut.
11:21:01 9    Q. Who is Joseph Jackson?
11:21:02 10   A. Joseph Jackson is another programmer that
11:21:05 11   was brought on. Victor suggested we
11:21:07 12   contract him with Victor to help Victor do
11:21:11 13   some of the stuff.
11:21:12 14   Q. And when was he contracted?
11:21:13 15   A. I believe in -- it would have been in the
11:21:19 16   fall before meeting Mark Zuckerberg.
11:21:28 17   Q. So that -- so Mr. Jackson was -- you talked
11:21:36 18   to Mr. Jackson before meeting with Mr.
11:21:38 19   Zuckerberg?
11:21:39 20   A. I believe so, yeah.
11:21:40 21   Q. Okay. And was he ever contracted with you?
11:21:43 22   A. As I said, he was a contract employer, yeah.
11:21:45 23   Q. Okay. And what were his -- what was his
11:21:47 24   job?
11:21:47 25   A. I don't remember specifically. I believe he

Page 86

11:21:51 1    was helping Victor finish off part of the
11:21:54 2    date side of the site. I believe he was
11:21:58 3    helping him maybe with some of the back-end
11:22:00 4    functionality of the website. Other than
11:22:07 5    that, I can't comment specifically.
11:22:10 6    Q. Did you ever meet with Mr. Jackson?
11:22:11 7    A. I did.
11:22:13 8    Q. When was that meeting?
11:22:13 9    A. Roughly the same time. Again, I don't know
11:22:15 10   the date. A lot of -- a lot of -- Victor
11:22:18 11   would have brought Mr. Jackson up to speed
11:22:20 12   in terms of the coding. I would have met
11:22:23 13   him and, you know, introduced myself and
11:22:25 14   told him that I appreciated his effort. But
11:22:27 15   other than that, Victor was pretty much in
11:22:30 16   charge of bringing him up to speed.
11:22:32 17   Q. And do you know if Mr. Mavinkurve or Tyler
11:22:34 18   Winklevoss ever met with Joe Jackson?
11:22:37 19   A. I don't believe so. Mr. -- yeah, Mr.
11:22:39 20   Mavinkurve would not have, and Tyler I
11:22:42 21   don't -- Tyler may have met him, but, again, not a
11:22:44 22   introduced himself, but, again, not a
11:22:46 23   meeting sort of in terms of coding and
11:22:48 24   whatnot.
11:22:48 25   Q. So to the best of your recollection, you

Page 87

11:22:51 1    only met with Joseph Jackson once or twice?
11:22:55 2    A. Yeah. He was a -- he was not a heavy
11:23:01 3    contributor. I think he helped Victor with
11:23:04 4    one or two issues, and that was about it.
11:23:06 5    Q. And how much did you pay him?
11:23:09 6    A. I forget the hourly rate. I think it was
11:23:12 7    fairly reasonable for a college level
11:23:14 8    programmer. Again, it would be speculation.
11:23:17 9    I would say we might have paid him a couple
11:23:20 10   hundred dollars, if that.
11:23:23 11   Q. And was his hourly rate like $20 an hour?
11:23:26 12   A. It might have been something in that
11:23:27 13   ballpark, maybe a little bit less. Again,
11:23:29 14   he's a junior in college -- or at that time
11:23:32 15   I believe he was a junior. And that's about
11:23:37 16   market rate, I would say.
11:23:39 17        MR. CHATTERJEE: Let me just check.
11:23:41 18   How close are we to finishing on time?
11:23:43 19        THE VIDEOGRAPHER: We have 40
11:23:44 20   minutes left on the tape.
11:23:50 21        MR. CHATTERJEE: Okay.
11:23:51 22   BY MR. CHATTERJEE:
11:23:51 23   Q. Did you ever tell Mr. Jackson he should keep
11:23:54 24   the information confidential and not share
11:23:55 25   it with others?

Page 88

11:23:56 1    A. It was clear that he was on a contract basis
11:24:03 2    and that he should complete his portion, and
11:24:07 3    Victor -- were it not I, Victor would have
11:24:13 4    certainly told him this is a project that
11:24:14 5    should not be talked about.
11:24:16 6    Q. Did you ever tell him that?
11:24:17 7    A. I don't recall if I told him, but Victor I
11:24:21 8    think most certainly would have.
11:24:23 9    Q. And did Victor tell you, Tyler Winklevoss or
11:24:28 10   Cameron -- or Divya Narendra that he
11:24:31 11   informed Mr. Jackson of his confidentiality
11:24:34 12   obligations?
11:24:35 13   A. I don't recall. I don't know. I can't say
11:24:39 14   specifically if -- to my recollection, Mr.
11:24:46 15   Gao would probably be a better individual to
11:24:49 16   ask on that term, but I think it was fairly
11:24:51 17   understood, and just like Victor brought
11:24:53 18   Mark up to speed in terms of proprietary
11:24:58 19   information, he would have done so with Joe
11:25:00 20   as well.
11:25:00 21   Q. So is it ConnectU's testimony that Mr.
11:25:02 22   Jackson was or was not told?
11:25:07 23   A. I believe that he understood that it was
11:25:10 24   proprietary information, is ConnectU's
11:25:14 25   position.

22 (Pages 85 to 88)

Page 91

11:25:14 1    Q.  The term "understood" is a confusing thing
11:25:15 2        to me.  Was he told --
11:25:17 3            MR. HORNICK:  Well, it's not a
11:25:18 4        confusing word.  Don't say that.
11:25:20 5    A.  How so?
11:25:21 6            MR. HORNICK:  Just ask your
11:25:22 7        question.
11:25:22 8    Q.  Well, did somebody tell him that he
11:25:24 9        shouldn't share it with other people?
11:25:25 10   A.  Well, "understood" sort of implies that
11:25:27 11       either -- you can read it, you can hear it,
11:25:28 12       you can understand it.  It's ConnectU's
11:25:34 13       position that he understood it.  And how he
11:25:37 14       understood it, I can't tell you exactly what
11:25:40 15       neurons were firing in his brain that day
11:25:42 16       that, you know, specifically gave him the
11:25:45 17       inclination.
11:25:46 18       Again, Victor was present at a lot of
11:25:48 19       those meetings.  Victor was absolutely aware
11:25:51 20       of the proprietary information, and he would
11:25:54 21       have made Joe Jackson aware of that, just
11:25:58 22       like he made Mr. Zuckerberg aware of that.
11:26:00 23   Q.  So let me just ask it again.  Does ConnectU
11:26:05 24       know if Mr. Jackson was told to keep the
11:26:07 25       information confidential?

Page 90

11:26:08 1    A.  It's ConnectU's position that Mr. Jackson
11:26:11 2        understood that it was proprietary
11:26:12 3        information.
11:26:12 4    Q.  Okay.  But you don't know if he was actually
11:26:14 5        told?
11:26:14 6    A.  It's our position.  Again, how he got that
11:26:20 7        understanding, I don't -- you know, it's not
11:26:22 8        for me to sort of speculate on, but it's our
11:26:26 9        position that he's -- he had that
11:26:27 10       understanding.
11:26:28 11   Q.  That he had that understanding, but you
11:26:31 12       don't know whether he was told or he just
11:26:32 13       knew it or what?
11:26:33 14   A.  I would assume that he was told, but, again,
11:26:36 15       that -- you know, who he got that
11:26:38 16       understanding -- you know, a lot of
11:26:40 17       programmers get understanding when you give
11:26:42 18       them a block of code and you say, "This is
11:26:44 19       code that I own, and this is a project that
11:26:47 20       we're launching," and, you know, that alone
11:26:49 21       for many people is a threshold for IP.
11:26:52 22       You know, programmers don't -- you
11:26:55 23       know, especially people like Mr. Zuckerberg
11:26:59 24       who are involved in an academic programming
1:27:01 25        environment where they have to do

Page 92

11:27:03 1        programming problem sets, I don't think
11:27:05 2        their teachers have to tell them that what
11:27:08 3        you write is their code and that you
11:27:11 4        shouldn't take code from a classmate or
11:27:14 5        that, you know, you shouldn't copy, just
11:27:16 6        like you don't copy a term paper.  It's an
11:27:19 7        understood thing in the academic community.
11:27:21 8        Teachers don't have to say that.  It's sort
11:27:23 9        of a bylaw of any kind of coding.
11:27:25 10       There's open source, and then there's
11:27:27 11       closed source.  And closed source is
11:27:29 12       proprietary information.  And closed source
11:27:34 13       is anything that's not made public purposely
11:27:36 14       or -- you know, for that matter.
11:27:38 15       So we're talking about sort of nuances
11:27:41 16       and this and that, but the fact of the
11:27:42 17       matter is these are programming individuals,
11:27:45 18       and they understood that it was proprietary
11:27:48 19       information.  That's our position.
11:27:49 20   Q.  Have you -- I might have asked you this
11:27:52 21       before.  I don't recall.  Have you ever
11:27:53 22       taken a programming course?
11:27:54 23           MR. HORNICK:  Yes, you asked that.
11:27:57 24       Asked and answered.
11:27:57 25   A.  Yes.  Asked and answered.  And the answer

