**EXHIBIT 10
(PART 2 OF 3)**

Page 137

```
 1   agreement he hadn't done any work or at
 2   least you didn't think he had done any work?
 3   A.  Yeah, I mean there's an e-mail if you --
 4       there are some e-mails that indicate that he
 5       may have done some work in sort of roughly
 6       late November, early December.  I haven't
 7       seen that work, so I can't say other than --
 8   Q.  Okay.  So I'm not really focused on the
 9       work --
10   A.  Right.
11   Q.  About that issue more before that second
12       meeting, were any other terms about what he
13       would get out of it discussed?
14   A.  Prior to the second meeting -- aside from
15       the fact that he was part of our team, I
16       don't believe any terms were discussed
17       specifically until the second meeting.
18   Q.  Okay.  And in the second meeting what were
19       the terms that were discussed?
20   A.  In the second meeting the terms were
21       effectively that it was a contribution
22       partnership.  Our contribution was marketing
23       and promotion and strategy.  His
24       contribution was on the coding and
25       programming level.  And that -- and that,
```

Page 138

```
 1   you know, the first sort of remuneration
 2   that he would receive from that would be, as
 3   I said, the benefit to his reputation.  And
 4   we also talked about the -- you know, the
 5   potential of an advertising platform.  And
 6   certainly if there's money that would come
 7   through with that, that it would be
 8   distributed among the partnership.
 9   Q.  And so that specific point was discussed
10       with Mr. Zuckerberg in that second meeting?
11   A.  At this -- this specific -- okay.  I
12       think -- at that point, right, the website
13       was far from launched.  So there's no actual
14       revenue model, like it's not generating
15       dollars on that day, okay?  So he does work,
16       and the first sort of compensation, the
17       first light at the end of the tunnel is the
18       prestige, the quasi celebrity status of
19       being part of this great product all around
20       campus and everybody knowing who you are,
21       and then --
22   Q.  Hold on.  And you discussed that issue with
23       him?
24   A.  Right.
25   Q.  Now, what other issues --
```

Page 139

```
 1   A.  Okay.
 2   Q.  -- did you discuss about what he would get
 3       out of it?
 4   A.  And then we also discussed and Victor
 5       discussed with him prior to this second
 6       meeting that it was -- there's a very large
 7       advertising potential.  And Mr. Zuckerberg
 8       was fully aware of how sites work and hits
 9       and how that correlates to money.  And we --
10       he was certainly aware of --
11   Q.  Hold on.  My question is, what did you tell
12       him, not what you think he understood.  What
13       did ConnectU or HarvardConnection tell Mr.
14       Zuckerberg about what he would get out of
15       the deal?
16   A.  That he --
17   Q.  I got the reputation thing.
18   A.  Yeah.
19   Q.  What else did you tell him?
20   A.  That he would reap any and all benefits that
21       would come along with being a part of the
22       HarvardConnection team, whether it be
23       monetary, money, prestige, fame, whatever it
24       is, he would get any and all.  It was
25       completely explicit there.
```

Page 140

```
 1   Q.  And who said that?
 2   A.  As I said, we talked about the potential for
 3       the site.  He was -- we talked about the
 4       respective roles in the partnership --
 5   Q.  No.  My question's very simple.  Who told
 6       him about the fact that he would be entitled
 7       to revenues from the partnership?
 8   A.  Well, I think -- okay.  I think by telling
 9       him that he's part of the team, okay, by
10       telling him that he's a partner and that
11       he's entitled to any types of remuneration,
12       I think "any and all" applies specifically
13       and non-exclusively to monetary benefits.
14   Q.  So there was no express statement to him
15       that he be entitled to remuneration?
16   A.  See, what I'm saying is we didn't actually
17       talk about -- we didn't spend a lot of time
18       talking about advertising revenue at that
19       meeting because that site wasn't even up,
20       okay?  What we talked about was getting the
21       project done and getting it launched, and
22       the most salient remuneration at that point
23       was the benefit to his reputation.  But that
24       did not -- that was not exclusive or -- you
25       know, to the fact that advertising money
```

35 (Pages 137 to 140)

| | |
|---|---|
| 01:09:29 1 | would certainly be equally distributed, were |
| 01:09:33 2 | and when it were to come in. So to answer |
| 01:09:36 3 | your question, any and all remuneration |
| 01:09:39 4 | based on the Web side, even if it was -- |
| 01:09:42 5 | Q. Okay. |
| 01:09:42 6 | A. -- you know -- |
| 01:09:43 7 | Q. Finish your question -- finish your answer. |
| 01:09:46 8 | A. So I'm saying while we didn't harp on the |
| 01:09:49 9 | advertising or the revenue potential, it was |
| 01:09:51 10 | certainly understood that any benefit from |
| 01:09:53 11 | the site, specifically because he was a |
| 01:09:56 12 | coder and involved with that aspect of it |
| 01:09:58 13 | and was part of the time, would be his. |
| 01:10:00 14 | Q. Okay. So did you tell him specifically that |
| 01:10:03 15 | any benefit from the site he would be able |
| 01:10:06 16 | to have a piece of? |
| 01:10:11 17 | A. Okay. Any benefit from the site he would |
| 01:10:16 18 | have a piece of, yes, being a partner of our |
| 01:10:20 19 | team, yes. |
| 01:10:20 20 | Q. And you told him that specific statement? |
| 01:10:23 21 | A. That specific word by word? It was probably |
| 01:10:27 22 | a fair -- it was probably different than |
| 01:10:29 23 | that. It was probably more to the extent, |
| 01:10:32 24 | "Look, you're on the HarvardConnection team. |
| 01:10:35 25 | This is going to be great for your |

| | |
|---|---|
| 01:10:36 1 | reputation. We're all in this together. |
| 01:10:39 2 | This is an equal partnership. And also, |
| 01:10:43 3 | think of the enormous advertising potential |
| 01:10:45 4 | this thing has." |
| 01:10:46 5 | Q. And so you told him it was an equal |
| 01:10:48 6 | partnership? |
| 01:10:48 7 | A. Again, at that time, as I mentioned before, |
| 01:10:52 8 | we didn't -- you know, he was brought on |
| 01:10:54 9 | with -- he had the expectation that, you |
| 01:10:57 10 | know, he was going to be part of the overall |
| 01:10:59 11 | development and the control of the site and |
| 01:11:00 12 | that at that point we divvied up the |
| 01:11:03 13 | contributions and it was premature to talk |
| 01:11:05 14 | about specific equity. |
| 01:11:06 15 | Q. Why didn't you just hire him as a contractor |
| 01:11:08 16 | like everyone else? |
| 01:11:10 17 | A. Because we -- ultimately when you're looking |
| 01:11:14 18 | for -- equity's a very good way of getting |
| 01:11:20 19 | really the most out of a situation and |
| 01:11:23 20 | people. And I think that, you know, Victor, |
| 01:11:27 21 | to take Victor for example, we did want him |
| 01:11:29 22 | as a partner, but he felt personally that he |
| 01:11:32 23 | could not undertake the responsibility of |
| 01:11:38 24 | being that, so he wanted to be contracted |
| 01:11:40 25 | piecemeal. But ultimately you want a |

| | |
|---|---|
| 01:11:43 1 | partner in the situation because they put, |
| 01:11:44 2 | you know, effort in. They go that extra |
| 01:11:46 3 | mile. |
| 01:11:57 4 | Q. Now, when you were -- did you ever tell Mr. |
| 01:12:01 5 | Zuckerberg that he couldn't work on any |
| 01:12:04 6 | competitive websites that were under |
| 01:12:07 7 | development? |
| 01:12:08 8 | A. Well, I think that -- I think certainly if |
| 01:12:22 9 | there is a project. I mean, when you |
| 01:12:24 10 | undertake a partnership, specifically did we |
| 01:12:30 11 | say don't work on, you know, the exact same |
| 01:12:34 12 | thing, well, I think that being part of the |
| 01:12:38 13 | team and the partnership, you know, is |
| 01:12:41 14 | proprietary. So he could not use a |
| 01:12:43 15 | proprietary code or functionality to work on |
| 01:12:45 16 | another similar website that had the same |
| 01:12:49 17 | proprietary functionality and code. So that |
| 01:12:52 18 | absolutely would be understood there, okay? |
| 01:12:55 19 | Q. But was it stated? |
| 01:12:57 20 | A. Was it specifically stated that I say, "You |
| 01:13:00 21 | cannot work on another project exactly like |
| 01:13:05 22 | this"? No, I did not say that. |
| 01:13:06 23 | Q. Okay. |
| 01:13:06 24 | A. However -- |
| 01:13:07 25 | Q. Go ahead. |

| | |
|---|---|
| 01:13:08 1 | A. However, as I said before, he was unable and |
| 01:13:11 2 | not allowed to use the same proprietary |
| 01:13:13 3 | information and functionality and business |
| 01:13:15 4 | models and everything that we conveyed to |
| 01:13:17 5 | him for another project like that. |
| 01:13:20 6 | Q. Was he allowed to pull upon anything else -- |
| 01:13:24 7 | well, let me say, you knew that he was doing |
| 01:13:26 8 | software projects for other people, right? |
| 01:13:28 9 | A. I was aware of Facemash, and that's all I |
| 01:13:30 10 | was aware of when we -- and that's all he |
| 01:13:33 11 | made us aware of that he was involved in. |
| 01:13:35 12 | Q. What about Coursematch? |
| 01:13:36 13 | A. I had not heard of that prior to -- and he |
| 01:13:39 14 | never brought that up. |
| 01:13:42 15 | Q. Had you ever heard of it? |
| 01:13:42 16 | A. I ever heard of it, yes. |
| 01:13:43 17 | Q. What is it? |
| 01:13:44 18 | A. I believe, my understanding is that |
| 01:13:47 19 | Coursematch allows people to basically say |
| 01:13:51 20 | what courses they're in, and then you can |
| 01:13:53 21 | effectively tell what course a person's in |
| 01:13:55 22 | from that website. But I've never been on |
| 01:13:57 23 | it. |
| 01:13:57 24 | Q. And are you aware about whether people who |
| 01:14:00 25 | are taking similar courses can connect to |

36 (Pages 141 to 144)

Page 147

```
01:14:02  1        each other?
01:14:04  2              MR. HORNICK:  On Coursematch?
01:14:05  3              MR. CHATTERJEE:  Yes.
01:14:06  4        A.  Again, I haven't seen the site.  I was under
01:14:08  5        the impression that it was -- it allowed
01:14:10  6        people to match up -- they could sort of
01:14:15  7        list what course they're in and find -- I
01:14:19  8        don't know.  I don't know the answer.  I
01:14:20  9        know it involves people finding people in
01:14:22 10        the classes.
01:14:23 11              MR. HORNICK:  I'll object that this
01:14:25 12        is outside the scope and also would require
01:14:27 13        that the witness have access to defendant's
01:14:30 14        confidential information which he hasn't
01:14:32 15        had.
01:14:33 16        Q.  Are you aware -- do you know who created
01:14:36 17        Coursematch?
01:14:37 18        A.  I'm under the impression that Mark
01:14:41 19        Zuckerberg, that was one of his projects.
01:14:42 20        Q.  And do you know if he created it before ever
01:14:46 21        meeting with you or Divya Narendra?
01:14:49 22        A.  I believe that he created it prior to
01:14:52 23        meeting with us, but at the time of meeting
01:14:55 24        and throughout our entire relationship he
01:14:58 25        never made us aware of that site.
```

Page 146

```
01:14:59  1        Q.  Were you aware that in order to access
01:15:03  2        Coursematch, it required a dot-edu address?
01:15:07  3        A.  Again, I haven't seen the site, so I don't
01:15:09  4        know.  I can't...
01:15:16  5        Q.  What websites -- in the course of the
01:15:18  6        development of HarvardConnection, what other
01:15:20  7        websites did you look at to develop that
01:15:23  8        website?
01:15:23  9        A.  We looked at -- as I mentioned, we
01:15:27 10        bookmarked Friendster in our second meeting.
01:15:29 11        We talked about that.  And we also looked at
01:15:31 12        some personal sites, because as you probably
01:15:35 13        know, a lot of thing -- a lot of what fuels
01:15:39 14        these types of sites is the sexual aspect,
01:15:41 15        the dating, finding that cute guy or girl in
01:15:44 16        your class and looking them up.  So what
01:15:47 17        better to sort of find out what values that
01:15:51 18        people look at when they're looking at a
01:15:54 19        prospective mate or whatnot and personal
01:15:58 20        sites.
01:15:58 21        Q.  When you say "personal sites," are those
01:16:00 22        dating websites?
01:16:01 23        A.  Yeah, like Yahoo -- well, Yahoo Personals
01:16:04 24        would be one site that we looked at, Yahoo
01:16:06 25        Personals.
```

Page 147

```
01:16:07  1        Q.  And would it be like match.com?
01:16:10  2        A.  I don't think we looked at match.  We looked
01:16:14  3        at Yahoo Personals, that's one salient one
01:16:18  4        that I can remember outside of Friendster.
01:16:19  5        Q.  And what about American Singles?
01:16:22  6        A.  I think that -- I logged onto American
01:16:26  7        Singles probably in post-February 2004, I
01:16:28  8        believe.  I'm not sure if I looked at it
01:16:30  9        prior to -- during the time I met with Mr.
01:16:32 10        Zuckerberg.  I don't recall.
01:16:34 11        Q.  So it isn't ConnectU's position that looking
01:16:42 12        at other websites and as guidance on how to
01:16:49 13        develop your website, the information on
01:16:52 14        those other websites isn't anything that you
01:16:55 15        would claim as a trade secret?
01:16:57 16              MR. HORNICK:  Objection, calls for
01:16:59 17        contention testimony, but you can answer.
01:17:01 18        A.  Again, those other websites are in the
01:17:03 19        public domain, and they're -- you know, they
01:17:06 20        are what they are.  They're there.  And I
01:17:10 21        would not call a public website such as, you
01:17:12 22        know, friendster.com a proprietary thing.  I
01:17:16 23        am -- yeah.
01:17:18 24        Q.  And, in fact, in developing ConnectU, you
01:17:20 25        assessed Thefacebook to develop your website
```

Page 148

```
01:17:25  1        with these features?
01:17:25  2        A.  We looked at Thefacebook, yes.
01:17:28  3        Q.  And you extracted course information from
01:17:32  4        ConnectU -- I mean, from Thefacebook?
01:17:34  5              MR. HORNICK:  Object to the form of
01:17:35  6        the question and assumes facts not in
01:17:36  7        evidence.
01:17:36  8        A.  Yeah, when collecting course information
01:17:40  9        there's basically two -- you know, it's
01:17:43 10        public course information that's posted by a
01:17:45 11        registrar from the school, and you can
01:17:47 12        either go to the registrar or you can go,
01:17:49 13        you know -- and Thefacebook had the courses.
01:17:51 14        So, yes, we did look at the courses which,
01:17:55 15        again, is public proprietary information,
01:17:59 16        and we collected that, yes.
01:18:01 17        Q.  How did you collect it?
01:18:02 18        A.  We just would like look at the file in a
01:18:07 19        text editor and just take the course file.
01:18:10 20        Q.  Did you ever extract e-mails from
01:18:12 21        Thefacebook?
01:18:13 22        A.  We -- yes, we have extracted e-mails from
01:18:17 23        Thefacebook.
01:18:18 24        Q.  Isn't it true that you've extracted 2.9 to 3
01:18:21 25        million e-mails from Thefacebook because of
```

37 (Pages 145 to 148)

01:18:24  1   a security hole you found?
01:18:25  2         MR. HORNICK:  Objection.  It's a
01:18:27  3   misleading question, but you can answer it
01:18:29  4   if you can.
01:18:30  5   A.  We have extracted e-mails basically just,
01:18:38  6   you know, following -- an e-mail has a -- at
01:18:45  7   that point they had a URL, and you could
01:18:46  8   follow that URL and it's completely
01:18:49  9   authorized -- it's not unauthorized access,
01:18:52  10  and you can follow that URL to find an
01:18:55  11  e-mail address, yes, you could.  And we did.
01:18:57  12  Q.  So did you find a way to extract those
01:19:01  13  e-mails without logging onto Thefacebook?
01:19:06  14        MR. HORNICK:  Objection.  I think
01:19:07  15  this is outside the scope.  It's not
01:19:09  16  30(b)(6) testimony.
01:19:12  17  A.  See, again, I don't remember -- I'm not a
01:19:15  18  programmer, but it's my understanding that
01:19:19  19  with unauthorized -- excuse me, with
01:19:21  20  authorized -- without using unauthorized
01:19:24  21  access those e-mails were accessible.
01:19:25  22  Q.  And ConnectU took them?
01:19:28  23        MR. HORNICK:  Object to the form of
01:19:29  24  the question.
01:19:29  25  A.  What do you mean by take?

01:19:31  1   Q.  Extracted the information?
01:19:32  2   A.  ConnectU followed an open URL, "open" being
01:19:36  3   that it was accessible with not having to
01:19:41  4   use unauthorized access, it was accessible,
01:19:44  5   out in the open, and ConnectU followed those
01:19:46  6   URLs and was able to collect e-mail
01:19:50  7   addresses.
01:19:50  8   Q.  And who did that?
01:19:51  9   A.  Winston Williams.
01:19:52  10  Q.  Winston Williams did that?  And when did he
01:19:55  11  do that?
01:19:56  12  A.  I believe he did it in the spring of this
01:19:58  13  year.
01:19:58  14  Q.  Were those e-mails ever used by ConnectU?
01:20:01  15  A.  I think we used some of them with the Social
01:20:06  16  Butterfly software.
01:20:06  17  Q.  And how were they used?
01:20:07  18  A.  If a friend used Social Butterfly and wanted
01:20:11  19  to invite their friends, then they could do
01:20:14  20  that with Social Butterfly.  And they --
01:20:16  21  Q.  So when you -- once you had those e-mails,
01:20:20  22  did you -- well, what did you do with them?
01:20:22  23  A.  We just held them in a holding bin, and if a
01:20:29  24  user said, I would like to invite my friend,
01:20:31  25  well, we would just invite their friends.

01:20:34  1   And as I said, we only used a portion of
01:20:36  2   them, because only a portion of the users
01:20:39  3   invited their friends.
01:20:40  4   Q.  Did you ever send e-mails to people based
01:20:42  5   upon those e-mails, that e-mail database?
01:20:47  6   A.  That's what I just said, that if a user --
01:20:51  7   Q.  Let me rephrase that.
01:20:52  8   A.  Okay.
01:20:53  9   Q.  Independent of a user request, did you ever
01:20:55  10  send an e-mail to people in that --
01:20:59  11  A.  With that bucket from the sort of open URL,
01:21:04  12  no, we did not send unsolicited e-mails to
01:21:06  13  those people.
01:21:06  14  Q.  Has ConnectU obtained any revenue to date?
01:21:10  15  A.  We have obtained some advertising revenue,
01:21:13  16  yeah.
01:21:13  17  Q.  And how much revenue is that?
01:21:17  18        MR. HORNICK:  I'll object that this
01:21:18  19  is outside the scope as well, but you can
01:21:20  20  answer it.  It's not 30(b)(6) testimony.
01:21:22  21  A.  I would say roughly no more than $1,000 of
01:21:30  22  revenue.
01:21:30  23  Q.  Okay.
01:21:30  24  A.  We haven't actively sought too much
01:21:33  25  advertising at this moment.

01:21:34  1   Q.  How many users does it have?
01:21:36  2   A.  I believe we have 66,000 plus, thereabouts.
01:21:40  3   Q.  And does it -- does it have any university
01:21:50  4   environments for California universities?
01:21:54  5   A.  Yeah, I believe we have California
01:21:57  6   universities, I believe so.
01:22:01  7   Q.  Can you give me some examples?
01:22:04  8   A.  UC Berkeley, I think that.
01:22:07  9         MR. CHATTERJEE:  Let's mark this as
01:22:08  10  Exhibit 5.  I think we're on Exhibit 5.
01:22:10  11        (Exhibit No. 5, Certificate of
01:22:10  12  Registration, Bates Nos. C004842 - 4845,
01:22:40  13  marked for identification.)
01:22:40  14  Q.  Mr. Winklevoss, what's been handed to you as
01:22:42  15  Exhibit No. 5, do you know what this is?
01:22:48  16  A.  Looks like a copyright signover from Joseph
01:22:57  17  Jackson to ConnectU and one from, I believe,
01:23:05  18  yeah, looks like a copyright signover from
01:23:08  19  Victor Gao, Sanjay, yeah.
01:23:11  20  Q.  What do you --
01:23:12  21        MR. HORNICK:  I'll object that this
01:23:14  22  is outside the scope.  This is not 30(b)(6)
01:23:17  23  testimony.
01:23:18  24  Q.  What do you mean, "signover"?
01:23:20  25  A.  Well, I would think that they wrote the code

01:23:22  1  and they would say this is copyright code
01:23:24  2  and it looks like copyright claim in
01:23:28  3  ConnectU, so I would assume that they're --
01:23:32  4       MR. HORNICK:  I'll object to the
01:23:34  5  extent that this calls for legal testimony
01:23:37  6  from the witness and speculation.
01:23:38  7       MR. CHATTERJEE:  I really only have
01:23:39  8  one question associated with this.
01:23:41  9  Q.  Do you have a signed agreement from these
01:23:44 10  three people, Joseph Jackson, Victor Gao and
01:23:47 11  Sanjay Mavinkurve assigning to ConnectU the
01:23:50 12  rights to the code?
01:23:52 13  A.  I believe we did.  And the ability to use
01:23:57 14  it, yes.
01:23:58 15  Q.  You have a signed agreement from each one of
01:24:00 16  those three people?
01:24:00 17  A.  I believe on -- with Joseph and Victor we
01:24:05 18  have a signed agreement, and we have a dual
01:24:07 19  ownership with Sanjay, too.
01:24:12 20       MR. CHATTERJEE:  Counsel, we have
01:24:12 21  not seen that agreement in our pile.
01:24:15 22       MR. HORNICK:  They've been
01:24:16 23  produced.
01:24:19 24  Q.  And when was that signed?
01:24:20 25  A.  This would have -- I believe these would

01:25:22  1  think that complies with the 30(b)(6)
01:25:24  2  notice.  We'll save the meet and confer for
01:25:26  3  another day.
01:25:27  4  Q.  But pursuant to his objection, go ahead and
01:25:29  5  answer it.
01:25:29  6  A.  Well, as I -- yeah, as my counsel said,
01:25:33  7  that, you know, I can't look at some of the
01:25:35  8  documents under the protective order, but
01:25:39  9  it's my understanding that Mr. Zuckerberg
01:25:42 10  has claimed in the press to have programmed
01:25:45 11  the website in under a week's time or
01:25:48 12  approximately a week, and I have been
01:25:50 13  advised that it's -- you know, the
01:25:57 14  HarvardConnection code is not something --
01:25:58 15  or a site of that magnitude is basically
01:26:00 16  humanly impossible to code it.  And I know
01:26:04 17  that he had access to our code and had a
01:26:07 18  block, so that's my belief that he
01:26:11 19  basically, you know, used our copyrighted
01:26:13 20  code.
01:26:16 21  Q.  And who advised you that he couldn't do it
01:26:18 22  that quickly?
01:26:19 23       MR. HORNICK:  Objection to the
01:26:21 24  extent that you have to reveal any
01:26:22 25  communications with counsel, you don't have

)1:24:22  1  have been done, you know, roughly -- I mean,
01:24:25  2  it says right here October 15th, but I would
01:24:27  3  think we collected them last summer.
01:24:36  4       MR. HAWK:  Yeah, we've looked for
01:24:38  5  them.  We haven't been able to find them if
01:24:39  6  you produced them.
01:24:39  7       MR. HORNICK:  I'll have to go back
01:24:41  8  and take another look.
01:24:42  9       MR. HAWK:  Yeah, I think you need
01:24:43 10  to confirm that because I don't believe
01:24:43 11  we've been able to find them.
01:24:54 12  BY MR. CHATTERJEE:
01:24:55 13  Q.  Can you tell me, what is your basis for
01:25:00 14  believing that Mr. Zuckerberg is infringing
01:25:02 15  ConnectU's copyright?
01:25:03 16       MR. HORNICK:  I'll object to this
01:25:05 17  question to the extent that it calls for
01:25:06 18  legal testimony, and also, the witness
01:25:09 19  cannot testify on this topic to the extent
01:25:11 20  that it would call for him to have access to
01:25:14 21  the defendants' confidential information.
01:25:16 22  But he can testify as to his general
01:25:18 23  knowledge and understanding relating to that
01:25:19 24  question.
1:25:20 25       MR. CHATTERJEE:  Okay.  I don't

01:26:23  1  to answer that question, and shouldn't
01:26:24  2  answer that question.
01:26:25  3  A.  Yeah, I mean, that aside, I know how long it
01:26:33  4  took a team of developers, you know, to
01:26:35  5  build the social network in general, and
01:26:37  6  just using basic logic dictates that one
01:26:40  7  week's time is unreasonable, humanly
01:26:44  8  impossible.
01:26:44  9  Q.  Did you entertain the thought at all that he
01:26:46 10  might have used code that he had written
01:26:48 11  previously for other people?
01:26:49 12  A.  Well, there's no real premise or basis to
01:26:54 13  believe that any of the code or any
01:26:56 14  significant portion of the code could have
01:26:59 15  been used to code that site, and, yeah.
01:27:05 16  Q.  And what knowledge did you have about Mr.
01:27:10 17  Zuckerberg's use of any of the confidential
01:27:12 18  information that you shared with him in
01:27:14 19  developing Thefacebook?
01:27:17 20       MR. HORNICK:  I'll object on the
01:27:19 21  basis as I did before, that to the extent it
01:27:21 22  calls for a legal testimony or contention
01:27:23 23  testimony, this witness can't provide it,
01:27:25 24  and also to the extent that that question
01:27:26 25  would -- or this whole line of questioning

01:27:29  1    would require him to have access to
01:27:31  2    defendants' confidential documents, he can't
01:27:33  3    have access to that, but he can give you his
01:27:35  4    general understanding of the facts that
01:27:37  5    relate to that question.
01:27:39  6    Q.  Go ahead.
01:27:39  7    A.  So I believe the question is what
01:27:45  8    understanding -- how do I have a belief that
01:27:48  9    he used some of our proprietary business
01:27:50 10    stuff -- methods?
01:27:52 11    Q.  Correct.
01:27:52 12    A.  Well, the belief -- I believe that we gave
01:28:00 13    him access, full -- cart blanche to our code
01:28:04 14    and our ideas, and I believe that a lot of
01:28:07 15    those core ideas are embodied in his current
01:28:10 16    website.
01:28:11 17    Q.  Okay.  So list those for me.
01:28:17 18    A.  So some of the -- well, the idea, as I said
01:28:20 19    earlier, like in the previous session,
01:28:22 20    taking an on-line community down to the
01:28:26 21    college level and then stringing it together
01:28:28 22    with other communities, that would be one of
01:28:31 23    the core ideas that we believe that is
01:28:33 24    embodied by Thefacebook.
01:28:35 25    Q.  Any others?

