**EXHIBIT 7**

**(PART 1 of 3)**

**PLAINTIFF'S EXHIBIT 7**

**RESPONSE TO DEFENDANTS' EXHIBIT 7**

**A (1)**

| Citation | Text of deposition | Comments | Rebuttal to Comments |
|---|---|---|---|
| 41:12-24 | Q. And so these are the only ones that you can remember? You can't remember any other ones, right?<br>　　　MR. HORNICK: Objection. It's not a question of remembering, it's a question of asking follow-up questions.<br>A. Right. I mean, if you want to prompt me and ask me if, you know, this part of the site was proprietary and this part wasn't, or if you want to be more specific, I can certainly help out, but I think I've given you a pretty good bone to pick on, you know, that. | Deposing attorney is entitled to ask the corporation its position about what its trade secrets are and to ask for a complete answer. ConnectU tries to recast the witness's lack of preparation as a failure by the deposing attorney to "ask[] follow-up questions."<br><br>Topic 2 (confidential information and trade secrets). | Addressed in opposition brief; witness fully answered antecedents to this follow up question, asking for identification of trade secret combination in suit (Dep. at 36-41), including testimony that witness prepared for deposition on this issue. |
| 92:23-94:18 | Q. And what was the state of development at the time Sanjay Mavinkurve left?<br>A. I can't say specifically, again, because I'm not a programmer and I wasn't diving into the code, but I believe at that time Sanjay had done more front-end work and had not linked in so much of the back end or created the database.<br>Q. So he had created the user interface?<br>A. I believe he created -- a lot of his contribution was based around the user interface.<br>Q. Are you claiming that the user interface was a trade secret of ConnectU?<br>　　　MR. HORNICK: Object to the extent it calls for a legal conclusion, but you can answer.<br>A. Certainly these -- well, if you look at -- to take an example, you know, Amazon has one-click ordering, and that's a trade secret, you know, and that is a layout situation, you know, | Lack of preparation for topic 5 (conception design and development of the HarvardConnection and ConnectU websites).<br><br><br><br><br><br><br><br>Testimony evasive and evinces lack of preparation for topics 2 and 10 (content and ownership of asserted trade secrets). | Addressed in opposition brief; witness answered question, for the company, even though he is not a programmer.<br><br><br><br><br><br><br><br>Plaintiff does not see Defendants' point; witness was answering a legal question as a lay witness. |

1

| | | | |
|---|---|---|---|
| | two clicks versus one click. I would say that our layout could have had proprietary stuff with it. It's possible.<br>Q. Do you remember anything specific about the user interface that Sanjay Mavinkurve created that you would claim is a trade secret?<br>A. To the extent that a user registers for the website, can log in and out, I think that -- you know, I'm not an expert, again, and I don't know exactly what constitutes user interface trade secrets, but there could very well have been trade secrets on that site in terms of the user interface.<br>Q. But you don't remember anything specifically?<br>A. Well, as my counsel said, I'm not really qualified to say what is and what isn't. So it's not really a matter of remembering it's a matter of knowing.<br>Q. So --<br>A. So if you ask me a specific question, again, with the interface, I can give you an answer yes or no. | Testimony evasive and evinces lack of 30(b)(6) preparation ("I'm not an expert and I don't know exactly what constitutes user interface trade secrets").<br><br><br><br>Does not answer the question<br><br><br><br>Topics 2, 3, 5, 10. | This is a frivolous example. The question asked for witness's memory, and did not require more; such a question is not a proper 30(b)(6) question; witness was answering a legal question as a lay witness.<br><br>This is a frivolous example. The question asked for witness's memory, and did not require more; such a question is not a proper 30(b)(6) question; witness not qualified to testify on legal issues. |

**A (2)**

| Citation | Text of deposition | Comments | Rebuttal to Comments |
|---|---|---|---|
| 43:7-23 | Q. And where – did you ever discuss that with Mark Zuckerberg?<br>A. Discuss what?<br>Q. That Harvard Connection was a social network with these ties and nodes?<br>A. Well, let me just step back a second and refresh your – perhaps you're aware or unaware that Mark happens to be a computer science major, as well as a psychology major. So he's fully versed the area of social networking. So he would absolutely be able to identify and know what a social network is in that respect.<br>    In terms of we – our second | The witness does not refer to any facts responsive to the question.<br><br>Topics 2, 4 and 5. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>This is a frivolous |

| | | |
|---|---|---|
| | meeting we talked about the website Friendster and bookmarked it as a good benchmark for potential future functionality. | | example. Witness specifically answered the question here (43:20-23) ("did you view Harvard Connection as a social network?" 43:7-8) |
| 47:20-49:7 | Q. Was there any expression, written or verbally, that this initial idea, this creative virtual community that could serve Harvard and then be rolled out to other universities, any expression to Mr. Mavinkurve that he shouldn't tell other people about it?<br>A. Clearly it was understood.<br>Q. Was it stated?<br>A. Was it stated by Mr. Narendra? I'm sure that Mr. Narendra would have communicated to him that it was a proprietary idea and that, A, it should be completed in a timely manner, and B, that it was our project and that it was -- shouldn't– effectively broadcast to other people.<br>Q. And so when you say you're sure, what's your basis for believing that?<br>A. Okay. What's my basis -<br>   MR. HORNICK: Well this witness is speaking on behalf of the company, so he's giving you company knowledge.<br>Q. Well, I want to know what was actually done.<br>A. Other than an understood and a communicated sort of desire to keep the project going in a, you know, secure fashion, I think that that's all I can really testify to.<br>Q. And so just so I'm clear, Mr. Narendra told Mr. Mavinkurve that he shouldn't tell anyone else about this idea?<br>A. I'm not sure I can answer that specifically for Mr. Narendra. What I can say is that I believe that Mr. Mavinkurve understood that this was not a project to the extent that this project should not be broadcast or | The witness asserts that it was understood, but refuses to say what was communicated or how it was communicated which are what the questions request. | This is a frivolous example and shows the inconsistency of Defendants' arguments and approach to the deposition, which was to insist on yes/no answers only when it suited their purposes. These were yes/no questions, but Defendants complain that the witness answered but did not provide information that the question did not request. |
| | | Reflects lack of preparation regarding topics 2 and 4.<br><br>Evasive. | This is a frivolous example. This is not a question a 30(b)(6) witness could answer. The witness is testifying |

