## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU LLC, | |
| Plaintiff, | CIVIL ACTION NO. 1:04-cv-11923 (DPW) |
| v. | |
| MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, CHRISTOPHER HUGHES, and FACEBOOK, INC., | |
| Defendants. | |
| MARK ZUCKERBERG and FACEBOOK, INC., | |
| Counterclaimants, | |
| v. | |
| CONNECTU LLC, | |
| Counterdefendant, | |
| and | |
| CAMERON WINKLEVOSS, TYLER WINKLEVOSS, and DIVYA NARENDRA, | |
| Additional Counterdefendants. | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.  INTRODUCTION

Although they combine and confuse them, Defendants' basic arguments are that for a period of time Plaintiff lacked standing to assert its state law claims, and that diversity jurisdiction was lacking from the original Complaint.  However, these arguments twist the facts and law and belie the current disposition of the case.  At this point, Defendants are desperate to dismiss the case procedurally because they can't win it substantively.  Why else would they present such tortured arguments?  Their motion should be denied because Plaintiff concededly has (and always had) standing, the real party in interest is named as Plaintiff, and subject matter jurisdiction was proper on the filing date and is concededly proper today.  Dismissal of any of Plaintiff's claims at this juncture would be contrary to the letter and spirit of the Federal Rules of Civil Procedure and federal statutory and case law, which ensure the resolution of cases on their merits and not on alleged hypertechnical and/or no-longer-existent deficiencies in the pleadings.

## II.  PLAINTIFF'S STATEMENT OF FACTS

The following is an updated version of the facts set forth in Plaintiff's prior briefs.

In December 2002, the founders of Plaintiff ConnectU LLC, Divya Narendra and Tyler and Cameron Winklevoss (the "Founders") came up with a great idea:  to bring the concept of a social and professional directory, networking, and dating website to the college level, starting with Harvard University, where they were juniors at the time.  At this point, they worked on the idea together informally as a team and did not take any action to formalize their relationship.  They thought of themselves as the Harvard Connection team.  (Ex 1, Trans. at 65, line 24- 66, line 1 "he would be part of the Harvard Connection team"; Trans. at 67, line 10-11 "we invited him to be part of a team." ). [1]

---

[1] At this point, the Founders had not officially formed any legal entity and therefore were operating as an unincorporated proprietorship.  The ConnectU Operating Agreement, ¶ 13.5 (Ex. 2), describes them as such (not as a sole proprietorship as alleged by Defendants, Motion at 8).  An unincorporated proprietorship is not a legal entity separate from the proprietor(s). *See American Casualty Co. v. Assiran, Civ.*, 289 F. Supp. 645 (D. Mass. 1968). When ConnectU's 30(b)(6) witness, Cameron Winklevoss, used the term "partnership," he was not using it in the legal sense.  He is not a lawyer, and could not be expected to make a legal conclusion, as Plaintiff's counsel objected at that time. (Ex. 1; Trans. at 16, lines 16-20)

In early November 2003, the Founders found Defendant Mark Zuckerberg and asked him to join with them to complete the site and launch and market it as quickly as possible (see Counterclaim ¶9, D.N. 14). Mr. Zuckerberg enthusiastically agreed, and dove into completing the "connect" side of the site, or so he told the Founders. Beginning around mid-November 2003, Mr. Zuckerberg sent Cameron Winklevoss a series of emails saying he had essentially completed the connect side and offering suggestions for the dating side of the site. On November 22, 2003, Mr. Zuckerberg wrote: "I have most of the coding done, and I think that once I get the graphics we'll be able to launch this thing…. it seems like everything is working". (Ex. 3) Yet every time the Founders tried to meet with him to see his progress, he stalled. Getting a meeting was a struggle; Mr. Zuckerberg continually put them off (see Ex. 4). Though the Founders met with Mr. Zuckerberg three times between November 26, 2003 and January 14, 2004 regarding his work on the site, he never showed them his work, yet continued to assure them that he was working diligently to complete the connect side of the site.[2]

The last meeting was January 14, 2004, during which Mr. Zuckerberg continued to lead the Founders to believe he was still on board and was working to complete the connect side (Ex. 8). What he didn't tell them at that meeting, or at any other time, was that 3 days earlier, on January 11, 2004, he registered the domain name "thefacebook.com". (Ex. 9) The morning of the meeting, he told the Founders he was working on another project with some other people. (Ex. 10) On February 4, 2004, the nature of that project became clear: Mr. Zuckerberg and the other individual Defendants launched a website called thefacebook.com, which is a social networking and dating site for college students that stole the Founders' idea for the Harvard Connection website.

