# EXHIBIT

# A



ORRICK

August 25, 2005

Joshua H. Walker
(650) 614-7339
jwalker@orrick.com

*VIA E-MAIL AND U.S. MAIL*

Troy E. Grabow Esq.
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue N.W.
Washington, DC 20001

Re:   <u>**ConnectU LLC v. Zuckerberg et al.**</u>, Civil Action No. 1:04-cv-11923 (DPW)

Dear Troy:

This letter relates to Response No. 2 of Plaintiff and Counterclaim Defendant ConnectU LLC's Responses to Defendant and Counterclaim Plaintiff TheFacebook, Inc.'s First Set of Interrogatories ("Plaintiff's Response"). We focus initially on this Response, because it is integral to the Defendants' positions with respect to their pending Cross-Motion for Protective Order. The Defendants have identified other deficiencies in ConnectU's responses to Interrogatories, which will be addressed separately.

Interrogatory No. 2 requests that Plaintiff ConnectU LLC ("ConnectU"): "Identify with precision and specificity each and every alleged trade secret ConnectU contends was misappropriated by Defendants." The response ConnectU provided does not properly respond to the Interrogatory, either factually or legally.[1] This letter will address the general failings of the disclosure and then discuss each separate alleged category which is deficient.

1. **General Deficiencies**

In its Response to Interrogatory Number 2, ConnectU has identified only general, non-specific categories of information as its trade secrets, and has not provided the requisite particularity necessary "to separate it from matters of general knowledge in the trade." *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 984 (S.D. Cal. 1999). This is an impermissible designation both as a matter of law, and as a matter of discovery.

As you are aware, in *Staffbridge, Inc. v. Nelson Assocs., Inc.*, No. 024912-BLS, 2004 WL 1429935, at *1 (Mass. Super. June 11, 2004), before permitting discovery relating to plaintiffs' claimed trade secrets, the Massachusetts Superior Court ordered plaintiffs to describe "with <u>rigorous and focused particularity</u> what, and only what, the plaintiffs claim to constitute the trade secrets allegedly

---

[1] During the telephonic meet and confer of August 22, 2005, counsel for Plaintiff stated that Response No. 2 would constitute Plaintiff's definitive trade secret designation for this case, and that there would be no further designation.

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 2

misappropriated by either of the defendants that form the basis for this law suit." *Id.* at *4 (emphasis added). The court further explained that "[t]he designation must, with clarity that can be understood by a lay person, make clear and distinguish what is protectable from that which is not." *Id.* *See also* 4 Milgrim, Trade Secrets § 16.01[5] (2005) ("a [trade secret] plaintiff can reasonably anticipate that the defendant will insist that it be apprised of <u>considerable detail</u> describing the trade secret. That insistence can reasonably be expected to precede the defendant's submitting to discovery of it") (emphasis added). The particularity demanded by the Superior Court in *Staffbridge* is representative of the level of detail that Courts generally, and Massachusetts Courts specifically, demand in trade secrets cases such as this one.

Notably, though, in contradiction to the law, ConnectU has made no effort in its Response to Interrogatory Number 2 to distinguish the alleged trade secret(s) from that information which was in the public domain. For instance, during the Rule 30(b)(6) deposition of ConnectU, Cameron Winklevoss testified as to numerous websites which were publicly known at the time of the alleged development of the Harvard Connection and possessed features common to those which ConnectU now lists as trade secrets. Yet, ConnectU's Response to Interrogatory Number 2 does nothing to distinguish its alleged trade secret(s) from any of this publicly known information – a problem that must be remedied. *See, e.g., Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, No. 04-1462 (Fed. Cir. Aug. 24, 2005), at 22 (applying Massachusetts trade secrets law and noting that "information that is in the public domain cannot be appropriated by a party as its proprietary trade secret").

ConnectU also has refused to make any information distinction between itself and Harvard Connection, contrary to the explicit instructions to TheFacebook, Inc.'s Interrogatories. This means that there is no indication in Response 2 as to whether, when or how any of the alleged trade secret matter was conceived before February 4, 2004, the date that TheFacebook launched. This temporal ambiguity, which permeates ConnectU's several vague references to "launch" dates, further muddies the waters as to what ConnectU actually is claiming as a misappropriated trade secret.

ConnectU's Response, on its face, is also incomplete. ConnectU's response provides that the claimed trade secrets "include, <u>but are not limited to</u>, the following, in combination . . . ." Plaintiff's Response, at 9 (emphasis added). As ConnectU is well aware, the law requires ConnectU to identify its trade secrets in total. Statements such as "but are not limited to" are inappropriate and an impermissible response, unless ConnectU explicitly acknowledges that the list is exhaustive of trade secrets it alleges are misappropriated. Indeed, in its general objection 11, which is incorporated into Response No. 2 (*id.* at 7, 8; *see also id.* at 4), ConnectU even states that it anticipates that "further discovery . . . and analysis will supply additional facts, add additional facts to the known facts, as well as establish entirely new factual conclusion and legal contentions, all of which may lead

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 3

to <u>substantial additions to, changes in, and variations</u> from the responses herein set forth."
Plaintiff's Response at 3-4 (emphasis added).

