11

1   we're hearing today actually seeks two very different things
2   and it could be two completely separate motions.  We combined
3   them because we had the pages to do it so we did so.  The two
4   things that the motion seeks are the face book code from the
5   time prior to launch and the time of launch and complete code
6   from after launch all the way up through October of 2004, and
7   in fact there's elements missing from the code that's been
8   produced even after that date.  So basically what we're looking
9   for is complete face book code from the time of inception to
10  date.  And in addition to that, we're looking for some code for
11  something called face match, something called course match and
12  also an on-line journal that Mr. Zuckerberg kept relating to
13  face match.  And then the second thing, the second distinct
14  thing that the motion seeks is documents that were created on
15  or after May 21st of 2004.  Now, by blocking the discovery of
16  both, the defendants have effectively blocked the big picture
17  of this case.  By blocking the code and the database
18  definitions that would go--
19          THE COURT:  Of those things you're requesting, how
20  many of them do they say exist but they refused to produce them
21  and how much, what of them do they say do not exist?
22          MR. HORNICK:  Well, with respect to the code, they
23  don't give very clear explanations at all as to what exists and
24  what doesn't exist.  They do say that there are 600 to 800
25  memory devices.  Well, we don't need imaging from nearly that

12

1   many, and I have a specific suggestion of what we can do that
2   would be a fairly pretty limited amount of imaging.  With
3   respect to the documents--
4           THE COURT:  Well, why do you need imaging, if I order
5   them to produce them, they produce them, why do you need
6   imaging?
7           MR. HORNICK:  Well, I believe their position is going
8   to be that they cannot find this code.
9           THE COURT:  Well, that's why I was asking.  They say
10  it doesn't exist?
11          MR. HORNICK:  Well, they say that it doesn't exist.
12  That's right.  I don't think anyone disputes that it existed at
13  one time.  There obviously had to be code the day that the
14  website launched.  There had to be code to develop that
15  website, but that code doesn't exist.  They say the earliest
16  code they can give us from October of 2004 and the website
17  launched in February of 2004.  So there's a whole eight months
18  there that aren't accounted for.  So I believe their position
19  is going to be that that code doesn't exit.  What we've asked
20  for in the motion is that the Court order that the code be
21  produced if it's found, but in addition that we want to image
22  certain memory devices where we are likely to find that code
23  then an expert can--
24          THE COURT:  Well, why would you be able to find it if
25  they can't find it and say it doesn't exist?

13

1    MR. HORNICK:  Well, we're not sure that they have
2 actually looked for it, but here is what imaging is all about,
3 Your Honor.
4    Imaging is simply a process to allow an expert to go
5 and then look for the code.  Now, if you delete something from
6 your computer, you may think it's gone--
7    THE COURT:  Oh, I know.
8    MR. HORNICK:  --but it's not.  It probably isn't, and
9 if the hard drive or whatever kind of memory device it happens
10 to be is imaged, an expert can then go take that and look in
11 the deleted areas and look all through it and try to find code
12 that is supposedly deleted.  Now, I don't think that the
13 defendants are going to represent that they've taken that step.
14 We want to take that step because they say they have simply
15 looked for the code in existing storage files and they can't
16 find it.  I think there's also a reason to suspect whether
17 their clients would be forthright with them with respect to
18 producing code.  So depending on what steps they've taken to
19 look for it, it could even be there.  That's why we ask that
20 the Court order it to be produced if it's found, and also that
21 we're permitted to do imaging so that our, or a, I should say,
22 an expert, an independent expert can look for it and try to
23 recover it.  After which, if it's recovered, it can be
24 produced.
25    THE COURT:  All right, now you were saying, you said

