1  do?

2        MR. CHATTERJEE:  We've done some of it.  We're trying

3  to do some more of it because, we notified them yesterday.  We

4  think we've found some additional material.  We're not sure

5  what it is, and we're trying to take the forensic images and

6  provide that information to them if it's responsive.

7        THE COURT:  Well, it seems to me that the way, the

8  way things work is that the plaintiff makes a request for

9  evidence that's relevant to the claims and defenses of either

10  party of which they're entitled to under the rules.  If they've

11  requested this stuff and you have not objected to it, then it

12  seems to me it's your burden to produce it.  And I normally

13  would not go to allowing one party to have a mirror image of

14  another party's computer unless I was, unless I had some reason

15  to believe number one that it wasn't being, that, you know,

16  that the defendant wasn't doing it to the extent that they were

17  obligated to do it under the federal rules, or there was some

18  sort of chicanery involved, and I think that's, that's where we

19  are on, on this particular things.

20        MR. CHATTERJEE:  We, we've produced everything we've

21  been able to find and we've searched fairly thoroughly of all,

22  all the electronic devices we've been able to find to date, and

23  we continue to do that.  So, Your Honor, I mean, we've produced

24  the code that we've been able to find.  Now what the plaintiff

25  wants to find, is they want to find the Harvard connection

1  code--

2           THE COURT:  Right.

3           MR. CHATTERJEE:  --on these laptops.  It isn't there.

4  They may not be happy about that, but that's a truism.  They

5  want to find Harvard connection code copied into the FaceBook

6  code that that we produced.  That isn't there.  They're not

7  happy about that.  We've, there are some pieces of

8  information--

9           THE COURT:  Well, they're not convinced it's not

10 there.  That, that's the issue.

11          MR. CHATTERJEE:  Right, and Your Honor, we searched

12 and, and--

13          THE COURT:  Right.

14          MR. CHATTERJEE:  --some evidence simply may not exist

15 anymore.  We, we've looked thoroughly for it, and I'm not sure

16 the Draconian relief of mirror imaging every single one of

17 these systems is going--

18          THE COURT:  You're saying it would do no good because

19 you've already done it, and you can't find it.

20          MR. CHATTERJEE:  Yes, Your Honor.

21          THE COURT:  That's your position.

22          MR. CHATTERJEE:  Yes, Your Honor.

23          THE COURT:  All right.

24          MR. HAMPTON:  Your Honor, if I might be heard

25 briefly--

1          THE COURT:  Sure.

2          MR. HAMPTON:   --on behalf of defendant Saverin.

3   Defendant Saverin's situation illustrates I think a bit of a

4   problem with the plaintiff's monolithic approach here.   Even

5   with Mr. Hornick's proposal for a rolling search, he's

6   requested the images of all the individual defendants' hard

7   drive.   Mr. Saverin is one of the individual defendants.   In

8   opposition to this motion, he submitted a declaration stating

9   under oath that he never had any of the code, either for the

10  Harvard connection or for the FaceBook, and his involvement

11  with this whole case was brief.  He's an economics student who

12  was providing some inside on the business model for the

13  FaceBook, never had the relevant code.  The situation is even

14  worse, however, Your Honor, because he longer has the hard

15  drive for the relevant period we're talking about.   The

16  computer that he was using at the time he's given to his

17  mother, who is a clinical psychologist in Florida.  She now has

18  the computer and is using that in the conduct of her business

19  and presumably that has highly sensitive patient information on

20  it.   So the plaintiff's proposal, although it seems reasonable

21  to say well we just want to start with the individual hard

22  drives of the individual defendants and the servers of the

23  FaceBook, really shows that at least with respect to defendant

24  Saverin how overbroad and unjustified that request is.   I'm

25  sure you'll hear from Mr. Hornick about what he thinks of where

24

1  we are on that issue now, but as I just heard his proposal

2  today, he would still propose that we provide the image of Mr.

3  Saverin's individual hard drive, and there's no record evidence

4  whatsoever that that is reasonably calculated to lead to

5  anything that's relevant in the case, particularly the source

6  code that they claim is really what they're after here.

