41

1  then come back and tell me if what they've done is less than
2  what you do and that you had some basis for saying if you were
3  allowed to do it, you're going to find something. So that,
4  that's the way I'm going to, I'm going to handle this
5  particular motion.
6          MR. HORNICK: Could I respond, Your Honor.
7          THE COURT: Sure.
8          MR. HORNICK: Just a couple of points. One is that
9  I'd be very interested to know if the defendants have made
10 images of any devices. If they haven't, I don't know how they
11 could have done what we want to do. Secondly, this approach
12 doesn't, will never allow us to find out whether this code was
13 deleted by one of the defendants, and third--
14         THE COURT: Well it will if they've done what you are
15 planning to do. He's indicated to me that they've gone through
16 the, and looked for among the deleted documents. But see
17 that's the reason, but you don't know exactly what they've
18 done, which is the reason I, I think before I make a ruling,
19 I'd like to have a more substantial record and have you know
20 exactly what they've done. And I'm, you know, I'm willing to
21 if, if this discovery reveals that these representations that
22 are made to me here, that they've done exactly what you would
23 have done are untrue, I'll shift, I'll do some, you know, some
24 cost shifting. But, you know, the way it works is that you
25 seek discovery from the other side. It's their obligation to

42

1  give it to you if it's relative to claim or defense of the
2  party.  They say they've done it, and they've done exactly what
3  you would, your independent expert would do.  And in the face
4  of that, I don't think that I am, the record is such that I can
5  order them over their objection to let you do mirror images of
6  their hard drives.  But the server's a different question, the
7  server that they launched it from is a different question
8  because they haven't, I don't know what they've done to that,
9  but I don't' think they've made a mirror image of that, which
10 is the reason I'm going to let you go right ahead and do
11 discovery on that.  But that's the, that's the reason for doing
12 it the way I'm doing it.  Now, you find out exactly what
13 they're doing and if, if it turns out that these
14 representations that have been made to me, are, they're untrue,
15 that's obviously going to affect the next step.
16         MR. HORNICK:  Your Honor, I'm going to assume that
17 privilege, attorney/client privilege and work product aren't
18 going to get in the way of this discovery.
19         THE COURT:  Well, we haven't heard anything about
20 that yet.  As I, as I--
21         MR. CHATTERJEE:  I doubt that the individuals had
22 anything to do with this.  This is all something that would
23 have been done by counsel with experts, and I can see a lot of
24 objections coming to the discovery that--
25         THE COURT:  No, they, you can do discovery on what

43

1  they did to, what counsel did and what anyone did to obtain
2  the discovery that you've requested and, because that's where
3  the, that's where the issue is.  They say they've done
4  everything that you would do and it's not there.  You disagree
5  with them.  Well, I'm going to let you do some discovery and
6  make a record if you can that there's stuff they haven't done
7  and and if you are able to do that we'll, we'll take further
8  action.
9           MR. HORNICK:  Thank you.  I think that would be a
10 good start, Your Honor.
11          THE COURT:  Okay, so that we're clear.  Discovery can
12 go forward against the person whose server was used to launch
13 it, and the defendants will give any identifying information
14 about that corporation to the plaintiffs that they need in
15 order to issue a subpoena and the plaintiffs may take discovery
16 of the efforts that you've made, the defendants have made to
17 obtain discovery that's sought and is the subject of this
18 motion.  All right?
19          MR. HAMPTON:  Your Honor, does the Court contemplate
20 that there'll be further discovery as to defendant Saverin?
21 It's our representation that the, it's not there, that it's
22 never been there and--
23          THE COURT:  If they want to question him about that,
24 they may.  And they may ask him questions about attachments and
25 all of that sort of thing.  They may take discovery of the

```
 1  defendants, including Mr. Saverin, yes.
 2           MR. HAMPTON:  Thank you, Your Honor.
 3           THE COURT:  Okay.  All right.  I will go through
 4  these, these motions, these other motions to the extent that
 5  I'm able to.  If I find that in reading them that there hasn't
 6  been, you know, if I'm, if I'm reading them and I, I get to the
 7  situation that someone is asking for something and the other
 8  side says we've already given it, or, you know, I very well may
 9  ask you to confer further on it.  But as I say, I haven't had a
10  chance to go through them all, which is the reason I haven't
11  put it on for hearing today.
12           Okay, anything else I need to take up?
13           MR. HORNICK:  Yes, Your Honor, this motion also
14  covered--
15           THE COURT:  Oh that's right, yes.
16           MR. HORNICK:  --documents after May 21st of 2004.
17           THE COURT:  That's right.  Okay, I'm, I'm sorry about
18  that.
19           MR. HORNICK:  The defendants agreed to produce
20  responsive pre May 21st documents "irrespective of relevance".
21  So relevance is not an issue with respect to producing
22  documents created after May 21st, and we're only--
23           THE COURT:  Wait a minute, wait a minute, you better
24  say that again.
25           MR. HORNICK:  Yes.  We have document requests that
```

