February 26, 2006

Monte Cooper
(650) 614-7375
mcooper@orrick.com

*VIA FAX AND EMAIL*

John F. Homick, Esq.
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001

Re:   **ConnectU v. Zuckerberg et al.**

Dear John:

This letter relates to our discovery conference of February 23, 2006, as well as your follow-up email correspondence dated February 24, 2006.

In this letter, I am offering numerous compromises in the hopes that we can focus on moving this case forward. Defendants believe that discovery conferences will be greatly facilitated if we focus our meet and confers on attempting to reach compromise while also efficiently tailoring discovery to the issues in the case and ensuring production of information focused on relevant discovery while at the same time minimizing burden and expense. My suggestion mirrors a discussion between your partner Scott Mosko and Neel Chatterjee with respect to the California lawsuit involving the same parties, in which the California Court asked the parties to try and set aside the existing "blood feud" mentality. I realize you indicated that you were unconcerned what your own partner and/or the California Court may have stated. However, Plaintiff's approach in the Massachusetts case appears to present the same "blood feud" mentality. I suggest that we put aside the emotions and needless accusations and focus on moving the case forward.

I.   **Plaintiff's request for mirror images of hard drives and related discovery.**

a.   **Plaintiff's request was directed at finding code**

During our discussion on February 23, 2006, you repeatedly suggested that the Court's November 18, 2005 Order is aimed at any efforts to mirror image relevant hard drives and other electronic devices for documents other than code, and that you will demand these devices be turned over to you for such purpose. Defendants disagree with your position. Defendants believe the Court held that Plaintiff may seek discovery related to the efforts taken to recover responsive code. The original meet and confer discussions following the Court's order also confirm that Plaintiff appeared to believe the order was addressed to the efforts taken to find such responsive

John F. Hornick, Esq.
**February 26, 2006**
Page 2

documentation. To that end, Plaintiff has served interrogatories and will be taking a 30(b)(6) deposition next week. It has only been since Defendants actually produced all code, which demonstrates the absence of any copying, that Plaintiff has shifted focus and demanded production of imaged hard drives for other purposes.

Plaintiff has incorrectly claimed that the underlying "mirror image" motion sought material other than code. As I advised you, the briefing that prompted the Court's Order and your arguments to the Court were almost exclusively focused on obtaining all available code. Virtually all of the code Plaintiff actually sought via that motion has been located and produced, as we have now told you numerous times. Mirror images of the drives were presented by plaintiff as the means to obtain that code; something that was not necessary then, and which remains unnecessary now. The Court also unequivocally recognized that what plaintiff was seeking was code, as evidenced by its numerous explicit references to "codes" at the hearing (and quoted multiple times in your February 16, 2006 letter).

To date, Plaintiff has done nothing to provide that which the Court required Plaintiff to do: provide a particularized showing that material is likely to be in a place that Defendants have not looked. That is to say, if you have reason beyond pure surmise that code exists somewhere that has not been searched, please advise both of the specific reasons for those beliefs, and the objective basis why you believe the code will actually be recovered from such an "un-searched" source. If you provide such a basis, Defendants will consider it.

### b. Compromise Suggestion related to mirror image issues.

While Defendants have no obligation to do so, Defendants for the third time offer the solution you once suggested: namely, that if you believe imaging for code has been insufficient, Defendants will submit the relevant hardware to a court appointed expert. If that expert determines any significant code is present that was not produced, Defendants will pay for the efforts. Otherwise, plaintiff will pay.

That very solution was the one you originally suggested at the hearing that led to the November 18, 2005 Order. More to the point, it also is the preferred solution set forth in the extremely rare cases that have actually ordered disclosure of imaging. *See, e.g., In re Triton Energy Ltd.*, 2002 U.S. Dist. LEXIS 4326, *13 (E.D. Tex. Mar. 7, 2002) (court appointed a computer specialist to extract information, and a special master to review the documentation extracted).

### c. Request for Assurances related to Plaintiff's electronic media.

As imaged electronic storage appears to be an issue of great importance to plaintiff and plaintiff believes such an obligation exists (something Defendants disagree with), Defendants would also like confirmation that Plaintiff has imaged copies of all electronic storage of all devices it

John F. Homick, Esq.
**February 26, 2006**
Page 3

believes may have relevant information. I note that I first raised the issue of mutual obligations with respect to these efforts during the discovery conferences held last summer.

Please also confirm that every version of the Harvard Connection code also has been produced, and that all relevant hard drives and electronic devices have been forensically searched to ensure as much. If versions do not exist, please explain where they may be located. To that end, it appears that the code recently produced by Joe Jackson is not a version previously produced by Plaintiff.

II.   **Suggestion for discovery following resolution of trade secret identification motion.**

Following resolution of these and other substantive motions, Defendants appreciate that discovery may re-commence. Like Plaintiff, Defendants want to figure out a way to find the relevant information in the massive amounts of irrelevant electronic data on the devices recently located. Of course, part of that approach requires plaintiff to identify its trade secrets properly, an issue which you are aware remains in dispute.

