# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Civil Action No. 04-11923-DPW**

**CONNECTU LLC**
    **Plaintiff**                                    .
                  .
                  .
       **v.**                                          .
                  .
**MARK ZUCKERBERG, et al**                         .
    **Defendants**                                  .
. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
HELD ON NOVEMBER 18, 2005

APPEARANCES:

For the plaintiff:  John F. Hornick, Esquire, Jonathan M.
Gelchinsky, Esquire, Margaret A. Esquenet, Esquire, Troy Grabow,
Esquire, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP,
901 New York Avenue, N.W., Washington, DC  20001, (202) 408-
4000.

For the defendants: Daniel K. Hampton, Esquire, Holland &
Knight, LLP, 10 St. James Avenue, Boston, MA  02116, (617) 523-
6850 and I. Need Chatterjee, Esquire, Robert D. Nagel, Esquire
Orrick, Herrington & Sutcliffe, LLP, 4 Park Plaza, Suite 1600,
Irvine, CA  02614-2558, (949) 567-6710.

Jeremy P. Oczek, Esquire, Proskauer Rose, LLP, One International
Place, Boston, MA  02110, (617) 526-9600.

For defendant Eduardo Saverin:  Daniel Hampton, Esquire, Holland
& Knight, LLP, 10 St. James Avenue, Boston, MA  02116, (617)
523-2700 and Robert Hawk, Esquire, Heller Ehrman, LLP, 275
Middlefield Road, Menlo Park, CA  94025, (650) 324-7156.
Court Reporter:


Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

1                          **I N D E X**

2   Proceedings                                          3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                     P R O C E E D I N G S

2    (Court called into session)

3              THE CLERK:  The Honorable Robert B. Collings

4    presiding.  The case of ConnectU LLC v. Mark Zuckerberg,

5    Civil Action No. 04-11923 will now be heard before this Court.

6    Will counsel please identify themselves for the record.

7              MR. HORNICK:  Good morning, Your Honor, I'm John

8    Hornick from the firm of Finnegan, Henderson, for the plaintiff

9    and I have with me my colleagues, Margaret Esquenet, Troy

10   Grabow and John Gelchinsky.

11             THE COURT:  Good morning.

12             MR. CHATERJEE:  Good morning, Your Honor, Neel

13   Chatterjee for all of the defendants and counterclaimants

14   except for Eduardo Saverin.  With me is Rob Nagel.  We're both

15   from the Orrick Herrington firm and then Jeremy Oczek from the

16   Proskauer Rose firm is also joining us.

17             MR. HAMPTON:  Good morning, Your Honor, Daniel

18   Hampton representing defendant Eduardo Saverin, and with me as

19   co-counsel is Robert Hawk from Heller Ehrman.

20             MR. HAWK:  Good morning, Your Honor.

21             THE COURT:  All right.  This case has been referred

22   to me now for all pretrial proceedings, so what I wanted to do,

23   I know there's a motion to extend the schedule that Judge

24   Woodlock set and there's a motion we're going to hear today and

25   there's a bunch of other motions, which I'll talk to you about

4

1  and I'm going to set them up for decision, either with or

2  without a hearing.

3         Tell me, let me hear from the plaintiff as to where

4  you are with respect to discovery and what type of deadlines

5  you want to put into the case.  Go ahead.

6         MR. HORNICK:  Yes, thank you, Your Honor.  Where we

7  are is that party discovery--

8         THE COURT:  Excuse me.

9         MR. HORNICK:  Oh, I'm sorry, Your Honor.

10        THE COURT:  Will you stand when you address the

11 Court, please.

12        MR. HORNICK:  I'm sorry.  I was assuming because of

13 the set up here with the microphone on the table we were

14 supposed to remain seated.  I apologize.

15        THE COURT:  That's all right.

16        MR. HORNICK:  Where we are with discovery is that

17 party discovery at least has been at a standstill since about

18 mid July with a few exceptions.  The defendants have made some

19 sporadic productions of documents, and in fact and I mean,

20 confer two days ago, said that they recognized the duty to

21 produce documents that helped their case and they've been doing

22 that, but since August 18th at least, the defendants have

23 refused to allow any depositions.  We have five depositions

24 noticed.  We haven't been able to take any of them, and the

25 defendants are withholding so much discovery that our experts

1  can't perform their analysis, our tech expert can't do his

2  comparison of the code of the two website sites for purposes of

3  copyright infringement analysis, and he can't compare the

4  websites as the face book launched for purposes of any of our

5  other analyses for our claims.  And our damages expert--

6          THE COURT:  Is all the discovery that you claim

7  they're withholding the subject of these motions?

8          MR. HORNICK:  Yes, Your Honor, with the exception of

9  a second set of discovery records in which we're meeting and

10  conferring at this time.

11          THE COURT:  Okay.

12          MR. HORNICK:  And then our damages expert needs

13  withheld financial information and documents so that it can

14  complete his report, and even though we have these five

15  depositions noticed and although the defendants are refusing to

16  allow them, we don't feel like we could really take them anyway

17  at this particular time because there's so many documents that

18  we need to prepare for them properly.

19          As I said, we're now meeting and conferring on a

20  second set of requests, which may or may not get resolved.  We

21  are taking some third party discovery.  We've just started that

22  and we've also served our first set of requests for admissions.

23  But basically, on party discovery, we're at a standstill and

24  have been so for several months.

25          THE COURT:  Okay.  Let me hear from the defendants.

1          MR. CHATTERJEE:  Thank you, Your Honor.  We

2   appreciate your giving us the time today.

3          Our view is there has been fairly extensive

4   production here.  The primary discovery issues that are out

5   there are – this is a trade secret copyright infringement case.

6          THE COURT:  Oh, I just love it, scant discovery, lot

7   of discovery.

8          MR. CHATTERJEE:  I'm sure you've heard--

9          THE COURT:  I guess it's the name of the game, but go

10  ahead.

11         MR. CHATTERJEE:  I'm sure you've heard it all before,

12  Your Honor.

13         The discovery issues that are outstanding, just to

14  encapsulate them, is, they want to seek a mirror image, the

15  motion that's subject to Your Honor's hearing today, of every

16  hard disk drive in our company and I can provide you with a

17  list but you have a sense of that--

18         THE COURT:  All right, well, we'll get to that

19  motion.

20         MR. CHATTERJEE:  We've, you know, we've tried to take

21  the deposition and tried to get their trade secrets identified.

22  There's a trade secret case that really lies--

23         THE COURT:  How many depositions, have any

24  depositions been taken at all in the case?

25         MR. CHATTERJEE:  There has been one 30(b)(6), which

7

1   was one of our attempts to try and get them to identify their

2   trade secrets.  That is the subject of a motion to compel, Your

3   Honor.

4          THE COURT:  Okay.  And how many other depositions do

5   you have noticed or how many others would you like to take once

6   these discovery disputes are resolved?

7          MR. HORNICK:  There probably will be a fair number of

8   third party depositions.  I would say at least five or six.

9   We'll want to take individual depositions.  That's probably

10  going to be three or four individual depositions and one

11  further 30(b)(6), Your Honor, so I'd say roughly 10.

12         THE COURT:  Okay.  Okay.  Now, let's see, so all you

13  want this motion to do is basically lift the deadlines in

14  paragraphs two, four and six?

15         MR. HORNICK:  Yes, Your Honor.

16         THE COURT:  All right.

17         MR. CHATTERJEE:  Well, Your Honor, also in paragraph

18  three, that's the close of discovery.

19         THE COURT:  I'm sorry, two through four and six.

20  (Pause)

21         THE COURT:  Well, I suppose one of the questions I

22  ask you is does it make sense to – I mean, I know it was set up

23  so that expert reports would be due November 1st and December 1st

24  and close of all discovery on December 15th.  Does it make more

25  sense to get a date for the completion of the fact discovery

8

1   and then have the expert discovery schedule?

2           MR. HORNICK:  Your Honor, I think so.  The problem

3   we've run into with expert and fact discovery closing on

4   December 15th is that we need important fact discovery for the

5   experts to do their reports by November 1st.  They haven't been

6   able to due that because of fact discovery being still open.

7   So I--

8           THE COURT:  I'm going to give you an extension.  I

9   just want to try and get--

10          MR. HORNICK:  I would suggest--

11          THE COURT:  --one that is going to work.

12          MR. HORNICK:  I would suggest that we have expert

13  discovery closing after fact discovery.

