# EXHIBIT B

1      **UNITED STATES DISTRICT COURT**

2      **DISTRICT OF MASSACHUSETTS**

3

4                              Civil Action No. 04-11923-DPW
5    **CONNECTU LLC**                    .
6         **Plaintiff**                  .
7                                        . Boston, Massachusetts
8            **v.**                       . March 3, 2006
9                                        .
10   **MARK ZUCKERBERG, et al**           .
11        **Defendants**                  .
12   . . . . . . . . . . . . . . .
13
14                   TRANSCRIPT OF MOTION HEARING
15            BEFORE THE HONORABLE ROBERT B. COLLINGS
16                UNITED STATES MAGISTRATE JUDGE
17   APPEARANCES:
18
19   For the plaintiff:  John F. Hornick, Esquire, Margaret A.
20   Esquenet, Esquire, Troy Grabow, Esquire, Finnegan, Henderson,
21   Farabow, Garrett & Dunner, LLP, 901 New York Avenue, N.W.,
22   Washington, DC  20001, (202) 408-4000.
23
24   For the defendants: Daniel K. Hampton, Esquire, Holland &
25   Knight, LLP, 10 St. James Avenue, Boston, MA  02116, (617) 523-
26   6850, Monte Cooper, Esquire, Joshua Walker, Esquire, Orrick,
27   Herrington & Sutcliffe, LLP, 1000 Marsh Road, Menlo Park, CA
28   94025, (650) 614-7375.
29
30   Steven M. Bauer, Esquire and Jeremy P. Oczek, Esquire,
31   Proskauer Rose, LLP, One International Place, Boston, MA
32   02110, (617) 526-9600.
33
34   For defendant Eduardo Saverin:  Daniel Hampton, Esquire,
35   Holland & Knight, LLP, 10 St. James Avenue, Boston, MA  02116,
36   (617) 523-2700 and Robert Hawk, Esquire, Heller Ehrman, LLP,
37   275 Middlefield Road, Menlo Park, CA  94025, (650) 324-7156.
38   Court Reporter:
39
40
41   Proceedings recorded by digital sound recording, transcript
42   produced by transcription service.
43
44
45
46

I-2

1                                **I N D E X**

2    Proceedings                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2         (Court called into session)

3         THE CLERK:  The case of ConnectU v. Mark Zuckerberg

4    et al, Civil Action No. 04-11923 will now be heard before this

5    Court.  Will counsel please identify themselves for the record.

6         MR. HORNICK:  Good morning, Your Honor, John Hornick

7    and my colleague, Margaret Esquenet, also Troy Grabow for the

8    plaintiff ConnectU and the counterclaim defendants.

9         THE COURT:  Good morning.

10        MR. HORNICK:  Good morning.

11        MR. COOPER:  Good morning, Your Honor, Monte Cooper

12   on behalf of what would be referred to as the Facebook

13   defendants which are all defendants other than Edward Saverin.

14   With me is Steve Bauer of the law firm Proskauer Rose.  Also

15   present are Jeremy Oczek of Proskauer Rose, Joshua Walker of

16   Orrick, Herrington & Sutcliffe.

17        THE COURT:  Okay.  If you want to use the jury box if

18   there are not enough seats, feel free.

19        MR. COOPER:  I think we'll have enough.

20        MR. HAWK:  Good morning, Your Honor, Robert Hawk from

21   Heller Ehrman for defendant Saverin.

22        MR. HAMPTON:  And with him Dan Hampton from Holland &

23   Knight, also for defendant Saverin.

24        THE COURT:  Is it the parties' intention just to go

25   through these motions seriatim or is there some other way in

1 which you want them argued?

2          MR. HORNICK:  Well, Your Honor, we, in going through

3 the discovery motions can probably address several related

4 requests at the same time.

5          THE COURT:  Okay.

6          MR. HORNICK:  But I was hoping that before we get

7 into the discovery motions we could talk about the discovery

8 that has proceeded since the Court ordered that discovery on

9 November 18th.

10          THE COURT:  Okay, where's the docket, Marie?

11          THE CLERK:  Right here, underneath.

12          THE COURT:  Oh, I'm sorry.

13          THE CLERK:  No problem.

14 (Pause)

15          THE COURT:  Okay, go ahead.

16          MR. HORNICK:  Yes, Your Honor, thank you.  On

17 November 18th of last year, the Court held a hearing and then

18 issued an order and it was on the plaintiff's motion for

19 imaging of the defendants' hard-drives and other electronic

20 memory devices, and just for the Court's recollection the order

21 covered three things.  One was, did the defendants do what our

22 client, ConnectU, would have done to search for and recover the

23 missing code.  And again, the code was the Facebook code, the

24 Harvard Connection code, the face match code and the

25 coursematch code.  And then the second thing that the order

1    said was did, we can do discovery on whether the Facebook

2    defendants, the other defendants, produced before 11/18 all

3    responsive information and documents found to that date.  And

4    then the third thing that the order said was, was, that we can

5    do discovery on was the Facebook truthful with the Court at the

6    November 18th hearing.

7              Since that time we have conducted some discovery.

8    Facebook has produced three CD-ROMs containing a huge amount of

9    mostly irrelevant code.  They permitted a Rule 30(b)(6)

10   deposition of the Facebook two days ago to which counsel

11   objected to almost every question that was asked, and the

12   bottom line is that up until the November 18th hearing, I

13   thought, I believed, that the Facebook defendants were

14   withholding information from their counsel, but at that hearing

15   counsel made some unequivocal representations to the Court

16   which are now proven to be false.  They said that they imaged

17   and searched some memory devices before that 11/18 hearing.  In

18   fact there were no memory devices at all that were imaged and

19   searched before the November 18th hearing.  And we have some

20   documents that show that, but in addition, the 30(b)(6) witness

21   two days ago confirmed that.  In fact there was one device that

22   was imaged two days before the hearing but it hadn't been

23   examined, and we've also found evidence of spoliation and

24   suppression of evidence.

25              With respect to spoliation, Mr. Zuckerberg who is one

1  of the key defendants here, had a hard-drive that he used

2  while he was at Harvard during the 2003-2004 academic year.

3  And that hard-drive supposedly was missing.  It's now been

4  found and the defendants have produced to us a copy of part of

5  the image that they made of the hard-drive that was in that

6  computer, but that hard-drive has been wiped clean of any code

7  during the relevant period.  But there's data on that hard-

8  drive from before the relevant period and after the relevant

9  period.  The 30(b)(6) witness said that Mr. Zuckerberg used

10  that computer during the relevant period and we have letters

11  from the defendants saying that it was used during the relevant

12  period and, in fact, it is the computer that Mr. Zuckerberg

13  used while he was at Harvard.  So if the code that we're

14  looking for isn't on it it had to be deleted.

15          In addition, we found on another device that they've

16  produced or I should say, a copy of an image that they made of

17  another device, a file or a program that deletes old versions

18  of code.  In addition to that, we've found evidence of

19  suppression of evidence.  The Facebook claim that

20  Mr. Zuckerberg's hard-drive was lost and in opposition to our

21  motion to compel the imaging, which they filed on August 18th of

22  last year, and the dates are very important, they said,

23  "plaintiff incorrectly makes much of the absence of

24  Zuckerberg's computer.  It is no longer in his possession.

25  Defendant Zuckerberg would be willing to provide the

 1  hard-drive he had during the winter of 2003-2004, but despite

 2  extensive searches he does not have it.  ConnectU is there for

 3  improperly seeking to compel production of a thing outside

 4  Zuckerberg's possession, custody or control."  Now that

 5  hard-drive allegedly was found in mid-November, two days or

 6  three days before the hearing.  Counsel turned it over to their

 7  expert on November 15th, and I have a document that I can show

 8  to that effect if necessary.

 9          Going back farther in time, May 31, 2005, that's when

10  the defendants' served responses to our discovery requests in

11  which we sought code from that hard-drive.  They said that they

12  didn't have the hard-drive in their responses.  They said that

13  it had crashed.  But files that we found on that hard-drive or

14  the copy of that hard-drive that they provided show that it was

15  used in mid-July, mid-July of last year.  That's one and a half

16  months after the discovery response and it's one month before

17  they said that it was lost.  We met and conferred for over six

18  hours during July of 2005.  Part of those discussions were to

19  try to find that hard-drive or to try to find that code.  They

20  told us during those meet and confer sessions that it's lost,

21  can't find it.  But in fact it was being used at exactly the

22  same time according to files that are on the hard-drive.  Then

23  on August 18th--

24          THE COURT:  Excuse me, being used by whom?

25          MR. HORNICK:  By, well, by, presumably by

I-8

1   Mr. Zuckerberg and I'll tell you why in a moment.  On August

2   18th they say Mr. Zuckerberg looked for it and can't find it,

3   but it was used until mid-July and two days ago the 30(b)(6)

4   witness said that it was turned over to the Facebook's IT

5   manager, Mr. Hayman, who wrote the 600 to 800 declaration that

6   we'll discuss later I'm sure.  He turned it over to the

7   Facebooks IT manager in August or September of 2005.  Then on

8   November 15th they say, we've found it.  We found the hard-drive

9   that they'd suppressed for the last five and a half months.

10  The Facebook code that we've been looking for from pre-launch

11  and launch and post-launch still has not been found and that's

12  contrary to statements that have been made in papers filed with

13  the court, the most recent papers filed with the court.  It's

14  contrary to representations that were made by their counsel to

15  me and it's contrary to a letter that they sent me on February

16  26th, but the 30(b)(6) witness couldn't answer whether this code

17  has been produced.  He didn't know.  He didn't know and yet

18  that is what the deposition was all about, whether this code

19  has been found and produced.

20          The Facebook defendants have repeatedly represented

21  that there is some relevant code and database on these CD's

22  that they've produced to us.  They say the code proves that

23  there was no copying.  But they won't tell us where it is and

24  then they said it's not on the CD's or at least not on the

25  early CD's that they've produced to us.

1           THE COURT:  It's not what?

2           MR. HORNICK:  It's not on them.

3           THE COURT:  Oh.

4           MR. HORNICK:  And they told us it was on them and

5    then they said it wasn't on them.   And then during a meet and

6    confer on February 23rd they said, they refused to say whether

7    or not all of the launch code has been produced.  Then they

8    promised a directory of the code on the CD's that they've

9    provided.  And then they changed their mind and they won't

10   produce that now, and I ask why are we having this show game?

11   If there's been no copying, no misappropriation, why wouldn't

12   they provide the code?  Why wouldn't they tell us where it is

13   clearly?

14           Instead what they've done is that they've produced

15   all of the code that they could find on these devices, a huge

16   amount of it, and it's cost us an enormous expense to find a

17   needle in a haystack, but, in fact, there is no needle there at

18   all.  In addition to the fact that the Facebook code hasn't

19   been found, the Harvard Connection code still has not been

20   found, the face match code and the course code, coursematch

21   code have not been found.  And one of the issues that the Court

22   allowed us to do discovery on was has the Facebook done

23   everything that ConnectU would have done to recover this code?

24   And they have not done so and I'll tell you why.

25           The Facebook's so called expert, which is called

1   Berry Hill Forensic something or another, imaged several

2   devices including Mr. Zuckerberg's hard-drive.  We don't know

3   anything about the methodology that they use because they won't

4   tell us.  And they've refused to give us the images that they

5   made and they've refused to give us the devices themselves.

6   And the 30(b)(6) witness said he was not allowed to see the

7   reports that they had made as a result of this imaging process

8   and the search that they made.  And that's really not

9   surprising, I suppose, because the Berry Hill person who did

10  this imaging isn't even qualified to use the software that was

11  used to do this process.  It's called Encase actually,

12  E-N-C-A-S-E, and the person at Berry Hill who did the imaging

13  isn't certified to use Encase.  Ironically, the 30(b)(6)

14  witness was but he was allowed to see the reports.  Berry

15  Hill's work was very sloppy.  They logged chain of custody for

16  some devices but not others.  And this is really important;

17  they searched only for what are called php files.  If Your

18  Honor creates a document on your computer in Word, for example,

19  it'll have .doc at the end of the document.  If you create

20  computer program files certain kinds will have .php at the end

21  and other kinds of programs will have other extensions at the

22  end.  And here, the witness, 30(b)(6) witness testified that

23  they searched only for php, Perl that's P-E-R-L, html and htm

24  files.  That would miss a whole slew of things.  It would miss

25  archive files for example.  It would miss files with a zip

1   extension at the end or tar, T-A-R, or bak, B-A-K.  It would

2   miss files that have aversion number at the end as opposed to

3   putting one of those extensions, and it also misses signature

4   mismatches.  Your Honor, if you create a file and it would

5   normally have doc at the end, the computer generates it

6   automatically.  If you change that to something else and which

7   you can do, it will get stored under that different file

8   extension and the only way that you can then find that document

9   as a doc file is to do searches within the file itself.  They

10  didn't do that.

11          In addition to that, we've been trying to find the

12  database definitions.  That has been a bone of contention for

13  quite a while now, and the database definition would not be a

14  php file.  The 30(b)(6) witness said they didn't search for the

15  database definitions at all, and he said it would be a .doc

16  file.  They didn't search for .doc files.  It could also be a

17  .txt file.  It could be a .sql file.  They didn't search for

18  those.  And every time I have raised the issue of database

19  definitions the defendants have said we don't know what you

20  mean by that term, and it's just a word game.  Because in their

21  response to request Number 180 where we requested the database

22  definitions, they said they searched for them and we'll produce

23  them and yet they say we don't know what that term means.  Then

24  in their reply to our motion to compel deposition testimony

25  they said that they produced them, yet they say they don't know

I-12

1   what the term means.  It's an expensive word game to

2   suppress crucial evidence and this was proven at the deposition

3   because the witness, again, had no problem at all with the term

4   database definition.  He was asked the question about database

5   definitions; no objection, I don't know what that means.  He

6   knew exactly what it meant but they didn't search for them, and

7   they have not produced them.

8           Something else that they didn't do is they didn't

9   attempt to recover or restore fragments of deleted files or if

10  they did we don't know because they won't show us their

11  analysis.  They won't share it with us.  So even if they did in

12  that respect what ConnectU would have done, they haven't told

13  us and they will have to tell us what they've done.  And the

14  30(b)(6) witness said that when they extracted code from these

15  images or from these devices, they didn't distinguish between

16  what had been deleted and restored and what was not deleted at

17  all.  So we can't tell from looking at what they've produced to

18  us whether any of this code that they produced was ever deleted

19  and then restored.  That's certainly something we would have

20  looked at if we could have.

21          There's no evidence at all that they looked for the

22  information that only an image would show.  As I said, Your

23  Honor, what they did is they took an image of certain devices,

24  then they made us a copy of that image.  The copy isn't as good

25  as the image itself.  There's a lot of information that the

I-13

1   image shows that the copy doesn't show.  There's no evidence

2   that they looked for that information.  The 30(b)(6) witness

3   didn't know what had been produced.  There's no evidence that

4   they imaged all the devices from pre-launch up to five months

5   out.  They imagined something called the Maverick Server.  That

6   wasn't used until about five months out so there's no evidence

7   that they imagined the servers in between.  And then there's a

8   whole list of devices that were identified in response to our

9   interrogatories 25 and 26, which they didn't image at all, and

10  they've refused to allow us to image.

11          So what we're requesting today in view of the

12  suppression and the misstatements and the fact that they didn't

13  do everything that we would have done, is that they give to us

14  the images that they used to make the CD's and they give us the

15  devices themselves.  Now they've said three times in three

16  different places they have no objection to providing

17  Mr. Zuckerberg's hard-drive.  At the November 18th hearing,

18  Mr. Chatterjee said I'm fine with that, he was referring to

19  imaging of Mr. Zuckerberg's hard-drive, I'm fine with that with

20  respect to Mr. Zuckerberg.  He just objected with respect to

21  the other defendants.  Then in response to request number 184,

22  the defendants said we will produce Mr. Zuckerberg's

23  hard-drive if we find it.  They've now found it.  And then on

24  August 18th in the opposition to the motion to compel which I

25  quoted earlier, they said defendant Zuckerberg would be willing

I-14

1    to provide the hard-drive he had during the winter of 2003-

2    2004, but despite extensive searches he does not have it, which

3    was not true at the time but they did say that they would

4    produce it and they say they have it now.  We need these

5    devices to assure that the images that they made are complete

6    especially in view of the sloppy job that their expert did by a

7    non-certified person.

8              THE COURT:  Well what precisely do you want?  I mean

9    this is obviously a further – so if you want something further

10   on motion 37, what specifically do you want?

11             MR. HORNICK:  We want them to produce to us the

12   images that their expert made and we want them to produce the

13   actual--

14             THE COURT:  Oh, images of what?

15             MR. HORNICK:  I'm sorry?  Oh, these are images of

16   particular devices.  And to be more specific they've produced

17   three CD's.  They're number TFB 84, 85 and 86.

18             THE COURT:  What particular devices?

19             MR. HORNICK:  Well, I'm trying to clarify that, Your

20   Honor.

21             THE COURT:  Oh okay.

22             MR. HORNICK:  They've produced three CD's, TFB 84, 85

23   and 86.  Those CD's have copies of portions of images that were

24   made of devices that they call 371-01.  That's Mr. Zuckerberg's

25   hard-drive, 371-02 and 03 which are the Maverick server, 371-05

1    and 371, I believe 7 and 9, and there may be one or two

2    others on there that I--

3    (Pause)

4              MR. HORNICK:  As I understand it, they imaged all 10

5    but they've only produced to us copies from portions of those.

6    So what we're asking for is the actual images of device numbers

7    371-01 through 371-10.  In addition, we're asking for the

8    devices themselves so that our expert can compare the images to

9    the devices to make sure they were totally and completely

10   imaged.  And I'd like to give the Court an example of the

11   type--

12             THE COURT:  Is that it?

13             MR. HORNICK:  Well, that's it with respect to images

14   and drives, yes.

15             THE COURT:  Is that it with respect to motion 37?

16             MR. HORNICK:  No, it's not.

17             THE COURT:  All right.  What else do you want?

18             MR. HORNICK:  In addition to that we're requesting,

19   the Court gave us permission to depose the individual

20   defendants in addition to the Facebook, Inc., and

21   Mr. Saverin has refused to do that, and with respect to the

22   other defendants they tell us that they will give us the

23   witness one time for seven hours, and we have to depose them on

24   all case related issues at the same time.  And we are lacking

25   so much discovery here that we don't want to depose them on any

1    issues except this, what I call forensic discovery at this

2    time.  So we'd like to be able to depose the individual

3    defendants at this time on these issues relating to the

4    November 18th order only and that it not be counted toward the

5    seven hour limit.

6            THE COURT:  Now, who specifically do you want to

7    depose?

8            MR. HORNICK:  Mr. Zuckerberg, Mr. Moskovitz,

9    Mr. McCollum, Mr. Hughes and Mr. Saverin.  In addition to that,

10   there, as I said, there was a list of devices identified in

11   response to Interrogatories 25 and 26 that were not imaged.  We

12   would like to have the option of imaging them if after our

13   other examinations we deem that it's necessary.  And then in

14   addition to that, we are asking that the discovery responses

15   that were provided to us, we served two interrogatories and

16   five or six production requests relating to the November 18th

17   order and with respect to the interrogatory answers they refuse

18   to give us a lot of information mostly related to the results

19   of their analyses.  So we ask that in response to the

20   interrogatories they give us their methodology and the results

21   of their analyses.  And then with respect to the production

22   requests, we ask that they give us documents relating to the

23   efforts they made, their methodology and their analyses.

24           In addition to that, we are requesting that we be

25   able to take the 30(b)(6) witness (sic) again of a witness

I-17

1   who's fully prepared to answer our questions about

2   everything that they did or allegedly did, and privilege was a

3   big issue during the deposition.  I raised this issue

4   specifically with Your Honor on November 18th, is privilege

5   going to be an issue?  And Your Honor said that we can depose

6   anybody about anything that they did including counsel.  And

7   yet privilege was a major obstruction to taking that deposition

8   on Wednesday.

9            In addition to that, there are a couple of requests

10  that are within the motions that specifically--

11           THE COURT:  Motions or motion 37?

12           MR. HORNICK:  Within the other motions--

13           THE COURT:  All right.  Well we aren't--

14           MR. HORNICK:  --that relate to this.  We'll get to

15  those later.

16           THE COURT:  --we aren't to the other motions yet.

17           MR. HORNICK:  Yes.  But, Your Honor, I would like to

18  just point out to you because I think it's very important that

19  with respect to these images and the copies that have been

20  given us, the images will show information that the copies will

21  not.  And I would like to show Your Honor an important example

22  of this.  I was trying to use the overhead, Your Honor, but I

23  couldn't figure out how to get the light on so--

24           THE COURT:  Noreen, do you know how to work this?

25           THE CLERK:  No.

I-18

1          MR. HORNICK:  I can just hand these copy up.

2     Everyone has a copy of it.

3     (Pause)

4          MR. HORNICK:  Your Honor, you have before you a set

5     of papers that I have marked for myself as Exhibit 5.  That's

6     only relevant to the extent that we get to any of these others

7     and we want to identify it in the transcript later on.  But

8     this first page is a photocopy of the front of the CD that is

9     called TFB 86.  If you turn to the next page you will see a

10    directory of what's on this CD.  This is information copied

11    from several devices named 371-01, 02, 03, 05, 06, 07, 09 and

12    10, and I have highlighted number 10.  If you turn to the next

13    page you will see--

14          MS. ESQUENET:  You highlighted nine.

15          MR. HORNICK:  I'm sorry, I highlighted nine, I'm

16    sorry.  If you turn to the next page, you will see what the

17    screen would show you if you were to click on that highlighted

18    nine from the previous page and what you would see is a

19    directory labeled C.  Now if you click on that directory, and I

20    think it's important to point out at this point that – actually

21    let's go back to the second page.  If you look at those numbers

22    next to 371-01 through 371-10, in the date modified column you

23    will see the date of February 14th of 2006.  That's the date

24    that the copy was made from the image.  But if you were to look

25    at this information on the image itself or on the device

1  itself, you wouldn't see February 14th of 2006.  You would

2  see the date that the directory was originally created, and

3  then if you turn over to the next page where you see the letter

4  C, that also has next to it the date of February 14th of 2006.

5  If you were to look at the image that date would be different.

6  It would be earlier.  It would be the date that the directory

7  was actually created.  And if we turn to the next page that is

8  a printout of what you would see on your screen if you clicked

9  on C, and here we have six folders, all of those folders also

10  have a date of February 14th of 2006.  The first folder there is

11  called Facebook.  Now work on Facebook was started sometime in

12  December of 2003.  If this were the image we were looking at

13  and not the copy of the image, we would see when this directory

14  was actually created.  It could have been created as early as

15  sometime in December of 2003.  A crucial issue in this case,

16  when did Mr. Zuckerberg start designing and building the

17  Facebook?  We know it was in December of 2003.  We're trying to

18  pin down exactly when.  He's gone on record in several places

19  saying that it was much later.  So has counsel.

20         If we then click on that Facebook folder and turn to

21  the next page you'll see what you would see on the screen if

22  you clicked on the Facebook folder.  And you see that I have

23  highlighted two files named course name and course parts.

24  They're in the Facebook folder.  They're Facebook files.  And

25  you see what they show as a date?  They show December 22nd and

1    December 23rd of 2003, far earlier than the defendants have

2    represented in interrogatory answers and elsewhere that

3    Mr. Zuckerberg started working on the Facebook.  But that date,

4    December 22nd and 23rd, that is the last date that file was

5    modified.  If you click on either one of those files with a

6    right click, you'll get a screen, which you'll see two pages

7    later.  It's called properties.  When you click on properties,

8    you'll get this screen that appears on the right hand side of

9    this page where we have course name highlighted.  And what that

10   shows you is a created date, a modified date and an access

11   date.  What you'll see there is that all of the dates say

12   December 23rd of 2003, but if you looked at the image or the

13   device itself as opposed to the copy that they've provided to

14   us, you would see or you could see a different date for

15   created, a different date for last modified and a different

16   date for access.  And that first date is crucial, the created

17   date.  That first date, although it shows up on the copy as

18   December 23rd, it could show on the image as earlier.  And the

19   only way for us to see that is on the image or on the device

20   itself.

21        Same thing is true of the next page, which highlights

22   course match.  That was December 22nd is the last modified date,

23   but if you look at the image or the device itself, you would

24   see all three dates there and they would not necessarily be

25   different and they could be earlier than December 22nd.  This is

1   only one example of the type of information you would see by

2   looking at the image that you would not see by looking at the

3   copy. In addition, you could see whether there were any files

4   that were not recovered. And as I said before the defendants'

5   30(b)(6) witness admitted they didn't search for the database

6   definitions so they are probably going to be on those images.

7   In addition to that, by looking at the image you can see when

8   the computer program was used by whom. You can see who used

9   it. You can see who was authorized to use it. You can see

10   whether other devices were connected to the machine. You can

11   see the original directory structure, not the one that we get

12   when a copy is made from the image. And there's all kinds of

13   other information that you can see by looking at the image

14   itself that you would not be able to see by looking at the

15   copies that have been provided for us. And that is why it is

16   so important that we get access to these images.

17        Now the defendants have offered to provide these, and

18   what they'll probably tell you is that they've offered to

19   provide these images to an independent expert. But when I

20   tried to pin them down on February 23rd as to whether they would

21   allow that independent expert to look for all of this

22   information that I just showed you, this stuff that you can

23   only see on the image, they said, no. That's outside the scope

24   of the Court's November 18th order, and I don't want, frankly,

25   to incur the additional expense of an independent expert when

1    this has already cost us a fortune to look for this needle

2    that is not in the haystack.  So what I am asking is that our

3    expert be able to examine these images and these devices at the

4    defendants' expense.  Thank you.

5        THE COURT:  All right.  I'll hear the defendants' on

6    the continued dispute over motion 37.

7        MR. COOPER:  Your Honor, there's so much that was

8    just said that I'm going to start with a preface.  I came here

9    to address the seven motions that are already on file.  I am

10   prepared to explain several of the points that Mr. Hornick just

11   made and explain to you why it has been vastly overstated what

12   has happened here and to suggest a methodology so that the

13   Court makes a reasoned decision on this issue of what has or

14   has not been produced and also to show the Court that despite

15   what Mr. Hornick is saying the cooperation level is not – is

16   completely misrepresented.

17       Let me start first of all with this allegation of

18   what the witness on Wednesday, two days ago, allegedly stated.

19   First of all, you don't even have the transcript in front of

20   you to evaluate what the characterizations of what data has or

21   has not been produced and why it hasn't been to even make a

22   reasoned decision on most of what was just stated.  For basic

23   production deficiencies as they have been alleged, for

24   instance, you keep hearing about the overwrite.  What we're

25   talking about is something called meta-data and slack space.

I-23

1    Let me – slack space is a region of the hard-drive that

2    contains file fragments that have been partially overwritten.

3    In our recovery process all active source code files were

4    produced that met the criteria.  Also, all deleted files that

5    were recovered with a file name were also produced.

6    Theoretically, file fragments exist in which the file name has

7    been overwritten thereby preventing recovery.  Analysis of the

8    file fragments is difficult at best and each file would require

9    manual analysis to determine whether or not it has source code

10   file.  In the alternative, I suppose we could search by key

11   words that might differentiate between source code and other

12   non-source code files.  And here is the key point, we have

13   offered to do that.  That was completely omitted from all this

14   discussion.  When Mr. Hornick talked about what did we search,

15   php file, html, html, pl, the extensions we've searched are

16   classic source code extensions.  He's started in talking about

17   imaging doc.  You are probably familiar with the doc extension

18   from either working with the Word doc or if you have an Apple

19   laptop there would be a comparable.  doc is not a source code

20   file.