11:27:58 1        is, no, I have not taken a programming
11:28:00 2        class, but that doesn't necess -- that
11:28:01 3        doesn't actually prevent me from
11:28:05 4        understanding and knowing the -- sort of the
11:28:07 5        bylaws and the codes of context in any
11:28:10 6        academic setting, including programming.
11:28:13 7    Q.  Now, the HarvardConnection activity, was it
11:28:16 8        a business or an academic setting or both?
11:28:19 9    A.  Well, it was a business setting, absolutely.
11:28:21 10       But when I was referencing the CS department
11:28:26 11       at Harvard, for example, that's a little bit
11:28:28 12       of both.  It's both an academic and it's an
11:28:32 13       IP, you know, informational property
11:28:35 14       situation.  Code is people's academic
11:28:37 15       property.  Code is proprietary unless you
11:28:40 16       say otherwise, okay?
11:28:42 17   Q.  Let's talk about Victor Gao.  So after
11:28:48 18       Sanjay Mavinkurve leaves to go work for
11:28:52 19       Google, what happens after that?
11:28:53 20   A.  We basically asked Victor -- I believe Divya
11:29:00 21       invited Victor to help us out, and Victor,
11:29:04 22       we contracted him.
11:29:04 23   Q.  And what was the state of development at the
11:29:08 24       time Sanjay Mavinkurve left?
11:29:10 25   A.  I can't say specifically, again, because I'm

23 (Pages 89 to 92)

Page 93

11:29:13 1 not a programmer and I wasn't diving into
11:29:15 2 the code, but I believe at that time Sanjay
11:29:20 3 had done more front-end work and had not
1:29:23 4 linked in so much of the back end or created
11:29:26 5 the database.
11:29:29 6 Q. So he had created the user interface?
11:29:32 7 A. I believe he created -- a lot of his
11:29:36 8 contribution was based around the user
11:29:37 9 interface.
11:29:43 10 Q. Are you claiming that the user interface was
11:29:45 11 a trade secret of ConnectU?
11:29:50 12 MR. HORNICK: Object to the extent
11:29:50 13 it calls for a legal conclusion, but you can
11:29:52 14 answer.
11:29:52 15 A. Certainly these -- well, if you look at --
11:30:01 16 to take an example, you know, Amazon has
11:30:06 17 one-click ordering, and that's a trade
11:30:10 18 secret, you know, and that is a layout
11:30:12 19 situation, you know, two clicks versus one
11:30:15 20 click. I would say that our layout could
11:30:17 21 have had proprietary stuff with it. It's
11:30:21 22 possible.
11:30:30 23 Q. Do you remember anything specific about the
11:30:32 24 user interface that Sanjay Mavinkurve
11:30:34 25 created that you would claim is a trade

Page 94

11:30:38 1 secret?
11:30:38 2 A. To the extent that a user registers for the
11:30:47 3 website, can log in and out, I think that --
11:30:52 4 you know, I'm not an expert, again, and I
11:30:55 5 don't know exactly what constitutes user
11:30:58 6 interface trade secrets, but there could
11:31:02 7 very well have been trade secrets on that
11:31:03 8 site in terms of the user interface.
11:31:07 9 Q. But you don't remember anything
11:31:09 10 specifically?
11:31:09 11 A. Well, as my counsel said, I'm not really
11:31:12 12 qualified to say what is and what isn't. So
11:31:15 13 it's not really a matter of remembering,
11:31:17 14 it's a matter of knowing.
11:31:19 15 Q. So --
11:31:19 16 A. So if you ask me a specific question, again,
11:31:21 17 with the interface, I can give you an answer
11:31:24 18 yes or no.
11:31:26 19 Q. Okay. Why don't you take Exhibit No. 2 and
11:31:33 20 turn to Paragraph 16.
11:31:41 21 MR. HORNICK: I should state for
11:31:41 22 the record that we're probably going to
11:31:44 23 amend Paragraphs 16 and 17 the next time we
11:31:47 24 amend.
11:31:47 25 MR. CHATTERJEE: Okay. Let me ask

Page 95

11:31:59 1 a -- well, I want to go through this first.
11:32:00 2 Q. So if you can read Paragraph 16, and let me
11:32:03 3 know when you're done.
11:32:04 4 A. Okay.
11:32:04 5 (Witness reviews document.)
11:32:38 6 A. Yes.
11:32:38 7 Q. So if you look at Paragraph 16, in the
11:32:41 8 second sentence the complaint states, "In
11:32:44 9 that capacity, he was entrusted with
11:32:46 10 Plaintiff's business management information
11:32:48 11 and procedures, including the descriptions
11:32:53 12 of the website's business model, various
11:32:56 13 functionality and content concepts, and the
11:32:58 14 type of information that would be collected
11:32:59 15 from users."
11:33:00 16 A. Uh-huh.
11:33:00 17 MR. HORNICK: Just for the record,
11:33:00 18 you know, counsel wrote that, and that
11:33:03 19 sentence is going to be amended.
11:33:04 20 MR. CHATTERJEE: Do you want to
11:33:05 21 tell me what it's going to be?
11:33:07 22 MR. HORNICK: I don't know what
11:33:07 23 it's going to say yet.
11:33:08 24 MR. CHATTERJEE: Okay.
11:33:12 25 Q. So, Mr. Winklevoss --

Page 96

11:33:14 1 A. Uh-huh.
11:33:14 2 Q. -- the phrase "Plaintiff's business
11:33:18 3 management information and procedures,
11:33:20 4 including the description" -- "descriptions
11:33:22 5 of the website's business model" --
11:33:26 6 A. Uh-huh.
11:33:26 7 Q. -- could you please tell me what the
11:33:28 8 confidential information that was entrusted
11:33:30 9 to Mark Zuckerberg was related to
11:33:34 10 plaintiff's business management information
11:33:36 11 and procedures, including the descriptions
11:33:38 12 of the website's business model?
11:33:41 13 MR. HORNICK: Objection, asked and
11:33:42 14 answered. You can answer it again.
11:33:42 15 A. Yeah, again, this is going to be amended,
11:33:44 16 but I believe I've answered each one of
11:33:47 17 these pieces. The procedures -- the
11:33:53 18 business procedures I think would have
11:33:54 19 related to what I have described as the
11:33:57 20 marketing and the rollout of the site which
11:33:59 21 would have started at one campus and gone to
11:34:02 22 many. In terms of the functionality, we've
11:34:06 23 gone over that. And the business model, I'm
11:34:10 24 not sure we've touched on this, but it was
11:34:12 25 clear that we would start at one school and

24 (Pages 93 to 96)

Page 99

11:34:15  1    that traffic equals revenue, and that the
11:34:19  2    most obvious and simple model would have
11:34:22  3    been advertising. And Mr. Gao basically
11:34:28  4    emphasizes a great deal to Mr. Zuckerberg
11:34:31  5    the ability to, you know, advertise to such
11:34:34  6    a demographic in terms of business model.
11:34:47  7    Q.  And that's everything about the business
11:34:50  8    management and procedures, including --
11:34:52  9    A.  I think that would be most of it.
11:34:54 10    Q.  Okay. And the various -- is there anything
11:34:56 11    that you can remember that you haven't said?
11:34:59 12    A.  Other than what I've really -- we've gone
11:35:04 13    over before about sort of what aspects we
11:35:06 14    thought that were proprietary.
11:35:07 15    Q.  And the various functionality and content
11:35:13 16    concepts, what were those?
11:35:15 17         MR. HORNICK:  Objection, asked and
11:35:15 18    answer. You can answer it again.
11:35:17 19    A.  Again, the content would have been whatever
11:35:19 20    content necessary to create an on-line
11:35:22 21    community for multiple purposes or, as your
11:35:26 22    client described, as a unique utility for
11:35:29 23    the college level, be it education fields,
11:35:32 24    house, dorm, the dot-edu e-mail extension
11:35:37 25    functionality being allowing individuals to

Page 98

11:35:38  1    connect or, rather, nodes to essentially tie
11:35:45  2    and connect to each other, creating an
11:35:47  3    on-line community.
11:35:48  4    Q.  All right. And what about the type of
11:36:02  5    information that would be collected from
11:36:03  6    users?
11:36:04  7    A.  As I mentioned before, it would be any type
11:36:06  8    of information that would help bring a
11:36:10  9    community to the college level. So if
11:36:14 10    that's where their dorm is, what their major
11:36:17 11    is, what their thesis description is, what
11:36:20 12    their dating preferences are, what their
11:36:23 13    interests are, those would be that type of
11:36:25 14    content.
11:36:39 15    Q.  Other than these categories that are
11:36:41 16    identified here, are you aware of any other
11:36:42 17    categories that would be -- that ConnectU
11:36:47 18    would consider is confidential information?
11:36:50 19         MR. HORNICK:  Object to
11:36:52 20    "categories." You can answer.
11:36:53 21    A.  I think that I've gone over some of the main
11:36:56 22    core things. My -- you know, I don't have a
11:36:58 23    photographic memory. There might be some
11:37:00 24    other content that I, you know, left out or
.1:37:03 25    can't quite recall right now.