01:28:39  1    A.  A lot of the content issue and a lot of the
01:28:42  2    whatever -- you know, a lot of the things
01:28:44  3    that are necessary in order to create a
01:28:46  4    community in such a manner.
01:28:48  5    Q.  Be a little more specific than that.  What
01:28:50  6    do you mean?
01:28:50  7    A.  Could you be a little more specific with
01:28:52  8    your questions, like...
01:28:53  9    Q.  Well, you say that the content that's on
01:28:55 10    Thefacebook.
01:28:56 11    A.  As I said before, the content with the
01:28:59 12    fields of profiles, profile fields and that
01:29:02 13    type of information, you know, student-
01:29:08 14    related information.
01:29:09 15    Q.  Such as?
01:29:09 16    A.  Such as houses, educational, field,
01:29:12 17    interests, thesis, you know, you name it.
01:29:20 18    Q.  Anything else you can remember?  You said
01:29:22 19    houses, thesis, courses --
01:29:25 20         MR. HORNICK:  You don't have to
01:29:26 21    repeat your answer.
01:29:27 22    Q.  Yeah, I might have missed one.  I'm just
01:29:31 23    wondering if there are any others.
01:29:31 24    A.  I think I said interests.
01:29:32 25    Q.  Interests.

01:29:33  1    A.  And I said and there may be more that I
01:29:35  2    can't recall off the top of my head right
01:29:36  3    now.
01:29:40  4    Q.  Okay.  Any other examples used by Mr.
01:29:42  5    Zuckerberg of trade secrets that you know
01:29:48  6    of?
01:29:48  7    A.  I think the first-mover advantage, we
01:29:51  8    stressed that we should be out there first.
01:29:53  9    Q.  Anything else?
01:29:54 10    A.  I believe we talked about the -- how we
01:30:03 11    would start at one school and branch out.
01:30:06 12    Q.  Anything else beyond that?
01:30:07 13    A.  I can't recall anything else right now.
01:30:16 14    Q.  Isn't it true that the original conception
01:30:18 15    of the HarvardConnection was really about
01:30:23 16    being a dating website?
01:30:24 17    A.  No.  That's not true with respect to the
01:30:29 18    fact that that was one aspect that you could
01:30:32 19    use the functionality for.
01:30:36 20         MR. CHATTERJEE:  Let's mark this as
01:30:37 21    Exhibit 6.
01:30:37 22         (Exhibit No. 6, E-mail string,
01:30:37 23    Bates Nos. C004792 - 4793, marked for
01:30:57 24    identification.)
01:30:57 25    Q.  Take a look at this.  Do you recognize this

01:31:00  1    document?
01:31:02  2    A.  This looks like an e-mail.
01:31:08  3         MR. HAWK:  Neel, do you have an
01:31:10  4    extra one?
01:31:10  5         MR. CHATTERJEE:  Sorry, Robert.  I
01:31:11  6    always forget about you.
01:31:13  7         MR. HAWK:  Thanks.
01:31:15  8         (Witness reviews document.)
01:31:35  9    A.  Yeah.  This looks like a forwarded e-mail
01:31:37 10    from -- that my father wrote to me.
01:31:40 11    Q.  And do you recall the discussions around
01:31:43 12    this e-mail?
01:31:44 13    A.  I think that basically what I recall is that
01:31:50 14    this is -- this was my father's potential
01:31:53 15    suggestion for what HarvardConnection might
01:31:55 16    want to -- what kind of route you might want
01:31:58 17    to go in.
01:31:58 18    Q.  And isn't it true that this e-mail is really
01:32:02 19    talking about a dating function?
01:32:05 20         MR. HORNICK:  Objection, relevance.
01:32:06 21    You can answer.
01:32:07 22    A.  Again, this is my father's -- he believed --
01:32:12 23    you know, he was suggesting in this e-mail
01:32:14 24    that HarvardConnection would -- could be a
01:32:17 25    site that would help Harvard men and women

40 (Pages 157 to 160)

Page 163

01:32:21 1   date. It was a suggestion, as I said, you
01:32:23 2   know, a potential way in which the site
01:32:26 3   could be directed.
01:32:28 4   Q.  Do you know what the conversations between
01:32:30 5   Divya and your father were?
01:32:34 6   A.  I would assume that they had to do with the
01:32:40 7   scope of the site and you know what the site
01:32:42 8   should sort of function like and what it
01:32:43 9   should be like to some extent, but I don't
01:32:45 10  know exactly what their conversations were.
01:32:51 11  Q.  Did you have any follow-up conversations
01:32:53 12  with your father about this e-mail?
01:32:54 13  A.  Well, I think for starters, I mean, the
01:32:59 14  charging fee, I'm almost certain I would
01:33:03 15  have -- I said that I would have told him
01:33:05 16  that that was not a good idea and that we
01:33:07 17  wouldn't do that. But I -- you know, I
01:33:13 18  think we -- I don't recall specifically what
01:33:16 19  the follow-up conversation to this would
01:33:18 20  have been.
01:33:18 21  Q.  Isn't it true that there were other websites
01:33:23 22  in existence prior to October 2003 that were
01:33:29 23  social networks on a domain or university-
01:33:31 24  specific basis?
01:33:32 25  A.  That might be true. At the time of 2003,

Page 162

01:33:39 1   November 2003, to, you know, when we were
01:33:45 2   speaking with -- there was -- there may have
01:33:47 3   been on-line communities or forums or
01:33:50 4   message boards for universities, but there
01:33:52 5   was not a concerted effort to branch any of
01:33:55 6   those out to other universities or
01:33:57 7   communities, and there was no mention of any
01:34:00 8   of those sites in our discussion from Mr.
01:34:05 9   Zuckerberg or with him.
01:34:07 10         MR. CHATTERJEE: So let's mark this
01:34:09 11  as Exhibit No. 7.
01:34:11 12         (Exhibit No. 7, E-mail, Bates No.
01:34:28 13  C004791, marked for identification.)
01:34:28 14  Q.  Take a look at this e-mail.
01:34:37 15  A.  Uh-huh.
01:34:38 16  Q.  Have you seen this e-mail before?
01:34:39 17  A.  Yes.
01:34:42 18  Q.  Is your recollection that the date of this
01:34:44 19  e-mail is roughly correct?
01:34:45 20  A.  Yeah, I would assume it's correct because
01:34:49 21  it's the -- you know, the header of the
01:34:51 22  e-mail.
01:34:52 23  Q.  Did you have conversations with Mr. Narendra
01:34:54 24  about this e-mail?
01:34:55 25  A.  Yeah. We may have had conversations about

this e-mail, yes.
01:35:02 1
01:35:04 2   Q.  Describe what those conversations were.
01:35:05 3   A.  Like can I just read the e-mail first?
01:35:07 4   Q.  Oh, sure. I'm sorry, I thought you had
01:35:10 5   already read it.
01:35:12 6         (Witness reviews document.)
01:35:37 7   A.  Okay. Yeah.
01:35:37 8   Q.  So do you have a recollection about this
01:35:40 9   e-mail?
01:35:40 10  A.  Yeah, I do. I do.
01:35:42 11  Q.  So describe your discussions with Mr.
01:35:44 12  Narendra about this.
01:35:46 13  A.  Well, basically these are alumni websites,
01:35:49 14  and I don't really recall exactly what
01:35:53 15  specifically was on TigerLink or the Harvard
01:36:01 16  Alumni Association, but I believe that we
01:36:02 17  discussed that was one aspect that we could
01:36:04 18  incorporate into the connect side of our
01:36:08 19  network, and that would be -- you know,
01:36:09 20  basically creating a venue and allowing --
01:36:13 21  you making it able to accommodate alumni,
01:36:18 22  but these are alumni-based sites.
01:36:21 23  Q.  So can you tell me what the differences were
01:36:24 24  between what you were creating and what is
01:36:27 25  shown on these various websites that Mr. --

Page 164

01:36:30 1   A.  Sure.
01:36:30 2   Q.  -- Narendra --
01:36:32 3   A.  Well, I believe, to my recollection, these
01:36:35 4   are not social networks, and these are
01:36:37 5   basically alumni -- these are exclusively
01:36:41 6   for alumni. I'm not sure if you can gain
01:36:44 7   access with a dot-edu or you have to apply
01:36:48 8   it, but they're basically very narrow in
01:36:51 9   scope, so to speak. They're not community
01:36:53 10  sort of building tools, so to speak, or
01:36:55 11  social networks for that matter.
01:36:57 12  Q.  Okay. Is there anything specifically that
01:36:59 13  you can identify that differentiated these
01:37:01 14  websites other than the fact that they
01:37:06 15  weren't community-based but any other
01:37:09 16  features that were different?
01:37:10 17  A.  I don't really recall what these exact
01:37:13 18  websites hold, but, you know, as I said,
01:37:15 19  they are websites specifically for alumni.
01:37:18 20  They are not built for the interaction of
01:37:20 21  alumni with undergrads or the undergrads
01:37:24 22  with undergrads. They're also university-
01:37:27 23  sponsored websites, so they are something
01:37:30 24  that's set up by an alumni association.
01:37:32 25  They are not independent of the university.

41 (Pages 161 to 164)

01:37:35 1    And they are also two-dimensional with
01:37:37 2    respect to the fact that they're not social
01:37:39 3    networks.
01:37:39 4    Q.  So people could tie together, is that --
01:37:41 5    A.  I don't believe that people do -- I believe
01:37:43 6    that these are more of a sort of a direct
01:37:47 7    listing in these things.
01:37:48 8    Q.  Are you speculating or did you know -- do
01:37:50 9    you know that to be true?
01:37:51 10   A.  I'm almost certain at the time that there
01:37:53 11   was no real social networking components to
01:37:57 12   these websites.
01:37:58 13   Q.  Are you familiar with a company called Club
01:38:02 14   Nexus?
01:38:02 15   A.  I've heard of that website, yeah, but I did
01:38:05 16   not actually hear about it until the summer
01:38:07 17   of 2004.
01:38:08 18   Q.  Do you know what it is?
01:38:08 19   A.  I believe it was a Stanford community.
01:38:12 20   Q.  And was it -- how was it different than what
01:38:16 21   you conceived HarvardConnection to be?
01:38:19 22   A.  Well, I think in some ways it was similar.
01:38:21 23   We're talking about a social network, an
01:38:23 24   on-line community based at the college
01:38:25 25   level.  There was no mention of the site

01:38:28 1    from our side.  We had not heard of it, and
01:38:32 2    there was no mention from Mr. Zuckerberg's
01:38:34 3    side about the site.  And also, as I pointed
01:38:38 4    out, Club Nexus was a project specifically
01:38:42 5    and only for Stanford students.  It was not
01:38:45 6    a project meant to branch out to other
01:38:49 7    campuses or interconnect on a higher level.
01:38:51 8    Q.  And so the point of differentiation between
01:38:58 9    Club Nexus and HarvardConnection is that
01:39:01 10   HarvardConnection had a plan to roll out to
01:39:03 11   other universities?
01:39:04 12   A.  You know, I haven't seen the Club Nexus
01:39:08 13   website.  I don't believe it's operational,
01:39:09 14   so I can't tell you exactly piece by piece
01:39:12 15   like what the difference between the
01:39:14 16   websites are.  I know it was basically a
01:39:16 17   project by some students there.  It was only
01:39:18 18   intended for the Stanford community.  That's
01:39:21 19   where it stayed.  That's where it died.  I
01:39:23 20   know that our project was a social network
01:39:25 21   that was -- specifically the end goal was to
01:39:29 22   leave Harvard and actually interconnect all
01:39:32 23   the schools together.  That was one of the
01:39:34 24   major differences, I would say.
01:39:35 25   Q.  And do you know when Club Nexus launched?

01:39:40 1    A.  As I said, I believe it launched before,
01:39:42 2    probably in 2001/2002, but as I said before,
01:39:48 3    I was not aware of it and none of us had
01:39:50 4    come across that site until 2004.
01:39:52 5    Q.  Have you ever heard of a company called
01:39:53 6    inCircle?
01:39:55 7    A.  I have heard of it now, but again, I was
01:39:59 8    unaware of it at the time.
01:40:00 9    Q.  And what do you understand inCircle to be?
01:40:02 10   A.  I believe it's a social network, or it was.
01:40:04 11   Q.  And is it for, you know, university-specific
01:40:08 12   communities?
01:40:08 13   A.  I believe it's a macro level social network.
01:40:11 14   Q.  Meaning what?
01:40:12 15   A.  Meaning anybody can join.
01:40:14 16   Q.  Anybody can join it.
01:40:15 17       And so it's not for like college
01:40:18 18   alumni or anything like that?
01:40:19 19   A.  I'm sure some of the people joining could be
01:40:23 20   college alumni, but is it specifically
01:40:26 21   geared towards that demographic?  Does it
01:40:28 22   require people with a college affiliation or
01:40:30 23   an e-mail to sign up?  I don't believe so.
01:40:32 24   Q.  Do you know when it was launched?
01:40:35 25   A.  I think I would say 2001/2002 maybe.

01:40:39 1    Q.  What about Affinity Engines; are you
01:40:42 2    familiar with that company?
01:40:43 3    A.  I've heard of Affinity Engines, yes.
01:40:47 4    Q.  And what do they do?
01:40:49 5    A.  I believe they make alumni social networks.
01:40:51 6    Q.  And for specific alumni groups?
01:40:54 7    A.  Yeah.  I believe they sell it to different
01:41:00 8    universities.
01:41:01 9    Q.  And do you know when it was launched?
01:41:03 10   A.  No, but I think that some of the individuals
01:41:07 11   involved with Affinity Engines were involved
01:41:11 12   with Club Nexus.
01:41:12 13   Q.  And why do you think that?
01:41:13 14   A.  Because I spoke with one member of Affinity
01:41:20 15   Engines.  He just, you know, asked -- I
01:41:23 16   think one day he asked me what, you know,
01:41:25 17   just said hello in ConnectU and he mentioned
01:41:29 18   that he -- I think he was involved with that
01:41:30 19   project.
01:41:33 20   Q.  And do you know when Affinity Engines
01:41:37 21   launched?
01:41:37 22   A.  I don't know, but, again, Affinity Engines
01:41:40 23   is strictly an alumni-based company.
01:41:44 24   Q.  So what's the difference between Affinity
01:41:47 25   Engines and your view of HarvardConnection?

42 (Pages 165 to 168)

Page 171

01:41:50 1    A.  Well, again HarvardConnection allows
01:41:52 2    students to connect to students, students to
01:41:56 3    connect to alumni, alumni to connect to
01:41:56 4    students.  I mean, it's not defined as an
01:41:58 5    alumni social network, it's defined as a
01:42:01 6    school social network.  It's also not -- a
01:42:05 7    company like Affinity Engines sells it to an
01:42:10 8    alumni association.  Ours is separate
01:42:10 9    outside of the alumni association, and it
01:42:12 10   allows student to student, student to
01:42:13 11   alumni, et cetera.
01:42:14 12   Q.  Now, how could alumni sign on to
01:42:17 13   HarvardConnection?
01:42:18 14   A.  They could get a post e-mail address which
01:42:21 15   is now -- at this stage in the game is
01:42:24 16   pretty much given to everybody by default,
01:42:27 17   but let's say you were a class of '67 from
01:42:30 18   Harvard when they didn't have e-mail.  You
01:42:33 19   could go to the Harvard web -- whatever
01:42:34 20   website was and apply for a post e-mail and
01:42:36 21   apply.
01:42:37 22   Q.  What's a post e-mail?
01:42:39 23   A.  Post just is a forwarding account, so if you
01:42:41 24   go to Harvard, you can be a student and --
01:42:43 25   you can get an e-mail for when you graduate

Page 170

01:42:46 1    that you can specify pretty much any first
01:42:50 2    part of the e-name.  It could be, you know,
01:42:52 3    your first name @post.harvard.edu, and so
01:42:57 4    that would fulfill our Harvard.edu
01:43:04 5    requirement.
01:43:04 6    Q.  Are you familiar with a group called CU
01:43:06 7    Community?
01:43:07 8    A.  Yes, I've heard of CU Community, but, again,
01:43:11 9    I did not hear about CU Community till
01:43:14 10   spring of '04.  I had not heard of it prior
01:43:17 11   to meeting with Mr. Zuckerberg or during our
01:43:20 12   meetings -- meeting.
01:43:20 13   Q.  And what was CU Community?
01:43:21 14   A.  I believe CU Community was basically a
01:43:23 15   meeting place of some sort with -- allowing
01:43:28 16   Columbia students to post information up
01:43:29 17   onto the website like pictures, and maybe
01:43:32 18   they had forums and whatnot.
01:43:35 19   Q.  Was it a social network?
01:43:37 20   A.  I don't know.  I am not sure what -- I don't
01:43:39 21   know if they were -- they allowed that
01:43:41 22   functionality.
01:43:41 23   Q.  And do you know when they launched?
01:43:44 24   A.  As I said, they were before, I think.  I
01:43:49 25   believe they were in 2002, but we had not

Page 172

01:43:51 1    heard of them or mentioned any of that
01:43:52 2    information to any other...
01:43:57 3    Q.  What about something called MIT Matchup;
01:44:02 4    have you ever heard of that?
01:44:03 5    A.  I think maybe I did hear about that.  I
01:44:06 6    mean, I think that's basically -- again, I
01:44:09 7    don't recall what that was, but I think that
01:44:11 8    might have been just sort of a lottery shoot
01:44:13 9    where you put in your e-mail maybe and it
01:44:15 10   matches you up or something like that.  But
01:44:19 11   I don't know that site.  I don't know --
01:44:20 12   never saw it, don't really know to what
01:44:22 13   extent --
01:44:23 14   Q.  Was it a dating site?
01:44:25 15   A.  It might have been.  I think so.  I don't
01:44:29 16   know, though, exactly what...
01:44:33 17   Q.  And do you know where it was started?
01:44:34 18   A.  I would assume MIT.
01:44:36 19   Q.  Was it rolled out to Harvard or anywhere
01:44:38 20   else?
01:44:38 21   A.  I don't know.  And I think that, again,
01:44:42 22   it's -- I think it was a very flat site in
01:44:46 23   scope.  I don't believe it was a social
01:44:47 24   network.  I think it was basically a lottery
01:44:50 25   where you threw in -- maybe filled out some

01:44:53 1    parameters, and, you know, it ran an
01:44:55 2    algorithm and spit some stuff out.
01:44:58 3    Q.  What about Crimson Connection; are you
01:45:02 4    familiar with that?
01:45:02 5    A.  No.  I may have gone to that domain, but I
01:45:06 6    don't believe -- I can't recall exactly what
01:45:07 7    Crimson Connection is right now.
01:45:10 8    Q.  SEASCommunity?
01:45:12 9    A.  I believe SEAS is -- was either the
01:45:16 10   precursor or the -- or after CU Community.
01:45:20 11   Q.  And do you know what SEASCommunity is?
01:45:23 12   A.  I believe it's the same sort of Columbia-
01:45:25 13   based messaging board, website.
01:45:30 14   Q.  And Campus Network?
01:45:31 15   A.  I believe that's the further incarnation of
01:45:34 16   SEAS, CU and then Campus Network.
01:45:40 17   Q.  Have you ever heard of Crimsonhookups.com?
01:45:44 18   A.  I think so, but I don't -- yeah, I've heard
01:45:47 19   of it, but I don't know about its time
01:45:48 20   frame.  I don't know where it falls into
01:45:50 21   play.
01:45:50 22   Q.  Do you know what it is?
01:45:51 23   A.  I would assume it's a dating site.
01:45:54 24   Q.  HarvardParties.com?
01:45:56 25   A.  Yeah, that's just a party directory, party

43 (Pages 169 to 172)

01:45:59 1  directory.

01:45:59 2  Q.  And did you ever sign on to it?

01:46:01 3  A.  I might have looked at it, maybe looked at

01:46:05 4  some pictures, but that's just basically --

01:46:07 5  it's an informational website. It's

01:46:09 6  really -- there's no social networking.

01:46:12 7  There's no -- that's a flat page.

01:46:14 8  Q.  And what about WesMatch?

01:46:16 9  A.  No, have not, have not heard about that.

01:46:19 10  Q.  Have you ever heard about it?

01:46:21 11  A.  I think I remember reading about that last

01:46:23 12  spring.

01:46:23 13  Q.  And what is WesMatch?

01:46:25 14  A.  I think it's for Wesleyan University, and it

01:46:29 15  matched people up for dating, I guess. I

01:46:33 16  don't know, though. I'm -- I believe that's

01:46:35 17  what it is.

01:46:36 18  Q.  And do you know how it was different, if at

01:46:39 19  all, from HarvardConnection?

01:46:41 20  A.  Well, I don't -- I don't know if it had any

01:46:45 21  social networking components. Clearly the

01:46:48 22  name indicates that it started and stopped

01:46:51 23  on Wesleyan, and I think that there was no

01:46:57 24  plan to branch that out. And, again,

01:47:00 25  that's -- HarvardConnection dating -- using

01:47:04 1  the website for dating is one sort of part

01:47:09 2  of the user functionality of the site.

01:47:36 3  Q.  Isn't it true that Divya Narendra never

01:47:38 4  considered this information about a

01:47:39 5  university-based community confidential?

01:47:43 6  MR. HORNICK: I'll object to the

01:47:44 7  form of the question, but you can answer it.

01:47:46 8  A.  No, I don't believe that he thought it

01:47:48 9  was -- I don't believe that that was true.

01:47:52 10  I believe that he did think that it was

01:47:53 11  confidential.

01:47:56 12  Q.  Do you know who else Mr. Narendra talked to

01:48:00 13  about this website development project?