3

| | | | |
|---|---|---|---|
| | made public to that extent. Exactly in which manner Mr. Narendra communicated that, I cannot say. | | for ConnectU, but the question asks what Mr. Narendra did, and long before ConnectU was incorporated. |
| 49:23-51:4 | Q. Okay. You testified that Mr. Mavinkurve understood that he shouldn't tell other people. And what I'm trying to understand is what did the ConnectU people do to make sure he understood that?<br>　　MR. HORNICK: Objection to the form of the question. You can answer.<br>A. Again, I said I can't -- I don't know specifically how Divya communicated it to him, but I'm fairly certain I can say that Mr. Mavinkurve was aware that it was a proprietary idea. And simply the fact that we put a lot of effort into it and that we always met in a secure closed area and made efforts not to broadcast it or speak of it or, in fact, outline the project to other people would certainly convey those aspect.<br>Q. And when you say that Mr. Mavinkurve was aware that it was a proprietary issue, I'm trying to understand why you think he was aware of that?<br>　　MR. HORNICK: Objection, asked and answered I think three times now.<br>A. Again, it -- how was -- the question was, how was he made aware of it? And I said that I don't know specifically how Divya communicated it to him, but I'm certain that Mr. Mavinkurve being in the CS realm and taking a job with Google, you know, in the following months would be fully aware that this was a propriety issue. That's all I can really say to that. | Evasive.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Reflects lack of preparation regarding topics 2 and 4. | Same as above.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Same as above; witness was asked why he "thinks" something, and the witness answered accordingly. |
| 52:12-53:23 | Q. Did Divya say to you or your brother or did you say to him, "Don't tell | The witness contradicts initial testimony that | Such comments mischaracterize the |

| | | | |
|---|---|---|---|
| | anyone about this idea"?<br><br>A. Absolutely, sure. We were very concerned the whole time about the -- you know, letting the cat out of the bag. As I said before, this was a novel idea, and it was not -- you know, we did not want to make it a public domain.<br><br>Q. So do you have a recollection of who said, "We shouldn't tell anybody about this"?<br><br>A. I think we all came to the conclusion ourselves. I don't think we had to -- you know, when you join a team and someone says, "Hey, this is a good idea," and you have an interest in the team from the team's aspect and an individual aspect, it's understood that ideas that are not public and are -- potentially have a large potential for success are proprietary.<br><br>Q. So the term "understood" is something that is confusing to me, quite frankly. What I'm wondering is, what were the express statements about keeping the information confidential that were made in that initial meeting?<br><br>A. The express statements would have been, "This is a great idea. We need to get this out first because, to our knowledge, nobody else has this, and we need to basically do everything we can" -- and we communicated this multiple times to Mr. Zuckeberg that it's very important to get this to market first. And the whole -- our preoccupation with the idea and the necessity of getting it to market first would certainly, I think point to the fact that it's proprietary. | someone said "Don't tell anyone about this idea," then admits this was false, in that everyone "came to the conclusion ourselves." | witness's testimony, which is not inconsistent and does not support Defendants' evasiveness arguments; at most, if Defendants are correct (which they are not), such testimony is a basis for impeachment, not additional time. |
| 56:24-58:12 | Q. Was there anything discussed with you and Mr. Zuckerberg about establishing a connection beyond just giving an e-mail address?<br><br>A. Again, it's all about -- the functionality is all the same. You | | |

| | | |
|---|---|---|
| | know, you add -- when you open up a connection, when you create a connection between a user, that's a connection, that's a tie between the nodes. How you want to exactly implement that tie or what you want to call it could vary. We had discussed a matchmaker connection where, you know, you would be-- a third party would make a connection between two users.<br><br>Q. And if that connection was accepted by the people who had received the requests, was that stored on the website that way?<br>A. That had not been coded into the website. As I said, we talked about that.<br>Q. But you talked about storing --<br>A. We talked about making a matchmaker function, and the implementation, that's to some extent up to a coder's -- up to their sort of decision to exactly how to store it and whatnot. But we talked about a matchmaker function, which would have effectively opened -- allowed a third party to create a connection or illustrate to two people that they thought that they should connect.<br>    And just to further iterate on that, the -- you know, a connection can also be user defined. What you might define it on a site, such as our connect side of the website, could be used for any number of processes. You put in a functionality, you put in an infrastructure, and then it's up to the user to define how they want to use it or what they want to use it for. | Non-responsive<br><br>Topics 2, 5. | This is a frivolous example. Defendants do not understand the witness's answer, but he answered the question. |
| 59:25-60:18 | Q. So did Mr. Mavinkurve attend the strategy meetings?<br>A. Well, to the extent that he knew -- he knew that, as I mentioned before, that he understood that there was a propriety project and he would put an input where he saw fit. | Failure to answer simple question. | Witness testified in response to immediately preceding question that Mr. Mavinkurve attended strategy meetings; witness apparently did not |