---

[2] Mr. Zuckerberg wrote: November 30, 2003: "everything will be ready for testing by Monday." (Ex. 5) December 1, 2003: "I have everything working on my system now." (Ex. 5) January 8, 2004: "I've made some of the changes, although not all of them, and they seem to be working on my computer." (Ex. 7)

As of April 2005, after its first 20 months of operation, thefacebook.com (which the individual Defendants ran as an unincorporated proprietorship for its first six months[3]) went from zero users to a reported 8.3 million registered users, operating at almost all 1400 U.S. colleges and universities, with an average of 80% membership among each college population. (Ex. 11)  Thefacebook.com is now the eleventh most visited website in the country.  *Id.*  The average user visits thefacebook.com an amazing six times per day.  (Ex. 12)  As of May 2005, thefacebook.com web pages have been viewed a reported **3 billion** times.  *Id.*  On September 26, 2005, the site had a record **200 million hits  that day alone**, and Mr. Zuckerberg "was eager to point out his site's similarity to the $81-billion-worth of Google, which he estimated as receiving 200 to 250 million hits per day."  (Ex. 13)  In mid-April 2005, venture capitalists pumped **$13 million** in capital into Thefacebook, Inc. (Ex. 14)  Recent estimates put its value at close to **$100 million**.  (Ex. 15)  The facebook.com's current advertisers, which are its primary revenue source, include Apple, Victoria's Secret, and Paramount Pictures.  (Ex. 12)  On February 7, 2005, thefacebook.com launched at the first European colleges.  (Ex. 17)  On September 2, 2005, thefacebook.com expanded to high schools.  (Ex. 15)

The Founders were shocked at Mr. Zuckerberg's duplicity and thievery, and sent him a cease and desist letter on February 10, 2004 (Ex. 16).  Mr. Zuckerberg responded, saying he did not start working on thefacebook.com website until after the January 14, 2004 meeting, and denying any wrongdoing.  (Ex. 18)  The media reported that Mr. Zuckerberg said he coded the entire thefacebook.com website in one week's time (a superhuman feat), supposedly in late January and early February 2004 (Ex. 19).  In fact, Mr. Zuckerberg started working on thefacebook.com at least as early as January 12, 2004 (see Confidential Ex. 16 to Plaintiff's Motion to Compel Answers to Interrogatories, D.N. 54), and has boasted in the media to conceiving thefacebook.com around Christmas 2003.  (Ex. 20)

---

[3] On July 29, 2004, TheFaceBook, Inc. incorporated in Delaware (Ex. 21).  As of September 30, 2005, the corporation is known as "Facebook, Inc."  Although they have changed the name of the legal entity, the party has not changed.

After the facebook.com website launched on February 4, 2004, the Founders knew they had lost the crucial jump on the market that Mr. Zuckerberg and the other individual Defendants had snatched away. Harvard Connection still wasn't ready to launch. They had none of the coding Mr. Zuckerberg said he wrote, and again they were without a programmer to complete the connect side of the site and help them launch it. In early March 2004, the Founders located and hired a professional website development company, which rewrote the computer code needed to run the site. In April 2004, the Founders incorporated as ConnectU LLC to launch and operate their website, now known as connectu.com, which was the same concept as Harvard Connection, but with a different name.

ConnectU was finally able to launch its site on May 21, 2004. Unfortunately, by this time thefacebook.com had a reported 150,000 users at 30 colleges across the U.S. (Ex. 19, 12), and school was ending for the summer. Connectu.com launched, but there were few students to use it because it was summer vacation. Compared to thefacebook.com's reported 8.3 million users today (Ex. 11), connectu.com has only about 67,000.

## III. THE COURT HAS JURISDICTION OVER THIS CASE

### A. Subject Matter Jurisdiction Has Been Proper Since Filing

When a party moves to dismiss for lack of subject matter jurisdiction, courts consider the facts alleged in the Complaint as being correct. If these facts reveal any reasonable basis on which the non-movant might prevail, the motion will be denied. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)(overruled on other grounds). As Defendants acknowledged, there is no lack of diversity on the face of ConnectU LLC's original Complaint, filed on September 2, 2004. (Motion at 2, fn. 2, and 2, lines 6-9). The original Complaint names only diverse parties because it names TheFacebook as "an implied or *de facto* partnership [doing] business as thefacebook.com a/k/a Thefacebook" (Dkt. ___, ¶ 10). It did not name TheFacebook, Inc. or any corporate defendant. It is of no consequence that an unnamed party would destroy diversity, *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 365-66 (1921) (unnamed members need not be of diverse citizenship), and Defendants cite no contrary law. And contrary to Defendants'

argument (Motion at 11, 16), Plaintiff never admitted that diversity was absent from the original Complaint.

When the Complaint was filed, Plaintiff believed the individual Defendants were still unincorporated. Before filing the Complaint, Plaintiff searched to determine if TheFacebook was incorporated. The search turned up no results, and Plaintiff proceeded accordingly, naming "TheFaceBook" as an unincorporated entity, as well as the individual Defendants, as to which there was complete diversity vis-à-vis Plaintiff ConnectU, LLC. After filing, Plaintiff learned of the existence of an entity called TheFaceBook, Inc., which may or may not have co-existed with TheFaceBook partnership.[4]

The fact that the named party, i.e., TheFaceBook implied or *de facto* partnership, allegedly did not exist at the time of the Complaint has no effect. Fed. R. Civ. P. 21 allows for the misjoinder and non-joinder of parties to be freely corrected. *See Lamar Advertising v. City of Lakeland*, 980 F. Supp. 1455, 1459 (M.D. Fla. 1997) (motion to dismiss denied because misjoinder is not grounds for dismissal, but court instead granted motion to strike names of improperly joined defendants). Prior to filing the Amended Complaint, Defendants could have moved to dismiss on the basis that TheFaceBook partnership did not exist, that the real party in interest, TheFaceBook, Inc., was not named, and that if the real party was named, diversity would be destroyed. Instead, they opted to wait until substantial discovery had been conducted and Plaintiff incurred substantial expense, and until after the jurisdictional basis of the suit was switched to a federal question, before they decided to move. In fact, problems relating to diversity jurisdiction should be resolved early on. *Dubisky v. Owens*, 849 F. 2d 1034, 1038 (7th Cir. 1988).