Such "open-ended" and indefinite designations of alleged trade secrets represent the precise danger that courts throughout the country have warned of -- namely, that a trade secret plaintiff will try to generically claim something belonging to it was misappropriated, and then try to use discovery to "fish out" inventions and ideas of defendants only to claim them as its own, after the fact. *See, e.g., Xerox Corp. v. IBM Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974). The generic designations by ConnectU of its trade secrets represents precisely such disingenuous gamesmanship, and render its present list as meaningless.

In addition to these general problems, each of the designations has particular deficiencies as well.

## II. **Specific Problems with Each Category.**

**Items 1-2, 5-6**:   ConnectU in several designations claims as a trade secret "[t]he entire project, enterprise, and ideas of bringing an online community in the form of a multi-purpose dating and social network website to the college/university level. . . ." General terms such as "ideas" and "enterprise" fail to apprise the Defendants as to what the trade secret(s) actually are purported to be. This particular problem renders wholly meaningless each of these designations. Indeed, terms such as "ideas" and "entire project" do nothing to separate the trade secret from that information which is generally known.

Likewise, ConnectU also further describes its trade secret(s) in conjunction with ordinary, non-specific website functions such as a "social network," "various user-defined purposes," "multi-purpose," and "user defined ways." Yet, in order to separate such general notions from information that is within the public knowledge, ConnectU must specify what exactly are each of these various functions, ways, and purposes with sufficient clarity so that the Defendants and the Court can actually understand and appreciate what separates the information from that which is publicly known. ConnectU has made no effort to satisfy this basic requirement.

**Item 3**:   ConnectU claims as a trade secret "[r]equiring uses to have a .edu address to access the site and become part of the community and network, for security and control...." There is nothing in this designation that in any way separates how the generic notion that a college user must possess a .edu email address to access a college website is a matter that is somehow separate from matters of general knowledge in the trade. Essentially, this broad characterization suggests that it is a trade secret for AOL to demand that its users have an AOL account. This is both illogical, and non-sensical. This designation needs to be further supplemented.

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 4

**Item 4**: Item (4) further claims as a trade secret "[a]ll information, fields, features, and functions provided on the website . . . including, without limitation . . . ." *Id.* at 9 (emphasis added). Again, ConnectU must name and define, with focused particularity, each field, feature, function, and information type actually provided on the Harvard Connection website that is deemed a trade secret – and further confirm that this "feature" existed prior to February 4, 2004. To generically reference *some* "features" and "functions" as trade secrets without actually explaining what they are and when they came into existence leaves it to the Defendants to guess the nature of ConnectU's alleged proprietary information. That is precisely what the law proscribes.

ConnectU does provide some "examples" of the claimed features in sub-items (a) through (k) to Item Number 4. Unfortunately, though, each of these further "specifications" likewise is wholly deficient, as explained as follows:

**a.** In sub-item (a), ConnectU claims as one particular feature and function "a social network comprised or [sic] nodes and ties." However, "social network," "nodes," and "ties" simply refer to three features that every social network (indeed, of any network generally) possesses. Plaintiff needs to describe what about the HarvardConnection use of a social network with nodes and ties distinguishes the "trade secret" from the information already in the public domain. In that regard, since a "node" typically refers to a switch or router that "ties" users via network links, it appears that ConnectU is claiming as a trade secret the idea of a social network that uses the very equipment that all networks require. This specification is tantamount to claiming HarvardConnection claims as a trade secret the idea of a social network itself. Given the existence of admitted wildly popular pre-existing social network sites such as Friendster and MySpace, ConnectU's specification is non-sensical and in no way separates the trade secret from matters of common knowledge.

**b.** In sub-item (b), ConnectU claims "information fields, including . . . ." *Id.* at 10 (emphasis added). By using the word "including" ConnectU has not completely identified what it purports to be its trade secret. If there are particular information fields claimed, ConnectU must name and define each with focused particularity, etc., and specify how the fields "existed" prior to February 4, 2004. The same is true for ConnectU's claim of "other fields relating to the college environment". *Id.* It is not at all clear what such "other fields" might be, or when they were part of Harvard Connection. As noted, these open-ended notions appear designed to "capture" other "trade secrets" via later re-characterization of the Defendants' own inventions contained in its own Website as something belonging to ConnectU, which the Courts deem to be improper.

**c.** In sub-item (c), ConnectU generically identifies a registration page that confirms a user has a .edu address. Since any campus site is going to request the user identify themselves via a .edu email address, please clarify if you mean that the registration page you list as a

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 5

trade secret includes security protocols to limit use to only .edu addresses. If so, please then identify what that protocol is/was, so that the Court and the Defendants can understand why it is a trade secret. Please also specify with the requisite particularity what ConnectU means by "build a profile."