14

1   you had a simple suggestion when I interrupted you with my
2   question.
3           MR. HORNICK: Yes, yes I do. The, what we really
4   need, and I think what we need to be practical is to get what
5   I'm going to name on a rolling basis in this order. If we find
6   what we want at the beginning we wouldn't have to keep rolling
7   down, down the line. Number one would be the individual
8   defendants' memory devices, since October of 2003, including
9   any crashed hard drives plus the FaceBook.com's devices or
10  servers at the time of launch, up to the time of launch, and
11  any backups. First we'd look at that because that takes us to
12  the time prior to launch and up to launch and it also takes us
13  into the individuals' devices that they've held since this all
14  started in October of 2003.
15          THE COURT: Well wouldn't, let me ask you this,
16  wouldn't, if in fact everyone can, is, agrees that this, these
17  codes existed on the defendants' computers at one time,
18  although they quote, don't exist, or it's alleged they don't
19  exist now, aren't the defendants able to specify as to what
20  memory devices these codes were on at any particular time?
21          MR. HORNICK: Well in interrogatories answer we've
22  tried to get identification of what memory devices there were,
23  and we haven't been able to get that information. So what
24  we're doing--
25          THE COURT: What do you mean you haven't been able to

YOUNG TRANSCRIPTION SERIVCES
(508) 384-2003

15

1  get them?

2        MR. HORNICK: Well, we hadn't, we, in, in response to
3  this motion the defendants put in a declaration saying there
4  were 600 to 800 memory devices plus computers. And so we
5  served an interrogatory, identify them. Well, we got was a
6  printout that identified serial numbers for 500 of something,
7  we don't know what. We don't know what the date of it was or
8  anything. We don't know what it was 500 of. So we've been
9  meeting and conferring to try to get an identification as that
10 word is defined in the local rules of what memory devices they
11 have. But you see, although we want to get that, and I think
12 we're entitled to get that information in response to an
13 interrogatory, we believe we can find the code by taking a more
14 surgical approach to particular memory devices. We can't
15 identify them with specificity because we haven't been given
16 that information, but I can certainly say that we'd like to
17 image whatever memory devices were being used up to the time of
18 launch and at the time of launch, and then after the time of
19 launch, assuming we don't find what we're looking for in there,
20 we'd want to look at the servers that were used for the
21 FaceBook after launch. At the time of launch it was launched
22 at one server at a server company. Server companies back up.
23 They have to back up. They'd have huge liability if they
24 don't. And in addition to that, the defendants were on notice
25 of these claims six days after launch, so they certainly should

16

1  have informed their server companies to maintain whatever they
2  had.  They should have maintained whatever they had in their
3  own possession.  Now within two months after launch, the
4  FaceBook was on five servers, so if we can't find what we need
5  on those original, that original one server, we go to the five.
6  On April 14th of 2004, it was moved to a different server.  If
7  we can't find what we need in the earlier things, we go to that
8  one.  And then after that, we can simply look at whatever
9  servers are used to run the FaceBook in various colleges, and
10 I'd start with Harvard.  So we don't need 600 memory devices.
11 We don't even need to take them offline to do this.  All we
12 need is to get access to their personal hard drives and other
13 devices, the server companies they no longer use, so there's no
14 burden there--
15         THE COURT:  What's this there's, and I'm not, I will
16 tell you right up front that I'm not someone who's
17 technologically expert, what is the distinction between a
18 server and hard drive?
19         MR. HORNICK:  Yes, well, in some sense there isn't a
20 big distinction, you Honor, but basically what happens is if
21 you were to create a website, if you would, and you did it on
22 your computer, it would be stored on the hard drive on your
23 computer.  You might back it up to some other memory device,
24 like a disk maybe, or one of those little drives that plugs
25 into the back of the computer.  You might also back it up to