7          MR. HORNICK:  Your Honor, if I might?

8          THE COURT:  Go ahead.

9          MR. HORNICK:  There's a very important reason to do

10  imaging other than what we've heard.  They say, and this is the

11  first we've heard that they've made these steps, there's a lot

12  of unexplained things about the background of this code, but

13  there's a very important reason to do imaging other than to

14  find the code and that's to find if it was deleted, for example

15  after claims were asserted in this case.  That's something

16  that, that an expert would look for.  Five years ago, ten years

17  ago--

18          THE COURT:  Wait a minute, hold on.

19          MR. HORNICK:  Yes.

20          THE COURT:  Hold on.  Are, are you looking, is your

21  search including a search for deleted documents that may be on

22  the hard drive that an expert would have been able to retrieve?

23          MR. CHATTERJEE:  Your Honor, we've searched for, for

24  code anywhere on these devices.

25          THE COURT:  Answer the question specifically.

25

1        MR. CHATTERJEE:  Yes.

2        THE COURT:  At, does your, has the search that you've

3  conducted involve a search that would involve the search of

4  deleted items that might be recovered?

5        MR. CHATTERJEE:  Yes, and it continues to this day.

6        THE COURT:  Continue, Mr. Hornick.

7        MR. HORNICK: So the issue is not just whether the

8  information might have been deleted, but when it was deleted

9  and in what situation, what concept.

10        THE COURT:  Well, if they can't find the deleted

11  items, how are they going to find when it was deleted?

12        MR. HORNICK:  Well an expert may be able to confirm

13  those things.  Five years ago, ten years ago, imaging hard

14  drives was unusual.  But today--

15        THE COURT:  I know.

16        MR. HORNICK:  --it has become very common.

17        THE COURT:  I know, but it's uncommon for one side in

18  a dispute to get a mirror image of another side's computer.

19  That is not the usual way the things are done in litigation.

20  That, that, that's an extraordinary remedy which is the reason

21  that I'm trying to assess the need, your asserted need and what

22  their position is.

23        MR. HORNCICK:  Well, Your Honor, I would say that

24  although that it is unusual that it may not happen on the every

25  day course, but it is not so drastic because all it is is the

26

1  device to help try to recover documents that everybody admits
2  existed at one time.

3       THE COURT:  Yes, but one of the problems with it is
4  you got the whole hard drive and you get tons of documents on
5  there that are, that are not, not relevant, not necessary for
6  the particular purpose and it's a, it's, a lot of defendants or
7  opposing parties see it as a gross invasion of the privacy of
8  their business.  That's the problem with it.

9       MR. HORNCICK:  Well other courts have considered that
10  very issue and the problem is that you can't do an image of
11  just the part that you need.

12       THE COURT:  I know, that's the--

13       MR. HORNCICK:  Because you don't know what part you
14  need.

15       THE COURT:  --reason why it's an extraordinary remedy
16  to give people mirror images of other people's computers.

17       MR. HORNCICK:  But we've built into the particular
18  protocol that we're proposing protections against finding and
19  using information that is not what we're looking for.  First of
20  all, we originally proposed that our expert would do this.  We
21  don't want it to be our expert now for various reasons.  We
22  would propose an independent expert do this.  And the
23  independent expert is to look only for code.  And the
24  independent expert, we will not be present while he does his
25  work.  He'll sign the protective order.  There will, nothing

27

1    that he does will disclose any attorney/client privilege.

2              THE COURT:  And it will be at your expense?

3              MR. HORNCICK:  And it will be at our expense, that's

4    right.  What he finds will be provided to both counsel and to,

5    and we can provide it to the Court or he can provide it to the

6    Court.  He maintains the copies of that, those devices,

7    whatever they are in a secure fashion or he can provide them to

8    the Court to maintain in a secure fashion until the case is

9    over.  The courts that have considered this issue have looked

10   at all of these issues about whether the, whether you're

11   providing access to privileged information or confidential

12   information or other types of information, and they've said

13   that you have to, have to weigh the needs of the case versus

14   the burden.  And in many cases have found that the needs of the

15   case outweigh the burden and what they do is they put into

16   place a protocol that protects the parties' rights so that,

17   that burden is minimized.

18             THE COURT:  All right.  What's your problem with that

19   protocol?