YOUNG TRANSCRIPTION SERIVCES
(508) 384-2003

45

1    are identified in the motion on the--

2           THE COURT: Right.

3           MR. HORNICK: --number 63, 67 and some others, and
4    those aren't limited in time. Therefore, the whole relevant
5    time period which goes back to probably that, those requests
6    probably asks for information back to October of 2003, roughly.
7    And they're not limited in time in the future. So the
8    defendants produced documents up to May 21st of 2004 without any
9    objection to relevance, but then they cutoff production on May
10   21st of 2004.

11          THE COURT: Well, do they object to producing any
12   documents after May 21, 2004?

13          MR. HORNICK: Yes, they do. They're withholding all
14   documents created after May 21, 2004 except documents that they
15   view as supporting their case, which are a few financial
16   documents that they've produced. And we're only seeking
17   documents that are relevant to the lawsuit and they admit that
18   they're withholding them. Their arguments were that this is
19   just a trade secret case. Mr. Chatterjee, said today this is a
20   trade secret and a copyright case. In their motion to dismiss,
21   they say this is mostly a common law claims case. In fact,
22   this case has several claims. We don't know which are going to
23   predominate at this time, and the discovery that we're seeking
24   isn't limited to trade secret issues, but they say because we
25   had not identified our trade secrets, they weren't going to

1  produce any documents created after May 21, 2004. How the two
2  things connect, I still haven't figured out. Now, we're
3  entitled to those documents after that date just as much as
4  we're entitled to them before that date, and there are probably
5  no more than a few hundred documents. The defendants argue
6  that it's 1/5 the quantity of documents in the Library of
7  Congress, but we argue there are probably only a few hundred,
8  and in their opposition to our motion to compel documents, they
9  admitted that there is relatively a small number of documents
10 that fall into that category, specifically at pages 6 and 7 of
11 their opposition to our motion to compel documents, which is
12 Docket No. 82. They argue that the documents that they have
13 after May 21st grew exponentially after that date, but that's
14 unlikely because they deal with college students, summer
15 vacation started around that time, and we've tried to take
16 discovery on the growth of their website. They've blocked
17 that, so we don't really know if that allegation is true. But
18 what happened on May 21st of 2004 is that our clients' website
19 launched. And here's a crucial fact; nobody knew, on the
20 defendants' side at least, nobody knew that that was going to
21 happen. So leading up to the time of May 21st of 2004, the
22 defendants were cruising along running their website. They
23 don't know whether ConnectU is going to launch. They don't
24 know when it's going to launch. Then on May 21st it launches.
25 Now, it's fair to assume that on that day and after that day

47

1  there were emails and other documents generated where they
2  would be discussing the launch of ConnectU, whether we have any
3  problems, whether there's any infringement we need to purge,
4  whether we are at risk in some way, but all of those documents
5  are being withheld.  They won't give us anything from May 21st
6  of 2004 onward.  We say that there's no basis whatsoever for
7  withholding them, Your Honor, and we ask that they be ordered
8  to produce them.
9           THE COURT:  Okay.  Let me hear the defendants on that
10 aspect, please.
11          MR. HAWK:  Your Honor, Robert Hawk for defendant
12 Saverin.  And I should address this issue I think in the first
13 instance that we were actually a counsel for all defendants at
14 the time the responses to these first set of document requests,
15 170 requests were put together.  And this is not a, an issue of
16 a May 21, 2004 arbitrary date cutoff issue.  It is an issue of
17 over breadth with regard to specific document requests that we
18 objected to.  The way that we got to this May 21, 2004 request,
19 well first of all, there were a number of requests that we did
20 not object to producing documents that were generated after May
21 21st.  And a number of those requests where we produce documents
22 and agree to produce documents generated after May 21st.  But
23 those requests were ones that were not totally overbroad and
24 objectionable in seeking essentially every document in the
25 company.  Where we use the May 21, 2004 date, it was really,