In furtherance of expediting the process and avoiding court intervention, Defendants suggest a compromise as to remaining data on the newly located devices. In addition to the previous, comprehensive Facebook code production, I propose that the voluminous (and largely or wholly irrelevant) remaining data be searched by mutually-agreeable keywords. This would occur only after the parties' disagreement related to plaintiff's identification of trade secrets is resolved, and only if the pending motion to dismiss does not render the effort moot (or if the Court orders discovery to proceed notwithstanding the pendency of the motion to dismiss). The dispute related to the trade secret identification will surely help frame some of the keyword searching, as this case is a trade secrets case at its core. Defendants will agree to produce relevant non-privileged matter recovered from these searches using such mutually agreed upon terms. As this effort is certain to require some electronic processing from a vendor, Facebook would be willing to split the cost evenly with Plaintiff for the processing.

In the event this solution is acceptable, it might also be useful to apply to electronic data that may be subject to the parties' pending motions. I caution, though, that some challenges will exist because of the need to image an enormous number of electronic devices, which would be expensive, are unlikely to contain relevant information or lead to admissible evidence. Therefore, please let Hopkins Guy, Neel Chatterjee or myself know immediately if you would like to discuss this solution.

John F. Hornick, Esq.
**February 26, 2006**
Page 4

### III. Code production Issues

#### a. Confirmation of production

Consistent with what I stated during the discovery conference, all PERL files that Hopkins Guy discussed with you that were generated before 2005, including code dating from or about February, 2004, has already been produced. After further investigation, it appears that you misconstrued a statement from Hopkins Guy concerning "six files," which regrettably caused the confusion you complained of repeatedly during the discovery conference. Apparently, Mr. Guy informed you that he believed approximately 6 PHP files dating from early 2004 have already been produced to you in the various productions. He made no representation as to the specific source drive TFB000085. Moreover, consistent with Mr. Guy's representations, a number of PHP files dating from early 2004 are, in fact, already in your possession.

#### b. Compromise related to file/source code directories.

Defendants are prepared to produce a file/source code directory for your reference, even though we have no obligation to do so. However, as I advised you during the discovery conference, the Defendants are not waiving the attorney-client or work product privileges with respect to their efforts to locate code. Defendants will produce the file/source code directory immediately upon assurance that Plaintiff will not treat such production as a waiver of work product protection or the attorney client privilege. If Plaintiff does not agree to this term, we will need to address it with the Court – perhaps with Defendants submitting the directory in camera to the Court and explaining our concerns. It is my hope court intervention is not necessary. Upon the assurance I seek, we will produce the directory immediately.

#### c. Database Definitions and compromise related to database definitions

During our conference, you once again stated that Defendants are withholding "database definitions", or "database structures." As I advised, Defendants believe that to the extent it understands what you are seeking, the information would have been included with the code already produced. Please explain why such information is relevant to this case. Plaintiff has made no claim related to database definitions and database structures. Indeed, they are not mentioned in Plaintiff's trade secret identification.

Assuming they are relevant in some way, I offer the following suggestion to try and resolve the impasse. Since you stated at the discovery conference that "database definitions" exist out of necessity in all relevant code, please identify the specific items in ConnectU's own software production that reflect database definitions or database structures as Plaintiff understands them. With such information, we can perhaps work through our own consultants to determine whether

John F. Hornick, Esq.
**February 26, 2006**
Page 5

such code does exist somewhere, or more readily identify the reason why you apparently have not located examples in the Defendants' production.

### IV.    Privilege Log

Defendants expect to produce a privilege log the week of February 27, 2006. Whether the file/source code directory appears on it is dependent upon your assurances mentioned above.

### V.    Depositions.

During the discovery conference held February 23, 2006, you demanded dates that the individual witnesses may be made available for depositions, even though you stated you would not take the depositions if the Court holds the time used counts toward the normal one-day seven hour deposition. As a courtesy, we will try and identify dates the witnesses can be available. Our position remains unchanged. Plaintiff may depose each individual once for seven hours. Defendants do not believe the deposition scheduling issue should be brought before the Court next Friday, as no motion has been filed and, consequently, the issue has not been calendared. As the Court has a tremendous volume of other material to address next Friday, raising the deposition issues then is improper.

### VI.    Interrogatory response

You asked that we confirm "non-evasive" as used in interrogatory responses was intended to mean "non-invasive." I hope to have an answer to you on that issue early next week.

As you will note, this letter offers numerous compromises and attempts to get this case back on the right track and eliminate the "blood feud" mentality. My hope is that you and your clients will try to engage in a more productive dialogue intended to achieve the objectives of discovery and meeting and conferring. We certainly hope to abide by the concerns expressed from the Court in the California action, as the Massachusetts Court is surely faced with similar concerns given the amount of motions practice. With that in mind, I look forward to talking with you soon.

Sincerely,

Monte M.F. Cooper

John F. Hornick, Esq.
**February 26, 2006**
Page 6

cc: Robert Hawk, Esq.
    Bhanu Sadasivan, Esq.
    Daniel Hampton, Esq.
    Jeremy Oczek, Esq.