14          THE COURT:  What's the defendants' position?

15          MR. CHATTERJEE:  You're Honor, I agree with you.  I

16  actually think that's a better way to go.

17          THE COURT:  All right.  Now, once I resolve all these

18  discovery motions, what timeframe would you need to complete

19  non-expert discovery?

20          MR. HORNICK:  Your Honor, we were going to propose

21  three months from the time the motions are resolved.  If they

22  were resolved today, we'd propose February 15th, which is

23  roughly three months from now.

24          THE COURT:  They're not going to be - one might be

25  resolved today, but the rest of them aren't going to be

9

1   resolved today.  I mean I'll get to them when I can get to

2   them, but that number of discovery disputes is quite a burden

3   on the Court.  I'm very happy to do it, but, you know, I've got

4   other cases and other mediations I've got to do, so I'll get to

5   it when I can.

6          What do you say as to the timeframe you need for

7   non-expert discovery once the motions are decided?

8          MR. CHATTERJEE:  Your Honor, I think it's probably

9   going to be closer to five months; however, there is a motion

10  to dismiss also pending and that may, of course--

11         THE COURT:  Well, I'm not going to stay any discovery

12  while that - I mean I'll get to that also.  I've got to do a

13  report and recommendation on that, but I'm not going to stay

14  any discovery, so you're going to go forward with the case,

15  with discovery.  So you think five months?

16         MR. CHATTERJEE:  I think five months and then we'll

17  deal with experts after that, Your Honor.

18         THE COURT:  Well, no, we're going to get that done

19  right now.  Now, once the fact discovery is completed, there

20  was a - how much time would you need to get your expert reports

21  in, plaintiff?

22         MR. HORNICK:  We were going to propose that we finish

23  them two weeks after fact discovery closes and that rebuttal

24  reports be due a month later and that--

25         THE COURT:  Well, did he set it up with - oh, he set

10

1    it up with those things you have the burden of proof on?

2            MR. HORNICK:  That's right, Your Honor.  So what

3    we're proposing is that--

4            THE COURT:  Two weeks and then rebuttal reports how

5    long after?

6            MR. HORNICK:  Month, one month, and then depositions

7    being completed one month after that.

8            THE COURT:  You mean the expert deposition?

9            MR. HORNICK:  Yes.

10            THE COURT:  What's defendants' view on that?

11            MR. CHATTERJEE:  That seems like a workable schedule,

12    Your Honor.  I think that the opening expert reports, two weeks

13    may be a little bit short, but not to a huge extent.

14            THE COURT:  All right.  I'm sorry, you said expert

15    depositions being completed 30 days after the rebuttal

16    Reports are due?

17            MR. HORNICK:  Yes, Your Honor.

18            THE COURT:  Okay.  I will set such a schedule.  I'll

19    make the decision between those things you disagree on, but I

20    will, I will put a new schedule in place, and I'll vacate the

21    deadlines that Judge Woodlock had set so that you're not,

22    you're not in violation of his order, you know, at any time.

23            All right, let me hear the issue with respect to the

24    mirror image, please.

25            MR. HORNICK:  Yes, Your Honor.  This motion that

ii

1    we're hearing today actually seeks two very different things

2    and it could be two completely separate motions.  We combined

3    them because we had the pages to do it so we did so.  The two

4    things that the motion seeks are the face book code from the

5    time prior to launch and the time of launch and complete code

6    from after launch all the way up through October of 2004, and

7    in fact there's elements missing from the code that's been

8    produced even after that date.  So basically what we're looking

9    for is complete face book code from the time of inception to

10   date.  And in addition to that, we're looking for some code for

11   something called face match, something called course match and

12   also an on-line journal that Mr. Zuckerberg kept relating to

13   face match.  And then the second thing, the second distinct

14   thing that the motion seeks is documents that were created on

15   or after May 21st of 2004.  Now, by blocking the discovery of

16   both, the defendants have effectively blocked the big picture

17   of this case.  By blocking the code and the database

18   definitions that would go--

19                THE COURT:  Of those things you're requesting, how

20   many of them do they say exist but they refused to produce them

21   and how much, what of them do they say do not exist?

22                MR. HORNICK:  Well, with respect to the code, they

23   don't give very clear explanations at all as to what exists and

24   what doesn't exist.  They do say that there are 600 to 800

25   memory devices.  Well, we don't need imaging from nearly that

1    many, and I have a specific suggestion of what we can do that

2    would be a fairly pretty limited amount of imaging.  With

3    respect to the documents--

4              THE COURT:  Well, why do you need imaging, if I order

5    them to produce them, they produce them, why do you need

6    imaging?

7              MR. HORNICK:  Well, I believe their position is going

8    to be that they cannot find this code.

9              THE COURT:  Well, that's why I was asking.  They say

10   it doesn't exist?

11             MR. HORNICK:  Well, they say that it doesn't exist.

12   That's right.  I don't think anyone disputes that it existed at

13   one time.  There obviously had to be code the day that the

14   website launched.  There had to be code to develop that

15   website, but that code doesn't exist.  They say the earliest

16   code they can give us from October of 2004 and the website

17   launched in February of 2004.  So there's a whole eight months

18   there that aren't accounted for.  So I believe their position

19   is going to be that that code doesn't exit.  What we've asked

20   for in the motion is that the Court order that the code be

21   produced if it's found, but in addition that we want to image

22   certain memory devices where we are likely to find that code

23   then an expert can--

24             THE COURT:  Well, why would you be able to find it if

25   they can't find it and say it doesn't exist?

1      MR. HORNICK:  Well, we're not sure that they have

2  actually looked for it, but here is what imaging is all about,

3  Your Honor.

4      Imaging is simply a process to allow an expert to go

5  and then look for the code.  Now, if you delete something from

6  your computer, you may think it's gone--

7      THE COURT:  Oh, I know.

8      MR. HORNICK:  --but it's not.  It probably isn't, and

9  if the hard drive or whatever kind of memory device it happens

10  to be is imaged, an expert can then go take that and look in

11  the deleted areas and look all through it and try to find code

12  that is supposedly deleted.  Now, I don't think that the

13  defendants are going to represent that they've taken that step.

14  We want to take that step because they say they have simply

15  looked for the code in existing storage files and they can't

16  find it.  I think there's also a reason to suspect whether

17  their clients would be forthright with them with respect to

18  producing code.  So depending on what steps they've taken to

19  look for it, it could even be there.  That's why we ask that

20  the Court order it to be produced if it's found, and also that

21  we're permitted to do imaging so that our, or a, I should say,

22  an expert, an independent expert can look for it and try to

23  recover it.  After which, if it's recovered, it can be

24  produced.

25      THE COURT:  All right, now you were saying, you said

1  you had a simple suggestion when I interrupted you with my

2  question.

3          MR. HORNICK:  Yes, yes I do.  The, what we really

4  need, and I think what we need to be practical is to get what

5  I'm going to name on a rolling basis in this order.  If we find

6  what we want at the beginning we wouldn't have to keep rolling

7  down, down the line.  Number one would be the individual

8  defendants' memory devices, since October of 2003, including

9  any crashed hard drives plus the FaceBook.com's devices or

10  servers at the time of launch, up to the time of launch, and

11  any backups.  First we'd look at that because that takes us to

12  the time prior to launch and up to launch and it also takes us

13  into the individuals' devices that they've held since this all

14  started in October of 2003.

15          THE COURT:  Well wouldn't, let me ask you this,

16  wouldn't, if in fact everyone can, is, agrees that this, these

17  codes existed on the defendants' computers at one time,

18  although they quote, don't exist, or it's alleged they don't

19  exist now, aren't the defendants able to specify as to what

20  memory devices these codes were on at any particular time?

21          MR. HORNICK:  Well in interrogatories answer we've

22  tried to get identification of what memory devices there were,

23  and we haven't been able to get that information.  So what

24  we're doing--

25          THE COURT:  What do you mean you haven't been able to

1  get them?