21        The problem here is Mr. Hornick has made no

22   explanation why he feels a doc file is relevant to source code.

23   The meta-data and the source code documentation he is

24   complaining about, he is complaining not because it is truly

25   relevant to the search that he wants but because the search

I-24

1    that was performed was not only adequate, it just didn't

2    satisfy what he hoped to find, which is an entirely different

3    issue and which only underscores when you have serious

4    allegations like what he's raising here in almost 30 minutes of

5    argument why it needs to be pragmatically briefed to you with

6    the full record.  I don't have any objection if you even do it

7    on an expedited basis, but it certainly shouldn't be decided ad

8    hoc at a hearing like this two days after the deposition of

9    which he's complaining about.

10            Let's talk about this database definition.  Again, in

11   the entire discussion you've just heard, the entire discussion,

12   it is the only part of the data that he talked about that

13   actually is subject to any of the motions to compel that were

14   put on calendar.  Interrogatories 25 and 26, which he

15   mentioned, you haven't even seen.  They are extensive,

16   something I would have to see a copy again, but I believe

17   they're like a seven page explanation of our details of our

18   search.  The database definitions are data-schema as he might

19   more properly call them if you are talking about a relational

20   database like my SQL server would be, are not going be

21   contained on the 10 drives we have.  They just won't be and

22   would only be on production drives.  Those files and those

23   drives are no longer available because they're driver files.

24   They would have been gone by the time of the suit.

25            More to the point and this, and I would like to use

I-25

1  this as a lead in for what I thought we were going to come

2  here for, and show you how just horribly complicated this case

3  has become in terms of discovery and why the representations

4  that were just made are completely irrelevant to why we should

5  be here today.  I would like to point out that at the core of

6  every single motion and to a degree even the arguments you've

7  just heard, even those arguments, is a question of the adequacy

8  of the plaintiff's trade secret designation.  Mr. Hornick has

9  just given you the most wonderful proof of why the trade secret

10  designation is improper and what has led to this sort of morass

11  of discovery argument.  In his entire trade secret designation,

12  it is notable that not once does he mention database

13  definitions, nor does he mention database structures, nor does

14  he mention database schema.  We don't even know what in his own

15  production he is referring to and have actually asked him

16  rather than have the Court try and deal in the abstract with

17  definitions like database schema or deal in the abstract with

18  what has or has not been produced like database definitions as

19  he puts it, point in his own production what he's talking

20  about.  Because in the long run all of this, what's good for

21  the plaintiff or what, plaintiff expects of the defendants must

22  necessarily follow has to also be equally true for the

23  plaintiff, particularly in a case where trade secrets are at

24  issue.

25            Having said that, I will also address one issue and

 1  then come back to the trade secret designation.

 2  Mr. Hornick made a representation that we reneged on a source

 3  code file.

 4          THE COURT:  I'm sorry, you what?

 5          MR. COOPER:  A source code file, a source directory.

 6          THE COURT:  No, the verb.  Reneged?

 7          MR. COOPER:  Reneged on a, R-E-N-E-G-E-D, on a--

 8          THE COURT:  Okay.  I just didn't hear the word.

 9          MR. COOPER:  What Mr. Hornick didn't say is we made

10  no such reneging of the agreement at all.  Mr. Hornick does not

11  want you to hear the issue.  It is not that we won't produce

12  the directory.  It's that all I ask is that there be an

13  assurance he is not saying that by preparing it, which we made

14  ourselves.  It isn't an extent file.  It isn't something that

15  existed.  We did this for the purpose of this very dispute.  In

16  preparing it, I simply ask will you give reasonable assurances

17  that you will not claim the production of this particular

18  source directory is a waiver of the work product privilege.

19          Now, Mr. Hornick says at the last hearing that it was

20  agreed there would not be any obstruction based on work product

21  or attorney-client.  Actually, what Your Honor said at the time

22  was I'm not about to rule on that here.  I have a part of the

23  very source file that I'm talking about and would like to show

24  it to you in camera right now so you can understand what it is

25  that we're talking about and understand the detail that

I-27

1  actually has been – the magnitude of our effort to meet the

2  demands of the plaintiff and then turn to the real issues at

3  hand.  If you'll allow me just to show you what I'm talking

4  about.

5           THE COURT:  Well – I'm sorry, you were talking about

6  something you were willing to produce if they would agree that

7  your production was not a waiver of work product as to, you

8  mean as to other things?

9           MR. COOPER:  Judge, that--

10          THE COURT:  Because it's clearly, I mean, if your

11  producing something you're waiving any privilege of protection

12  as to that individual thing that you're producing.

13          MR. COOPER:  Yeah--

14          THE COURT:  Are you saying you don't want it to be a

15  waiver with respect to other things, is that what--

16          MR. COOPER:  Yeah.  I just don't want this to be

17  viewed as a general waiver of work product as it relates even

18  to compliance with the Court's order unless the Court is here

19  to tell me today that in making the order in November you

20  expected us to waive work product and--

21          THE COURT:  No, I didn't expect anything of the sort.

22          MR. COOPER:  That's all we've ever asked.

23          THE COURT:  But on the other hand, if there's an

24  agreement that by turning this document over you don't waive

25  work product as to other documents, that doesn't mean that the

I-28

1    assertion of work product as to other documents is not

2    subject to attack on other grounds.  Do you understand that?

3              MR. COOPER:  Agreed, Your Honor.

4              THE COURT:  Okay.

5              MR. COOPER:  Now that belies the issue at hand.

6    Mr. Hornick stood up and said we reneged on the agreement.  He

7    also then stood up and said we agreed to waive work product.

8    Both facts are wrong.  We agreed to produce this document and

9    stated we would do it immediately.  I can call back to

10   California after this hearing and have it produced on the

11   assurance that by producing it we are not agreeing to waive

12   work product to the rest of the world.  We created it to help

13   this dispute.  This production was done to--

14             THE COURT:  All right.  Well, you're saying something

15   different now.  You're saying not work product as to other

16   documents.  You're saying waiving the right to assert work

17   product as to this document, vis-a-vis third parties, is that

18   what you're--

19             MR. COOPER:  Oh, no, no, I'm sorry--

20             THE COURT:  You switched--

21             MR. COOPER:  --if you misunderstood me.

22             THE COURT:  --yeah, your switched your--

23             MR. COOPER:  You had it right originally.  All I'm

24   saying--

25             THE COURT:  Okay.  Are you saying that, when you said

1    that this doesn't mean that you've waived it as to other

2    things that perhaps might be on the same subject matter?

3            MR. COOPER:  That is correct, Your Honor.

4            THE COURT:  All right.  Let me ask Mr. Hornick,

5    what's wrong with that way of dealing with this, at least this

6    aspect of the problem?

7            MR. HORNICK:  If all they're saying is that the mere

8    act of producing this directory is not going to waive

9    privilege, then I don't have a problem with that.

10           THE COURT:  What they're saying is that by giving

11   this to you, which they claim is work product, they are going

12   to give it to you.  They are waiving work product with respect

13   to the particular thing they're giving you, but they don't want

14   the act of giving that material which is protected by work

15   product to be a waiver of more than the work product with

16   respect to that particular document.  That you won't claim,

17   well you gave us this document, we want document X which they

18   claim is protected by work product and you say, no, by giving

19   us the first one you waived it as to the second.  That's what

20   they want to avoid.  Do you agree to take it on that basis?

21           MR. HORNICK:  As you've described it, yes, Your

22   Honor, that's fine.

23           THE COURT:  Did I describe it correctly?

24           MR. COOPER:  Yes, Your Honor.

25           THE COURT:  All right.  Well that takes care of--

I-30

1      MR. HORNICK:  Well my problem was that, Your

2  Honor, was that we wouldn't be able to ask the witness about it

3  because they would assert privilege with respect to any

4  information that might be asked about it.  That's why I didn't

5  want to agree to it.

6      THE COURT:  All right.  Well now, what, well, except

7  as to the particular document the work product protection is

8  waived.  So you can use the document.  And you can question

9  witnesses with the document.  It's just that what they're

10  saying is they don't want it, the waiver as to this document

11  which we will call X, to be considered a waiver as to another

12  document they haven't produced they claim is work product which

13  we'll call document Y.  And as I understand it everyone agrees

14  on that.  All right.  Now what is it then that you will be

15  producing now that we have that agreement on the record?

16      MR. COOPER:  I believe it's a file, a directory of

17  what all the source files are.  It includes the file path, the

18  file name, the byte size--

19      THE COURT:  All right.

20      MR. COOPER:  --the last change date which is direct

21  involvement to most of what you just heard a second ago, the

22  device and the date sent.  An enormous amount of information

23  that was designed to take care--

24      THE COURT:  And I should refer this as to

25  the--

1           MR. COOPER:  Source.

2           THE COURT:  --directory of - I just need to know what

3   to call it in my court notes that's all.

4           MR. COOPER:  The source file directory.

5           THE COURT:  Source file directory.

6           MR. COOPER:  Yeah.

7           THE COURT:  Okay.  Well, we've made some progress.

8   Continue.

9           MR. COOPER:  All right.  But, I mean, again, Your

10  Honor, it underscores the whole problem with this approach of

11  raising this issue ad hoc.  We actually made this very offer on

12  Sunday so that it could in fact be used.  If he had wanted to

13  at the deposition--

14          THE COURT:  Well, I don't know whether it was a

15  failure to communicate or what, but I think it's clear as to

16  what's waived--

17          MR. COOPER:  Yeah.

18          THE COURT:  --what's not waived, et cetera,

19  et cetera, so let's move on.

20          MR. COOPER:  All right.

21          THE COURT:  I'd rather not hear about ancient

22  history.  I'd rather try and make some progress on this.

23          MR. COOPER:  I mentioned earlier that there were

24  particular search terms that were directed to specific types of

25  source code extensions.  As I said, php is a source code

I-32

1    extension, doc is not.  We made a gargantuan effort to

2    recover all source code.  At the hearing that was held in

3    November the issue was source code.

4            THE COURT:  I remember that.

5            MR. COOPER:  As the motions were framed, it was

6    source code.  That is what we have tried to produce.

7    Mr. Hornick has stood up and for the most part not talked about

8    source code.  That's what--

9            THE COURT:  Except that he still hasn't gotten the

10   source codes that were the subject of the November hearing as I

11   understand it?

12           MR. COOPER:  No, he has.  That's the whole point.

13   What he hasn't received is any of the data that exists that is

14   not source code and that is where this dispute rises.  Remember

15   as the Court itself anticipated when it was talking about

16   imaging, imaging is going to capture a whole panoply of other

17   types of data that isn't source code.  These are

18   hard-drives of individual students that can have for instance

19   downloadable music.  It's not a source code file.  It's not

20   relevant.  What he is complaining is that the search terms

21   didn't include non-source code extensions, that he hasn't

22   received any other source code that - let me rephrase it.  He

23   hasn't gotten source code that he wanted because it just

24   doesn't exist.  What he's now asking for--

25           THE COURT:  Except it did exist at one time as I

1   understand it.

2         MR. COOPER:  We have given an extensive interrogatory

3   explaining the history of the drives themselves.  One of the

4   disks that he was referring to was, I believe, Vaiaba, I

5   believe it's V-A-I-A-B-A--

6         MR. HORNICK:  Vaiaba.

7         MR. COOPER:  --Vaiaba hard-drive blind to Mark

8   Zuckerberg that Mr. Zuckerberg just started in September of

9   2003 before this case even existed and before the litigation

10  issue even existed.

11        THE COURT:  Well, wait a minute.  Let me stop you

12  there cause as long as you're talking about Mr. Zuckerberg, why

13  won't you turn over his hard-drive?  Mr. Hornick represents

14  that you said you would once it was found.  Now it's found.

15  Why won't you stay with your representation?

16        MR. COOPER:  We never agreed to turn over the

17  hard-drive forensic imaging by Mr. Hornick which is what--

18        THE COURT:  Well, what were you agreeing to turn it

19  over for, to put on a Christmas tree or something?

20        MR. COOPER:  No, we have copies of the hard-drive, I

21  mean--

22        THE COURT:  Yeah.

23        MR. COOPER:  I mean, that's, I mean, there's a

24  difference.

25        THE COURT:  He represented to me and if we get into a

1  point where I'm getting misrepresentations, I'm going to

2  tell you there are going to be very serious sanctions imposed.

3          MR. COOPER:  I understand.

4          THE COURT:  He represented to me in his argument that

5  you had agreed to, if, when this hard-drive was lost that you,

6  if it were found you'd be willing to turn over the hard-drive.

7  Mr. Hornick is that what you represented?

8          MR. HORNICK:  Yes, Your Honor, three times.

9          THE COURT:  That's all I want to know--

10         MR. HORNICK:  All right.

11         THE COURT:  --just yes.

12         MR. HORNICK:  Okay.

13         THE COURT:  Now, are you saying you did not make such

14  a representation?

15         MR. COOPER:  For forensic imaging?  It's my

16  understanding--

17         THE COURT:  Well, I mean, you know, and it's not a

18  question - we're willing to turn it over, you know, if there's

19  no exception, you're willing to turn it over.  Now did you in

20  fact represent you'd be willing to turn it over when it was

21  found, if and when it was found?

22         MR. COOPER:  Your Honor, as I recall the answer is no

23  but I don't want to misrepresent--

24         THE COURT:  All right.  Then Mr. Hornick--

25         MR. COOPER:  If Mr. Hornick can point me to what he's

1  referring to as my representation, it might be easier.

2           THE COURT:  Go ahead, Mr. Hornick, please do that.

3           MR. HORNICK:  Yes, Your Honor.  Thank you.  We have

4  three specific examples, Your Honor.  The first is the November

5  18th hearing, page 34.  I'm going to see if I can put this up on

6  the screen.

7  (Pause)

8           MR. HORNICK:  This is from page 34, the November 18th

9  transcript.  The Court said, and we're talking about the

10  imaging, should we be allowed to do the imaging, and the Court

11  said, "I know, but if you don't object except on the grounds of

12  burden and it's not a burden to you and it's all at their

13  expense and you have all the other protections, I don't see a

14  basis for denying it."  And Mr. Chatterjee said, "Your Honor,

15  I'm fine with that with respect to Mr. Zuckerberg."  Then the

16  second example is that if we look at the response to request

17  number 184, which is in our motion to compel documents

18  beginning with 171, and covered 171, 174 to 182 and I'm sorry,

19  Your Honor, but I don't know the Court's docket number on that,

20  if you look at their response with respect--

21           MR. COOPER:  126?

22           MR. HORNICK:  That's--

23           MR. COOPER:  Docket 126.

24           THE COURT:  Yeah, it's 126.

25           MR. HORNICK:  Docket number 126.  And with respect

1    to, I'm sorry, it's number 184, request number 184 which in

2    our motion is page 15.

3    (Pause)

4            MR. HORNICK:  And this request sought, if you look at

5    request number 185, this request sought the hard-drive, the

6    hard-drive referred to on page 15 of the Facebook defendants'

7    opposition to our motion to compel imaging.  That's what I

8    quoted from earlier today, Your Honor.  That is where they said

9    the device had been lost.  And I'll get to this quote, that's

10   the third example, but for the moment to focus on this, this is

11   request number 185, this is requesting the hard-drive.  In the

12   response – I'm sorry, Your Honor, I wasn't actually prepared to

13   – I have to correct what I said.  184 is the one that I'm

14   talking about.  This is number 184.  184 requests the

15   hard-drive referred to in defendants' response to production

16   request number 30.  This is the one of which the face match

17   codes supposedly existed.  It is the same hard-drive that would

18   be used during the relevant period and the defendants' have now

19   admitted in response to request number 184 and 185 that the

20   hard-drive referred to in request number 30 and the hard-drive

21   referred to in the August 18th brief are the same one.  Request

22   184 and 185 requested these as if they were two separate

23   devices.  In response the defendant said they are one device.

24   This request asks for the hard-drive and in the response, which

25   is at the top of the next page, they say, "defendants have

1  already performed a reasonable search and produced

2  responsive material but will produce additional responsive

3  matter to the extent it is newly discovered.   The responsive

4  matter to this request is the hard-drive." The third example,

5  Your Honor, is that in the August 18th brief that the defendants

6  filed, I don't have the brief with me today, I will represent

7  to you that this is an exact quote from the brief at the top

8  of, first full paragraph on page 15 of the defendants'

9  opposition to our motion to compel imaging they said,

10 "plaintiff incorrectly makes much of the absence of

11 Zuckerberg's computer that is no longer in his position.

12 Defendant Zuckerberg would be willing to provide the hard-drive

13 he had during the winter of 2003-2004 but despite extensive

14 searches he does not have it." Those are my three examples,

15 Your Honor.  I stand by them.

16          THE COURT:  Okay.

17          MR. COOPER:  Well, first of all page 34 is the

18 easiest.  I'd rather, if Your Honor will allow me, I'll hand up

19 the whole transcript.

20          THE COURT:  I should have that but I don't.

21          MR. COOPER:  I have a copy, Your Honor.  This is a

22 copy of the entire transcript, Judge.

23          THE COURT:  All right.  If that's an extra copy why

24 don't I just take that?  I'm sure it's in the stuff here.  And

25 you want me to look at page 34?

1          MR. HORNICK:  Yeah, but, I mean, Mr. Hornick

2   didn't start where you need to start.  Start on page 33 line

3   19.  Note, "Did you ask on – did they ask on interrogatories

4   what the name of the company was?"  Mr. Chatterjee, "I don't

5   think they did", which he was talking off the top of his head,

6   "I can't recall for certainty.  They may have, but I can't."

7   The Court, "Well do you have any problem letting him know the

8   name of the company and the address of the company?"

9   Mr. Chatterjee, "No."  And we didn't.  They actually subpoenaed

10  Equinox.

11         THE COURT:  Oh, all right.  And that's the reason I

12  put in the order that they could do that?

13         MR. COOPER:  Yeah.  The Court, "Okay, all right.

14  Well, I know it's not within your possession, custody or

15  control and it's going to require another method of obtaining

16  discovery.  Anything else you want to say on this?"  Mr.

17  Chatterjee, "Your Honor, as I said we've all placed that

18  Mr. Hornick is recommending, and what he didn't get to finish

19  is, search.  The Court, "I know, but if you don't object except

20  on the grounds of burden and it's not a burden to you and it's

21  at their expense and you have all the protections, I don't see

22  a basis for denying it."  This is what Mr. Chatterjee is

23  responding to, that point of yours.  Your Honor, I'm fine with

24  that with respect to Mr. Zuckerberg.  But there's no discussion

25  whatever of the hard-drive in terms of production of it to the

1    defendant.  This is about where do we search because it's in

2    our custody and control.  Equinox as Mr. Chatterjee informed

3    you was not.  Mr. Zuckerberg being one of the defendants

4    certainly is.  This is not about producing the

5    hard-drive.  This is about exactly what your court order

6    contemplated.  Where would we search to make certain a diligent

7    search had been performed.

8            Now as for the going back and forth between the

9    hard-drives, Mr. Hawk, who represented all of the defendants at

10   the time request for 30 was requested, and I conferred.  And to

11   the best of our knowledge, at no point did we ever state that

12   we would produce the hard-drive to Mr. Hornick or the

13   defendants in the way they're describing.  What we said and

14   what if you look carefully at the response that they cited to

15   184 to the extent relevant information exists.  Again, Your

16   Honor, that was subject to this whole debate about how forensic

17   retrieval would occur.  It wasn't a wholesale we will produce.

18   What you've just heard had virtually four different attorneys

19   over here confused and then when we finally saw what was the

20   basis of the argument, we understood why we were confused.  We

21   didn't make the representation that Mr. Hornick is saying.  I

22   mean, the best proof to that is your own transcript.

23           Again, I would like to go back to the point, we have

24   seven matters on file.  If Mr. Hornick feels there's been a

25   deficiency in this type of brevity with respect to the

1  hard-drive forensic recovery, he should actually put it in

2  the notice motion so exactly these types of misunderstandings

3  do not get decided ad hoc and in the abstract.  I mean, all of

4  us here are, understand your admonishment not to misrepresent.

5  The risk is that we will inadvertently misrepresent because of

6  confusion when we don't understand the full extent of what the

7  defendant or the plaintiff is trying to ask the defendants to

8  concede to.  That is certainly something the Court can

9  recognize is not in the interest of anybody in here and

10  certainly not in the Court's own interest.

11         But having said that, I will make one other point.  I

12  would ask the Court to understand with everything that was said

13  here today, an offer was made to Mr. Hornick multiple times

14  over the last month.  That offer is, if you think we didn't

15  find the right source files and they exist on the drives that

16  have been searched, we would take up the very solution that

17  Mr. Hornick offered in the hearing in November, not as he

18  characterized it, give him the forensic evidence.

19         There was a vast amount of briefing on the issue of

20  the extremely rare cases where that relief is ordered by any

21  court.  And in all most uniform position of the courts is, in

22  order to protect attorney-client and virtually all the privacy

23  rights of the individuals and all the other matters that may be

24  subject to the extraneous data available on these imagined

25  files, they'd be given to a third party appointed by the Court.

1  In at least one of the cases the court referred to it as its

2  own special master.  That independent expert can search and

3  tell the parties if it feels there was an inadequate search,

4  what data should have been found that wasn't and then it vies,

5  here it is and we go from there.  We offered to do that with

6  this proviso.  We are so confident and we'll even go back - we

7  haven't offered to Mr. Hornick on key word searches but even

8  with that proviso, we're so confident that any source code that

9  could be located at all on any of these forensic image files

10 has been produced to him that our offer was give it to a third

11 party neutral.  Let someone in the position of a court who is

12 an expert make that decision and whoever the mediator feels was

13 in the greatest right, if the special master felt that the

14 defendants did an adequate job then plaintiff pays.  If the

15 special master felt that we did an inadequate job, defendants

16 pay.  That is a fair and neutral evaluation.  It is not made ad

17 hoc at a hearing on arguments that haven't even been briefed

18 before the Court.  It had been referred to Mr. Hornick at least

19 three times in letters dating into January.  Most importantly,

20 it is the very, very solution Mr. Hornick himself asked the

21 Court in November.  It is only because, as I said, the data

22 that has been produced to him is not satisfactory to his claims

23 that now we are getting all these other extraneous arguments

24 relating to slack space, relating to meta data, relating to

25 extensions that aren't source code extensions.  It is only

I-42

1    because of that that we are hearing these arguments today

2    instead of the arguments that are on calendar.

3              THE COURT:  All right, let me hold that issue for a

4    while and let's move on to the other motions.  And let's start

5    with the earliest, is number 52, which is plaintiff's motion to

6    compel answers to Interrogatories 6, 9 through 14, 16 and 18.

7              MR. COOPER:  Okay.

8              THE COURT:  And that's plaintiff's motion so I'll

9    hear plaintiff.

10             MR. HORNICK:  Yes, Your Honor.

11   (Pause)

12             MR. HORNICK:  Starting off, Your Honor, with

13   Interrogatory number 6, this interrogatory requests the factual

14   basis for the counterclaims that the defendants have raised,

15   and I should start by saying that this relates to all

16   counterclaims.  The defendants are holding up all of the

17   discovery that we're going to discuss today because of their

18   motion to compel a more particularized identification of trade

19   secrets.  And yet this request and all of the other requests we

20   will talk about today do not relate solely to the trade secret

21   claim.  And in fact this particular request doesn't relate to

22   the trade secret claim at all, and yet the defendants have

23   refused to provide more than conclusory statements and

24   arguments to support the counterclaims that they've made.

25             In our motion to compel we gave some very specific

I-43

1    types of facts that they could describe to give us an answer

2    to this.  They ignored those arguments in their response.  What

3    we're looking for is the facts about Mr. Zuckerberg's day to

4    day activities from around mid-November until around

5    mid-February, mid-November of 2003 to mid-February of 2004.

6    They could give us that as support for their argument that they

7    have counterclaims, valid counterclaims.  They could tell us

8    how the process that Mr. Zuckerberg used to create the Facebook

9    was independent of the work that he did for Harvard Connection.

10   They could tell us the source of his ideas for the Facebook if

11   they were not in fact the Harvard Connection.  They could tell

12   us what work he performed on Harvard Connection.  Where is it?

13   When did they deliver it?  How could Harvard Connection launch

14   using the work that he provided.  They could tell us how in

15   detail is the facebook different from Harvard Connection.  We,

16   one of the counterclaims is that we alleged that the Facebook

17   is a clone of Harvard Connection.  Well, if they say it's not,

18   tell us the facts, why isn't it?  These and other types of

19   facts--

20              THE COURT:  Are we looking at the same interrogatory?

21              MR. HORNICK:  Number 6?

22              THE COURT:  I mean, Interrogatory 6 says describe the

23   false and defamatory fact for representations--

24              MR. HORNICK:  Yes.  That's right.

25              THE COURT:  --and the date and location of

 1  representations and facts supporting the allegation if

 2  they're false.

 3        MR. HORNICK:  Yes, that's right, Your Honor.

 4        THE COURT:  And just, I mean you're saying they could

 5  have put in this, they could have put in that.  They could have

 6  put in all sorts of things, but why is what they said not

 7  responsive to the interrogatory?

 8        MR. HORNICK:  Because what they said is purely

 9  conclusory statements.  In other words, if you look at the

10  statements that they allege are the defamatory statements they

11  are things such as that our client said that the Facebook is a

12  clone of ConnectU, of Harvard Connection.  And they say, so we

13  say well what's the basis of that?  What's the basis of your

14  allegation that that is not true?  What is your basis of the

15  allegation that that's a misrepresentation?  And they just say

16  the negation, it's simply not a clone.

17        THE COURT:  No, they say Mr. Zuckerberg did not use

18  or copy any of the work.  I mean, it sounds to me, frankly,

19  that this, you know, if you want something more you ought to

20  get it in deposition.

21        MR. HORNICK:  Well, the problem, Your Honor, is that

22  I might have agreed with that before the deposition limit was

23  changed to seven hours, but we have an awful lot to cover in

24  this case, and I frankly, I don't want to waste it during the

25  deposition on what I view as baseless counterclaims.  I'd

1    rather use an interrogatory for what it's intended to be

2    used for and get the facts that support their counterclaims.

3    They've given us only conclusory statements.  If you look at

4    all of those statements, they're just simply saying we didn't

5    do this.  We didn't do that.  I want to know what the

6    underlying facts are.

7            THE COURT:  Well, if they didn't do something that

8    you allege, what other facts--

9            MR. HORNICK:  Well, that's why we gave examples, Your

10   Honor, because I expected exactly that response from them.  So

11   in our brief we gave some examples of the types of facts that

12   they could provide.  They could tell us if this is not a clone

13   then what were the differences?  Remember, we've never even

14   seen the Facebook from the date of the launch.  We don't have

15   that in discovery.

16           THE COURT:  I'm sorry, I'm denying interrogatory--

17           MR. HORNICK:  Okay.

18           THE COURT:  --motion to compel Interrogatory 6.

19   Let's move on to nine.

20           MR. HORNICK:  Number 9 is – this interrogatory

21   relates directly to damages, Your Honor.  It is asking for all

22   of the Facebook's investors and investments that are made in

23   the Facebook and any kinds of financing and then information

24   relating to meetings, and this interrogatory is related to

25   Interrogatory number 23.  This is how I said we might be able

1    to handle a lot of these at the same time.  Interrogatory 23

2    is in the motion with the docket number 121, and it's also

3    related to request numbers 70, 71 and 171.  And this

4    information really relates directly to the damages claims, the

5    damages for all of the claims that we've asserted, again, not

6    just trade secret claims.