Page 100

11:37:04  1    Q.  And as you sit here today, you've said
11:37:06  2    everything that you recall as far as --
11:37:08  3    A.  Yeah, as best as I can recall, that type of
11:37:11  4    content would have been very relative to
11:37:15  5    this type of website.
11:37:18  6    Q.  Okay. Now, if you look at the following
11:37:20  7    sentence, it says, "Zuckerberg understood
11:37:22  8    that this business management information
11:37:25  9    and procedures were secret and agreed to
11:37:30 10    keep them confidential."
11:37:31 11         Do you see that?
11:37:32 12    A.  Uh-huh.
11:37:32 13    Q.  Could you explain to me how he understood
11:37:38 14    that?
11:37:39 15         MR. HORNICK:  Objection, asked and
11:37:40 16    answered. You can answer it again.
11:37:41 17    A.  Yeah, I mean, we went over this sort of with
11:37:43 18    the whole code tangent, but it's actually --
11:37:51 19    your client has, himself, acknowledged his
11:37:55 20    agreement and understanding of our business
11:37:57 21    model, the ability to go to -- the idea of
11:38:01 22    starting at one school and branching out to
11:38:03 23    other schools. He's acknowledged that, and
11:38:06 24    he's also acknowledged the importance of
11:38:08 25    first-mover advantage. So as far as I know,

11:38:12  1    it's really -- he's already acknowledged the
11:38:16  2    understanding.
11:38:18  3    Q.  So what were the conversations between
11:38:20  4    ConnectU or HarvardConnection and Mark
11:38:21  5    Zuckerberg about confidentiality?
11:38:23  6    A.  I think we've already gone over this.
11:38:28  7    Again, I can further highlight -- we have
11:38:33  8    multiple e-mails where we're stressing to
11:38:36  9    get it out in a timely manner, we need to
11:38:40 10    launch, we need to get it first to market,
11:38:43 11    illustrating that -- you know, the advantage
11:38:44 12    of a first-mover advantage in terms of
11:38:48 13    getting the site out. And he was fully
11:38:49 14    aware of that, and he acknowledged that.
11:38:51 15    And we already talked about his
11:38:54 16    understanding of what proprietary
11:38:58 17    information is and what it -- what was and
11:38:59 18    what wasn't.
11:39:03 19    Q.  Okay. I'm asking a really simple question.
11:39:07 20    A.  Uh-huh.
11:39:07 21    Q.  What were the discussions between ConnectU
11:39:09 22    or HarvardConnection principals, you, Divya
11:39:12 23    Narendra and Tyler Winklevoss, and Mr.
11:39:16 24    Zuckerberg about confidentiality of the
11:39:18 25    information?

25 (Pages 97 to 100)

Page 103

11:39:19 1    MR. HORNICK: Objection, asked and
11:39:20 2    answered. You can answer it again.
11:39:21 3    A. Yeah, I mean, I think he understood that,
1:39:27 4        you know, in our meetings and through our
11:39:30 5        stressing of the fact that it, you know,
11:39:32 6        it's a -- and Victor Gao would have also
11:39:35 7        stressed it multiple times to him as well,
11:39:38 8        that this is not a concept that is in the
11:39:40 9        public domain, it has yet to be done before,
11:39:44 10       we invested time and money into this code,
11:39:46 11       and that it's proprietary, and --
11:39:48 12   Q. Did you ever tell him that?
11:39:50 13   A. Did I specifically say -- what do you mean?
11:39:54 14       Tell him what?
11:39:54 15   Q. Did you specifically tell Mark Zuckerberg,
11:39:56 16       "Don't tell anyone about this information or
11:39:59 17       about this business model"?
11:40:01 18   A. Well, I think the question should be did
11:40:02 19       ConnectU tell him?
11:40:04 20   Q. Well, I'm going to break it down to the
11:40:06 21       various people who own ConnectU.
11:40:07 22   A. Well, is ConnectU being deposed, or is
11:40:10 23       Cameron Winklevoss being deposed?
11:40:11 24   Q. I'm asking you. He can object that it's
11:40:15 25       outside the scope. I'm asking, did you?

Page 102

11:40:17 1    A. Did I personally? In various e-mails I
11:40:20 2        stressed the necessity of this site needing
11:40:22 3        to get out before market, before other
11:40:25 4        sites, and that it would be confidential,
11:40:27 5        yes.
11:40:28 6    Q. Isn't it true that in no e-mail that was
11:40:31 7        ever exchanged between you and Mark
11:40:34 8        Zuckerberg was it stated, "Don't tell anyone
11:40:37 9        else about this information"?
11:40:40 10       MR. HORNICK: Objection to the form
11:40:41 11   of the question. Did it say those exact
11:40:43 12   words? Is that your question?
11:40:44 13       MR. CHATTERJEE: Yes.
11:40:44 14   A. There is a collage of e-mails and
11:40:47 15       correspondence that absolutely point to an
11:40:51 16       understanding and a forceful imparting of
11:40:57 17       the idea of confidential information. And
11:41:00 18       as I said before, Victor Gao had a two-hour
11:41:03 19       tutorial with Mr. Zuckerberg, two-hour
11:41:06 20       tutorial at the computer, you know, with
11:41:08 21       him, explaining to him the whole concept and
11:41:10 22       the whole idea behind HarvardConnection.
11:41:13 23       So if you want to break it down, well,
1:41:16 24       did -- was it -- there a specific e-mail or
11:41:20 25       versus the whole, you know, conversation

Page 103 (continued)

11:41:21 1    aspect and the whole collage, you're taking
11:41:24 2    a snippet out of one situation.
11:41:26 3    Q. Well, I'm trying to -- okay. So in the
11:41:28 4        e-mails was there any statement, "Don't tell
11:41:32 5        anyone about this," that exact statement?
11:41:34 6    A. The exact statement, "Don't tell anyone
11:41:37 7        about this"? The exact words "Don't tell
11:41:41 8        anyone about this," I don't believe there
11:41:43 9        were those exact words in an e-mail.
11:41:44 10   Q. Anything like that?
11:41:45 11   A. As I said --
11:41:46 12       MR. HORNICK: Object to the form of
11:41:46 13   the question.
11:41:46 14   A. -- there's a collage of stressed importance
11:41:51 15       towards launching the site first, towards
11:41:54 16       the fact that source code is proprietary,
11:41:59 17       the fact that he's a partner of a group.
11:42:01 18       There's any -- there's innumerable accounts
11:42:04 19       of it.
11:42:04 20       MR. CHATTERJEE: Let's mark this as
11:42:07 21   Exhibit No. 4.
11:42:07 22       (Exhibit No. 4, E-mails, Bates Nos.
11:42:21 23   C004577 - 4631, marked for identification.)
11:42:21 24       MR. HAWK: Neel, do you have an
11:42:22 25   extra one?