01:48:05 14  A.  The only people that Divya have talked to in

01:48:09 15  terms of website project would have been

01:48:12 16  prospective programmers or programmers that

01:48:15 17  we had and people, perhaps close, trusted

01:48:23 18  friends maybe, to test parts of the site

01:48:29 19  were clearly instructed that it was

01:48:30 20  confidential, proprietary. And the only

01:48:34 21  other people would have been perhaps one or

01:48:38 22  two or maybe three prospective employers

01:48:41 23  that he was interviewing with who couldn't

01:48:44 24  possibly have been in a position to compete.

01:48:46 25  Q.  With respect to these prospective employers,

01:48:51 1  how would they know that they need to keep

01:48:52 2  that information confidential?

01:48:53 3  A.  I think, you know, he certainly could have

01:48:58 4  and would have instructed them that it was

01:49:04 5  confidential information, and I think it was

01:49:06 6  pretty clear that -- at that time period you

01:49:08 7  also have to remember that when he was

01:49:09 8  applying for jobs, we were given the

01:49:12 9  impression by Mr. Zuckerberg that the site

01:49:13 10  was close to launch in any event. So there

01:49:18 11  was -- it was inconceivable that they were

01:49:20 12  in a position to compete.

01:49:23 13  Q.  Okay.

01:49:23 14  MR. HORNICK: I'll object that this

01:49:24 15  is outside the scope and not 30(b)(6)

01:49:25 16  testimony.

01:49:49 17  Q.  Did you ever hear Mr. Narendra tell these

01:49:50 18  prospective employers that they should keep

01:49:54 19  the information confidential?

01:49:55 20  A.  No, I --

01:49:57 21  MR. HORNICK: Objection. This is

01:49:59 22  not 30(b)(6) testimony. It's outside the

01:49:59 23  scope, but you can answer it.

01:50:03 24  A.  I was not present during the employment

01:50:04 25  meeting, so, no, I did not hear.

01:50:06 1  MR. CHATTERJEE: Let's mark this as

01:50:07 2  Exhibit 8.

01:50:08 3  (Exhibit No. 8, E-mail, Bates No.

01:50:34 4  C004810, marked for identification.)

01:50:34 5  Q.  Please read through this --

01:50:36 6  A.  Sure.

01:50:36 7  Q.  -- and let me know when you're done.

01:50:39 8  (Witness reviews document.)

01:51:42 9  MR. CHATTERJEE: Did I give you

01:51:43 10  one?

01:51:44 11  MR. HAWK: You did, yeah.

01:51:49 12  (Witness reviews document.)

01:51:54 13  A.  All done.

01:51:56 14  Q.  Mr. Winklevoss, do you know how many people,

01:51:59 15  prospective employers, or I'll use your

01:52:03 16  term, "close, trusted friends" Mr. Narendra

01:52:07 17  shared the HarvardConnection concept with?

01:52:09 18  A.  I think that maybe two or three people at

01:52:14 19  major firms and maybe no more than a handful

01:52:20 20  of close friends. So I would say you could

01:52:23 21  probably count it on one to two hands.

01:52:26 22  Q.  Could it be as high as 10 prospective

01:52:30 23  employers?

01:52:30 24  MR. HORNICK: Objection. Don't

01:52:32 25  speculate.

44 (Pages 173 to 176)

Page 179

01:52:33 1  A. As I said, I'm aware that he --
01:52:35 2       MR. HORNICK: It's outside the
01:52:36 3  scope.
01:52:36 4  A. I'm aware --
01:52:38 5       MR. HORNICK: -- of the 30(b)(6)
01:52:39 6  testimony. Sorry.
01:52:40 7  A. I'm aware that he has talked to one -- I
01:52:44 8  believe one employer about it. I know that
01:52:45 9  for a fact. And I assume because he applied
01:52:49 10  to I think two or three jobs, that he would
01:52:53 11  have talked to two or three employers about
01:52:54 12  it.
01:52:55 13  Q. So it's at least two or three?
01:52:56 14  A. I would say two or three, yeah.
01:52:59 15  Q. Okay. And close, trusted friends,
01:53:01 16  approximately how many?
01:53:02 17       MR. HORNICK: Objection,
01:53:02 18  speculation. You can answer if you know.
01:53:05 19  A. I think probably two or three. I would say,
01:53:09 20  yeah, but, again I can't say for sure.
01:53:13 21  Q. Now, you said that there's one employer for
01:53:17 22  certain that you know discussed it with.
01:53:20 23  Who is that?
01:53:20 24  A. I think that he had -- I think I recall a
01:53:23 25  meeting maybe when he was at Credit Suisse

Page 178

1:53:25 1  that he might have talked to the employer
01:53:27 2  then. But, again, I think he had
01:53:32 3  conversations with two or three, but I don't
01:53:34 4  know.
01:53:34 5  Q. And do you know what friends he had the
01:53:37 6  conversations with?
01:53:37 7  A. Specifically, no. I mean, I think -- I
01:53:45 8  don't know specifically, no.
01:53:46 9  Q. What about Mr. Gao. Do you know if he
01:53:48 10  discussed this with any prospective
01:53:50 11  employers or any friends?
01:53:53 12  A. I don't know that. He may have. I don't
01:53:57 13  know.
01:53:58 14  Q. And do you know if he -- if Mr. Gao had any
01:54:02 15  discussions with people not affiliated with
01:54:05 16  HarvardConnection?
01:54:08 17  A. I could not say whether he did or not.
01:54:10 18  Q. What about Tyler Winklevoss?
01:54:12 19  A. I don't believe that Tyler did.
01:54:14 20  Q. So he's never had any conversations with --
01:54:17 21  A. Aside from -- aside from close -- like, as I
01:54:20 22  mentioned before, close friends, he may
01:54:22 23  have. Such as roommates may have said, "Oh,
01:54:27 24  what are you doing?" And he might have
1:54:28 25  said, "I'm working on a website," end of

Page 180

01:54:31 1  story.
01:54:31 2  Q. With no additional detail beyond that?
01:54:33 3  A. No, I don't believe so.
01:54:34 4  Q. And what about you?
01:54:35 5  A. I believe the same way, yeah.
01:54:37 6  Q. So you haven't talked with anyone other
01:54:39 7  than --
01:54:40 8  A. Some close friends were aware that I was on
01:54:42 9  a website. They may have been aware that I
01:54:45 10  was involved with the Harvard Community, but
01:54:47 11  much more than that, no, I don't believe so.
01:54:53 12  Q. And what about Sanjay Mavinkurve?
01:54:56 13  A. To my knowledge, he has not spoken to
01:54:59 14  anybody.
01:55:01 15  Q. And what about Joe Jackson?
01:55:06 16  A. To my knowledge, he had not, either.
01:55:14 17  Q. But you don't know?
01:55:15 18       MR. HORNICK: Objection, don't
01:55:16 19  speculate. He gave you his answer.
01:55:17 20  A. I don't know.
01:55:19 21  Q. So if you can take a look at this document
01:55:22 22  we've marked as Exhibit 8.
01:55:24 23  A. Uh-huh.
01:55:24 24  Q. Are there any confidential information of
01:55:30 25  HarvardConnection that Mr. Narendra has

01:55:32 1  disclosed in this e-mail?
01:55:36 2  A. Well, I think basically Mr. Narendra
01:55:41 3  illustrates two potential possibilities of
01:55:45 4  use for the site. It's by no means all-
01:55:48 5  encompassing. I don't think he really
01:55:54 6  expounds on anything that -- on anything
01:56:01 7  proprietary here.
01:56:04 8  Q. So it's your -- so what you're saying is
01:56:07 9  there's nothing proprietary shared in this
01:56:09 10  e-mail?
01:56:10 11  A. Oh, well, you know, the whole -- the
01:56:30 12  nightclub, the local club thing seems like
01:56:33 13  that could be proprietary. The Harvard
01:56:36 14  bands and promotional thing could be
01:56:37 15  proprietary. With respect -- social hub
01:56:44 16  might be proprietary. But, again, this is a
01:56:48 17  close trusted friend. This is not somebody
01:56:52 18  who -- you know, this falls under the
01:56:55 19  individuals that I mentioned before.
01:56:56 20  Q. Do you know who this person is that was sent
01:56:59 21  this e-mail?
01:56:59 22  A. Yeah, I believe he's a close friend of
01:57:02 23  Divya's. And I think that -- I think that
01:57:06 24  he's an individual that could be trusted.
01:57:09 25  Q. And what's his name?

45 (Pages 177 to 180)

Page 181

```
01:57:11  1   A.  I believe the e-mail says it, Marko Soldo.
01:57:14  2   Q.  Do you know him?
01:57:15  3   A.  I do know him.
01:57:15  4   Q.  So how do you spell his name?
01:57:18  5   A.  M-A-R-K-O, S-O-L-D-O.
01:57:22  6   Q.  And do you know where he is now?
01:57:24  7   A.  He could be anywhere in the world.  I don't
01:57:28  8       know.  He's not -- I don't -- I think he's
01:57:34  9       Croatian perhaps and I don't know where he
01:57:35  10      is.
01:57:36  11  Q.  Do you know if there are any follow-on
01:57:38  12      discussions from this e-mail?
01:57:38  13  A.  Not that I'm aware of, I don't believe so.
01:57:48  14  Q.  Do you know why Mr. Narendra wrote this
01:57:50  15      e-mail?
01:57:50  16  A.  As I said, you know, we may have talked --
01:57:57  17      you know, mentioned it to a friend or two
01:57:59  18      for testing of some sort, and it's possible
01:58:03  19      that Divya wanted to hear his input in a
01:58:09  20      trusted environment.
01:58:11  21  Q.  You've used this term, "trusted
01:58:15  22      environment."  What do you mean by that?
01:58:16  23  A.  I just mean that, as I said, close friends,
01:58:19  24      you know, that were aware that this was a
01:58:22  25      closely guarded project.
```

Page 182

```
01:58:24  1   Q.  Is there anything on that e-mail that
01:58:26  2       suggests to you that the information is
01:58:29  3       confidential?
01:58:30  4   A.  I don't see anything in this e-mail that
01:58:36  5       specifically says confidential.
01:58:40  6            MR. CHATTERJEE:  Okay.  Let's mark
01:58:41  7       this as Exhibit No. 9.
01:58:43  8            (Exhibit No. 9, E-mail, Bates No.
01:59:00  9       C004820, marked for identification.)
01:59:00  10  Q.  Take a look at it, and let me know when
01:59:02  11      you're done.
01:59:03  12           (Witness reviews document.)
01:59:34  13  A.  Uh-huh.
01:59:34  14  Q.  Do you know who Suzanne R. is?
01:59:36  15           MR. HORNICK:  Just I'll object that
01:59:38  16      this is outside the scope, and it's not
01:59:40  17      30(b)(6) testimony.  You can continue.
01:59:41  18  A.  I believe that -- I think this lady is a
01:59:45  19      potential employer.
01:59:46  20  Q.  And why do you think that?
01:59:47  21  A.  Because it sounds like she's giving a
01:59:54  22      presentation to people at Harvard and
01:59:56  23      there's the mention of a resume and offer of
02:00:00  24      suggestions, so...
02:00:01  25  Q.  So you're surmising it from the content of
```

Page 183

```
02:00:04  1       the e-mail?
02:00:05  2   A.  Yeah.  It looks like she is an individual,
02:00:07  3       you know, based on, you know, concentration,
02:00:09  4       GPA, resume, presentation, black suit, that
02:00:15  5       she would be a potential employer.
02:00:19  6   Q.  Is there any confidential information of
02:00:21  7       HarvardConnection that's disclosed in this
02:00:22  8       e-mail?
02:00:22  9   A.  There's potential with the local clubs and
02:00:43  10      theaters being Harvard-specific, giving, you
02:00:46  11      know, benefits to Harvard students.  This
02:00:50  12      selling skeletons to large universities and
02:00:54  13      institutions that lack social alumni hub is
02:00:57  14      one potential business sort of offshoot that
02:01:05  15      you could do with the social network.  But I
02:01:06  16      don't see anything else or anything really
02:01:07  17      that strikes me as proprietary.
02:01:08  18  Q.  But those things you just identified --
02:01:11  19  A.  Well, no, I mean, you can take a social
02:01:13  20      network and sell it to a university that
02:01:19  21      might lack a social network or an alumni
02:01:21  22      network, for that matter, and that would be
02:01:23  23      a business -- that would be a potential
02:01:26  24      business model.  I don't know if that would
02:01:28  25      be proprietary.
```

Page 184

```
02:01:30  1   Q.  And this concept that you talked about
02:01:32  2       earlier of linking people from different
02:01:35  3       universities together, when -- who came up
02:01:38  4       with that idea?
02:01:39  5   A.  I think actually I might have come up with
02:01:42  6       that idea.
02:01:43  7   Q.  And when did you come up with that idea?
02:01:45  8   A.  It was before Mr. Zuckerberg was on the
02:01:50  9       team, and I think I actually came up with it
02:01:52  10      when Mr. Gao was involved, and I think we --
02:01:56  11      in fact, I remember the cell phone
02:01:57  12      conversation we had in MicroCenter.  And
02:02:01  13      that was -- might have been the first time
02:02:02  14      that I mentioned it to Mr. Gao.
02:02:06  15  Q.  Cell phone conversation at MicroCenter, what
02:02:08  16      was that?
02:02:08  17  A.  That would have been in the fall like maybe
02:02:11  18      September '04 -- '03.
02:02:16  19  Q.  And describe that phone call to me.
02:02:18  20  A.  I think I basically, you know, mentioned to
02:02:21  21      Victor the potential of taking this to
02:02:26  22      multiple universities and linking it
02:02:28  23      together.
02:02:28  24  Q.  And what does MicroCenter have to do with
02:02:32  25      this?
```

46 (Pages 181 to 184)

Page 187

| | | |
|---|---|---|
| 02:02:32 | 1 | A. I just remember that I was there, that's |
| 02:02:34 | 2 | all. |
| 02:02:34 | 3 | Q. So you were at MicroCenter? |
| 02:02:37 | 4 | A. On -- yeah, and I was leaving MicroCenter |
| 02:02:40 | 5 | and I called him from my phone when I was |
| 02:02:42 | 6 | leaving. And I just remember that instant |
| 02:02:47 | 7 | in time, nothing else really relevant. |
| 02:02:49 | 8 | Q. And did you have other -- well, let me ask |
| 02:02:53 | 9 | this: Were all of your meetings about the |
| 02:02:58 | 10 | HarvardConnection website in dorm rooms? |
| 02:03:01 | 11 | MR. HORNICK: With whom? |
| 02:03:03 | 12 | MR. CHATTERJEE: With anybody |
| 02:03:04 | 13 | involved at HarvardConnection. |
| 02:03:05 | 14 | A. I was -- |
| 02:03:07 | 15 | MR. HORNICK: Throughout the entire |
| 02:03:08 | 16 | time period? That's your question. |
| 02:03:10 | 17 | MR. CHATTERJEE: Yeah, let's narrow |
| 02:03:12 | 18 | it a little bit. That's a fair point. |
| 02:03:13 | 19 | BY MR. CHATTERJEE: |
| 02:03:13 | 20 | Q. Through April of '03 -- or April '04, sorry? |
| 02:03:18 | 21 | A. Aside from the two times that I met with |
| 02:03:21 | 22 | Mark in the lunchroom -- |
| 02:03:22 | 23 | MR. HORNICK: Let's go back. You |
| 02:03:23 | 24 | said April '04 -- up to April '04 or after |
| 02:03:27 | 25 | April '04. |

Page 186

| | | |
|---|---|---|
| 2:03:28 | 1 | MR. CHATTERJEE: Up until? |
| 02:03:29 | 2 | MR. HORNICK: Up until April '04. |
| 02:03:30 | 3 | MR. CHATTERJEE: So let me restate |
| 02:03:31 | 4 | the question just so it's clear. |
| 02:03:33 | 5 | BY MR. CHATTERJEE: |
| 02:03:33 | 6 | Q. Before April '04 did you have any meetings |
| 02:03:37 | 7 | in public areas with people about the |
| 02:03:38 | 8 | HarvardConnection? |
| 02:03:38 | 9 | A. The only two meetings that I had in a public |
| 02:03:43 | 10 | area or that could sort of be considered as |
| 02:03:48 | 11 | a quasi public area would have been the |
| 02:03:50 | 12 | dining room with Mr. Zuckerberg. However, |
| 02:03:52 | 13 | the dining room was in off hours and nobody |
| 02:03:55 | 14 | else was in the dining room at the time. So |
| 02:03:59 | 15 | it was effectively a closed room with no |
| 02:04:02 | 16 | public observers. |
| 02:04:06 | 17 | Q. Were the other meetings all in dorm rooms? |
| 02:04:08 | 18 | A. I believe they were all in dorm rooms or in |
| 02:04:12 | 19 | private, closed spaces without public |
| 02:04:14 | 20 | people. |
| 02:04:14 | 21 | Q. So other than dorm rooms, where were these |
| 02:04:19 | 22 | other private, closed places? |
| 02:04:21 | 23 | A. We may have met with Victor like in a room |
| 02:04:23 | 24 | in Pforzheimer House like in a closed-off |
| :04:28 | 25 | section of a room. But, again, it would not |

Page 187

| | | |
|---|---|---|
| 02:04:29 | 1 | have been in a place where there would be |
| 02:04:31 | 2 | public people who could readily observe the |
| 02:04:34 | 3 | conversations. |
| 02:04:35 | 4 | Q. In these dorm room meetings, were roommates |
| 02:04:38 | 5 | there? |
| 02:04:38 | 6 | A. They may have been, but, again, they were -- |
| 02:04:43 | 7 | these were pretty closed discussions, so, |
| 02:04:45 | 8 | you know, you have suites, so you have |
| 02:04:48 | 9 | individual rooms so just because there are |
| 02:04:50 | 10 | other people in -- that inhabit a space does |
| 02:04:55 | 11 | not mean that they were there partaking in |
| 02:04:57 | 12 | the conversations. |
| 02:04:57 | 13 | Q. Could they hear the conversations? |
| 02:04:59 | 14 | A. I don't -- I don't believe -- I don't see |
| 02:05:03 | 15 | any reason why they would have. We were in |
| 02:05:05 | 16 | rooms that were closed off or their rooms |
| 02:05:07 | 17 | were -- their doors were closed, whatnot. |
| 02:05:10 | 18 | Q. So there weren't situations where all of you |
| 02:05:12 | 19 | were -- like the roommates and everyone else |
| 02:05:14 | 20 | was in the same room? |
| 02:05:15 | 21 | A. No, it wasn't like a round table, if you |
| 02:05:17 | 22 | will, where they were sort of listening and |
| 02:05:19 | 23 | jumping in and partaking, no. |
| 02:05:21 | 24 | Q. Well, I'm not even talking about partaking, |
| 02:05:24 | 25 | just physically in the same room? |

Page 188

| | | |
|---|---|---|
| 02:05:25 | 1 | A. No, I believe that when we were in the same |
| 02:05:27 | 2 | room, they were either -- had closed doors, |
| 02:05:31 | 3 | were not part of the discussions. |
| 02:05:38 | 4 | MR. CHATTERJEE: Let's mark this as |
| 02:05:41 | 5 | Exhibit 9, and after this we'll take a |
| 02:05:43 | 6 | break. |
| 02:05:43 | 7 | MR. HORNICK: I think it's 10, |
| 02:05:45 | 8 | isn't it? |
| 02:05:45 | 9 | MR. CHATTERJEE: Maybe 10. I might |
| 02:05:47 | 10 | have got my numbers off. |
| 02:05:50 | 11 | (Exhibit No. 10, E-mail, Bates No. |
| 02:06:28 | 12 | C003852, marked for identification.) |
| 02:06:28 | 13 | (Witness reviews document.) |
| 02:06:28 | 14 | Q. Mr. Winklevoss, what's been handed to you is |
| 02:06:34 | 15 | Exhibit 10. Do you recognize this document? |
| 02:06:35 | 16 | A. Yes, I do. |
| 02:06:37 | 17 | Q. What is this? |
| 02:06:37 | 18 | A. This is just an e-mail that I sent to Divya |
| 02:06:40 | 19 | and Victor and when sort of looking at |
| 02:06:42 | 20 | different Web URLs, I stumbled upon |
| 02:06:44 | 21 | Crimson.org, and there was a construction |
| 02:06:46 | 22 | sign at the time. And there was really no |
| 02:06:50 | 23 | content, but there was the possibility, |
| 02:06:53 | 24 | perhaps, that maybe these guys were -- or |
| 02:06:56 | 25 | there was something -- sort of alumni |

47 (Pages 185 to 188)

Page 189

02:06:58  1    website that might have been launched. I
02:07:00  2    think to this day that nothing has been
02:07:02  3    launched.
2:07:03   4    Q.  Was there any content on it?
02:07:05  5    A.  As I said, there was a construction -- a guy
02:07:07  6    with a hat saying "under construction."
02:07:08  7    Q.  Why were you concerned about that website?
02:07:13  8    A.  Same reason I would be concerned about any
02:07:16  9    kind of first-mover advantage. There was
02:07:19 10    a -- it looked like this was a site that was
02:07:21 11    under construction and that perhaps these
02:07:24 12    people were doing something that was
02:07:26 13    somewhat related, and that's really the
02:07:29 14    main -- that's why I would be concerned.
02:07:31 15    Q.  Do you know someone with the initials R.B.
02:07:37 16    Scott?
02:07:37 17    A.  I don't know that person, but Divya does.
02:07:40 18    Q.  And who is that person?
02:07:41 19    A.  That's a close friend of Divya's that Divya
02:07:44 20    worked with over the -- over one summer.
02:07:47 21    And I believe he may have asked him if he
02:07:51 22    wanted to become a part of the project at
02:07:53 23    one point.
02:07:53 24    Q.  And do you know what his full name is?
02:07:56 25    A.  I believe his name is Rob Scott.

Page 190

02:07:58  1    Q.  Do you know where he's located?
02:08:00  2    A.  I think in California.
02:08:02  3    Q.  And do you know who he works for?
02:08:04  4    A.  I don't know that.
02:08:06  5        MR. CHATTERJEE:  Okay.  Why don't
02:08:07  6    we take a break.
02:08:08  7        MR. HORNICK:  Okay.
02:08:09  8        MR. CHATTERJEE:  We've been going
02:08:10  9    for just about an hour.
02:08:12 10        THE VIDEOGRAPHER:  The time is
02:08:14 11    2:08.  This is the end of Tape No. 3, and we
02:08:16 12    are off the record.
02:08:19 13        (Recess taken.)
02:21:38 14        THE VIDEOGRAPHER:  The time is
02:21:40 15    2:21.  This is the beginning of Tape 4, and
02:21:42 16    we are back on the record.
02:21:44 17    BY MR. CHATTERJEE:
02:21:44 18    Q.  Mr. Winklevoss, we're back.  Now, prior to
02:21:51 19    February 2004, would you describe
02:21:53 20    HarvardConnection as a business?
02:21:56 21    A.  Yeah, I would say it was a business entity,
02:22:01 22    yeah.
02:22:01 23    Q.  Did you register that business with Harvard
02:22:06 24    University?
02:22:06 25    A.  No.