| | | | |
|---|---|---|---|
| | Q. Were there any strategy meetings after Mr. Mavinkurve was hired that he wasn't present at?<br>A. Again, all the meetings were pretty much all, you know, with the two or three of us.<br>Q. And Mr. Mavinkurve was always at those meetings?<br>A. Yeah. He would be present or aware of anything that -- you know, there's -- any kind of decision he would be fully aware of because he would be the one implementing it or coding it. | Counsel tries again.<br><br>The second response qualified by "pretty much."<br><br>The third response avoids answering.<br><br>Topics 2, 5 and 10. | understand this follow up question (59:25), then answered the question unequivocally. |
| 63:23-68:3 | Q. Was there any discussion about what share of the partnership he would have?<br>A. With respect to dot-com companies, they're generally started as projects and sort of a small group of people with an idea, and it's sometimes unclear exactly where, you know, two months from that -- the start point or six months from that start point where exactly the equity will lay. Mr. Zuckerberg himself has reapportioned equity multiple times.<br>     So to the extent of talking about equity shares at that point, it was premature. However, everything was an equal partner. Everybody did contribute.<br>Q. So I want to make sure this is clear. So was there any discussion about what share of the partnership Mr. Zuckerberg would have?<br>A. The specific share, it was premature to speak about that at that time.<br>Q. So is the answer to my question no?<br>A. The answer is that it was premature to speak about specific shares. Was it understood by Mr. Zuckerberg that he would get a share? Yes.<br>Q. Okay. Did you tell Mr. Zuckerberg how much of a share of the partnership he would have?<br>A. Well, there is more --<br>Q. Please just answer the question. It's | Topic 1. | Addressed in opposition brief; Defendants provide no comment here. The witness answered these questions fully, despite Defendants' badgering attempts to obtain yes/no answers to questions that could not be fully answered with yes/no. |

a yes or no.

MR. HORNICK: The witness can answer the question however he wants.

A. Yea, I mean, you're – I'm assuming you're talking about equity share, the multiple benefits to a project, which could include prestige, equity. There's multiple levels. And at that point we had no revenue source, and the product was far from completion. We stressed to him multiple times that one of his major benefits would be a sort of a reinventing of himself in terms of his reputation post the Facemash debacle. In fact, he would be the center point of the launch, not us, even though it was our idea.

So we did not have specific talks about equity share, but as I said, he was an equal partner. Whatever you might want to infer from the equal partner, be it a quarter, a quarter, a quarter, that's fine.

Q. Did you tell Mr. Zuckerberg that he would be an equal partner?

A. I told Mr. Zuckerberg that he was -- we conveyed to Mr. Zuckerberg that he would be a par of the HarvardConnection team --

Q. And --

A. -- okay, not a contract programmer.

Q. And did you convey to him what his share of the partnership would be?

MR. HORNICK: Objection, asked and answered.

A. As I said before, we did not speak about specific equity stakes at that point. It was premature. If, you know -- I might point out at that time that Mr. Zuckerberg had yet to make a contribution. So, generally speaking, you know, in any law firm, particularly -- you know, I'm sure your firm works this way -- you work for seven, eight, ten years and then become a partner. People don't hand

8

| | | | |
|---|---|---|---|
| | out partnership.  You know, you don't give out equity.<br>        So everybody was aware that they were on a team, they'd make contributions, and that depending on the size of the contribution after a certain time period, they would be given equity.<br>Q. Was there ever any discussion at any point with Mr. Zuckerberg about what his share of the partnership would be?<br>A. Other than the fact that he was an equal partner on ConnectU and given full creative control and full input into what the product could and should be, there was not a specific discussion about specific amounts of equity at that time.<br>Q. Was there ever discussions stating that he was an equal partner?<br>A. As I said, we invited him to be part of the team.  We invited him to contribute.  He agreed to contribute, end of story.<br>Q. And where I'm focusing now is the word "equal."<br>A. Uh-huh.<br>Q. So did you ever tell Mr. Zuckerberg he would be an equal partner?<br>A. Well, I think the fact that we gave him our whole source code, gave him creative control, gave him full, you know -- asked him for multiple input would certainly lend to the word "equal."  There was no one-way dialogue.  In fact, if anything, it was skewed in his favor.  And so he had more than enough reason to believe that it was going to be on equal terms, his terms, and that's as far as really I can comment on that. | | |
| 68:4-<br>69:19 | Q. Did he ever tell you that he wanted to be an equal partner?<br>A. He never asked for monetary compensation, and all -- I can't -- what he essentially agreed to was to | Failure to answer the question. | This is a frivolous example. The witness testified that the Founders did not use the word "partner" (342:25- |

| | | |
|---|---|---|
| | contribute to the coding that he said he would contribute to. | 343:20), so the witness answered based on what actually happened. |
| | Q. Did he ever agree to take some equity? | |
| | A. Again, he agreed to complete a portion of the website and become part of the team. | Failure to answer the question. |
| | Q. And -- but my question is, did he ever agree to any specific allocation of equity in the partnership? | The witness specifically answered the question here. |
| | A. He did not say, "I need X amount of equity or amount," no, he didn't say that. | |
| | Q. And were there any discussions about allocation of equity during your relationship with Mr. Zuckerberg? | The witness specifically answered the question here. |
| | A. As I said before, it was premature to talk about allocation. This was a contribution basis where, you know, you join a team, you contribute, and you can reallocate partnerships. With myself and Tyler and Divya Narendra we didn't allocate partnership until later on because it was unclear what our respective contributions would be. | Failure to answer the question. |
| | Q. So that actually raises another issue. Prior to joining with Mr. Zuckerberg, were there any discussions between Mr. Tyler Winklevoss, you, Divya Narendra about how the equity would be divided? | |
| | A. We, again, as I said before, were -- we operated on an equality basis, and so we had four individuals with Mark Zuckerberg. When Mark Zuckerberg decided to -- or effectively launched Thefacebook, there was three individuals. At that point there's three equal partners in the company. Over time that has clearly changed in terms of the contributions that individuals have put into the company. | Not responsive to question. Topic 1. | The witness answered the question here and in many other places to the best of his ability, given that he testified that it was premature to be discussing equity in a website that was not even complete (see 63-68). |
| 72:6-73:4 | Q. Did you ever tell her that her understanding was wrong? | The first two questions and answers are context |