---

[4] Defendants' argument assumes that there was only one TheFaceBook entity on the filing date, rather than, for example, a TheFaceBook partnership **and** a TheFacebook corporation. Many companies are comprised of one or more corporations and other legal entities. To date, Defendants have blocked discovery of their corporate form and related entities. (See Plaintiff's Production Request No. 102, covered by its pending motion to compel, D.N. 68)

Plaintiff filed the Amended Complaint on October 28, 2004, which made the issue of diversity moot. The Amended Complaint switched the basis for subject matter jurisdiction from diversity jurisdiction to federal question jurisdiction.[5] Switching the basis for subject matter jurisdiction is proper. *Carlton v. Baww*, 751 F.2d 781, 786-89 (5th Cir. 1985) (amendment under 28 U.S.C. 1653 allowed to assert federal question jurisdiction when diversity was destroyed). Pursuant to 28 U.S.C. § 1653, which allows defective allegations of jurisdiction to be amended to avoid dismissals on technical grounds, parties can amend their pleadings to assert the correct jurisdictional basis for their suits. Contrary to Defendants' argument (Motion at 1), the Amended Complaint did not "cure" faulty jurisdiction because jurisdiction was not faulty in the original Complaint. Moreover, even if it were, adding a federal question cures a lack of diversity on the filing date. *Blanchard v. Terry & Wright, Inc.*, 331 F.2d 467, 468-69 (6th Cir. 1964) (motion to dismiss was denied and Plaintiff was granted leave to amend to allege federal claim where diversity jurisdiction alleged on the face of the complaint was faulty); *Moore v. Coats Co.*, 270 F.2d 410 (3d Cir. 1959) (allowed the use of an amendment of the complaint to create venue that previously had been absent. The court relied on prior cases involving subject-matter jurisdiction and concluded that the two should be treated similarly under 28 U.S.C. §1653). Defendants ignore this point and cite no contrary law.

Thus, the original Complaint supported diversity because it named only diverse parties. Even if the unnamed TheFaceBook, Inc. somehow destroyed diversity at that time, federal statutory and case law permit jurisdictional allegations to be corrected and subject matter jurisdiction became undisputed when Plaintiff filed the Amended Complaint.

**B.      Defendants' Reliance on *Grupo* is Misguided**

Defendants' characterize *Grupo Dataflux v. Atlas Global Group, L.P.*, 521 U.S. 567 (2004), as compelling dismissal in this case. (Motion at 1, 10)  In reality, other than affirming the

---

[5] Because Defendants do not contest that federal question jurisdiction is proper for a copyright infringement claim, this issue is not explored further. Defendants also concede federal question jurisdiction over the copyright claim as of the filing date of the Amended Complaint. (Motion at 14)

rule that subject matter jurisdiction is tested on the filing date (subject to some exceptions), the *Grupo* holding was narrow and has no applicability to this case. Unlike *Grupo*, subject matter jurisdiction in this case was properly pleaded on the filing date, and is now premised on federal question jurisdiction, not diversity. And unlike *Grupo*, where a partnership named on the filing date contained diversity-destroying partners, who later left the partnership, ConnectU did not name any nondiverse parties in the original Complaint. Changes in the diversity of **named** parties was never an issue in this case, but they were the crux of *Grupo*.[6] Contrary to Defendants' argument (Motion 12, 13), *Grupo* also does **not** say that adding a federal claim cannot cure a diversity defect at the time of filing. (Defendants cited *Grupo*, 541 U.S. at 571).

## C.    Dismissal Based on Purely Technical Grounds Wastes Court Resources

Defendants admit that if the Court dismissed, Plaintiff can refile the same day in federal court. (Motion at 12) Since there is no statute of limitations problem, Plaintiff would be able to refile and the Court would re-start a case that is already well into discovery and has been proceeding for over a year. Defendants show no consideration for the fact that this motion asks the Court to waste time and resources. In light of Defendants' tortured argument, for which they cite no law, that diversity was absent on the filing date because the named party, the TheFaceBook, was really a nondiverse corporation and not a diverse partnership, such a result would be absurd. In denying a motion to dismiss based on lack of subject matter jurisdiction, a sister court noted that judicial resources would be wasted and resolution would be delayed if it permitted the case to be dismissed, since the dismissal would be without prejudice, thereby

---

[6] In *Grupo*, a Texas-based limited partnership that included two Mexican citizens as members filed a diversity action for breach of contract against a Mexican corporation. After removal of the Mexican citizens from the partnership, a jury trial was held in federal district court. Following a verdict for the partnership, the court granted defendant's motion to dismiss for lack of subject matter jurisdiction because the named defendant and the members of the named plaintiff partnership were not diverse on the filing date. The Fifth Circuit reversed. The Supreme Court, agreeing with the district court, reversed. The First Circuit has cited *Grupo* and categorized its holding in benign terms, stating that *Grupo* notes "that a post-filing change in the parties to an action, unlike a change in the initial parties' citizenship, **can** affect subject matter jurisdiction." *Ortega v. Star-Kist Foods*, 370 F.3d 124, 137 (1st Cir. 2004) (emphasis added).

allowing plaintiff to re-institute the case. *Fox v. Bourgeois*, 799 F. Supp. 1274, 1275 (D.N.H. 1992).