**d.** In sub-item(d), ConnectU claims "enabling the user to create profiles that could be used for functionality relating to dating or connecting for other social or professional reasons". *Id.* (emphases added). Since virtually all social networks permit users to build a profile, ConnectU must specify the functionality it is claiming is protected as a trade secret and the way it is different from information in the public domain. Further, use of the phrase "could" is not limiting. If the purported trade secret included uses for other purposes, ConnectU must so state all other purposes, because otherwise the referenced website "function" claimed is incomplete and ambiguous.

**e – i.** As to sub-items (e)-(i), ConnectU must identify the mechanism and manner of searching for user profiles, connecting to profiles, seeing other users' profiles, saving other users' profiles, and identifying users' email addresses, and explain how or why those features are different from information already in the public domain. All popular social networks like Friendster and MySpace permit viewers to see search for, see, and save other users' profiles, and provide the option of listing email accounts. These connections are, in fact, the core purpose of such networks. Sub-items (e)-(i) thus appear to be no more than generic descriptions of features common to virtually every social network, and in no way apprise the Defendants what is the alleged trade secret.

**j.** As to sub-item(j), ConnectU claims it was a trade secret for Harvard Connection to provide "users with information, such as information about nightclubs and bands." However, virtually every website in existence provides the user "with information." Here, the purported trade secret is given by only one relevant example, and hence is unlimited and ambiguous. Please specifically identify all types of information provided to users made the website a "trade secret," and why. If this information is claimed to be limited to information about nightclubs and bands, ConnectU should so state.

**k.** As to sub-item(k), ConnectU claims it was a trade secret to enable users to upload their thesis and resume. Here, the problem is that on any website or social network, a user can upload personal written materials such as theses and resumes, as well as a wide variety of other materials including poetry, diary entries, jokes, etc. Please therefore clarify how and wy the "uploading" feature that you claim was somehow different than any these other commonly available and well-known uploading features. Otherwise, nothing in this designation in any way suggests the feature is a trade secret.

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 6

**Item 7:** ConnectU generically claims as a trade secret "[t]he layout, design, and user interface of the Harvard Connection website screens...." Again, virtually every website has a layout appearance – much of which is limited by the underlying code. More to the point, such layouts are seen by virtually the entire Internet community once they are launched, and hence are typically the antithesis of a trade secret. Since consistent with this problem you claim this feature was a trade secret only "until such time that such website were to be launched by the founders," the **only** way for the Defendants or the Court to tell what is the alleged trade secret is to specify what exactly is the layout claimed and when it existed – preferably by either describing in detail the relevant Harvard Connection website screens, or identifying by bates-number what document ConnectU is referring to. Presently, there is insufficient description to ascertain the nature of the trade secret.

**Item 8:** While in Item (8) ConnectU identifies the "Harvard Connection code" as a trade secret, ConnectU then generically refers to its "underlying functionality" and "surface functionality" without explaining what actually are these divided features. Surface functionality would appear to refer to the same layout features as is claimed in Item (7) – and hence would not add anything to the trade secret list. If the underlying functionality of the Harvard Connection Code is somehow a trade secret separate from the code construction itself, then this listing suffers from the same problems as Items 1-2, and 5-6, and it is imperative that ConnectU actually specify the claimed "features." Indeed, it appears that by repeatedly generically referencing "features," ConnectU is attempting to avoid specifying any trade secrets at all -- in all likelihood as a result of the fact that the claimed feature is likely to be common to social networks in general. In any event, these deficiencies need to be corrected.

**Item 9:** As Item (9), ConnectU claims as a "trade secret" the notion of a "plan to monetize the website after it launched and built a user base...." A significant number of pre-existing websites are now and were previously "for profit," including social networks directed at college and high school students and graduates such as "Classmates.com." There is nothing in ConnectU's designation that remotely separates the alleged trade secret from matters of public knowledge, and the identification is either wholly deficient, or not a trade secret at all.

In an effort to avoid Court intervention, the Defendants request that you either (a) supplement Response to Interrogatory Number 2 no later than Wednesday, August 31, 2005, or agree to a meet-and-confer on this issue within time provided by the Local Rules. If ConnectU refuses either request, the Defendants will request the Court's intervention to advise as to the adequacy of the Response and designation.

Please advise by the close of business no later than Friday, August 26, 2005, whether ConnectU will supplement, or when it would be willing to meet-and-confer. We look forward to your response, and the answers to the above questions.

DOCSSV1:422716.1


ORRICK

Troy E. Grabow, Esq.
August 25, 2005
Page 7

Sincerely,

Joshua H. Walker, Esq.

cc:  John F. Hornick, Esq. (via e-mail)
     Robert B. Hawk, Esq. (via e-mail)
     Daniel K. Hampton, Esq. (via e-mail)
     Steve M. Bauer, Esq. (via e-mail)
     Jeremy Oczek, Esq. (via e-mail)

DOCSSV1:422716.1