17

1  the server here at the court that runs your whole network.
2  That's what a server is.  It's just a hard drive in a different
3  place that a lot of people are linked into.  Now--
4           THE COURT:  But is it, to, to get on the server's
5  hard drive, does it have to be backed by an individual off of
6  an individual computer?
7           MR. HORNICK:  You might, you might store something on
8  that server, but if we wanted to take an image of it, we would
9  then go to that server, take an image of that.  Now, what I'm
10 saying about what happens--
11          THE COURT:  No, my question is, why, when you're
12 saying that things from an individual computer's hard drive get
13 on the hard drive of the server when someone backs them up, so
14 isn't the server then, you know, isn't the best evidence so to
15 speak the individual hard drive of the computer?
16          MR. HORNICK:  Well, it depends on what we're looking
17 for here, Your Honor.  If we're looking for the Harvard
18 connection code that Mr. Zuckerberg worked on, that's probably
19 going to be in the individual's computer.  It's probably not
20 going to be in the server that ran the website.  If we're
21 looking for that face match code or the course match code or
22 that online journal, it's probably going to be on the
23 individual computers.  But if we're looking for the FaceBook
24 code up to the time of launch, it probably was on
25 Mr. Zuckerberg's computer.  On the day of launch, it was on

```
                                                                    18
 1   some third party server.  He uploads it to that server.  The
 2   server then runs it, runs the website.  They no longer use that
 3   server, so you'd want to go that one, image it and it's not
 4   going to be any burden to, I mean, they don't have to take down
 5   the business to do that.  And then at some point in time, they
 6   moved to another server.  So what I'm saying is that if we
 7   start with the personal computers and the server on the date of
 8   launch, we may find what we need and we might not have to go
 9   any farther.
10            THE COURT:  Okay.  We may hear from the defendant.
11            MR. CHATTERJEE:  Your Honor, it just, it seems to me
12   that this is a very focused issue they want to get certain
13   code.  We've searched for it.  We have--
14            THE COURT:  How have you searched for it?  Tell me
15   what you've done.
16            MR. CHATTERJEE:  We, we, we have actually gone to the
17   facilities.  We've actually gone to Marc Zuckerberg, the
18   founder of FaceBook and really the person with the fulcrum of
19   this case.  We've gone to his home and we've actually
20   physically searched his home without, without him participating
21   and we've gone--
22            THE COURT:  Now, how have you searched his home?
23            MR. CHATTERJEE:  We've actually gone through, you
24   know, all of his, you know, his room where he keeps all of his
25   electronic equipment.  We've gone through the, the other people
```

1  in the house that live there, there are a number of people
2  that live there, they're a bunch of college students,
3  essentially living together.  We've gone to the FaceBook
4  offices and physically searched it.  We've produced code that,
5  one of the things that wasn't entirely clear from the
6  presentation was that, it creates the inference that there's
7  been no code provided.  We've provided a fair amount of code.
8  There's one memory stick that we have where we produced that
9  code and it was a corrupted file.  Now, the server that
10 Mr. Hornick was talking about, originally when the FaceBook was
11 created, the server actually was a laptop computer.  It was one
12 in the same.  As the, as the needs of the system grew, they
13 exported it to other places in order to support, you know,
14 dozens, hundreds, millions of people accessing the system, but
15 there would be new versions of the up code created as the
16 system grew and the needs changed.  We produced all of the code
17 that we've been able to find from those earlier days.  We
18 continue searching and we've actually, now that the FaceBook
19 has grown there's a person in charge of operations and there's
20 also a person in charge of the IT infrastructure.  We continue
21 working with them to see if we can locate the additional that
22 would be responsive that deals with the source of--
23         THE COURT:  I take it there's no dispute that they're
24 entitled to the source codes and the only issue is whether they
25 exist or not, is that true or not?

20

1          MR. CHATTERJEE:  Your Honor, I, I think there's one
2  refinement on that.  It's, when you say the source code--
3          THE COURT:  Or source codes.
4          MR. CHATTERJEE:  Right, the, I, I think after a
5  certain point in time, the source codes totally change and
6  there's really no, no need or relevance for that, but, however,
7  during the relevant time period, the pre-launch--
8          THE COURT:  Is there a dispute as to the relevant
9  time period?
10         MR. CHATTERJEE:  I think there is, Your Honor.  That,
11 that's actually the second part.
12         THE COURT:  What do you say the, oh, that's the, the
13 May 21, 2004 issue?
14         MR. CHATTERJEE:  Yes, Your Honor, although we have
15 produced the source codes.
16         THE COURT:  Okay.  Now when you say you searched,
17 what have you done with respect to hard drives?
18         MR. CHATTERJEE:  We have, do you mean have we imaged
19 them, is that your question?  We--
20         THE COURT:  Have you looked for deleted items on
21 them?
22         MR. CHATTERJEE:  Yes.  We've, I mean obviously
23 there's--
24         THE COURT:  Have you, have you done what they, if
25 they got the mirror image, have you done what they're going to