20             MR. CHATTERJEE:  Your Honor, it's, it's exactly the

21   escalation procedure that Mr. Hornick identified.  First off--

22             THE COURT:  But in what, what, why is there, why is

23   that a, why is his proposal a problem from your point of view?

24   The person who's going to look at it is not connected with

25   them.  In other words, they're not going to, you're not going

28

1    to have the problem of information that otherwise would not be

2    disclosed to them, being disclosed to them.  And it's going to

3    be done at their expense, and the person is willing to sign

4    whatever protective order is necessary to protect you.  Why do

5    you object to it?

6              MR. CHATTERJEE:  It's, it, it's an issue of burden,

7    Your Honor.  I mean this is a--

8              THE COURT:  Why is it a burden on you--

9              MR. CHATTERJEE:  It's because of—

10             THE COURT:  --as opposed to them?

11             MR. CHATTERJEE:  It's because of the business

12   disruption that would flow from it.  If they just want to--

13             THE COURT:  How is mirror, making a mirror image of

14   hard drives disrupt the business?  I thought that was something

15   that was fairly easily done?

16             MR. CHATTERJEE:  It, it is not, Your Honor.  In, in

17   order to image our entire server architecture, that's where the

18   600 devices come into play.  You can't, you have to shut down

19   the system in order to make copies of all of these things.

20             THE COURT:  And how long does that take?

21             MR. CHATTERJEE:  It could take up to two weeks to do,

22   Your Honor.  And, and if, if we follow Mr. Hornick's procedure,

23   and let me offer maybe--

24             THE COURT:  And is that the, but that is the problem

25   you have with it, that it's, it's the burden on your business

1   and the disruption, that's your objection?

2        MR. CHATTERJEE:  Yes, Your Honor.  If, now, the other

3   piece of it of course is if we're going to, if we're going to

4   do any kind of mirror imaging, I think we should focus on the

5   place of where it's likely to be.  And to me, I think

6   Mr. Hampton talked about one of the defendants.  The other

7   defendants were also non-technical people.  The person at the

8   fulcrum is Mark Zuckerberg and if, if we, we don't have the,

9   the computer we, we are still looking for it, and we may find

10  it, that he had during the relevant time period, that's the

11  issue.  But, if we wanted to image, for example, his hard drive

12  and look for source code on that hard drive during any of the

13  relevant time periods on his personal computer, that might be

14  one thing we could do, and if we can't go, we've tried to go

15  back to the outsourced server, architectural people that we

16  signed an agreement with to get it, they, they didn't have it

17  anymore.  We can try and find some additional materials that

18  are not in service that are during this relevant early time

19  period for FaceBook, and we could image those.  But that's a

20  very narrow inquiry.  If it's not there, it's not going to be

21  anywhere.  And we've already looked there.

22        THE COURT:  Well, what, let me ask the plaintiff's

23  counsel, what do you say to his, which seems to be the only

24  objection to doing this is this burden and interruption.

25        MR. HORNICK:  Yes.  First of all there'd be no

1  disruption of their business because to image the individual's
2  devices won't disrupt their business.  To image the server that
3  was used at the time of launch and shortly after launch will
4  not interrupt their business because they're not using those
5  servers anymore, and if we ever get to the point where we need
6  to image their servers that they're using today, first of all,
7  we'd only want to image the one that is running Harvard, that's
8  not their whole business; secondly, I'd be very surprised if a
9  company like this is not using redundant servers.  That means
10 you're running both at the same time.  You have a backup.  If
11 one dies, you have a backup that's running.  So you can image
12 one, the company runs on the other one.  No disruption of the
13 business.  Now, in addition to that, I heard a very interesting
14 fact.  They asked the third party server if they have it.  They
15 said we don't have it anymore.  I'm sure they didn't go in and
16 image their hard drive and look for it, and that's what we want
17 to do.

18        THE COURT:  Well let's, let me ask you this.  If we,
19 if, if you were doing it so you were not disrupting their, I
20 mean, does it make sense to do it, you talked about a rolling
21 basis, just do a discreet number initially and have your expert
22 look at that, and if that, if we did it that way, what would,
23 what would be the discreet number you'd start with, just go
24 down the list?

25        MR. HORNICK:  Well, I'd start with the devices of the