48

1   Your Honor, just a, an attempt by us to reach some kind of
2   compromise to offer the plaintiff some of the documents that
3   they had asked for even though the requests themselves were
4   vastly overbroad.  For example, counsel, where we interpose
5   that that objection is where, for example where plaintiff asked
6   for all documents that relate to the development of the
7   website.  And there were two reasons that that was just not,
8   not a practical kind of request.  It would, if Microsoft, for
9   example, were the, were the defendant in this case, they'd be
10  asking for, you know, reams and tons of material and this
11  company, it's certainly not Microsoft, but it is a company that
12  has grown exponentially since May 21st of 2004.  And the reason
13  we selected a date is that we tried to get a non-arbitrary date
14  where we could compromise and give plaintiff a lot of the
15  documents that they were looking for and ones that were likely
16  to be more relevant, but not take on the huge burden of
17  producing documents, a huge volume of documents where plaintiff
18  did not specify the kind of request that the, where the
19  requests were simply overbroad, Your Honor.  Where the requests
20  were not overbroad, we went ahead and agreed to produce
21  documents, regardless of timeframe.  And so what we asked
22  plaintiff to do was to give us more specific requests.  If they
23  were going to not limit the documents by time, they needed not
24  to give us overbroad requests.
25          THE COURT:  And what was their response?

49

1        MR. HAWK: Their response was no, there might be
2   something, Your Honor, there might be something out there that
3   we're entitled to and we are not willing to narrow these
4   overbroad requests. And that's, that's really why we weren't
5   able to come to a compromise that worked on this particular
6   issue.
7        THE COURT: Okay. Mr. Chatterjee.
8        MR. CHATTERJEE: Your Honor, there's two additional
9   things that I wanted to discuss in addition to Mr. Hawk. Let
10  me, let me just read to you what some of the document requests
11  say. All documents relating in any way to the development of
12  the FaceBook.com website. That's request No. 33, the very
13  first one they're seeking to compel on. That is the company.
14  All documents in the possession, custody or control of Mark
15  Zuckerberg, the FaceBook Inc., and all the other defendants
16  relating in any way to the subject matter of this lawsuit. I,
17  I, I couldn't even begin to pretend how to respond to that.
18  That's again, that's the entire company, the subject matter of
19  the lawsuit is the FaceBook and is that something that the
20  plaintiff can claim some sort of title to? And that, that,
21  that is an enormously broad request. We've tried to pare it
22  down, and frankly, Your Honor, when I deal with cases like
23  this, the way I typically do meet and confers is I say, okay,
24  we have these document requests, somewhat an antiquated
25  approach in the context of electronic discovery. Here's the

50

1  bright line rules that we've applied to try and figure out how
2  to conquer the shapes of discovery.  What is it, what else is
3  it that you think you really need that will move the ball
4  forward?  Can you specify what it is you think you really need,
5  rather than working through each of the individual requests,
6  although you may get to that in the process of meet and confer.
7  Rather than follow that approach, which is one we suggested in
8  the meet and confer, we engaged in a seven hour meet and confer
9  where we went through each and every one of these, where you
10 had to recite the same script over and over again.  It just
11 seems to me to be, I mean, these, these requests are so broad,
12 we should really be focusing on, what is the specific thing
13 that people really need.
14         The second point I wanted to make is this case, and I
15 think Your Honor's holding in the *Microwave Research* case a, a
16 number of years ago is quite telling.  That's--
17         THE COURT:  Boy, you're going way back now?
18         MR. CHATTERJEE:  It goes back to 1986, Your Honor,
19 and that was actually a breech of contract case and trade
20 secret case and a common law and fair competition, many of the
21 same claims that one has here, where Your Honor adopted an
22 approach basically saying the plaintiff has to put their cards
23 on the table.  They have to have, show a well founded belief of
24 the fact that their trade secrets misappropriated or that the
25 other cause of action is viable before they're given the keys

51

1  to the company to just start fishing within it.  That well-
2  founded belief is what frames the discovery.  We are struggling
3  as we sit here today to understand what are the contours of
4  really what's at issue here.  We also have a motion to compel,
5  which isn't scheduled for today related to interrogatory No. 2,
6  where we've asked them to specify their trade secrets.  We also
7  have a motion to compel related to the 30(b)(6) deposition
8  where we tried to do the same thing.  These are all somewhat
9  interrelated.  I'm not even sure if it makes sense to resolve
10 this single piece of the motion without looking at the context
11 of the other motions in order to frame what the correct scope
12 of discovery should be, if there's any to be framed at all.
13         Thank you, Your Honor.
14         THE COURT:  All right, let me hear you in response--
15         MR. HORNICK:  Yes.
16         THE COURT:  --to this allegation that these are
17 overbroad and you refuse to engage in any limitations on them.
18         MR. HORNICK:  Yes.  Your Honor, first I should point
19 out that the plaintiffs in this case haven't withheld any
20 documents in production.  And we've been very cooperative, and
21 we're not getting any cooperation back.  We're blocked at every
22 turn.  And on these particular requests, I think it's worth
23 pointing out that the defendants had no objection to producing
24 documents responsive to them as long as they were dated before
25 May 21st.  So our point is how can they possibly be overbroad if