2  MR. HORNICK:  Well, we hadn't, we, in, in response to

3  this motion the defendants put in a declaration saying there

4  were 600 to 800 memory devices plus computers.  And so we

5  served an interrogatory, identify them.  Well, we got was a

6  printout that identified serial numbers for 500 of something,

7  we don't know what.  We don't know what the date of it was or

8  anything.  We don't know what it was 500 of.  So we've been

9  meeting and conferring to try to get an identification as that

10  word is defined in the local rules of what memory devices they

11  have.  But you see, although we want to get that, and I think

12  we're entitled to get that information in response to an

13  interrogatory, we believe we can find the code by taking a more

14  surgical approach to particular memory devices.  We can't

15  identify them with specificity because we haven't been given

16  that information, but I can certainly say that we'd like to

17  image whatever memory devices were being used up to the time of

18  launch and at the time of launch, and then after the time of

19  launch, assuming we don't find what we're looking for in there,

20  we'd want to look at the servers that were used for the

21  FaceBook after launch.  At the time of launch it was launched

22  at one server at a server company.  Server companies back up.

23  They have to back up.  They'd have huge liability if they

24  don't.  And in addition to that, the defendants were on notice

25  of these claims six days after launch, so they certainly should

1  have informed their server companies to maintain whatever they

2  had.  They should have maintained whatever they had in their

3  own possession.  Now within two months after launch, the

4  FaceBook was on five servers, so if we can't find what we need

5  on those original, that original one server, we go to the five.

6  On April 14th of 2004, it was moved to a different server.  If

7  we can't find what we need in the earlier things, we go to that

8  one.  And then after that, we can simply look at whatever

9  servers are used to run the FaceBook in various colleges, and

10  I'd start with Harvard.  So we don't need 600 memory devices.

11  We don't even need to take them offline to do this.  All we

12  need is to get access to their personal hard drives and other

13  devices, the server companies they no longer use, so there's no

14  burden there--

15          THE COURT:  What's this there's, and I'm not, I will

16  tell you right up front that I'm not someone who's

17  technologically expert, what is the distinction between a

18  server and hard drive?

19          MR. HORNICK:  Yes, well, in some sense there isn't a

20  big distinction, you Honor, but basically what happens is if

21  you were to create a website, if you would, and you did it on

22  your computer, it would be stored on the hard drive on your

23  computer.  You might back it up to some other memory device,

24  like a disk maybe, or one of those little drives that plugs

25  into the back of the computer.  You might also back it up to

17

1   the server here at the court that runs your whole network.

2   That's what a server is.  It's just a hard drive in a different

3   place that a lot of people are linked into.  Now--

4            THE COURT:  But is it, to, to get on the server's

5   hard drive, does it have to be backed by an individual off of

6   an individual computer?

7            MR. HORNICK:  You might, you might store something on

8   that server, but if we wanted to take an image of it, we would

9   then go to that server, take an image of that.  Now, what I'm

10  saying about what happens--

11           THE COURT:  No, my question is, why, when you're

12  saying that things from an individual computer's hard drive get

13  on the hard drive of the server when someone backs them up, so

14  isn't the server then, you know, isn't the best evidence so to

15  speak the individual hard drive of the computer?

16           MR. HORNICK:  Well, it depends on what we're looking

17  for here, Your Honor.  If we're looking for the Harvard

18  connection code that Mr. Zuckerberg worked on, that's probably

19  going to be in the individual's computer.  It's probably not

20  going to be in the server that ran the website.  If we're

21  looking for that face match code or the course match code or

22  that online journal, it's probably going to be on the

23  individual computers.  But if we're looking for the FaceBook

24  code up to the time of launch, it probably was on

25  Mr. Zuckerberg's computer.  On the day of launch, it was on

18

1   some third party server.  He uploads it to that server.  The

2   server then runs it, runs the website.  They no longer use that

3   server, so you'd want to go that one, image it and it's not

4   going to be any burden to, I mean, they don't have to take down

5   the business to do that.  And then at some point in time, they

6   moved to another server.  So what I'm saying is that if we

7   start with the personal computers and the server on the date of

8   launch, we may find what we need and we might not have to go

9   any farther.

10          THE COURT:  Okay.  We may hear from the defendant.

11          MR. CHATTERJEE:  Your Honor, it just, it seems to me

12   that this is a very focused issue they want to get certain

13   code.  We've searched for it.  We have--

14          THE COURT:  How have you searched for it?  Tell me

15   what you've done.

16          MR. CHATTERJEE:  We, we, we have actually gone to the

17   facilities.  We've actually gone to Marc Zuckerberg, the

18   founder of FaceBook and really the person with the fulcrum of

19   this case.  We've gone to his home and we've actually

20   physically searched his home without, without him participating

21   and we've gone--

22          THE COURT:  Now, how have you searched his home?

23          MR. CHATTERJEE:  We've actually gone through, you

24   know, all of his, you know, his room where he keeps all of his

25   electronic equipment.  We've gone through the, the other people

1    in the house that live there, there are a number of people

2    that live there, they're a bunch of college students,

3    essentially living together.  We've gone to the FaceBook

4    offices and physically searched it.  We've produced code that,

5    one of the things that wasn't entirely clear from the

6    presentation was that, it creates the inference that there's

7    been no code provided.  We've provided a fair amount of code.

8    There's one memory stick that we have where we produced that

9    code and it was a corrupted file.  Now, the server that

10   Mr. Hornick was talking about, originally when the FaceBook was

11   created, the server actually was a laptop computer.  It was one

12   in the same.  As the, as the needs of the system grew, they

13   exported it to other places in order to support, you know,

14   dozens, hundreds, millions of people accessing the system, but

15   there would be new versions of the up code created as the

16   system grew and the needs changed.  We produced all of the code

17   that we've been able to find from those earlier days.  We

18   continue searching and we've actually, now that the FaceBook

19   has grown there's a person in charge of operations and there's

20   also a person in charge of the IT infrastructure.  We continue

21   working with them to see if we can locate the additional that

22   would be responsive that deals with the source of--

23          THE COURT:  I take it there's no dispute that they're

24   entitled to the source codes and the only issue is whether they

25   exist or not, is that true or not?

20

1          MR. CHATTERJEE:  Your Honor, I, I think there's one

2    refinement on that.  It's, when you say the source code--

3          THE COURT:  Or source codes.

4          MR. CHATTERJEE:  Right, the, I, I think after a

5    certain point in time, the source codes totally change and

6    there's really no, no need or relevance for that, but, however,

7    during the relevant time period, the pre-launch--

8          THE COURT:  Is there a dispute as to the relevant

9    time period?

10          MR. CHATTERJEE:  I think there is, Your Honor.  That,

11    that's actually the second part.

12          THE COURT:  What do you say the, oh, that's the, the

13    May 21, 2004 issue?

14          MR. CHATTERJEE:  Yes, Your Honor, although we have

15    produced the source codes.

16          THE COURT:  Okay.  Now when you say you searched,

17    what have you done with respect to hard drives?

18          MR. CHATTERJEE:  We have, do you mean have we imaged

19    them, is that your question?  We--

20          THE COURT:  Have you looked for deleted items on

21    them?

22          MR. CHATTERJEE:  Yes.  We've, I mean obviously

23    there's--

24          THE COURT:  Have you, have you done what they, if

25    they got the mirror image, have you done what they're going to

1     do?

2          MR. CHATTERJEE: We've done some of it. We're trying

3     to do some more of it because, we notified them yesterday. We

4     think we've found some additional material. We're not sure

5     what it is, and we're trying to take the forensic images and

6     provide that information to them if it's responsive.

7          THE COURT: Well, it seems to me that the way, the

8     way things work is that the plaintiff makes a request for

9     evidence that's relevant to the claims and defenses of either

10    party of which they're entitled to under the rules. If they've

11    requested this stuff and you have not objected to it, then it

12    seems to me it's your burden to produce it. And I normally

13    would not go to allowing one party to have a mirror image of

14    another party's computer unless I was, unless I had some reason

15    to believe number one that it wasn't being, that, you know,

16    that the defendant wasn't doing it to the extent that they were

17    obligated to do it under the federal rules, or there was some

18    sort of chicanery involved, and I think that's, that's where we

19    are on, on this particular things.

20         MR. CHATTERJEE: We, we've produced everything we've

21    been able to find and we've searched fairly thoroughly of all,

22    all the electronic devices we've been able to find to date, and

23    we continue to do that. So, Your Honor, I mean, we've produced

24    the code that we've been able to find. Now what the plaintiff

25    wants to find, is they want to find the Harvard connection

22

1  code--

2           THE COURT:  Right.

3           MR. CHATTERJEE:  --on these laptops.  It isn't there.

4  They may not be happy about that, but that's a truism.  They

5  want to find Harvard connection code copied into the FaceBook

6  code that that we produced.  That isn't there.  They're not

7  happy about that.  We've, there are some pieces of

8  information--

9           THE COURT:  Well, they're not convinced it's not

10  there.  That, that's the issue.