7            The Facebook has had enormous growth and enormous

8    success from the date that it launched.  It launched in

9    February of 2004 when it had zero users that day.  It now has I

10   believe about 8,000,000 users.  The media gives it a value of

11   about $100,000,000, and investors have pumped money into it.

12   And the Facebook's gain is our clients' loss or at least part

13   of our clients' loss.  So we need to know everything about

14   who's invested in it and how much they've invested and how much

15   the company is worth.

16           THE COURT:  Okay.  Next, 10.

17           MR. HORNICK:  Ten.  Ten relates to developers and

18   owners, shareholders, anybody who holds rights in the Facebook,

19   directors and officers.  They've given us a partial answer.

20   They identified only the names of their co-developers, people

21   who developed the code, their directors and their officers.

22   But we made some arguments about why that was incomplete and

23   why they had not provided all of the information that we

24   requested, and for the most part they ignored those objections.

25   They said, we don't know what rights holders means.  We said

I-47

1  well that would be people who hold rights in the Facebook.

2  They said they don't know what code developers other than, we

3  don't know what developers are other than code developers.  We

4  said, well, it would be people who developed the Facebook in

5  any other way except for writing code.  So what we're asking is

6  that they provide all of this information.  Now it's directly

7  relevant to who the key players were, who we want to depose.

8  And incidentally, in terms of who an investor would be, they

9  didn't identify one of the

10  co-defendants, Mr. Saverin.

11        It would also be relevant to an argument that

12  defendants have made.  They have said that Mr. Zuckerberg could

13  not possibly have been a partner of the Harvard Connection

14  founders because there was no written agreement to that effect.

15  But we believe that the documents that the Facebook has, its

16  own corporate documents, will show that they didn't have any

17  formalized agreements between their partners either until very

18  late in time.  So if they're going to take the position that

19  they are partners together before they had that agreement, they

20  have to concede our argument that the Harvard Connection

21  founders were partners with Mr. Zuckerberg.

22        Also, this information is directly relevant to

23  whether the Facebook defendants had standing to assert their

24  counterclaims.  Who owned the company at the time that the

25  counterclaims were filed?  And also whether the individual

I-48

1  defendants can hide behind the corporate shield.  Also, who

2  worked with Mr. Zuckerberg before the Facebook launched?  And

3  also who worked at the Facebook when ConnectU was launched?

4  This level of detail is called for by this interrogatory and it

5  is also related to request number 107 which asks for documents

6  to this effect.

7            THE COURT:  Okay, 10 - 11, excuse me.

8            MR. HORNICK:  Eleven.  Eleven asks for information

9  relating to which universities were available on an operational

10 basis on the Facebook or with the Facebook on a month to month

11 basis from the time of launch.  Number 12 relates to registered

12 users totaling by school on a daily basis from the time of

13 launch.  Number 13 relates to hits per day and the total per

14 school, total and by school from the time of launch.  And

15 number 14 relates to hits per day by the same user.  Media, or

16 at least one interrogatory answer says that the average student

17 visits this site six times per day and we are asking for this

18 detailed information.  All they've provided us is the answer

19 for one day.  And we need this information so that our expert

20 can track the growth of the Facebook from the time that it

21 launched to the present day to show the viral growth of the

22 Facebook, to show the exponential increase in value, to show

23 how it really has kind of a captive and some people would say

24 addicted audience.  And this is also related to request numbers

25 85 to 89 which are asking for the document back-up for this,

I-49

1   and also request number 186 which asks for web activity logs

2   which to some extent overlaps with this information.  And as I

3   said, this is related directly to our damages claim and that

4   what we've said is that our expert needs this information and

5   that if our expert doesn't have this information the defendants

6   should be precluded from criticizing any extrapolations that

7   our expert makes regarding this information.

8               THE COURT:  Sixteen.

9               MR. HORNICK:  Number 16 is asking for the value of

10  the Facebook.  And that one is also related to Interrogatory

11  number 23.

12              THE COURT:  The value with respect - in what sense?

13              MR. HORNICK:  Well, the value, the monetary value of

14  the Facebook.  The request asks for what is the monetary value

15  of the Facebook?

16              THE COURT:  The corporation?

17              MR. HORNICK:  Yes, I'm sorry, of the Facebook, Inc.

18  or of the website, but I think that they are really one in the

19  same.  So we asked for the value.  They objected that they

20  don't know what monetary value means and we said it's an

21  obvious term.  Anybody knows what monetary value means and they

22  came--

23              THE COURT:  Well, why doesn't the financial

24  statements for the pertinent years give you that information

25  which they've made available to you?  They say you did pursuant

1  to Rule 33(b).

2           MR. HORNICK:  Two reasons, Your Honor.  One is that

3  they haven't produced all the financial statements.  And two,

4  those financial statements do not reflect the market valuation

5  that the market sees in the Facebook.  If you look at the

6  media, the media says it's worth $100,000,000.  The financial

7  statements, at least none of the financial statements that have

8  been given to us reflect that market value.

9           Their expert is going to commit to a value.  He's

10  probably going to do it in opposition to our expert.  There's

11  no reason why if their expert is going to commit to a value

12  they can't tell us what that value is.

13           THE COURT:  You're talking about a market value.  In

14  other words what the company could be sold for?

15           MR. HORNICK:  What the company could be sold for.

16  They can qualify whatever value they provide.  I assume they

17  will define it.  They've said it could mean all different kinds

18  of things and I've said fine, tell us what they are and tell us

19  how you define them.

20           THE COURT:  And as of what date does this

21  interrogatory seek the information?

22           MR. HORNICK:  Well, this interrogatory was actually

23  as of May 31st of 2005, but since we haven't had an answer, we'd

24  like to have an up-to-date answer and we will certainly be

25  seeking updated responses to various discovery requests when we

I-51

1    get close to trial under Rule 26(e).

2              THE COURT:  And I guess the last one was 18.

3              MR. HORNICK:  Number 18 is the factual basis for the

4    affirmative defenses.  And here they have identified 26

5    affirmative defenses.  Then we ask what's your factual basis

6    for them?  And they gave us a conclusory answer, and we have

7    asked for the detailed factual basis for particular items that

8    are listed in our motion or that are listed in our motion, yes,

9    in our motion.  Page 16 we have items one through, I believe,

10   one through 21 where we're asking what is your factual basis

11   for this allegation?  Or I should say what is your factual

12   basis for this defense?

13             THE COURT:  Okay.  Okay.  I think that does it on 52.

14   I want to hear the defendants.

15             MR. COOPER:  Your Honor, I'm going to try and

16   recognizing time is precious to the Court and also logistically

17   you will see after this motion ours is the next up, and I

18   believe once we address the core issue which is at our next

19   motion, you will understand how it relates to the present one

20   and all others.  And hopefully I, I'm confident the Court will

21   see a global solution I will propose.

22             As it relates to the particulars, and I'll just go

23   through very quickly, understanding that what I'm referring to

24   is the very next motion that's on your docket relates to our

25   motion to compel a particularized trade secret designation,

1   which is a general objection we have to all of these

2   requests to the extent that they relate to information and

3   theft, we have not yet received an adequate trade secret

4   definition.  Again, I'll refer to that in a moment.  I just

5   want to call it to your attention that every single one of

6   these interrogatories is subject to it, that particular defense

7   but it deserves its own argument and its own time.

8           The respect to defamatory statements, I do not know--

9           THE COURT:  Well, let's start with Interrogatory 9.

10          MR. COOPER:  Which is?

11          THE COURT:  Well, that's one of the ones they're

12   seeking to compel.

13          MR. COOPER:  All right.  Well, first of all,

14   plaintiff stood up and said that the identity of each and all

15   investors, potential investors, loans, including but not

16   limited to loans from any individual defendant from any

17   non-party, including Peter Field, investments, gifts, let's

18   see, sports and entertainment facilities, contributions, offers

19   including but not limited to investment offers and offers to

20   purchase or buy out all or part of the Facebook business, forms

21   of financing contributed or received by the Facebook, and any

22   or all individuals used in connection with, related to the

23   Facebook website and all meetings with potential investors.

24   What is it he really wants?  If that isn't the definition of a

25   compound interrogatory, I don't know what is.  He stood up and

1    said, well, it's all relevant to damages.  I would love to

2    know how entertainment tickets is relevant and how his damages

3    expert expects to use baseball tickets as an evaluation of

4    damages.  What is it the plaintiff really wanted in that

5    interrogatory?  It is a fundamental problem with all of these

6    interrogatories, and all I have to do is repeat the question to

7    understand the problem.  This is the quintessential compound

8    interrogatory.  It does not ask the same thing.  It asked for

9    investors and then it asked for sports tickets.  It asked for

10   contributions and then it asked for financing.  It asked for

11   offers and it asked for loans from individual non-parties.

12   These are not the same thing.  Defendant threw in as much as it

13   could into one interrogatory in hope that it would stick

14   together as a conglomerate of what it wants.

15          Now the Court may understand what you think is

16   relevant in this, but our objection recognized that this was a

17   compound interrogatory in its quintessential sense.  Maybe you

18   can tell me what you think is the most relevant.

19          THE COURT:  Well, our local rules--

20   (Pause)

21          THE COURT:  Local Rules 33.1(c)(2) says no part of an

22   interrogatory shall be left unanswered merely because an

23   objection is interposed to another part of the interrogatory

24   and, which would seem to indicate that you're under an

25   obligation to indicate what in response to this interrogatory

I-54

1  you are willing to produce and answer that.  And so that's

2  the question I'm going to put to you, what are you willing to

3  give in response to interrogatory 9?

4          MR. COOPER:  Your Honor, subject to understanding the

5  trade secret issue is out there at the time that this--

6          THE COURT:  Well, what does the trade secret have to

7  do with the, of an investors into the corporation?  How is that

8  interfaced?  I don't understand that.

9          MR. COOPER:  When we get to the trade secret, I can

10 make a more--

11         THE COURT:  I mean, I understand where you're talking

12 about until you have more information you might not be able to

13 flush out your affirmative defenses or your basis of your

14 claims but that's not Interrogatory 9.

15         MR. COOPER:  No, I understand that, Your Honor.

16         THE COURT:  So I don't understand why – I want to

17 know what you're willing to give in response to Interrogatory 9

18 which the rule would seem to indicate that you were required to

19 do when you were presented with it, although I agree with you

20 that it's a compound interrogatory, and I agree with you that

21 it very well may have some points that under the rule would be

22 counted as separate interrogatories for purposes of the limit,

23 but what are you willing to, what are you willing to give,

24 anything?

25         MR. COOPER:  Well, I believe we actually gave the

I-55

1   investment but we can if we haven't--

2              THE COURT:  Well that's not what you said--

3              MR. COOPER:  Before, before I--

4              THE COURT:  That's not what you said in response to

5   Interrogatory 9.

6              MR. COOPER:  Yeah.

7              THE COURT:  You said you're not going to give them

8   anything--

9              MR. COOPER:  Yeah.

10             THE COURT:  --or you objected to everything.

11             MR. COOPER:  Your Honor, let me restate, subject to

12  an argument you will be hearing shortly as to why it's

13  premature for us to give any of the information at the time at

14  which it is not premature subject to appropriate

15  confidentiality protection, we'd certainly give them the names

16  of the investors.

17             THE COURT:  And the amounts?

18             MR. COOPER:  If the Court views that as relevant we

19  will produce it.

20             THE COURT:  Well, I mean, if they're trying to figure

21  out a value I suppose the amount of capital going into a

22  corporation is going to be relevant.

23             MR. COOPER:  If it is, then we'd certainly, Your

24  Honor, I'm not here to try--

25             THE COURT:  All right.

I-56

1          MR. COOPER:  --and belie - but Your Honor

2    understands that it is subject to high, high sensitivity of

3    confidentiality both to the investor and to the client.

4          THE COURT:  Well that's a different problem.

5          MR. COOPER:  I understand.  I just don't want to

6    start hearing evaluations in open court.

7          Your Honor, by the way, if what you just said is true

8    then what it should probably be is by investment not by

9    individual because what you're talking about, who the investor

10   is isn't--

11         THE COURT:  Well, you said you were willing to give

12   them the names of the investors and I was saying that you

13   needed some more.  And now since I said you needed something

14   more you're going to go back and say you're not going to give

15   them the list of investors?

16         MR. COOPER:  I guess--

17         THE COURT:  Is that what--

18         MR. COOPER:  --because what I heard you say is that -

19   I will be honest, Your Honor, I'm not here to deny what my

20   concern is.  The plaintiff has already served 10 subpoenas, a

21   number on our investors.  The minute they see the names of all

22   the other investors, I'm just concerned that I'm going to start

23   getting calls that virtually every one of our investors is

24   getting a subpoena.  And that's somewhat oppressed--

25         THE COURT:  Aren't there limits to the number of

1    depositions that can be taken?

2          MR. COOPER:  Certainly there are limits to number of

3    depositions but not to the number of subpoenas.

4          THE COURT:  What would you be subpoenaing them for

5    other than give a deposition testimony?

6          MR. HORNICK:  Documents, Your Honor.

7          THE COURT:  Oh.

8          MR. COOPER:  And, Your Honor, let me make it clear,

9    they already have done that.  They've identified a number of

10   investors and they have sent subpoenas to them.  We have to

11   date not objected on the basis of any need for a protective

12   order, but if what they're after is the total valuation, then

13   why are they going to do that?

14         THE COURT:  All right.  Let's move on to number 10.

15         MR. COOPER:  Well, again, I have a couple of problems

16   with this.  Again, it is compound in a way that is very similar

17   to the problem previously.  It says developers, owners,

18   shareholders, equity owners, rights holders, directors,

19   officers, employees and independent contractors on a monthly

20   basis.  I believe we showed you in our response that that

21   information is subject to First Circuit concerns about the

22   employment records.  The plaintiff hasn't really articulated

23   what it really wants here.  Certainly, on a monthly basis it's

24   horribly overbroad no matter even if it were just by all

25   developers let alone all the other categories.  It might be

1  better to ask what is it that is most necessary about this

2  subject to the rights of the third parties that are protected

3  by First Circuit authority that recognize that this is an

4  improper request.  I believe we certainly could give them the

5  names of the officers and board members.  Can the Court

6  identify any other relevance beyond that?

7          THE COURT:  Well, it's not up to me.  All right.

8          MR. COOPER:  And so the Court recognizes, I'm

9  looking, I didn't even know it when I just said it, but we

10  did—

11          THE COURT:  Well that's what I – I was looking at the

12  same thing.  How about 11?  Eleven I guess, 12, 13 and 14 are a

13  bit similar.

14          MR. COOPER:  What the plaintiff requested here and

15  what I have articulated to Mr. Hornick back in July is

16  extremely, extremely burdensome.  I had suggested that we

17  identify the number of members registered to use the face.com

18  website as it exists in our own records to the extent it exits

19  as of like a date certain of every year, but what they're

20  requesting is on a daily basis.  And I never got a limitation

21  beyond the daily basis.  Understand the procedure here.  We

22  were negotiating on these very terms.  On July 28th before we

23  had received some of the documentation we had anticipated from

24  plaintiff, they moved to compel.  So certain of the limitations

25  we had discussed, limitations that plaintiff had discussed and

1    limitations that defendants had discussed didn't make it

2    into anybody's motion.  One that I know here didn't is the

3    daily basis issue.  I mean, I definitely know that we can

4    identify the number of registered users on a date certain of

5    every year.  How about January 1?  We can identify--

6            THE COURT:  Is that difficult?

7            MR. COOPER:  As I recall from talking to the client,

8    they were trying to find out if they even have that

9    information, but I believe we were under the impression that it

10   could be ascertained.

11           THE COURT:  How difficult?

12           MR. COOPER:  Yeah, we couldn't produce the data as

13   they requested.  That's the problem.

14           THE COURT:  In what respect?

15           MR. COOPER:  Daily basis, number of person--

16           THE COURT:  But you said you could do it on specified

17   dates.

18           MR. COOPER:  Yeah.

19           THE COURT:  And my question was how difficult is

20   that?  I don't, just by dates I don't mean everyday, but I'm

21   just trying to find out how difficult is it to give that

22   information as to certain, a certain date let us say in a

23   particular year.

24           MR. COOPER:  Your Honor, I would be a liar if I said

25   I knew the precise answer to that question.  I would rather not

I-60

1    misrepresent then make a representation that I know.  As I

2    said, we were exploring--

3          THE COURT:  Well 11 asks for, they're talking about

4    monthly basis.  In other words, identify the universities,

5    college and other schools at which thefacebook.com is available

6    or operational on a monthly basis from August 23 to the date of

7    defendant's response to this interrogatory.

8          MR. COOPER:  Well, the university, colleges or other

9    schools can be identified.

10         THE COURT:  Okay.

11         MR. COOPER:  Whether it is available on an

12   operational or monthly basis is a whole different matter.  I

13   can give you as of--

14         THE COURT:  Well, did you give dates on which they

15   became operational, available and operational?

16         MR. COOPER:  When we inquired of the client, the

17   answer wasn't clear that they had that, the way that they

18   overwrite their data that they had that information.  They can

19   give you the snapshot as it exists right this moment, but the

20   problem is you're talking about a matrix that changes on a

21   daily basis or at least--

22         THE COURT:  Well isn't, once the thing becomes

23   operational at a particular school doesn't it remain so?

24         MR. COOPER:  Well, not necessarily, I mean, a school

25   can - I suppose there are schools that are on the periphery

1    that, they're closed--

2        THE COURT:  Oh, I mean if the school closes, that's

3    different.  All right.

4        MR. COOPER:  See the problem is, Your Honor, and they

5    get--

6        THE COURT:  And then 12, 13 and 14 your problem is--

7        MR. COOPER:  Yeah.

8        THE COURT:  Twelve is the daily?

9        MR. COOPER:  Yeah.  One other thing that, I know this

10    is hard to understand, but the Facebook covers almost every

11    university in the United States.  When you have an ongoing

12    operational system, that data changes on a regular basis.  To

13    go into the server to recall that information when it isn't

14    data that is actually kept by the company in its ordinary

15    course of business is the whole problem.  They're asking for

16    information that isn't--

17        THE COURT:  Well we got two things.  Number one - we

18    got three things actually.  They request certain information.

19    Are you able to get it for them?  If the answer is, no, it's

20    not available, that's one thing.  Number two, is it available

21    and hard to get and if so how hard?  That's the burdensome

22    issue.  And the third thing is what is available and what is

23    easily produced.  And I'm not sure I have a sense as to those

24    three questions with respect to these interrogatories.

25        MR. COOPER:  And that's fair, Your Honor, because

I-62

1    what I know is able to produce is the moment that we stand

2    right now.

3             THE COURT:  Well, you did that--

4             MR. COOPER:  Yeah.

5             THE COURT:  --in 12, 13 and 14.

6             THE COURT:  Right.

7             MR. COOPER:  It gets progressively harder as the data

8    is overwritten.  If the Court feels that a more supreme effort

9    is to be made, we'll abide by any motion to compel--

10            THE COURT:  All right.

11            MR. COOPER:  --that occurs here.

12            THE COURT:  All right.

13            MR. COOPER:  I am not here to say that I know for a

14   fact it's impossible.

15            THE COURT:  Okay.

16            MR. COOPER:  I only know what I know which is that

17   I've been told at least that it's difficult.  Mr. Hawk, who may

18   have had an earlier, I'll defer to him if he thinks I've not

19   said anything he himself knows differently from when he was

20   representing--

21            MR. HAWK:  No, I'm afraid I don't know anymore on

22   this topic than you do, unfortunately.

23            THE COURT:  Okay.

24            MR. COOPER:  But, Your Honor, I also am sensitive

25   that I don't want to misstate.

I-63

1          THE COURT:  All right.  Number 16 is the--

2          MR. COOPER:  Monetary value.

3          THE COURT:  --monetary value.

4          MR. COOPER:  Yeah, the--

5          THE COURT:  Now what financial statements have you

6    produced?

7          MR. COOPER:  Yeah, we've produced balance sheets I'm

8    aware of.  I have a production log.  Balance sheets as of

9    December 31, 2004, profit and loss, statement of cash flows,

10   balance sheets of January 31, 2005, profit and loss, statement

11   of cash flows.  Balance sheet as of February 28, 2005--

12         THE COURT:  So you've given them the monthly balance

13   sheets?

14         MR. COOPER:  Well, these are college students.  We

15   produced the balance sheets that I know of that, as I stand

16   here now I don't know that we're withholding any balance

17   sheets.

18         THE COURT:  Okay.

19         MR. COOPER:  There may be more later on.

20         MR. HAWK:  What we did produce at the time was what

21   they had, an outsourced financial accounting group that was

22   sort of doing their finances but it was very, it was even a

23   smaller operation than when we responded to that, but we asked

24   their outside accountant so to speak to produce financial

25   statements and they did so and that's what we produced.  We

I-64

1  didn't hold anything back.  In fact we had them produce

2  exactly what they used for their investors and so on.

3          MR. COOPER:  Let me make something clear here, Your

4  Honor.  We're not talking about a Fortune 500 company.

5          THE COURT:  I understand.

6          MR. COOPER:  We're talking about a bunch of college

7  students.  Certainly they're running a very successful

8  enterprise but they still are, it's only in recent times that

9  it's grown more into the more traditional silk and valley (ph)

10  model with perhaps greater sophistication than what you are,

11  and more along, akin to what you are used to, but when this

12  company started these were college students.  It isn't like

13  they kept the type of records that you are probably more

14  accustomed to seeing in a case like this.

15          THE COURT:  And number 18 you say that is related to

16  the trade secret issue that's the next motion?  The factual

17  basis of the affirmative defenses?

18          MR. COOPER:  Well, we gave a rather extensive answer

19  to that.  What plaintiff claimed is that it's conclusory.  We

20  did make this defense in part subject to our trade secret

21  defense, but we didn't fail to answer it either.

22          THE COURT:  Okay.  All right, I'll take that motion

23  under advisement.

24          MR. COOPER:  And, Your Honor, so that there is no

25  failure to believe our sincerity, I will do my best to get a

1    supplemental response to the part of those requests that I

2    actually told you myself that as I stand here today I don't

3    know the answer to it.

4         THE COURT:  Well, why don't you let me deal with it

5    first.

6         MR. COOPER:  Okay.  I just don't – you've made it

7    clear--

8         THE COURT:  I'd rather not – I'd rather try and cut

9    down on the number of filings that are coming in on this case.

10        MR. COOPER:  I appreciate that, but a lot of –

11   there's ultra-sensitivity to your points about not also wanting

12   to misrepresent.  I'm not meaning to stand up here and if I

13   make a mistake of my understanding, I don't want it to be seen

14   as that I'm trying to misrepresent anything.  I'm telling you

15   what I know, what I understand as of right now.

16        THE COURT:  Okay.

17        MR. COOPER:  And I'm just sensitive that I not make a

18   mistake.

19        THE COURT:  Okay.  All right, I've got to recess for

20   a telephone call, a conference call at one, and then we'll take

21   a luncheon recess and then reconvene.  Is there anything that

22   we can do between now and 1:00?  If this trade secret thing is

23   a biggie that's going to take some time, I'd rather not start

24   it now.  Are any of the other motions or something we can do

25   rather quickly?

I-66

1            MR. COOPER:  Your Honor, I believe in the interest

2   of every, at least certainly in the interest of defendants, I'd

3   just rather take a recess because I believe the other motions

4   are going to be so much easier to understand the context with

5   the trade secret issue--

6            THE COURT:  All right.

7            MR. COOPER:  --in front of them.

8            MR. HAWK:  The only other motion, the only exception

9   to that, I don't want--

10           MR. COOPER:  Yeah, 32.

11           MR. HAWK:  --to get in the way of that, Your Honor,

12  but I think the motion on the deposition that's of the 30(b)(6)

13  witness of ConnectU is one that could be dealt with I think

14  very quickly because I - the Court already has in front of it -

15  is it all right to--

16           THE COURT:  Is that the joint motion to compel

17  testimony from ConnectU, LLC's response to-

18           MR. HAWK:  Yes, Your Honor.

19           THE COURT:  --the defendant's amended 30(b)(6)

20  notice.

21           MR. HAWK:  Yes, Your Honor, that's the one.

22           MR. COOPER:  Yes.

23           THE COURT:  All right, I'll go to that.

24           MR. HAWK:  On that particular motion, Your Honor, the

25  issue I think is very straightforward.  We concluded during the

1    deposition, after the deposition that this particular young

2    man who was produced to testify as a 30(b)(6) designee for

3    ConnectU simply didn't understand or was not willing to fulfill

4    his obligation to answer questions.  He was evasive and just

5    didn't answer questions, and there's a rather extensive

6    discussion of that in the briefing that I think there are

7    rather extensive examples of it.  I can go over a couple of

8    those examples if Your Honor would like, but the bottom line is

9    we concluded that we really wanted to have the witness back

10   after an order by the Court that he give non-evasive, just

11   straightforward either yes, no, I don't know type of answers to

12   the questions.  Not to say that he didn't, you know, say

13   anything else but that if we were entitled to get much more

14   responsive answers than we did during that deposition.

15            THE COURT:  Okay.

16            MR. HAWK:  So that's the basis of it, Your Honor.

17            THE COURT:  Okay.  I'll hear the plaintiff?

18            MS. ESQUENET:  Your Honor, if I may speak to that

19   motion?

20            THE COURT:  Yeah.

21            MS. ESQUENET:  Defendants in this case in reviewing

22   the deposition overlook two salient issues.  First, it's not

23   that they deserve yes or no answers to questions.  It's they

24   deserve answers that are fair and accurate, and looking at the

25   deposition, you can tell that the questions that Mr. Hawk in

1    particular asked and Mr. Chatterjee were asking were loaded

2    questions, and it wasn't fair to ask the witness to answer them

3    in a yes or no manner.  So the witness elaborated in order to

4    have a complete and accurate answer on the record.  I think

5    we're all, you know, familiar with the yes or no questions that

6    are impossible to answer that way and that's why *Miller v.*

7    *Wasecka* (ph) requires that yes or no answers are only required

8    if the answer can be fairly, if the question can be only fairly

9    answered in that manner.

10           And additionally, it is plaintiff's position that

11   defendants did not completely meet and confer on this issue.

12   Specifically, plaintiff asked for a list of questions that

13   defendants believed were not answered.  That list was never

14   showed up and, therefore, even now defendants are, I'm sorry,

15   plaintiff is unclear as to which questions that defendants

16   believe are not answered.  And either Mr. Hawk or Mr. Cooper

17   I'm sure will tell you that they're not required to provide

18   such a list and that wasn't necessary.  But during the

19   deposition itself, on page 398 of the deposition, line 9

20   through 11, Mr. Chatterjee offers such a list.  At the end of

21   the deposition Mr. Chatterjee, one of the deposing attorneys,

22   says we will identify for you all of the questions for which

23   Mr. Winklevoss provided no answer.  No such list was ever

24   forthcoming.  And the motion similarly does not provide any

25   questions that the defendants believe were not answered.

I-69

1          It is our view, therefore, that this deposition

2    which was well over, actually it was almost eight hours, was

3    thorough and there's no need for re-deposition.  Moreover, even

4    at the end of the deposition, Mr. Hornick, Mr. Winklevoss'

5    attorney, offered to extend the deposition right there and then

6    for questions that weren't answered, that the defendants'

7    counsel believed weren't answered and defendants' counsel chose

8    not to take the witness and Mr. Hornick up on that offer, and

9    there's no reason to extend that testimony time today.

10          THE COURT:  All right, hold on just a second.

11   (Pause)

12          THE COURT:  I'm just trying to see, we have not with

13   this electronic filing we're not – does this all deal with the

14   August 9, 2005 deposition?

15          MS. ESQUENET:  Yes, Your Honor.

16          THE COURT:  And that I take it has been submitted as

17   Exhibit 10 to declaration of Joshua H. Walker?

18          MS. ESQUENET:  Yes, I believe the entirety of the

19   deposition was submitted as a motion.