Page 104

11:42:23 1        MR. CHATTERJEE: Yeah.
11:42:25 2        MR. HORNICK: I'll just object for
11:42:26 3    the record that this exhibit seems to be
11:42:29 4    about 50 or so unrelated documents, meaning
11:42:31 5    that there are 50 separate documents.
11:42:32 6        MR. CHATTERJEE: Right. And that's
11:42:34 7    fine.
11:42:38 8    BY MR. CHATTERJEE:
11:42:39 9    Q. These documents, Mr. Winklevoss, were
11:42:41 10       produced by your counsel and at least appear
11:42:44 11       to be all the conversations between you and
11:42:45 12       Mr. Zuckerberg.
11:42:46 13   A. All of the e-mail conversations.
11:42:47 14   Q. All of the e-mail conversations. Could you
11:42:52 15       take a look through them, and we can take a
11:42:55 16       break if necessary, and tell me where in
11:42:57 17       these documents Mr. Zuckerberg is instructed
11:43:00 18       in any way not to tell anyone else about it?
11:43:03 19       MR. HORNICK: The witness has
11:43:04 20   already answered that question at least four
11:43:06 21   times.
11:43:06 22   A. Yeah, I mean, again, I don't have to
11:43:09 23       actually -- you know, to answer your
11:43:10 24       question, I don't even have to point to any
11:43:12 25       specific instance where I instructed him. I

26 (Pages 101 to 104)

Page 105

```
11:43:14  1  have to point to the fact that he
11:43:17  2  acknowledged a marketing rollout plan, that
11:43:21  3  he acknowledged first-mover advantage, that
11:43:25  4  he acknowledges that source code is
11:43:27  5  proprietary information.  I mean, your
11:43:29  6  defendant is doing the talking.
11:43:31  7  Q.  And I'm asking you to identify where in
11:43:33  8  these documents the acknowledgment of
11:43:36  9  confidentiality and not sharing the
11:43:40 10  information with others is reflected.
11:43:41 11  A.  Well, how is that relevant to the threshold
11:43:44 12  of confidential --
11:43:45 13       MR. HORNICK:  Cameron, you have to
11:43:46 14  answer the question --
11:43:46 15  Q.  You have to answer the question.
11:43:48 16       MR. HORNICK:  -- but I will say
11:43:48 17  that it's asked and answered because the
11:43:49 18  witness has told you four times that it's
11:43:51 19  the entire collection of documents in answer
11:43:51 20  to the question.
11:43:51 21       MR. CHATTERJEE:  Well, I --
11:43:52 22       MR. HORNICK:  You just don't listen
11:43:53 23  to him, and you don't like it, but that's
11:43:54 24  his answer.
11:43:55 25       MR. HAWK:  No, he doesn't answer
```

Page 106

```
11:43:56  1  the question.  That's the big problem in his
11:43:59  2  deposition so far is that he's not answering
11:44:01  3  the questions that are asked.
11:44:02  4       MR. HORNICK:  I think he's answered
11:44:04  5  every question very thoroughly.
11:44:06  6       MR. HAWK:  And --
11:44:06  7       MR. CHATTERJEE:  Hold on, counsel.
11:44:08  8  I appreciate your comments, Mr. Hawk.  I
11:44:12  9  frankly agree with them.
11:44:12 10  BY MR. CHATTERJEE:
11:44:13 11  Q.  We may be back here asking the Judge to
11:44:14 12  actually have the deposition taken in his
11:44:15 13  courtroom because you aren't answering my
11:44:17 14  questions.  That aside, that's an issue for
11:44:19 15  another day.  Right now I'm just asking you
11:44:23 16  a very simple question.  Where in these
11:44:25 17  e-mails is it reflected, if anywhere, that
11:44:28 18  Mr. Zuckerberg understood the information
11:44:29 19  was to be kept confidential?
11:44:31 20       MR. HORNICK:  Asked and answered.
11:44:34 21  A.  So, well, in the -- does this have --
11:44:38 22  Q.  If you look at the bottom, there's a
11:44:40 23  numbering scheme.
11:44:43 24  A.  All right.
1:45:09  25       (Witness reviews documents.)
```

Page 107

```
11:45:25  1       MR. CHATTERJEE:  We can go off the
11:45:26  2  record and the video while he's looking
11:45:28  3  through these documents.
11:45:29  4  Q.  And you can let us know when you're --
11:45:30  5       MR. CHATTERJEE:  Actually, let's
11:45:30  6  just keep it on.  We'll just keep it on.
11:45:34  7       (Witness reviews documents.)
11:45:54  8       MR. HORNICK:  I have to state for
11:45:55  9  the record this is not a complete set of
11:45:56 10  e-mails.
11:45:56 11       MR. CHATTERJEE:  Okay.
11:46:02 12       (Witness reviews documents.)
11:46:15 13       MR. CHATTERJEE:  Counsel, do you
11:46:16 14  know which e-mail is missing?
11:46:17 15       MR. HORNICK:  Everything prior to
11:46:18 16  November 25th is missing.
11:46:20 17       MR. CHATTERJEE:  Okay.
11:46:23 18       MR. HORNICK:  There may be others,
11:46:25 19  but I may not be able to identify them.
11:46:40 20  They were all produced, too.
11:46:45 21       (Witness reviews documents.)
11:46:50 22  A.  Well, I mean, I think one point is that your
11:46:53 23  client says, "I began working on
11:46:55 24  Thefacebook, using none of the same code nor
11:46:58 25  functionality that is present in
```

Page 108

```
11:46:59  1  HarvardConnection."
11:47:00  2       Now --
11:47:01  3  Q.  What page is that?
11:47:02  4  A.  This is Page 4630.  Why would he -- why
11:47:02  5  would he say that, and why would he not use
11:47:08  6  the coding functionality if he didn't
11:47:11  7  believe it was proprietary?
11:47:14  8  Q.  Okay.
11:47:16  9  A.  So I think, you know, that speaks -- and,
11:47:16 10  again, that's your defendant's -- your
11:47:17 11  defendant's words.
11:47:21 12  Q.  And anything else you can identify?
11:47:23 13  A.  I think I've answered the question.
11:47:25 14  Q.  Well, other than that one statement, is
11:47:28 15  there anything else you can identify in what
11:47:30 16  I've marked as Exhibit 4?
11:47:31 17  A.  If you want me to go through these and sort
11:47:32 18  of look a little bit more thoroughly, that's
11:47:34 19  the first thing that popped out.  I think it
11:47:37 20  sufficiently answers the question.
11:47:40 21  Q.  Sure.  Why don't you look through it more
11:47:42 22  thoroughly and see if there's anything else.
11:47:44 23  A.  To really, you know, more thoroughly sort of
11:47:46 24  hammer it home, Victor Gao, again, in
11:47:51 25  multiple conversation -- you know, a
11:47:54
```

27 (Pages 105 to 108)

11:47:56  1   two-hour conversation imparted to Mark the
11:47:59  2   sort of the proprietary nature of the
11:48:02  3   website. So I really don't think it's
11:48:03  4   necessary.
11:48:05  5         MR. HORNICK: I'll say that your
11:48:07  6   question is reaching the oppressive level
11:48:09  7   under the Federal Rules.
11:48:12  8         MR. CHATTERJEE: You can seek a
11:48:15  9   protective order if you think it's
11:48:16 10   oppressive. I'm just asking --
11:48:18 11         MR. HORNICK: I can stop it under
11:48:19 12   that basis, if you read the rule.
11:48:22 13         MR. CHATTERJEE: If you want to
11:48:24 14   stop it, stop it.
11:48:24 15         MR. HORNICK: I don't want to, no.
11:48:26 16   I want to give you your full day.
11:48:26 17   A.  And I'd like you to be --
11:48:26 18         MR. HORNICK: I suggest you move
11:48:26 19   on. The witness has answered your question,
11:48:26 20   many times.
11:48:31 21         MR. CHATTERJEE: I actually asked
11:48:31 22   him to identify everywhere in these
11:48:32 23   documents --
11:48:33 24         MR. HORNICK: And he told you the
11:48:33 25   whole set of documents, and I told you the

11:48:36  1   set of document documents is incomplete, so
11:48:38  2   your questioning is unfair and oppressive.
11:48:40  3   A.  You actually asked me to point to one
11:48:42  4   instance, and I did do that.
11:48:43  5   Q.  Okay. Can you point to any other instances?
11:48:45  6   A.  I pointed to several before the e-mails
11:48:47  7   about the verbal conversation between Mr.
11:48:51  8   Gao --
11:48:51  9   Q.  Well, we'll get to the verbal conversations.
11:48:53 10   I'm focusing on the e-mails at the moment.
11:48:56 11   A.  Well, we've actually already gone over the
11:48:58 12   verbal conversations. That was the first
11:49:00 13   line of questioning before the e-mail
11:49:01 14   questioning, so...
11:49:02 15   Q.  Please answer my question with respect to
11:49:05 16   these documents.
11:49:05 17   A.  So that's the -- I think that that's the
11:49:07 18   most illustrative point, and I don't think
11:49:10 19   that it's -- as I said before, it's the
11:49:12 20   collage of e-mails. And I don't think that
11:49:14 21   I -- you know, I think that's the most
11:49:16 22   relevant point, and I think that that's the
11:49:18 23   most worthwhile point to answer that
11:49:20 24   question with.
11:49:22 25   Q.  So you're just saying it's the entire