Page 191

02:22:07  1    Q.  Okay.  And was there any particular reason
02:22:08  2    why not?
02:22:08  3    A.  We were unaware that you would have to
02:22:12  4    register with the university.
02:22:15  5    Q.  Well, did you subsequently become aware of
02:22:17  6    that?
02:22:17  7    A.  No.  We never really came across that.
02:22:21  8    Q.  Okay.  Other than e-mails, prior to February
02:22:23  9    2004, were there any documents created that
02:22:26 10    kind of described what the plan for
02:22:29 11    HarvardConnection was?
02:22:29 12    A.  I don't believe -- no, I don't believe that
02:22:35 13    there was -- aside from the physical code
02:22:37 14    and whatever that that we've produced, I don't
02:22:39 15    believe that there are other documents, no.
02:22:41 16    Q.  Well, other than -- so let's break that
02:22:43 17    down.  So code and e-mails, other than those
02:22:46 18    two things, is there anything -- was there
02:22:50 19    any sort of document created that reflected
02:22:53 20    what the plan was for HarvardConnection?
02:22:55 21    A.  No, I don't believe so.
02:22:57 22    Q.  Okay.  Do you know who Chris Lentz is?
02:23:01 23    A.  Yes, Chris Lentz is a friend of mine.
02:23:03 24    Q.  And how did you come to know him?
02:23:07 25    A.  I grew up with him the last 20 years over

Page 192

02:23:10  1    the last -- over the summer, so I've known
02:23:12  2    him pretty much throughout childhood.
02:23:14  3    Q.  And where does he work currently?
02:23:16  4    A.  He works in New York City.
02:23:18  5    Q.  And where?
02:23:19  6    A.  I don't know the name of the firm, but...
02:23:28  7        MR. CHATTERJEE:  Okay.  Let's mark
02:23:29  8    this as -- are we on Exhibit 11?
02:23:32  9        MR. WALKER:  Yes.
02:23:33 10        MR. HORNICK:  Yes.
02:23:33 11        (Exhibit No. 11, E-mail, Bates No.
02:23:49 12    C004841, marked for identification.)
02:23:49 13        MR. HORNICK:  Did you have a copy
02:23:50 14    for me?
02:23:50 15        MR. CHATTERJEE:  Oh, I'm sorry, I
02:23:51 16    thought I gave you one.
02:23:57 17    Q.  After you've read through this, let me know.
02:23:59 18    A.  Yeah.
02:24:00 19    Q.  Okay.  So who is Rob Scott?
02:24:02 20    A.  As I mentioned before, he was a close friend
02:24:07 21    of Divya.  Divya, I believe, lived with him
02:24:11 22    over his sophomore summer, and Divya I think
02:24:13 23    in this e-mail might have looked to recruit
02:24:17 24    him for additional manpower.
02:24:19 25    Q.  Other than Mr. Scott, was there anyone else

48 (Pages 189 to 192)

Page 195

02:24:22 1     that was recruited for additional manpower?

02:24:23 2  A. I may have asked Chris Lentz post-February,

02:24:32 3     but prior to February 2004, aside from the

02:24:37 4     people that we've discussed, Nate Rosenberg

02:24:41 5     may have been approached. And who else? I

02:24:50 6     think that was it.

02:24:51 7  Q. Okay. So did Mr. Scott ever sign a

02:24:53 8     confidentiality agreement with anyone from

02:24:57 9     HarvardConnection?

02:24:58 10  A. Not that I'm aware of, no.

02:25:00 11  Q. Was he ever told not to disclose anything

02:25:03 12     that he saw with anyone else?

02:25:05 13  A. Yeah, as I said before, he was a close,

02:25:08 14     trusted friend. I'm not sure if Divya --

02:25:10 15     because I didn't have the conversation or

02:25:12 16     talk to him, I don't know if Divya had that

02:25:14 17     conversation with him. But, you know, he

02:25:19 18     would have certainly fallen into the

02:25:21 19     category of both, you know, close and

02:25:23 20     trusted friend.

02:25:24 21  Q. But you don't know if he was ever told,

02:25:26 22     "Hey, don't share this with others"?

02:25:28 23  A. I don't know if he was specifically told

02:25:30 24     that.

02:25:31 25  Q. Okay. So do you know if Mr. Scott ever

Page 194

02:25:34 1     accessed the code?

02:25:35 2  A. I think his only access was from sort of the

02:25:40 3     URL. I don't believe that he had any server

02:25:43 4     access.

02:25:43 5  Q. Did you -- did you ever have conversations

02:25:47 6     with Mr. Narendra about this e-mail?

02:25:49 7  A. He may have mentioned that this -- that Rob

02:25:54 8     was a potential extra manpower, but I don't

02:25:58 9     remember having like an extensive

02:26:00 10     conversation.

02:26:01 11  Q. Do you have any understanding as to what Mr.

02:26:04 12     Narendra meant when he said, "So the basic

02:26:06 13     code is all there, but it needs a lot of

02:26:08 14     cleaning up"?

02:26:09 15  A. I think what he's saying there is that

02:26:12 16     the -- well, the user -- a fair amount of

02:26:16 17     work had been done, but it wasn't complete.

02:26:18 18     It needed to be tied up. The date side

02:26:22 19     seemed to be somewhat complete, but, you

02:26:24 20     know, essentially the front needed to be

02:26:27 21     tied to the back, and maybe parts of the

02:26:29 22     back would be built out a little bit more,

02:26:34 23     depending on -- you know, this e-mail was

02:26:35 24     the 23rd, so depending on where the site was

02:26:38 25     at that point.

Page 195

02:26:39 1  Q. Now, I notice that this is dated December

02:26:43 2     23rd, 2003. That was after Mark Zuckerberg

02:26:45 3     started working for you, right?

02:26:46 4  A. Yeah, as I said, this individual would have

02:26:49 5     been approached for additional manpower.

02:26:53 6  Q. And did you have discussion about additional

02:26:55 7     manpower being necessary?

02:26:57 8  A. Well, I think it was clear at this time that

02:26:58 9     Mark was pretty heavy with schoolwork, so

02:26:58 10     while we certainly didn't want him not to

02:27:00 11     be, you know, part of the team, you know, it

02:27:04 12     did look like he was busy from time to time

02:27:06 13     with problem sets and stuff. So I don't

02:27:09 14     know if Divya mentioned this to Mark, but

02:27:11 15     this individual would have been brought on

02:27:14 16     on a contract basis.

02:27:15 17  Q. And why do you say that?

02:27:16 18  A. Just because, again, like this e-mail, you

02:27:19 19     know, it's not saying, Do you want to be a

02:27:21 20     partner, it's not saying, We need you to do

02:27:23 21     huge blocks of code, it's basically saying,

02:27:26 22     We might need a little help here, especially

02:27:27 23     if we're going to go into exam period and

02:27:30 24     whatnot. That's why I'd say that.

02:27:34 25  Q. And it's your testimony today that these

Page 196

02:27:44 1     links didn't allow Mr. Scott to access the

02:27:47 2     actual code?

02:27:48 3  A. Yes, that's how it would -- that would be

02:27:49 4     correct. These are just basic website URLs,

02:27:53 5     yeah.

02:27:56 6  Q. And by this point in time, December 23rd,

02:27:58 7     2003, the date side was largely complete?

02:28:03 8  A. I believe so, yes.

02:28:11 9  Q. Have you ever heard of something called

02:28:12 10     Tickle.com?

02:28:13 11  A. I have. I did not hear about it till about

02:28:18 12     February or March of this year.

02:28:21 13  Q. And what is Tickle.com?

02:28:23 14  A. I believe tickle is a social network that,

02:28:26 15     you know, allows people -- again, it's a

02:28:29 16     macro social network. I think people might

02:28:32 17     be able to take certain tests, like

02:28:35 18     personality tests or things to find out

02:28:39 19     about themselves, more about themselves, but

02:28:42 20     I don't know much more about that.

02:28:43 21  Q. Did you say March of this year?

02:28:44 22  A. Yeah.

02:28:45 23  Q. So it wasn't March of 2004, it was March

02:28:47 24     of --

02:28:47 25  A. It would have been 2004, I believe, yeah.

49 (Pages 193 to 196)

Page 197

Page 199

| | |
|---|---|
| 02:28:51  1 | MR. CHATTERJEE: Let's mark this as |
| 02:28:52  2 | Exhibit 11. |
| 02:28:52  3 | MR. HORNICK: 12. |
| 02:28:54  4 | MR. CHATTERJEE: Or 12. I'm |
| 02:28:55  5 | looking at that one that's right there |
| 02:28:57  6 | (indicating). |
| 02:28:57  7 | (Exhibit No. 12, E-mail, Bates No. |
| 02:29:41  8 | C009556, marked for identification.) |
| 02:29:41  9 | (Witness reviews document.) |
| 02:29:41 10 | Q.  After you've read it, let me know? |
| 02:29:43 11 | A.  Uh-huh. |
| 02:29:44 12 | (Witness reviews document.) |
| 02:30:01 13 | A.  Yeah, uh-huh. |
| 02:30:01 14 | Q.  Okay.  Does this refresh your recollection |
| 02:30:03 15 | as to when you may have heard of it? |
| 02:30:06 16 | A.  Yeah, this e-mail -- I remember this e-mail, |
| 02:30:08 17 | and I remember my father giving me a URL, |
| 02:30:11 18 | and I believe at the time I went to the URL |
| 02:30:13 19 | and it was not there.  The site was not |
| 02:30:16 20 | down, or I remember specifically that I |
| 02:30:18 21 | could not find the site.  I remember my |
| 02:30:20 22 | father mentioning a Harvard grad had started |
| 02:30:24 23 | sort of an IQ test or whatever.  And I |
| 02:30:26 24 | remember specifically being a little |
| 02:30:28 25 | confused as to why, you know, I couldn't |

| | |
|---|---|
| 02:31:45  1 | Tickle.com other than what I saw in March of |
| 02:31:50  2 | 2005.  My assumptions from this e-mail is |
| 02:31:53  3 | that it was -- and from the current |
| 02:31:55  4 | iteration of the site is that it had some |
| 02:31:57  5 | sort of IQ test.  But other than that, I |
| 02:32:00  6 | know nothing about it. |
| 02:32:00  7 | Q.  You mentioned the name Nate Rosenberg? |
| 02:32:05  8 | A.  Uh-huh. |
| 02:32:05  9 | Q.  Do you know where he is now? |
| 02:32:07 10 | A.  No. |
| 02:32:08 11 | Q.  What discussions, if any, did you have with |
| 02:32:11 12 | him? |
| 02:32:12 13 | A.  I think we simply asked him if he could |
| 02:32:15 14 | code, what level of coding he could do, and |
| 02:32:21 15 | that was it. |
| 02:32:22 16 | Q.  Did you describe to him anything about what |
| 02:32:24 17 | you were doing? |
| 02:32:24 18 | A.  We may have -- yeah, we may have mentioned |
| 02:32:29 19 | what we were doing, but it would have been |
| 02:32:30 20 | under the, you know, assumption that it was |
| 02:32:33 21 | proprietary and confidential. |
| 02:32:35 22 | Q.  Okay.  Did you tell him it was proprietary |
| 02:32:38 23 | and confidential? |
| 02:32:38 24 | A.  I believe that Divya may have told him, |
| 02:32:41 25 | yeah.  I didn't do a lot of the recruiting. |

Page 198

Page 200

| | |
|---|---|
| 02:30:30  1 | find the site.  But the reason I heard about |
| 02:30:33  2 | it, the reason Tickle I imagine that I heard |
| 02:30:37  3 | about it in March of 2005 there is because |
| 02:30:41  4 | somebody mentioned that Tickle was purchased |
| 02:30:43  5 | by Monster.com and it was a preexisting |
| 02:30:47  6 | site, but I actually never saw it on this |
| 02:30:49  7 | date or remember going to it at this point. |
| 02:30:54  8 | So I think my instinct is that this was in |
| 02:30:56  9 | between the transfer or something like that, |
| 02:30:58 10 | but I had actually never gone and been on |
| 02:31:01 11 | the site at that point. |
| 02:31:02 12 | Q.  Did you have any discussions about this |
| 02:31:04 13 | website around March 8th, 2004? |
| 02:31:13 14 | A.  No.  The only discussion about this e-mail |
| 02:31:14 15 | was the idea of something like an IQ test or |
| 02:31:17 16 | something cool that would drive traffic. |
| 02:31:20 17 | And that was the only discussion.  In fact, |
| 02:31:22 18 | I wholeheartedly forgot this whole URL.  And |
| 02:31:27 19 | it was in fact Tickle.  The only instance |
| 02:31:30 20 | where I remember Tickle was the form that |
| 02:31:32 21 | it's in now that I saw in March. |
| 02:31:35 22 | Q.  And do you have any idea how Tickle.com is |
| 02:31:41 23 | different from what the HarvardConnection |
| 02:31:43 24 | was conceived to be? |
| 02:31:44 25 | A.  Again, I don't know anything about |

| | |
|---|---|
| 02:32:43  1 | Divya was the one who would have found Nate. |
| 02:32:47  2 | Q.  And so you don't know for certain whether |
| 02:32:50  3 | anyone -- |
| 02:32:51  4 | A.  I don't know for certain if Divya mentioned |
| 02:32:53  5 | that -- said that to him, no. |
| 02:32:56  6 | MR. CHATTERJEE: Okay.  Let's mark |
| 02:32:58  7 | this as Exhibit No. 13. |
| 02:32:59  8 | (Exhibit No. 13, E-mail string, |
| 02:32:59  9 | Bates Nos. C006955 - 6959, marked for |
| 02:33:00 10 | identification.) |
| 02:33:17 11 | Q.  And actually, before I get to -- |
| 02:33:17 12 | A.  Sure. |
| 02:33:20 13 | Q.  -- Exhibit 13, did Nate Rosenberg ever do |
| 02:33:23 14 | any work for you? |
| 02:33:23 15 | A.  No. |
| 02:33:26 16 | Q.  And do you know why? |
| 02:33:28 17 | A.  I don't think he had the qualifications.  Or |
| 02:33:29 18 | rather he said he didn't have the time, but |
| 02:33:31 19 | I don't think he had the qualifications. |
| 02:33:33 20 | Q.  Prior to February 2004 do you know if anyone |
| 02:33:40 21 | affiliated with ConnectU said in writing |
| 02:33:43 22 | that any of its information was |
| 02:33:46 23 | confidential? |
| 02:33:47 24 | A.  In writing I don't know of any document that |
| 02:33:54 25 | says that. |

50 (Pages 197 to 200)

Page 201

```
02:33:56  1    Q.  Okay.  So is the answer no?
02:33:57  2    A.  The answer is, in writing the answer is no.
02:34:03  3    Q.  So all of the indications that the
02:34:05  4        information was confidential was stated
02:34:09  5        orally?
02:34:10  6    A.  It was either stated orally through the
02:34:13  7        various either collage of e-mail, and as
02:34:16  8        your client has, you know, indicated that,
02:34:20  9        yes, that -- and for whatever inferences
02:34:24 10        that your client had stated --
02:34:26 11    Q.  I'm not worried about my client.  What I'm
02:34:28 12        wondering is, you know, is the only
02:34:31 13        indication that the information was
02:34:33 14        confidential based upon words the people
02:34:37 15        used, "Don't share this with others," things
02:34:40 16        like that?
02:34:40 17    A.  It would have been primarily orally, yes.
02:34:42 18    Q.  Okay.  Were there any other ways that it was
02:34:44 19        expressed?
02:34:44 20    A.  Aside from the group of e-mail, I don't
02:34:47 21        believe so.
02:34:47 22    Q.  If you can take a look at Exhibit 13.
02:34:58 23    A.  Uh-huh.
02:35:07 24        (Witness reviews document.)
02:35:14 25    A.  Where exactly?
```

Page 202

```
02:35:16  1    Q.  Well, let's start with on Page C6956.
02:35:21  2    A.  Okay.
02:35:28  3    Q.  If you look about two-thirds of the way down
02:35:30  4        the e-mail on the second half of the page --
02:35:33  5    A.  Uh-huh.
02:35:33  6    Q.  -- it says, "He also worked on buddyzoo."
02:35:37  7        Do you know, what is "buddyzoo"?
02:35:42  8    A.  Let me just read this for a second.
02:35:45  9        (Witness reviews document.)
02:36:13 10    A.  Yeah.  I mean, again, I just thought I would
02:36:15 11        point out the team working on the site is
02:36:18 12        myself, Tyler, Mark and my friend Divya.  So
02:36:22 13        there's a -- to further clarify, another --
02:36:24 14        no, I'm just --
02:36:24 15    Q.  Just answer --
02:36:24 16    A.  I understand.
02:36:25 17    Q.  -- my question.
02:36:25 18    A.  I understand.  I'm sorry.
02:36:26 19    Q.  I just want to know what "buddyzoo" is.
02:36:29 20    A.  Okay.  Buddyzoo is -- Mark mentioned that
02:36:33 21        site, and I believe -- he says he had a part
02:36:39 22        in it.  I don't see any mention on the site
02:36:42 23        of him being a part of it, so I don't know
02:36:44 24        whether he is a part of it.  But I believe
2:36:47  25        it takes your buddy list, your screen name
```

Page 203

```
02:36:50  1        and compares how many people you are on --
02:36:55  2        how many screen name lists that you're on,
02:36:58  3        if that makes sense.  So --
02:37:00  4    Q.  Explain it further.  I'm not --
02:37:02  5    A.  Okay.  So my understanding is that it would
02:37:04  6        take -- you would upload your buddy list to
02:37:07  7        buddyzoo, the website, I guess it was, and
02:37:10  8        then it would take a look and see how many
02:37:12  9        other buddy lists that your name is on of
02:37:18 10        other people's and then tally up a score of
02:37:22 11        some sort, I think.
02:37:23 12    Q.  And what is a buddy list?
02:37:25 13        MR. HORNICK:  Object to this line.
02:37:28 14        It's outside the scope and is not 30(b)(6)
02:37:30 15        testimony.
02:37:30 16    Q.  And what is a buddy list?
02:37:31 17    A.  Oh, AOL Instant Messenger, you have sort of
02:37:34 18        a list of screen names.
02:37:35 19    Q.  Okay.  So if you can turn to Page C006957.
02:37:44 20    A.  6957, yeah.
02:37:46 21    Q.  If you see at the top of the page there's an
02:37:51 22        e-mail from Christopher Lentz, and in the
02:37:54 23        third paragraph he says, "I'm sure you know
02:37:56 24        about Daily Jolt."
02:37:59 25    A.  Uh-huh.
```

Page 204

```
02:37:59  1    Q.  And it says, "also check out
02:38:01  2        http://basement.dartmouth.edu/."
02:38:06  3        Do you know what those are?
02:38:07  4    A.  The Daily Jolt is basically a message board
02:38:10  5        for schools.  I think it started either at
02:38:13  6        Brown or Amherst.  And I actually continue
02:38:19  7        don't know what the basement in Dartmouth
02:38:21  8        is.  I don't know if I ever actually looked
02:38:23  9        at that site.
02:38:24 10    Q.  And how did the Daily Jolt differ from what
02:38:28 11        HarvardConnection was trying to do?
02:38:29 12    A.  There's nothing in the Daily Jolt that's
02:38:32 13        any -- to my knowledge, is a social network.
02:38:35 14        It's basically a message board.  Students
02:38:37 15        post things, and other students respond and
02:38:39 16        comment.
02:38:41 17    Q.  So if you can look at the next -- it looks
02:38:44 18        like there's another e-mail string.  It
02:38:47 19        says, "On Monday, December 15, 2003, at 3:28
02:38:53 20        p.m., Cameron Winklevoss wrote."
02:38:53 21    A.  Uh-huh.
02:38:54 22    Q.  Do you see that?  Beneath that, did you
02:38:59 23        disclose anything that ConnectU or
02:39:01 24        HarvardConnection says this is confidential
02:39:04 25        information?
```

51 (Pages 201 to 204)

02:39:04 1    MR. HORNICK: And read it
02:39:06 2 carefully, Cameron.
02:39:07 3    THE WITNESS: Yeah.
02:39:07 4    (Witness reviews document.)
02:39:35 5 A. This -- yeah, this may, in fact, be
02:39:56 6 proprietary information, but I will point
02:39:57 7 out that myself and Mr. Lentz were engaged
02:39:59 8 in business activities at this point. And
02:40:05 9 he had a company called Greenwave Wireless,
02:40:07 10 which --
02:40:07 11 Q. I understand. My question's very, very
02:40:09 12 simple. It's -- and I'll restate it --
02:40:09 13    MR. HORNICK: Object.
02:40:12 14 Q. -- in case it was unclear.
02:40:13 15    MR. HORNICK: Well, actually, the
02:40:14 16 witness answered the question.
02:40:15 17    MR. HAWK: No, he didn't. He said
02:40:17 18 this may be or something like that.
02:40:18 19    MR. HORNICK: That was his answer.
02:40:19 20    MR. CHATTERJEE: Well, let's not
02:40:20 21 argue about it. I'm going to ask the
02:40:21 22 witness a question. He's going to answer
02:40:22 23 it, and, you know, if he's non-responsive,
02:40:24 24 we'll go to court on it.
02:40:26 25    MR. HAWK: We don't want something

02:40:27 1 like may be. We want an answer to the
02:40:27 2 question.
02:40:27 3    BY MR. CHATTERJEE:
02:40:29 4 Q. What is --
02:40:29 5    MR. HORNICK: He gave his answer.
02:40:30 6 Q. What is the confidential ConnectU/
02:40:34 7 HarvardConnection information that is
02:40:35 8 disclosed in this e-mail?
02:40:37 9 A. This -- the concept of a portal with
02:40:42 10 controllable sort of content is a
02:40:46 11 proprietary information; however, I believe
02:40:49 12 at this time I had a nondisclosure with Mr.
02:40:51 13 Lentz as well as an oral agreement and
02:40:54 14 understanding that this was completely
02:40:58 15 confidential and proprietary. So that
02:41:00 16 answers your question.
02:41:01 17 Q. So did you have a written agreement with
02:41:02 18 him?
02:41:02 19 A. I would have to check. I'm not sure. But
02:41:04 20 I'm certain that Mr. Lentz -- we had an oral
02:41:08 21 agreement.
02:41:08 22 Q. Have you talked with Mr. Lentz about this
02:41:10 23 litigation at all?
02:41:11 24 A. He's aware that we're in a lawsuit. I have
02:41:17 25 not really talked to him since we spoke in

02:41:22 1 December, and then we didn't really -- about
02:41:23 2 this specific litigation other than, you
02:41:26 3 know, Are you suing them, yes, no, not
02:41:28 4 really, no, I don't believe so.
02:41:31 5 Q. Is there anything in the content of this
02:41:33 6 e-mail that indicates that it's
02:41:35 7 confidential?
02:41:36 8    MR. HORNICK: Which e-mail are you
02:41:37 9 talking about?
02:41:37 10    MR. CHATTERJEE: This string.
02:41:38 11    MR. HORNICK: The whole thing?
02:41:39 12    MR. CHATTERJEE: The entire
02:41:40 13 document.
02:41:40 14    MR. HORNICK: Read through it,
02:41:41 15 Cameron.
02:41:42 16 Q. Take your time.
02:41:43 17 A. Okay.
02:41:43 18    (Witness reviews document.)
02:44:40 19 A. I think, as I said before, the portal
02:44:44 20 concept and the multiple schools is a
02:44:46 21 proprietary piece of information, but as I
02:44:48 22 also said, we were discussing here a
02:44:51 23 potential business synergy and relationship,
02:44:54 24 and we would have been covered and would
02:44:56 25 have -- it would have all been protectable

02:44:59 1 information. This is not someone that I'm
02:45:01 2 just spilling something to.
02:45:03 3    MR. CHATTERJEE: Could you please
02:45:05 4 read my question back.
02:45:09 5    (Record read.)
02:45:19 6 A. Oh, okay. Excuse me. I don't believe
02:45:27 7 there's anything in these e-mails that
02:45:30 8 indicate that it's confidential, no.
02:45:31 9    MR. HORNICK: I should state for
02:45:33 10 the record, though, that I think this e-mail
02:45:35 11 also contains confidential information of
02:45:38 12 Mr. Lentz.
02:45:40 13 Q. And before these e-mails were exchanged, did
02:45:43 14 you have any conversations with Mr. Lentz?
02:45:45 15 A. Yeah. And Mr. Lentz -- before or -- sorry,
02:45:49 16 was the question before?
02:45:50 17 Q. Before this e-mail exchange occurred.
02:45:53 18 A. We may have talked on the phone. I would
02:45:56 19 assume that we would have talked on the
02:45:58 20 phone.
02:45:59 21 Q. And so you're not sure? You don't remember?
02:46:01 22 A. I don't know the -- like if it started as an
02:46:04 23 e-mail -- I mean, if it started as an e-mail
02:46:08 24 dialogue, then we would be reading that. So
02:46:10 25 I'm assuming that -- in fact, no, I remember

52 (Pages 205 to 208)

02:46:12 1    that we spoke in person. Initially he
02:46:17 2    mentioned he had a wireless business. And I
02:46:20 3    said, "Oh, that sounds interesting." And
02:46:21 4    then I think we may have talked and tried to
02:46:24 5    set up some sort of discussion.
02:46:25 6  Q.  And so prior to sending this e-mail, it's
02:46:27 7    your testimony that you had an agreement
02:46:29 8    with him that all the information that
02:46:32 9    you're talking about --
02:46:32 10  A.  Right.
02:46:33 11  Q.  -- was confidential?
02:46:34 12  A.  An oral agreement that is confidential
02:46:37 13    between the co-parties, absolutely, yeah.
02:46:38 14  Q.  So the two of you had that agreement --
02:46:38 15  A.  Uh-huh.
02:46:40 16  Q.  -- before any e-mails were exchanged?
02:46:42 17  A.  Sure, yeah. I mean, as I said, he has a
02:46:43 18    business, a wireless business. He sent over
02:46:46 19    a lot of information, a lot of material. He
02:46:47 20    had a partner, and it was -- you know, he
02:46:52 21    had a lot of protectable information on the
02:46:53 22    table, too.
02:47:00 23  Q.  So after your relationship ended with Mark
02:47:02 24    Zuckerberg, who did you get involved with
02:47:04 25    next on the programming side?