| | | | |
|---|---|---|---|
| | A. Yes.  In fact, I believe I told her over the phone absolutely, but, again, this is my mother's opinion.  And my mother sends me e-mails all the time that I disagree with.  And to keep up with, you know, replying to such e-mails is -- can be quite laborious, so…<br>Q. So describe these conversations you had with your mother where you told her she was wrong.<br>A. I simply said he actually was a partner and that, you know, the fact that he was a partner does necessarily -- you know, it's clear, through, regardless of that that he wasn't part of the initial idea and that, you know, that that was about it exactly what I just told you.<br>Q. And what was her response?<br>A. I mean, I don't recall at the time, but it doesn't really -- it's not really relevant what her -- you know, again, it's her opinion.  And it's -- it was inaccurate. | for the third.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Failure to answer the question by stating that the witness doesn't recall what his mother said, but that it was inaccurate.<br><br>Topic 1. | This is a frivolous example.  This is not a proper 30(b)(6) question.  Witness was testifying for the company, and the question asked for his mother's response to something he told her.  His mother is not part of the company, so he testified that her response, which he did not recall, was irrelevant, and that her opinion on this point was inaccurate. |
| 74:9-75:11 | Q. So let me give you an example.  If, for example, you and I were both participants on the HarvardConnection, and I sent you a request and then you responded affirmatively, would that -- would that connection that we've just established be stored through HarvardConnection in any way?<br>A. As I said before, we visualized connections that you made and connections that were requested of you through the website.  We did not visualize those on the user's profile. | The witness does not answer the question. | This is a frivolous example.  The witness specifically answered the question. |

| | | | |
|---|---|---|---|
| | But that doesn't -- you know, that's irrelevant to the question of what you're saying is did we sustain those relationships?  From a virtual standpoint we recorded, yes, I would say we sustained them to that extent.          Let's be careful not to get confused here, though.  You know, social network is -- I'm assuming that you're getting an what sort of constitutes a social network.  And a social network by definition, as I mentioned before, constitutes tools that allow people to connect, okay?  What form those tools might take, you know is a different aspect.  So in qualifying a social network, it is tools that allow people to connect. | | |
| 81:20-82:14 | Q.  Did you ever terminate his partnership? A.  Well, I think a better question is, did he ever fulfill the contribution level that he agreed to?  And he was -- to our knowledge, we have yet to receive that contribution. Q.  And that's not my question.  Did you ever terminate the partnership with him? A.  Well, I think the -- you know --          MR. HORNICK:  I think you're putting words into the witness's mouth. A.  Yeah.  Again, the question might better be phrased, as did he complete the sort of contribution he agreed to that would have suggested him being an equal partner?  And absolutely not.  He -- or maybe he did complete it, but we don't have it. Q.  Okay.  Mr. Winklevoss, you're not answering my question.          MR. HORNICK:  You're giving him an unfair question, that's why. | The witness refuses to answer the question and proposes a "better question."  Counsel re-poses the simple question.   ConnectU's counsel interjects. The witness refuses to answer the question and proposes an alternative question.     ConnectU's counsel indicates that the witness not to answer.  Topic 1. | Addressed in opposition brief. |
| 87:23- | Q.  Did you ever tell Mr. Jackson he | | |

| 91:19 | should keep the information confidential and not share it with others? | | |
|---|---|---|---|
| | A. It was clear that he was on a contract basis and that he should complete his portion, and Victor -- were it not I, Victor would have certainly told him this is a project that should not be talked about. | Fails to answer question posed. | The witness answered that "were it not I, Victor would have certainly told him. . . " |
| | Q. Did you ever tell him that? | The witness denies knowledge, referring the questioner to another individual, indicating lack of preparation (that he did not ask that individual for this information). | The witness did not recall if he told Mr. Jackson, and repeats that Victor Gao, a third party witness whose knowledge the corporation cannot be expected to possess, "most certainly would have." |
| | A. I don't recall if I told him, but Victor I think most certainly would have. | | |
| | Q. And did Victor tell you, Tyler Winklevoss or Cameron -- or Divya Narendra that he informed Mr. Jackson of his confidentiality obligations? | | |
| | A. I don't recall. I don't know. I can't say specifically if -- to my recollection, Mr. Gao would probably be a better individual to ask on that term, but I think it was fairly understood, and just like Victor brought Mark up to speed in terms of proprietary information, he would have done so with Joe as well. | Speculation. | Same; the witness testified that he reviewed the entire opus of documents related to the case, and they did not refresh his recollection on this point; thus, this is the best information known or reasonably available to ConnectU. |
| | Q. So is it ConnectU's testimony that Mr. Jackson was or was not told? | Does not answer the question about what ConnectU told Jackson; speculates as to what Jackson "understood." | The witness answered this line of questions with the best information known or reasonably available to ConnectU. |
| | A. I believe that he understood that it was proprietary information, is ConnectU's position. | | |
| | Q. The term "understood" is a confusing thing to me. Was he told -- | | |
| | MR. HORNICK: Well, it's not a confusing word. Don't say that. | | |
| | A. How so? | | |
| | MR. HORNICK: Just ask your question. | | |
| | Q. Well, did somebody tell him that he shouldn't share it with other people? | Deposing counsel asks the question for the fifth time. The witness still does not answer the question about what was *told* by ConnectU rather than what he believes was *understood* by Johnson. | The witness answered this question at the beginning of this repetitive line of questioning (87). |
| | A. Well, "understood" sort of implies that either -- you can read it, you can hear it, you can understand it. It's ConnectU's position that he understood it. And how he understood it, I can't tell you exactly what neurons were firing in his brain | | |