For these reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction on the filing date should be denied.

## IV.    THE COURT HAS JURISDICTION OVER THE STATE LAW CLAIMS

### A.    The State Law Claims Do Not Predominate

Defendants argue without explanation that the copyright claim is "overwhelmed by the state law questions," and that it is attenuated, weak, and confused. (Motion at 13-16). Yet all of the claims arose from the same set of operative facts.[7] At this time, it cannot be determined which claim(s), if any, will predominate because Defendants have been withholding so much discovery (Plaintiff has three pending motions to compel, D.N. 37, 52, 68). Defendants fail to mention that they have produced no readable thefacebook.com source code from the time of its February 2004 launch, preceding the launch, or from the launch through September 2004, and have produced no database definition ("DBD") for any version of their code. It is this early code and DBD that is the best evidence of infringement. Plaintiff has filed a motion to compel the imaging of Defendants' electronic memory devices (Dkt. 37), which are likely to contain such code, which Defendants have not denied. Until that motion is resolved and this early code and DBD are obtained, Plaintiff cannot provide an infringement or misappropriation of code analysis, or complete its expert report due November 1, 2005. The primary purpose of the motion to compel images of electronic memory devices is to obtain code for the copyright claim, which Defendants claim they lost. Defendants' failure to preserve the code sought by Plaintiff's motion may result in making the copyright claim the most important claim. If Defendants do not find and produce their early code and DBD, Plaintiff will seek an adverse inference supporting its

---

[7] Contrary to Defendants' argument (Motion at 14), none of the facts that gave rise to the claims pre-date the creation of the Harvard Connection code. The claims arose from Mr. Zuckerberg's agreement to complete such code and launch a website with the Founders.

copyright claim, based on spoliation of evidence (Defendants were on notice of Plaintiff's claims days after they launched thefacebook.com, Ex. 16 ).

　　None of the cases cited by Defendants supports dismissal of the state claims. In *Diven* v. *Amalgamated Transit Union Int'l & Local 689*, the Plaintiff didn't even allege the proper facts for a federal claim, so only state claims were before the court. 38 F.3d 598 at 602 (D.C. Cir. 1994). In *Alger v. Ganick, O'Brien & Sarin* the state claims involved a nonparty to the federal claims and in *Town of Jaffrey v. Town of Fitzwilliam* the state claims substantially broadened the range of defenses and the theories of liability. 38 F.3d 598, 602 (D.C. Cir. 1994); 35 F. Supp.2d 148, 157-58 (D. Mass. 1999); 846 F. Supp. 3 (D.N.H. 1994). Here, the copyright claim applies to all Defendants and all state claims are against some or all of the same parties, the defenses are applicable to all claims (see Defendants' Answer, which does not separate out the defenses by claim), the same facts are relevant to all claims, and the Complaints seek essentially the same remedies for all claims. Most notably, *Borough of W. Mifflin v. Lancaster*, where Defendants argued that the federal tail was wagging the state dog, actually held that the district court did have jurisdiction, compelled it to hear the case, stated that dismissal is discouraged, and noted that Plaintiff failed to show that "state claims were more important, more complex, more time consuming to resolve, or in any way more significant than their federal counterpart." 45 F.3d 780 at 790. Defendants have made no showing in this regard.

　　The district courts have original and exclusive jurisdiction of any civil action "arising under" the Copyright Act. 28 U.S.C. § 1338(a). Defendants' concede that a claim for copyright infringement is a proper basis for federal jurisdiction (Motion at 12-14). In cases where original jurisdiction exists, supplemental jurisdiction must be exercised unless 28 U.S.C. § 1367(c) is satisfied. 28 U.S.C. § 1367(a); *McLaurin v. Prater*, 30 F.3d 982, 984 (8th Cir. 1994) (section 1367(a) dictates that the court "shall" have supplemental jurisdiction where, "shall" has been consistently understood to mean that something is mandated); *Cedillo v. Villar Enterprises & Darling Deleware Co.*, 773 F. Supp. 932, 939 (N.D. Tex. 1991) (if the claim is within the court's

supplemental jurisdiction, the court must exercise such jurisdiction unless one of the exceptions in § 1367(c) is satisfied.  No such exceptions are present here.

### B.    No Exceptional Circumstances Justify Declining Supplemental Jurisdiction

Under 28 U.S.C. § 1367(c)(4), courts can decline supplemental jurisdiction under "'exceptional circumstances." Therefore, declining jurisdiction under (c)(4) should be the exception, not the rule.  *Executive Software N. Am., Inc. v. United States Dist. Court*, 24 F.3d 1545, 1557-1560 (9th Cir. 1994).  No such exceptional circumstances exist.   In fact, the only allegedly exceptional circumstances Defendants cite attack the copyright claim, not supplemental jurisdiction.

Defendants try to create exceptional circumstances by arguing, again without explanation or legal support, that there are "serious questions of ownership of the copyrighted material" (Motion at 15).  To the contrary, the copyright is unequivocally owned by ConnectU LLC.  The copyright Registration Certificate constitutes *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate.  17 U.S.C. 410(c).  The Certificate of Registration names ConnectU LLC as a joint owner with Mr. Mavinkurve, with the transfer of third party rights to ConnectU occurring by written assignment.  (See Ex. 22).[8]

Additionally, Defendants call the copyright claim weak (Motion at 15, 16).  As noted *supra*, Defendants' chokehold on discovery and inability to produce its own code and DBD have prevented Plaintiff from completing its infringement analysis.  Defendants' stonewalling and failure to preserve evidence does not, however, mean that Plaintiff's claim is weak.