52

1  you are willing to produce responsive documents prior to that
2  date. How can they possibly be overbroad?
3        THE COURT: Well, because I take it, because
4  according to what I'm hearing from the defendant is that since
5  that time the company has grown to such an extent that the
6  amount of documentation is so large that it would be burdensome
7  and it's not all relevant.
8        MR. HORNICK: Well, Your Honor, we're only asking
9  them to apply the criteria of relevance that they applied when
10 they produced pre-May 21st documents, and as I said earlier in a
11 later brief, they admitted that we were right, that there is a
12 relatively small quantity of documents that they are
13 withholding that are responsive to these requests. I've
14 pointed the Court before to their opposition to our motion to
15 compel documents. At page six they say, "FaceBook defendants
16 are only withholding some financial documents and corporate
17 documents created after May 21, 2004."
18        THE COURT: Well, yes, but that's just, that's just
19 the financial documents. That doesn't, I mean, that does, is,
20 is that a statement as to the universe of documents--
21        MR. HORNICK: If, if you read that--
22        THE COURT: requested after May 21st?
23        MR. HORNICK: Yes, if you read that paper, they were,
24 in context, they were talking about what they were withholding
25 as stated after May 21st, and they said we are only withholding

53

some financial and corporate documents created after May 21, 2004. So we don't think the quantity is this large quantity that they're talking about. We think it's a relatively small quantity, and we don't see why they can't produce them, because they did not object to the relevance with respect to documents before that date.

With respect to what we're looking for, well, Your Honor, we don't know what they have. They want us to tell us what--

THE COURT: Now hold on just a second. Mr. Chatterjee, what about that point? They're only withholding a small number of documents after May 21st, 2004?

MR. CHATTERJEE: That's just flat out wrong, Your Honor. Your understanding is that, that you articulated is exactly what our point was, which was with respect to this narrow category of financial information, a certain kind of financial information, there are certain things that we've withheld and I can talk about that if you want. Those are subjects of other motions. But that is a very different issue that in saying documents relating in any way to the development of the FaceBook website.

THE COURT: All right. That's enough. I've heard, go ahead. You wanted to, as to what we're looking for.

MR. HORNICK: Yes, well, the reason that we have a request that is basically asking for any documents that relate

54

1   to the lawsuit is because we don't know what they have and
2   what we can ask for. We have a lot of other document requests
3   and they have produced documents in response to some, and
4   they've promised to produce documents in response to others.
5   The ones where they promised, they withdrew the promise. We
6   have a separate motion pending. But this particular limited
7   set, they stood on their objection. We won't produce anything
8   created after May 21, 2004, and as a result, we don't have
9   things like email that these people exchanged after that date.
10  We don't have financial documents after that date, with few
11  exceptions. We don't have any corporate documents after that
12  date. We don't have any documents that relate to any efforts
13  that they might have made to cover up their wrongful acts after
14  that date. We don't have their communications with the media
15  after that date. And I don't know if Your Honor is aware of
16  this or not, but there are about five to 15 articles a day
17  published about the FaceBook.com. They are talking to the
18  media all the time. We don't have documents that talk about
19  how the FaceBook has grown since that date. All of this is
20  crucial for our, for our expert, but we don't want to name
21  particular categories and then have them say they object to
22  those because they don't understand them or they're holding
23  back things that we didn't simply ask for because they say oh,
24  it didn't technically fall within that category so, therefore,
25  we have some catchall requests that ask for any documents that

55

1  relate to the lawsuit. And that's not an unreasonable
2  request. We're entitled to discovery and anything related to
3  the claims, defenses or counterclaims. And they've just made
4  an arbitrary cutoff date on May 21st, which just happens to be
5  the date on which a lot of documents could start to be
6  generated because they found out that our client had now
7  launched their website and they may be in real trouble.
8         THE COURT: Okay. I'll take the matter under
9  advisement. Thank you very much and we'll remain in session to
10 hear the criminal matter.
11        MR. CHATTERJEE: Thank you, Your Honor.
12        MR. HORNICK: Thank you, Your Honor.
13 //
14 //
15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //

56

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____                          January 11, 2006

Maryann V. Young