11           MR. CHATTERJEE:  Right, and Your Honor, we searched

12  and, and--

13           THE COURT:  Right.

14           MR. CHATTERJEE:  --some evidence simply may not exist

15  anymore.  We, we've looked thoroughly for it, and I'm not sure

16  the Draconian relief of mirror imaging every single one of

17  these systems is going--

18           THE COURT:  You're saying it would do no good because

19  you've already done it, and you can't find it.

20           MR. CHATTERJEE:  Yes, Your Honor.

21           THE COURT:  That's your position.

22           MR. CHATTERJEE:  Yes, Your Honor.

23           THE COURT:  All right.

24           MR. HAMPTON:  Your Honor, if I might be heard

25  briefly--

1          THE COURT:  Sure.

2          MR. HAMPTON:  --on behalf of defendant Saverin.

3   Defendant Saverin's situation illustrates I think a bit of a

4   problem with the plaintiff's monolithic approach here.  Even

5   with Mr. Hornick's proposal for a rolling search, he's

6   requested the images of all the individual defendants' hard

7   drive.  Mr. Saverin is one of the individual defendants.  In

8   opposition to this motion, he submitted a declaration stating

9   under oath that he never had any of the code, either for the

10  Harvard connection or for the FaceBook, and his involvement

11  with this whole case was brief.  He's an economics student who

12  was providing some inside on the business model for the

13  FaceBook, never had the relevant code.  The situation is even

14  worse, however, Your Honor, because he longer has the hard

15  drive for the relevant period we're talking about.  The

16  computer that he was using at the time he's given to his

17  mother, who is a clinical psychologist in Florida.  She now has

18  the computer and is using that in the conduct of her business

19  and presumably that has highly sensitive patient information on

20  it.  So the plaintiff's proposal, although it seems reasonable

21  to say well we just want to start with the individual hard

22  drives of the individual defendants and the servers of the

23  FaceBook, really shows that at least with respect to defendant

24  Saverin how overbroad and unjustified that request is.  I'm

25  sure you'll hear from Mr. Hornick about what he thinks of where

1   we are on that issue now, but as I just heard his proposal

2   today, he would still propose that we provide the image of Mr.

3   Saverin's individual hard drive, and there's no record evidence

4   whatsoever that that is reasonably calculated to lead to

5   anything that's relevant in the case, particularly the source

6   code that they claim is really what they're after here.

7            MR. HORNICK:  Your Honor, if I might?

8            THE COURT:  Go ahead.

9            MR. HORNICK:  There's a very important reason to do

10  imaging other than what we've heard.  They say, and this is the

11  first we've heard that they've made these steps, there's a lot

12  of unexplained things about the background of this code, but

13  there's a very important reason to do imaging other than to

14  find the code and that's to find if it was deleted, for example

15  after claims were asserted in this case.  That's something

16  that, that an expert would look for.  Five years ago, ten years

17  ago--

18           THE COURT:  Wait a minute, hold on.

19           MR. HORNICK:  Yes.

20           THE COURT:  Hold on.  Are, are you looking, is your

21  search including a search for deleted documents that may be on

22  the hard drive that an expert would have been able to retrieve?

23           MR. CHATTERJEE:  Your Honor, we've searched for, for

24  code anywhere on these devices.

25           THE COURT:  Answer the question specifically.

1        MR. CHATTERJEE:  Yes.

2        THE COURT:  At, does your, has the search that you've

3   conducted involve a search that would involve the search of

4   deleted items that might be recovered?

5        MR. CHATTERJEE:  Yes, and it continues to this day.

6        THE COURT:  Continue, Mr. Hornick.

7        MR. HORNICK: So the issue is not just whether the

8   information might have been deleted, but when it was deleted

9   and in what situation, what concept.

10       THE COURT:  Well, if they can't find the deleted

11  items, how are they going to find when it was deleted?

12       MR. HORNICK:  Well an expert may be able to confirm

13  those things.  Five years ago, ten years ago, imaging hard

14  drives was unusual.  But today--

15       THE COURT:  I know.

16       MR. HORNICK:  --it has become very common.

17       THE COURT:  I know, but it's uncommon for one side in

18  a dispute to get a mirror image of another side's computer.

19  That is not the usual way the things are done in litigation.

20  That, that, that's an extraordinary remedy which is the reason

21  that I'm trying to assess the need, your asserted need and what

22  their position is.

23       MR. HORNCICK:  Well, Your Honor, I would say that

24  although that it is unusual that it may not happen on the every

25  day course, but it is not so drastic because all it is is the

1  device to help try to recover documents that everybody admits

2  existed at one time.

3       THE COURT:  Yes, but one of the problems with it is

4  you got the whole hard drive and you get tons of documents on

5  there that are, that are not, not relevant, not necessary for

6  the particular purpose and it's a, it's, a lot of defendants or

7  opposing parties see it as a gross invasion of the privacy of

8  their business.  That's the problem with it.

9       MR. HORNCICK:  Well other courts have considered that

10  very issue and the problem is that you can't do an image of

11  just the part that you need.

12       THE COURT:  I know, that's the--

13       MR. HORNCICK:  Because you don't know what part you

14  need.

15       THE COURT:  --reason why it's an extraordinary remedy

16  to give people mirror images of other people's computers.

17       MR. HORNCICK:  But we've built into the particular

18  protocol that we're proposing protections against finding and

19  using information that is not what we're looking for.  First of

20  all, we originally proposed that our expert would do this.  We

21  don't want it to be our expert now for various reasons.  We

22  would propose an independent expert do this.  And the

23  independent expert is to look only for code.  And the

24  independent expert, we will not be present while he does his

25  work.  He'll sign the protective order.  There will, nothing

27

1    that he does will disclose any attorney/client privilege.

2            THE COURT:  And it will be at your expense?

3            MR. HORNCICK:  And it will be at our expense, that's

4    right.  What he finds will be provided to both counsel and to,

5    and we can provide it to the Court or he can provide it to the

6    Court.  He maintains the copies of that, those devices,

7    whatever they are in a secure fashion or he can provide them to

8    the Court to maintain in a secure fashion until the case is

9    over.  The courts that have considered this issue have looked

10   at all of these issues about whether the, whether you're

11   providing access to privileged information or confidential

12   information or other types of information, and they've said

13   that you have to, have to weigh the needs of the case versus

14   the burden.  And in many cases have found that the needs of the

15   case outweigh the burden and what they do is they put into

16   place a protocol that protects the parties' rights so that,

17   that burden is minimized.

18           THE COURT:  All right.  What's your problem with that

19   protocol?

20           MR. CHATTERJEE:  Your Honor, it's, it's exactly the

21   escalation procedure that Mr. Hornick identified.  First off--

22           THE COURT:  But in what, what, why is there, why is

23   that a, why is his proposal a problem from your point of view?

24   The person who's going to look at it is not connected with

25   them.  In other words, they're not going to, you're not going

28

1  to have the problem of information that otherwise would not be

2  disclosed to them, being disclosed to them.  And it's going to

3  be done at their expense, and the person is willing to sign

4  whatever protective order is necessary to protect you.  Why do

5  you object to it?

6        MR. CHATTERJEE:  It's, it, it's an issue of burden,

7  Your Honor.  I mean this is a--

8        THE COURT:  Why is it a burden on you--

9        MR. CHATTERJEE:  It's because of—

10        THE COURT:  --as opposed to them?

11        MR. CHATTERJEE:  It's because of the business

12  disruption that would flow from it.  If they just want to--

13        THE COURT:  How is mirror, making a mirror image of

14  hard drives disrupt the business?  I thought that was something

15  that was fairly easily done?

16        MR. CHATTERJEE:  It, it is not, Your Honor.  In, in

17  order to image our entire server architecture, that's where the

18  600 devices come into play.  You can't, you have to shut down

19  the system in order to make copies of all of these things.