20          THE COURT:  And how long is the deposition?

21          MS. ESQUENET:  I have the manuscript at 403 pages.

22          THE COURT:  Is that 403 pages with four pages to a

23   page or is that--

24          MS. ESQUENET:  It's a total of 403 pages.

25          THE COURT:  All right.

I-70

```
 1          MR. HORNICK:  Your Honor--

 2          THE COURT:  And how many pages is the manuscript?

 3          MS. ESQUENET:  100, not including the key word index.

 4          THE COURT:  Okay.  Do you have an extra copy of that?

 5          MS. ESQUENET:  I don't, Your Honor, but I believe you

 6  can have mine if you'd just let my colleague.

 7          MR. COOPER:  We do, Your Honor.

 8          THE COURT:  If you have one--

 9          MS. ESQUENET:  You know what, I do.  You can--

10          THE COURT:  It would just save me from printing it

11  out that's all.

12  (Pause)

13          MR. HAWK:  Your Honor--

14          THE COURT:  Well, let me find out, are you all done?

15  You made your points that you want to make?

16          MS. ESQUENET:  I've made my points to the extent of

17  the points that Mr. Hawk made.

18          THE COURT:  All right.

19          MS. ESQUENET:  If he says something else, I would

20  like an opportunity to respond.

21          THE COURT:  Fine.  Go ahead, you may say something

22  briefly and then we'll recess.

23          MR. HAWK:  All right.  Your Honor, just a couple of

24  examples, and it sounds like Your Honor is going to look at the

25  transcript yourself and I actually think that's a very good
```

1  idea.  But the notion that these were complicated questions

2  and are unfair questions that didn't get responsive answers, is

3  just not right.  At page 59, Mr. Chatterjee asked the witness,

4  "So did Mr. Mavin Curvey attend the strategy meetings?"

5  Answer, "Well to the extent that he knew, he knew that, as I

6  mentioned before that he understood there was a proprietary

7  project and he would put an input where he saw fit" which

8  didn't have anything to do.,

9         THE COURT:  Are you looking at 59 on the miniscript

10  or on the regular one?

11         MR. HAWK:  59 on the regular--

12         THE COURT:  Oh, all right.

13         MR. HAWK:  --page and it started at the very bottom,

14  line 25 is where the question starts.

15         THE COURT:  Okay, which of the--

16         MR. HAWK:  The question that starts, "So did

17  Mr. Mavin Curvey attend the strategy meetings", at the very

18  bottom of the page.

19         THE COURT:  I'm looking at page 59, which contains

20  233 to 236 of the miniscript.  Where are you?

21         MR. HAWK:  I'm sorry, maybe I can – can I look over

22  your shoulder?

23         MS. ESQUENET:  Oh, he's look – you were looking at

24  the page numbers in the bottom right hand corner, Your Honor?

25         THE COURT:  Yeah.

 1            MS. ESQUENET:  It would be page 15 of the

 2  manuscript.

 3            THE COURT:  Oh, oh.

 4            MS. ESQUENET:  Page 57 to page 60 of the deposition.

 5            THE COURT:  Oh, okay.  All right, now I'm on page 15

 6  of the miniscript and where are we now as far as – which of the

 7  pages of the manuscript?

 8            MR. HAWK:  59, Your Honor.

 9            THE COURT:  59, all right.

10            MR. HAWK:  At the very bottom.

11            THE COURT:  All right.

12            MR. HAWK:  "So did Mr. Mavin Curvey attend the

13  strategy meetings?"  Answer, "Well to the extent he knew, he

14  knew that as I mentioned before."  You see the answer there,

15  Your Honor?

16            THE COURT:  Yeah.

17            MR. HAWK:  I mean there are a lot of examples in

18  here.  The examples--

19            THE COURT:  Wait a minute.  Hold on just--

20            MR. HAWK:  --are actually called out.  I mean it's--

21            THE COURT:  Sure.  Just a second.  Just a second.

22  (Pause)

23            THE COURT:  I'm not sure there's very much more

24  you're going to get out of that line of questioning.  I mean,

25  he's basically saying that to, as I read it, to the best of his

 1   recollection he was there pretty much all of the time and

 2   otherwise was aware of what was going on.  I mean, it doesn't

 3   appear that the witness has a specific memory of specific

 4   meetings and who was present.  What more are you going to get

 5   if you're asking further questions on that one?

 6           MR. HAWK:  You may be right on that particular

 7   example, Your Honor.

 8           THE COURT:  Well, if that's the best example--

 9           MR. HAWK:  We may not get a lot more out of that, but

10   there are--

11           THE COURT:  If that's the best example you can give

12   me I'm not--

13           MR. HAWK:  That is not the best example I can give

14   Your Honor by a long shot.  The examples, first of all, are--

15           THE COURT:  Well, why don't we break and when we come

16   back give me your example of your best one, all right.

17           MR. HAWK:  All right.

18           THE COURT:  Okay.  We'll convene at quarter of two.

19   (Recess)

20   //

21   //

22   //

23   //

24   //

25   //

II-74

 1          THE CLERK:  Court is back in session.

 2          THE COURT:  Okay.  Give me your best, your best

 3  question.

 4          MR. HAWK:  All right, Your Honor.  I have it picked

 5  out and it starts at page 369, but what I would want to say is

 6  that I think to appreciate what happened at the deposition and

 7  defendants were really effectively deprived of the chance to

 8  examine this witness properly, you need to look at really the

 9  sort of totality of at least the examples that are pointed out

10  in Mr. Walker's declaration that was filed as document 92 on

11  our docket.

12          THE COURT:  369, what line?

13          MR. HAWK:  369, yes, sir.  Yes, Your Honor.

14          THE COURT:  Line?

15          MR. HAWK:  At the top, line 2.  "Did you overhear

16  Mr. Zuckerberg commit to anyone else at Harvard Connection that

17  he would respect the confidentiality of information that he had

18  been given about Harvard Connection?"  Answer:  "Specifically

19  phrasing that you use no.  I did not overheard him say those

20  words."  So that was good.  We got an answer.  Then I ask him,

21  "Okay.  Fine.  And did anyone, did Mr. Narendra ever tell you

22  at any time that he had obtained assurances from Mr. Zuckerberg

23  that Mr. Zuckerberg would respect confidentiality of Harvard

24  Connection information?  You know, as I said earlier, both

25  Mr. Narendra and Mr. Gowe, specifically Mr. Gowe explained to

II-75

1  Mr. Zuckerberg the proprietary and confidential nature of

2  the", and then I do interrupt.  I say, "That wasn't my

3  question, sir.  My question was, did Mr. Narendra ever tell you

4  that Mr. Zuckerberg had committed to him to respect the

5  confidentiality of Harvard Connection information?"  Then I

6  thought I had an answer because he says, "I'm not sure."  But

7  then he goes on to say, "I don't believe, I believe that in the

8  second meeting where we were all present, we made it very

9  clear, the proprietary nature of the site, making something

10  clear that it's proprietary is not, is the same effect of

11  telling someone, don't tell him you know."  And I said, "Not my

12  question."  And then he goes on and says, "Because

13  Mr. Zuckerberg understands what proprietary information is."

14  And I ask him the question again.  "I'm not asking what

15  Mr. Zuckerberg understood.  My question was very specific.  I

16  ask you for the third time."  Then Mr. Hornick objects and I'll

17  object that he's answered it many times.

18         THE COURT:  All right.  You don't need to go through

19  the objections.  Go down to line 25.

20         MR. HAWK:  All right.  "Did Mr. Narendra ever tell

21  you that Mr. Zuckerberg had committed in his presence to

22  respect the confidentiality of Harvard Connection information?

23  Let's just say I would say that, did he ever, yes or no, did he

24  ever tell you that?  Mr. Zuckerberg agreeing to become part of

25  the team and to answer any question that you might have like

1  let's not talk about micro this, that word, phrases, okay?

2  No, that's not what my question was." I want him to answer my

3  question. Then he says, "His agreement to complete that side

4  of the code and become part of the team was understanding and

5  acceptance of the fact that it's proprietary information as I

6  pointed out, C4, 46, whatever the document was, the fact that

7  Mr. Zuckerberg didn't use our code proves that he was fully

8  aware of it, so you know you're asking, I can't recall every

9  instance and every personal sentence that was said to Mr.

10 Zuckerberg and if he said yes or you know specifically in the

11 way that you're describing to this person that he understood,

12 what I'm saying, that by becoming part of the team he

13 affectively and directly knew it was proprietary and

14 confidential information. But you do understand, sir, that you

15 haven't answered my question?" And then there's a long

16 colloquy between counsel. And I think after that I gave up.

17 What I was trying to get out was the very simple answer like

18 I've gotten to my other questions that, you know, you didn't

19 hear, do you recall hearing these words?

20         THE COURT:  Right.  Okay. Let me take that under

21 advisement.

22         MR. HAWK:  And, Your Honor, on that same motion,

23 there is a part that we had also pointed out that the witness

24 had not been adequately prepared and that when we also

25 complained about speaking objections and we also talked about,

1    well, it's actually Mr. Cooper wanted to say just a couple

2    of words because that was a joint motion.

3              THE COURT:  Go ahead.

4              MR. COOPER:  Your Honor, I just want to

5    compartmentalize because it leads into the motion that matters

6    a great deal to the defendants, which is the motion for

7    information of trade secrets.  One part of the motion to compel

8    is not about testimony.  It's about the absence of testimony.

9    Plaintiff actually designated seven or three topics for

10   30(b)(6) deposition testimony, topic 7, 8 and 9.  Topic 7,

11   which again, part of the 30(b)(6) motion was ultimate code

12   produced by the Facebook, remember the face code in the file

13   entitled December.zip.  This is one of the source code files

14   that has actually been produced to the plaintiff.  All code you

15   contend infringes Harvard Connection code, ConnectU code or any

16   other matter.  Topic 8, of the code produced by the face code

17   in the file October.zip.  Again, this is a source code file.

18   All code that you contend infringes Harvard Connection code,

19   ConnectU code or any other matter.  Topic 9 and perhaps the one

20   that really underscores, of any code subsequently produced by

21   the Facebook, i.e. subsequent to the production of the files

22   labeled December.zip and October.zip prior to August 9th, 2005,

23   all code you contend infringes Harvard Connection code,

24   ConnectU code or any other matter.  Plaintiff refused to

25   produce a witness who had testified to any of these subjects.

1    Those subjects, Your Honor, are the plaintiff's copyright

2    claims.  There's virtually no reason that we should be in

3    Federal Court at all because there's no diversity between the

4    parties if the plaintiff cannot articulate a true copyright

5    claim.  To date, the plaintiff's position about copyright is

6    that because Mark Zuckerberg allegedly had access to the

7    Harvard Connection code and allegedly brought the Facebook to

8    term too fast for the plaintiff's belief to be done without

9    copying that there's a copyright violation.  However, as Your

10   Honor most certainly does not need me to tell you, copyright

11   requires substantial similarity.  As of this date, 20 months

12   after the lawsuit and including back in August, you are seeing

13   two categories of source code that is in fact the Facebook

14   source code.  We just asked what is it in that you contend is

15   in fact copy or infringes the Harvard Connection code.  This is

16   not our burden.  It is absolutely not.  This is substantial

17   similarity and the plaintiffs refuse to produce any witness and

18   as of this date, 20 months later, despite the fact that this

19   hearing began with a 45 minute explication of how we had not,

20   allegedly had not abided by the Court's requirement to produce

21   source code, here is source code we did produce and they won't

22   tell us what is in it that doesn't infringe.  If in fact as we

23   heard this morning this case is about spoliation, then say it.

24   Say you don't have any factual evidence of substantial

25   similarity, but a witness has to be able to testify to that.

 1  There's a related Interrogatory number 1 the plaintiffs have

 2  also not refused to base on, respond.

 3          Now, I want you to understand, to understand why this

 4  is so upsetting to the defendants, what the basis is for not

 5  producing that witness.  Ostensibly, it's because we designate

 6  those files confidential.  Under the protective order, we

 7  designated our files confidential.  That is wholly valid.  This

 8  is our source code.  Plaintiff complains that it's designated

 9  under the confidentiality as confidential and, therefore, can't

10  be shown to its lay witness.  Apparently we're not clear who.

11  That must be either Mark or Cameron Winklevoss or one of the

12  other investors in the company who don't even have a code

13  background.  What is it that the plaintiff can come into this

14  Court and complain about production after production and

15  identify to you all the source code it believes ought to be

16  produced.  Here we have source code that, that was produced and

17  they say they can't produce a copyright infringement witness

18  because they can't show that to non-technical witnesses.  That

19  is why this has been withheld.  We have moved to compel those

20  topics.  We should know it.  Your Honor needs to know this to

21  actually have any fundamental understanding of much of what was

22  argued in the morning and much of what's about to fall under

23  trade secret.

24          Thank you.

25          MR. HORNICK:  Your Honor, may I respond to that

1  briefly?

2          THE COURT:  Yeah.

3          MR. HORNICK:  I am quite surprised that this is not a

4  completely dead issue by now, and it kind of evidences

5  something that I've been concerned about and that is that I'm

6  not sure that the defendants' counsel is really fully familiar

7  with all of the briefs that have been filed.  The reason that

8  there can be no witness, or one of the reasons I should say

9  there can be no witness to testify on those topics is again, we

10  don't have complete code.  Yes, they produced some code from

11  October of 2004.  They produced some code from December of

12  2004, but they haven't produced complete code and they haven't

13  produced again what, the database definitions.  Without the

14  database definitions and without complete code, there can be no

15  code comparison.  We say it over and over and over again, every

16  single brief we file, and they still keep making this argument.

17  I find it unbelievable.

18          With respect to the protective order, they conceded

19  that no ConnectU witness can see their code.  The only person

20  that can see their code is an expert and we've never refused to

21  give them an expert analysis.  We just keep saying, you will

22  get it after you give us compel code and database definitions

23  and we do the analysis.

24          And with respect to Interrogatory 1, which they say

25  we haven't answered either, there is no motion to compel

1    pending on it.

2           THE COURT:  Next is 63, the motion about

3    particularized identification of trade secrets and response of

4    the Facebook defendants Interrogatory number 6.

5           MR. HORNICK:  I'm sorry, Your Honor, I was getting

6    organized.  Which one did you call?

7           THE COURT:  The defendant Facebook's motion to compel

8    particularized identification of trade secrets in response to

9    the Facebook defendants' Interrogatory number 2.  It's number

10   63 on the docket.

11          MR. COOPER:  Your Honor--

12          THE COURT:  Go ahead.

13          MR. COOPER:  Before I begin, may I leave you a copy

14   of a case.

15          THE COURT:  A copy of a case?

16          MR. COOPER:  Yes.

17          THE COURT:  Sure.

18          MR. COOPER:  The case is cited, repeatedly cited in

19   the brief, but the reason I asked the Court to take notice of

20   it is because from the defendants, all of the defendants'

21   standpoint, the present motion that's before you defines much

22   of the reason we're here today.

23          THE COURT:  I'm sorry. Keep your voice up.  This

24   motion does what?

25          MR. COOPER:  Defines much of the reason we are here

II-82

1  today.  There are six, possibly seven, depending on how you

2  define it, possibly eight, depending on how you define it,

3  motions on calendar.  All of them, every single motion in one

4  form or another has roots in the present motion to compel, and

5  the reason is because the present motion to compel relates to

6  both a legal and a factual issue.  The legal issue, which is

7  embedded or is incorporated into the case I just cited to you,

8  the *Stafbridge (ph)* case, again, I mention this is repeatedly

9  cited in the briefs, not only sets out the legal standard

10  under, not only easily and readily explains the whole problem

11  with the trade secret designation, not only easily and readily

12  explains in four simple pages what the solution is, it also

13  explains why the solution exists.  I'm here to tell you today

14  that if the Court applies the *Stafbridge* solution much of all

15  that we talked about in the morning, much of what we will

16  possibly carve out this afternoon, may very well become moot,

17  because the Court doesn't just cite a standard.  It cites and

18  it sets out an adequate way to handle the very problem we face.

19  You have heard repeatedly from Mr. Hornick this case is not a

20  trade secret case, that it includes claims of unfair calm,

21  breach of contract, copyright infringement, a variety of other

22  claims, even though much of what we've talked about is core

23  trade secret information.  All of the zip files, all of the php

24  files, all of the source code files we've talked about are all

25  core intellectual property type documentation.  The law as this

1    Court is almost certainly aware without my having to cite

2    has long imposed a requirement that the plaintiff identify

3    trade secrets with particularity when it alleges that in fact

4    the case involves a trade secret misappropriation claim.

5            In the summer when all of the meet and confers, the

6    original ones, the ones we talked about this morning, the ones

7    we talked about in November and the ones that we later talk

8    about possibly this afternoon were raised, in all of those

9    discussions, the issue of whether the plaintiff had adequately

10   identified its trade secrets was repeatedly cited by me as the

11   main problem plaintiffs had in producing any documentation,

12   particularly documentation after May 21st, 2004.  That is the

13   date the ConnectU website, it self launched, and at that point

14   whatever trade secrets the plaintiffs claimed may or may not

15   have existed, certainly much of it became public knowledge

16   because of the public display of the website.  So, throughout

17   the summer, we repeatedly asked the plaintiffs when you would

18   ask questions like you did this morning, what can you produce,

19   we would ask the plaintiffs, when can you produce to us a list

20   of adequate trade secrets?  When we were in discussions in the

21   summer, we thought we were arriving at some common ground and

22   then on July 28th, the plaintiff moved to compel a set of

23   documents and sent a letter to us saying confirm that you're

24   going to produce the rest.  On August 8th, the 30(b)(6)

25   deposition that you just heard which involved the witnesses

1    ability to identify what trade secrets it alleged had been

2    misappropriated occurred and on August 22nd the plaintiff

3    answered Interrogatory 2 and said that they had adequately

4    responded to the trade secret designation required by the law

5    that we had requested, even though we had never requested the

6    designation given an interrogatory in August after everything

7    else.  We had asked for it up to the point of which they filed

8    their own motion to compel.  At that point, all of the

9    litigation that you are seeing in front of you today inherently

10   invoked this problem that the plaintiff and the defendants

11   fundamentally disagree as to whether the trade secret

12   designation Interrogatory 2's response is adequate under the

13   law.

14            The reason I give you *Stafbridge* is for three

15   separate reasons.  *Stafbridge* is a software case.  It is a

16   Massachusetts Superior Court case.  Ironically, it involves

17   some of the very type of data that you have been hearing

18   Mr. Hornick complain about.  The database schema, that's

19   actually cited.  In the case the court is addressing the

20   fundamental question whether the plaintiff, who actually took

21   the software and identified code modules, which is not what you

22   are going to see Interrogatory 2 does, the plaintiff had

23   identified code modules and the court complained it was too

24   generic.  It couldn't tell what those code modules were

25   separate from any type of software that had the same type of

1    functionality.  It had competing experts and it specifically

2    explained why the plaintiff's expert was inadequate to tell it

3    what it needed to know independent of what the defendant needed

4    to know.  The Court also had in front of it much like this case

5    related claims, breach of license agreement, and maybe one

6    other tort claim, breach of fiduciary duty.  Those are claims

7    that are actually not far off the claims in this case.  Mr.

8    Hornick has been stating that this case isn't a trade secret

9    case.  Of course, what the court then did in the *Stafbridge*

10   case is what I think if this Court applies will fundamentally

11   change the log jam that it sees in front of it today.  The

12   court agreed with the defendant that merely throwing a bunch of

13   code modules without explaining in specific terms so that it

14   could understand with reasonable, I believe rigorous and

15   focused particularity, what and only what the plaintiffs claim

16   constitute the trade secrets.  I repeat, that is in the

17   highlighted language I gave you on page 5 of 5 at the top,

18   which also has underneath it page 4.  It specifically, the

19   court's order is set out at the end of this particular ruling

20   and that court order, I believe, is a road map how to get this

21   case back on track.  The court explains not only the standard,

22   it says that the plaintiff shall set forth with rigorous and

23   focused particularity what and only what the plaintiffs claim

24   constitute the trade secrets.  In all the briefing that's

25   happened in front of you, you've heard, if you take the time to

1    read through all the papers again, you'll see a lot of

2    debate about whether the *Stafbridge* use of the language

3    rigorous and focus particularity would better be described as

4    reasonable particularity.  Mr. Hornick and

5    Ms. Esquenet have an article that we have cited in which they

6    concede that at least reasonable particularity is a requirement

7    in most trade secret cases in order to focus discovery so that

8    the bull's eye does not begin to focus in on the arrow.  In

9    other words, so that you don't get the discovery and then

10   decide precisely what it is that you want to describe as the

11   trade secret.

12          Now, *Stafbridge* has a very logical solution to this.

13   The Court, and there are two parts of what the Court rules.

14   It's independently worthwhile to think about, the Court says

15   you must set forth with rigorous and focus particularity, and

16   here's the language that plaintiffs avoid in every single

17   brief, what and only what the plaintiffs claim constitute the

18   trade secrets.  Again, what and only what, then the court

19   specifically states the designation must with clarity that can

20   be understood by a lay person make clear and distinguish what

21   is protectable from that which is not.  That is a beautiful and

22   wonderful solution.  The court is saying you tell me in

23   technical terms and then explain as I can explain it to a lay

24   person why that's a trade secret.  That is how trade secrets

25   are to be designated.  It is a beautiful and succinct

II-87

1    explanation of what is necessary.  In this case, I would

2    note the judge had a practical reason for wanting to apply this

3    based on its own experience as an officer of the court, in an

4    earlier trade secret case, the Court had had a misappropriation

5    common-law claim, coupled with a statute 93A claim.  The

6    common-law claim went to the jury.  The 93A claim went to the

7    court.  Incidentally, both claims are at issue in this case as

8    I understand it.  At least 93A is certainly.  What happened,

9    the jury found misappropriation.  The court independently from

10   the bench ruled that there were no trade  secrets.  That was an

11   issue on appeal and it was fundamentally at the core of what

12   this court was thinking about.  The reason is if the trade

13   secrets are described amorphously, that is exactly what can

14   happen with the jury.  They don't understand what is

15   misappropriate.  If the trade secrets are described with

16   particularity, presumably the Court and the jury will be

17   aligned.

18          Now, I don't mean to stop there because this case not

19   only sets out the problem, it sets out the solution.  It says

20   that you must describe this with particularity that I've

21   described and then it sets out a procedure how to do it.  It

22   then says, I will give the plaintiff a chance.  I will have, I

23   think in the opinion it may be about 30 days from now you give

24   me this particularization as I have described it.  The

25   defendants will have a chance to state one of two things.

II-88

1   Either they agree it's particular enough and we go forward

2   without any intervention of the Court, or I myself will review

3   this trade secret designation again at the status conference it

4   sets and advise the parties go forward or this claim is gone.

5   Now, the Court also sets forth the reason that this is not a

6   harsh ruling as you might think that sounds.  It says to the

7   plaintiff, you also have the ability to just dismiss the claim

8   altogether and I'll let you go forward on your licensing and

9   other claims and that's what discovery will be tailored to.

10  What would happen if that were the case here.  All the forensic

11  imaging that we're talking about.  Everything that we're

12  talking about that relates to the intellectual property issues,

13  fundamentally it's tied directly to our concern that they

14  adequately tell us what our trade secrets are.  The plaintiff

15  actually has more information than most trade secret plaintiffs

16  could ever have to hope for at a point at which *Stafbridge*

17  occurs because normally the procedure is to deny them any

18  discovery even if they have extrinsic claims until they

19  designate the trade secret with particularity.  That was the

20  situation in this case.  It is certainly the situation in many

21  others.  In our case, the plaintiff actually has the code.

22  It's complaining about what it's citing, but much like the

23  copyright claims I mentioned a moment ago, the plaintiff won't

24  even tell us precisely what our, what the limits of its trade

25  secret are, and the best way to prove that is to go directly to

1    their response as it begins.

2         We ask in our interrogatory that the plaintiffs

3    identify the trade secret with precision and specificity.  Each

4    and every alleged trade secret ConnectU contends was

5    misappropriated by defendants, that's the very, very simple

6    interrogatory that is at issue here.  It is not, it is not the

7    verbose one we heard this morning.  It is a very succinct and

8    direct question, identify with precision and specificity each

9    and every trade secret ConnectU contends was misappropriated by

10   defendant.  If the Court wants to see both the interrogatory

11   and the response--

12        THE COURT:  I have it right here.

13        MR. COOPER:  It's Exhibit 2, all right.  Note that

14   the precision and specificity are the precise words used in

15   Stafbridge.  Note also the defendant, pardon me, the plaintiff

16   never objects to the choice of language that we use.  This is

17   what the plaintiff comes to the Court today saying was its

18   designation as it applies to *Stafbridge*.  That's its choice. It

19   elected to do it as an interrogatory, but the plaintiff did not

20   complain about how we demand the specificity occur and we said

21   each and every alleged trade secret.  When you go to, after the

22   general and specific objections and note again the specific

23   objections that relate again to identifying those October and

24   December zip files, but not too incomplete.  The defendants

25   begin the trade secrets misappropriated by defendants include

1   but are not limited to.  The very language but are not

2   limited to right away tells you this is an inadequate trade

3   designation without ever going a step further.  Our

4   interrogatory asks for each and every, they are beginning the

5   interrogatory response by deliberately telling us they're

6   giving us some.  Then the first, and also, Your Honor, the

7   plaintiff in its briefing has suggested that the trade secrets

8   are a combination and in fact they use the words in

9   combination.  The problem is they begin the sentence with the

10  trade secrets.  They do not say the trade secret, singular.

11  They say plural.  Then they numerically identify I believe nine

12  categories.  Category four is broken into subparts, but if you

13  look at categories six, again, the idea of launching a website

14  embodying the pre-launched trade secret aren't set forth in

15  this response.  So the first two problems, before I even get

16  into any definition of language here, the first two problems

17  you already have not only from the trade secret designation

18  itself but from the plaintiff's problematical briefing and

19  choice of language is what is the trade secrets they even

20  designate here?  Is it a combination of all nine of these?  Is

21  it a combination of some?  What are the others, including but

22  not limited to?  That is at the highest level of what the

23  defendants are facing.  That is the simplest and clearest

24  example of what's problematical with this because the trade

25  secret designation in English doesn't tell you what it is.  But

II-91

1  let's start looking at some of the fundamentals that are

2  then set out and they further show why the *Stafbridge* case is

3  on all four points and why this is a horribly inadequate trade

4  secret designation.  One needs only to look at category 8, only

5  8, the Harvard Connection code itself as well as the

6  functionality of the code.  What does that mean?  In the

7  Stafbridge case, if you will recall, the whole case is based on

8  source code, even the *Stafbridge* Court understood that it isn't

9  sufficient to say source code because that gives no apprisal to

10  the plaintiff.  Source code includes all sorts of common forms

11  of coding that is necessary and often standardized under

12  international standard.  What type of coding?  You heard

13  earlier today, some of the extensions that already exist.

14  Html, php, those are not proprietary standards.  Html is how

15  the world wide web works.  So saying that the Harvard

16  Connection code as well as the functionality code is the trade

17  secret you misappropriated, says nothing.  It doesn't tell us

18  what about the code we supposedly are using, and the

19  functionality of the code is what software does.  Software is

20  defined as algorithms.  The application algorithm.  I am

21  confident from patent cases that you may have had in front of

22  here, what I'm telling you is fundamentally known to you.  If

23  you have children, they even at an early age understand html

24  scripting.  They understand software.  Saying that the Harvard

25  Connection code itself as well as the functionality of the code

II-92

1  is a trade secret tells the plaintiff nothing or the

2  defendant nothing.  Then it gets worse.  The Harvard connection

3  code would remain a trade secret after launch.  The surface

4  functionality of the code and perceivable by users of the

5  website would not be a trade secret after such time that such

6  website was launched by the founders.  What is the perceptible

7  functionality?  What is the non-perceptible functionality.