11:49:25  1   collection? There's nothing specifically on
11:49:26  2   any individual --
11:49:27  3   A.  I just showed you a specific instance. That
11:49:29  4   was the fact that he didn't use our code and
11:49:31  5   functionality in a site indicates an
11:49:34  6   understanding, as I've said before, of the
11:49:35  7   proprietary nature of the code, the
11:49:37  8   functionality and the business ideas
11:49:40  9   surrounding the site.
11:49:40 10   Q.  Okay. And Mr. Winklevoss, other than that
11:49:42 11   one instance, are there any other specific
11:49:44 12   instances where you can say that, or are you
11:49:46 13   just saying it's all of the e-mails kind of
11:49:49 14   together?
11:49:49 15   A.  I'm saying it's a collage. I'm saying that
11:49:51 16   Mr. Gao imparted the proprietary nature of
11:49:54 17   the site to him and that, yeah, I think
11:49:56 18   that's -- you have multiple instances there.
11:50:02 19   And, again, there might be more instances
11:50:04 20   that I can't recall off the top of my head
11:50:06 21   right now.
11:50:06 22   Q.  Okay.
11:50:06 23   A.  Okay? That does not exclude what I can't
11:50:10 24   recall.
11:50:10 25   Q.  So let's go to the conversations. Do you

11:50:13  1   know if Tyler -- I mean, if, yeah, Tyler
11:50:15  2   Winklevoss or Divya Narendra ever told Mr.
11:50:19  3   Zuckerberg that he shouldn't share the
11:50:20  4   information with others?
11:50:21  5   A.  I'm fairly certain that Divya would have and
11:50:25  6   did, and Tyler I'm not certain about. I
11:50:28  7   don't know if he would have. But I don't
11:50:31  8   think that Tyler would need to have. I
11:50:32  9   think one person is enough.
11:50:33 10   Q.  Now, you said that Mr. Gao and Mr.
11:50:37 11   Zuckerberg had a conversation about
11:50:39 12   confidentiality?
11:50:39 13   A.  He -- no. They had -- as I said, they had a
11:50:44 14   tutorial regarding the code, the site and
11:50:45 15   the ideas behind the site. And Mr. Gao
11:50:48 16   would have imparted to him the understanding
11:50:50 17   that there was -- that this is -- this is
11:50:54 18   proprietary information. Now, Mr. Gao and
11:50:57 19   Mr. Zuckerberg are also classmates in CS at
11:51:02 20   Harvard, and they understand the problem
11:51:03 21   sets and code that you write in class is
11:51:05 22   proprietary information, and unless you give
11:51:07 23   written consent or sort of the ability to
11:51:10 24   rebroadcast or republish that code, you have
11:51:12 25   no right to do that.

28 (Pages 109 to 112)

Page 115

```
11:51:13  1       So, again, we're talking about
11:51:15  2    educating people who this is their bread and
11:51:18  3    butter.  You know, we're talking about this
11:51:20  4    type of, you know, you're telling -- you
11:51:24  5    know, you're preaching to the choir
11:51:26  6    basically, is what I'm getting at.
11:51:30  7    Q.  Have you talked to Mr. Gao about this
11:51:32  8    lawsuit since it was launched?
11:51:34  9    A.  Other than really the nature -- you know,
11:51:38 10    the fact that we needed his help in getting
11:51:41 11    the code off of -- you know, whatever code
11:51:44 12    he had and whatever cooperation he needed to
11:51:46 13    contribute to file the lawsuit in terms of
11:51:50 14    collecting his documents or whatever it was,
11:51:52 15    no, we have not had extensive conversations
11:51:55 16    about the nature of the lawsuit, no.
11:51:58 17    Q.  And have you -- so your conversations with
11:52:03 18    Mr. Gao since the launching of the lawsuit
11:52:07 19    is really just about documents, or is it
11:52:09 20    about any of the substantive issues?
11:52:11 21    A.  I would say that it's -- they were pragmatic
11:52:13 22    discussions, what needed -- as I said,
11:52:15 23    documents.  If we need code for
11:52:18 24    HarvardConnection, I asked Victor to say,
11:52:20 25    "Could you please give us code that you
```

Page 114

```
1:52:22   1    have?"  Victor has commented, he has made
11:52:25  2    comments about what he thought that was done
11:52:28  3    in the code, what he thought Mark's
11:52:31  4    contribution was.
11:52:37  5    Q.  Now, when did Mr. Gao start working with
11:52:42  6    you?
11:52:44  7    A.  I believe that in the -- before Mark
11:52:47  8    Zuckerberg, in the fall of 2003.
11:52:50  9    Q.  And for how long did he work with you?
11:52:53 10    A.  He worked -- you know, as I said, it was a
11:52:58 11    contract basis.  So I believe that he
11:53:01 12    completed whatever portions that we agreed
11:53:04 13    that he complete, and we paid him for that.
11:53:07 14    He may have checked up on it, looked into
11:53:09 15    the code every once in a while, see if
11:53:12 16    there's progress, but other than the -- what
11:53:15 17    we defined as his contribution, I believe
11:53:18 18    that that's what he did.
11:53:19 19    Q.  And where is Mr. Gao now?
11:53:22 20    A.  I believe he's in Virginia.  He works there.
11:53:26 21    Q.  And do you know where he works?
11:53:28 22    A.  At -- no, I don't.  I don't know the
11:53:31 23    company.  I don't know where he works.
11:53:32 24    Q.  Did you ever have Mr. Gao sign any sort of
1:53:39  25    contract or agreement?
```

Page 115

```
11:53:40  1    A.  No.  We -- there might be an e- -- well, I
11:53:46  2    don't know if there are e-mails indicating
11:53:48  3    the work that was -- I forget if we e-mailed
11:53:53  4    about that, but we had an oral agreement,
11:53:57  5    and that was about it.
11:53:58  6    Q.  And what were the terms of that agreement?
11:53:59  7    A.  "Will you complete Section X of website?"
11:54:06  8       "Yes, I will complete it."
11:54:08  9       "How much would you like?"
11:54:09 10       "I would like this amount."
11:54:10 11       "Okay.  Here is that amount when you
11:54:11 12    complete it.  And be fully aware that this
11:54:15 13    code is proprietary and that everything
11:54:17 14    involved is protected."
11:54:19 15    Q.  And you told him he shouldn't share anything
11:54:23 16    about his work with anyone else?
11:54:25 17    A.  Sure.
11:54:27 18    Q.  Is that a yes?
11:54:27 19    A.  Yes.
11:54:28 20    Q.  Okay.  When you say Section X was what he
11:54:33 21    was doing, what is that?
11:54:34 22    A.  I don't know.  You would have to ask him.
11:54:35 23    It would have been a section of the site
11:54:36 24    that was left incomplete.  I mean, he
11:54:40 25    could -- in some -- you know, he would tell
```

Page 116

```
11:54:42  1    us, I guess, what, you know, what needed to
11:54:44  2    be completed and how long it would take and
11:54:46  3    whatnot.  I mean, you know, that's how
11:54:50  4    computer software development works,
11:54:51  5    people -- you ask the developer, say, "Look,
11:54:53  6    we need help," they tell you how much time
11:54:55  7    and work and money, and you agree to it.
11:54:58  8    Q.  And how do you know that; that's how
11:55:00  9    software development works?
11:55:03 10    A.  Because that's what I do.  We do -- have
11:55:06 11    done contract software work.
11:55:09 12    Q.  You mean you've hired people?
11:55:10 13    A.  Well, I mean in software.  You break your
11:55:14 14    muffler and you go to Meineke and they give
11:55:16 15    you an estimation.  It's called estimation
11:55:18 16    of, you know, what the project entails.
11:55:20 17    Q.  How much did you pay Victor Gao?
11:55:22 18    A.  I think we paid him a couple hundred
11:55:24 19    dollars.  Again, I don't know the exact
11:55:26 20    amount.  And I couldn't quote you an exact
11:55:29 21    hourly rate.
11:55:38 22    Q.  And in fall 2003 until -- after Mark
11:55:43 23    Zuckerberg -- well, let me put it this way.
11:55:46 24       After June of 2003 did Victor Gao do
11:55:49 25    anything further for you?
```

29 (Pages 113 to 116)

Page 119

11:55:50 1    A. I don't -- he may have gone into the server.
11:55:53 2      He may have looked around. He may have been
11:55:55 3      curious. He had access to the server. And
11:56:00 4      I'm not sure if he completed anything.
11:56:02 5    Q. Did anyone else have access to the server?
11:56:05 6    A. I don't believe anybody other than the
11:56:09 7      programmers have had access to the server.
11:56:14 8    Q. And how is "access" defined?
11:56:17 9    A. Being the ability to log in.
11:56:21 10    Q. And was it through a password or something?
11:56:27 11    A. It would be password protected, yeah, it
11:56:29 12      would have been password protected.
11:56:30 13    Q. And where was the server located?
11:56:33 14    A. What state or what -- on the -- where on the
11:56:38 15      World Wide Web or...
11:56:40 16    Q. Let's say what state?
11:56:41 17    A. I don't actually -- I don't know what state
11:56:44 18      it would have been in.
11:56:45 19    Q. Was it a Harvard server?
11:56:47 20    A. No, it was not a Harvard server.
11:56:48 21    Q. So what company provided that?
11:56:50 22    A. I believe it was Hurricane Electric.
11:56:56 23    Q. Okay. Now, you had said earlier that Sanjay
11:57:02 24      Mavinkurve created the registration. How
11:57:04 25      did that registration work?