Page 210

02:47:07 1  A.  We -- the next company we approached was a
02:47:14 2    company called Animal 57. And that didn't
02:47:17 3    work out so well, because they were not
02:47:19 4    qualified for the job.
02:47:21 5  Q.  Did you ever sign a nondisclosure agreement
02:47:23 6    with them?
02:47:23 7  A.  I believe -- I'm not sure. I don't recall
02:47:30 8    if we signed -- I don't think we -- we
02:47:32 9    signed a contract with them, and they
02:47:34 10    agreed -- and perhaps in the contract there
02:47:37 11    was confidential -- a confidentiality at
02:47:41 12    that point. But, again, this is post
02:47:43 13    February 4th. So the ideas that I, you
02:47:48 14    know, have stated that were proprietary and
02:47:51 15    private in terms of knowledge had been made
02:47:54 16    public at that point.
02:47:55 17  Q.  So is it your testimony, then, that
02:47:59 18    everything about HarvardConnection was then
02:48:01 19    out in the public?
02:48:03 20  A.  Post-Facebook launch, yes.
02:48:07 21  Q.  When did Facebook launch?
02:48:09 22  A.  February 4th.
02:48:09 23  Q.  February 4th, okay.
02:48:12 24    MR. CHATTERJEE: So let me mark
02:48:13 25    this as Exhibit No. 14.

Page 211

02:48:13 1    (Exhibit No. 14, E-mail with
02:48:13 2    attachment, Bates Nos. C003587 - 3603,
02:48:55 3    marked for identification.)
02:48:55 4    MR. HORNICK: I'll note for the
02:48:56 5    record that you have a document range in
02:48:58 6    this exhibit of C3587 through 3603.
02:49:04 7  Q.  Yeah, there's something misattached. Let's
02:49:06 8    just take off the section with the green
02:49:08 9    page afterwards. Sorry about that.
02:49:08 10  A.  Okay. So --
02:49:10 11  Q.  Didn't notice that before.
02:49:22 12  A.  (Witness complies.)
02:49:23 13  Q.  Great. Thank you. Do you know what this
02:49:26 14    document is, Mr. Winklevoss?
02:49:27 15  A.  It looks like a site map of some sort.
02:49:28 16  Q.  Is it the site map to the HarvardConnection
02:49:37 17    website?
02:49:37 18  A.  Let me think. This would be a site map.
02:49:38 19    Yeah, it's a little jumbled here. But I
02:49:43 20    think it was basically the HarvardConnection
02:49:44 21    site and what we -- yeah, what we'd like
02:49:48 22    them to build.
02:49:50 23  Q.  Was this the same thing that you wanted Mark
02:49:53 24    Zuckerberg to build, or were there changes
02:49:55 25    made?

Page 212

02:49:55 1  A.  There were some changes to this. I mean,
02:49:57 2    for example, we had the matchmaker thing
02:50:00 3    right here. There were certainly -- you
02:50:06 4    know, we may have updated the site map. You
02:50:09 5    know, the site when Mark Zuckerberg first
02:50:12 6    saw was in November 2003, and from the code
02:50:15 7    that we have currently it stayed at a
02:50:18 8    standstill whereas the ideas were moving at
02:50:21 9    a rapid pace. And so this was the first
02:50:25 10    time, really, since I would say November
02:50:28 11    2003 that we put them down on paper.
02:50:29 12  Q.  So it wasn't put down on paper before --
02:50:32 13  A.  In -- with respect to a site map, I don't
02:50:36 14    believe -- no, I don't believe so.
02:50:42 15  Q.  And now, you've said that the Animal 57
02:50:45 16    didn't work out too well. Could you
02:50:46 17    describe what you mean by that?
02:50:47 18  A.  They took on the project. They basically
02:50:50 19    bit off more than they could chew. They
02:50:52 20    didn't have the expertise. They said that
02:50:55 21    they did. They didn't. And they were
02:50:56 22    really unable to do it, and so we terminated
02:50:59 23    the relationship.
02:51:00 24  Q.  How did you decide that Animal 57 would be a
02:51:05 25    candidate to program this website?

53 (Pages 209 to 212)

Page 213

02:51:07  1    A.  I did some searching for Internet build
02:51:10  2        developers on the website.  I talked to a
02:51:14  3        couple people, you know, asked them -- I
02:51:17  4        asked Randy Barth if they could do a site,
02:51:20  5        what the time frame is, what the cost would
02:51:22  6        be.  It sounded reasonable, and we went --
02:51:24  7        we met with them and then went with them.
02:51:27  8    Q.  And how long were they doing software
02:51:29  9        development for ConnectU?
02:51:30 10    A.  I think the -- I think it was a three-week,
02:51:33 11        three or four-week window when we met with
02:51:36 12        them, and then when they -- from that point
02:51:39 13        they said they could deliver the website.
02:51:40 14    Q.  So they gave roughly a month before they
02:51:43 15        could deliver the website?
02:51:44 16    A.  Yeah, they -- would say they gave us a
02:51:47 17        month, but after a month's time period,
02:51:50 18        nothing had been done.  You know, very
02:51:52 19        little had been done, and so their time
02:51:56 20        estimate was substantially smaller than what
02:51:59 21        it should have been.
02:52:00 22    Q.  And after -- so what happened with Animal
02:52:04 23        57?
02:52:04 24    A.  Well, I think we gave them extension maybe
02:52:07 25        of a couple weeks.  But it didn't look like,

Page 214

02:52:10  1        you know, -- it didn't look like they were
02:52:13  2        going to be able to finish it.  And they
02:52:17  3        were underqualified.  So after that we
02:52:19  4        approached iMarc and had them develop the
02:52:22  5        site.
02:52:23  6    Q.  And when did you bring iMarc on board?
02:52:26  7    A.  I believe it was like in March, maybe
02:52:33  8        March -- middle of March, something like
02:52:39  9        that, I think.
02:52:40 10    Q.  And what did iMarc do?
02:52:42 11    A.  IMarc started -- they basically programmed
02:52:46 12        the site from scratch over, because the php
02:52:49 13        at that point, the work from
02:52:52 14        HarvardConnection was -- many people had
02:52:54 15        worked with it.  And it was easier to
02:52:56 16        basically start again, clean slate.
02:52:59 17    Q.  Now, did you enter into any kind of
02:53:02 18        nondisclosure agreement with iMarc?
02:53:04 19    A.  Yeah, we had an NDA with them, yeah.
02:53:08 20    Q.  And was there any new confidential
02:53:11 21        information developed?
02:53:11 22    A.  Any confidential information developed.  I
02:53:19 23        can't recall right now.  I don't believe so.
02:53:24 24        Between Animal 57 and iMarc or --
02:53:28 25    Q.  No, after signing the agreement with iMarc.

Page 215

02:53:30  1    A.  Oh, well, you know, there were -- sure,
02:53:40  2        sure, we would have developed ideas and
02:53:41  3        stuff that would have been confidential,
02:53:44  4        sure.
02:53:44  5    Q.  And how long did it take for iMarc to
02:53:48  6        complete the website?
02:53:49  7    A.  I believe they did it in two months, working
02:53:51  8        very, very hard and very fast.
02:53:55  9    Q.  And how many people were staffed on the
02:53:58 10        ConnectU project?
02:53:58 11    A.  I think there was one lead project manager,
02:54:00 12        one lead programmer and there may have
02:54:05 13        been -- there might have been -- there was a
02:54:07 14        graphics person who did graphics.  So there
02:54:10 15        was two, three people, one person sort of
02:54:12 16        making sure all the ducks were in a row, one
02:54:15 17        person programming, lead programmer, one
02:54:18 18        graphics individual, and there may have been
02:54:19 19        another programmer time to time.
02:54:24 20    Q.  And when did ConnectU launch?
02:54:28 21    A.  I believe -- I'm going to say May 25th,
02:54:32 22        2004, but I don't know that date for sure.
02:54:34 23        I know it was at the end of May.
02:54:36 24    Q.  Since the nondisclosure agreement with iMarc
02:54:41 25        what is the confidential information that

Page 216

02:54:43  1        was created?
02:54:43  2        MR. HORNICK:  Objection.  And this
02:54:44  3        is outside the scope.  And I'm going to ask
02:54:47  4        you, this is really not relevant to the
02:54:52  5        case.  And what I -- rather than getting
02:54:54  6        into a fight over it, what I would suggest
02:54:55  7        that you do is you put that into a separate
02:54:58  8        30(b)(6) notice and let's fight over it
02:55:00  9        before you have a witness on it, because I
02:55:02 10        don't really think you're entitled to our
02:55:05 11        current confidential information.
02:55:06 12        MR. CHATTERJEE:  The notice says
02:55:08 13        the concept, design and development of the
02:55:10 14        ConnectU website.
02:55:10 15        MR. HORNICK:  Yeah, it doesn't say
02:55:11 16        what the trade secrets are.  You've got a
02:55:13 17        separate one up there for the confidential
02:55:15 18        information that was shared with Zuckerberg.
02:55:18 19        That's No. 2.  Why are you entitled to our
02:55:21 20        current confidential information?  What does
02:55:23 21        that have to do with any of the claims or
02:55:25 22        defenses or counterclaims?
02:55:26 23        MR. CHATTERJEE:  It has to go with
02:55:28 24        the efforts to mitigate any damages.  It is
02:55:31 25        directly relevant if you create any new

54 (Pages 213 to 216)

Page 219

| | |
|---|---|
| 02:55:32 1 | intellectual property, so -- |
| 02:55:32 2 | MR. HORNICK: I'm sorry, you can't |
| 02:55:33 3 | have it today. |
| 02:55:33 4 | MR. CHATTERJEE: -- what he |
| 02:55:33 5 | considered is confidential. |
| 02:55:34 6 | MR. HORNICK: It's outside the |
| 02:55:34 7 | scope. |
| 02:55:35 8 | MR. CHATTERJEE: Mr. Hornick -- |
| 02:55:37 9 | MR. HORNICK: You listen to me. |
| 02:55:38 10 | MR. CHATTERJEE: No, you listen to |
| 02:55:39 11 | me. |
| 02:55:39 12 | MR. HORNICK: You assert -- |
| 02:55:40 13 | MR. CHATTERJEE: You're instructing |
| 02:55:41 14 | him not to answer; is that correct? |
| 02:55:42 15 | MR. HORNICK: Yes, I am. |
| 02:55:43 16 | MR. CHATTERJEE: Okay. Thank you. |
| 02:55:43 17 | There's no need to get involved in a debate |
| 02:55:46 18 | if you're instructing him not to answer. |
| 02:55:48 19 | MR. HORNICK: But I tried to do it |
| 02:55:48 20 | with you in a reasonable way. I suggested |
| 02:55:50 21 | to you that you do a separate 30(b)(6), and |
| 02:55:52 22 | let's fight over it properly. Let's take it |
| 02:55:53 23 | before the Judge if we have to, let you take |
| 02:55:53 24 | a little time and think about whether you |
| 02:55:53 25 | think you really need that and whether |

Page 218

| | |
|---|---|
| 02:55:59 1 | you're really entitled to it before we waste |
| 02:55:59 2 | time during this deposition. I -- |
| 02:56:01 3 | MR. CHATTERJEE: Mr. Hornick -- |
| 02:56:01 4 | MR. HORNICK: If you want to work |
| 02:56:01 5 | this out -- |
| 02:56:01 6 | MR. CHATTERJEE: -- if you want to |
| 02:56:02 7 | meet and confer, we can do that outside of |
| 02:56:03 8 | the deposition. I do not -- |
| 02:56:03 9 | MR. HORNICK: -- when you're trying |
| 02:56:06 10 | to ask the witness questions about it. This |
| 02:56:09 11 | is a very, very sensitive area. |
| 02:56:11 12 | MR. CHATTERJEE: Mr. Hornick, all |
| 02:56:12 13 | you need -- |
| 02:56:12 14 | MR. HORNICK: I don't think the |
| 02:56:13 15 | Judge is going to tell you that you can have |
| 02:56:14 16 | this information. |
| 02:56:15 17 | MR. CHATTERJEE: All you need to do |
| 02:56:15 18 | is instruct the witness not to answer. |
| 02:56:15 19 | MR. HORNICK: I'm trying to work it |
| 02:56:15 20 | out -- |
| 02:56:15 21 | MR. CHATTERJEE: Your objections |
| 02:56:16 22 | have been coaching the witness. This is not |
| 02:56:18 23 | a time to resolve that. We'll meet and |
| 02:56:20 24 | confer later. |
| 02:56:20 25 | MR. HORNICK: Okay. |

Page 220

| | |
|---|---|
| 02:56:22 1 | BY MR. CHATTERJEE: |
| 02:56:22 2 | Q. What development work was done on the |
| 02:56:26 3 | ConnectU website after signing up with |
| 02:56:29 4 | iMarc? |
| 02:56:30 5 | A. Development? |
| 02:56:31 6 | Q. Yes. |
| 02:56:31 7 | A. Well, we -- they basically started from a |
| 02:56:36 8 | clean slate and coded the site from ground |
| 02:56:40 9 | up. And I think you probably have the site |
| 02:56:44 10 | map that we gave them. And that would |
| 02:56:47 11 | pretty much outline the initial phase of |
| 02:56:49 12 | development. |
| 02:56:49 13 | Q. And was it changed in any way? |
| 02:56:50 14 | A. You know, it might have -- sure, it might |
| 02:56:58 15 | have been changed to some extent. As I |
| 02:57:01 16 | said, the HarvardConnection development was |
| 02:57:03 17 | in arrested development from November 2003. |
| 02:57:05 18 | Nothing was implemented in that site or at |
| 02:57:07 19 | least implemented and given to us. So |
| 02:57:09 20 | certainly there is changes in the website. |
| 02:57:12 21 | Q. Okay. Have all the rights associated with |
| 02:57:23 22 | the HarvardConnection partnership been |
| 02:57:26 23 | transferred to ConnectU LLC? |
| 02:57:29 24 | MR. HORNICK: Objection, calls for |
| 02:57:31 25 | a legal conclusion but you can testify to |

Page 220

| | |
|---|---|
| 02:57:32 1 | the extent that you know facts relating to |
| 02:57:35 2 | that question. |
| 02:57:35 3 | A. I know that Victor and Joseph, they |
| 02:57:38 4 | transferred their rights, and I believe we |
| 02:57:40 5 | have a dual ownership of -- or dual license |
| 02:57:44 6 | with Sanjay. |
| 02:57:45 7 | Q. And that's for the copyrights or for all |
| 02:57:49 8 | rights? |
| 02:57:50 9 | MR. HORNICK: Objection. It calls |
| 02:57:51 10 | for a legal conclusion -- |
| 02:57:53 11 | A. I believe -- |
| 02:57:52 12 | MR. HORNICK: -- and legal |
| 02:57:53 13 | testimony. |
| 02:57:54 14 | THE WITNESS: Sorry. Sorry. |
| 02:57:56 15 | A. I believe that entails the copyrights, and I |
| 02:58:00 16 | would assume also all the all rights. I |
| 02:58:02 17 | don't know the answer to the other portion |
| 02:58:04 18 | of that question. |
| 02:58:07 19 | Q. And how is it that ConnectU LLC owns the |
| 02:58:13 20 | trade secrets of the HarvardConnection |
| 02:58:15 21 | partnership? |
| 02:58:16 22 | A. We transferred like myself, Tyler and Divya |
| 02:58:20 23 | transferred the rights of our trade secrets |
| 02:58:24 24 | to ConnectU. |
| 02:58:25 25 | Q. And how did you do that? |

55 (Pages 217 to 220)

02:58:27  1    A.  Interoperating LLC agreement.
02:58:29  2    Q.  And when did you do that?
02:58:30  3    A.  Well, when -- I mean, could you be a little
02:58:37  4         more specific with the question?
02:58:39  5    Q.  Sure.  When -- when were the rights
02:58:41  6         transferred to the LLC?
02:58:43  7               MR. HORNICK:  Objection, it calls
02:58:44  8         for a legal conclusion and legal testimony,
02:58:48  9         but you can answer it if you know.
02:58:49 10    A.  The LLC was drafted fairly recently in the
02:58:55 11         last month or so.  And the LLC was signed on
02:59:00 12         the 5th.  So that would be the -- when the
02:59:05 13         official transfer of the IP would have been.
02:59:10 14    Q.  Were there any discussions prior to, let's
02:59:14 15         say, July 2005 between you, Tyler Winklevoss
02:59:20 16         and Divya Narendra about transferring the
02:59:24 17         rights associated with trade secrets or any
02:59:28 18         of your claims in the complaint to ConnectU
02:59:31 19         LLC?
02:59:32 20               MR. HORNICK:  I have to object and
02:59:33 21         instruct you not to reveal any discussions
02:59:35 22         you may have had with counsel about that
02:59:36 23         topic.
02:59:38 24               THE WITNESS:  Okay.
02:59:39 25    A.  Well, the corporate entity, as I mentioned

02:59:42  1         earlier, was formed about a year prior in
02:59:46  2         July -- excuse me, sorry.  It was I think on
02:59:50  3         May 26th.  So when that corporate entity
02:59:52  4         formed, I'm under the impression that all
02:59:56  5         sort of right IP and whatnot was owned by
03:00:02  6         ConnectU at that point.
03:00:03  7    Q.  Okay.  So my question is much more focused
03:00:05  8         than that again.  Were there any discussions
03:00:08  9         between you, Tyler Winklevoss and Divya
03:00:11 10         Narendra reflecting what your impression
03:00:15 11         was?  And let's not talk about privileged
03:00:18 12         conversations, but just between the three of
03:00:20 13         you.
03:00:20 14    A.  In terms of transfer of the company?
03:00:23 15    Q.  Yes.
03:00:24 16    A.  No.  Other than the fact that we all, you
03:00:27 17         know, felt and believed that that was owned
03:00:35 18         by the company, that the IP and trademarks
03:00:38 19         and protectable stuff was owned by the
03:00:39 20         company.
03:00:39 21    Q.  But there was no discussion about the
03:00:41 22         transfer of rights?
03:00:42 23    A.  Not at that -- I don't believe so in that
03:00:45 24         period of time.
03:00:46 25    Q.  Was there any -- in this document that you

03:00:49  1         talked about, was there -- the one about the
03:00:52  2         LLC agreement, were there any negotiations
03:00:54  3         about that agreement between the various
03:00:56  4         principals?
03:00:56  5    A.  No, there really wasn't.  We basically
03:01:03  6         drafted it, and that was -- there was no
03:01:06  7         real negotiation there.
03:01:07  8    Q.  Was there an early draft of the agreement
03:01:09  9         where the transfer of rights was not
03:01:12 10         included?
03:01:12 11    A.  I think the first draft of the agreement did
03:01:16 12         not have the transfer of rights.  That was
03:01:19 13         written up by a non-IP lawyer.  And he
03:01:23 14         basically produced I guess you would say a
03:01:26 15         boilerplate LLC.
03:01:28 16    Q.  And who was that lawyer?
03:01:30 17    A.  Stuart Ratner.
03:01:32 18    Q.  And where is Mr. Ratner located?
03:01:34 19    A.  He's in Stamford, Connecticut.
03:01:37 20    Q.  Stamford?
03:01:38 21    A.  S-T-A-M-F-O-R-D.
03:01:41 22    Q.  Us West Coasters always get that mixed up
03:01:44 23         with another name.
03:01:46 24               And later on there was another
03:01:50 25         amendment that added --

03:01:51  1    A.  Yes.  He's not an IP lawyer, so it really
03:01:56  2         wouldn't be his forte or -- I'm not sure he
03:01:59  3         would feel comfortable putting that into the
03:02:01  4         document, so he was sort of in charge of the
03:02:03  5         first draft, and then it was later added.
03:02:04  6    Q.  Now, was the goal of that provision to
03:02:19  7         transfer all rights or just the intellectual
03:02:21  8         property rights?
03:02:22  9               MR. HORNICK:  Well, I'll object to
03:02:23 10         the extent that calls for legal expertise,
03:02:25 11         but you can answer if you know.
03:02:26 12               MR. CHATTERJEE:  I'm asking for
03:02:27 13         what his intention was.
03:02:28 14    A.  I believe all rights to ownership of the
03:02:30 15         code and IP stuff as well.
03:02:34 16    Q.  What about the fraud claim?
03:02:35 17    A.  What do you mean by that?
03:02:37 18    Q.  Well, in your complaint you've asserted a
03:02:40 19         complaint for fraud.
03:02:41 20    A.  Uh-huh.
03:02:41 21    Q.  Would that be the type of thing that was
03:02:46 22         covered by the transfer, or was it your
03:02:47 23         intention for that to be transferred?
03:02:49 24    A.  What do you mean by transferring fraud?  I'm
03:02:51 25         not sure I understand.  I'm sorry, but...

56 (Pages 221 to 224)

03:02:54  1    Q.  So you understand that ConnectU LLC has
03:02:58  2        accused Mr. Zuckerberg --
03:02:59  3    A.  Uh-huh.
03:02:59  4    Q.  -- of fraud?
03:03:00  5    A.  Uh-huh.
03:03:01  6    Q.  Yes?
03:03:02  7    A.  Yes. Yes.
03:03:03  8    Q.  Okay. So in this transfer of rights in the
03:03:11  9        LLC agreement, was it your intention to
03:03:13 10        transfer the claim for fraud from yourself
03:03:16 11        personally to the ConnectU LLC?
03:03:18 12    A.  The claim that we made towards him or that
03:03:21 13        we made towards him --
03:03:23 14    Q.  Yes.
03:03:26 15    A.  Okay. Well, I believe we sued him under
03:03:29 16        ConnectU, the corporate entity ConnectU, so
03:03:31 17        I'm not sure if we would individually
03:03:32 18        have -- my understanding would be that the
03:03:37 19        company had that claim against Mr.
03:03:38 20        Zuckerberg and Thefacebook.
03:03:40 21    Q.  Would you agree with me that ConnectU as a
03:03:43 22        business entity didn't exist when Mr.
03:03:45 23        Zuckerberg was in a partnership with you?
03:03:46 24    A.  At that time it did not as a business
03:03:53 25        entity. However, when he was sued, it was a

Page 226

03:03:56  1        business entity.
03:03:56  2    Q.  All right. So it didn't exist at the time
03:03:58  3        Mr. Zuckerberg was working with you?
03:03:59  4    A.  With that claim that you specifically refer
03:04:01  5        to was levied by the corporate --
03:04:04  6        corporation in ConnectU against Mr.
03:04:06  7        Zuckerberg, so I guess my question is, why
03:04:09  8        are you asking if individually I would want
03:04:12  9        to transfer such a claim if that claim was
03:04:14 10        made on behalf of a corporation that was a
03:04:15 11        corporation at the time of the file of the
03:04:17 12        lawsuit.
03:04:18 13    Q.  Okay. Thank you for your answer.
03:04:20 14    A.  Okay.
03:04:20 15    Q.  Could you describe for me what you
03:04:27 16        understand the role of Dustin Moskovitz to
03:04:32 17        be with respect to this lawsuit?
03:04:35 18        MR. HORNICK: I'll just object to
03:04:36 19        the witness can answer this question to the
03:04:38 20        extent that it wouldn't require him to see
03:04:40 21        any of the defendants' confidential
03:04:41 22        information, which he hasn't seen.
03:04:47 23    A.  With respect to his involvement with the
03:04:49 24        lawsuit, it's our assumption and belief that
03:04:51 25        Mr. Moskovitz and all parties, for that

Page 228

03:04:54  1        matter, are involved to the extent that they
03:04:58  2        were not in -- they were not a corporate
03:05:01  3        entity at this time we alleged the abuses
03:05:03  4        and that they took part in the development
03:05:07  5        and/or promulgation of the website
03:05:11  6        post-launch knowing full well our issues
03:05:15  7        with the website.
03:05:17  8    Q.  Okay. Why don't you pull out the complaint.
03:05:22  9        I think it's marked as Exhibit No. 2. And
03:05:39 10        go to Paragraph 21.
03:06:02 11        (Witness reviews document.)
03:06:03 12    A.  Uh-huh.
03:06:03 13    Q.  So in this paragraph it states, "Defendant
03:06:08 14        Zuckerberg shared Plaintiff's confidential
03:06:11 15        business information and the
03:06:13 16        HarvardConnection Code with Defendants
03:06:14 17        Saverin, Moskovitz, McCollum, and Hughes,
03:06:18 18        who knowingly used, and continue to use,
03:06:20 19        Plaintiff's confidential business plans and
03:06:22 20        the HarvardConnection Code to develop,
03:06:24 21        launch, and/or maintain TheFaceBook.com
03:06:26 22        website."
03:06:27 23        Do you see that?
03:06:29 24    A.  Uh-huh.
03:06:29 25    Q.  Now, do you have any knowledge of Mr.