| | | |
|---|---|---|
| | that day that, you know, specifically gave him the inclination.<br><br>Again, Victor was present at a lot of those meeting. Victor was absolutely aware of the proprietary information, and he would have made Joe Jackson aware of that, just like he made Mr. Zuckerberg aware of that.<br>Q. So let me just ask it again. Does ConnectU know if Mr. Jackson was told to keep the information confidential?<br>A. It's ConnectU's position that Mr. Jackson understood that it was proprietary information.<br>Q. Okay. but you don't know if he was actually told?<br>A. It's our position. Again, how he got that understanding, I don't -- you know, it's not for me to sort of speculate on, but it's our position that he's -- he had that understanding.<br>Q. That he had that understanding, but you don't know whether he was told or he just knew it or what?<br>A. I would assume that he was told, but, again, that -- you know, who he got that understanding -- you know, a lot of programmers get understanding when you give them a block of code and you say, "This is code that I own, and this is a project that we're launching," and, you know, that alone for many people is a threshold for IP.<br><br>You know, programmers don't -- you know, especially people like Mr. Zuckerberg who are involved in an academic programming environment where they have to do programming problem sets, I don't think their teachers have to tell them that what you write is their code and that you shouldn't take code from a classmate or that, you know, you shouldn't copy, just like you don't copy a term | Speculation on what someone else "would have" done without knowledge of what they did, reflecting a failure to prepare for the deposition.<br><br><br>Counsel asks the question again, for the sixth time. The witness repeats his non-responsive answer.<br>Counsel asks the question for the seventh time. The witness repeats his non-responsive answer.<br><br>Counsel asks the question for the eighth time.<br><br><br>The witness refuses to answer, enumerating different ways that Jackson might have come to know that the allegedly confidential information was confidential.<br><br>Topics 2, 10. | Defendants' counsel repeats a question, over and over again, that the witness answered at the beginning of the line, so the witness keeps trying to answer it in a way that will satisfy the questioner.<br>The witness is trying to convey the point that regardless of the way, or by whom, Mr. Jackson was told, it is the company's position that he WAS told. |

| | | | |
|---|---|---|---|
| | paper. It's an understood thing in the academic community. Teachers don't have to say that. It's sort of a bylaw of any kind of coding.<br><br>There's open source, and then there's closed source. And closed source is proprietary information. And closed source is anything that's not made public purposely or -- you know, for that matter.<br><br>So we're talking about sort of nuances and this and that, but the fact of the matter is these are programming individuals, and they understood that it was proprietary information. That's our position. | | |
| 98:15-103:19 | Q. Other than these categories that are identified here, are you aware of any other categories that would be -- that ConnectU would consider is confidential information?<br><br>MR. HORNICK: Object to "categories." You can answer.<br>A. I think that I've gone over some of the main core things. My -- you know, I don't have a photographic memory. There might be some other content that I, you know, left out or can't quite recall right now. | Lack of preparation. Evasive. | The witness fully answered this question when it was first asked (36-41), and again at 96-98. |
| | Q. And as you sit here today, you've said everything that you recall as far as --<br>A. Yeah, as best as I can recall, that type of content would have been very relative to this type of website. | Evasive. | This is a frivolous example. The question was "you've said everything that you can recall" and the witness answered "Yeah, as best I can recall". |
| | Q. Okay. Now, if you look at the following sentence, it says, "Zuckerberg understood that this business management information and procedures were secret and agreed to keep them confidential."<br><br>Do you see that?<br>A. Uh-huh.<br>Q. Could you explain to me how he understood that?<br><br>MR. HORNICK: Objection, asked and answered. You can | Non-responsive; offers ConnectU's legal conclusion instead. | This is a frivolous example. This is not a proper Rule 30(b)(6) |

| | | |
|---|---|---|
| answer it again. | | question. ConnectU cannot be expected to know how Mr. Zuckerberg understood something. But the witness answered that Mr. Zuckerberg understood because Mr. Zuckerberg and his counsel wrote letters expressing such understanding, and Defendants acknowledged the first mover advantage in paragraph 16 of their Answer to the Amended Complaint. Plaintiff does not know what Defendants mean by "Refers to non-responsive documents." |
| A. Yeah, I mean, we went over this sort of with the whole code tangent, but it's actually -- your client has, himself, acknowledged his agreement and understanding of your business model, the ability to go to -- the idea of starting at one school and branching out to other schools. He's acknowledged that, and he's also acknowledged the importance of first-mover advantage. So as far as I know, it's really -- he's already acknowledged the understanding. | | |
| Q. So what were the conversations between ConnectU or HarvardConnection and Mark Zuckerberg about confidentiality? | Refers to non-responsive documents. | |
| A. I think we've already gone over this. Again, I can further highlight -- we have multiple e-mails where we're stressing to get it out in a timely manner, we need to launch, we need to get it first to market illustrating that -- you know, the advantage of a first-mover advantage in terms of getting the site out. And he was fully aware of that, and he acknowledged that. And we already talked about his understanding of what proprietary information is and what it -- what was and what wasn't. | Non-responsive | The witness specifically answered the question, which he answered earlier (53, 90-91). |
| Q. Okay. I'm asking a really simple question. | | |
| A. Uh-huh. | | |
| Q. What were the discussions between ConnectU or HarvardConnection principals, you, Divya Narendra and Tyler Winklevoss, and Mr. Zuckerberg about confidentiality of the information? | | |
| MR. HORNICK: Objection, asked and answered. You can answer it again. | | |
| A. Yeah, I mean, I think he understood that, you know, in our meetings and through our stressing of the fact that | Starts to provide facts that could lead to an answer. | |