Defendants also argue, without explanation, that Plaintiff's copyright claim is confused (Motion at 16).  The Amended Complaint more than adequately stated a proper claim for copyright infringement, which need not be pled with particularity. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163  (1993).  Copyright claims that

---

[8]  As a joint owner, ConnectU can sue Defendants independently.  17 U.S.C. § 501(b);  *Johnson v. Tuff-N-Rumble Mgmt., Inc.*, 2000 U.S. Dist. LEXIS 12071 at *22 (E.D. La. August 14, 2000)(federal law treats co-owners as "tenants-in-common," with each owning an undivided interest in the whole copyright and each entitled to exercise all of the exclusive rights of a copyright owner set forth in section 106 of the Copyright Act).

merely allege ownership of the copyright by the plaintiff, registration in compliance with the applicable statute, and infringement by the defendant are sufficient. *Mid America Title Company v. Kirk*, 991 F.2d 417, 421-22 (7th Cir. 1993)(citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE 2d §1237.

### C.     The Court Has Original Jurisdiction for Unfair Competition Claims

Title 28, U.S.C., § 1338(b) confers original jurisdiction "of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws." This statute prevents piecemeal litigation. *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994). Included within the ambit of unfair competition is breach of fiduciary duty, misappropriation, unjust enrichment, improper use of confidential information, and trade secret misappropriation. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531 (1935)(holding that unfair competition has been extended to apply to misappropriation as well as misrepresentation); *Pursche v. Atlas Scraper & Engineering Co.*, 300 F.2d 467, 483 (9th Cir. 1961). Therefore, for almost all of the claims in this case, the Court has original jurisdiction.

### D.     ConnectU is the Successor to the Fraud And Fiduciary Claims

The successor-in-interest can sue for fraud and breach of fiduciary duty claims in Massachusetts. *Lexington Savings Bank v. Linnehan*, 1998 Mass. Super. LEXIS 348 at *5 (Mass. Super. Feb. 9. 1998) (successor-on-interest inherited all rights, including right to sue for fraud). Pusuant to ¶ 13.5 of the Operating Agreement (Ex. 2), ConnectU is the successor-in-interest to any claims the Founders might have and therefore is the *de facto* owner of these claims. In the alternative, the Founders may easily be added to the Complaint under Fed. R. Civ. P. 17(a) as co-Plaintiffs, as discussed below.

## V.     RATIFICATION UNDER RULE 17(A) MOOTS THE MOTION

### A.     Standing Is Proper Based On Ratification Under Rule 17(a) And Relation Back Of The Real Party In Interest

Defendants concede that Plaintiff has had standing to assert the state law claims (except possibly fraud and breach of fiduciary duty) since the Founders signed the Operating Agreement on August 5, 2005 (Motion at 12: "no Article III case or controversy existed as to those claims until two months ago"). Their argument is that ConnectU lacked standing to assert such claims from the filing date through August 4, 2005, and therefore that such claims should be dismissed. If Defendants were correct that standing must be judged on the filing date (Motion at 12) and can't be cured by joinder or ratification by the real parties in interest, Rule 17(a) would not exist.

Rule 17(a) provides in part that no action shall be dismissed on the ground that it is not prosecuted by the real party in interest until a reasonable time has been allowed after objection for **ratification of commencement of the action by**, or joinder or substitution of the real party in interest. Fed. Rule. Civ. Pro. 17(a)(emphasis added). Ratification validates an arrangement by which the real party in interest authorizes the continuation of an action brought by another and agrees to be bound by its result, thereby eliminating any risk of multiple liability. *See* 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE 2d. § 1555 at 709. Ratification is deemed sufficient to cure any real party objections. *National Safe Corp. v. Texidor Sec. Equip., Inc.*, 101 F.R.D. 467, 469 (D.P.R. 1984). While Defendants quote Rule 17(a) in their motion, they fail to address ratification or cite any case law or arguments that would prevent the Founders from ratifying this action. Therefore, it would be inappropriate for Defendants to attempt to sandbag Plaintiff on this issue in their reply brief.

Rule 17(a) provides that ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.[9] *Dumore v. United*

---

[9] Plaintiff saw no standing defect before August 5, 2005. The Founders created ConnectU to succeed to their pre-incorporation rights and operate ConnectU. ConnectU has always been the *de facto* or actual owner of the Founders' rights. The Operating Agreement assigns the Founders' rights to ConnectU. It was not signed until August 5, 2005 because it took some time to work out its lengthy and complex terms, but ConnectU and the Founders knew it would be signed. Contrary to Defendants' arguments ("Plaintiff was not assigned any of the state law claims until August 5, 2005, at the earliest"; Motion at 12), (1) the assignment was *nunc pro tunc* to the date ConnectU was incorporated and (2) the agreement merely formalized the Founders' longstanding intent that all of their pre-incorporation rights would become ConnectU assets (see, e.g., ¶ 13.5, which provides "Each Member [Founder] hereby acknowledges and represents that to the extent he contributed to the concept, design, development, execution, and/or operation of the website that was originally to be known as Harvard Connection, and/or to the

*States*, 358 F.3d 1107, 1111 (9th Cir. 2004).   Ratification allows for a "correction in parties." *Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt.*, 620 F.2d 1, 3 n.2 (1st Cir. 1980) (ratification during trial would have been sufficient).   Under the "relation back" doctrine, cure of a real party defect is deemed effective as of the original filing date.   Fed. Rule Civ. P. 17(a) and 15(c).