20        THE COURT:  And how long does that take?

21        MR. CHATTERJEE:  It could take up to two weeks to do,

22  Your Honor.  And, and if, if we follow Mr. Hornick's procedure,

23  and let me offer maybe--

24        THE COURT:  And is that the, but that is the problem

25  you have with it, that it's, it's the burden on your business

1    and the disruption, that's your objection?

2    MR. CHATTERJEE: Yes, Your Honor. If, now, the other

3    piece of it of course is if we're going to, if we're going to

4    do any kind of mirror imaging, I think we should focus on the

5    place of where it's likely to be. And to me, I think

6    Mr. Hampton talked about one of the defendants. The other

7    defendants were also non-technical people. The person at the

8    fulcrum is Mark Zuckerberg and if, if we, we don't have the,

9    the computer we, we are still looking for it, and we may find

10   it, that he had during the relevant time period, that's the

11   issue. But, if we wanted to image, for example, his hard drive

12   and look for source code on that hard drive during any of the

13   relevant time periods on his personal computer, that might be

14   one thing we could do, and if we can't go, we've tried to go

15   back to the outsourced server, architectural people that we

16   signed an agreement with to get it, they, they didn't have it

17   anymore. We can try and find some additional materials that

18   are not in service that are during this relevant early time

19   period for FaceBook, and we could image those. But that's a

20   very narrow inquiry. If it's not there, it's not going to be

21   anywhere. And we've already looked there.

22   THE COURT: Well, what, let me ask the plaintiff's

23   counsel, what do you say to his, which seems to be the only

24   objection to doing this is this burden and interruption.

25   MR. HORNICK:   Yes. First of all there'd be no

1   disruption of their business because to image the individual's

2   devices won't disrupt their business.  To image the server that

3   was used at the time of launch and shortly after launch will

4   not interrupt their business because they're not using those

5   servers anymore, and if we ever get to the point where we need

6   to image their servers that they're using today, first of all,

7   we'd only want to image the one that is running Harvard, that's

8   not their whole business; secondly, I'd be very surprised if a

9   company like this is not using redundant servers.  That means

10  you're running both at the same time.  You have a backup.  If

11  one dies, you have a backup that's running.  So you can image

12  one, the company runs on the other one.  No disruption of the

13  business.  Now, in addition to that, I heard a very interesting

14  fact.  They asked the third party server if they have it.  They

15  said we don't have it anymore.  I'm sure they didn't go in and

16  image their hard drive and look for it, and that's what we want

17  to do.

18          THE COURT:  Well let's, let me ask you this.  If we,

19  if, if you were doing it so you were not disrupting their, I

20  mean, does it make sense to do it, you talked about a rolling

21  basis, just do a discreet number initially and have your expert

22  look at that, and if that, if we did it that way, what would,

23  what would be the discreet number you'd start with, just go

24  down the list?

25          MR. HORNICK:  Well, I'd start with the devices of the

1   individuals, and I don't know how many they have.  Let's

2   assume they each have one laptop or one computer, so there are

3   five individuals, and by the way those individuals are

4   important because Mr. Moskovitz, Mr. Zuckerberg has said in the

5   press, Mr. Moskovitz, this was as much his website as it was

6   mine.

7           THE COURT:  Okay.

8           MR. HORNICK:  And Mr. McCollum, he's a programmer

9   too, and he's a graphics guy, neither of the other two are, so

10  he would have probably been involved in the graphics.

11          THE COURT:  So you've got five individuals.

12          MR. HORNICK:  Five individuals plus whatever server

13  was used to run that launch.  Now if it was one of their

14  individual computers, we've already, that's already on the

15  list, but if it was a third party computer, it would be--

16          THE COURT:  I thought he, they represented to you

17  that it was launched, the website was launched from an

18  individual computer and it was only later that it was expanded,

19  isn't that what you told me?

20          MR. CHATTERJEE:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. HORNICK:  Fine, so we've got that one on the

23  list.  Then, the moment that it went on to some third party

24  server, which was sometime between February 4th and sometime in

25  March of 2004, we want to go to that company, and we don't know

1   who it was.  We, we have a suspicion of who it was but we

2   don't really know.

3           THE COURT:  That's the one that they said they asked

4   and they couldn't--

5           MR. HORNICK:  I assume so.  I don't really know that.

6           THE COURT:  Okay.

7           MR. HORNICK:  We want to go to that company and we

8   want to go and look at whatever server they were using to run

9   the FaceBook.  And then if we didn't find it there, on April

10  14th they went to yet a different company.  We'd want to go to

11  them.  And then by the end of May they were on yet a different

12  company, I believe, and we'd want to go to them.  So I assume

13  they only need one server to run Harvard at the time that they

14  were just shortly after launch.  They, I think they had 30

15  schools by the end of May, if I recall correctly.  So if we

16  were to look at the server that was running Harvard in that

17  time period, we'd probably find what we were looking for or not

18  find it at all.  So to go back and recap the list--

19          THE COURT:  Well why wouldn't we at least start with

20  the individuals and then the server of the, of the company that

21  had the server on the, at the time of launch?  Why wouldn't we

22  start with that and see if that got you the information you

23  wanted before you went to others?

24          MR. HORNICK:  That's what I'm saying, Your Honor, a

25  rolling basis.

1    THE COURT:  Well I'm not, I'm, you're saying

2  rolling, that means it rolls without any court intervention.

3  I, what I was, and what I, what I'm thinking of is, you know,

4  allowing it as to a certain, sort of holding the rest in

5  abeyance.

6    MR. HORNICK:  At, that actually, the more the Court

7  is involved in it, the happier I would be, Your Honor.  So--

8    THE COURT:  I'm not sure the happier I'd be, but,

9  okay, go ahead.

10    MR. CHATTERJEE:  Your Honor, we don't, to the best of

11  my knowledge, and I could be wrong on this, I'd have to check

12  with my client, we don't have a relationship with that company

13  anymore.  So, I, I'm not that they can even be heard on this

14  issue.

15    THE COURT:  Have you, have they asked you the name of

16  the company?

17    MR. CHATTERJEE:  They, I believe the name of the

18  company was Equinex (ph).

19    THE COURT:  No, did they ask you on interrogatories

20  what the name of the company was?

21    MR. CHATTERJEE:  I don't think they did.  I can't

22  recall for certainty.  They may have.  But I, I can't--

23    THE COURT:  Well, do you have any problems letting

24  them know the name of the company and the address of the

25  company?

1        MR. CHATTERJEE:  No.

2        THE COURT:  Okay.  All right.  Well, I, you know, if

3  it's not within your possession, custody or control, then it's

4  going to require another method of obtaining discovery.

5  Anything else you wanted to say on this.

6        MR. CHATTERJEE:  Your Honor, as I've said, we've, all

7  places that Mr. Hornick is recommending--

8        THE COURT:  I know, but if, they, if you don't object

9  except on the grounds of burden and it's not a burden to you,

10  and it's at their expense and you have all the protections, I

11  don't see a basis for denying it.

12        MR. CHATTERJEE:  Your Honor, I'm fine with that with

13  respect to Mr. Zuckerberg.  It's the other individual

14  defendants--

15        THE COURT:  Well, I know the--

16        MR. CHATTERJEE:  --that are not involved—

17        THE COURT:  --this gentleman has a particular

18  problem, which I'll get to, but, do any of the other defendants

19  besides Saverin have a problem?  You represent all of them,

20  except for him.

21        MR. CHATTERJEE:  I represent all of them and, and

22  none of them were doing code development.  That, that's their

23  issue.  They don't, they, they haven't been involved in the

24  code at all.  And they certainly don't--

25        THE COURT:  Well, are there, there, I haven't looked

1  at the papers in a while.  Are there affidavits from them

2  indicating that the codes were never on their computers?

3          MR. CHATTERJEE:  We did and we'd be happy to submit

4  that.

5          THE COURT:  I mean are you representing that to me?

6          MR. CHATTERJEE:  I, I am representing that to you.

7          THE COURT:  Other than Mr. Zuckerberg, none, no code

8  was ever on the, any of the computers of any of the other

9  individuals?

10         MR. CHATTERJEE:  That, that's my understanding, Your

11  Honor.

12         THE COURT:  All right.

13         MR. HORNICK:  Your Honor, interestingly when we were

14  doing this briefing, Saverin did put in declarations.  None of

15  the other people put in declarations.  And if you looked at the

16  briefs, there's very little information about what really

17  happened.  I'm hearing a lot of it for the first time today.