8  Those are code, those are coded in to the actual software.

9  That's what *Stafbridge* is talking about and even then, you must

10 not only specify those modules with sufficient specificity so

11 that we know that that's a trade secret, but you also must

12 explain it in sufficient terms so that a lay person, i.e. the

13 court, can also understand it.  The layout design and user

14 interface of the Harvard Connection website, number 7, what

15 layout, what design, what user interface?  These are not

16 abstract questions being asked by the plaintiff or asked by the

17 defendant.  These fundamentally require specificity.  Every

18 case requires that.  This is not a rule you need to

19 Massachusetts.  There's case law that originates in California

20 under statute that it's so important under THE Uniform Trade

21 Secret Act.  Plaintiff actually sites much of that law.  It

22 exists in Delaware.  It exists in many jurisdictions, but most

23 importantly as reflected by *Stafbridge*, it exists here in

24 Massachusetts, and why is this so critical?  Because the

25 plaintiff won't identify what it specifies was taken, it then

1    comes to the Court and says we're entitled to all this

2    forensic retrieval so that we can show that the defendants are

3    withholding all this information that shows they've destroyed

4    the data supposedly.  A spoliation argument.  Well, if the

5    plaintiff can't identify any trade secret that it actually

6    knows was misappropriated and this is going to be a spoliation

7    case, that has to be set out as the argument, but I'm also

8    going to step back one more time, we have heard today five

9    times, five times that I count, the word database definitions

10   or database schema.  You can go through this entire trade

11   secret designation and you will never see that word once.  If

12   Mr. Hornick is so sincerely concerned that it actually

13   fundamentally was important to his decision not to produce a

14   copyright witness at the 30(b)(6) that actually occurred before

15   this designation, if it's so important to everything that is

16   happening in this case that it was necessary to talk about

17   without a motion on file, then why isn't it in this

18   designation?  And more importantly, this also underscores why

19   using abstract language like data definitions itself is

20   improper.  As the *Stafbridge* case points out, it must be what

21   database definitions are you talking about in your own code,

22   not just the database definitions.  That by itself tells you

23   how much problems exist in all of the motions that are here

24   today, because without that level of specificity, the case law

25   normally says we don't have to produce anything.  In this

II-94

1  particular case, the plaintiff has been given almost what no

2  other case would offer, which is code, and yet to this date we

3  still don't have a designation.  The plaintiff has stood on

4  this and has refused to amend this ever.  Well, if

5  Mr. Hornick is correct and this isn't a trade secret case, I go

6  back to *Stafbridge*, then give it up.  If this is an unfair comp

7  case because you can't meet this standard and you don't want

8  to, that you want discovery and you want it at an egregious

9  level that we are being asked to produce it to the point of

10  imagining, which the court cases are clearly against as a

11  general rule, if you are only that level of specificity, then

12  you are obligated to produce it yourself.  If you want database

13  definitions, you tell the defendants what in your codes

14  reflects the database definitions and why you think it's been

15  misappropriated.  If you want to say that the layout was

16  misappropriated, you identify the gooey command lines and you

17  explain it in such terms as so that a lay person understands

18  that's what we're talking about.  You want the design and

19  interface, you tell the court and the plaintiff what in the

20  user interface.  Are we talking about interactions?  This is a

21  social network according to everybody in here, nodes, links,

22  what in those links, a hyperlink by itself is not in any way

23  proprietary.  It's a standard.  Is it the names of the

24  individuals like any 16 to 24 year old might have as an email

25  nickname for purposes of communicating with friends in college

1  like say I hate Duke?  I say that because I'm a Duke grad

2  and they lost recently, but you go to any of these, Your Honor,

3  any, I can go down this entire list and show you a problem with

4  every one of them at the fundamental level I'm describing.  But

5  it gets much, much deeper and I can explain it even better in

6  the context of what's about to follow after this.

7         In our papers we show you how every single

8  designation in this list we can cite a public website that

9  existed prior to this designation.  That wasn't done for the

10  purpose of like a patent case anticipation.  It was done to

11  show what they described are also networks as they existed in

12  2003.  It included a very, very well documented and known

13  system called Club Nexus, which there were various iterations

14  that became a--

15         THE COURT:  Well, wait a minute, if you're asking

16  them to delineate what they claim to be trade secrets, why are

17  you, I mean, the fact that you don't think they're trade

18  secrets, doesn't go to the question whether their answers are

19  sufficient or not.

20         MR. COOPER:  The, it will at one point and the

21  plaintiffs themselves cite it.  I understand.  That's a very

22  good point, Your Honor.  There's two issues, one is the

23  specificity so we know what the trade secret is.

24         THE COURT:  Right.

25         MR. COOPER:  And that I would hope, I just explained

1  why the plaintiffs don't believe that specificity exists.

2            THE COURT:  Oh, I understand that's your position.

3            MR. COOPER:  Now, the other reasons to the extent

4  that the trade secret identifies what is in the public domain

5  on its face and doesn't specify anything, you're right.  Then

6  apply *Stafbridge*.  Say if you can't amend this in 30 days, if

7  this is going to be what you will take to the court as your

8  designation, let's set a Rule 56 schedule right now because

9  these--

10            THE COURT:  Well, that's beyond this

11  motion.

12            MR. COOPER:  well, it may be beyond the motion, Your

13  Honor, except for the extent that I again point back to the

14  *Stafbridge* solution which is to say I'm giving you 30 days.  If

15  this is the risk you want to take, the genialities are going to

16  kick this, that's what actually *Stafbridge* cites.  It says it's

17  going to sua sponte impose summary judgment.  I'm not asking--

18            THE COURT:  Except this isn't a consent case so I

19  can't do that.

20            MR. COOPER:  I agree, but at least--

21            THE COURT:  I don't have jurisdiction to do that.

22            MR. COOPER:  At least the specificity has to be--

23            THE COURT:  I understand your point that it doesn't

24  meet the specificity standard.  I understand that.

25            MR. COOPER:  Okay.  And I can go one by one, but I

1   don't want to belabor the Court.  I really do not.

2           THE COURT:  All right.  Let me hear the plaintiff.

3           MR. HORNICK:  As I said before, there are many claims

4   in this case.  I believe there are eight claims plus there are

5   24 defenses and there are seven counterclaims.  None of those

6   claims depend on the trade secret claim and we're prepared to

7   discuss that if necessary.  I can show you how the trade secret

8   claim isn't necessary for any of those other claims, but unless

9   the Court wants to get into that, I'll save that for another

10  day.  Mr. Cooper says that the forensic imaging is all about

11  the trade secret part of the case.  Well, it's actually mostly

12  about the copyright part of the case, and it's about that part

13  of the case, the reason I've said over and over again we need

14  to compare the code to see if there was copyright infringement.

15  Misappropriation, we can see that.  The Facebook exists.  I

16  don't need to see their code to know that they misappropriated.

17  It will add to our case, but I don't need to see it to know

18  that they've misappropriated the basic idea and I'll get to

19  that as well.  This motion has stopped all discovery in this

20  case, but as I've said, none of this discovery relates solely

21  to the trade secret claim.  The defendants stole a secret idea.

22  It turned out to be worth $100,000,000.  Now they say it's

23  nothing, and what do we define in our identification, we've

24  defined essentially what their website is.  They've misstated

25  and they've oversimplified the law.  The law does not support

1   turning this motion to compel into a motion for summary

2   judgment.  The law only wants the plaintiff to commit to what

3   its trade secret is, and we did that in our interrogatory

4   answer on August 22nd.  My question is, if our trade secret

5   beneficiation is so easy to attack, why do they want more?  Why

6   do they want us to define it more if it's so easy to attack?

7   They should leave it the way it is.  The answer is because they

8   want to use this and they have used this for the last eight

9   months to stall discovery.  ConnectU has now defined its trade

10  secret combination.  It has set a base line.  It is now up to

11  ConnectU to make its case and it's up to the defendants to

12  challenge it if they'd like to do so in summary judgment or at

13  trial.  Most courts have adopted a reasonable particularity

14  standard or something like it.  Today we heard that the

15  standard should be higher under *Stafbridge*.  The, it doesn't

16  matter because as I'll show in a moment it's not really

17  relevant to this at all because the Facebook conceded that the

18  standard is reasonable particularity.  In their opposition to

19  our motion to compel request numbers 42, et cetera, which we'll

20  be discussing later this afternoon, at pages 1 and 2 and again

21  on page 14, they conceded the standard, and I'm going to quote

22  from that brief, "overwhelming federal and state case law,

23  including from the District of Massachusetts and Massachusetts

24  state courts clearly requires that ConnectU specify its claimed

25  intellectual property such as trade secrets with reasonable

1    particularity before any of its discovery requests can be

2    compelled and they cited the *L3 Communications* case and that's

3    important because *L3 Communications* was decided by Judge

4    Gestell, same judge who decided the *Stafbridge* case, and he

5    decided L3 after he decided *Stafbridge*, and he applied the

6    unusual standard, reasonable particularity.  He was quoting the

7    *Englehardt* case from the Delaware Chancery court.  He cited

8    some other cases.  He cited *Cambridge Internet Solutions*, which

9    is a Massachusetts Superior Court case, that required the

10   plaintiff to show a factual basis for the trade secret claim

11   and "some specificity" where it's possible to do so and

12   required more specificity in situations where the secret was

13   more amenable to being specified and it cited other cases as

14   well, the *Imex* case and the *Xerox* case, which applied a similar

15   standard, but then Judge Gestell must be the repository for

16   these kinds of cases because on October 31st of last year he got

17   another case.

18          THE COURT:  Well, he's in the business section of the

19   Suffolk Superior Court which is why he gets a lot of these

20   cases.

21          MR. HORNICK:  Well, he got the *Tortalot Solutions* v.

22   *Tradestone* Software case and same issue came up.  This is

23   October 31st of last year.  Judge Gestell, same judge who

24   decided both Stafbridge and L3 Communications--

25          THE COURT:  Excuse me, what's the name of this again?

1          MR. HORNICK:  *Tortalot*.  I can hand a copy up.

2          THE COURT:  Thanks.  That's kind of hard to read.

3          MR. HORNICK:  The judge said, I'm sorry, I'm on page

4    3, and I've taken the liberty of highlighting everyone's

5    copies.  "The issue of software misappropriation sounds very

6    much like trade secret misappropriation and as such there are

7    two issues that properly should be resolved before discovery

8    begins, a detailed description", so he used the term detailed

9    description, "of what is claimed to be a trade secret must be

10   provided and a protective order of some sort needs to be worked

11   out."  Then he goes on and he says, "There must be a clear

12   designation that distinguishes unique proprietary material from

13   the vast body of the *Tortalot* program and source code."  And

14   this is important to what I'll say later.  The Courts do not

15   require the trade secret designation to distinguish the

16   proprietary material from the public domain material.  They

17   only require, the cases only require that the trade secret

18   material be distinguished from other material in the case, and

19   I'll address that as I go on.  That's the most recent

20   pronunciation out of Judge Gestell on this subject.

21          But in addition to that, Your Honor addressed this

22   very topic in *Microwave Research* and Your Honor did not

23   directly address the issue of specificity, how much specificity

24   needs to be provided.  In fact the judge, Your Honor said that

25   when the trade secret can't be specified you look at whether

1    there's a substantial factual basis for the trade secret

2    claim.  And this is consistent with other Massachusetts cases

3    which we cited in our brief.  Now, it's our contention that we

4    have satisfied the designation requirement under a reasonable

5    particularity standard.  It's also our contention that the law

6    does not necessarily require any kind of a designation.  Your

7    Honor is required only that there be a substantial factual

8    basis.  I think we've shown that in the fact section of every

9    brief that we've submitted, then there's a section of whether

10   the issue I should say, whether the trade secret must be

11   separated from information in the public domain.  The

12   defendants have argued that it does.  The law does not require

13   it.  This would turn ever motion to compel a trade secret

14   identification into a summary judgment as we said in our brief.

15   The cases that the defendants cite to say that trade secrets

16   must be secret, they must be something separate from the public

17   domain are not discovery stage cases except for *Stafbridge* and

18   *L3 Communications*, which we're addressing now. But even if we

19   did have to separate our secret from the public domain, the

20   cases say you only need a modicum of originality.  That's the

21   *Prescott* case, which we cited, also *Peggy Lawton Kitchens*

22   involving a chocolate chip recipe which says the insertion of

23   an ingredient, adding, "that modicum of originality which

24   characterizes a trade secret."  In *Stafbridge*, the Court only

25   required in the order, and there's two things we need to look

1    at in *Stafbridge*, that's the opinion part and the order

2    part, and the order, the Court only required the trade secret

3    to be separated from the vast body, that's a quote that Judge

4    Gestell has used in every one of these cases, from the vast

5    body of the plaintiff's own source code, and I'll get to that

6    with respect to our designation.  He left challenging the

7    secrecy with respect to the public domain for another, day and

8    although he paraphrased the expert, this is in the opinion now,

9    paraphrased the expert on whether the secret was somehow

10   separate from the public domain, he said that the expert, the

11   expert said that he needed the trade secret to be separated

12   from plaintiff's own source code so that the expert could then

13   tell whether the secret was different from what's in the public

14   domain.  In *L3 Communications*, there was no separation at all

15   required from the public domain.  The opinion doesn't mention

16   the public domain at all, and in fact when Judge Gestell

17   mentioned the "vast body" in that case, he said it had to be

18   distinguished from the vast body of information alluded to in

19   the amended complaint.   And in *Tortalot*, I read the quote from

20   that case.  There is no requirement there to separate the trade

21   secret from the public domain.  He said only that the vast body

22   needed to be separated from the plaintiff's program and source

23   code and in microwave research, there was no separation

24   required.

25              Now, what is ConnectU's trade secret?  It was a

1  project to create a social network for college students.

2  Interrogatory number 2 tells what and only what that trade

3  secret is.  It identifies a combination of ideas and features

4  and it is something that I will take to my grave that is a

5  combination.  They cannot be separated.  It is a combination.

6  They are listed in response to Interrogatory number 2, but this

7  wasn't just a project.  This was ConnectU's project.  It was

8  ConnectU's secret project, and I don't think we can lose sight

9  of that fact.  What's important isn't that there was just some

10  project going on that Mr. Zuckerberg stole.  He was involved in

11  that project.  It was a secret.  He wasn't supposed to take the

12  elsewhere and that's what he did.  We could print out the

13  Harvard Connection code and the pages that it generates and we

14  can provide that and we can say this is part of our trade

15  secret definition, but the defendants can print it out just as

16  well, and they can look at what they say, and what they show is

17  a road map to what this site was intended to be, but the Devil

18  is not in the details here, Judge.  The details of the Harvard

19  Connection site were incomplete when Mr. Zuckerberg was hired,

20  and he was hired and he was brought on as a partner for

21  purposes of completing the site, but what he did is he stole

22  the concept.  He stole the big idea.  Even if there are details

23  that differ between these sites, what he did is he stole the

24  big idea, and all of the details that we list under that about

25  what this website was supposed to be, to a great extent are,

1  they're peripheral.  What's important is he stole the big

2  idea and we define that.  Everything that he saw and everything

3  that he learned when he was working with the Harvard Connection

4  founders was secret at the time.  It was part of the secret

5  project, the pre-launch project and the plans that the Harvard

6  Connection founders had, the plans for the site.  They were all

7  secret.  The launch timing, they planned to get it out fast

8  before anyone else did, before the school year ended, that was

9  a secret.  The intent to capture the first mover advantage,

10  that was a secret.  The entire code, all the functions and the

11  teachers in it, they were secret.  Nobody was supposed to have

12  access to them.  Certainly no one was supposed to copy them and

13  start their own website.  Now, the defendants will say, well,

14  you have to separate what in that code is secret from what

15  might have been standard in the industry or you need to

16  separate the non-secret parts and the secret parts.  Our point

17  is this was all a secret project.  Everything they were doing

18  was secret and he shouldn't have taken anything from it at all.

19  If he took something from it that wasn't copyrighted, maybe

20  there's not a copyright infringement, but there might be unjust

21  enrichment.  If he took something from it that was somehow not

22  protectable in some other way, that doesn't mean that he didn't

23  violate his fiduciary duty to the plaintiffs.

24          The cases support secrecy for all of those things

25  that I mentioned and in particular they support the fact that

1  code itself can be secret.  The *Dickerson* case, I'm sorry,

2  *Dickerman* case, the *Touch Point* case, those cases both say that

3  code can be secret, and if the problem here, if the problem

4  here is the words including but not limited to, we don't need

5  them.  The numbered items that we have listed as our answer to

6  Interrogatory 2 are what we view the trade secret combination

7  to be.  The Harvard Connection founders were the first to

8  synthesize this combination of elements.  That's shown by the

9  instant and viral success of the Facebook website.  It has

10 200,000,000 users.  The average student visits it six times per

11 day, as I said earlier.  Interrogatory number 22, which we'll

12 get to it later, and request number 176 and 177, which we will

13 get to later, prove that our designation is sufficient because

14 we asked particularly in 176 and 177 tell us what precedent

15 there is in the public domain that this combination that the

16 Harvard Connection founders synthesized tell us where there is

17 public domain precedent for it.  176 asks for, tell us public

18 domain precedent for all of the features.  177 asks, I believe

19 for the first three they refused to answer or to produce

20 documents in response to those requests and they refused to

21 answer Interrogatory 22 which asks them to identify those

22 public domain sources.  If they can't tell us a public domain

23 precedent for the entire combination, that means the entire

24 combination is new and that's our point.  The dissection of

25 each one of these elements and showing this element was here

1   and this element was there, that's not appropriate here.

2   You can dissect the chocolate chip cookie receipt from Peggy

3   Lawton Kitchens, flour was known, eggs were know, chocolate

4   chips were known, vanilla was known, even ovens were known, but

5   the synthesis that Peggy Lawton gave to those ingredients, the

6   way that she baked them, that's what gave her a commercial

7   advantage and that's what Massachusetts law requires to find a

8   trade secret.  It gives the finder, the founder a commercial

9   advantage.  That's *Jet Spray Cooler* and a case called *Eastern*

10  *Marble*, which actually the Facebook people cited.  And that

11  secret, that chocolate cookie recipe, Peggy's recipe, it is

12  still valuable to her if an unknown third party had the same

13  recipe, but she was the first to commercialize it and if

14  somebody took that recipe, she'd have a claim against them.

15          As I said, whether certain elements were known before

16  the founder synthesized them as we've specified them here is

17  irrelevant because dissection is improper under the law.

18  There's no evidence that Mr. Zuckerberg or the founders of

19  Harvard Connection were aware of any of these third party

20  websites that the defendants mentioned in their response to,

21  that they mentioned in their motion to compel, but that they

22  refused to put into the interrogatory answer, and also there's

23  plenty of law that says the public availability of information

24  that's part of a trade secret is not a defense to actually

25  having stolen it.

II-107

1          The cases say that we do not need to prove that

2   the secret was sufficiently maintained at this stage of the

3   case.  The defendants argue that we do, so we addressed it

4   anyway and we cited cases that say that absolute secrecy isn't

5   required.  Heroic efforts are not required, that the standard

6   for protecting a secret is not reasonable and it's not

7   perfection, and that partners, like employees are presumed to

8   know that the secrets of the organization that they're working

9   with shouldn't be used for their own personal benefit.

10          THE COURT:  Aren't you getting a bit beyond the

11   sufficiency of the answer?

12          MR. HORNICK:  Well, Your Honor, the problem is that

13   these issues were all raised, and I know that unless I address

14   all of them, I'm going to be told later on that I didn't

15   address them, and I've actually finished with my presentation.

16   Just to summarize--

17          THE COURT:  Okay.

18          MR. HORNICK:  --ConnectU did actually define it's

19   trade secret combination.  The law does not require separating

20   it from anything in the public domain.  It's improper to

21   dissect that combination.  It must be considered as a whole and

22   whether certain aspects were known is irrelevant to this

23   discovery motion.

24          THE COURT:  Okay.  I'll take it under advisement.

25   Next is 68, plaintiff's motion to compel production of

II-108

1    documents in response to production requests 20.

2              MR. HORNICK:  Before I start with number 42---

3              THE COURT:  Just hold on.  I just want to get them in

4    front of me and find out, this vast array of papers.

5              Here it is.

6    (Pause)

7              MR. HORNICK:  Docket number 68, Your Honor.

8              THE COURT:  That's the motion.  I'm looking for the

9    actual--

10             MR. HORNICK:  The brief?

11             THE COURT:  No, the request for production and the

12   responses.  Are they set forth in--

13             MR. HORNICK:  They would have been in Exhibit--

14             THE COURT:  --laid out in your memorandum.  Okay.  As

15   long as they're laid out in complete--

16             MR. HORNICK:  Well, they're set forth in the brief.

17             THE COURT:  Complete?

18             MR. HORNICK:  Completely.

19             THE COURT:  Okay.

20             MR. HORNICK:  Well, they are not set forth

21   completely, Your Honor.  The reason is that these were, these

22   requests were propounded and after meeting and conferring the

23   defendants agreed to produce all these documents, so there

24   weren't any, we were at the point where they had agreed to

25   produce them and then because of the motion to compel

II-109

1    identification of trade secrets, they reneged on that and

2    they filed their cross motion for protective order.  They

3    didn't produce them.  So we didn't actually reproduce their

4    objections because we thought we were way beyond that and they

5    had agreed to produce them.  Now, the entire set is an exhibit

6    to something I'm sure, but I'm not sure if we can put our

7    finger on it easily.

8                 THE COURT:  Wait a minute.

9    (Pause)

10                THE COURT:  Where's this motion for protective order?

11                MR. HORNICK:  Your Honor, the motion for protective

12   order was actually a cross motion that was one in the same with

13   the Facebook defendants' opposition to our motion to compel

14   imaging.  But it is, it requests essentially the same thing as

15   the motion that we just argued.  I think you'll probably agree

16   with that, so I assume when Your Honor doctored all of this

17   that you viewed the motion we just argued as covering that and

18   I think it probably does.

19                THE COURT:  Well, let me ask defendants what their

20   view of this is now.

21                What do you say on – yeah, I didn't remember that, I

22   didn't remember the protective order as part of the, in

23   opposition to 37 as dealing with a protective order to, 37 was

24   the imaging.  How does that relate to this?

25                MR. HORNICK:  We moved for imaging.

1            THE COURT:  Right.

2            MR. HORNICK:  And another part of that motion was for

3    documents created on or after May 21st of 2004 which is still

4    pending, and around that same, so the time was coming up for

5    the defendants to oppose that motion and when they did, they

6    cross moved for protective order so they wouldn't have to

7    produce any more documents until after we had provided in their

8    view a better trade secret designation.

9            THE COURT:  I'm sorry, I had forgotten that was part

10   of it.  I was under the view that 37 was totally involved with

11   the question of imaging.

12           All right.  Let me get to defendants' view on this

13   motion 68.  Is this going to fall one way or the other

14   depending on how I rule on the sufficiency of the trade secret

15   designations?

16           MR. COOPER:  Yes and no.  Mr. Hornick is correct

17   that, I believe the reason it may be confusing is that it was

18   docket 47 I believe, 43.  If you look at the conclusion of our

19   opposition to ConnectU's motion to compel mirror images, we do

20   raise the trade secret.  We raise the protective order both as

21   it relates to mirror imaging and as to the inadequacy of trade

22   secret designation and then that, to expedite briefing that

23   occurs in the future after that motion, we repeatedly cite.

24   That's also part of what I mean when I said at the outset of my

25   own argument that much of this will be relieved if the Court

II-111

1    understands that at the core of every single motion is the

2    trade, but--

3            THE COURT:  Well, let me ask you this, if I decide

4    the last motion I heard and, what does that do to this motion?

5            MR. COOPER:  It doesn't, there are other elements in

6    this motion and that was the point that we raised in our brief,

7    that the trade secret designation--

8            THE COURT:  Well, had you agreed to produce these

9    documents?

10            MR. COOPER:  No, and this repeatedly is pointed out

11    by us.  What we had agreed at the time was that if the

12    plaintiff provided first an adequate trade secret designation,

13    we would consider whether we could produce documents narrowly

14    tailored to the request.  As I mentioned earlier this morning,

15    with respect to one of the other categories, I believe it was

16    the one that you were asking about the daily usage.  I

17    mentioned that.  What I want to make clear is the plaintiff

18    moved to compel and simultaneously sent us a letter saying you

19    agreed to produce all this and made no reference to our trade

20    secret issue.  We responded later saying we did not agree.  We

21    had a condition precedent relating to the trade secret

22    designation and we never even received it.  That is at the core

23    of every one of the motions that remain, including this one.

24            THE COURT:  But once you do, what happens to this

25    motion?

1              MR. COOPER:  It still has overbroad designations.

2    We set them out in our opposition.  Plaintiff originally just

3    said, plaintiff said defendants failed to produce as they

4    promised to produce.  We actually then, our opposition points

5    out why that's not the case, and we set out specific reasons

6    why these, several of these requests are improper independent

7    of that.  Like — let me take the easy one.  All documents

8    relating in anyway to any documents involving the Harvard

9    Administration Board and individual defendants, 42.  The very

10   first one raised.  Independent of the trade secret designation,

11   Mr. Hornick wants to make an exploration of administrative

12   disciplinary proceedings at Harvard University.  He even has

13   subpoenaed Harvard University for such records as it relates to

14   something called face match, not Harvard Connection mind you,

15   face match.  That's wholly irrelevant to this case.  That is

16   more than just our trade secret designation.  I cite that as an

17   example.  The plaintiff filed a motion completely basing it on

18   this notion that we agreed.  We said in opposition that item by

19   item set out the specific reasons we still disagreed.  The

20   plaintiff had a condition precedent to us narrowing the

21   request, which was, gave us an adequate trade secret

22   designation, but as to 42, face match, no.  This was always

23   considered overbroad.  Mr. Hornick and I had an argument over

24   the prejudice of this particular request because of the fact he

25   thinks it's relevant to impeachment because it relates to

II-113

1   disciplinary proceedings at Harvard University.  I mean,

2   that's my memory of it, it's an impeachment issue, but that

3   certainly is independent of the trade secret and there are

4   other requests that also fall in that category.

5           MR. HORNICK:  Your Honor, I might be able to get this

6   moving a little bit.  We obviously disagree about whether they

7   agreed to produce the documents or not.  We say that they did

8   and they say that they did with the condition that we identify

9   trade secrets.  So we--

10          THE COURT:  And they say more than that.  They say

11  even if trade secrets were adequately designated that there are

12  other objections to these.

13          MR. HORNICK:  And that's what I'm getting to.  We

14  filed a motion, and we didn't provide argument as to why

15  they're relevant or why they should be produced because we

16  understood that they had agreed to produce them.  They were

17  only holding them until they got a trade secret designation.

18  Then they opposed the motion and they put in their reasons,

19  their arguments, the arguments about not being relevant or

20  whatever it happened to be, and then in our reply brief, we

21  responded to all of those arguments, so all of the objections

22  that are relevant have been briefed before the Court.  So if we

23  go through these, we can address what our reasons are for

24  wanting them and what the defendants reasons are for not

25  wanting to produce them.

1          THE COURT:  Okay.  All right.  Maybe I'll just

2     use your brief then as far as what they request.  I don't have

3     the defendants' responses to them.

4          MR. HORNICK:  I've been informed, Your Honor, that

5     Exhibit 17 to docket number 37 is where the full set can be

6     found.