Page 118

11:57:05 1    A. Well, it was incomplete registration because
11:57:10 2      he never completed it, but the essence of it
11:57:13 3      was taking -- a person would enter in their
11:57:19 4      e-mail address, and then the site would
11:57:20 5      determine if it's a Harvard e-mail address
11:57:23 6      and either let them in or out.
11:57:37 7    Q. How would it determine if it was a Harvard
11:57:38 8      e-mail address?
11:57:39 9    A. The dot-edu extension.
11:57:42 10    Q. If you can turn to Paragraph 17 -- actually,
11:57:56 11      yeah, if you could just read Paragraph 17.
11:58:05 12        MR. HORNICK: That's a paragraph I
11:58:07 13      think I said earlier that we'll be amending
11:58:09 14      as well.
11:58:09 15        MR. CHATTERJEE: You're going to
11:58:10 16      amend both 16 and 17.
11:58:11 17        MR. HORNICK: That's what I said
11:58:12 18      earlier, yes.
11:58:13 19        MR. HAWK: Are you doing that
11:58:14 20      because they're incorrect?
11:58:16 21        MR. HORNICK: No. I --
11:58:18 22        MR. CHATTERJEE: Let's talk about
11:58:19 23      that --
11:58:19 24        MR. HORNICK: I'm not happy with
11:58:21 25      them, so we may amend them.

Page 119

11:58:22 1        MR. CHATTERJEE: Let's talk about
11:58:23 2      that after -- during a break.
11:58:25 3      BY MR. CHATTERJEE:
11:58:25 4    Q. So could you describe to me all of the terms
11:58:30 5      of the agreement with Mark Zuckerberg at the
11:58:35 6      time that you got involved with him?
11:58:37 7    A. Okay. So I think this is sort of circling
11:58:43 8      back to some of the stuff, so forgive me if
11:58:46 9      I repeat myself. We invited him to become
11:58:51 10      part of the team. It was understood that he
11:58:53 11      was an equal partner and that he agreed, you
11:58:57 12      know, his knowledge and agreement to
11:59:00 13      complete, I guess, the connect portion of
11:59:01 14      the website and reap any sort of benefits or
11:59:07 15      remuneration that might come along from such
11:59:09 16      a website, be it, you know, the sort of the
11:59:13 17      reputation benefit post-Facemash, be it any
11:59:21 18      sort of future revenue source we may have.
11:59:25 19      So, yeah, that would be about it.
11:59:36 20    Q. Okay. And were those all the terms?
11:59:37 21    A. I mean, again, we went over the understood
11:59:40 22      nature, the proprietary nature that, you
11:59:43 23      know, the site should not be -- you know,
11:59:47 24      it's proprietary. The -- we went over some
11:59:51 25      of the business model as far as advertising,

Page 120

11:59:54 1      the huge potential with that demographic.
11:59:59 2      We went over the marketing aspect of the
12:00:03 3      website, taking it from one school and then
12:00:06 4      branching it out. And we stressed a lot
12:00:11 5      of -- you know, a lot of sort of proprietary
12:00:14 6      business management, information and
12:00:16 7      procedures.
12:00:18 8        And as I said, it was a contribution
12:00:21 9      level. Everybody was equal partner, and
12:00:25 10      based -- assuming that they contributed.
12:00:27 11    Q. And when did this discussion occur?
12:00:29 12    A. Again, you're -- you know, we already went
12:00:37 13      over this. In an e-mail dated January 8th
12:00:42 14      your client says that -- he refers to the
12:00:45 15      project as "we," using many operative words,
12:00:48 16      "we." In the February 12th e-mail from your
12:00:51 17      client, aside from proving the proprietary
12:00:54 18      nature of our code and software and
12:00:55 19      functionality, your client also acknowledges
12:00:57 20      that he expected to be part of the overall
12:01:01 21      development and control, "control" being a
12:01:03 22      very important word there --
12:01:06 23    Q. Well, I'm not asking what my client said.
12:01:08 24      What I'm asking is, at the beginning of the
12:01:10 25      relationship you've outlined a number of

30 (Pages 117 to 120)

Page 123

| Time | Line | |
|---|---|---|

**Page 121**

12:01:12  1   terms.
12:01:13  2   A.  Okay.
12:01:13  3   Q.  Was there a discussion about that?
12:01:14  4   A.  There was an expectation from your client
12:01:16  5   that those terms were the terms.
12:01:18  6   Q.  Okay.  And why do you say that at the very
12:01:22  7   beginning of the relationship?
12:01:23  8   A.  Well, I'll -- again, I'll refer to 4630.
12:01:43  9   4630, C4630.  Let's see, "I worked with the
12:01:52 10   expectation" -- okay -- "with the
12:01:56 11   expectation that I would be included in
12:01:58 12   overall development and control of the
12:01:59 13   project.
12:02:03 14        So that would -- I mean, I would
12:02:05 15   assume that he would get that expectation at
12:02:07 16   the beginning.  I don't think --
12:02:08 17   Q.  Did you have discussion about it?
12:02:09 18   A.  Certainly we had meetings.  As I said, we
12:02:12 19   talked in meetings about the timely nature
12:02:14 20   to get this site to launch, the first issue
12:02:18 21   with us needing to get it out and launched.
12:02:21 22   His expectations are built on, again, for
12:02:24 23   lack of, you know, a more concrete example
12:02:29 24   in the -- with regard to business dealings,
12:02:32 25   you can't hang one business relationship on

**Page 122**

.2:02:35  1   one e-mail.  You can't hang a partnership on
12:02:38  2   one sentence.  It's a collage, okay?  We
12:02:42  3   have a collage of e-mails, a collage of
12:02:44  4   discussions, and, you know, your client
12:02:48  5   somehow managed in that whole collage to
12:02:50  6   decipher and pick out the most meaningful
12:02:54  7   aspect in that he expected to be part of the
12:02:56  8   overall development and control and part
12:02:59  9   of -- and that he acknowledged an agreement.
12:03:01 10   Q.  Okay.  So when was the first time that
12:03:04 11   anyone from ConnectU or HarvardConnection
12:03:07 12   communicated with Mark Zuckerberg?
12:03:11 13   A.  I believe Divya sent him an e-mail.  I think
12:03:13 14   you wrote it down on the first page -- in
12:03:17 15   2003, November he was invited to become part
12:03:19 16   of the HarvardConnection team.
12:03:20 17   Q.  And did they meet in person?
12:03:22 18   A.  I'm not sure if they met in person.  I know
12:03:27 19   I met Mr. Zuckerberg in person I believe
12:03:30 20   right before Thanksgiving 2003.
12:03:33 21   Q.  And do you know if there were any in-person
12:03:37 22   meetings by anyone with HarvardConnection
12:03:39 23   before that?
12:03:39 24   A.  With Mr. Zuckerberg?
2:03:42 25   Q.  Yeah.