03:06:36  1        Moskovitz getting your confidential business
03:06:39  2        information or the HarvardConnection code?
03:06:42  3        MR. HORNICK: I'll object to that
03:06:44  4        question to the extent that it implies that
03:06:46  5        the witness should have access to any of
03:06:47  6        your confidential information, so I'm not
03:06:49  7        sure he's capable of answering that
03:06:51  8        question. You can try.
03:06:53  9    A.  Well, we know from various articles that Mr.
03:07:00 10        Moskovitz was involved in the -- you know,
03:07:03 11        in helping Thefacebook post-launch and to
03:07:08 12        that -- with that respect that we know -- we
03:07:11 13        believe that Mr. Zuckerberg used our
03:07:12 14        business information and confidential
03:07:17 15        practices to aid his website. So that's --
03:07:20 16    Q.  Okay. So other than working with
03:07:21 17        Thefacebook website, you don't have any
03:07:23 18        other facts that you know of?
03:07:25 19    A.  His association with the company and working
03:07:30 20        with it in the group, that is our fact --
03:07:32 21        that's our belief.
03:07:37 22    Q.  And I'll ask you the same question as to Mr.
03:07:40 23        McCollum.
03:07:46 24        MR. HORNICK: Is there a question
03:07:46 25        pending?

Page 229

| | |
|---|---|
| 03:07:48 1 | MR. CHATTERJEE: I was asking the |
| 03:07:48 2 | same question as to Mr. McCollum, what |
| 03:07:48 3 | facts -- |
| 03:07:48 4 | MR. HORNICK: Well, I think the |
| 03:07:52 5 | witness -- all right. |
| 03:07:52 6 | MR. CHATTERJEE: And, Mr. Hornick, |
| 03:07:54 7 | please stop coaching the witness. |
| 03:07:56 8 | MR. HORNICK: I haven't coached the |
| 03:07:58 9 | witness all day. |
| 03:08:00 10 | BY MR. CHATTERJEE: |
| 03:08:00 11 | Q. What confidential business information for |
| 03:08:03 12 | HarvardConnection code was shared with Mr. |
| 03:08:06 13 | McCollum by Mr. Zuckerberg? |
| 03:08:10 14 | A. Again, I believe that his involvement with |
| 03:08:11 15 | the company and there's various articles |
| 03:08:13 16 | that describe a situation in which these |
| 03:08:15 17 | individuals developed the website and |
| 03:08:19 18 | continued to work on it in their dorm room |
| 03:08:21 19 | environment indicating, you know, that he |
| 03:08:26 20 | was aware and had access to and made use of |
| 03:08:30 21 | our proprietary information. |
| 03:08:31 22 | Q. Okay. What evidence did you have that Mr. |
| 03:08:37 23 | Hughes was shared -- or had confidential |
| 03:08:42 24 | business information of ConnectU and the |
| 03:08:43 25 | HarvardConnection code shared with him by |

Page 230

| | |
|---|---|
| 03:08:45 1 | Mr. Zuckerberg? |
| 03:08:46 2 | A. I would say the same answer, same beliefs |
| 03:08:51 3 | that I did for the -- said for the other |
| 03:08:52 4 | two. |
| 03:08:53 5 | Q. And other than what you have said, you have |
| 03:08:55 6 | nothing else to base it on? |
| 03:08:56 7 | A. I think it's -- I think what I said is what |
| 03:09:00 8 | we -- primarily what we base it on. |
| 03:09:03 9 | Q. Okay. Are there any other actions that you |
| 03:09:21 10 | know of taken by Mr. Moskovitz, Mr. McCollum |
| 03:09:25 11 | and Mr. Hughes that you believe support your |
| 03:09:29 12 | claims against Mr. Zuckerberg and the other |
| 03:09:34 13 | defendants? |
| 03:09:34 14 | A. I would be unaware of them at this time, |
| 03:09:40 15 | because I -- again, I can't say sort of a |
| 03:09:43 16 | lot of the protected documents, so what I |
| 03:09:46 17 | can infer and what I know from just sort of |
| 03:09:49 18 | logic, reasoning is that these are all close |
| 03:09:53 19 | acquaintances, they claim to have created |
| 03:09:55 20 | the website and the idea in their dorm room |
| 03:09:59 21 | environment. They all claim to be |
| 03:10:02 22 | instrumental in the development of it. And |
| 03:10:04 23 | that leads me to believe that they made use |
| 03:10:07 24 | of our information. |
| 03:10:08 25 | Q. Is there -- do you know of any reason why |

Page 231

| | |
|---|---|
| 03:10:20 1 | the ConnectU partnership or |
| 03:10:22 2 | HarvardConnection partnership is not listed |
| 03:10:25 3 | as a signatory to the LLC agreement? |
| 03:10:31 4 | A. I'm sorry, can you say that -- |
| 03:10:32 5 | Q. Well, do you know why there's no |
| 03:10:34 6 | representative of the HarvardConnection |
| 03:10:35 7 | partnership or the ConnectU partnership? |
| 03:10:37 8 | Why aren't either of them signed on? |
| 03:10:39 9 | MR. HORNICK: Objection, |
| 03:10:40 10 | mischaracterizes the document which you |
| 03:10:41 11 | haven't even shown to the witness. |
| 03:10:43 12 | Q. Do you know if they signed it, if there's a |
| 03:10:46 13 | representative -- |
| 03:10:47 14 | A. HarvardConnection? |
| 03:10:50 15 | Q. Yes. |
| 03:10:50 16 | A. I know that I'm a member of |
| 03:10:51 17 | HarvardConnection and that I signed the |
| 03:10:53 18 | document. |
| 03:10:53 19 | Q. And is there a separate signature line for |
| 03:10:56 20 | HarvardConnection or for ConnectU, the |
| 03:11:01 21 | unincorporated proprietorship? |
| 03:11:05 22 | A. Well, I mean, as I said before -- |
| 03:11:12 23 | MR. HORNICK: Objection, this |
| 03:11:13 24 | question calls for legal expertise, which |
| 03:11:17 25 | the witness doesn't have. You can try to |

Page 232

| | |
|---|---|
| 03:11:20 1 | answer it. |
| 03:11:27 2 | A. Well, it would be my understanding that we |
| 03:11:30 3 | basically transferred our ownership to the |
| 03:11:33 4 | LLC, and that document effectively -- I |
| 03:11:45 5 | think the transfership would cover any type |
| 03:11:48 6 | of situation that you're probably describing |
| 03:11:51 7 | whereby ConnectU -- whatever entity you're |
| 03:11:55 8 | referring to under ConnectU would sign that. |
| 03:11:57 9 | Q. What was the amount of money that was |
| 03:12:01 10 | expended on the HarvardConnection website |
| 03:12:04 11 | before March -- well, I guess before |
| 03:12:10 12 | February 4th, 2004? |
| 03:12:13 13 | A. I would say that we spent probably no more |
| 03:12:18 14 | than $1,000 because most of the work was not |
| 03:12:24 15 | done sort of an hourly per basis (sic). |
| 03:12:29 16 | Q. And how many hours of people time was spent |
| 03:12:31 17 | in creating the HarvardConnection website |
| 03:12:33 18 | prior to approximately, let's say, February |
| 03:12:37 19 | 4th, 2004? |
| 03:12:39 20 | A. I would say -- |
| 03:12:40 21 | MR. HORNICK: Don't speculate. |
| 03:12:43 22 | A. Prior to February 2004. It would be my |
| 03:12:46 23 | assumption that there would be hundreds of |
| 03:12:48 24 | hours of coding there. It spanned over a |
| 03:12:51 25 | significant portion of time, and there's a |

58 (Pages 229 to 232)

Page 235

03:12:53 1    lot of work that went into that site.
03:12:55 2    Q.  500 hours?
03:12:57 3        MR. HORNICK:  Objection.
03:12:58 4    A.  I can't -- I would be in the hundreds of
03:13:01 5        hours, but I can't really pinpoint it down
03:13:04 6        more than that.  And your client, I don't
03:13:09 7        know how many hours he put in, so...
03:13:39 8        MR. CHATTERJEE:  We can go off the
03:13:40 9    record.  I think I'm going to pass you, but
03:13:41 10   I want a few minutes, so let's take a break
03:13:43 11   for five, ten minutes.
03:13:46 12       THE VIDEOGRAPHER:  The time is
03:13:47 13   3:15 -- correction, the time is 3:13, and we
03:13:52 14   are off the record.
03:13:53 15       (Recess taken.)
03:23:12 16       THE VIDEOGRAPHER:  The time is
03:23:17 17   3:23, and we are back on the record.
03:23:19 18       MR. CHATTERJEE:  So Mr. Hornick, do
03:23:20 19   you want to --
03:23:21 20       MR. HORNICK:  Yeah, before we went
03:23:23 21   back on the record I said that I wanted to
03:23:24 22   withdraw instruction that I gave the witness
03:23:27 23   not to answer a question that you had posed,
03:23:29 24   so I'm withdrawing that objection not to
03:23:31 25   answer the question.

Page 234

03:23:35 1        BY MR. CHATTERJEE:
03:23:35 2    Q.  So -- I'm going to get to that in a minute.
03:23:40 3        That was on the ConnectU trade secrets.  I
03:23:42 4        wanted to ask you a few other questions
03:23:43 5        before I get to there.
03:23:44 6        Other than kind of reading the press
03:23:47 7        about who was involved in Thefacebook and
03:23:48 8        what they stated, did you do any other
03:23:51 9        factual investigation before launching your
03:23:54 10       website about Thefacebook?
03:23:56 11   A.  I don't think that there's -- excuse me,
03:24:04 12       other than what's sort of publicly written,
03:24:08 13       I don't think that there's other information
03:24:10 14       that you could access, other than the reason
03:24:12 15       and belief that we find that it's humanly
03:24:14 16       impossible to make that website in one week
03:24:16 17       and that he had our block of code and
03:24:19 18       business information.
03:24:20 19   Q.  And so I'm going to try and break it down.
03:24:25 20       If I'm missing something I'm going to ask
03:24:28 21       you -- tell me what other facts I'm missing.
03:24:30 22       So the comments to the press and the quotes,
03:24:33 23       the shortness and time.  Other than those
03:24:37 24       two things, is there anything else that you
3:24:40 25        investigated?

Page 236

03:24:40 1    A.  They're roommates.  They're both computer
03:24:45 2        programmers, and that -- Mr. Moskovitz and
03:24:47 3        Mr. Zuckerberg.  And they all listed
03:24:55 4        themselves on the website as founders, as
03:24:58 5        part of the creation of the website upon
03:25:01 6        launch, and, yeah, I think that that's --
03:25:05 7        those are some of the main points as to why
03:25:09 8        we believe that they're involved.
03:25:10 9        MR. HORNICK:  I'll just state for
03:25:11 10       the record that the witness may not be privy
03:25:14 11       to investigations by my counsel.
03:25:16 12   Q.  Did you investigate Thefacebook website
03:25:18 13       itself?
03:25:18 14   A.  I read the about us page, yes.
03:25:21 15   Q.  Anything else?
03:25:22 16   A.  In terms of their like involvement, no.
03:25:27 17   Q.  No, as far as your belief that Mr.
03:25:30 18       Zuckerberg --
03:25:30 19   A.  Oh, oh, oh.
03:25:31 20   Q.  -- or anyone else did anything wrong.
03:25:38 21   A.  Yeah.  I mean, again, I don't -- there's --
03:25:41 22       right now at the sort of the filing of the
03:25:44 23       lawsuit and the belief there, those would be
03:25:47 24       the main reasons why I believe that.  And I
03:25:50 25       can't think of any other reasons right now.

03:25:53 1    Q.  So you looked at the about us Web pages.
03:25:55 2        Did you look at any other portions of
03:25:58 3        Thefacebook website?
03:25:59 4    A.  I think I looked around.  It's -- you know,
03:26:03 5        I looked around and a lot of the conceptual
03:26:06 6        stuff and a lot of the content looked
03:26:08 7        similar.
03:26:09 8    Q.  And did you sign up with a membership?
03:26:13 9    A.  I didn't sign up, no.  I have not signed up.
03:26:15 10   Q.  So how did you get access to the site?
03:26:20 11   A.  One of my roommates is a member.
03:26:24 12   Q.  And who's that?
03:26:24 13   A.  Alex Chastain-Chapman is one of my
03:26:27 14       roommates, and Mark Hall is one of my
03:26:29 15       roommates.
03:26:29 16   Q.  Current roommates or --
03:26:31 17   A.  At the time they were my roommates at senior
03:26:34 18       year, Harvard.
03:26:35 19   Q.  And what does Mr., is it Chassis?
03:26:39 20   A.  Chastain-Chapman.
03:26:40 21   Q.  Oh, Chapman.  What is Mr. Chapman doing now?
03:26:44 22   A.  He worked in New York City -- or rather, he
03:26:48 23       works in Greenwich, Connecticut but lives in
03:26:51 24       New York City.
03:26:51 25   Q.  And where does he work?

59 (Pages 233 to 236)

Page 239

03:26:52 1    A.  I think the company -- it's a public -- I
03:26:55 2        don't know the name -- yeah, I don't know
03:26:56 3        the name off the top of my head.
03:26:58 4    Q.  And what about Mr. Hall?
03:27:01 5    A.  He works at Citigroup, I believe, in New
03:27:05 6        York City.
03:27:05 7    Q.  When Thefacebook launched, did you have any
03:27:08 8        discussions with Tyler Winklevoss, Howard
03:27:12 9        Winklevoss or Divya Narendra about the
03:27:14 10       website?
03:27:14 11   A.  Sure.
03:27:16 12   Q.  And what were those discussions?
03:27:17 13   A.  The similarities and the fact that he worked
03:27:21 14       for us for -- or supposedly worked for us
03:27:24 15       for three or four months.
03:27:39 16   Q.  And Mr. Hall, where is he now?
03:27:41 17   A.  He's in New York City at Citigroup.
03:27:47 18   Q.  After November 2003 when you and Mr.
03:27:59 19       Zuckerberg had your initial discussions, how
03:28:02 20       many meetings did you have?
03:28:03 21   A.  We had three meetings.
03:28:05 22   Q.  And how long were those meetings?
03:28:07 23   A.  I would say roughly an hour, each meeting.
03:28:10 24   Q.  And what did you discuss in those meetings?
03:28:16 25   A.  I think we already went over a lot of that.

Page 238

03:28:22 1        The first meeting was more -- was basically
03:28:24 2        an introduction.  Victor had already
03:28:26 3        prompted him with a lot of the information.
03:28:29 4        The second meeting was more defining of the
03:28:34 5        roles.  And the third meeting was basically
03:28:37 6        a status project report on where things
03:28:41 7        stood.
03:28:41 8    Q.  And so you didn't baby-sit him in the same
03:28:43 9        way you baby-sat Sanjay Mavinkurve?
03:28:50 10   A.  Well, Mark was -- he didn't live in my house
03:28:53 11       so it was much harder to get down.  The way
03:28:55 12       the house system is set up, you -- to go
03:29:02 13       from my quad to where he lived was quite a
03:29:06 14       long journey, it was about a 20-minute walk,
03:29:09 15       whereas when Sanjay was working with us, we
03:29:12 16       were in the same house.  So it was very easy
03:29:14 17       for me to go over to his room and check up.
03:29:16 18       And also, Mark was apparently a little more
03:29:19 19       elusive, harder to get a hold of.
03:29:26 20   Q.  I'll use the term "baby-sit" the way you
03:29:28 21       used that word.  Did you baby-sit Victor
03:29:31 22       Gao?
03:29:31 23   A.  No, again, baby-sit, what I meant to say
03:29:34 24       there was simply basically sitting with the
03:29:39 25       coder with his code and kind of going

Page 239

03:29:41 1        through the process there.  It's more of
03:29:43 2        partly an educational experience, partly
03:29:46 3        just to show, look, I'm putting in the
03:29:48 4        effort, too.  Even though I can't code, I'll
03:29:52 5        at least sit with you while you're sitting
03:29:54 6        here.  Victor, again, you know, he moved to
03:29:57 7        another house.  He moved to Mather House,
03:29:59 8        which is actually even further from
03:30:01 9        Pforzheimer House.
03:30:02 10       So it was sort of logistically
03:30:05 11       speaking, not really feasible to spend a lot
03:30:07 12       of time next to those guys while they coded.
03:30:12 13   Q.  Other than the in person meetings and the
03:30:15 14       e-mail correspondence, did you have other
03:30:18 15       discussions with Mr. Zuckerberg?
03:30:20 16   A.  I don't believe so.  I think maybe we talked
03:30:22 17       on the phone once or twice.  But I don't
03:30:27 18       believe that we had other discussions.
03:30:29 19   Q.  And were those telephone conversations long
03:30:33 20       calls, short calls?
03:30:34 21   A.  They were pretty brief.  I think they were
03:30:36 22       mostly to set up the meetings.
03:30:40 23   Q.  And going back to the ConnectU confidential
03:30:45 24       information, after signing the nondisclosure
03:30:49 25       agreement with iMarc, what trade secrets

Page 240

03:30:53 1        were developed by ConnectU?
03:30:54 2    A.  Well, I know that our code and all code sort
03:30:57 3        of written from that point forward is
03:30:59 4        confidential, and trade and proprietary, but
03:31:02 5        other than that, I'm actually not prepared
03:31:05 6        today really to answer that question.
03:31:06 7    Q.  Okay.  Do you believe that Mark Zuckerberg
03:31:20 8        intentionally stalled you from developing
03:31:22 9        the website?
03:31:25 10       MR. HORNICK:  Object to the form of
03:31:26 11       the question.  You can answer.
03:31:26 12   A.  Yes, I do.
03:31:29 13   Q.  And why do you believe that?
03:31:30 14   A.  Well, let's -- I believe that based on the
03:31:36 15       assumption that for three months we didn't
03:31:40 16       have any work, and he was able to do
03:31:45 17       Thefacebook in a week.
03:31:46 18   Q.  And did you go -- during the time period
03:31:49 19       that you had Mark Zuckerberg involved, who
03:31:53 20       else did you talk to to do this work?
03:31:55 21       MR. HORNICK:  Objection to --
03:31:57 22       assumes facts not in evidence, but you can
03:31:59 23       answer.
03:31:59 24   A.  You mean what other programmers did we talk
03:32:03 25       to or --

60 (Pages 237 to 240)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Page 243

```
03:32:03  1    Q.  Well, did you have any concerns that maybe
03:32:06  2        you should get someone else that can do it
03:32:08  3        faster?
03:32:08  4    A.  Well, you know, most -- if you look through
03:32:10  5        the e-mails, I mean, most of the time Mark
03:32:13  6        said that he was wrapping things up or tying
03:32:15  7        it up, and we were led to believe that
03:32:19  8        things were going along as planned, and
03:32:23  9        there's also breaks involved.  So that sort
03:32:26  10       of chopped up some time.
03:32:27  11   Q.  And but you approached Rob Scott after
03:32:32  12       getting Mark Zuckerberg involved, right?
03:32:34  13   A.  Divya sent out that e-mail.  I was --
03:32:37  14       actually sent that e-mail out.  I think
03:32:40  15       maybe Mark was citing a problem set or two
03:32:43  16       during that sort of pre-break situation and
03:32:46  17       maybe thought that a little extra manpower
03:32:48  18       might help at that time.
03:32:49  19   Q.  And didn't she send an e-mail to Victor Gao
03:32:52  20       in January reflecting the fact that Mark's
03:32:56  21       interest had waned quite a bit in the
03:32:58  22       project?
03:32:58  23   A.  Well, what date is that e-mail?  Can you
03:33:01  24       tell me?
03:33:01  25   Q.  I can hand it to you.
```

Page 242

```
03:33:03  1    A.  Sure.
03:33:03  2            MR. CHATTERJEE:  Exhibit 13 -- what
03:33:04  3        are we on, Exhibit 13?
03:33:06  4            MR. HORNICK:  14.  15.
03:33:31  5            (Exhibit No. 15, E-mail, Bates Nos.
03:33:54  6        C003850 -3851, marked for identification.)
03:33:54  7            (Witness reviews document.)
03:33:54  8    A.  Yeah, I mean, this is a January 25th e-mail.
03:33:57  9        This is Mr. Zuckerberg, we met with him on
03:34:00  10       the 14th, and he mentioned that he was still
03:34:03  11       going to work on HarvardConnection, although
03:34:07  12       it may not have been as high of a priority
03:34:10  13       at that point.  But that's January 14th.
03:34:17  14       And he also said that he would follow up
03:34:18  15       with e-mail correspondence and we hadn't
03:34:20  16       heard back from him at that point.  So
03:34:22  17       clearly my interpretation at that point was
03:34:25  18       that his interest may have been waning quite
03:34:28  19       a bit.  What I now interpret it as is an
03:34:31  20       intentional stall.
03:34:33  21   Q.  Okay.  And you state in this e-mail, the
03:34:35  22       second line, that you want -- "We want you
03:34:38  23       to be an active part of the team as we move
03:34:40  24       towards launch."
03:34:42  25           Now, in stating that to Victor Gao,
```

Page 244 (top right)

```
03:34:44  1        were you trying to express to him that you
03:34:46  2        wanted him to be a partner?
03:34:52  3    A.  Well, this is actually more an e-mail to get
03:34:55  4        Victor revved up to help us out, finish off
03:34:58  5        the last -- what we thought was some last
03:35:04  6        elements involved in the site, "active"
03:35:07  7        meaning just sort of being a coder.  But
03:35:09  8        Victor had already expressed to us multiple
03:35:11  9        times before all he was looking for was
03:35:15  10       monetary compensation.  So we were basically
03:35:17  11       just trying to revive him from the dead.
03:35:19  12   Q.  So when you were saying being an active part
03:35:22  13       of the team, it had a different meaning here
03:35:25  14       than it did in conversations you had with
03:35:26  15       other people?
03:35:27  16   A.  What I'm saying is that Victor's active part
03:35:30  17       in the team would have been a monetary
03:35:34  18       active part and that Mark Zuckerberg's and
03:35:34  19       other people's may have been an equity stake
03:35:36  20       such as Mark Zuckerberg's active part of the
03:35:39  21       team.  Whenever Victor was active, he was a
03:35:42  22       monetary active part of the team.
03:35:44  23   Q.  You mean he was paid money?
03:35:45  24   A.  He was a contracted active part.
03:35:51  25           MR. CHATTERJEE:  Okay.  I'm going
```

Page 244

```
03:35:53  1    to pass the witness to Mr. Hawk.
03:36:05  2        (Pause.)
03:36:05  3            THE VIDEOGRAPHER:  Should I go off
03:36:07  4        the record real quick?
03:36:08  5            MR. HAWK:  Sure, if you want to.
03:36:10  6            THE VIDEOGRAPHER:  I can change the
03:36:13  7        tape, too.  The time is 3:36.  This is the
03:36:18  8        end of Tape No. 4, and we are off the
03:36:23  9        record.
03:36:27  10       (Discussion off the record.)
03:37:02  11           THE VIDEOGRAPHER:  The time is
03:37:05  12       3:37.  This is the beginning of Tape 5, and
03:37:07  13       we are back on the record.
03:37:08  14
03:37:08  15           CROSS EXAMINATION
03:37:08  16
03:37:09  17   BY MR. HAWK:
03:37:10  18   Q.  Good afternoon, Mr. Winklevoss.  My name is
03:37:13  19       Robert Hawk, and I represent Mr. Eduardo
03:37:16  20       Saverin in your company ConnectU's lawsuit
03:37:18  21       against Mr. Saverin.  Before we -- before I
03:37:21  22       start asking questions I did want to
03:37:23  23       emphasize one ground rule for the
03:37:27  24       deposition.  And it is that until I specify
03:37:30  25       otherwise, I'm going to be asking you
```

61 (Pages 241 to 244)

Page 245

03:37:32 1 questions about facts. Now, there may be
03:37:35 2 some exceptions to that, but I'll tell you
03:37:38 3 if I want your belief or something other
03:37:40 4 than facts I'll tell you that in the
03:37:41 5 question, okay?
03:37:42 6     So I want you to understand that I
03:37:45 7 will be asking you about facts, and I don't
03:37:47 8 want you to speculate. I don't want you to
03:37:50 9 guess. I don't want you to give me your
03:37:53 10 belief unless I ask for it. I want to --
03:38:00 11 I'm going to ask you about facts, and if you
03:38:02 12 don't know the answer to my question, I want
03:38:04 13 you to tell me that you don't know the
03:38:06 14 answer to my question. Is that an agreeable
03:38:07 15 way to proceed?
03:38:09 16 A. Uh-huh. Yes.
03:38:09 17 Q. Yes, okay.
03:38:10 18     All right. If you would take a look,
03:38:12 19 please, sir, at Exhibit 1 that's already
03:38:14 20 been marked as the amended notice of
03:38:16 21 deposition. And would you look in there at
03:38:25 22 Topic No. 3 in the amended notice of
03:38:29 23 deposition, do you have the topics before
03:38:39 24 you and you see --
03:38:42 25 A. Yeah, No. 3.