16

| | | | |
|---|---|---|---|
| | it, you know, it's a -- and Victor Gao would have also stressed it multiple times to him as well, that this is not a concept that is in the public domain, it has yet to be done before, we invested time and money into this code, and that it's proprietary, and --<br>Q. Did you ever tell him that?<br>A. Did I specifically say -- what do you mean?  Tell him what?<br>Q. Did you specifically tell Mark Zuckerberg, "Don't tell anyone about this information or about this business model"?<br>A. Well, I think the question should be did ConnectU tell him?<br>Q. Well, I'm going to break it down to the various people who own ConnectU.<br>A. Well, is ConnectU being deposed, or is Cameron Winklevoss being deposed?<br>Q. I'm asking you. He can object that it's outside the scope.  I'm asking, did you?<br>A. Did I personally?  In various e-mails I stressed the necessity of this site needing to get out before market, before other sites, and that it would be confidential, yes.<br>Q. Isn't it true that in no e-mail that was ever exchanged between you and Mark Zuckerberg was it stated, "Don't tell anyone else about this information"?<br>     MR. HORNICK:  Objection to the form of the question.  Did it say those exact words?  Is that your question?<br>     MR. CHATTERJEE:  Yes. | Returns to arguing, refusing to answer, suggesting a different question.<br><br><br><br><br><br><br><br><br><br><br><br><br>Coaching. | This is a frivolous example.  The witness seeks to clarify whether the questions are directed to himself personally or ConnectU.  At the beginning of the deposition, Defendants' counsel said "If you don't understand a question that I'm asking, please let me know." (8:23)<br><br><br>This is a frivolous example.  Plaintiff's counsel was asking for clarification of what the question was.  Defendants' counsel confirmed Plaintiff's counsel's understanding. |
| | A. There is a collage of e-mails and correspondence that absolutely point to an understanding and a forceful | Answers by reference to | This point is irrelevant to the issue of whether Defendants should be |

| | | |
|---|---|---|
| imparting of the idea of confidential information. And as I said before, Victor Gao had a two-hour tutorial with Mr. Zuckeberg, two-hour tutorial at the computer, you know, with him, explaining to him the whole concept and the whole idea behind HarvardConnection.<br><br>So if you want to break it down, well, did -- was it -- there a specific e-mail or versus the whole, you know, conversation aspect and the whole collage, you're taking a snippet out of one situation.<br>Q. Well, I'm trying to -- okay. So in the e-mails was there any statement, "Don't tell anyone about this," that exact statement?<br>A. The exact statement, "Don't tell anyone about this"? The exact words "Don't tell anyone about this," I don't believe there were those exact words in an e-mail.<br>Q. Anything like that?<br>A. As I said--<br>MR. HORNICK: Object to the form of the question.<br>A. --there's a collage of stressed importance towards launching the site first, towards the fact that source code is proprietary, the fact that he's a partner of a group. There's any -- there's innumerable accounts of it. | "collage" of documents whose contents witness has earlier admitted he doesn't know.<br><br><br>Admits he cannot reference any specific document to provide an answer, indicating a lack of preparation as to topics 1, 2, and 10.<br><br><br><br><br><br><br><br><br><br><br><br>Again witness will refer only to a "collage" of documents, reflecting a lack of preparation.<br><br>Topics 1, 2, and 10. | given more deposition time. The witness made no such admission, and testified that he reviewed the entire opus of documents and all communications with Mr. Zuckerberg (10-11), and that various statements were made to or by Mr. Zuckerberg in various email (18, 22, 74, 100). There is no other testimony regarding such emails prior to this point in the deposition.<br><br>Defendants mischaracterize the witness's testimony, which is that the collage of emails as a whole answers their question.<br><br><br><br><br><br>This is a frivolous example. The question was "anything like that", and the witness referred to the collage of emails, thereby answering the question. |
| 108:12-111:24 | Q. And anything else you can identify?<br>A. I think I've answered the question.<br>Q. Well, other than that one statement, is there anything else you can identify in what I've marked as Exhibit 4?<br>A. If you want me to go through these and sort of look a little bit more thoroughly, that's the first thing that | The witness contests whether he's required to answer. | This is a frivolous example. The witness simply said that he believed he had answered the question, which was: "Where in these emails is it reflected, if anywhere, that Mr. Zuckerberg |

| | | |
|---|---|---|
| | popped out. I think it sufficiently answers the question.<br>Q. Sure. Why don't you look through it more thoroughly and see if there's anything else.<br>A. To really, you know, more thoroughly sort of hammer it home, Victor Gao, again, in multiple conversation -- you know, a two-hour conversation imparted to Mark the sort of the proprietary nature of the website. So I really don't think it's necessary.<br>    MR. HORNICK: I'll say that your question is reaching the oppressive level under the Federal Rules.<br>    MR. CHATTERJEE: You can seek a protective order if you think it's oppressive. I'm just asking --<br>    MR. HORNICK: I can stop it under that basis, if you read the rule.<br>    MR. CHATTERJEE: If you want to stop it, stop it.<br>    MR. HORNICK: I don't want to, no. I want to give you your full day.<br>A. And I'd like you to be --<br>    MR. HORNICK: I suggest you move on. The witness has answered your question, many times.<br>    MR. CHATTERJEE: I actually asked him to identify everywhere in these documents --<br>    MR. HORNICK: And he told you the whole set of documents, and I told you the set of document documents is incomplete, so your questioning is unfair and oppressive. | The question, posed for the third time, seeks identification of any other evidence. Non-responsive. | understood the information was to be kept confidential?" (106:16-19)<br>The witness offered to do precisely this, even though be believed he had fully answered (108:17-20), then says for the third time that he has fully answered the question. Plaintiff's counsel then pointed out for the first of three times that Defendants' questioning was reaching the oppressive level under Rule 30(d)(4). |
| | A. You actually asked me to point to one instance, and I did do that.<br>Q. Okay. Can you point to any other instances?<br>A. I pointed to several before the e-mails about the verbal conversation between Mr. Gao --<br>Q. Well, we'll get to the verbal | Evasive. | The witness points out that he has already answered Defendants' |