Defendants' motion erroneously states that, under *Grupo*, "post-initiation of litigation attempts to cure . . . standing defects are ineffective" (Motion at 10).   This is soundly countered by Rule 17, and standing was not an issue in *Grupo*.   Defendants cite a number of other cases for this proposition, such as *Paradise Creations*.   However, none of those cases discusses Rule 17(a) or 28 U.S.C. § 1653, or the interplay between correcting the real party in interest and the "relation back" doctrine.[10]

**B.  The Founders Have Already Ratified this Action**

In the ConnectU Operating Agreement, the Founders clearly ratified ConnectU's filing and maintenance of this suit.   Paragraph 13.5 assigns to ConnectU each Member's intellectual property and other rights, including all "rights of each Member [Founder] needed by the Company to conduct its business and to pursue any claims against any third parties relating to such websites and/or the business of the Company", *nunc pro tunc* to the date of ConnectU's incorporation.   This provision includes the right to sue and recover damages for the past, present, and future infringement or violation of such rights.   (Ex. 2) As discussed *infra*, an assignment is valid even if the assignment occurs after an action has been instituted. See *Southern Nat'l Bank of Texas v. Tri Fin. Corp*, 317 F. Supp. 1173, 1186-87 (S.D. Tex. 1970)(allowing ratification by letter from real party in interest to plaintiff).   However, in the event that the Operating

---

website that became known as ConnectU.com, either before or after the incorporation of the Company, it is each Member's intent that all rights, title, and interest, including all rights in Intellectual Property covering such contributions, shall be exclusively owned by the Company".

[10]  For instance in *Schrieber Foods, Inc. v. Beatrrice Cheese, Inc.* the Federal Circuit actually allowed for a defect in jurisdiction to be cured.

Agreement is not sufficient to ratify ConnectU's filing and maintenance of this action, Plaintiff

hereby notifies the Court that the undersigned attorneys represent Plaintiff, ConnectU LLC, and

the Founders, Cameron Winklevoss, Tyler Winklvoss, and Divya Narendra (who are

counterdefendants in this action), and that the Founders (1) authorized the filing and maintenance

of the action  (2) agree that they will be bound by the result in this case.  Such notice fully

satisfies the requirements of ratification under Rule 17(a).  *Icon Group v. Mahagony Run Dev.*

*Corp.*, 829 F.2d 473, 478 (3d Cir. 1987)(outlining requirements for proper ratification); *Big John*

*v. Indiana Grain Head Co.*, 718 F.2d 143, 147 (5th Cir. 1983) (real party in interest need not be

formally joined or substituted if it ratifies commencement of action).

   Even when the claim is not assigned until after the action is instituted, the assignee is the

real party in interest and can maintain an action. *Dubuque Stone Prods. Co. v. Fred L. Gray Co.*,

356 F.2d 718, 724 (8th Cir. 1966);  *Kilbourn v. Western Surety Co.*, 187 F.2d 567 (10th Cir.

1951).  An assignment of interest should be recognized, provided the assignment occurs before

trial, the plaintiff is a real party in interest in at least one other claim (here, the copyright claim,

which Defendants' concede is properly asserted by ConnectU, Motion at 17), and the defendant

suffers no prejudice from its recognition (discussed *infra*). *Dubuque Stone Prods. Co.*, 356 F.2d

at 724.

   Defendants challenge the Founders' assignment in the Operating Agreement because,

besides the trade secrets claim, "the specific language of the contract reflect that no other rights

were specifically or clearly conveyed." (Motion at 8).  This contention flies in the face of the

clear language of ¶ 13.5 and the tenets of contract interpretation.  In all matters of contract law,

the essence of the inquiry is to effectuate the intent of the parties.  If the principal purpose of the

parties is ascertainable, it is given great weight.  Restatement (second) of Contracts, § 202(1).

Here, the intent of the parties is quite clear, as the Operating Agreement plainly states that it is

the intent of each Member (Founder) that all right, title, and interest in intellectual property and

other rights (including all rights to sue) be owned by ConnectU.  Moreover, and deficiencies in

the assignment can be cured, *nunc pro tunc*, at any time by simple amendment because the Founders are all Members of ConnectU LLC (as Defendants recognize, Motion at 7).

Defendants also argue without legal support that "the nominal assignment ... to ConnectU necessarily must have failed because Harvard Connection, the "actual" third party owner of all rights and claims, was not a signatory to that agreement" (Motion at 9). Defendants are wrong because Harvard Connection was not a legal entity and each of the Founders signed the Operating Agreement. See American Casualty Co. v. Assiran, 289 F. Supp. at 646 (D. Mass. 1968) This argument is also inconsistent with Defendants' argument that the Founders are the real parties in interest (Motion at 4, 6).