18  What Mr. Zuckerberg said in the press, this site is as much

19  Mr. Moskovitz' as it is mine.  And he was doing code

20  development, and there are documents to show that.

21  Mr. McCollum, same thing is true.  Mr. Hughes, maybe not.  But

22  I'll tell you something about Mr. Saverin, on January 12th of

23  2004, Mr. Zuckerberg sent an email saying I want to show you

24  the website, this website that was being developed.  And it's

25  entirely possible that the website might have been emailed to

1  Mr. Saverin.  He didn't deny that in his declaration.  He just

2  said he never had the code on his computer.  But it's possible

3  that he may have received emails, and there could have been

4  attachments to emails.  So, even Mr. Saverin could have

5  something on his computer, which isn't covered by his

6  declaration.  Now, I would object to there being declarations

7  filed today that say that none of these people ever had

8  anything on their computer when those should have been provided

9  in the briefing process.  It would have been a natural thing to

10  do.  Saverin did it.  We didn't get any explanation whatsoever,

11  any declarations whatsoever from the other defendants.

12         THE COURT:  Well I - yes, go ahead.

13         MR. HAMPTON:  Well, Your Honor, I, I, I think that

14  you understand the position with Mr. Saverin.  We've heard an

15  interesting theory as to how it's conceivably possible that

16  there might be code on Mr. Saverin's computer but that doesn't,

17  that's not the kind of showing that you would need in the face

18  of Mr. Saverin's declaration that there's no code there.  The

19  plaintiff's have a theory here that they're desperately in

20  search of some evidence to support it.  I would suggest that

21  they ought to start looking in the logical places, and if

22  during that process they come up with some actual information

23  to suggest that Mr. Saverin's perjured himself and his

24  declaration says he doesn't have any code, that would the

25  appropriate time to talk about imaging his hard drive.

37

```
 1            THE COURT:  Was the name of the company that he

 2   mentioned the one that you suspected it was?

 3            MR. HORNICK:  Yes, it was, Your Honor.  And we did

 4   ask for that information in discovery--

 5            THE COURT:  And now who was, who were, what it the

 6   name of the corporation and where are they located?

 7            MR. HORNICK:  Equinex.  I don't know where they are

 8   located.

 9            THE COURT:  Where are they located?  What's their

10   business address?

11            MR. CHATTERJEE:  I can't recall off the top of my

12   head, Your Honor.  My, I, I'd have to go back to--

13            THE COURT:  I take it it's on this planet, right.

14            MR. CHATTERJEE:  It's in the U.S. and it's on the

15   east coast.

16            THE COURT:  It's in the U.S., all right, okay.  It's

17   on the, what coast?

18            MR. CHATTERJEE:  I think it's on the east coast, Your

19   Honor.

20            THE COURT:  East coast.

21            MR. HORNICK:  They are the, what's called the master

22   service agreement from Equinex is confidential Exhibit 20 to

23   our motion, and we suspected it because there's a date that's

24   almost illegible on it, but the, the document itself is almost

25   illegible and this is, part of the problem is we've been asking
```

1  for all of this information about server companies that they

2  use, and we haven't been able to get, that's covered by their

3  motions as a matter of fact.  So we do have something that

4  identifies Equinex, but we don't have any, enough information

5  to go on for purposes of doing a, a subpoena for example.

6          THE COURT:  What do you need?

7          MR. HORNICK:  Well, we need to know where they are,

8  their--

9          THE COURT:  Right.

10          MR. HORNICK:  --address and that would probably be

11  enough.

12          THE COURT:  Is their address readily accessible to

13  the defendants?

14          MR. CHATTERJEE:  Your Honor, I can, I can check with

15  my client.  I'm, I'm fairly certain I should be able to find

16  that out.

17          MR. HORNICK:  Your Honor, we'd also like to know the

18  dates that they actually used Equinex.  We don't know that

19  either.

20          THE COURT:  And this, this was asked for in discovery

21  and refused?

22          MR. HORNICK:  Yes, Your Honor.

23          THE COURT:  On what basis was--

24          MR. HORNICK:  We have, that's covered by other

25  motions--

39

1          THE COURT:  I know, what, on what basis was the

2     basis for its refusal?

3          MR. HORNICK:  I don't recall specifically at the

4     moment, Your Honor.  There were, there was more than plain

5     objections to all of these requests and that one, I believe was

6     104, 103, something like that.

7          MR. CHATTERJEE:  Your Honor, they asked us to

8     identify the, the web hosting services and we did.  We listed

9     Equinex right here in the interrogatory response.  They didn't

10    ask for the dates of particular usage, but we can provide them.

11    I mean I don't have an issue with providing them with the

12    earliest server company we worked with.

13         THE COURT:  Well I suppose as I, I should just put

14    the question to you again, Mr. Chatterjee.  Other than, as to

15    the individual defendants that you represent, even though you

16    indicate that you claim they don't have the codes on their hard

17    drives, do you, do you object to them doing the mirror imaging

18    of those computers in the manner and according to the protocol

19    they've mentioned?

20         MR. CHATTERJEE:  Your Honor, we do object because

21    there's no--

22         THE COURT:  On what basis do you object?

23         MR. CHATTERJEE:  --because, and argue, the law

24    requires the have a, they have to give a showing of a

25    particular likelihood of finding the materials, when, we, we've

1  searched them and they're not.

2       THE COURT:  All right.  This is what I'm going to do.

3  First of all, you can, I, I want the defendants to turn over to

4  the plaintiffs the who information with respect to this outfit

5  that evidently was the one that they uploaded the codes on in

6  order to launch the thing and that you can go ahead and take

7  discovery with respect to that organization.  I will also allow

8  the plaintiff to take discovery as to, and you may, I don't

9  know if you want to wait on this or not, but you may take

10  discovery as to what the defendants have done to look for these

11  codes.  I mean it seems to me that, that even though it is

12  somewhat simple and it is a situation where, you know, the

13  basic rule that the producing party has the obligation to find

14  this stuff and turn it over if it's relevant and we're not

15  hearing anything like you know, the *Zubalight* (ph) case where

16  there, it is an undue burden to look at this stuff and find

17  this stuff.  Mr. Chatterjee basically represents to me that his

18  client has done what you're going, what you propose to do with

19  respect to the hard drives of the individuals that he

20  represents and the, and the servers of the, any hard drives

21  within his custody, control or possession of he or any of his

22  clients.  And upon that representation, I'm not sure you're

23  entitled to an order of the Court that you get, be able to

24  mirror image this.  But I think you're entitled to do

25  discovery, to, you know, find out exactly what they've done and

41

1    then come back and tell me if what they've done is less than

2    what you do and that you had some basis for saying if you were

3    allowed to do it, you're going to find something.  So that,

4    that's the way I'm going to, I'm going to handle this

5    particular motion.

6              MR. HORNICK:  Could I respond, Your Honor.

7              THE COURT:  Sure.

8              MR. HORNICK:  Just a couple of points.  One is that

9    I'd be very interested to know if the defendants have made

10   images of any devices.  If they haven't, I don't know how they

11   could have done what we want to do.  Secondly, this approach

12   doesn't, will never allow us to find out whether this code was

13   deleted by one of the defendants, and third--

14             THE COURT:  Well it will if they've done what you are

15   planning to do.  He's indicated to me that they've gone through

16   the, and looked for among the deleted documents.  But see

17   that's the reason, but you don't know exactly what they've

18   done, which is the reason I, I think before I make a ruling,

19   I'd like to have a more substantial record and have you know

20   exactly what they've done.  And I'm, you know, I'm willing to

21   if, if this discovery reveals that these representations that

22   are made to me here, that they've done exactly what you would

23   have done are untrue, I'll shift, I'll do some, you know, some

24   cost shifting.  But, you know, the way it works is that you

25   seek discovery from the other side.  It's their obligation to

42

1   give it to you if it's relative to claim or defense of the

2   party.  They say they've done it, and they've done exactly what

3   you would, your independent expert would do.  And in the face

4   of that, I don't think that I am, the record is such that I can

5   order them over their objection to let you do mirror images of

6   their hard drives.  But the server's a different question, the

7   server that they launched it from is a different question

8   because they haven't, I don't know what they've done to that,

9   but I don't' think they've made a mirror image of that, which

10  is the reason I'm going to let you go right ahead and do

11  discovery on that.  But that's the, that's the reason for doing

12  it the way I'm doing it.  Now, you find out exactly what

13  they're doing and if, if it turns out that these

14  representations that have been made to me, are, they're untrue,

15  that's obviously going to affect the next step.