7          MR. COOPER:  I agree.

8          MR. HORNICK:  That's the imaging motion which--

9          THE COURT:  I don't think I have – you know, we

10    brought out only the papers that I thought we were going to be

11    hearing today.  Do you have the rest of the file?

12    (Pause)

13         THE COURT:  Yeah, they're probably going to be in

14    that file.  So this is Exhibit what to 37?

15         MR. HORNICK:  17.

16         MR. COOPER:  I agree.

17         THE COURT:  See if you can find Exhibit 17 to 37.

18    (Pause)

19         THE COURT:  Well, why don't you go ahead because I

20    have the request in front of me anyway.

21         MR. HORNICK:  Well, we can take 42 and 40 through 46

22    together.

23         THE COURT:  Right.

24         MR. HORNICK:  They seek the Harvard Administrative

25    Board documents for Mr. Zuckerberg, Mr. Moskovitz, Mr. McCollum

1  and Mr. Hughes.  These are relevant to all of the claims in

2  the case except possibly the copyright claims, so regardless of

3  the outcome of the trade secret motion, they're relevant to all

4  of the other, almost all of the other claims.  In the meet and

5  confers, the Facebook promised to produce documents relating to

6  Harvard Connection and the Facebook that were Harvard Ad Board

7  files, but we're also seeking--

8       THE COURT:  What did the Harvard Ad Board do with

9  respect to this, to anything with respect to these matters?

10      MR. HORNICK:  Yes.  Two important things.  One was

11  that just a couple of weeks before the Harvard Connection

12  founders asked Mr. Zuckerberg to join with them to finish the

13  Harvard Connection website, Mr. Zuckerberg created a website at

14  Harvard University called face match.  Face match put faces of

15  two people next to each other and asked students to determine

16  which one was better looking.  He got in a lot of trouble about

17  that and it was taken up before the Harvard Administrative

18  Board.  Then when the - under the Harvard Ethical Rules.  Then

19  when this all came to a head when the Facebook launched, the

20  founders of Harvard Connection filed a complaint with the

21  Harvard Administrative Board against Mr. Zuckerberg relating to

22  the Facebook.  So we want the Harvard Ad Board documents

23  relating to the Facebook because they could contain information

24  relating to this case, and in fact, Harvard has produced some

25  documents.  We don't know if we have everything.  That's why we

II-116

1  want them from the defendants as well, but Harvard has

2  produced some documents and in one of those documents, Mr.

3  Zuckerberg said in a submission to the Harvard Ethical Board, I

4  didn't start working on the Facebook website until after

5  January 14th, 2004.  I showed you today two files showing that

6  they were working on that website as early as December 22nd, of

7  2003.  So he lied to the Harvard Ad Board.

8           THE COURT:  What would you expect these defendants to

9  have that aren't in the files of the Ad Board?

10          MR. HORNICK:  Well, administrative files inside of

11 institutions are notoriously incomplete, and it's possible that

12 they may have documents that Harvard didn't have.  In addition

13 to that--

14          THE COURT:  Have these documents that Harvard got,

15 produced, been produced to defendant also?

16          MR. HORNICK:  Yes, they did.  But, Your Honor, I

17 should be able to get--

18          THE COURT:  Hold on just a second.

19          MR. HORNICK:  Yes.

20          THE COURT:  Do your clients have any documents that

21 were not produced by Harvard?

22          MR. COOPER:  Yes.

23          THE COURT:  They do?

24          MR. COOPER:  Yes.

25          THE COURT:  And to what extent?

II-117

1          MR. COOPER:  We were just talking about, not

2   many.  It maybe there was one--

3          THE COURT:  Because I'm not going to--

4          MR. COOPER:  I know of at least--

5          THE COURT:  I'm not going to fool around with this.

6   If they've got all the documents from the Harvard--

7          MR. COOPER:  No.

8          THE COURT:  If they've got all the documents from the

9   Harvard Ad Board, and your clients have some that relate to the

10  same thing that Harvard doesn't have, I'm going to order them

11  produced, and I don't see what it has to do with the, the

12  proper designation of trade secrets.  So what is there that the

13  plaintiff doesn't have that he hasn't already gotten from the

14  Harvard Ad Board?  How many documents and what are they?

15         MR. COOPER:  I believe between one and five

16  documents, they're emails.

17         THE COURT:  They're emails?  From whom to whom?

18         MR. COOPER:  I believe it's from Mark Zuckerberg

19  maybe to members of the Admin Board.

20         THE COURT:  Do you have them?

21         MR. COOPER:  Here today?

22         THE COURT:  Yeah.

23         MR. COOEPR:  No.

24         THE COURT:  Is there any reason why they shouldn't be

25  produced?

 1              MR. COOPER:  For personal, I mean, Your Honor,

 2    it's like tax returns.  I mean, what--

 3              THE COURT:  They've got all the records of the

 4    Harvard Ad Board.

 5              MR. COOPER:  No, I believe that's not true.  Harvard

 6    filed its own response.  Harvard was not represented by us.

 7              THE COURT:  Oh, I understand that.

 8              MR. COOPER:  And I believe, I don't have the subpoena

 9    here, but Harvard I believe made its own objections.

10    Understand, if they didn't, then I stand corrected, but Harvard

11    produced--

12              THE COURT:  Did Harvard object to your subpoena in

13    any way?

14              MR. HORNICK:  No.  No, Your Honor.  I've been just

15    informed they have not objected, but they have informed us that

16    they don't always keep complete files.  They get rid of them

17    sometimes, so--.

18              THE COURT:  All right, but they produced to you what

19    they had?

20              MR. HORNICK:  It's my understanding they produced

21    what they had, is that right?  Ms. Esquenet can address that.

22              THE COURT:  They had those, they've looked at them

23    and you say there are perhaps five documents that were not in

24    the file that relate to these requests that are in the

25    defendants' possession?

1      MR. COOPER:  I can definitely speak to one and as

2  many as maybe five, but, Your Honor, this is about face match.

3  This isn't about ConnectU.

4      THE COURT:  The motion to compel is allowed.  You

5  produce those.  Next?

6      MR. HORNICK:  Next we can take 70 and 71 together,

7  Your Honor.  These are documents.  This is towards the end of

8  the motion because this was in the category of documents that

9  they were "leaning" toward producing to us.  These documents

10  relate to Interrogatory number 9 that we discussed earlier and

11  number 23 that we discussed earlier, investors, investments,

12  loans, gifts, contributions, offers and other financing to the

13  Facebook.  Earlier we were talking about whether they should be

14  required to answer an interrogatory providing that information.

15  Now we're talking about can't we get these documents from the

16  defendants, any documents relating to financing, investors and

17  investments, directly relevant to all of our claims and to

18  damages, not just to the trade secret claim.  They have nothing

19  to do with whether the trade secrets are properly identified.

20  They have produced a few pre-May 21, 2004 documents.  They must

21  have more documents and this is a very good example of

22  documents that we need to have that are dated after May 21st of

23  2004.  That's the subject of another pending motion, but we'll

24  see a lot of examples as we go through here today of the types

25  of documents that it's crucial that we get that were dated

1  after May 1st of 2004.  And in terms of relevance, which I

2  didn't address, these are directly relevant to the Facebook's

3  growth, their success and its value, its growing value and

4  damages, and early today, earlier today, Mr. Cooper said that

5  when Facebook started out, it was pretty unsophisticated and

6  maybe that was true, maybe it wasn't true.  Maybe they didn't

7  keep good records, but he also said they're more sophisticated

8  today.  They now have a very sophisticated investor on their

9  board.  They have a CFO.  They've got to be keeping records

10  from which their value can be determined.  They've got to be

11  estimating their value for purposes of investors.  They've got

12  to be providing business plans.  They've got to be doing their

13  due diligence for purposes of getting investors, and those are

14  all the types of documents that are covered by this request and

15  there's no reason why they shouldn't exist today, and if they

16  didn't exist early on, there's no reason why we shouldn't be

17  able to get them.  They're directly related to key parts of

18  this case.

19        THE COURT:  All right.  Go ahead.  Next.  Which one

20  do you want to take next?

21        MR. HORNICK:  Next we can take 85 to 89, which relate

22  to Facebook usage.  These are also related to Interrogatories

23  11 to 14 that we discussed earlier, and this, let me just turn

24  to them, these are asking for documents relating to traffic to

25  the website, universities at which the Facebook is available

II-121

1  and operational, number of persons who are registered,

2  number of hits per day, number of hits per day by the same

3  user.  This is also the kind of information that Facebook has

4  probably put together to provide to investors so that investors

5  know whether they want to invest in this organization or not.

6  These documents relate to all of the claims in the case,

7  especially damages.  It doesn't matter whether the trade

8  secrets are defined or not to get these documents.  They relate

9  directly to the viral growth and value of the Facebook, the

10  improper head start that the Facebook obtained, the stealing of

11  the market and also to the addictive nature of the site.  This

12  type of information, these documents would show that any

13  potential advertiser on the Facebook site has a truly, a truly

14  captive audience because they go to this site six times a day.

15  Eight million people visiting this site, an average of six

16  times a day.  I don't know how they study.

17         Should we go onto the next one, Judge.

18         THE COURT:  Yeah.

19         MR. HORNICK:  The next ones we can take together are

20  90 through 95 and 98 through 100.  These are Facebook--

21         THE COURT:  98 through 100 or 101?

22         MR. HORNICK:  98 through 100, that's right.

23         THE COURT:  Rather than 101?

24         MR. HORNICK:  101, I have it broken out separately.

25         THE COURT:  All right.  90 to 95?

1    MR. HORNICK:  90 to 95, 90 asks for fix,

2  documents on fixed costs 91, valuable costs to 92, overhead,

3  93, revenue, 94, gross profit, 95, net profit, 98, bank and

4  financial accounts, 99, assets and 100, debt.  These are all of

5  the basic building blocks of a damages expert's report and we

6  are entitled to these documents.  They relate to all of the

7  claims of the case.  They don't relate at all to whether the

8  trade secrets have been properly defined.

9    96 belongs in there as well.  96 is state and federal

10 tax returns for the individual defendants.  This relates to the

11 defendants' profits from the unlawful acts.  It relates to

12 damages in the case.  It doesn't matter whether the trade

13 secrets have been adequately defined.  These are documents that

14 the defendants were leaning toward producing, but chose not to

15 when they filed their cross motion for protective order.

16    Number 101 is the value of the Facebook.  This is the

17 documentary counterpart to Interrogatory number 16 that we

18 discussed earlier--

19    THE COURT:  All right.

20    MR. HORNICK:  --and we, we also had Interrogatory 23,

21 which value was part of and then there's request numbers 171,

22 which value was part of that, we'll discuss later today.  The

23 value of the Facebook as I've said several times is relevant to

24 all the claims.  It's relevant to damages.  It doesn't matter

25 whether the trade secrets have been adequately defined.  I

1    don't know what could be more relevant to our client's

2    damages than the value of the Facebook today.  As I said

3    before, the defendants' gain is ConnectU's loss and, at least

4    part of its loss.

5         Next we can take 102 to 104 together.  These ask for

6    Facebook corporate documents.  These relate to all of the

7    claims, all of the defenses and all of the counterclaims.  It

8    doesn't matter whether the trade secret has been adequately

9    defined.  They relate to the value of the Facebook.  They

10   relate to defusing the defendants' argument that ConnectU's

11   partnership claim is weakened somehow by the lack of a written

12   agreement between the Harvard Connection founders and

13   Mr. Zuckerberg.  They relate to whether Facebook had standing

14   to assert its counterclaims.  They relate to whether the

15   individuals can hide behind the corporate shields, especially

16   contracts entered into in the first six months of the

17   Facebook's existence because they didn't incorporate until six

18   months after they launched which means that any contracts

19   entered into within the first six months were entered into by

20   individuals not by corporation.

21        THE COURT:  Is there a general timeframe for this

22   request because I note looking at the request itself there's

23   not?

24        MR. HORNICK:  Well, the Facebook has only been in

25   existence as some kind of an entity since mid December of 2003.

II-124

1    We're asking that they produce back to whenever the

2    documents would first exist.  As I said, the corporation wasn't

3    formed until late July 2004, so we wouldn't want to limit

4    ourselves to corporate documents back to the date the

5    corporation was formed because the entity existed and was

6    operating--

7             THE COURT:  Is there any documents that this company

8    ever generated that you don't want?

9             MR. HORNICK:  That I don't want?

10            THE COURT:  Yeah.  Frankly, I don't know that I've

11   ever seen document requests this broad.  I mean, I'd strike a

12   search warrant as an unconstitutional general search warrant if

13   they asked for all this stuff.

14            MR. HORNICK:  Your Honor, we tried it before--

15            THE COURT:  I mean, corporate records, records

16   directly, business meeting, corporate resolutions, corporate

17   filings with any state, employee payroll records, financial

18   records, stock certificates, contracts, loan documents.  I

19   mean, I don't know what you're planning out here, but it's just

20   very, very broad.

21            MR. HORNICK:  Well, Your Honor, they are broad.

22            THE COURT:  I'm certainly not going to allow a motion

23   to compel as to all this stuff.

24            MR. HORNICK:  Your Honor, they are broad.

25            THE COURT:  Any contract between any non-party on the

1    Facebook.  Oh, my God, they have a contract order on

2    pencils?

3           MR. HORNICK:  Well, Your Honor, pencils may be a

4    trivial example, but if there were contracts during the six

5    months, for six months for--

6           THE COURT:  Well, that's why I was asking you for the

7    time limitation because you keep saying six months but these

8    interrogatories, or these requests, as I understand it, are not

9    limited by a timeframe.

10          MR. HORNICK:  Well, these requests were, when they

11   were propounded, they were propounded for the time period from

12   the Facebook's inception up to late April of 2005, which was

13   when they were propounded, so they covered a period of about a

14   year and a half.  It's not a long period of time.  They company

15   is only two years old, so we're not talking about a lot of

16   documents here.  They are broad because we don't know what they

17   have.  I don't know any other way, and the defendants keep

18   saying tell us what you want.  I don't know what we want

19   because I don't know what they have and they certainly aren't

20   going to tell us, so we have propounded broad requests, that's

21   right.  We do it in every case, because it's the only way to

22   find documents that you don't know one way or the other whether

23   they exist.  We don't know where we're going to find the

24   evidence.  But we know that this type of evidence is relevant

25   to the claims, and it falls clearly within the scope of

II-126

1    permissible discovery under the federal rules and under the

2    *Oppenheimer*, I think it was the *Oppenheimer* case cited by the

3    Supreme Court, which said it's relevant if it bears on or

4    reasonably could bear, could lead to other matters that could

5    bear on any issue that is or maybe in the case.

6            THE COURT:  That's been superseded of course by the

7    federal rule which limits it, limits that definition

8    substantially.

9            All right.  You aware of that?

10           MR. HORNICK:  No, I was not aware of that, Your

11   Honor.

12           THE COURT:  The *Oppenheimer* standard has been limited

13   by the federal rules and, I'm trying to think, probably about

14   two or three years ago, so that's not the standard anymore.

15           All right, why don't you move on. I just think these

16   are overbroad.  What I'm going to do with them I don't know,

17   but I don't think I'm going to allow all this stuff.

18           MR. HORNICK:  Well, Your Honor, if it's your decision

19   that there are aspects of them that are overbroad, I would

20   contend that that is not a basis for denying them for the same

21   reason that the defendants under the local rules are obligated

22   to produce to the extent that they don't have an objection.  So

23   certainly documents within the scope of these requests are

24   relevant to this lawsuit and we have a right to obtain them and

25   we will be prejudiced if we do not obtain them.

1          Number 105 is the Facebook's plans and

2    strategies.  These are relevant to all claims.  They are

3    relevant to damages.  It does not matter whether the trade

4    secrets have been adequately defined and it is in these

5    documents that we may find evidence of intent, of the cover up

6    of their wrongful activities and also these are the type of

7    documents that would be used to try to lure investors so

8    they're likely to be relevant to showing the value of the

9    company.

10          Number 107 is the Facebook's owners.  This is the

11    documentary counterpart to Interrogatory number 10 which we

12    discussed earlier.  It's relevant to all of the claims.  It

13    doesn't matter whether the trade secrets have been adequately

14    defined, and it seeks documents that will identify the key

15    players at Facebook so that we can figure out who to depose,

16    and it's relevant to many of the issues that I mentioned

17    earlier with respect to the request that relate to the

18    ownership of the company, whether the Facebook has standing to

19    assert its counterclaims, whether the individuals can hide

20    behind the corporate shield.

21          Numbers 108 and 109 relates to website locations,

22    server identity, server locations.  This was, this is the

23    documentary counterpart, well, no, it's related to

24    interrogatory 21.  Interrogatory 21 came later and it asks for

25    similar types of information.  This relates to finding the

1   missing code.  The defendants in, and as the Court

2   instructed after the November 18th hearing, identified some

3   information, provided information relating to who their web

4   hosting servers are.  That information is inherently

5   inconsistent and incomplete because they provided other

6   information and an interrogatory answer that was different from

7   the information they provided in a letter following Your

8   Honor's November 18th order.  So we're asking for any documents

9   they have not produced that relate to who provided server

10  capacity and who hosted the website.

11          The, number 110 is the frequently asked questions

12  that are on the Facebook website.  These relate to all claims.

13  It doesn't matter whether the trade secret has been adequately

14  defined, and the Facebook said that at some point that all of

15  the FAQ's are posted on the website, and we tried to get them

16  to clarify whether they all remain on the website so that if we

17  look today we would see every FAQ that had ever been asked.

18  They wouldn't tell us that.  They said they were considering

19  the production of other documents, terms of use and privacy

20  documents and then decided not to produce them when they filed

21  their motion, cross motion for protective order and these are

22  relevant to public perception of any similarities between the

23  websites and also how the servers operate.  One of the

24  frequently asked questions asks how do you host this site?  Do

25  you have a separate host, do you have a separate server for

1      every university?

2              THE COURT:  I'm sorry, which one are you talking

3      about now?

4              MR. HORNICK:  Number 110.  As I was saying--

5              THE COURT:  I'm sorry.  I understood the frequently

6      asked questions.  I understood that you said they wouldn't tell

7      you if all of them still remain.

8              MR. HORNICK:  Yes.

9              THE COURT:  And that's--

10             MR. HORNICK:  Then they voluntarily--

11             THE COURT:  That's all you asked for some I'm

12     confused as to where you're going.

13             MR. HORNICK:  Well, they voluntarily said during our

14     meet and confers that they had some other documents that they

15     thought were responsive which they call terms of use and

16     privacy policies that they were going to produce in response to

17     this question.  It was them that decided that they were somehow

18     responsive so they decided then not to produce them, so I'm

19     trying to obtain those documents because they thought they were

20     responsive.

21             THE COURT:  Terms of use and what?

22             MR. HORNICK:  Privacy documents.

23             THE COURT:  All right.

24             MR. HORNICK:  Then request number 113 is user

25     demographics.  This is directly relevant to damages.  It

1   doesn't matter whether the trade secret has been adequately

2   defined, and it's relevant to the addictive nature of the site

3   and the fact that this is a captive market for monitoring the

4   site, making money off of it.

5          And then there's 169, which is the last one in this

6   motion, and this is documents provided to or reviewed by

7   experts, and we had some discussions about this and we agreed

8   that neither side needs to produce expert related work product,

9   but they had refused to produce the documents that the expert

10  is relying on in order to form the basis of this opinion.

11         THE COURT:  Are we at the point where you've done

12  expert discovery?

13         MR. HORNICK:  No, we haven't, we're not to that

14  point.  We're not to that point.

15         THE COURT:  Why is this a, somewhat premature?

16         MR. HORNICK:  The reason it's in here, the reason

17  it's in here is because it was discussed during the meet and

18  confers.  We reached an impasse and we wanted to get it before

19  the Court now so that we could minimize, believe it or not,

20  minimize the number of motions that needed to be filed.

21         THE COURT:  Well, the rule on that is quite clear,

22  that if you show something to the expert it's not work product.

23  In other words because the rule says anything considered by the

24  expert, not necessarily relied on, anything considered by the

25  expert, so, I think that one is, I think that's pretty clear,

II-131

1    and it has to be a testifying expert also, but I'll deal

2    with that.

3            Okay.  Now, let me ask counsel for defendant, other

4    than 169, what has, I don't understand why this motion is

5    dependent on the identification of trade secrets.

6            MR. COOPER:  It isn't.  Your Honor, we actually put

7    in--

8            THE COURT:  Did you say it isn't?

9            MR. COOPER:  It isn't.  Let me make this very clear,

10   each of--

11           THE COURT:  I thought you told me that this motion

12   would be, one at least in the first instance would rise and

13   fall on the question as to the identification of the, and the

14   specification of the trade secrets.  Did I mishear you?

15           MR. COOPER:  You may not have misheard me.  I may

16   have been vague in what I'm trying to say.

17           THE COURT:  But you did file a formal response to

18   these document requests?

19           MR. COOPER:  Yes, I did, Your Honor, and we filed an

20   opposition to this motion.

21           THE COURT:  No, no.  I mean, you served a response?

22           MR. COOPER:  There's some, I can give some clarity to

23   your confusion if you'll just give me a moment and I can sort

24   of explain again the dichotomy here.

25           THE COURT:  All right.

1          MR. COOPER:  All of the motions have an element

2    of the trade secret as an objection.  They all also have--

3          THE COURT:  Well, the question is on this one, other

4    than on 169 where you've got expert stuff--

5          MR. COOPER:  And I can give a couple of examples,

6    that's why I was, I'm almost leery of explaining this again

7    since I've already been ordered to produce face match when we

8    had independent objections, but for instance, Mr. Hornick stood

9    up and talked about frequently asked questions and then said,

10   well, we agree to give TOS and some others.  No, we actually

11   went through each of these on over breadth on undue burden and

12   on other, on all the classical bases of objection, objecting

13   independent of trade secret.  What we had said was--

14         THE COURT:  And you actually served a response

15   pursuant to Rule 34(b)?

16         MR. COOPER:  Absolutely.

17         THE COURT:  Okay.

18         MR. COOPER:  I have a copy of it.

19         THE COURT:  That's all right, I believe you.  I just

20   want to make sure that, what we're talking about here.

21         MR. COOPER:  And let me give an example.

22         THE COURT:  Then if you served a response, what has

23   this cross motion for protective order to do with these

24   particular requests?

25         MR. COOPER:  There's a standing objection as it

1    relates to all documents after May 21st, 2004.

2              THE COURT:  Oh, right.  All right.

3              MR. COOPER:  That's where I need to make

4    clarification.

5              THE COURT:  All right.

6              MR. COOPER:  May 21st, 2004 is when the ConnectU

7    launched, therefore, there's this particular need for us to

8    know the trade secrets because by Mr. Hornick's own admission,

9    whatever is visible in the ConnectU site after May 21st, 2004

10   can't be a trade secret.  That is part of his very argument

11   that he gave you a few minutes ago.  It's publicly accessible

12   to anybody, you included.

13             THE COURT:  Okay.

14             MR. COOPER:  With respect to some of the requests you

15   just heard, including for instance tax returns, I don't, I am

16   sure based on your own experience in millions of these cases, I

17   don't have to repeat the law on the privacy issues that are

18   independently involved on some of the recur.

19             THE COURT:  Well, I understand that.  I'm just trying

20   to, I'm just trying to understand, and I think you answered the

21   question, except as to 169 these particular documents are not

22   related to the designation of trade secrets.

23             Now the other question I have for you is why with

24   respect to damages should these documents be limited to the

25   time period before May 21st, 2004?

1              MR. COOPER:  The case law that we were relying

2    on, Your Honor, said no discovery goes forward until there's an

3    adequate designation of trade secrets.

4              THE COURT:  Well, the problem with that is that trade

5    secrets are only part of the case, that the damages case is

6    going to remain even if the trade secrets are abandoned or

7    thrown out, so that, it seems to me that that time limitation

8    at least to these that go to damages.  There may be other

9    objections - (Inaudible - #4:41:47) - there's stuff like that,

10   but they're not going to be limited to May 21st.

11             MR. COOPER:  I've only set out our position on the

12   law.  If the Court is going to say as to some issues like

13   damages, no matter what happens the Court is going to compel

14   that certain production occur, what I would suggest is that in

15   a broad category to say, I mean, I'm here to try and get the

16   relief that is understandable that the Court understands our

17   position.  If you're going to tell me that as a matter of, no

18   matter what happens with the trade secret designation, there's

19   definitely going to be some relevance to some of the requests

20   subject to the over breadth, but I've--

21             THE COURT:  And you don't disagree with that, do you?

22             MR. COOPER:  No, I don't.

23             THE COURT:  Oh, okay.

24             MR. COOPER:  But I do disagree about several of the

25   characterizations you just heard.

1      THE COURT:  All right.  Well, I'll hear you, go

2  ahead.

3      MR. COOPER:  I mean, for instance, I was just advised

4  that I agreed to provide facts, FAQ's, frequently asked

5  question documents, which examples were actually given in the

6  production and subject to our objections for terms of service.

7  Terms of service was a request that isn't even part of this

8  particular motion.  Terms of service--

9      THE COURT:  Which I think I pointed out.

10      MR. COOPER:  Well, it's deeper than that.

11  Mr. Hornick seems have forgot in terms of service was a

12  discussion that occurred under number 112 which is not in front

13  of you.  All docs sufficient to identify the type of

14  information collected from users of thefacebook.com website.

15  The reason they didn't move to compel on that was the privacy

16  issues that he referred to, TOS and privacy.  The privacy

17  issues which we're talking about is the privacy issues of the

18  users.  He's conflating some issues here that go beyond merely

19  the over breadth, go beyond the trade secrets.  I understand

20  time has passed so I can understand how some of this confusion

21  can occur, but I want to make a generalized point about all of

22  these requests, including the ones that are forthcoming, the

23  ones that have already been discussed.  A mention was made of

24  the *Oppenheimer* standard.  You are absolutely correct.  The

25  2001 amendments to Rule 26 of the Rules of Civil Procedure

1  specifically changed the reasonableness standard from

2  *Oppenheimer* and in the advisory notes specifically advised that

3  the precise reason why was the overwhelming desire of the bar

4  to stop fishing expeditions.  I can't remember if the word

5  fishing expeditions is cited, but you were wondering when it

6  was overruled.  It was the 2001 amendments.

7           THE COURT:  I knew it was in the last couple of

8  years.

9           MR. COOPER:  If this isn't a fishing expedition, I

10  don't know what is.  We have 198 requests for production.

11           THE COURT:  I think actually Mr. Hornick specifically

12  said it was a fishing expedition, not in so many words, when he

13  said I make it broad so I can, so basically I can go fishing

14  and see if there's any evidence.

15           MR. COOPER:  Then I could, I do not need to stand up

16  in front of you because I have the advisory committee of the

17  rule changes in 2001 behind me.  You already know that change.