**Page 123**

12:03:42  1   A.  Victor Gao may have -- Victor Gao would have
12:03:48  2   brought him up to speed.  I'm not sure when
12:03:51  3   that -- that may have been after I first met
12:03:54  4   with him.  We had a phone conversation
12:03:56  5   between the first meeting.  This was all in
12:03:57  6   the time when he was getting ad boarded so
12:04:00  7   he was -- I'm not sure exactly where it
12:04:05  8   fell, but I know that the first meeting was
12:04:07  9   on November 2003 right before Thanksgiving.
12:04:14 10   Q.  And so in that first meeting that you had
12:04:18 11   with Mark Zuckerberg, how long was that
12:04:20 12   meeting?
12:04:20 13   A.  It was perhaps 30 minutes, 30, 40 minutes.
12:04:25 14   Q.  And what was discussed in that first
12:04:26 15   meeting?
12:04:27 16   A.  I just basically asked him if he understood
12:04:31 17   every -- you know, if he was aware of the
12:04:35 18   project, if he had any questions, when he
12:04:35 19   might be able to complete some stuff.  I
12:04:39 20   believe he assured me or rather said that he
12:04:42 21   would work on it over Thanksgiving.  It was
12:04:45 22   a fairly positive meeting and kind of left
12:04:48 23   it at that.  Basically, Mr. Zuckerberg would
12:04:53 24   go on break and sort of do some of the
12:04:55 25   things that we talked about and see what he

**Page 124**

12:04:58  1   produced on Monday.
12:04:59  2   Q.  And what was -- what was he supposed to do
12:05:03  3   over the break?
12:05:04  4   A.  Well, I think it was -- well, it wasn't
12:05:08  5   necessarily to be finished over the break,
12:05:09  6   but the idea was that he would -- you know,
12:05:11  7   we met and he would go work, and break would
12:05:14  8   certainly be an opportune time to work on a
12:05:17  9   project outside of school.  And, you know,
12:05:20 10   it certainly would have started with what he
12:05:23 11   agreed to in his -- you know, which would
12:05:25 12   have been the connect side.
12:05:25 13   Q.  And was there anything more specific about
12:05:27 14   what the connect side would include?
12:05:29 15   A.  You know, the connect side I think we
12:05:34 16   detailed, you know, what that sort of -- he
12:05:38 17   was fully aware that -- what that side, you
12:05:41 18   know, entailed, what the completion of the
12:05:44 19   connect side entailed.
12:05:45 20   Q.  And how was he fully aware of that?
12:05:47 21   A.  Well, it sort of -- as aware as when you
12:05:52 22   give an architect a blueprint and they're
12:05:55 23   aware of what it takes to build a house, you
12:05:57 24   give a programmer a slab of code and you
12:05:59 25   give them another programmer to give them a

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Page 125

12:06:02 1   tutorial and bring them up to speed about
12:06:05 2   the code, that programmer should be aware
12:06:08 3   and would be aware at his level of what is
12:06:10 4   required when he agreed to complete it.
12:06:13 5   Q.   Well, so he gets some code from Victor Gao,
12:06:18 6      and then what was he supposed to do --
12:06:20 7   A.   The connect side, as I said.
12:06:23 8   Q.   The connect side.
12:06:24 9        And basically was that supposed to be
12:06:25 10     roughly the same as the date side or...
12:06:29 11  A.   I think that, as I said, you know, from a
12:06:31 12     conceptual level the functionality of
12:06:32 13     creating links is similar, and I think that
12:06:35 14     there was perhaps some overlap.  I don't
12:06:37 15     know exact -- I can't -- again, it's
12:06:40 16     speculation, I'm not a computer programmer.
12:06:43 17     I don't know what it takes to complete the
12:06:44 18     connect side.  He does, he did, and he
12:06:46 19     agreed to do it.
12:06:54 20  Q.   Anything else discussed in that first
12:06:56 21     meeting?
12:06:56 22  A.   I think that -- I think that that was about
12:07:01 23     it.
12:07:02 24  Q.   Okay.  When was the tutorial from Victor
12:07:05 25     Gao?

Page 127

12:08:02 1   about out of time on the tape.  Why don't we
12:08:04 2   take a lunch break --
12:08:05 3        MR. HORNICK:  Fine.
12:08:06 4        MR. CHATTERJEE:  -- and then get
12:08:07 5   together afterwards.
12:08:10 6        THE VIDEOGRAPHER:  The time is
12:08:11 7   12:08.  This is the end of Tape No. 2, and
12:08:17 8   we are off the record.
12:08:25 9        (Lunch recess taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 126

12:07:05 1   A.   Again, I don't -- I believe it was before
12:07:06 2      the meeting.  And as I said before, during
12:07:09 3      that tutorial Victor imparted upon him the
12:07:13 4      proprietary nature of the project and the
12:07:16 5      concept and everything else proprietary in
12:07:19 6      that tutorial.  I believe it was before the
12:07:22 7      meeting in 2003.
12:07:23 8   Q.   You've used the word "proprietary."  What do
12:07:26 9      you mean when you've used that word?
12:07:27 10  A.   Well, again, I'm not a lawyer as my counsel
12:07:32 11     said, and I don't -- you know, it's not up
12:07:33 12     to me to decide necessarily what is
12:07:35 13     proprietary.
12:07:35 14  Q.   Well, I'm just wondering how you're using
12:07:37 15     that word.
12:07:38 16  A.   Well, what we described -- I mean, I've
12:07:39 17     pointed out functionality that I believe
12:07:41 18     fits under that umbrella.  And I believe
12:07:45 19     proprietary to some -- you know, involves
12:07:47 20     anything that's not in the public domain
12:07:49 21     that should be kept secret and were to be
12:07:54 22     put in the public domain or broadcast would
12:07:57 23     be detrimental to the company or the
12:07:58 24     individual.
12:08:01 25        MR. CHATTERJEE:  Okay.  We're just

Page 128

12:55:10 1        AFTERNOON SESSION
12:55:12 2        THE VIDEOGRAPHER:  The time is
12:55:37 3   12:55.  This is the beginning of Tape 3 and
12:55:39 4   we are back on the record.
12:55:40 5
12:55:40 6        (CAMERON H. WINKLEVOSS, Resumed.)
12:55:40 7        DIRECT EXAMINATION, Continued
12:55:40 8
12:55:40 9   BY MR. CHATTERJEE:
12:55:40 10  Q.   Okay.  We are back on the record, Mr.
12:55:45 11     Zuckerberg.  And you understand you're --
12:55:47 12        MR. HORNICK:  Wait a minute.  He's
12:55:49 13     not Mr. Zuckerberg.
12:55:50 14  Q.   Not Mr. Zuckerberg, Mr. Winklevoss, you
12:55:53 15     understand you're still under oath?
12:55:54 16  A.   Yes.
12:55:55 17  Q.   Before Mr. Zuckerberg started working on the
12:55:58 18     HarvardConnection website, who discussed the
12:56:01 19     terms of the agreement with him?
12:56:05 20        MR. HORNICK:  Object to the form of
12:56:06 21     the question, but you can answer it.
12:56:07 22  A.   The forms of the partnership agreement?  Is
12:56:11 23     that what you're referring to?
12:56:13 24  Q.   Well, just the agreement with him.
12:56:16 25  A.   So who discussed the agreement with him

32 (Pages 125 to 128)

Page 129

12:56:18 1  prior to him working on it or --
12:56:20 2  Q. Yes.
12:56:21 3  A. Okay. I believe that both Divya and Victor
12:56:27 4  would have spoken to him.
12:56:33 5  Q. Did you?
12:56:33 6  A. I don't recall if I spoke prior to his
12:56:40 7  working on it about the terms of the
12:56:44 8  agreements with respect to like -- yeah.
12:56:49 9  Q. Okay. What did Mr. Narendra tell Mr.
12:56:51 10  Zuckerberg about the terms of the agreement?
12:56:53 11  A. Well, I think he invited him to become part
12:56:57 12  of the team, and then I think that the
12:56:59 13  agreement sort of -- the terms, you know, as
12:57:06 14  we met and conferred and -- because I mean,
12:57:09 15  again, you can't -- at the onset, you know,
12:57:13 16  you approach -- we approached him and
12:57:15 17  invited him, but he had to look at the
12:57:17 18  software and determine whether he could do
12:57:18 19  it or not before anything was sort of
12:57:22 20  established.
12:57:23 21  Q. Right. So before we started working on the
12:57:25 22  code, Mr. Narendra and Mr. Gao met with him
12:57:29 23  and discussed the terms of the agreement?
12:57:31 24  A. I believe that -- yeah, I believe that --
12:57:34 25  well, I think the first step was that Divya

Page 130

2:57:36 1  invited him to become onto it (sic) and then
12:57:41 2  he said -- you know, expressed his interest,
12:57:43 3  and then Victor explained to him sort of
12:57:46 4  what was going on with the code. And then
12:57:48 5  he basically agreed to complete it, and
12:57:51 6  during our meeting, I believe it was our
12:57:54 7  second meeting, we basically outlined, among
12:58:00 8  other things, a couple of the possible
12:58:02 9  benefits that he could achieve from being
12:58:03 10  part of the team.
12:58:05 11  Q. Okay. That second meeting, were you at that
12:58:07 12  second meeting?
12:58:07 13  A. Yes.
12:58:08 14  Q. Okay. And so in that second meeting were
12:58:10 15  the terms of the agreement with Mr.
12:58:12 16  Zuckerberg discussed?
12:58:13 17  A. The terms being -- let me just think for a
12:58:18 18  second. In the second meeting we talked
12:58:21 19  about -- well, I think the terms were sort
12:58:24 20  of set up en route to that meeting,
12:58:29 21  effectively. We were inviting him onto the
12:58:31 22  team, asking him if he could create part of
12:58:33 23  the code, him agreeing to create the code,
12:58:36 24  agreeing to be a contributor. It was all
2:58:39 25  sort of a -- it was established up to that