Page 246

03:38:43 1 Q. No. 3. And you understand these are the
03:38:45 2 topics that the defendants have asked that a
03:38:49 3 ConnectU person be designated to testify
03:38:52 4 about these topics. Do you understand that?
03:38:53 5 A. Yes.
03:38:54 6 Q. Okay. And Topic No. 3 is the "Alleged use
03:38:59 7 by Mark Zuckerberg or any other Defendant of
03:39:02 8 the source code for the HarvardConnection
03:39:04 9 website."
03:39:05 10     Do you see that?
03:39:06 11 A. Yes.
03:39:07 12 Q. Now, are you the most knowledgeable person
03:39:10 13 that is a part of ConnectU about the alleged
03:39:13 14 use by Mark Zuckerberg or any other
03:39:16 15 defendant of the source code for the
03:39:18 16 HarvardConnection website?
03:39:19 17 A. Yes, I would be for ConnectU based on, you
03:39:25 18 know, what evidence is available, yes.
03:39:27 19 Q. Okay. So there's nobody more knowledgeable
03:39:30 20 than you, that you're aware of, at ConnectU
03:39:34 21 about the alleged use by Mark Zuckerberg or
03:39:36 22 any other defendant of the source code for
03:39:38 23 the HarvardConnection website, correct?
03:39:42 24 A. That would be correct, yes.
03:39:44 25 Q. Okay. Now, fine. Look if you would,

Page 247

03:39:47 1 please, at deposition Topic No. 4, and
03:39:50 2 that's where we have asked that ConnectU
03:39:51 3 produce someone to testify about the
03:39:53 4 "Alleged use by Mark Zuckerberg or any other
03:39:56 5 Defendant of Plaintiff's alleged
03:39:59 6 confidential business information."
03:40:01 7 A. Uh-huh.
03:40:01 8 Q. Do you see that?
03:40:02 9 A. Yes.
03:40:02 10 Q. Now, are you the most knowledgeable person
03:40:04 11 at ConnectU regarding the alleged use by
03:40:07 12 Mark Zuckerberg or any other defendant of
03:40:10 13 plaintiff's alleged confidential business
03:40:11 14 information?
03:40:12 15 A. With -- yes, with respect to the fact that
03:40:18 16 I'm the most knowledgeable person with
03:40:20 17 regards to what is confidential business
03:40:21 18 information of ConnectU, yes.
03:40:24 19 Q. Well, that wasn't exactly my question. I'm
03:40:26 20 asking about this topic right here that's
03:40:28 21 spelled out in this notice of deposition.
03:40:30 22     Are you the most knowledgeable person --
03:40:33 23 A. Yes.
03:40:33 24 Q. -- at ConnectU -- let me finish the
03:40:35 25 question.

Page 248

03:40:35 1     Are you the most knowledgeable person
03:40:37 2 at ConnectU regarding the alleged use by
03:40:39 3 Mark Zuckerberg or any other defendant of
03:40:41 4 plaintiff's alleged confidential business
03:40:44 5 information?
03:40:44 6 A. Yes.
03:40:44 7 Q. Thank you.
03:40:47 8     Now, would you look at Topic No. 6.
03:40:50 9 Topic No. 6 is "The alleged role of Eduardo
03:40:56 10 Saverin, Dustin Moskovitz, Andrew McCollum,
03:40:59 11 and Christopher Hughes in the acts alleged
03:41:02 12 in the Amended Complaint."
03:41:05 13     Are you the most knowledgeable person
03:41:07 14 at ConnectU regarding that topic?
03:41:08 15 A. Yes.
03:41:09 16     MR. HORNICK: Just for the record,
03:41:11 17 this witness isn't capable of testifying on
03:41:13 18 those topics to the extent it would require
03:41:17 19 him to have any access to the defendants'
03:41:19 20 confidential information.
03:41:21 21     MR. HAWK: You know what? I don't
03:41:24 22 know why you're saying that. I'm asking
03:41:25 23 questions to establish what is known by the
03:41:27 24 plaintiff in this case, who has brought this
03:41:29 25 lawsuit. And I don't even see what

62 (Pages 245 to 248)

Page 251

```
03:41:32  1    relevance your statement has, but I don't
03:41:34  2    want to argue with you about it. I don't
03:41:35  3    know if it's a coaching statement. I don't
03:41:36  4    know what the point of it is, but I'm going
03:41:38  5    to go forward.
03:41:39  6        MR. HORNICK: Okay. Good.
03:41:41  7        MR. HAWK: All right. Fair enough.
03:41:42  8    BY MR. HAWK:
03:41:43  9    Q.  What was Eduardo Saverin's role with
03:41:48 10    Thefacebook in January 2004?
03:41:56 11    A.  Well, to the extent of my knowledge he was
03:41:58 12    involved with Thefacebook prior to the
03:42:01 13    coding and was involved in the development.
03:42:04 14    What specifically, I haven't looked at the
03:42:07 15    documents, but that's what I know.
03:42:11 16    Q.  You say he was involved in the development
03:42:12 17    and in the coding of Thefacebook in
03:42:15 18    January --
03:42:16 19    A.  Not the coding. Not the coding.
03:42:17 20    Q.  -- 2004. No, let me finish my question.
03:42:20 21    A.  I didn't say that.
03:42:21 22    Q.  Okay. Well, then let me finish the
03:42:22 23    question, and then you can say, "No, I
03:42:24 24    didn't say that."
03:42:24 25        MR. HORNICK: Why don't you let him
```

Page 250

```
3:42:25  1    finish his answer.
03:42:26  2        MR. HAWK: No, I want him to let me
03:42:27  3    finish my question. I'm going to let him
03:42:28  4    finish his answer, all right? But --
03:42:30  5        MR. HORNICK: All right. Let him
03:42:32  6    finish his answer.
03:42:32  7        MR. HAWK: Yeah, but he's got to
03:42:32  8    let me finish my question.
03:42:33  9        MR. HORNICK: Well, he was
03:42:34 10    answering your question from before, and you
03:42:36 11    interrupted him.
03:42:36 12        MR. HAWK: All right. You don't
03:42:37 13    interrupt me, okay?
03:42:40 14    BY MR. HAWK:
03:42:40 15    Q.  Now, let me put a question --
03:42:42 16    A.  Sure.
03:42:42 17    Q.  -- on the table. Is it your testimony that
03:42:46 18    Eduardo Saverin was involved in the coding
03:42:47 19    of Thefacebook at any time? Is that your
03:42:50 20    testimony, sir?
03:42:50 21    A.  That is not my testimony.
03:42:52 22    Q.  Okay. Do you know what Eduardo Saverin's
03:42:56 23    role was in Thefacebook in January 2004?
03:42:58 24    A.  I know that he was involved with the
3:43:03  25    development of the site from a business
```

Page 251

```
03:43:04  1    aspect and prior to the coding of the
03:43:09  2    website from a conceptual aspect or at least
03:43:14  3    prior to coding he was involved with the
03:43:15  4    development of the project, and I know
03:43:22  5    that -- I cannot say if he was involved with
03:43:24  6    the code. I don't think he is a programmer.
03:43:26  7    I can't say that he didn't see the code or
03:43:28  8    didn't see our ideas.
03:43:32  9    Q.  Okay. So is it correct, sir, that you don't
03:43:34 10    know whether or not Mr. Saverin had any
03:43:36 11    involvement at all with the coding of
03:43:39 12    Thefacebook, correct?
03:43:40 13        MR. HORNICK: Objection,
03:43:40 14    mischaracterizes his testimony. You can
03:43:42 15    answer.
03:43:43 16    A.  I do not know if he had any involvement with
03:43:45 17    the coding of Thefacebook.
03:43:46 18    Q.  All right. And you say, though, that he was
03:43:48 19    involved in the business aspect of
03:43:50 20    Thefacebook; is that right?
03:43:51 21    A.  (No verbal response.)
03:43:53 22    Q.  Yes.
03:43:53 23    A.  Yes.
03:43:54 24    Q.  All right. What's your basis for that
03:43:55 25    statement?
```

Page 252

```
03:43:56  1    A.  The basis is that -- well, he touts himself
03:44:02  2    as the business mind behind Thefacebook. He
03:44:05  3    touts himself as the CFO of Thefacebook.
03:44:09  4    And he's also called himself a co-founder
03:44:12  5    and co-creator, in fact, in some cases
03:44:15  6    creator of Thefacebook.
03:44:17  7    Q.  And when did he say those things?
03:44:19  8    A.  Various news articles, various -- yeah,
03:44:23  9    various news articles.
03:44:28 10    Q.  Okay. And you say he's claimed in various
03:44:30 11    news articles to be the CFO?
03:44:32 12    A.  Uh-huh.
03:44:32 13    Q.  And what else does he claim to be, a
03:44:34 14    founder?
03:44:35 15    A.  Co-founder, creator, or co-creator.
03:44:39 16    Q.  Okay. All right. Other than Mr. Saverin's
03:44:46 17    statements that you've read in publicly
03:44:51 18    available source, do you have any other
03:44:52 19    sources for your knowledge of what Mr.
03:44:54 20    Saverin did or didn't do with regard to
03:44:56 21    Thefacebook?
03:44:57 22    A.  Well, I know that he had told many people on
03:45:05 23    campus that he was involved with it. He had
03:45:07 24    sent out many e-mails to people telling them
03:45:11 25    to sign up for Thefacebook, I mean, outside
```

63 (Pages 249 to 252)

Page 253

03:45:13 1     of print, but those would clearly be the
03:45:17 2     most obvious examples of his involvement.
03:45:19 3     Q.   Well, have you seen these e-mails that you
03:45:22 4     say Mr. Saverin sent out?
03:45:24 5     A.   He sent -- I'm certain that he sent e-mails
03:45:28 6     to his social club --
03:45:30 7     Q.   That wasn't the question. Have you seen the
03:45:32 8     e-mails that you've testified about that Mr.
03:45:34 9     Saverin supposedly set out?
03:45:36 10    A.   No, I have not.
03:45:37 11    Q.   Okay. And so you know about these e-mails
03:45:40 12    from people telling you about them; is that
03:45:42 13    right?
03:45:42 14    A.   That's correct.
03:45:43 15    Q.   All right. Now, when did Mr. Saverin become
03:45:45 16    involved with Thefacebook?
03:45:47 17    A.   As I said before, he became involved with
03:45:49 18    Thefacebook prior to the coding of the site.
03:45:52 19    Now, if you go by Mr. Zuckerberg's time
03:45:56 20    line, that would be one week from launch.
03:46:00 21    We have reason to believe that that's
03:46:01 22    humanly impossible and that, in fact, we
03:46:06 23    have -- there are news articles specifically
03:46:09 24    that say that the concept was derived in the
03:46:15 25    end of September -- excuse me, December by

Page 254

03:46:19 1     Mr. Zuckerberg. And given the fact that Mr.
03:46:22 2     Zuckerberg approached Mr. Saverin prior to
03:46:25 3     coding, we would assume that it would be
03:46:27 4     well into, you know -- well, before February
03:46:30 5     4th that he was involved.
03:46:32 6     Q.   Why -- what's the basis for your testimony
03:46:36 7     that Mr. Saverin was involved with
03:46:38 8     Thefacebook prior to coding?
03:46:40 9            MR. HORNICK:   Objection, asked and
03:46:41 10    answered. You can say it again.
03:46:42 11    A.   Mr. Saverin says in the FM article dated
03:46:46 12    February 9th, 2005 that Mark Zuckerberg was
03:46:49 13    a close friend of him and approached him
03:46:53 14    prior to coding of Thefacebook. That is my
03:46:56 15    reason for belief.
03:46:58 16    Q.   All right. And what specifically did Mr.
03:47:01 17    Saverin do? As you said, he was involved in
03:47:06 18    the business aspect or the conceptual
03:47:08 19    aspect. What specifically did Mr. Saverin
03:47:10 20    do for Thefacebook?
03:47:10 21    A.   I cannot say specifically what he did. I
03:47:14 22    know that, as I said before, I know he was
03:47:16 23    involved in the business aspects, whatever a
03:47:18 24    CFO does.
03:47:22 25    Q.   Well, when did Mr. Saverin become the CFO?

Page 255

03:47:24 1     You don't know that, do you?
03:47:26 2     A.   He -- he was launched as the business CFO of
03:47:29 3     the website. He says it in very -- early
03:47:32 4     paper articles that he is the business CFO,
03:47:36 5     and he's also touted as the co-creator and
03:47:39 6     co-founder. I don't know exactly what his
03:47:41 7     role was. I didn't talk to him, you know, I
03:47:44 8     didn't ask him what his role was, but we can
03:47:46 9     assume he was --
03:47:48 10    Q.   Well, I don't want to assume anything.
03:47:49 11    A.   Well, we can assume that he was a
03:47:50 12    co-creator, if you will, or a co-founder,
03:47:52 13    whatever that is -- whatever you want to
03:47:53 14    interpret from that.
03:47:54 15    Q.   All right. I guess my question for you,
03:47:56 16    sir, is, what specifically did Mr. Saverin
03:47:58 17    do for Thefacebook in January 2004?
03:48:01 18    A.   All I know is that he was a co-founder of
03:48:06 19    Thefacebook.
03:48:07 20    Q.   Okay. So as far as specific work, specific
03:48:11 21    tasks, you don't know what Mr. Saverin did
03:48:14 22    or didn't do for Thefacebook in January
03:48:17 23    2004; is that fair?
03:48:18 24    A.   That is fair, yes.
03:48:21 25    Q.   And you also don't know how many hours Mr.

Page 256

03:48:24 1     Saverin spent in January 2004 related to
03:48:27 2     Thefacebook, correct?
03:48:28 3     A.   That would be correct, yes.
03:48:35 4     Q.   When did Mr. Saverin first become aware of
03:48:38 5     HarvardConnection?
03:48:38 6     A.   Again, my -- our belief is that --
03:48:51 7     Q.   I don't want your belief. If you don't know
03:48:53 8     the answer to my question, I want you to
03:48:55 9     tell me that. What I don't want is your
03:48:57 10    belief. When did Mr. Saverin first
03:49:00 11    become -- I'm sorry, when did he first
03:49:02 12    become aware of HarvardConnection?
03:49:03 13    A.   He -- I don't know. I do not know.
03:49:09 14           MR. HORNICK:   I'll object. That's
03:49:10 15    not 30(b)(6) testimony.
03:49:12 16           MR. HAWK:   Oh, that's incredibly
03:49:14 17    30(b)(6) testimony.
03:49:16 18           MR. HORNICK:   I'm not sure how he
03:49:17 19    can know what was in Mr. Saverin's mind, so
03:49:19 20    I don't think that's 30(b)(6) testimony.
03:49:21 21           MR. HAWK:   Okay. Well...
03:49:25 22    BY MR. HAWK:
03:49:26 23    Q.   Did Mr. Saverin ever see any line of source
03:49:30 24    code for HarvardConnection?
03:49:30 25    A.   I don't know.

64 (Pages 253 to 256)

Page 259

03:49:33 1    Q.  Did Mr. Saverin ever see any Web page, any
03:49:37 2        functioning Web page for any version of the
03:49:39 3        HarvardConnection website?
03:49:40 4    A.  I do not know.
03:49:45 5    Q.  Did Mr. Zuckerberg in January 2004 ever
03:49:50 6        discuss or otherwise communicate with Mr.
03:49:53 7        Saverin about HarvardConnection?
03:49:55 8            MR. HORNICK:  Objection.  This is
03:49:56 9        all not 30(b)(6) testimony.  None of this
03:49:59 10       line of questioning is 30(b)(6) testimony.
03:50:02 11       You can ask this witness --
03:50:02 12           MR. HAWK:  We disagree.
03:50:03 13           MR. HORNICK:  -- as an individual.
03:50:03 14           MR. HAWK:  I'm asking the
03:50:04 15       questions.  If you want to instruct him not
03:50:06 16       to answer, go ahead.
03:50:08 17           MR. HORNICK:  No, no, no, go ahead,
03:50:09 18       but it's not 30(b)(6) testimony.
03:50:11 19           MR. HAWK:  Well, we disagree.
03:50:11 20       BY MR. HAWK:
03:50:12 21   Q.  I'm sorry, let me put the question --
03:50:12 22           MR. HORNICK:  (Unintelligible.)
03:50:12 23   A.  Sure.
03:50:12 24   Q.  -- back out there so you can hear it.
03:50:14 25   A.  Sure.

Page 258

03:50:14 1    Q.  Did Mr. Zuckerberg in January of 2004 ever
03:50:17 2        discuss or ever communicate -- otherwise
03:50:19 3        communicate with Mr. Saverin about
03:50:22 4        HarvardConnection?
03:50:22 5    A.  I don't know.
03:50:29 6    Q.  Did Mr. Saverin write any code for
03:50:31 7        Thefacebook?
03:50:32 8    A.  I can't answer that.
03:50:33 9    Q.  You can't answer that because you don't
03:50:34 10       know?
03:50:34 11   A.  Primarily, yeah, because I don't know, yes.
03:50:43 12   Q.  Has Mr. Saverin ever seen any source code
03:50:46 13       for the TheFacebook?
03:50:47 14           MR. HORNICK:  Objection.  This
03:50:49 15       still isn't 30(b)(6) testimony.
03:50:50 16   A.  Again, I don't know that.
03:50:59 17   Q.  Was Mr. Saverin ever made aware of any of
03:51:01 18       the HarvardConnection trade secrets that you
03:51:03 19       contend Mr. Zuckerberg misappropriated?
03:51:05 20           MR. HORNICK:  By whom?
03:51:08 21           MR. HAWK:  By anybody.
03:51:09 22           MR. HORNICK:  Well, by --
03:51:10 23   Q.  Let me --
03:51:12 24           MR. HORNICK:  By HarvardConnection
03:51:12 25       or by Mr. Zuckerberg or by somebody else?

Page 259

03:51:15 1            MR. HAWK:  I said by anyone, so let
03:51:17 2        me rephrase question.
03:51:19 3    A.  Sure.
03:51:19 4    Q.  Was Mr. Saverin ever made aware of any of
03:51:21 5        the HarvardConnection trade secrets you
03:51:23 6        contend Mr. Zuckerberg allegedly
03:51:25 7        misappropriated?  And let's start with your
03:51:27 8        counsel.  Was he ever made aware of those
03:51:30 9        supposed trade secrets by Mr. Zuckerberg?
03:51:32 10   A.  I don't know that.
03:51:35 11   Q.  Was Mr. Saverin ever made aware prior to you
03:51:40 12       accusing Mr. Zuckerberg of misappropriating
03:51:44 13       HarvardConnection's trade secrets -- well,
03:51:48 14       strike that.  Strike that.  Let's come back
03:51:50 15       to that.
03:51:50 16           Now, you've looked at TheFacebook
03:52:04 17       website I think you've testified earlier,
03:52:06 18       correct?
03:52:06 19   A.  Yeah, I have looked at the website.
03:52:08 20   Q.  And what HarvardConnection trade secrets
03:52:12 21       have been used in TheFacebook website?
03:52:15 22           MR. HORNICK:  Objection, asked and
03:52:16 23       answered.  You can answer it again.
03:52:18 24           MR. HAWK:  No, it wasn't asked and
03:52:18 25       answered --

Page 260

03:52:18 1            MR. HORNICK:  Not by you.
03:52:21 2            MR. HAWK:  -- but I don't want to
03:52:21 3        argue with you.  No, it wasn't asked and
03:52:22 4        answered.
03:52:22 5            MR. HORNICK:  Yes, it was today.
03:52:23 6        BY MR. HAWK:
03:52:23 7    Q.  I want you to listen to the question.  I
03:52:26 8        won't argue with your counsel, but this
03:52:27 9        question hasn't been asked and answered.
03:52:28 10       What HarvardConnection trade secrets have
03:52:30 11       been used in the TheFacebook website based
03:52:33 12       on your review of TheFacebook website?
03:52:35 13           MR. HORNICK:  Asked and answered.
03:52:36 14       You can answer it again.
03:52:37 15   A.  The -- as I said, focusing a college -- an
03:52:42 16       on-line network with multiple purposes onto
03:52:46 17       a small niche college community and then
03:52:51 18       branching that out to multiple other schools
03:52:54 19       and connecting them.
03:52:56 20   Q.  Let's -- I don't want to interrupt you --
03:52:58 21   A.  Sure.
03:52:58 22   Q.  -- but let's just try and go one by one.
03:53:01 23   A.  Okay.
03:53:01 24   Q.  The first one is creation of an on-line
03:53:04 25       network focused on a college community,