| | | | |
|---|---|---|---|
| | conversations. I'm focusing on the e-mails at the moment. | | repetitive questions. |
| | A. Well, we've actually already gone over the verbal conversations. That was the first line of questioning before the e-mail questioning, so… | Evasive. | The witness points out that he has already answered questions about verbal conversations. |
| | Q. Please answer my question with respect to these documents | | |
| | A. So that's the -- I think that that's the most illustrative point, and I don't think that it's -- as I said before, it's the collage of e-mails. And I don't think that I -- you know, I think that's the most relevant point, and I think that that's the most worthwhile point to answer that question with. | Evasive and non-responsive. | The question was "Well, other than that one statement, is there anything else you can identify in what I've marked as Exhibit 4?" (108:14-16). The witness answered that the example he gave was "the most illustrative point" and that the collage as a whole answers the question. |
| | Q. So you're just saying it's the entire collection? There's nothing specifically in any individual -- | | |
| | A. I just showed you a specific instance. That was the fact that he didn't use our code and functionality in a site indicates an understanding, as I've said before, of the proprietary nature of the code, the functionality and the business ideas surrounding the site. | Witness refuses to answer the pending question and restates ConnectU's legal position. | The witness restates his prior answer. Defendants' counsel says "Okay." |
| | Q. Okay. And Mr. Winklevoss, other than that one instance, are there any other specific instances where you can say that, or are you just saying it's all of the e-mails kind of together? | Counsel poses the unanswered question for the eighth time. | Witness has answered the question each time. |
| | A. I'm saying it's a collage. I'm that Mr. Gao imparted the proprietary nature of the site to him and that, yeah, I think that's -- you have multiple instances there. And, again, there might be more instances that I can't recall off the top of my head right now. | Witness will answer the question only by reference to documents.<br><br>Evasive. | This is a frivolous example. The question asked the witness to answer with respect to the documents. |
| | Q. Okay. | Topics 1, 2 and 10 | |
| | A. Okay? That does not exclude what I can't recall. | Lack of preparation. | |
| 112:10-113:6 | Q. Now, you said that Mr. Gao and Mr. Zuckerberg had a conversation about confidentiality. | | |
| | A. He -- no. They had -- as I said, they | Speculative and evasive. | This is a frivolous |

20

| | | | |
|---|---|---|---|
| | had a tutorial regarding the code, the site and the ideas behind the site. And Mr. Gao would have imparted to him the understanding that there was -- that this is -- this is proprietary information. Now, Mr. Gao and Mr. Zuckerberg are also classmates in CS at Harvard, and they understand the problem sets and code that you write in class is proprietary information, and unless you give written consent or sort of the ability to rebroadcast or republish that code, you have no right to do that.<br>    So, again, we're talking about educating people who this is their bread and butter. You know, we're talking about this type of, you know, you're telling -- you know, you're preaching to the choir basically, is that I'm getting at. | Reflects a failure to prepare as 30(b)(6) designee (topics 1, 2 and 10). | example. Defendants mischaracterize the witness's testimony and the witness corrects him. |
| 120:11-122:9 | Q. And when did this discussion occur?<br>A. Again, you're -- you know, we already went over this. In an e-mail dated January 8th your client says that -- he refers to the project as "we," using very operative words, "we." In the February 12th e-mail from your client, aside from proving the proprietary nature of our code and software and functionality, your client also acknowledges that he expected to be part of the overall development and control, "control" being a very important word there --<br>Q. Well, I'm not asking what my client said. What I'm asking is, at the beginning of the relationship you've outlined a number of terms.<br>A. Okay.<br>Q. Was there a discussion about that?<br>A. There was an expectation from your client that those terms were the terms.<br>Q. Okay. And why do you say that at the very beginning of the relationship? | Witness does not answer the question. The witness makes non-responsive assertions about what Zuckerberg's emails show he "understood."<br><br><br>Counsel clarifies. | This is a frivolous example. The witness stated that he had already answered the question, and tried to provide additional information regarding an email conversation with Mr. Zuckerberg. |

| | | | |
|---|---|---|---|
| | A. Well, I'll -- again, I'll refer to 4630. 4630, C4630. Let's see, "I worked with the expectation" -- okay -- "with the expectation that I would be included in overall development and control of the project."<br><br>So that would -- I mean, I would assume that he would get that expectation at the beginning. I don't think --<br>Q. Did you have discussion about?<br>A. Certainly we had meetings. As I said, we talked in meetings about the timely nature to get this site to launch, the first issue with us needing to get it out and launched. His expectations are built on, again, for lack of, you know, a more concrete example in the -- with regard to business dealings, you can't hand one business relationship on one e-mail. You can't hang a partnership on one sentence. It's a collage, okay? We have a collage of e-mails, a collage of discussions, and, you know, your client somehow managed in that whole collage to decipher and pick out the most meaningful aspect in that he expected to be part of the overall development and control and part of -- and that he acknowledged an agreement. | Witness refuses to answer the question.<br><br><br><br><br><br><br><br><br><br>Counsel again poses the unanswered question.<br><br><br><br><br><br><br><br>Evasive and non-responsive.<br><br>Lack of preparation regarding topic 1. | This is a frivolous example. The witness was asked "and why do you say that at the very beginning of the relationship?", and the witness answered by referring counsel to, and quoting, documents.<br><br><br><br>Incomprehensible comment.<br><br><br><br><br><br>This is a frivolous example. The vague question was "Did you have discussion about it?" and the witness answered "Certainly we had meetings. As I said, we talked in meetings about the timely nature to get this site to launch, the first issue with us needing to get it out and launched." Nothing in this answer shows lack of preparation. |
| 135:2-9 | Q. Okay. So from that second meeting previously did you every -- did anyone at ConnectU or HarvardConnection ever discuss with Mr. Zuckerberg what he would get out of it, out of doing this work?<br>A. Well, so, as I said, his remuneration, you know, we took him on as a member of the team -- | Vague and evasive answer. | This is a frivolous example, and shows Defendants' badgering. |