### C. The Founders Ratified Within A Reasonable Amount of Time

Rule 17(a)'s "reasonable time" determination is left to the sound discretion of the court. *National Safe Corp.*, 101 F.R.D. at 472. Most of the case law, including *Weissman v. Weener*, cited by Defendants, discusses a reasonable time for ratification **after a court order to do so**. 272 F.3d 302, 308 (5th Cir. 2011). *See also Icon Group*, 829 F.2d at 477 (dismissal improper because plaintiff should have been afforded another opportunity to ratify where there was no evidence of the kind of truly contumacious behavior that justifies dismissal for failure to comply with a court order); *Wheeling-Pittsburgh Steel Corp. v. Donovan Wire & Iron Co.*, 614 F.2d 945, 946 (4th Cir. 1980) (dismissal without prejudice for failure to comply with court order improper where there existed no evidence of harassment, bad faith, or abuse of process by party opposing dismissal).[11]  Rule 17(a) requires a real party in interest objection to be made timely to allow the plaintiff a reasonable time to obtain ratification by the real party in interest.[12]  Defendants'

---

[11] In *Wieburg*, the only case cited by Defendant that actually discusses a reasonable amount of time after defendant's objection, the plaintiff "went to great lengths to remain the sole plaintiff" and "fully demonstrated her intent not to surrender control of this suit." *Wieburg v. GTE Southwest Inc.*, 71 Fed.Appx. 440, 442 (5th Cir 2003). This set of facts contrasts starkly with this case, where the Founders offered to be added to this action before this motion was filed. During the October 12, 2005 meet and confer that proceeded this motion, Plaintiff offered to join the Founders as co-Plaintiffs. Even though Defendants knew that Founders were willing to be added as co-Plaintiffs, they proceeded with this motion anyway.

[12] *United Healthcare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996) (real party in interest objection should be raised in a timely fashion, with "reasonable promptness"; objection waived when not raised until

delay in asserting a real party objection is sufficient grounds to deny this motion. *National Safe Corp.*, 101 F.R.D. at 472.

Defendants point to three boilerplate defenses as proof that they objected almost one year ago to ConnectU's standing to assert the state law claims. One such defense was that Plaintiff failed to state a claim because the Complaint "asserts claims on behalf of a corporate entity which purportedly arose prior to the formation of that entity." (Motion at 6, 18-19) How is this failing to state a claim, if the pre-formation rights are assigned to the corporation? Defendants also did not think enough of this defense to file a Rule 12(b)(6) motion, so why should Plaintiff have taken it seriously? The other affirmative defenses Defendants cite are that Plaintiff is not the copyright owner and lacks standing (Motion at 6, 18-19). Defendants do not appear to be challenging Plaintiff's ownership of the Harvard Connection copyright and ConnectU is properly the owner. Nevertheless, they say these defenses put Plaintiff on notice of their objections and started the clock ticking under Rule 17(a) (Defendants argue "[d]espite the notice provided by the Answer, Plaintiff took no action to address any of the above defects", and didn't seek to amend or to add the Founders, Motion at 6, 19).

Plaintiff, on the other hand, saw the defenses as baseless and asked for their factual basis in Interragatory No. 18. Defendants' provided no facts in their response and Plaintiff moved to compel. That motion is pending. (D.N. 52). In addition, the Founders and ConnectU prepared and signed the Operating Agreement and ratified the filing under Rule 17(a) a reasonable time after Defendants asserted these defenses in their Answer, even though Plaintiff didn't know their factual basis. The first real notice Plaintiff received of Defendants' objection to ConnectU's standing was during the October 12, 2005 meet and confer that preceded this motion. By that

---

pretrial conference, one week before trial); *Chicago & Northwestern Transp. Co. v. Negus-Sweenie, Inc.*, 549 F.2d 47, 50 (8th Cir. 1977) (when real party in interest objection is "not raised in a timely or seasonable fashion, the general rule is that the objection is deemed waived").

time, however, the Founders had already ratified when they signed the Operating Agreement on August 5, 2005, which was eight and a half months after Defendants' Answer. In view of the length and complexity of the Operating Agreement and Defendants' stonewalling of discovery on the factual basis of their defenses, the Founders' ratification by execution of the Operating Agreement eight and a half months after the Answer was not unreasonably long. Dismissing ConnectU's state law claims at this time would be unprecedented and totally contrary to Rule 17(a).

### D. Plaintiff Has Been Operating In Good Faith

The Advisory Notes to Rule 17(a) recognize that "[m]odern decisions are inclined to be lenient when an honest mistake has been made in choosing the party in whose name the action is to be filed." See *Levinson v. Deupree*, 345 U.S. 648 (1953). Plaintiff sees no mistake, but if one was made it was honest and understandable. ConnectU has been presumed to be the real party in interest since filing. As stated in the Operating Agreement, it has been Founders' intention all along that ConnectU owns all of their pre-incorporation rights, including intellectual property rights, and all of their claims. ConnectU filed this case because it did not deem it necessary to join the Founders, which are its Members under the Operating Agreement (see Motion at 17). ConnectU existed at the time the Complaint was filed, ConnectU was the successor to Harvard Connection, the Founders intended that ConnectU would have their pre-incorporation rights, they were working on an operating agreement that would formalize everyone's rights, and the assignment set forth in the Operating Agreement was to be *nunc pro tunc*.

Defendants boldly assert that Plaintiff has "continued to withhold the real parties in interest" ( Motion at 20), despite its knowledge that Plaintiff volunteered to add the Founders to the Complaint. Plaintiff has no incentive to manipulate the real party requirement. By comparison, in the cases cited by Defendants, the courts could not help but find that there was no "honest and understandable mistake."[13] No such evidence exists here.