16          MR. HORNICK:  Your Honor, I'm going to assume that

17  privilege, attorney/client privilege and work product aren't

18  going to get in the way of this discovery.

19          THE COURT:  Well, we haven't heard anything about

20  that yet.  As I, as I--

21          MR. CHATTERJEE:  I doubt that the individuals had

22  anything to do with this.  This is all something that would

23  have been done by counsel with experts, and I can see a lot of

24  objections coming to the discovery that--

25          THE COURT:  No, they, you can do discovery on what

43

1  they did to, what counsel did and what anyone did to obtain

2  the discovery that you've requested and, because that's where

3  the, that's where the issue is.  They say they've done

4  everything that you would do and it's not there.  You disagree

5  with them.  Well, I'm going to let you do some discovery and

6  make a record if you can that there's stuff they haven't done

7  and and if you are able to do that we'll, we'll take further

8  action.

9          MR. HORNICK:  Thank you.  I think that would be a

10  good start, Your Honor.

11          THE COURT:  Okay, so that we're clear.  Discovery can

12  go forward against the person whose server was used to launch

13  it, and the defendants will give any identifying information

14  about that corporation to the plaintiffs that they need in

15  order to issue a subpoena and the plaintiffs may take discovery

16  of the efforts that you've made, the defendants have made to

17  obtain discovery that's sought and is the subject of this

18  motion.  All right?

19          MR. HAMPTON:  Your Honor, does the Court contemplate

20  that there'll be further discovery as to defendant Saverin?

21  It's our representation that the, it's not there, that it's

22  never been there and--

23          THE COURT:  If they want to question him about that,

24  they may.  And they may ask him questions about attachments and

25  all of that sort of thing.  They may take discovery of the

1    defendants, including Mr. Saverin, yes.

2            MR. HAMPTON:  Thank you, Your Honor.

3            THE COURT:  Okay.  All right.  I will go through

4    these, these motions, these other motions to the extent that

5    I'm able to.   If I find that in reading them that there hasn't

6    been, you know, if I'm, if I'm reading them and I, I get to the

7    situation that someone is asking for something and the other

8    side says we've already given it, or, you know, I very well may

9    ask you to confer further on it.  But as I say, I haven't had a

10   chance to go through them all, which is the reason I haven't

11   put it on for hearing today.

12           Okay, anything else I need to take up?

13           MR. HORNICK:  Yes, Your Honor, this motion also

14   covered--

15           THE COURT:  Oh that's right, yes.

16           MR. HORNICK:  --documents after May 21st of 2004.

17           THE COURT:  That's right.  Okay, I'm, I'm sorry about

18   that.

19           MR. HORNICK:  The defendants agreed to produce

20   responsive pre May 21st documents "irrespective of relevance".

21   So relevance is not an issue with respect to producing

22   documents created after May 21st, and we're only--

23           THE COURT:  Wait a minute, wait a minute, you better

24   say that again.

25           MR. HORNICK:  Yes.  We have document requests that

45

1  are identified in the motion on the--

2           THE COURT:  Right.

3           MR. HORNICK:  --number 63, 67 and some others, and

4  those aren't limited in time.  Therefore, the whole relevant

5  time period which goes back to probably that, those requests

6  probably asks for information back to October of 2003, roughly.

7  And they're not limited in time in the future.  So the

8  defendants produced documents up to May 21st of 2004 without any

9  objection to relevance, but then they cutoff production on May

10 21st of 2004.

11          THE COURT:  Well, do they object to producing any

12 documents after May 21, 2004?

13          MR. HORNICK:  Yes, they do.  They're withholding all

14 documents created after May 21, 2004 except documents that they

15 view as supporting their case, which are a few financial

16 documents that they've produced.  And we're only seeking

17 documents that are relevant to the lawsuit and they admit that

18 they're withholding them.  Their arguments were that this is

19 just a trade secret case.  Mr. Chatterjee, said today this is a

20 trade secret and a copyright case.  In their motion to dismiss,

21 they say this is mostly a common law claims case.  In fact,

22 this case has several claims.  We don't know which are going to

23 predominate at this time, and the discovery that we're seeking

24 isn't limited to trade secret issues, but they say because we

25 had not identified our trade secrets, they weren't going to

1   produce any documents created after May 21, 2004.  How the two

2   things connect, I still haven't figured out.  Now, we're

3   entitled to those documents after that date just as much as

4   we're entitled to them before that date, and there are probably

5   no more than a few hundred documents.  The defendants argue

6   that it's 1/5 the quantity of documents in the Library of

7   Congress, but we argue there are probably only a few hundred,

8   and in their opposition to our motion to compel documents, they

9   admitted that there is relatively a small number of documents

10  that fall into that category, specifically at pages 6 and 7 of

11  their opposition to our motion to compel documents, which is

12  Docket No. 82.  They argue that the documents that they have

13  after May 21st grew exponentially after that date, but that's

14  unlikely because they deal with college students, summer

15  vacation started around that time, and we've tried to take

16  discovery on the growth of their website.  They've blocked

17  that, so we don't really know if that allegation is true.  But

18  what happened on May 21st of 2004 is that our clients' website

19  launched.  And here's a crucial fact; nobody knew, on the

20  defendants' side at least, nobody knew that that was going to

21  happen.  So leading up to the time of May 21st of 2004, the

22  defendants were cruising along running their website.  They

23  don't know whether ConnectU is going to launch.  They don't

24  know when it's going to launch.  Then on May 21st it launches.

25  Now, it's fair to assume that on that day and after that day

47

1   there were emails and other documents generated where they

2   would be discussing the launch of ConnectU, whether we have any

3   problems, whether there's any infringement we need to purge,

4   whether we are at risk in some way, but all of those documents

5   are being withheld.  They won't give us anything from May 21st

6   of 2004 onward.  We say that there's no basis whatsoever for

7   withholding them, Your Honor, and we ask that they be ordered

8   to produce them.

9           THE COURT:  Okay.  Let me hear the defendants on that

10  aspect, please.

11          MR. HAWK:  Your Honor, Robert Hawk for defendant

12  Saverin.  And I should address this issue I think in the first

13  instance that we were actually a counsel for all defendants at

14  the time the responses to these first set of document requests,

15  170 requests were put together.  And this is not a, an issue of

16  a May 21, 2004 arbitrary date cutoff issue.  It is an issue of

17  over breadth with regard to specific document requests that we

18  objected to.  The way that we got to this May 21, 2004 request,

19  well first of all, there were a number of requests that we did

20  not object to producing documents that were generated after May

21  21st.  And a number of those requests where we produce documents

22  and agree to produce documents generated after May 21st.  But

23  those requests were ones that were not totally overbroad and

24  objectionable in seeking essentially every document in the

25  company.  Where we use the May 21, 2004 date, it was really,

48

1    Your Honor, just a, an attempt by us to reach some kind of

2    compromise to offer the plaintiff some of the documents that

3    they had asked for even though the requests themselves were

4    vastly overbroad.  For example, counsel, where we interpose

5    that that objection is where, for example where plaintiff asked

6    for all documents that relate to the development of the

7    website.  And there were two reasons that that was just not,

8    not a practical kind of request.  It would, if Microsoft, for

9    example, were the, were the defendant in this case, they'd be

10   asking for, you know, reams and tons of material and this

11   company, it's certainly not Microsoft, but it is a company that

12   has grown exponentially since May 21st of 2004.  And the reason

13   we selected a date is that we tried to get a non-arbitrary date

14   where we could compromise and give plaintiff a lot of the

15   documents that they were looking for and ones that were likely

16   to be more relevant, but not take on the huge burden of

17   producing documents, a huge volume of documents where plaintiff

18   did not specify the kind of request that the, where the

19   requests were simply overbroad, Your Honor.  Where the requests

20   were not overbroad, we went ahead and agreed to produce

21   documents, regardless of timeframe.  And so what we asked

22   plaintiff to do was to give us more specific requests.  If they

23   were going to not limit the documents by time, they needed not

24   to give us overbroad requests.