18  The fact of the matter is there are 198 requests that have been

19  served in this case.  We have four motions to compel.  We have

20  26 interrogatories, one more than permitted by the federal

21  rules, three sets of requests for production, one more

22  permitted than by the local rules.  You have, I believe,

23  somewhere between 10 and 15, we'll just take the conservative

24  10 subpoenas that have been served.  Much of the investment

25  information he's talking about he's independently sought from

1   the investors through a subpoena eliciting a third party

2   objection.  I don't need to point out beyond what you're

3   already reading, the problematical nature of these broad

4   requests.  Many of these requests I also don't want to belabor

5   because I already went through what are problematical about

6   asking for details like sports tickets.  I mean, I'm just am

7   hard pressed to believe that that's a valid damages.  Even if

8   you tailor a request to have us produce documents subject to

9   damages, it must be reasonably tailored.  It doesn't require

10  all the dynamics of the investor information.  What you want,

11  if I'm not mistaken is us to give an aggregate investment

12  value.  Why should all the investors also be subject to this

13  level of a burden?  What is it the defendant or the plaintiff

14  really wants?  Does he really want the names in the minute

15  amount of share hold things of each investor or is it what the

16  value of the company is?  Those are the sorts of questions we

17  should be talking about.  Again, the fundamental issue in

18  discovery is what do you want and why.  In this case, if you're

19  right, this is a fishing expedition.  The law says that burden

20  is never to be born.  It must be reasonably tailored to the

21  allegations of the case.  It must be calculated to lead to

22  reasonable, reasonably related to evidence and a demand for

23  sports tickets isn't, and that is actually called out.  I mean,

24  I could go through every one of these requests, Your Honor, but

25  I'm willing to just let you read the request and see the

II-138

1    problems without my ever having to open my mouth because

2    I'm so confident in it.

3           THE COURT:  And I take it you purport your view in

4    the, whether it's the opposition or the reply brief or

5    whatever?

6           MR. COOPER:  Yes, that's correct, Your Honor.

7           THE COURT:  Okay.  I'll take that under advisement.

8           19 to 23, interrogatories, number 121?

9           MR. HORNICK:  Your Honor, there's a lot of overlap in

10   these requests today, and there's a reason for that.  The

11   reason is that I can't get any discovery from the defendants,

12   and I have asked these questions narrowly.  I've asked them

13   broadly and no matter how I ask them, the defendants say

14   there's something wrong with them.  If I ask for specifics,

15   they say they're compound.  They say they're too specific.  You

16   don't really need that information, and if I ask broadly they

17   say it's too broad.  It's a plastic whip saw but the rules say

18   we're entitled to broad discovery and we have tried in every

19   way that we can think of to seek that discovery.  We can't get

20   it from the defendants so we're trying to get it from third

21   parties, but we shouldn't have to get it from third parties.

22   We should be able to get it directly from them.

23           THE COURT:  Excuse me.  Maureen?

24   (Pause)

25           THE COURT:  Go ahead.

1    MR. HORNICK:  We can take numbers 19 and 20

2  together--

3    THE COURT:  Hold on just a second please.

4  (Pause)

5    THE COURT:  Okay.  We're starting with 19.

6    MR. HORNICK:  19 and 20.

7    THE COURT:  All right.

8    MR. HORNICK:  These two interrogatories, requests and

9  identification of the defendants' memory devices.  Number 19

10  asks for an identification of Mr. Zuckerberg's memory devices.

11    THE COURT:  Wait a minute, hold on.  I'm sorry.

12  (Pause)

13    MR. HORNICK:  Number 19 asks for Mr. Zuckerberg's

14  memory devices that he's had since inception.  Number 20 asks

15  for identification of the other Facebook defendants' memory

16  devices since inception.  I mentioned earlier that this is

17  related to the issue of trying to find and recover code.

18  Finding this, getting this identification relates, it does to

19  the trade secret claim, but it relates more to the copyright

20  claim and in fact it relates to all of the other claims as

21  well, because for example whether Mr. Zuckerberg completed the

22  code that he said he would complete goes directly to the

23  contract claim.  This is just an example.  And we're still

24  trying to find that Harvard Connection code so we're trying to

25  identify all the devices in which it might be found.  So that's

1    an example of how these devices can be relevant to any of

2    the claims.  They're particularly relevant to the copyright

3    claim.   The answer to this interrogatory was that they didn't

4    provide anything at all except four pages of documents under

5    Rule 33(d).  That's TFB 52 to 55.  It's our view that they

6    cannot rely on Rule 33(d) because they're withholding documents

7    under other requests and the *Blake* case which we cited says

8    that.

9           Now, the Facebook has kind of gotten hung up on the

10   fact that these requests ask for the identification of 600 to

11   800 hard-drives and other memory devices.  We're not the ones

12   who first raised the issue of there being 600 to 800 memory

13   devices.  They brought that up in opposition to our motion to

14   compel imaging as a way of trying to cause that motion to be

15   denied, so once they said we have 600 to 800 devices, they

16   would contain $1/20^{th}$ of the Library of Congress, and we'd have

17   to take the Facebook down for two weeks to image them.  We

18   said, well, we want to know what devices you have.  We've

19   actually never asked you that in any other interrogatory, but

20   although it is a long interrogatory, it is asking for very

21   simply information.  What devices do you have?  Where are they

22   located?  Who are the custodians?  And what we got was just

23   these few documents, TFB 52 through 55.   Those documents are

24   insufficient because they don't identify anything.  They have

25   500 serial numbers for something.  We don't know what they are

1    serial numbers for.  They are for a single shipment in July

2    2005, which was 17 months after the Facebook launch.  They

3    can't possibly be identifying the memory devices from early in

4    the case, and when we asked well, what more can you tell us

5    about these documents, they refused to tell us anything more.

6    The response that they provided, they provided the same

7    response for both interrogatories 19 and 20 and they can't be

8    the same.  Zuckerberg's devices can't be the same as the

9    devices that would be responsive to number 20.  They do not

10   identify the devices from which the Facebook produced the data

11   on those CD's that we discussed earlier.  The responses do not

12   identify Zuckerberg's crashed hard-drive.  They don't identify

13   his lost hard-drive.  There's no reason why they can't give us

14   this information other than they just don't want to.  Their

15   argument is, oh, we don't have to answer this interrogatory,

16   these interrogatories because they're all part of the imaging

17   motion and Judge Collings' November 18th order resolved all that

18   so we don't have to answer this interrogatory.  But we view

19   these interrogatories as part of that discovery, although they

20   were propounded before Your Honor ruled on November 18th.  They

21   are an important element of trying to identify what these

22   devices are so we'll see the whole universe, and once we know

23   the whole universe we can figure out which ones aren't

24   important.  I doubt any of those ones, all those 500 devices

25   identified on TFB 52 to 55 are relevant.  I may be wrong but I

1    doubt they are, what's going to be relevant is other parts

2    of that interrogatory answer, especially early devices.

3              THE COURT:  Okay, next.

4              MR. HORNICK:  The next one is number 21, which is,

5    asks for similar information to document request number 108 and

6    109, which we discussed earlier.  This is asking for documents

7    to identify website providers and hosting services, and here

8    this information was relevant to all of the claims.  It doesn't

9    matter whether the trade secrets have been adequately

10   identified because we're trying to find code that relates

11   primarily to a copyright claim.  The answer was incomplete and

12   it's inconsistent.  It doesn't provide the specifics of the

13   services rendered by each company.  It's inconsistent because

14   it omits providers that were identified in the defendants'

15   December 1st letter that was provided to us after the November

16   18th hearing.  The November 1st, I'm sorry, the December 1st

17   letter identifies two providers, one that provided hosting

18   services from February of 2004 through September of 2004 and

19   another that provided services from May of 2004 through

20   September of 2004, but according to the media, they had a

21   single server launch five by March 31st of 2004, then moved to a

22   server in Mr. Zuckerberg's hometown, then moved again later.

23             THE COURT:  According to the media, what media?

24             MR. HORNICK:  The media, the media follows the

25   Facebook very closely and we can learn a lot, we learn more

1    from the media than we learn from discovery in this case.

2         Now, the defendants produced, identified a few

3    documents in a supplemental response to Interrogatory 21.  We

4    have said we cannot find a complete answer to this

5    interrogatory in those documents and, therefore, under the

6    *Petroleum Insurance Agency* case that we cited in the briefs,

7    they must give us a complete written answer to this

8    interrogatory.  As I said earlier, this information is directly

9    relevant to finding the missing code.  It's also relevant to

10   whether the providers were instructed to preserve evidence.

11   It's also relevant to whether Facebook sought any code from

12   them before the November 18th hearing as they said they did

13   during that hearing, and it's also relevant to the spoliation

14   and suppression of evidence issues.

15        The next one is 22.  This is one that I mentioned

16   earlier when we were discussing the identification of trade

17   secrets.  In this interrogatory we asked for Facebook

18   defendants to tell us of public domain sources that existed

19   before the launch of the Facebook that contained any of the

20   elements of the, of ConnectU's trade secret combination,

21   disclosure combination, and they refused to answer this

22   interrogatory.  They instead pointed us to their motion to

23   compel a trade secret identification, and they pointed us to

24   the 30(b)(6) deposition of ConnectU, both of which are improper

25   under the law.  Those are not proper substitutes for an

II-144

1  interrogatory answer, and as I said earlier, answering this

2  interrogatory would reveal the weakness of their defense that

3  elements of the Harvard Connection website or the Facebook

4  website were in the public domain or were known prior to the

5  time that the Facebook launched.  They named the few that they

6  allege are precedential in their motion to compel but they will

7  not put them into an interrogatory answer.  If they cannot

8  answer this interrogatory, it's further evidence that the trade

9  secret identification is entirely adequate.  We are simply

10 seeking a list, a complete list of the third party precedential

11 websites on which the defendants rely.  This does not relate

12 solely to the trade secret claim.  We need this information in

13 particular for the deposition of Mr. Zuckerberg.  We wanted to

14 ask him did you in fact know about these cites before the

15 Facebook launched.  If there are no such cites that the

16 defendants can provide in response to this interrogatory, they

17 should be ordered to say so.

18         Interrogatory number 23, this is another one of our

19 attempts to try to get investment information from the

20 defendants.  No matter how we ask, they object.  We hear a lot

21 about how important are tickets, sports tickets.  Well, I don't

22 think anybody would say that sports tickets, that this case is

23 going to hinge on sports tickets, but those kinds of perks are

24 the kinds of perks that 1) should have come to ConnectU, and 2)

25 those are the kinds of perks that a jury might be interest in.

1    They might not be interested in a lot of this other stuff,

2    but when they hear that people are being given cars and items

3    like that, their ears may perk up.  That is information that

4    could be very relevant in presenting this case to a jury, but

5    what's really important, I think we're entitled to all this

6    information, but what's really important is the type of

7    information that we request here, investment information,

8    investors, the amounts invested, ownership percentages, value

9    of the Facebook estimated for each investor and identified

10   related documents such as financial projections.  These

11   documents relate to all the claims in the lawsuit.  It doesn't

12   matter whether the trade secrets have been adequately

13   identified.

14       THE COURT:  How does this differ from the earlier

15   interrogatory?

16       MR. HORNICK:  Well, the earlier interrogatory 1) it

17   mentioned sports tickets and things like that, so we tried

18   asking it with taking those things out and we also included

19   value, which I believe was not included in the earlier

20   interrogatory, and, but it really doesn't matter how we asked

21   him.  There's always something wrong with it.  In response,

22   they named a few investors and they also said that they

23   produced some documents under Rule 33(d).  Those documents

24   were, there are 20 pages of documents.  They're unresponsive,

25   they're out of date.  They did not make a burdensome objection,

II-146

1   so Rule 33(b) doesn't apply under the *Blake* case.  We said

2   we can't find the answer under the documents, so they need to

3   produce a full written answer under the *Petroleum Insurance*

4   case, and because they are withholding other documents, they

5   can't rely on Rule 33(d).  You can't say I'm not providing an

6   answer to an interrogatory.  I'm producing documents instead

7   under 33(d) and then withhold documents under 33(d).  These

8   documents are subject to other motions to compel, and under

9   *Blake* there's no basis for Section 33(d) if you're withholding

10  documents.  They say that the request is compound but it,

11  everything in it is a logical extension of the main question

12  and that asks them to state the basis for any of the

13  information which is a defined term under the local rules, but

14  more importantly, I'm not sure how it's possible to avoid

15  asking questions like this when there's an interrogatory limit.

16  We can't possibly, we could break this out into many, many

17  interrogatories, then we'd be told that we were over the limit,

18  which we're not by the way.  We are right at the limit.  The

19  one that goes over the limit was agreed that it would not be

20  counted toward the limit because it is a result of the November

21  18th order, and here they also argued for a stricter standard of

22  relevance to protect their investors.  There's no case law to

23  support that.  There's no evidence that relationships with

24  their investors would be harmed, and we are seeking documents

25  from the investors now, so the investors are aware of this.  At

1   least the investors that we know about, but as I said

2   earlier, we shouldn't have to get these documents from the

3   investors.  We should be able to get them from the defendants

4   in this case.

5           THE COURT:  Okay.  Let me hear the defendant.

6           MR. COOPER:  Your Honor, on a couple of these, I'm

7   almost inclined to say I would just prefer you to read the

8   response, as well in this case a supplemental response.  In

9   this particular instance, they're moving to compel on

10  interrogatory responses that were actually even supplemented.

11  At a high level, again, I'm not going to waste the Court's time

12  in this hearing belaboring a fishing expedition.  Mr. Hornick

13  as he's going along, I give him credit.  He's getting creative

14  in trying to justify issues like sports tickets.

15          THE COURT:  Well, he took them out of this one so

16  let's not hear anymore about sports tickets.

17          MR. COOPER:  Okay, but at a certain level, he still

18  isn't justifying asking why he needs every detail about the

19  investor.  You asked me earlier about damages per se, and the

20  issue here isn't investors.  It isn't these tangential issues.

21  As I understand it and as you put it to me, it's a question of

22  value and what is it that he really wants?  Does he want to

23  know what the value of the company is or does he want to know

24  all these tangential issues about the investors which he's also

25  seeking via subpoena and which incidentally we responded to

1    these interrogatories.

2         Switching back, he mentioned something that's

3    important to take into account with respect to 19 and 20 in

4    which we point out in the opposition.  He thought he originally

5    served these interrogatories before the November 18th hearing.

6    We responded in kind at the November 18th hearing.  Recognizing

7    it was moot, they changed their theory.  This isn't about

8    whether or not we adequately responded to 19 and 20.  It's just

9    that after the November 18th hearing, they wanted more

10   information, but that's not the same thing as saying the

11   response that was provided was inadequate.

12        With response to the particular issue of

13   Interrogatory 22, the website with public domain information,

14   that one should be of curiosity to you.  When we talked at

15   length earlier about the motion to compel on the trade secret

16   designation, you made a very concerted point of telling me not

17   to make the distinction between summary judgment and

18   identification.  Well, now the shoe is on the other foot.  If

19   in fact the public domain information is relevant to that

20   interrogatory designation, then the question you asked me

21   earlier seems to be saying, why is the plaintiff wanting to

22   know what all the public domain information is.  I mean,

23   22--

24        THE COURT:  Well, why isn't it appropriate that that

25   be learned as a matter of discovery?  It may not be used until

1   summary judgment, but why isn't it appropriate?  What I was

2   dealing with was that part of the case from Judge Van Gestell

3   that talked about, you know, if they don't do it, thrown out.

4   I was saying that goes beyond discovery, but here they're just

5   making a discovery request or it's almost like a contention

6   interrogatory, and I don't see the connection between what I

7   said earlier and getting information about what your contention

8   is.

9        MR. COOPER:  My point simply was earlier when I was

10  raising the public domain issue, it was to show that this was

11  so general that I could point to domain sites that at a high

12  level they can't deny meet those definitions.  That was why we

13  briefed the issue.  Remember, what they're asking for here is

14  contentions related to our own briefing.  Now, you may be

15  right.  The best way to look at 23 I suspect is as a contention

16  interrogatory, but the problem is it's directed to an argument

17  we were making why the trade secret designation was inadequate

18  for purposes of understanding what the trade secret is.  Now

19  they're saying, well tell us what the public domain is for a

20  trade secret.  We're already telling them we don't understand

21  what you're claiming to be the trade secret.

22       THE COURT:  Oh, I understand that 22 is related to

23  the designation of trade secrets.

24       MR. COOPER:  Then I'm not going to waste your time.

25  I mean, as I said, I believe if you look at the responses that

1    are given to each of these, the problems with these

2    interrogatories to the extent they are moving to compel for

3    further information beyond what was provided to them is self

4    evidence.

5            THE COURT:  Thanks.  Okay.  We're getting down to the

6    end.

7            Actually, let's take a 10 minute break.  It's been a

8    couple of hours since lunch.  We'll take a 10 minute break.

9    We'll reconvene at five of four.

10   (Recess)

11           THE CLERK:  All rise.

12           THE CLERK:  Court is back in session.

13           THE COURT:  Please be seated.

14           Now, we have 126, which is the next one.  Plaintiff's

15   motion to compel Facebook defendants production of documents in

16   response to request productions 171, 174, 182, 184 and 187, and

17   I'll hear the plaintiff of that.  Let me just get them before

18   me, please.

19           Okay.

20           MR. HORNICK:  Your Honor, starting with 171, here we

21   have our friends, the investors again, and rather than

22   discussing this particular request from a substantive point,

23   I'd like to give Your Honor some idea of how this has come

24   about.  In our first set of requests which were propounded

25   almost a year ago now, we set forth a production request and

1    interrogatories had asked for the identification of

2    investors and value.  They were in separate requests at the

3    time.  We received objections.  We went through seven hours of

4    meeting and conferring.  We finally got to the point where they

5    were going to give us some documents and not others.  Then

6    everything came to a standstill, and then in the fall, we

7    decided that we would serve a second set of discovery requests.

8    In those requests we tried to ask for some very important

9    information in a slightly different way that maybe wouldn't be

10   as objectionable to the defendants, but it turned out to be

11   just as objectionable, which forced us to have to file a second

12   set of motions to compel.  We didn't want to have to bother the

13   Court with anything more than we had to do, had to bother the

14   Court with, but the problem is we can't go forward with the

15   case without discovery.  So here we are in a situation today

16   where we keep seeming to run into the same types of requests

17   but there is, the reason for it is the set of facts that I just

18   described.  This particular request, 171, is similar to 70 and

19   71 and 101 that we discussed earlier and it's related to

20   interrogatories number 16 and 23.

21          THE COURT:  Okay.

22          MR. HORNICK:  The next request is 174, which is

23   asking for the factual basis for the defendants' counterclaims.

24   Interrogatory 6, which Your Honor denied, was asking for an

25   interrogatory answer that gave us the basis of the

1  counterclaims, but this request is asking the defendants to

2  produce whatever documents they have that would support their

3  counterclaims but they refuse to do so.  I don't know why they

4  would want to refuse to produce documents that support their

5  counterclaims, but if they don't have such documents, we ask

6  that they be required to amend their answer to say that they

7  don't have such documents.

8            Number 175 asks for Mr. Zuckerberg's homework over a

9  two month period.  He was a student at Harvard University

10  during the 2003, 2004 academic year.  It was during that time

11  from around roughly mid November to, some time in November of

12  2003 to some time in January of 2004 that he was a partner

13  working on a Harvard Connection code, and during that time

14  period the Harvard Connection founders were trying to find out

15  if he had done the work that he had said he would do and had

16  done and every time they tried to get a meeting with him, he

17  put them off.  Also, in document that he filed with the Harvard

18  Ethics Board, he told them that he wrote the code between

19  January 15th of 2004 and February 4th of 2004 while juggling

20  course work and taking exams and having a girlfriend.  So what

21  we want to do is we want to get that homework.  We've asked

22  specifically for certain homework in another request that's not

23  the subject of any motion, but we've broadened the request for

24  all of his homework during this relevant period because we want

25  to reconstruct his schedule in detail over that

1   two-month period.  He should have preserved this evidence.

2   He was on notice of the plaintiff's claims from six days after

3   the Facebook launched and he was represented by counsel at that

4   time.  This information is relevant to all the claims in the

5   case and to the defenses.  It doesn't matter whether the trade

6   secret has been adequately defined, and it's relevant to

7   whether Zuckerberg acted in good faith to his voracity and

8   credibility, when did he really start working on the Facebook

9   and it's also relevant to the spoliation and suppression of

10  evidence issues.

11          176 and 177 and 178 can be taken together.  We've

12  already discussed them earlier.  These are the ones where we

13  have asked the defendants to identify public domain sources of

14  elements of the trade secret combination, and 176 and 177 ask

15  them to identify respectively sources of all of the elements of

16  the combination, that's number 176 and 177 asks for certain

17  parts of that combination.  178 asks for any elements of the

18  combination.  The defendants have ignored our arguments on

19  this.  As I said earlier, their inability to produce these

20  documents shows the weakness of their trade secret

21  identification motion and there's no reason not to respond.

22  Whether their motion to compel is granted or denied, there are

23  no argument, and they present no arguments whatsoever for not

24  providing these documents if their motion is denied.  We need,

25  as I said earlier, we need these documents.  Earlier we were

1   talking about the interrogatory, we need these documents

2   again so we can ask Mr. Zuckerberg, did you know about these

3   public domain sources when you, before you launched the

4   facecode?  If they have no documents responsive to these

5   requests, they should be ordered to say so.

6            Request number 179 is for design of technical

7   documents, specifications for the website code and the

8   database.  None have been produced.  Our expert needs these

9   documents.  The, as I said earlier, the Facebook has produced

10  incomplete code for October of 2004 and December of 2004, and

11  we need the database documents covered by this request for the

12  reasons that are related to number 180, which is the database

13  definitions, which I'll get to in a moment.  Here, they made an

14  objection in the meet and confer and then in their opposition

15  that they don't need to produce any post May 21st, 2004

16  documents.  That was not in their requests, so that objection

17  has been waived, but it's important to understand that they

18  can't possibly have that objection to this request because they

19  themselves have produced October 2004 and December 2004 code,

20  so how can they, how can they refuse to produce the technical

21  documentation that relates to that code, for those particular

22  versions of the code.

23           180 is we're back to the subject of database

24  definitions, and I won't repeat anything I said earlier but

25  what I will say is in response to something Facebook defendants

II-155

1   said earlier, and that is that we view the database

2   definition as an integral part of the site, as an integral part

3   of the code, and Mr. Cooper said it is not part of the code,

4   but yet it is something that was specifically requested in this

5   particular request, but also in our request number 66, which is

6   not the subject of any motion, we asked for all documents

7   sufficient to identify all elements of thefacebook.com website

8   as it existed on February 4th of 2004 and all elements, and then

9   it ends by saying, including the underlying code.  All elements

10  of the website as of launch or as of pre-launch or as of

11  post-launch would include the database definition.  Database

12  definition is an integral part of their website.  The website

13  will not function without it, and it is also an integral part

14  of the Harvard Connection website and ConnectU.  They would not

15  function without the database definitions.

16         Number 181 is, also incidentally to the database

17  definitions issue, the, when we were talking earlier about the

18  fact that the defendants had not done all that we would have

19  done to search for the code and the database definitions, they

20  said that wouldn't be on the servers they searched.  They would

21  be on the production servers, and there's no evidence

22  whatsoever that they searched their production servers.  So

23  that's also something that we would have done to look for those

24  database definitions.

25         Number 181 is any pre-existing code used in the

1    Facebook and the defendants have said there is some such

2    code. We are asking them to produce it or to specify where in

3    the production it is if in fact they have produced it.  This

4    relates to whether Mr. Zuckerberg wrote the Facebook code in

5    the timeframe he alleges, whether any Facebook ideas or code

6    were pre-existing or from some other source.  It's relevant to

7    all of the claims.  It doesn't matter whether the trade secrets

8    have been adequately defined.

9           Then there's number 182, which is coursematch code.

10   Everything I said about 181 really applies to 182 as well, and

11   then there's 184 and 185.  We talked about these earlier today

12   when we were talking about the discovery relating to the

13   November 18th order, and this is when I pointed out the three

14   situations in which the defendants said unequivocally that they

15   had no problem in producing Mr. Zuckerberg's hard-drive.

16   Mr. Cooper took you to page 34 of the November 18th hearing

17   transcript which I took you to and he said we weren't talking

18   about imaging.  If you read the couple of pages before and a

19   couple of pages after, Your Honor made the statements, I'm sure

20   that when you read them that you'll realize that you were

21   talking about imaging, but whether you were talking about

22   imaging in that particular instance or not, as I think you

23   were, it is clear in the other two examples that I cited that

24   the defendant said that they had no problem whatsoever

25   producing Mr. Zuckerberg's hard-drive and we want to re-iterate

1   our need to obtain it because as I've said several times we

2   cannot see on the copy that they produced the crucial evidence

3   that would only be available on the hard-drive and the image

4   and there's no reason to believe that the image was properly

5   done.

6           Number 186 is web activity logs, statistics and

7   reports of website usage.  This is similar to information that

8   was requested in request numbers 85 to 89 and Interrogatories

9   11 to 14, but although it is a similar type of information, it

10  is looking at a different source or a specific source of such

11  information, namely, web activity logs and documents that would

12  contain statistics or reports of usage.  This goes to the heart

13  of the damages case.  Both our expert and the Facebook's expert

14  will need this information.  It's directly relevant to all the

15  claims and damages.  It doesn't matter whether the trade

16  secrets have been adequately defined, and if this information

17  is voluminous as if the defendant, as the defendants say it is,

18  they can produce it electronically which will collapse that

19  voluminous information down into the size of something like a

20  CD, and if they do not answer or provide this documentation, we

21  ask that they be precluded from attempting to counter

22  ConnectU's evidence or expert opinion on this issue.  It's

23  directly relevant to the viral growth and value of the Facebook

24  and to their improper head start and to the addictive nature of

25  that site.

1          And finally, and we have request number 187, this

2    request was originally propounded as request number 50 and it

3    had an exhibit attached.  We inadvertently attached the wrong

4    exhibit.  Rather than working with us and saying well, we'll

5    produce it if you give us the right exhibit, the defendants

6    objected so we re-propounded request number 50 as request

7    number 187, and what this asks for is specific coding that

8    Mr. Zuckerberg said he wrote in an email that he wrote to one

9    of the Harvard Connection founders on November 22nd, 2003.  He

10   said he'd written the code.  He used the word coding so they

11   can't object to the word coding, and we're asking that they

12   produce that coding, and it's directly relevant to whether

13   Mr. Zuckerberg fulfilled his agreement, which is a breach of

14   contract claim.  It doesn't matter whether the trade secret

15   claim has been adequately defined.  It's relevant to the other

16   claims as well, and it's relevant to whether Mr. Zuckerberg

17   used that coding in the, in the Facebook, and we ask that this

18   code either be produced or confirm that they destroyed it.

19          Thank you.

20          THE COURT:  Okay.  Let me hear the defendant.

21          MR. COOPER:  Many of these requests that counsel has

22   just gone through, he's identifying them in a manner that isn't

23   the actual request but of course is his argument as to what he

24   believes the response suggests.  In other words, for instance,

25   when he talks about requests relating to 184, 85, 87, the

1   Zuckerberg hard-drive request, the coding of Zuckerberg in

2   his November email that refers to, I'm going to go back to what

3   I've said at the beginning of this hearing, at the very, very

4   beginning, we have produced all code.  What Mr., fundamentally

5   what Mr. Hornick is upset about is that the evidence isn't

6   supporting his allegation.  Now, he also referred to, tell us

7   where the code in all that is.  Your Honor, if you recall at

8   the outset, we had this whole discussion about this work

9   product document.  We were prepared to this, but again, we

10  couldn't get even this reasonable assurance that there wouldn't

11  be a claim for waiver.  Now, if that's the case, it's an odd

12  request that he's demanding that we waive the work product

13  privilege via the request for production if that's what's going

14  on here.

15          THE COURT:  Well, I thought we resolved that.

16          MR. COOPER:  I believe we did too.

17          THE COURT:  Well, this morning I mean.

18          MR. COOPER:  Yes, I agree.  I'm just simply pointing

19  out there is repetition going on and I don't want to, in order

20  words, yes, we resolved it to my satisfaction.