Page 131

12:58:41 1  point, you know. And then at that point
12:58:42 2  he -- it was outlined exactly sort of what
12:58:47 3  his contribution would relatively be. Our
12:58:50 4  contribution was the promotional aspect of
12:58:52 5  it and the strategic aspect of it. And so
12:58:54 6  his -- you know, up to that point was more
12:58:57 7  of a definition of what his contribution
12:59:00 8  would be.
12:59:00 9  Q. Right.
12:59:00 10  A. If that makes sense.
12:59:02 11  Q. And so did you explain to him what you and
12:59:04 12  Mr. Narendra and your brother were going to
12:59:06 13  be doing?
12:59:07 14  A. Yes. We explained that we were the
12:59:09 15  promotional aspect. And one, you know, and
12:59:12 16  one example of promotion that we would have
12:59:15 17  done was throw a party for the Harvard
12:59:17 18  student body in which we would launch the
12:59:19 19  site. And that was sort of a -- one of the
12:59:22 20  larger promotional aspects that we thought
12:59:25 21  that -- that we would be in charge of.
12:59:28 22    So to just sort of recap, building up
12:59:30 23  from the initial invitation to the team up
12:59:33 24  to the point of the second meeting we were
12:59:36 25  sort of defining -- determining whether he

Page 132

12:59:38 1  was interested. He was. Determining what
12:59:41 2  needed to be done, if he could do it. He
12:59:44 3  took a look and did that, and then at that
12:59:46 4  meeting we effectively outlined our
12:59:48 5  respective contributions to the project.
12:59:50 6  Q. And so you're -- so when you say what he was
12:59:54 7  supposed to do, what was that?
12:59:56 8  A. As I said, it was the -- he agreed to
12:59:59 9  complete the connect side of the site.
01:00:01 10  Q. Okay.
01:00:01 11  A. And maybe perhaps any other loose ends that
01:00:04 12  he saw that might have...
01:00:06 13  Q. Was there any discussion before Mr.
01:00:08 14  Zuckerberg started work about what he would
01:00:11 15  get out of it?
01:00:12 16    MR. HORNICK: I'll just object that
01:00:14 17  it assumes facts not in evidence that he
01:00:16 18  actually did any of the work, but other than
01:00:18 19  that, you can answer the question.
01:00:19 20  A. So -- sorry. Could you repeat the question?
01:00:27 21    MR. CHATTERJEE: If the court
01:00:28 22  reporter will read it back, please.
01:00:30 23    (Record read.)
01:00:38 24  A. Before he started work. Let me think for a
01:00:49 25  second. Well, I think it was -- there was a

33 (Pages 129 to 132)

Page 133

```
01:00:55  1    discussion in the sense that he was invited
01:01:00  2    on the team. So in that respect he was a
01:01:02  3    contributor, an equal contributor and not a
01:01:04  4    contractor. And so prior to his work, you
01:01:09  5    know, he was aware that he was part of what
01:01:11  6    we call the HarvardConnection team and what
01:01:14  7    Victor clearly instructed him as that entity
01:01:18  8    would have been. That role was later sort
01:01:21  9    of defined a little bit more and a little
01:01:23 10    bit more refined at the second meeting.
01:01:26 11    Q.  Okay. And in that second meeting he hadn't
01:01:30 12       been charged with doing anything yet?
01:01:32 13    A.  What do you -- no, I mean, in fact -- I
01:01:36 14       mean, well, what do you mean by "charged,"
01:01:38 15       like? He actually did no work over
01:01:42 16       Thanksgiving because he didn't have his
01:01:44 17       laptop.
01:01:44 18    Q.  Okay. Oh, so the second meeting was after
01:01:47 19       Thanksgiving?
01:01:48 20    A.  The second meeting was after Thanksgiving.
01:01:50 21    Q.  Okay.
01:01:50 22    A.  And I mean, again, like we have -- as my
01:01:53 23       counsel said, we haven't seen any work, so
01:01:55 24       for me to assume that -- you know, I can't
01:02:01 25       say where that work is or, you know, I
```

Page 134

```
01:02:05  1    know -- I'm certain that he did not work
01:02:07  2    over Thanksgiving.
01:02:08  3    Q.  Okay. And he told you that?
01:02:10  4    A.  He told me that he left his laptop power
01:02:16  5       charger.
01:02:16  6    Q.  Did you express any dissatisfaction with
01:02:18  7       that?
01:02:19  8    A.  I was a little bit -- I guess you could say
01:02:25  9       a little mystified. You know, I mean, but
01:02:28 10       kids -- college kids are college kids. And
01:02:31 11       he said he -- would I have any reason not to
01:02:35 12       take him at his word?
01:02:37 13    Q.  Well, no, but I mean, did you tell him, you
01:02:38 14       know, "I'm disappointed about that" or
01:02:40 15       anything like that?
01:02:40 16    A.  Well, no. I mean, I think we basically
01:02:44 17       accepted -- I accepted it. You know, at
01:02:48 18       that point it's pretty early on.
01:02:50 19    Q.  So before you had -- so before that second
01:02:55 20       meeting at any point --
01:02:57 21    A.  I don't believe any work was done up to that
01:02:59 22       point.
01:02:59 23    Q.  Okay. So --
01:03:00 24    A.  To my knowledge, and to what I've seen, I
01:03:03 25       don't believe any work was done up to that
```

Page 135

```
01:03:05  1       second meeting.
01:03:06  2    Q.  Okay. So from that second meeting
01:03:09  3       previously did you ever -- did anyone at
01:03:12  4       ConnectU or HarvardConnection ever discuss
01:03:14  5       with Mr. Zuckerberg what he would get out of
01:03:17  6       it, out of doing this work?
01:03:18  7    A.  Well, so, as I said, his remuneration, you
01:03:26  8       know, we took him on as a member of the
01:03:28  9       team --
01:03:29 10    Q.  But my question's very, very specific.
01:03:32 11    A.  Okay.
01:03:32 12    Q.  What was discussed? Like what was he told
01:03:35 13       he would get out of it?
01:03:36 14    A.  Well, we told him for starters since we
01:03:38 15       didn't have a revenue source at that point,
01:03:40 16       we told him that the first thing that we
01:03:42 17       would look to do would, you know, have a big
01:03:47 18       article in The Crimson basically saying look
01:03:52 19       what Mark's done. You know, he had the
01:03:56 20       Facemash issue, but he has used his skills
01:03:59 21       to pull out this great community aid
01:04:02 22       product. And he was -- that was really the
01:04:03 23       first instance of remuneration that we
01:04:06 24       talked about, is that he would -- it would
01:04:08 25       be great for his reputation.
```

Page 136

```
01:04:10  1    Q.  And any other specific terms about what he
01:04:12  2       would get out of it prior to that November
01:04:15  3       meeting, second meeting?
01:04:17  4    A.  I think Divya might have stressed how it
01:04:21  5       would be a good notch on his belt in terms
01:04:23  6       of a resume and any kind of -- you know, as
01:04:26  7       a computer programmer, you have a portfolio,
01:04:29  8       just like any sort of activity, and
01:04:32  9       completion of this type of project would
01:04:34 10       certainly help him later down the road.
01:04:37 11       That was discussed. And I think -- and I
01:04:42 12       think it was understood that this had
01:04:44 13       potential as an advertising platform and
01:04:49 14       that, you know, any money that would come
01:04:52 15       our way would certainly go to everybody.
01:04:55 16    Q.  And so somebody at ConnectU or
01:04:57 17       HarvardConnection told Mr. Zuckerberg that
01:04:59 18       before that second meeting?
01:05:02 19       MR. HORNICK: Object to the form of
01:05:03 20       the question, but you can answer it.
01:05:05 21    A.  Prior -- okay. So the second meeting, as I
01:05:10 22       said, that's what we're talking about,
01:05:11 23       right?
01:05:12 24    Q.  Before that second meeting, before Mr.
01:05:14 25       Zuckerberg had -- when everyone's in
```

34 (Pages 133 to 136)