65 (Pages 257 to 260)

| | | |
|---|---|---|
| 03:53:06 | 1 | right?  A social networking website for a |
| 03:53:12 | 2 | college community? |
| 03:53:12 | 3 | A.  For a college community that students and |
| 03:53:15 | 4 | alumni can access and use that is not put up |
| 03:53:19 | 5 | by an administration or student body -- |
| 03:53:24 | 6 | university body. |
| 03:53:25 | 7 | Q.  Okay.  So that's No. 1.  What's the second |
| 03:53:33 | 8 | trade secret that you have seen evidenced in |
| 03:53:35 | 9 | the TheFacebook website, the second |
| 03:53:38 | 10 | HarvardConnection trade secret? |
| 03:53:39 | 11 | A.  The linkage of multiple campuses with that |
| 03:53:47 | 12 | type of website. |
| 03:53:48 | 13 | Q.  Are there any others besides these two that |
| 03:53:55 | 14 | you contend were HarvardConnection trade |
| 03:53:58 | 15 | secrets that you saw evidenced on |
| 03:54:00 | 16 | TheFacebook website? |
| 03:54:01 | 17 | A.  I think the information was potentially like |
| 03:54:18 | 18 | the respective information -- |
| 03:54:20 | 19 | Q.  The what information? |
| 03:54:21 | 20 | A.  The respective information that we collected |
| 03:54:23 | 21 | from users. |
| 03:54:24 | 22 | Q.  Okay.  So the information collected from |
| 03:54:26 | 23 | users.  And you -- |
| 03:54:29 | 24 | A.  The parameters. |
| 03:54:29 | 25 | Q.  -- earlier testified like, I mean, their |

| | | |
|---|---|---|
| 03:54:32 | 1 | name, right, and the house that they lived |
| 03:54:34 | 2 | in? |
| 03:54:34 | 3 | A.  No, I actually never said the name.  I said |
| 03:54:37 | 4 | house, you know, someone's house, their |
| 03:54:42 | 5 | major, their thesis, you know, thesis or |
| 03:54:45 | 6 | what their interests are, dating |
| 03:54:51 | 7 | preferences, if they're single, et cetera, |
| 03:54:53 | 8 | what they're looking for. |
| 03:54:55 | 9 | Q.  Anything else as far as content, asking for |
| 03:54:59 | 10 | content that you contend was a trade secret |
| 03:55:01 | 11 | of HarvardConnection that was |
| 03:55:02 | 12 | misappropriated and went up on TheFacebook |
| 03:55:06 | 13 | website? |
| 03:55:06 | 14 | A.  That's all I can think of right now. |
| 03:55:16 | 15 | Q.  Okay.  Now, this information that was |
| 03:55:17 | 16 | collected, the house, the major, the thesis, |
| 03:55:21 | 17 | the dating preferences -- first of all, with |
| 03:55:23 | 18 | dating preferences, that -- TheFacebook asks |
| 03:55:29 | 19 | for the same kinds of dating preference |
| 03:55:31 | 20 | information that other dating -- or that a |
| 03:55:33 | 21 | dating website asks for, right? |
| 03:55:35 | 22 | A.  There would be some overlap.  I mean, there |
| 03:55:38 | 23 | are similar questions, yes. |
| 03:55:39 | 24 | Q.  Well, is there anything unique in the dating |
| 03:55:41 | 25 | preference information that |

| | | |
|---|---|---|
| 03:55:45 | 1 | HarvardConnection was going to ask for that |
| 03:55:48 | 2 | TheFacebook misappropriated and put into his |
| 03:55:50 | 3 | website? |
| 03:55:50 | 4 | A.  The dating information with respect to the |
| 03:55:53 | 5 | context it's asked in, okay, the information |
| 03:55:57 | 6 | is asked on a dating site, okay?  Is it |
| 03:55:59 | 7 | asked on a student alumni connection website |
| 03:56:02 | 8 | based on the college community?  No. |
| 03:56:05 | 9 | Q.  Well, I want to get back up to that -- |
| 03:56:08 | 10 | A.  Okay. |
| 03:56:08 | 11 | Q.  -- purported -- |
| 03:56:09 | 12 | A.  Sure. |
| 03:56:09 | 13 | Q.  -- trade secret.  I'm just looking at the |
| 03:56:11 | 14 | information collected and your contingent |
| 03:56:13 | 15 | that the information collected was a trade |
| 03:56:16 | 16 | secret.  And what I'm asking you is, was |
| 03:56:17 | 17 | there anything unique or unusual about the |
| 03:56:20 | 18 | dating preference information the |
| 03:56:23 | 19 | Thefacebook asks for -- |
| 03:56:23 | 20 | A.  Well, they -- |
| 03:56:24 | 21 | Q.  -- suggesting to you that that had been |
| 03:56:26 | 22 | misappropriated from HarvardConnection? |
| 03:56:27 | 23 | MR. HORNICK:  Objection.  This all |
| 03:56:29 | 24 | calls for legal expertise, but you can |
| 03:56:32 | 25 | answer. |

| | | |
|---|---|---|
| 03:56:32 | 1 | A.  But a trade -- you're talking about |
| 03:56:35 | 2 | proprietary -- trademark proprietary |
| 03:56:37 | 3 | information.  You know, if you take a, sort |
| 03:56:41 | 4 | of a slide, you know, one section of that |
| 03:56:43 | 5 | information, no, it might not be |
| 03:56:45 | 6 | proprietary, okay?  If you take the whole |
| 03:56:48 | 7 | package of the information, it absolutely is |
| 03:56:50 | 8 | proprietary. |
| 03:56:50 | 9 | So if asking people on a website what |
| 03:56:52 | 10 | their dating preference is, if the question |
| 03:56:54 | 11 | is, is that information proprietary?  No. |
| 03:56:57 | 12 | How and in what context you ask that |
| 03:56:59 | 13 | information, yes. |
| 03:57:00 | 14 | Q.  Well, the context, you're talking about |
| 03:57:01 | 15 | because it was a social networking site for |
| 03:57:04 | 16 | campuses, right? |
| 03:57:04 | 17 | A.  Uh-huh. |
| 03:57:05 | 18 | Q.  And I've already -- that's a separate trade |
| 03:57:05 | 19 | secret -- |
| 03:57:05 | 20 | A.  Yeah. |
| 03:57:09 | 21 | Q.  -- as far as the three that you've |
| 03:57:10 | 22 | identified?  Was there -- |
| 03:57:10 | 23 | MR. HORNICK:  Objection, |
| 03:57:11 | 24 | mischaracterizes. |
| 03:57:12 | 25 | Q.  All right.  Was there -- in what other way |

66 (Pages 261 to 264)

Page 267

```
03:57:18  1   was asking about dating preferences a
03:57:20  2   proprietary trade secret of
03:57:23  3   HarvardConnection?
03:57:23  4       MR. HORNICK: Objection, vague,
03:57:25  5   indefinite.
03:57:27  6       MR. HAWK: That's not -- that's
03:57:28  7   what I'm not understanding.
03:57:29  8       MR. HORNICK: In what other way, is
03:57:30  9   your question.
03:57:31 10       MR. HAWK: All right. Well, fine.
03:57:32 11   I'll reask the question.
03:57:33 12   A.  So can you reask the question?
03:57:35 13   Q.  Yeah, let me reask the question.
03:57:37 14       Is your contention that in some way
03:57:42 15   Thefacebook's -- how it asks for dating
03:57:44 16   preferences somehow reflected a
03:57:46 17   misappropriation of trade secrets from the
03:57:47 18   HarvardConnection, right?
03:57:48 19   A.  Not so much how, but in what context, okay?
03:57:55 20   We're talking about a college website. So
03:57:57 21   in the context of a college-based website in
03:58:01 22   asking for dating stuff, information like
03:58:03 23   that, yes, that is proprietary.
03:58:05 24   Q.  Okay. So the trade secret that was
03:58:07 25   misappropriated with regard to content and
```

```
03:59:18  1   HarvardConnection that were in and of
03:59:20  2   themselves innovative and trade secrets, it
03:59:24  3   was the whole package together that was
03:59:26  4   innovative and a trade secret. Is that
03:59:29  5   basically your position?
03:59:30  6   A.  To my knowledge -- my position is that the
03:59:32  7   core and togetherness of the packaging of
03:59:36  8   those features was definitely a trade
03:59:39  9   secret. Now, it was our belief, you know,
03:59:45 10   there was a situa -- yeah, that's my belief,
03:59:47 11   that the whole package was a trade secret,
03:59:49 12   yes.
03:59:49 13   Q.  So in and of itself, asking for dating
03:59:51 14   preferences, that was not a trade secret of
03:59:56 15   HarvardConnection at any time, correct?
03:59:58 16   That had been done by a lot of other
04:00:00 17   websites, right?
04:00:01 18   A.  Asking for dating preferences is not --
04:00:03 19   yeah, that would not be proprietary.
04:00:03 20   Q.  That's not a trade secret, right?
04:00:08 21   A.  Yes.
04:00:08 22   Q.  And asking for a person's house at Harvard
04:00:12 23   that they live in or their major or their
04:00:14 24   thesis, those are not trade secrets on a
04:00:18 25   college website, to ask that kind of
```

Page 266

```
03:58:10  1   asking for dating preferences relates to the
03:58:13  2   fact that these questions were being asked
03:58:15  3   on a social networking site aimed at a
03:58:18  4   college, correct?
03:58:19  5   A.  That would be correct, yes.
03:58:21  6   Q.  Okay. Is there any other way in which
03:58:24  7   asking for dating preferences would be a
03:58:28  8   misappropriation of a HarvardConnection
03:58:30  9   trade secret?
03:58:31 10       MR. HORNICK: Objection. Vague, I
03:58:33 11   don't know what you mean.
03:58:35 12       MR. HAWK: I think the witness
03:58:35 13   does.
03:58:36 14   A.  Again, the asking of dating information
03:58:42 15   exclusively on a college level may not be
03:58:45 16   proprietary. Asking dating information on a
03:58:48 17   college website when you simultaneously ask
03:58:52 18   for educational information is proprietary.
03:58:54 19   So you're trying to take sort of slide
03:58:57 20   shots, and I'm saying that it's actually a
03:58:59 21   moving motion picture, so to speak, okay?
03:59:03 22   It's not a still shot. I mean, if I take
03:59:06 23   one piece of the puzzle, it's an
03:59:08 24   interconnected thing.
3:59:14 25   Q.  So there weren't any particular parts of
```

Page 268

```
04:00:20  1   information on a college website? Would you
04:00:23  2   agree with me?
04:00:23  3       MR. HORNICK: Objection,
04:00:24  4   mischaracterizes.
04:00:25  5   A.  I --
04:00:25  6   Q.  In and of -- in and of themselves?
04:00:27  7       MR. HORNICK: Objection. What kind
04:00:29  8   of a question that?
04:00:31  9       MR. HAWK: It's a good one.
04:00:35 10       MR. HORNICK: In and of themselves
04:00:36 11   is a question?
04:00:37 12       MR. HAWK: You know what?
04:00:40 13       MR. HORNICK: He's already given
04:00:41 14   you an answer.
04:00:38 15       MR. HAWK: You're interfering with
04:00:39 16   the deposition, okay?
04:00:40 17       MR. HORNICK: He's already given
04:00:41 18   you an answer.
04:00:43 19       MR. HAWK: Just make your
04:00:44 20   objection, all right? If you have an
04:00:44 21   objection, just make it, but let me
04:00:46 22   cross-examine the witness, all right?
04:00:47 23   You'll --
04:00:48 24       MR. HORNICK: I asked you if that
04:00:49 25   was a question.
```

67 (Pages 265 to 268)

Page 271

04:00:49  1    MR. HAWK:  Yeah, but that's not an
04:00:51  2  objection.  You can object to my questions.
04:00:54  3  I don't want to get into banter like this
94:00:56  4  back and forth.  If you have an objection,
04:00:58  5  just state it.  Otherwise, I'm going to
04:01:01  6  conduct the examination of the witness.
04:01:02  7    MR. HORNICK:  And if you ask
04:01:03  8  questions like, I'll ask you if that's
04:01:05  9  really --
04:01:05 10    MR. HAWK:  All right.  Well, that's
04:01:05 11  improper.  You're interfering with the
04:01:06 12  deposition.
04:01:06 13    MR. HORNICK:  Ask proper questions,
04:01:08 14  Robert.  You'll be fine.
04:01:09 15    MR. HAWK:  No, John, I'm not going
04:01:10 16  to -- I'm not going to get into this with
04:01:11 17  you.  We'll -- you know, if we're going to
04:01:12 18  have to have motion practice to keep you
04:01:13 19  from interfering with the deposition, we'll
04:01:16 20  do it.
04:01:16 21    MR. HORNICK:  Go ahead and ask your
04:01:18 22  questions.
04:01:18 23    MR. HAWK:  Yea, I'm going to go
04:01:19 24  ahead and ask my question, if I can remember
04:01:22 25  what it was after all that.

Page 270

04:01:25  1    BY MR. HAWK:
04:01:26  2  Q.  Isn't it fair to say, Mr. Winklevoss, that
04:01:28  3  in the context of a college website, there's
04:01:31  4  nothing novel or worthy of being what you
04:01:36  5  would understand a trade secret to ask
04:01:39  6  visitors their house or their major or their
04:01:41  7  thesis?  That in and of itself would not be
04:01:47  8  a trade secret?
04:01:48  9  A.  Well, at the time of our relationship with
04:01:49 10  Mr. Zuckerberg we were unaware of any other
04:01:51 11  public instance where -- that that was --
04:01:55 12  that asking for that information had been
04:01:57 13  done before.  And let me further reiterate
04:02:00 14  that asking for that information is not all
04:02:04 15  that we did.  We asked for a full range of
04:02:07 16  information.
04:02:08 17  Q.  Right.  But I was just going to the specific
04:02:13 18  content that you had -- that you had
04:02:14 19  mentioned, the house, the major and the
04:02:16 20  thesis.
04:02:19 21  A.  We were under the impression that there was
04:02:20 22  no public instance at that time for that
04:02:21 23  information on a college website social
04:02:24 24  network, yes.
04:02:25 25  Q.  So you thought that it was one of your --

you think one of your protectable trade
04:02:27  1
04:02:29  2  secrets is the fact that you intended to ask
04:02:34  3  Harvard University students on a website to
04:02:35  4  list their house, their major and their
04:02:37  5  thesis; is that fair?
04:02:38  6  A.  Coupled with the other features.  I mean,
04:02:44  7  okay, in and of itself asking someone what
04:02:47  8  their major is on a website is not
04:02:51  9  protectable, okay?
04:02:52 10  Q.  All right.  And is the same true for asking
04:02:54 11  someone what their major is or what their
04:02:56 12  thesis was?
04:02:57 13    MR. HORNICK:  Objection, asked and
04:02:58 14  answered that was his prior answer.
04:02:59 15  A.  I don't think asking someone for their
04:03:01 16  thesis had ever been done on a website.
04:03:05 17  Q.  So you think that was a protectable --
04:03:05 18  A.  That would --
04:03:07 19  Q.  -- trade secret?
04:03:07 20  A.  That would be protectable, and the ability
04:03:09 21  as we talked about to upload a thesis and a
04:03:12 22  resume, I believe that those would have been
04:03:14 23  protectable and had not been done before.
04:03:16 24  Q.  Okay.  All right.  Now, have you seen
04:03:18 25  anything subsequent to -- well, at any time

Page 272

04:03:25  1  that has informed you that there were other
04:03:28  2  websites out there on other college campuses
04:03:32  3  asking students for information like their
04:03:34  4  major and their thesis prior to the launch
04:03:37  5  of Thefacebook?
04:03:40  6  A.  No website prior to the launch of
04:03:42  7  TheFacebook stringed in all of the
04:03:44  8  components that HarvardConnection did in a
04:03:46  9  proprietary manner such as we did, no.
04:03:52 10    MR. HAWK:  Sorry, could you --
04:03:53 11  A.  No website -- no website.
04:03:54 12    MR. HORNICK:  If you're finished,
04:03:55 13  you're finished, and he can read back the
04:03:57 14  answer.
04:03:57 15    THE WITNESS:  Oh, sure.
04:03:58 16  Q.  Yeah, I was just going to ask her to read it
04:04:00 17  back.
04:04:18 18  A.  Oh, sorry.
04:04:04 19    (Record read.)
04:04:20 20  Q.  Okay.  That wasn't my question about what a
04:04:22 21  launch site did prior to the --
04:04:25 22  A.  Or any site for that matter, any college-
04:04:27 23  based site, yes.
04:04:28 24  Q.  So no college-based site asked -- and this
04:04:31 25  is true today, as far as you know, that no

68 (Pages 269 to 272)

Page 275

04:04:34 1    college site, or site focused on colleges,
04:04:38 2    asked the site visitors to provide
04:04:41 3    information about their major or their
04:04:44 4    thesis?
04:04:44 5    A.   That's not what I said.  I said no site, to
04:04:49 6    our knowledge today, prior to the launch of
04:04:52 7    Thefacebook string together all of the
04:04:55 8    components that we had for
04:04:57 9    HarvardConnection.  Whether -- you know, and
04:04:58 10   those components, we've gone over some of
04:05:00 11   those components --
04:05:00 12   Q.   Right.
04:05:02 13   A.   -- the dating information and the --
04:05:03 14   Q.   See, that's where we're having a problem
04:05:06 15   because I'm trying to look at each one of
04:05:07 16   these components individually.
04:05:09 17   A.   But you already asked me that question prior
04:05:11 18   to this question.  This is supposed to be
04:05:13 19   the recap question where you ask me all of
04:05:17 20   them together.
04:05:17 21   Q.   All right.  Let me try it again.  Let me try
04:05:18 22   it again.  We may just be miscommunicating,
04:05:21 23   and it may well be my questions.
04:05:22 24       Prior to the launch of Thefacebook,
04:05:24 25   are you aware that there were other sites

Page 274

4:05:26 1     aimed at college campuses that asked website
04:05:31 2    visitors for information about their major
04:05:32 3    or their thesis?
04:05:33 4    A.   There were, yes.
04:05:34 5    Q.   Okay.  Fine.
04:05:35 6    A.   Okay.
04:05:35 7    Q.   Now, let's talk about the idea of an on-line
04:05:40 8    network focused on a college community.
04:05:43 9    A.   Okay.
04:05:43 10   Q.   Prior to the launch of Thefacebook there
04:05:46 11   were other on-line communities, social
04:05:50 12   networking sites focused on college
04:05:53 13   communities, correct?
04:05:54 14   A.   A college community, yes.
04:05:56 15   Q.   Right.  Okay.  All right.  And that was
04:05:59 16   No. 1, right?
04:05:59 17   A.   Okay.
04:06:00 18   Q.   No. 2 was the linkage of the multiple
04:06:02 19   campuses, right?
04:06:03 20   A.   Right.
04:06:03 21   Q.   And prior to the launch of Thefacebook, was
04:06:08 22   there any other website ever launched, a
04:06:13 23   social networking site aimed at college
04:06:15 24   communities that linked more than one
1:06:20 25   campus?

Page 276

04:06:20 1    A.   No, I don't believe so.
04:06:38 2    Q.   Okay.  Now, you testified earlier you are
04:06:40 3    aware of the MIT Matchup --
04:06:45 4    A.   Uh-huh.
04:06:45 5    Q.   -- website, right?
04:06:45 6    A.   Yeah.
04:06:45 7    Q.   Correct?
04:06:47 8    A.   Yeah.
04:06:47 9    Q.   And it's your understanding that that
04:06:50 10   website linked MIT, Harvard and Wellesley?
04:06:52 11   A.   No, I didn't -- I was unaware of that, and I
04:06:56 12   also believe that MIT Match (sic) was not a
04:06:58 13   social network.  I believe MIT Match was --
04:07:01 14   my understanding is it's purely a dating
04:07:03 15   site.
04:07:03 16   Q.   Okay.
04:07:05 17   A.   So, again, it's missing pieces of the
04:07:09 18   puzzle.
04:07:09 19   Q.   All right.  Well, let's shift gears a little
04:07:21 20   bit, then.  Has there ever been more than
04:07:23 21   one version of the HarvardConnection source
04:07:26 22   code?
04:07:26 23   A.   I believe it's been one version that's been
04:07:29 24   constantly worked on, yeah.
04:07:31 25   Q.   Okay.  So you're not aware of there having

04:07:36 1    been version 1, version 2 --
04:07:37 2    A.   No.
04:07:37 3    Q.   -- separate versions?
04:07:39 4    A.   I'm not aware of that, no.
04:07:45 5    Q.   So you are aware that your attorneys sought
04:07:47 6    a copyright registration for the
04:07:50 7    HarvardConnection source code, correct?
04:07:51 8    A.   Yes.
04:07:54 9    Q.   Okay.  And so these attorneys, where did
04:07:59 10   they get the copy of the source code that
04:08:03 11   was deposited with the copyright office?
04:08:06 12   Did they get that from you?
04:08:07 13   A.   I believe that that code was -- we received
04:08:13 14   the latest version of the code, or the most
04:08:15 15   complete, that basically included everybody
04:08:18 16   who had worked on it, you know, because, as
04:08:22 17   I said, it was one work in progress.  And I
04:08:24 18   believe Victor Gao procured it.  He had the
04:08:30 19   full code, and it was turned over to our
04:08:32 20   attorneys.
04:08:32 21   Q.   Mr. Gao had the full code.  Where did he
04:08:35 22   have it?
04:08:35 23   A.   I believe he downloaded the full code in
04:08:39 24   February of 2004, post-facebook launch from
04:08:44 25   the server and had it on his hard drive.

69 (Pages 273 to 276)

Page 277

04:08:48 1    Q. And that is the code that was printed out
04:08:50 2       and that you gave to your attorneys to be
04:08:52 3       deposited with the copyright office,
04:08:53 4       correct?
04:08:54 5    A. Yes.
04:08:54 6    Q. All right. Did you -- are you aware that
04:08:57 7       any deletions or omissions were made from
04:09:01 8       what Mr. Gao provided as the
04:09:05 9       HarvardConnection code before it was
04:09:07 10      deposited with the copyright office?
04:09:09 11   A. No. We asked him for the complete code.
04:09:10 12      MR. HORNICK: But I should say that
04:09:11 13      the witness might not be aware of deletions
04:09:14 14      that were made.
04:09:15 15   A. To my knowledge, there were no deletions
04:09:16 16      made.
04:09:17 17   Q. Right. Now, as you sit here, is it correct
04:09:24 18      that you do not know what contributions, if
04:09:26 19      any, Mr. Zuckerberg made to the
04:09:28 20      HarvardConnection code, correct?
04:09:34 21   A. Well, I have e-mails indicating that he had
04:09:36 22      basically -- in fact, to my knowledge from
04:09:39 23      his e-mail, he completed the connect side,
04:09:42 24      the Harvard -- of the HarvardConnection
04:09:46 25      code. We were never given that code.

Page 278

04:09:48 1    Q. Well, how do you know that you weren't given
04:09:50 2       the code? How do you know that -- let me
04:09:52 3       just finish the question --
04:09:54 4    A. Sure.
04:09:54 5    Q. -- or ask a different one?
04:09:55 6    A. Sure.
04:09:56 7    Q. How did you know that Mr. Zuckerberg did not
04:09:58 8       download the work that he had done onto the
04:10:00 9       server containing the HarvardConnection
04:10:03 10      code?
04:10:03 11   A. Sorry, your question is, how do I know that
04:10:07 12      he did not download the work?
04:10:09 13   Q. How do you know that he did not -- that the
04:10:14 14      HarvardConnection code on the server did not
04:10:16 15      reflect changes made by Mr. Zuckerberg?
04:10:18 16   A. Victor Gao said that the changes -- the
04:10:23 17      completion that he spoke of was not present
04:10:26 18      on the server, according to Victor Gao.
04:10:29 19   Q. Okay. Did Mr. Gao tell you that based on
04:10:33 20      his inspection, Mr. Zuckerberg had made no
04:10:36 21      contributions to the HarvardConnection code?
04:10:39 22   A. Mr. Gao told me that Mr. Zuckerberg made
04:10:42 23      very minor and minimal changes or additions
04:10:48 24      to the HarvardConnection code.
04:10:49 25   Q. How many lines of code did Mr. Zuckerberg

Page 279

04:10:52 1       write that are now a part of the
04:10:54 2       HarvardConnection code?
04:10:54 3    A. I don't know that off the -- I just don't
04:10:58 4       know that.
04:10:59 5    Q. And I mean, it could be several hundred,
04:11:02 6       correct?
04:11:02 7    A. Mr. Gao was under the impression, based on
04:11:07 8       looking at the code, that he had been on
04:11:09 9       there for no more than two hours, and the
04:11:14 10      majority of the work that he did was
04:11:16 11      actually taking code Mr. Gao wrote and
04:11:19 12      copying it and putting in names, various
04:11:23 13      connect names.
04:11:24 14   Q. But -- all right. But -- fair enough. But
04:11:27 15      my question was different. My question was,
04:11:29 16      you don't know that -- you don't know --
04:11:33 17      first of all, I think you've already
04:11:35 18      testified -- let me make sure -- you don't
04:11:38 19      know how many lines of code that Mr.
04:11:39 20      Zuckerberg contributed to the
04:11:42 21      HarvardConnection code that has been filed
04:11:45 22      with the copyright office, correct?
04:11:47 23   A. That --
04:11:47 24      MR. HORNICK: Objection. That --
04:11:49 25      no Zuckerberg code that I know of has been

Page 280

04:11:51 1       published --
04:11:52 2       MR. HAWK: Hey, you're not
04:11:54 3    testifying here. If you have an objection,
04:11:56 4    you just go ahead, buddy, but look, don't
04:11:57 5    interfere.
04:11:57 6       MR. HORNICK: You're asking a
04:11:57 7    question --
04:11:58 8       MR. HAWK: Don't coach your --
04:11:58 9    don't coach your witness.
04:11:58 10      MR. HORNICK: -- he can't answer.
04:11:59 11      MR. HAWK: Don't coach the witness.
04:12:01 12      MR. HORNICK: And it wasn't a true
04:12:02 13   question. When we --
04:12:02 14      MR. HAWK: If you have an
04:12:02 15   objection, just -- you're interfering with
04:12:03 16   the deposition.
04:12:05 17      MR. HORNICK: Ask your question.
04:12:06 18      MR. HAWK: I -- well, if you would
04:12:07 19   stop interrupting, I would ask the question.
04:12:10 20      MR. HORNICK: I can't stop inter --
04:12:11 21   you've got to be -- you've got to --
04:12:11 22      MR. HAWK: No, I don't have to do
04:12:11 23   anything --
04:12:12 24      MR. HORNICK: -- ask questions,
04:12:12 25   Robert.

70 (Pages 277 to 280)