| | | | The witness specifically answered this question, as he did at 63-69. |
|---|---|---|---|
| 138:25-144:5 | Q. Now, what other issues --<br>A. Okay.<br>Q. -- did you discuss about what he would get out of it?<br>A. And then we also discussed and Victor discussed with him prior to this second meeting that it was -- there's a very large advertising potential. And Mr. Zuckerberg was fully aware of how sites work and hits and how that correlates to money. And we-- he was certainly aware of -- | Does not answer the question. | This is a frivolous example. The witness specifically answered this repetitive question. |
| | Q. Hold on. My question is, what did you tell him, not what you think he understood. What did ConnectU or HarvardConnection tell Mr. Zuckerberg about what he would get out of the deal?<br>A. That he --<br>Q. I got the reputation thing.<br>A. Yeah.<br>Q. What else did you tell him?<br>A. That he would reap any and all benefits that would come along with being a part of the HarvardConnection team, whether it be monetary, money, prestige, fame, whatever it is, he would get any and all. It was completely explicit there. | Question posed for the second time. | The witness had already answered the question (see 63-69, and above). |
| | Q. And who said that?<br>A. As I said, we talked about the potential for the site. He was -- we talked about the respective roles in the partnership --<br>Q. No. My question's very simple. Who told him about the fact that he would be entitled to revenues from the partnership?<br>A. Well, I think -- okay. I think by telling him that he's part of the team, okay, by telling him that he's a partner and that he's entitled to any types of remuneration, I think "any | Evasive.<br><br>Counsel repeats the question for the third time. | The witness answered the question. He is testifying for ConnectU, which is the successor to the Harvard Connection Founders. In this context, "we talked" refers to the Founders. |

23

| | | |
|---|---|---|
| and all" applies specifically and non-exclusively to monetary benefits. | | |
| Q.  So there was no express statement to him that he be entitled to remuneration? | Counsel tries a fourth time. The witness evades answering the question - "was there an express statement?" | Defendants changed the question and the witness specifically answered it. Defendants obviously do not understand the witness. |
| A.  See, what I'm saying is we didn't actually talk about -- we didn't spend a lot of time talking about advertising revenue at that meeting because that site wasn't even up, okay?  What we talked about was getting the project done and getting it launched, and the most salient remuneration at that point was the benefit to his reputation.  But that did not -- that was not exclusive or -- you know, to the fact that advertising money would certainly be equally distributed, were and when it were to come in.  So to answer your question, any and all remuneration based on the Web side, even if it was -- | This testimony is about that the witness asserts "would" have happened, and not whether there was "an express statement." | The witness was trying to provide a complete answer. |
| Q.  Okay. | | |
| A.  -- you know -- | | |
| Q.  Finish your question -- finish your answer. | | |
| A.  So I'm saying while we didn't harp on the advertising or the revenue potential, it was certainly understood that any benefit from the site, specifically because he was a coder and involved with the aspect of it and was part of the time, would be his. | The witness does not answer.  Instead, witness testifies non-responsively about what he believes Zuckerberg understood, not about his own knowledge.  Counsel asks the question for the fifth time. | This is a frivolous example.  Counsel told the witness to complete his answer, which he did. |
| Q.  Okay.  So did you tell him specifically that any benefit from the site he would be able to have a piece of? | | |
| A.  Okay.  Any benefit from the site he would have a piece of, yes, being a partner of our team, yes. | | |
| Q.  And you told him that specific statement? | Counsel asks a sixth time. Vague and evasive. The witness contradicts previous answer. | The witness answered the question unequivocally, but counsel badgers him by asking again. |
| A.  That specific word by word?  It was probably a fair -- it was probably different than that. It was probably more to the extent, "Look, you're on the HarvardConnection team. This is | | Defendants asked if the witness used the exact |

| | | |
|---|---|---|
| | going to be great for your reputation. We're all in this together. This is an equal partnership. And also, think of the enormous advertising potential this think has." | | words from his prior answer, and the witness clarifies. |
| | Q. And so you told him it was an equal partnership?<br><br>A. Again, at that time, as I mentioned before, we didn't -- you know, he was brought on with -- he had the expectation that, you know, he was going to be part of the overall development and the control of the site and that at that point we divvied up the contributions and it was premature to talk about specific equity.<br><br>Q. Why didn't you just hire him as a contractor like everyone else?<br><br>A. Because we -- ultimately when you're looking for -- equity's a very good way of getting really the most out of a situation and people. And I think that, you know, Victor, to take Victor for example, we did want him as a partner, but he felt personally that he could not undertake the responsibility of being that, so he wanted to be contracted piecemeal. But ultimately you want a partner in the situation because they put, you know, effort in. They go that extra mile.<br><br>Q. Now, when you were -- did you ever tell Mr. Zuckerberg that he couldn't work on any competitive websites that were under development?<br><br>A. Well, I think that -- I think certainly if there is a project. I mean, when you undertake a partnership, specifically did we say don't work on, you know, the exact same thing, well, I think that being part of the team and the partnership, you know, is proprietary. So he could not use a proprietary code or functionality to work on another similar website that | The witness does not answer the question asked.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Non-responsive and speculative about what he believes Mr. Zuckerberg "understood." | Defendants further badger the witness, after he had answered the question twice at this point in the deposition, and again earlier in the deposition (see 63-69, and above).<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>The witness specifically answered the question in his next statement. |