---

[13] In *Feist v. Consolidated Freightways Corp.*, plaintiff's actions made his intentions appear dubious when he immediately filed a worker's compensation claim after filing for bankruptcy. The court found that "the timing of

Defendants also argue that "Plaintiff created the misleading appearance of diversity jurisdiction by keeping the individual plaintiffs out of the case." (Motion at 20)  This makes no sense.  Defendants argue that diversity did not exist because Plaintiff and the unnamed TheFaceBook, Inc. were Delaware corporations when the Complaint was filed, but the Founders were residents of Connecticut and New York.  Adding them would not have affected diversity or its "appearance".

Often in Rule 17(a) cases there are concerns about the addition of new plaintiffs after the expiration of a statute of limitations.  *See United States ex rel. Wuluff v. CMA, Inc.*, 890 F.2d 1070, 1074-75 (9th Cir. 1989) (Rule 17(a) does not apply to situation in which party with no cause of action files suit to toll statute of limitations and later obtains cause of action through assignment).  However, the statute of limitations has not yet run in this case, so there are no such concerns about abuse of the Rule 17(a).

### E.  Defendants Will Not be Prejudiced By Joinder of the Founders, If Needed

Joinder of co-plaintiffs under Rule 17(a) "should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997).  Such is true here.  Courts have allowed for relation back to allow for a change in the real party in interest when allowing the amendment doesn't impair Defendants' ability to evaluate the claim or defend the lawsuit because only the identity of the claimant had changed.  *Manko v. U.S.*, 830 F.2d 831, 841 (8th Cir. 1987).  Joining co-Plaintiffs here would change nothing about this lawsuit and Defendants would not be prejudiced in any way.

---

these actions by Plaintiff gives the Court reason to doubt that when he finally did bring this action in his own name, he did so as the result of an honest mistake.  Plaintiff's explanations fail to eliminate these doubts. His testimony as to the reason for his delay in filing bankruptcy is contradicted by other testimony in the record." 100 F. Supp. 2d 273, 280 (E.D. Pa. 1999).  In *Lans v. Gateway 2000*, plaintiff similarly damaged his credibility by arguing simultaneously that he both forgot that he had made the assignment and that he thought the assignment was invalid. 84 F. Supp. 2d 112, 123 (D.C.D. 1999).

Defendants cannot have their cake and eat it too, by delaying a year to raise an objection, refusing discovery on the issue, and then profiting from the delay by claiming prejudice. Defendants do not explain how they were allegedly prejudiced by the ratification of this action by the Founders in August 2005, or how joining the Founders would prejudice them now. They say only that Plaintiff's alleged "muddling of the parties and claims" will prejudice them. (Motion at 20) This is disingenuous. Defendants create an image that Plaintiff has shrouded the true identity of the parties in secrecy, when in reality Plaintiff has presented the same simple story in the Complaint (beginning at ¶ 11) and facts section of each motion it has filed. As stated in the facts section of this brief, the Founders, college students at the time, began by working together informally, as many start-up businesses do. After a period of working together as a team, they incorporated, to launch and operate the website now known as ConnectU. After incorporation, they formalized their relationship with the Operating Agreement. The first line of the Complaint and the Amended Complaint both define "Plaintiff ConnectU LLC f/k/a Harvard Connection," after which the defined term "ConnectU" is used to simplify the allegations. The term "Harvard Connection" refers to the early website, the website project, and the team, but no formal legal entity by that name ever existed and there is no evidence to the contrary. Therefore, the history is simple and straightforward and the addition of the Founders to this action would not create any confusion, nor would it create any additional burden on Defendants.

Joining the Founders will not affect Defendants' defenses asserted in their Answer. (D.N. 14). All valid defenses available to Defendants against ConnectU are also available to them, to the extent they are valid and applicable, against the Founders. There is no trial date and the parties have jointly moved to vacate the Scheduling Order, pending the resolution of all pending motions. *See Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co.*, 515 F. Supp. 64, 84 (D.S.C. 1979) (finding no prejudice due to assignment of claims which took place one year before trial). Even if Defendants propound new discovery requests, Plaintiff and the Founders have produced all of the documents they have relating to this lawsuit. Defendants have not deposed the Founders and the parties have (1) agreed to put depositions on hold pending the

resolution of the pending motions.  No expert reports have been exchanged.  Therefore, there is no conceivable way in which Defendants' were prejudiced by the ratification of the August 5 suit by the Founders, who are persons that they themselves added to the suit in the Counterclaims, and they would not be prejudiced by the joinder of the Founders.  On the other hand, Plaintiff will be prejudiced if this suit is dismissed at this time, since it will be forced to refile an identical action in the same court (where three important and costly motions to compel are pending) and commence the litigation process all over again.

## V.    CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss should be denied, or in the alternative the Founders should be permitted to join as co-Plaintiffs under Rule 17(c) for some or all claims, as the Court deems necessary.


Respectfully submitted,

DATED:  October 28, 2005

/s/ John F. Hornick
Lawrence R. Robins (BBO# 632610)
Jonathan M. Gelchinsky (BBO# 656282)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA  02142
Telephone:  (617) 452-1600
Facsimile:  (617) 452-1666
larry.robins@finnegan.com
jon.gelchinsky@finnegan.com

John F. Hornick (*pro hac vice*)
Margaret A. Esquenet (*pro hac vice*)
Troy E. Grabow (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue N.W.
Washington, DC  20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

Attorneys for Plaintiff and Counterclaim
Defendants