25            THE COURT:  And what was their response?

1          MR. HAWK:  Their response was no, there might be

2    something, Your Honor, there might be something out there that

3    we're entitled to and we are not willing to narrow these

4    overbroad requests.  And that's, that's really why we weren't

5    able to come to a compromise that worked on this particular

6    issue.

7          THE COURT:  Okay.  Mr. Chatterjee.

8          MR. CHATTERJEE:  Your Honor, there's two additional

9    things that I wanted to discuss in addition to Mr. Hawk.  Let

10   me, let me just read to you what some of the document requests

11   say.  All documents relating in any way to the development of

12   the FaceBook.com website.  That's request No. 33, the very

13   first one they're seeking to compel on.  That is the company.

14   All documents in the possession, custody or control of Mark

15   Zuckerberg, the FaceBook Inc., and all the other defendants

16   relating in any way to the subject matter of this lawsuit.  I,

17   I, I couldn't even begin to pretend how to respond to that.

18   That's again, that's the entire company, the subject matter of

19   the lawsuit is the FaceBook and is that something that the

20   plaintiff can claim some sort of title to?  And that, that,

21   that is an enormously broad request.  We've tried to pare it

22   down, and frankly, Your Honor, when I deal with cases like

23   this, the way I typically do meet and confers is I say, okay,

24   we have these document requests, somewhat an antiquated

25   approach in the context of electronic discovery.  Here's the

1  bright line rules that we've applied to try and figure out how

2  to conquer the shapes of discovery.  What is it, what else is

3  it that you think you really need that will move the ball

4  forward?  Can you specify what it is you think you really need,

5  rather than working through each of the individual requests,

6  although you may get to that in the process of meet and confer.

7  Rather than follow that approach, which is one we suggested in

8  the meet and confer, we engaged in a seven hour meet and confer

9  where we went through each and every one of these, where you

10  had to recite the same script over and over again.  It just

11  seems to me to be, I mean, these, these requests are so broad,

12  we should really be focusing on, what is the specific thing

13  that people really need.

14          The second point I wanted to make is this case, and I

15  think Your Honor's holding in the *Microwave Research* case a, a

16  number of years ago is quite telling.  That's--

17          THE COURT:  Boy, you're going way back now?

18          MR. CHATTERJEE:  It goes back to 1986, Your Honor,

19  and that was actually a breech of contract case and trade

20  secret case and a common law and fair competition, many of the

21  same claims that one has here, where Your Honor adopted an

22  approach basically saying the plaintiff has to put their cards

23  on the table.  They have to have, show a well founded belief of

24  the fact that their trade secrets misappropriated or that the

25  other cause of action is viable before they're given the keys

1    to the company to just start fishing within it.  That well-

2    founded belief is what frames the discovery.  We are struggling

3    as we sit here today to understand what are the contours of

4    really what's at issue here.  We also have a motion to compel,

5    which isn't scheduled for today related to interrogatory No. 2,

6    where we've asked them to specify their trade secrets.  We also

7    have a motion to compel related to the 30(b)(6) deposition

8    where we tried to do the same thing.  These are all somewhat

9    interrelated.  I'm not even sure if it makes sense to resolve

10   this single piece of the motion without looking at the context

11   of the other motions in order to frame what the correct scope

12   of discovery should be, if there's any to be framed at all.

13            Thank you, Your Honor.

14            THE COURT:  All right, let me hear you in response--

15            MR. HORNICK:  Yes.

16            THE COURT:  --to this allegation that these are

17   overbroad and you refuse to engage in any limitations on them.

18            MR. HORNICK:  Yes.  Your Honor, first I should point

19   out that the plaintiffs in this case haven't withheld any

20   documents in production.  And we've been very cooperative, and

21   we're not getting any cooperation back.  We're blocked at every

22   turn.  And on these particular requests, I think it's worth

23   pointing out that the defendants had no objection to producing

24   documents responsive to them as long as they were dated before

25   May 21st.  So our point is how can they possibly be overbroad if

52

1    you are willing to produce responsive documents prior to that

2    date.   How can they possibly be overbroad?

3              THE COURT:  Well, because I take it, because

4    according to what I'm hearing from the defendant is that since

5    that time the company has grown to such an extent that the

6    amount of documentation is so large that it would be burdensome

7    and it's not all relevant.

8              MR. HORNICK:  Well, Your Honor, we're only asking

9    them to apply the criteria of relevance that they applied when

10   they produced pre-May 21st documents, and as I said earlier in a

11   later brief, they admitted that we were right, that there is a

12   relatively small quantity of documents that they are

13   withholding that are responsive to these requests.  I've

14   pointed the Court before to their opposition to our motion to

15   compel documents.  At page six they say, "FaceBook defendants

16   are only withholding some financial documents and corporate

17   documents created after May 21, 2004."

18             THE COURT:  Well, yes, but that's just, that's just

19   the financial documents.  That doesn't, I mean, that does, is,

20   is that a statement as to the universe of documents--

21             MR. HORNICK:  If, if you read that--

22             THE COURT:  requested after May 21st?

23             MR. HORNICK:  Yes, if you read that paper, they were,

24   in context, they were talking about what they were withholding

25   as stated after May 21st, and they said we are only withholding

53

1   some financial and corporate documents created after May 21,

2   2004.  So we don't think the quantity is this large quantity

3   that they're talking about.  We think it's a relatively small

4   quantity, and we don't see why they can't produce them, because

5   they did not object to the relevance with respect to documents

6   before that date.

7          With respect to what we're looking for, well, Your

8   Honor, we don't know what they have.  They want us to tell us

9   what--

10          THE COURT:  Now hold on just a second.

11  Mr. Chatterjee, what about that point?  They're only

12  withholding a small number of documents after May 21st, 2004?

13          MR. CHATTERJEE:  That's just flat out wrong, Your

14  Honor.  Your understanding is that, that you articulated is

15  exactly what our point was, which was with respect to this

16  narrow category of financial information, a certain kind of

17  financial information, there are certain things that we've

18  withheld and I can talk about that if you want.  Those are

19  subjects of other motions.  But that is a very different issue

20  that in saying documents relating in any way to the development

21  of the FaceBook website.

22          THE COURT:  All right.  That's enough.  I've heard,

23  go ahead.  You wanted to, as to what we're looking for.

24          MR. HORNICK:  Yes, well, the reason that we have a

25  request that is basically asking for any documents that relate

54

1   to the lawsuit is because we don't know what they have and

2   what we can ask for.  We have a lot of other document requests

3   and they have produced documents in response to some, and

4   they've promised to produce documents in response to others.

5   The ones where they promised, they withdrew the promise.  We

6   have a separate motion pending.  But this particular limited

7   set, they stood on their objection.  We won't produce anything

8   created after May 21, 2004, and as a result, we don't have

9   things like email that these people exchanged after that date.

10  We don't have financial documents after that date, with few

11  exceptions.  We don't have any corporate documents after that

12  date.  We don't have any documents that relate to any efforts

13  that they might have made to cover up their wrongful acts after

14  that date.  We don't have their communications with the media

15  after that date.  And I don't know if Your Honor is aware of

16  this or not, but there are about five to 15 articles a day

17  published about the FaceBook.com.  They are talking to the

18  media all the time.  We don't have documents that talk about

19  how the FaceBook has grown since that date.  All of this is

20  crucial for our, for our expert, but we don't want to name

21  particular categories and then have them say they object to

22  those because they don't understand them or they're holding

23  back things that we didn't simply ask for because they say oh,

24  it didn't technically fall within that category so, therefore,

25  we have some catchall requests that ask for any documents that

55

1  relate to the lawsuit.  And that's not an unreasonable

2  request.  We're entitled to discovery and anything related to

3  the claims, defenses or counterclaims.  And they've just made

4  an arbitrary cutoff date on May 21st, which just happens to be

5  the date on which a lot of documents could start to be

6  generated because they found out that our client had now

7  launched their website and they may be in real trouble.

8         THE COURT:  Okay.  I'll take the matter under

9  advisement.  Thank you very much and we'll remain in session to

10 hear the criminal matter.

11        MR. CHATTERJEE:  Thank you, Your Honor.

12        MR. HORNICK:  Thank you, Your Honor.

13 //

14 //

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

<u>CERTIFICATION</u>

I, Maryann V. Young, court approved transcriber, certify

that the foregoing is a correct transcript from the official

digital sound recording of the proceedings in the

above-entitled matter.

_____                    <u>January 11, 2006</u>

Maryann V. Young