21          Let's take a look at 186, all web log activity logs

22  and all documents concerning or containing statistics or

23  reports of usage of thefacebook.com website.  Responding to

24  that as it is, that particular request as it is written, would

25  entail printing out millions of pages reflecting constantly

II-160

1  changing levels.  Now, Mr. Hornick now says, well, give us

2  electronically.  As those other requests, there's no temporal

3  limitation.  Do you know there's virtually no temporal

4  limitation?  What is the relevance of the daily web log usage

5  when four to six million people as he points out sign on.  Can

6  you imagine the burden on AOL to produce that particular

7  request.  I mean, just think of commonsensical how the web

8  works.  More importantly he says it's relevant to their damages

9  theory.  How?  What is the daily web log usage going to show

10  any more than a daily calculation of loss and profit is going

11  to show.  No expert relies on the daily value.  They rely on

12  aggregate values, and he keeps telling you the aggregate value.

13  So the Court should ask itself what is it he really wants and

14  why.  This is the fundamental point of all these requests.

15  This one, 186, underscores the burden that plaintiff expects

16  the defendant to incur for its own purposes that you can't

17  really show any relationship to any value.  I mean, damages?

18  Again, I ask, why isn't an aggregate statistic value good

19  enough.  He talks about they want to show growth in that, but

20  you don't show growth by daily profit.  You show it by

21  quarterly profit.

22          Request 182 referred to the coursematch.  Again,

23  there's a question here, what is relevant about coursematch in

24  a lawsuit relating to ConnectU and Facebook, but to the extent

25  that we could try and find any code, we tried to produce it.

1  Defendants then or plaintiff then seeks to compel a

2  different response.  It underscores again what I'm trying to

3  point out.  Many of the responses just simply the plaintiff

4  doesn't like, not that there was an inadequate response.

5          One that is particularly interesting that you heard

6  them request is 175, identifying, constituting or concerning

7  Mark Zuckerberg's problem sets, class papers and other homework

8  or class assignments from December 1st, 2003 through February

9  4th, 2004.  They have a theory about course work.  These are

10  Harvard students at the age of twenty something.  Your Honor,

11  can you image if you had a daughter if she was served a

12  subpoena, give me all your homework from even a four-month

13  period, and most college students don't even maintain it after

14  the grades are given.  I certainly didn't when I was in

15  college, but most importantly, it shows you how intrusive the

16  plaintiff gets.  They're seeking homework.  I mean, they have a

17  theory as to relevance but it's tangential.  The point here is

18  these requests again reflect the fishing expedition we have

19  been subjected to, the overburden that we have been subjected

20  to, extensive burden.  I will again, rather than belabor this

21  issue, simply say, you can read our response.  I believe it's

22  adequate.  You can read our opposition.  Again, it will set

23  forth as it has in all the other responses that overlap many of

24  these overlap by Mr. Hornick's own admission.  It will set

25  forth the reason that these requests are improper and there is

II-162

1    no basis for compelling the information sought beyond the

2    answers that were actually given which are adequate.

3           Thank you.

4           THE COURT:  Thank you.  Now, the motion that just

5    came in the end of last month with respect to settlement

6    conference or mediation, the time for response to that hasn't

7    occurred, but as long as you're all here, what is the

8    plaintiff's view on that?

9           MR. COOPER:  Your Honor, for this - oh, I'm sorry,

10   the plaintiff's view - it's defendants' motion.

11          THE COURT:  I know, but I want to find out what the

12   plaintiff's view is.

13          MR. HORNICK:  Yes, Your Honor, our response isn't due

14   until the 10th, but I'm prepared to address it today.  The

15   motion requests a settlement conference mediation or some other

16   settlement technique, and during the meet and confer that we

17   held on this particular issue, we informed the Facebook

18   defendants that we, our client does not view such a conference

19   as being beneficial at this time.  There's been so little

20   discovery.  There is so much that is being withheld.

21   Mediation, we also said to them is an inherently voluntary

22   process and settlement is not fostered by a motion to try to

23   force our clients into mediation.  We also said that the Local

24   Rule 16.4(C) says that mediation may be granted upon agreement

25   of all the parties, and we said that ConnectU does not agree to

1   mediation at this time.  I believe that settlement during

2   such a process would be unlikely because the Facebook has been

3   making statements that they believe that this case has nuisance

4   value.  ConnectU's view on the other hand is that they want the

5   keys to the kingdom.  So if we're forced into mediation, I

6   think it's going to be a waste of time, a waste of money.  It's

7   likely going to be counterproductive.  ConnectU is going to

8   view this as another way to delay the case as I do and that it

9   will be another tactic to further increase the cost of this

10  case unnecessarily, and what I say is that if the Facebook has

11  some kind of a serious settlement offer that they want us to

12  consider, they should make it and we'll consider it and we'll

13  respond appropriately.

14           THE COURT:  Mr. Bauer, did you want to speak on this

15  matter?

16           MR. BAUER:  Yes, Your Honor.  Thank you.  I'm just

17  Boston counsel, but there's a few facts that I think are just

18  important for the Court to know and as Boston counsel a little

19  bit removed from this, I think I can provide a little different

20  prospective.

21           First, there's been no demand made in this case at

22  all from the plaintiffs.  These are just a few background

23  facts.  So after all this time in this case, plaintiffs get to

24  make any demand.  Second, the principles have never met in this

25  case for any settlement, but what triggers the timing of this

II-164

1  motion, Your Honor, is that there was a hearing in

2  California on February 17th, and at that hearing, I'm just going

3  to read a couple of sentences from the judge out there, and

4  this is the court, "I'm just going to make a suggestion if you

5  haven't done it already, because my take on this file is that

6  it has all the earmarks of a blood feud.  There must be a lot

7  of money at stake.  I know something about the internet

8  business.  There has to be a lot of money at stake in this

9  litigation or has to be a blood feud for all these lawyers who

10  are so able and so expensive to be litigating this case here

11  and in Massachusetts.  So, Your Honor, where I go with this, I

12  have a suggestion that may help with all of these discovery

13  motions and all those motions to compel that are before you and

14  what we've heard today, Your Honor, or at least what I've

15  heard, because I haven't been in all these settlement or

16  discovery conferences, is that ConnectU is asking for

17  essentially every single piece of paper Facebook has and every

18  single digital fit, every single bit, whether it's source code,

19  whether it's fragments or whether it's blank space.  On the

20  flip side, ConnectU has basically told the Court today that

21  they have no evidence of copyright infringement, none, which is

22  why they want to keep looking, and by the way, if there is no

23  copyright infringement, this Court looses jurisdiction, and as

24  far as I've heard today, they aren't prepared to identify these

25  specific trade secrets.  So, with all that background, the

1    Court in California made a suggestion, and I think it might

2    make sense for this Court, and this is the Court's suggestion,

3    I'm making a suggestion that the - he has the names, but that

4    the counsel get together and see not necessarily that the case

5    go away, but they talk out some of these issues and pare this

6    down, because frankly it is unfair to the Court and to all the

7    litigants who come into this court for us to be essentially

8    taken over by a case.  We can't do it.  We just can't do it.

9    So with that background, Your Honor, I--

10            THE COURT:  He's a very, very intelligent perceptive

11   judge.

12            MR. BAUER:  And, Your Honor--

13            THE COURT:  That's exactly what I was thinking.

14            MR. BAUER:  And, Your Honor, that's exactly, this was

15   shown to me as a transcript because again I am dispatched and

16   removed, the suggestion was let's get in front of the Court

17   with the timing.  We know Your Honor has a lot of experience

18   with settlement.  Settlement, mediation is never a one time,

19   rarely a one time event.  You need to have a first event and it

20   becomes a process.  The Court has the jurisdiction to order the

21   parties to come face to face.  They never have.  It has the

22   jurisdiction to require that to happen here.  The cost would be

23   on Facebook because the Facebook lawyers and clients are in

24   California.  The suggestion, Your Honor, would be that you

25   order a mediation session some time in the next 30 days while

1   Your Honor has all these discovery motions pending, and a

2   few things may happen from that mediation.  First, we would

3   expect to see a demand from the plaintiff finally.  Second, we

4   would have the principles in the same room.  And third, as part

5   of the order, there should be an order that the parties try to

6   pare this case down, and what I would hope that comes out of

7   that is that it might make it easier for Your Honor on all

8   these discovery issues that are pending, and it's consistent

9   with what is going on here in California, and that's our

10  suggestion, Your Honor.

11          THE COURT:  And what, and did anything happen as a

12  result of the judge's suggestion in California.

13          MR. BAUER:  Your Honor, that's all very recent, but I

14  think that there's going to be a similar motion filed out

15  there, but there's nothing right now pending.  That was the

16  judge's order.  The date on this was just recent.  It was

17  February 17th, and so Mr.--

18          MR. COOPER:  Your Honor, in all fairness, I'm the

19  attorney that, I was one of the attorneys at that hearing.

20  Counsel for the defendants, in order to answer your question

21  adequately, you need to understand the posture.  Counsel for

22  the defendants is consistent in each case.  We appear in both

23  California, which is a different case involving the same

24  parties on a misappropriation claim and we appear out here;

25  however, counsel for plaintiff, Mr. Hornick, is not the lead

II-167

1  counsel in California and they have, in California lead

2  counsel for the defendants met with his partner who is not

3  involved in this action in an attempt to pare down the case.

4  We have made proposals.  It's our understanding they may have

5  been rejected in the context of the discovery, but Mr. Bauer is

6  correct.  I contemplate that it's very likely we would make a

7  similar motion in California as to at least the mediation, but

8  I don't want to misrepresent that we haven't at least already

9  started the process.  We did in fact meet face to face to try

10  and make a proposal.  We, being the defendants in this action,

11  the plaintiff in California did in fact forward one to

12  Mr. Moscow.  He forwarded a counterproposal at least on

13  discovery.  It didn't, it was rejected.  However, that being

14  the case, it is not, it is not the Facebook's position that the

15  process is open.

16        MR. HAWK:  Your Honor, if I could just correct one

17  additional point as a matter of the record, and unfortunately

18  at a time before Mr. Bauer was involved with the case or

19  either, there was in fact a demand made by the plaintiffs in

20  conjunction with the initial status conference--

21        THE COURT:  Well, that's what I was just going to

22  look at because I recall that as being a requirement.

23        MR. BAUER:  I'm sorry, Your Honor.

24        MR. HAWK:  It happened.  It was made, I think

25  everything that Mr. Bauer has said since then can be amended

II-168

1  with the understanding that the settlement offer was

2  considered unrealistic--

3          THE COURT:  Offer or demand?

4          MR. HAWK:  I'm sorry, the settlement demand was

5  considered unrealistic at least, and I've actually toned down

6  the level of adjectives that I might apply to the demand.  It

7  was literally a demand that ConnectU be given the keys to the

8  kingdom.

9          MR. COOPER:  Your Honor, if you'd like I have the

10  transcript from California.

11          THE COURT:  No, that's all right.

12          MR. COOPER:  Okay.

13          MR. HORNICK:  Your Honor, could I respond briefly to

14  one or two points there?

15          THE COURT:  Sure.

16          MR. HORNICK:  They said that the principles never

17  met.  That's untrue.  Howard Winklevoss, who is one of the

18  managers in, ConnectU is an LLC, and the officers are called

19  managers, Howard Winklevoss met with the Facebook CFO a couple

20  of weeks ago at the Facebook CFO's request in California and

21  our client concluded that settlement talks wouldn't go anywhere

22  at this time, and regarding the California case, that case I

23  think the Court should just know was filed by the Facebook, not

24  by ConnectU--

25          THE COURT:  Oh, I understand that.

1              MR. HORNICK:  --and I'm not involved in that

2    case.  I can't really talk about it.  I also heard that we

3    admitted there's no evidence of copyright infringement.  I said

4    nothing of the kind.  I didn't say one way or the other today

5    whether there's evidence of copyright infringement.  I talked

6    about the fact that the October and December 2004 code is

7    incomplete and that code can't be compared, and I also disagree

8    on the law regarding jurisdiction if that claim were to be

9    dismissed and I don't think it's necessary--

10             THE COURT:  What's the basis for jurisdiction if the

11   claim is dismissed?

12             MR. HORNICK:  There's plenty of law, Your Honor, that

13   says this late in the case if--

14             THE COURT:  I don't see this as being that late.

15             MR. HORNICK:  Well, nevertheless, there is no motion

16   pending to dismiss the copyright claim.

17             THE COURT:  There is.  There's a motion to dismiss.

18   We're working on it.

19             MR. HORNICK:  Well, on the--

20             THE COURT:  On jurisdiction.

21             MR. HORNICK:  Yeah, the motion to dismiss, well,

22   yeah, it can be viewed that way.  I don't see that that is a

23   good motion, and even if it were to be granted--

24             THE COURT:  Well, that remains to be seen.

25             MR. HORNICK:  Well, even if it were to be granted, it

II-170

1    can be refiled the next day and I don't think there's

2    anything that would--

3            THE COURT:  Refiled in another court.

4            MR. HORNICK:  No, it, the copyright claim would have

5    to be refiled in this court.

6            THE COURT:  Well, wait a minute.

7            MR. HORNICK:  The Federal Court has exclusive

8    jurisdiction over copyright claims.

9            THE COURT:  I know but I thought the motion to

10   dismiss was, the motion to dismiss for lack of jurisdiction was

11   based on the fact that it wasn't a viable copyright claim?

12           MR. HORNICK:  No.

13           THE COURT:  I haven't looked at that in a while.

14           MR. HORNICK:  No.  It's based upon the standing

15   argument and to be honest, I didn't read it before we came here

16   today, but it's based upon a standing argument.  It's not any

17   kind of an argument that there is no copyright claims from a

18   substantive point.

19           MR. COOPER:  Your Honor, if I could explain, the

20   motion that is pending on the copyright claim relates to the

21   timing and the standing of the parties at the time.

22           THE COURT:  Oh, all right.  Okay.

23           MR. COOPER:  There has not been a summary judgment of

24   no copyright infringement because they have yet to identify any

25   element of copyright infringement for us to deal with.

1          THE COURT:  All right.  Well, I mean, I really

2    can't say it any better than the judge in California said it,

3    but on the other hand, I'm reluctant to send this to one of my

4    colleagues to do mediation.  It could go to one of my

5    colleagues under the Court's ADR program.  If there's a, if

6    there's a, you know, if there's little likelihood that any

7    progress would be made, because I'm not particularly happy

8    about burdening a colleague with a useless exercise and it also

9    adds to the expense to counsel to participate in a mediation,

10   and the other problem is that I don't want it to be a situation

11   where if I did send it to mediation you'd end up before

12   whatever judge got it and say that well, we really can't, we

13   really don't have basic discovery to enable us to evaluate the,

14   evaluate the strengths and weaknesses of our case, so

15   considering that we're so far apart, the thing that might cause

16   one side or the other or both to move would be some sort of

17   analysis as to the strength and weakness of the case, and if

18   there's a, if one side or the other or both go they don't have

19   the discovery necessary to do that evaluation, that also puts,

20   makes the mediation less useful.  So I'm not inclined to send

21   this to an involuntary mediation at this time.  So I'm going to

22   deny that motion, but in denying it I'm certainly not saying

23   that this is a case that not should be subject to alternative

24   dispute resolution techniques at some point in time, and that

25   counsel should be consistently re-evaluating their positions

II-172

1    with respect to whether or not a mediation would be

2    helpful.

3         The only thing that we've left up in the air is the

4    re-argument, the gratuitous re-argument on motion 37 which

5    occurred at 11:15 this morning.  I think that the plaintiff's

6    counsel in response to the Court's question, specifically laid

7    out what he wanted, and I suppose I should ask, because I'm not

8    sure you responded to this aspect of it, is, Mr. Hornick, what,

9    if I thought that it was appropriate to require the defendants

10   to give over the mirror images, what is your position with

11   respect to them going to an independent expert as opposed to,

12   as to propose to the plaintiff.

13        MR. HORNICK:  Well, Your Honor, we would rather not

14   incur the expense of an independent expert.  I have this going

15   on in another case at this time actually, and there are cases

16   out there that have, where the Court has appointed an expert

17   who has acted as an independent.  There are also situations

18   where the Court has appointed the plaintiff's expert as its

19   expert or an officer of the Court for the purposes of this

20   particular procedure, and in this other case that I'm dealing

21   with right now, we established a protocol where the, our expert

22   would do the imaging and then would turn over to the other side

23   a report on what was found, and the expert would also say, I

24   find that this is relevant and then the defendants' counsel

25   looks at that report and they say that, if they agree that it's

II-173

1  all relevant, they have to produce it.  If they disagree

2  that any of it's relevant, they go back to the expert and they

3  argue with him about it.  If he then agrees with them, they

4  don't have to produce it.  If he doesn't agree with them, then

5  the items that they disagree on must be submitted to the Court

6  for the Court to determine, and anything that the defendant's

7  withhold from what's been identified by the expert has to be

8  submitted to the Court as well, so the Court can determine

9  whether that should be withheld.  And then after that procedure

10  is resolved, it can be provided to the plaintiff.  Now, that's

11  a procedure that could be used here.

12          THE COURT:  Well, what about all the stuff that your

13  expert or plaintiff's expert would see that's not relevant.

14          MR. HORNICK:  Well, the point here is that the

15  expert, and that happens in any one of these cases where the

16  plaintiffs--

17          THE COURT:  Except that if it's an independent

18  expert, it's not someone working for you.

19          MR. HORNICK:  Well, Your Honor, the, that's

20  absolutely true, and if the Court would be more comfortable

21  with having an independent expert doing this examination, we

22  ask that the defendants be required to pay for it and that

23  would solve the problem.

24          THE COURT:  Okay.

25          MR. COOPER:  Your Honor?

1        THE COURT:  Yeah, I'm going to, well say what you

2   want to say and then I'm going to tell you what I want to do

3   with respect to this re-argument on 37.  Go ahead.

4        MR. COOPER:  Again, there's a part of me that asks

5   the Court rather than take virtually everything you've heard

6   this morning without any papers at an ad hoc type of argument,

7   at least give us the--

8        THE COURT:  Well, that's what I was going, and I'm

9   sorry, I thought you were going to respond to what he was

10  talking about.

11       MR. COOPER:  I have one fact I just didn't get to

12  tell you this morning, they're going to be moot in light of

13  what you just said.  I want this to be made known.  There are

14  485 to 500 gigabytes of extraneous data.  If you have a memory

15  stick, you can start doing the calculations and understand what

16  it is that plaintiff has asked you to allow.  Now, if what

17  you're going to say is that we'll have the opportunity to brief

18  this issue and explain our position--

19       THE COURT:  Maybe I'm not understanding exactly what

20  he, what you're saying because they want the images of the

21  particular devices that, and a list of the devices not imaged.

22       MR. COOPER:  Right.

23       THE COURT:  Now, what are you saying?

24       MR. COOPER:  When you add in the amount of data from

25  the images, the device is not imaged.  Say for instance server

1  clusters, there was no basis for our forensic individual to

2  think any code could have ever been transferred to.  The only

3  argument that plaintiff ever made to us is well maybe somebody

4  copied it to those servers.  All of that, my point is, you

5  start adding in all that, we're talking about 485 to 500

6  gigabytes of data.  That's why I said, for all of the devices--

7           THE COURT:  And ergo what?  I mean what do you, what

8  inference do you want me to drawer from that?  They're asking

9  for it to be, you know, to be turned over to let's say an

10 independent expert.  Why does that create a burden for you that

11 there's a lot on there?

12          THE COURT:  Not a problem at all.  It's the searching

13 of 485 gigs if we have to turn that over.  I just want to make

14 this clear, the plaintiff's position--

15          THE COURT:  Well, I assume the expert will be doing

16 the searching.

17          MR. COOPER:  That's true.  I guess the issue I react

18 to--

19          THE COURT:  You're just saying the searching is going

20 to be a lot more expensive than perhaps people realize.  Is

21 that what you're saying?

22          MR. COOPER:  Yeah, and that's why I want to say by

23 saying that we pay for it all, I've made an offer that's fair.

24 Who pays for it is the individual who ends up showing that the

25 code is there or isn't there.  Why is that an unreasonable

II-176

1    request?  Why does the plaintiff get to say we have to pay

2    for imaging that we are saying will not produce this

3    information and be proven correct on and then we end up paying

4    for that.  That's all.  I'm not--

5           THE COURT:  I haven't even gotten to the point of

6    paying so--

7           MR. COOPER:  Okay.  Okay.  That's all.

8           THE COURT:  I'm not necessarily agreeing that the

9    defendant has to pay for anything because as I say I haven't

10   gotten that far.

11          THE COURT:  But what I wanted to say is that he is

12   told, he laid down specifically what he wanted in that, over

13   and above what was gotten as a result of the colloquy we had on

14   November 18th, and I'm going to give you an opportunity, which I

15   think you requested, is that you get a chance to respond to

16   that, and I just need to know how much time do you need?

17          MR. COOPER:  The plaintiff isn't going to argue with

18   me on this, one of the people I need to talk to, his wife is

19   about to give birth in the next four days, literally--

20          THE COURT:  Is two weeks enough time or do you

21   want--?

22          MR. COOPER:  Can you give me 21 days just to overcome

23   that?

24          THE COURT:  Yeah.

25          MR. COOPER:  Thank you.  That would be Friday the

1   24th?

2          THE COURT:  Yeah, the 24th.  Now, we did resolve the

3   fact that the directory, what do we call it again, source file

4   directory?

5          MR. COOPER:  Yes.

6          THE COURT:  It's called source file directory.

7          MR. COOPER:  It doesn't have a title.  That's what I

8   called it.

9          THE COURT:  Okay.  Well, everyone agrees it can be

10  called that and then we'll know what we're talking about.

11  Let's get a date when that's going to be produced.  Let's get

12  some agreement on that.

13         MR. HORNICK:  How about Monday?

14         THE COURT:  Pardon me?

15         MR. HORNICK:  How about this Monday?

16         THE COURT:  That's fine, the 6th.  Okay.  Anything

17  else I need to take up.

18         MR. COOPER:  Your Honor, I have one question.  In

19  order to respond to Mr. Hornick's position this morning, I'm

20  not sure, the last time we tried to get a transcript, it took a

21  little bit.  How would you like that addressed.

22         THE COURT:  Well, I think you ought to order it.

23         MR. COOPER:  We'll expedite.  That's not a problem.

24         THE COURT:  I don't know how long it will take, but

25  you got, I mean, I specifically asked him what he wanted and I

1 assume that you folks took notes.

2          MR. COOPER:  I mean, it lasted 45 minutes.  It took

3 notes, but it would be, if I have the transcript I have no

4 problem.  Can I make the request that before the end of this

5 weekend Mr. Hornick lays out his grievance in a letter or in a,

6 some sort of a position to summarize the points that he made,

7 either that or if I know the transcript will be available in a

8 short order, then it won't be a problem.  But if--

9          THE COURT:  Well, I suppose you could order the

10 transcript in parts, order the, you know, the part before the

11 recess and talk to the person who does that, who I believe is

12 Maryann Young, and see if she can get the, you know, the before

13 lunch part done and into a separate transcript to you so that

14 you'd have it.

15          MR. COOPER:  My only question is, that's satisfactory

16 to me.  If that's not available, what should I do.

17          THE COURT:  Well, if that's not available, why don't

18 you contact the clerk, and we'll see what adjustments can be

19 made.

20          MR. COOPER:  Thank you.  You understand the

21 logistical problem.

22          THE COURT:  Yeah.  Anything further from the

23 plaintiff?

24          MR. HORNICK:  One thing, Your Honor, I hesitate in

25 raising this because we've taken up so much of your time today,

1    but there are some fairly minor amendments that we would

2    like to make to the complaint, and Your Honor said in November

3    that when you rule on these pending motions, you would close

4    discovery, I believe you said four months after you rule.  When

5    the parties submitted their 26.1 report, 26(f) report at the

6    beginning of the case, which I think is also Local Rule 16.1

7    report--

8              THE COURT:  Right.

9              MR. HORNICK:  --the parties had agreed that the

10    deadline for amending pleadings would be 60 days before the

11    close of fact discovery.  Now, judge, the judge in the case set

12    an earlier date which has passed, but I am asking that when

13    Your Honor resets the scheduling order after ruling on these

14    motions, that we put into place the deadline that the parties

15    had originally agreed on, which was 60 days before the close of

16    fact discovery.  We have some very minor changes that we want

17    to make to the complaint and I could even address them with the

18    Court verbally, but I hesitate to bring them up considering the

19    fact that we've been here so long and I know that the

20    defendants are going to oppose it because I asked them about it

21    in advance.  I hate to file another motion, but I think that

22    will be unavoidable at some point in time.  If--

23              THE COURT:  Well, do you know what, I mean, do you

24    know what you want to do to amend the complaint now?

25              MR. HORNICK:  Yes, I do.

1          THE COURT:  Why should you not just file it now?

2          MR. HORNICK:  Well, the reason, well, I'm raising it

3    now because they are minor changes and if the Court sets a

4    deadline for amending of 60 days before the close of fact

5    discovery, I'm assuming that the Court will apply the standard

6    that as long as it's within that period it's okay as long as

7    it's in the interest of justice.  There's been no prejudice,

8    but if the Court doesn't set that deadline and the defendants

9    are going to argue well the deadline was a year ago, then we're

10   going to have to go through more briefing and it's going to be

11   a complicated mess again.  So I'm trying to find a way to short

12   circuit it over very simply amendments, which I've tried to get

13   the defendants to agree to or at least the Facebook defendants

14   to agree to and they've refused.

15         THE COURT:  I'm sorry, I don't understand why you

16   need to wait until 60 days before the end of discovery to file

17   this motion.

18         MR. HORNICK:  No, I don't need to wait.  I was hoping

19   that maybe we could even address them today without a motion.

20         THE COURT:  No, I think the better thing is to do as

21   a matter of, a matter of motion.  I'm just looking here to

22   see what--

23         MR. HORNICK:  We can go ahead and file at anytime.

24         THE COURT:  I'm trying to see whether Judge Woodlock

25   gave me the authority to alter, what the terms of his reference

1    were and I'll just have to look that up because I don't, I

2    don't recall what it was.  If it's just discovery, I can't deal

3    with the question of--

4         MR. COOPER:  your Honor, I believe it was all

5    pretrial proceedings, but I don't--

6         THE COURT:  Was it, all right.  Well, let me--

7    (Pause)

8         THE COURT:  All right.  We'll find that and, but my

9    view is that if, you know, if you know what they are and you

10   know what you want to do, I don't think there's any reason to

11   wait.  I would file a motion to amend now and then let the

12   defendants object to it within, or respond to it within the 14

13   days and that would probably, that would probably go to Judge

14   Woodlock to decide because that's, I'm not sure that's, that

15   comes within pretrial proceedings or not, but I would check

16   with him before I would rule on it.  So, I mean, why wait?

17        MR. HORNICK:  Well, the reason I brought it up is

18   because if we're going to be told that we're precluded because

19   the deadline passed in the original scheduling order, then why

20   would we bother to file a motion?

21        THE COURT:  You might be told that by the defendant,

22   but that's not necessarily what the Court might do.

23        MR. HORNICK:  Well, I suppose that's all I was

24   looking to hear.

25        THE COURT:  All right.  I mean, I have no idea what

II-182

1    Judge Woodlock would do if he decides it.  I'm not sure

2    what I would do if I were to decide it.  If it's, and I suppose

3    a lot depends on the extent to which it is just, you know, just

4    minor stuff or it's something that's a bit more substantive.

5    So I would suggest you file that, either you file that now, you

6    know, or, file it now and, or if you wish, file the motion

7    seeking that the original date be re-instated.  You could do

8    either one of the two things, but I think you ought to get it

9    set.

10            Okay?

11            MR. HORNICK:  Yes.  Thank you for so much of your

12   time today, Your Honor.

13            THE COURT:  Okay.  No problem.

14            All right.  The Court will be in recess.

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____          March 13, 2006_____

Maryann V. Young_____