# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## of

## CONNECTU, LLC

Dated as of April 6, 2004

CONFIDENTIAL
INFORMATION

C011285

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## CONNECTU, LLC

A Delaware Limited Liability Company

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT, intended to be effective as of April 6, 2004, (the "Operating Agreement" or the "Agreement") of CONNECTU, LLC (hereinafter referred to as "ConnectU" or the "Company") by and among Cameron Winklevoss, an individual residing at _____ _____ (herein "Cameron"), Tyler Winklevoss, an individual residing at _____ (herein "Tyler"), Howard Winklevoss, an individual with an office address of 500 W. Putnam Avenue, Greenwich, CT 06830 (herein "Howard"), and Divya Narendra, an individual residing at _____ (herein "Divya").

## WITNESSETH:

WHEREAS, the parties to this Agreement have reached an understanding concerning the form and various other aspects of their business relationship with each other, as well as the organization and operation of the Company and its business and affairs; and intend for this Agreement to govern and control, to the extent stated or fairly implied herein, the business and affairs of the Company, including the Company's governance structure, tax status, and the Company's dissolution, winding up and termination;

WHEREAS, the Company was formed by Articles of Organization filed on April 6, 2004 with the Delaware Secretary of State;

WHEREAS, the Company was formed for the purpose of developing certain internet business concepts; and

WHEREAS, the parties hereto have agreed to operate the Company in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and such other good and valuable consideration as may be set forth below, the receipt and sufficiency of which the parties hereto acknowledge, the Members hereto agree as follows:

CONFIDENTIAL
INFORMATION

C011286

## ARTICLE I.
## DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below. Certain other terms used in this Agreement are defined elsewhere in this Agreement. For purposes of this Agreement, a defined term has its defined meaning throughout this Agreement and in each exhibit, attachment, and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.

"Act" means the Delaware Limited Liability Company Act (Section 18-101 through 18-1109 of the Delaware Laws), as amended from time to time.

"Adjusted Capital Account" of a Member at any time means the Capital Account of such Member at such time, increased by any deficit restoration obligation of such Member (including, without limitation, any Capital Contribution which such Member is unconditionally required to make after such time but on or before the end of the Fiscal Year in which such Member's Interest is liquidated (or, if later, ninety (90) days after the date of such liquidation) and any amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation §1.704-2(g)(1) or (i)(5)), and decreased by any adjustments described in Treasury Regulation §1.704-1(b)(ii)(d)(4), (5) or (6).

"Affiliate" means a Person that directly or indirectly through one or more intermediary's controls or is controlled by or is under common control with such Person as hereinafter defined. The term "control" (including the terms "controlling," "controlled by' and "under common control," etc.) means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a business entity or other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means Limited Liability Company Operating Agreement, as it may be amended or restated from time to time in accordance with the terms hereof.

"Agreement Date" has the meaning set forth in the preamble.

"Appraisal", except as otherwise set forth herein, in the event that a determination of the fair market value of the Company's assets is required for purposes of this Agreement, such value, if not otherwise agreed upon by an 80% Majority-In-Interest of the Members, shall be determined by a firm of recognized standing in appraising chosen by the Company's regularly engaged accountants. The decision of said accountants shall be final and binding.

"Appraised Value" means the value of the Company as determined by Appraisal.

"Assignee" means a Person who is the transferee of a Member's Interest, provided such person is in compliance with all of the requirements of the Act, the Certificate of

3

CONFIDENTIAL
INFORMATION

C011287

Formation of the Company, and this Agreement and that has not been admitted as a Member.

"Available Cash" means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company as of the end of each fiscal quarter derived from any source (other than Capital Contributions and Liquidation Proceeds) less a reasonable amount of Reserves.

"Bankruptcy", with respect to any Person, means the assignment for benefit of creditors, filing of a voluntary petition in bankruptcy, reorganization or similar proceedings, adjudication as bankrupt or insolvent, or the seeking or consents to appointment of a receiver or liquidator of all or substantially all of the Person's assets

"Board" or "Board of Managers" has the meanings set forth in Section 8.1.

"Business Day" (whether such term is capitalized or not) means any day, excluding Saturdays and Sundays, that is not a federal or religious holiday.

"Business of the Company" means any and all significant commercial activities whether currently conducted or reasonably planned or anticipated to be conducted in the future, by the Company, which currently involve consulting, researching, developing, designing, manufacturing, distributing or marketing one or more products in any applicable industry.

"Capital Account" means, with respect to any Member, the capital account established and maintained for such Member pursuant to Section 6.2. The Capital Accounts of the Members as of the close of business on the Agreement Date shall be as set forth on Schedule A hereto.

"Capital Asset" means any equipment or other asset of the Company that under generally accepted accounting principles is treated as a capital asset.

"Capital Contribution" means, with respect to any Member, the aggregate amount of cash, and the agreed upon net value of any services and/or property, other than money, contributed by such Member (or his predecessor in interest) to the capital of the Company pursuant to Article VI hereof with respect to such Member's Units.

"Capital Gain" means, for any Fiscal Year, the Company's net taxable gain, if any, for such year from a Capital Transaction, as computed for federal income tax purposes, but using Gross Asset Value instead of adjusted tax basis, after reduction for expenses directly attributable to such a Capital Transaction (whether or not such amounts are treated as capital gain for federal income tax purposes).

"Capital Transaction" means the sale or other disposition (including, without limitation, a condemnation or liquidation of the Company) of all or substantially all of the assets of the Company.

4

CONFIDENTIAL
INFORMATION

C011288

"Cause" means, with respect to any person, the occurrence of any of the following:

(a)    at any time exceeding his actual authority by attempting to legally bind or commit the Company to any obligation or liability in excess of such authority or knowingly misrepresenting to any person his actual authority;

(b)    the exhibition of willful gross nonperformance, negligence or misconduct that in any case results (or could reasonably result), as determined by the Board in good faith and regardless of whether such actions were carried out by such person in good faith, in material harm to the Company or any of its Affiliates;

(c)    misappropriation of assets or engaging in activities or undertaking or planning any actions that can be reasonably construed as otherwise defrauding the Company or any of its Affiliates; or

(d)    any material breach of any provision of this Agreement or any other agreement between such person and the Company or any of its Affiliates.

"Certificate" means the Certificate of Formation of the Company, as amended to date and as it may be further amended in accordance with this Agreement.

"Class" means the Class A Members, the Class B Members, the Class C Members, if any, or the Members of any other class subsequently created pursuant to the provisions of this Agreement, as appropriate.

"Code" means the Internal Revenue Code of 1986, as amended from time to time and any applicable regulations promulgated thereunder.

"Company" shall mean ConnectU, LLC.

"Company Minimum Gain" with respsect to a Fiscal Year has the meaning of "partnership minimum gain" set forth in Treasury Regulation §§1.704-2(b)(2) and 1.704-2(d).

"Confidential Information" means all non-public information regarding the Company and its business, operations, know-how, members, managers, officers and employees, including but not limited to, Trade Secrets (as defined below) and proprietary information; business plans; new or changed products before public introduction; marketing, branding and/or advertising plans or strategies; design and engineering information; formulas; manufacturing processes and capacities; tooling; product and test data; programs (including computer software programs); procedures and manuals; confidential reports and communications; technical information; customer, vendor, supplier and employee data, including but not limited to names and addresses of same; methodologies; price strategies, costs and quantities sold; and internal information

5

CONFIDENTIAL
INFORMATION

C011289

regarding personnel skills, compensation, and organization charts, budgets or costs of individual departments.

"Control" of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement, or otherwise.

"Covered Person" means any past or present Member, any successors or heirs of a past or present Member, any past or present Affiliate of a past or present Member, or any past or present officers, member of the Board of Managers, employees, consultants, representatives or agents of the Company, a past or present Member or their respective Affiliates, or any past or present employee, consultant, representative or agent of the Company or any of its Affiliates, or any past or present officer or advisor of the Company.

"Credits" means all investment tax or similar credits allowed by the Code with respect to activities of the Company or the Property or the activities of the Company.

"Damages" has the meaning given that term in Section _____ hereof.

"Depreciation" for any Fiscal Year, means an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Disability" or "Disabled" means

      (a)    the occurrence of a disability, such that for a period of six (6) months in any twelve-month period, the person in question is incapable of substantially fulfilling the duties set forth in this Agreement or assigned or contemplated to be assigned by the Board or an individual Manager because of physical, mental or emotional incapacity resulting from injury, sickness or disease as determined by an independent physician mutually acceptable to the inflicted person and the Company; or

      (b)    the occurrence of incompetency such that a legal proceeding has been instituted seeking the appointment of a guardian over the personal affairs of the person in question.

"Dissociation" means any action which causes a person to cease to be a member.

6

CONFIDENTIAL
INFORMATION

C011290

"Distributions" means distributions by the Company to the Members of Available Cash or Liquidation Proceeds or other amounts, but not Tax Payment Distributions.

"Equity Unit" means Class A Voting Units.

"Executive" means a member of the Executive Committee.

"Executive Committee" means the group that is designated pursuant to Section _____ hereof.

"Family" or "Member of a Family" means, as applied to any individual, any parent, spouse, child, spouse of a child, brother, sister, uncle, aunt or cousin of such individual, and any trust created for the benefit of any such Persons and each custodian of any property of any of such Persons.

"Fiscal Year" means any calendar year of the Company commencing on January 1 (or, for 2004, the filing date of the Certificate) and ending on December 31, or any portion of such period for which the Company is required to allocate items of Company income, gain, loss or deduction.

"Founding Members" means those Members who are Members as of October 1, 2004 and identified on Schedule A to this Agreement.

"GAAP" means United States generally accepted accounting principles consistently applied in accordance with past practices.

"Governmental Authority" (whether such term is capitalized or not) means any United States (federal, state or local) or foreign government, or governmental, regulatory or administrative authority, agency or commission.

"Gross Asset Value" with respect to any asset, means the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(b)     the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

CONFIDENTIAL
INFORMATION

C011291

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager;

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(m), subsection (f) of the definition of Profit and Loss, and Section ____ hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent the Manager determines that an adjustment pursuant to subsection (b) hereof is necessary or approprirate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d); and

(e)    The Gross Asset Values of Company assets shall be adjusted in a manner similar to subsection (b) hereof at such other times as the Manager may determine in its sole discretion.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (a), (b), (d) or (e) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profit, Capital Gain and Loss.

"Income" and "Loss" mean, respectively, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a), except that for this purpose (i) all items of income, gain, deduction or loss required to be separately stated by Code Section 703(a)(1) shall be included in taxable income or loss; (ii) tax exempt income shall be added to taxable income or loss; (iii) any expenditures described in Code Section 705(a)(2)(B) (or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation § 1.704-1 (b)(2)(iv) (i)(2)) which are not properly chargeable to capital account and not otherwise taken into account in computing taxable income or loss shall be subtracted; and (iv) taxable income or loss shall be adjusted to reflect any item of income or loss specifically allocated in Section 4, Allocations and Distributions.

"Indebtedness" means, as applied to any person, (i) all indebtedness for borrowed money, whether current or funded, or secured or unsecured, (ii) all indebtedness for the deferred purchase price of property or services represented by a note or other security, (iii) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (iv) all indebtedness secured by a purchase money mortgage or other lien to secure all or part of the purchase price of property subject to such mortgage or lien, (v) all obligations under leases which shall have been or must be, in accordance with generally accepted accounting principles, recorded as capital leases in respect of

CONFIDENTIAL
INFORMATION

C011292

which such person is liable as lessee, (vi) any liability in respect of banker's acceptances or letters of credit, and (vii) all indebtedness referred to in clauses (i), (ii), (iii), (iv), (v) or (vi) which is directly or indirectly guaranteed by or which such person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"Indemnified Party" means any person entitled to seek indemnification pursuant to the provisions of Article XIII.

"Indemnifying Party" means any person against whom indemnification may be sought pursuant to the provisions of Article XIII.

"Intellectual Property" means (1) inventions, discoveries, and designs, (2) patents and patent applications, any patents issuing on the applications or continuations, continuations-in-part, or divisions thereof, reissues, reexaminations, or extensions or improvements of such patents, and any invention disclosures, (3) copyright registrations and applications, copyrighted works of authorship (as defined in 17 U.S.C. § 102) covered by such registrations and applications, and all other works of authorship, whether registered or not, and all renewals, extensions, and Derivative Works thereof, (4) Confidential Information, Trade Secrets, know-how, and other proprietary information, and all tangible and intangible embodiments thereof, and (5) trade marks, service marks, trade names, domain names, and applications and registrations thereof, and all associated goodwill.

"Interest" of a Member means all rights, powers, duties and obligations of such Member in and with respect to the Company as provided herein or by applicable law, including, without limitation, the right of a Member to be allocated a fractional share of Profit, Capital Gain, Loss and special allocations, to receive distributions from the Company and to participate in the management of the Company in accordance with this Agreement.

"Interest Rate" means the interest rate equal to prime or reference rate of J.P. Morgan Chase & Co. as listed from time to time in the Wall Street Journal plus five (5) percentage points, compounded annually.

"Involuntarily Transfer" means any transaction, proceeding or action by or in which any Member shall be deprived or divested involuntarily of any right, title or interest in or to any of his common interest, including without limiting the generality of the foregoing death, disability, seizure under levy of attachment or execution, transfer in connection with bankruptcy or other court proceeding to a trustee in bankruptcy or receiver or other office or agency, transfers occasioned by dissolution of marriage or separation, whether pursuant to voluntary settlement or court order, any transfer upon, or occasioned, by, dissolution of a Company or other entity, or any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat of abandoned property.

9

CONFIDENTIAL
INFORMATION

C011293

"Liquidation Proceeds" means the proceeds from the sale of all or substantially all of the Company's Property at the time of liquidation of the Company and all proceeds thereof, including, without limitation, the receipt of a note or other instrument providing for payments in installments.

"Liquidating Trustee" means the Manager or, if there is no Manager or the Manager does not have the capacity to act, the Person(s) appointed by the Executive Committee to windup and liquidate the Company pursuant to Article ____ hereof.

"Majority-In-Interest" means Members holding an aggregate of Eighty Percent (80%) of the Percentage Interests held by all Members, except that in those instances where a Member is excluded from a vote or consent such as described in Section 12.1, the "Majority-In-Interest" shall mean Members holding an aggregate of Eighty Percent (80%) of the Equity Units held by the Members entitled to vote or consent.

"Manager" means a member, individually, of the Board of Managers and Managers means the members, collectively, of the Board of Managers.

"Member" means each of the persons who have executed this Agreement and admitted as a member to the Company hereunder.

"Member or Membership Interest" means an undivided equity interest in the Company.

"Member Nonrecourse Debt" has the meaning of "partner nonrecourse debt" set forth in Treasury Regulation §1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation §1.704-2(i)(3).

"Member Nonrecourse Deductions" has the meaning of "partner nonrecourse deductions" set forth in Treasury Regulation §§1.704-2(i)(1) and 1.704-2(i)(2).

"Net Cash Flow" means, for any Fiscal Year, the amount by which the sum of (a) the gross cash receipts of the Company during such Fiscal Year and (b) the amount of any reduction in the Reserves for the prior Fiscal Year exceeds the sum of (c) the gross cash expenditures of the Company during such Fiscal Year (including, without limitation, amounts paid pursuant to required repurchases of Interests under Section ____ or otherwise), (d) the amount of any increase in the Reserves for the prior Fiscal Year and (e) any required distributions pursuant to Section ____ hereof and any prior distributions pursuant to Section ____ during such Fiscal Year.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation §1.704-2(b)(1).

CONFIDENTIAL
INFORMATION

C011294

"Nonrecourse Liability" has the meaning set forth in Treasury Regulation §1.704-2(b)(3).

"Net Profits" and "Net Losses" means the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined for federal income tax purposes in accordance with the method of accounting selected by the Managers, as required herein.

"Option Period" has the meaning set forth in Section 11.2.

"Optioned Units" has the meaning set forth in Section 11.2(b).

"Percentage Interest", with respect to a Member, means the number of Units owned by such Member divided by the total number of Units owned by all of the Members.

"Permitted Transfer" has the meaning set forth in Section 10.3.

"Person" (whether or not capitalized) means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government..

"Profit" or "Loss" means, for any Fiscal Year, the Company's taxable income or loss, respectively, for such Fiscal Year as computed for federal income tax purposes (including, without limitation, all items required to be separately stated pursuant to Code Section 703(a)(1), with the following adjustments:

Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such taxable income or loss;

(a)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss shall be subtracted from such taxable income or loss;

(b)     in the event the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b), (c) or (e) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(c)     gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

CONFIDENTIAL
INFORMATION

C011295

(d)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(e)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation §1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profit or Loss; and

(f)    notwithstanding any other provision hereof, any amount of Capital Gain and any items which are specially allocated pursuant to Section ___ or ____ hereof shall not be taken into account in computing Profit or Loss. However, any net loss realized upon a Capital Transaction that does not result in a positive amount of Capital Gain in a Fiscal Year shall be taken into account in computing Profit or Loss for such Fiscal Year.

The amounts of Capital Gain and the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section ___ and ___ hereof shall be determined by applying rules analogous to those set forth in subsections (a) through (f) herein.

"Profits Interest" means a profits interest in the Company (within the meaning of Treasury Regulation §1.721-1(b) and Revenue Procedure 93-27), which shall be subject to the allocations set forth in this Agreement, including, without limitation, Section ____.

"Property" means all properties and assets, whether tangible or intangible, that the Company may own or otherwise have an interest in from time to time.

"Protective Period" has the meaning set forth in Section 13.1.

"Reserves" means amounts set aside from time to time by the Managers pursuant to Section 9.5.

"Revaluation" shall mean the occurrence of any event described in Section 6.2, Capital Accounts, in which the book basis of Property is adjusted to its fair market value.

"Substitute Member" means an assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

"Tax" means, with respect to a Fiscal Year, the federal, state and local income tax that would be paid by a hypothetical individual member of the Company who is a citizen of

CONFIDENTIAL
INFORMATION

C011296

the United States residing in the State of Connecticut on (a) the portion of the Profit, Capital Gain and net income and gain specially allocated by the Company pursuant to this Agreement for such Fiscal Year that is treated as capital gain for federal income tax purposes, computed by assuming that all such amounts are allocable solely to Connecticut and that the individual is in maximum marginal tax bracket with respect to such type of capital gain as set froth in the applicable tax rate schedule for such Fiscal Year (without regard to phase-outs, alternative taxes and the like and without regard to any other tax attribute of the individual), and (b) the balance of the Profit, Capital Gain and net income and gain specially allocated by the Company pursuant to this Agreement for such Fiscal Year, computed by assuming that all such amounts area allocable solely to Connecticut and that the individual is in the maximum marginal ordinary income tax bracket as set forth in the applicable tax rate schedule for such period (without regard to phase outs, alternative taxes and the like and without regard to any other tax attribute of the individual).

"Tax Matters Member" has the meaning set forth in Section 9.7.

"Tax-Payment Distributions" means cash distributions to Members by the Managers required pursuant to Section 7.1 with respect to each Member's respective income tax liability determined on the basis of their respective shares of taxable income of the Company calculated on a cumulative basis for all taxable years (or portions thereof) during which such person is a Member, offsetting taxable income with prior taxable losses, pursuant to Section 7.1.

"Termination of Affiliation" means any failure of a holder of Incentive Units to be employed by the Company or otherwise engaged in the management and affairs of the Company for any reason, including as a result of resignation, termination, death or Disability, as determined by the Board of Managers.

"Trade Secrets" mean any information or know-how, whether currently existing or developed in the future, including but not limited to formulas, processes or methods that (i) derives independent economic value, actual or potential, from not being generally known to or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of reasonable efforts by the Company to maintain its secrecy.  Trade Secrets shall also include all other information or data that qualifies as a trade secret under applicable law

"Transfer" means any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by request, devise or descent, or other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any Member Units.

CONFIDENTIAL
INFORMATION

C011297

"Treasury Regulations" means the permanent and temporary income tax regulations promulgated under the Code, as may be amended from time to time (including corresponding provisions of successor Treasury Regulations).

"Unit" means generically either an Equity Unit or a Non-Equity Unit.

CONFIDENTIAL
INFORMATION

C011298

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.1    Formation. The Company is a limited liability company organized under the provisions of the Delaware Act. The Certificate has been filed with the Secretary of State of the State of Delaware. The parties to this Agreement are all of the Members of the Company. A Member's Member Interest in the Company shall be personal property for all purposes. All real and other property owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property by reason of its Member Interest.

2.2    Name. The name of the Company is, and the business of the Company shall be conducted under the name of, " *ConnectU LLC.*" The name of the Company may be changed from time to time by amendment of the Certificate in accordance with this Agreement. The Company may transact business under an assumed name by filing an assumed name certificate in the manner prescribed by applicable law.

2.3    Continuation and Term. The Company was formed under the name "ConnectU, LLC" upon the filing on April 6, 2004 of the Certificate with the Secretary of State of the State of Delaware pursuant to the Delaware Act. The Members hereby agree that this Operating Agreement shall be the Company's limited liability company agreement to continue the Company as a limited liability company pursuant to the provisions of the Delaware Act and to set forth the rights and obligations of the Members and certain matters related thereto. The Company shall have perpetual existence unless terminated pursuant to the provisions of this Agreement.

2.4    Offices. The registered office of the Company in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by law. The principal office of the Company shall be at 500 W. Putnam Avenue, c/o Winlevoss Consultants, Greenwich, CT 06830, or at such other place as the Board may designate, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate.

2.5    Admission of Members. By executing this Agreement, each Person who is a party hereto (as the same may be amended from time to time) is being admitted as a Member of the Company in the Class set forth above such Person's name on Schedule A, all upon the terms and subject to the conditions set forth in this Agreement.

CONFIDENTIAL
INFORMATION

C011299

## ARTICLE III
## BUSINESS PURPOSES AND POWERS

3.1     Business Purpose. The Company was organized in the State of Delaware to carry on any lawful business, purpose or activity under the Act, or the laws of any jurisdiction in which the Company is authorized to do business.

3.2     Powers of the Company. The Company's purpose set forth in Section 3.1 may be accomplished by taking any action that is permitted under the Act.

## ARTICLE IV.
## MEMBERSHIP

4.1.     Member Status. There shall be at least one Member.  The name and address of each Member, the numbers and types of Units owned by such Member as of the date hereof, and such Member's Capital Account as of the date of this Agreement, are as set forth on Schedule A hereto.  In the event of any change with respect to the information stated on Schedule A hereto pursuant to or in accordance with the provisions hereof, the Board shall promptly cause (a) Schedule A to be amended to reflect such change and (b) a copy of the revised Schedule A to be provided to each of the Members. In case of any Member that is a corporation, trust or other entity, such designee shall be an officer, director, trustee or other individual of similar authority with respect to such Member.

4.2.     Founding Members.  The Founding or initial Members of the Company shall be those persons who have signed this Agreement.

4.3.     Additional Members.  Additional Members may be admitted to membership upon eighty percent (80%) consent of the current members.  Any such admission shall be effective only after the new Member has executed and delivered to the Board a document including the new Member's notice address and an agreement to be bound by this Agreement substantially in the form of Exhibit A hereto.

4.4.     Withdrawal. Except following the transfer of its Member Interest as provided in Article X and the admission of its transferee as a Member pursuant to Section 4.3 or 11.1(a), a Member may not withdraw from the Company.

4.5.     Lack of Authority. No Member shall have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company, except for a Member that is acting in the capacity of Manager in accordance with Article VIII, or in the capacity of an officer pursuant to authorization by the Board in accordance with Section 8.8.

4.6.     Membership Book and Members of Record. The Board shall cause to be maintained, among other records, a membership book containing records evidencing the

CONFIDENTIAL
INFORMATION

C011300

Member Interests, the names and addresses of the holders of all issued Member Interests of the Company, the numbers and types of Member Interests held by each such holder, the date of issuance of such Member Interests, and whether or not such Member Interests originate from original issue or transfer. Names and addresses of Members as they appear on such book shall be the official list of Members of record of the Company for all purposes except as otherwise provided herein. The Company shall keep this record of Members at its registered office or principal place of business, or at the office of its transfer agent or registrar. The Company shall be entitled to treat the holder of record of any Member Interest as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such Member Interest or any rights deriving from such Member Interest on the part of any other person, including a purchaser, assignee, or transferee, unless and until such other person becomes the holder of record of such Member Interest, regardless of whether the Company has either actual or constructive notice of the Member Interest of such other person.

4.7.    Change of Name or Address. Each Member shall promptly notify the Board, by written notice sent by certified mail, return receipt requested, of any change in name or address of the Member from that as it appears upon the official list of Members of record of the Company. The Board shall cause to be entered such changes into all affected Company records, including the official list of Members of record.

4.8    Representations and Warranties. Each Member, and in the case of an organization, the Person(s) executing this Agreement on behalf of the organization, hereby represents and warrants to the Company and each other member that:

(a)    if that Member is an organization, that it is duly organized, validly existing, and in good standing or legal existence under the laws of its state of organization and that it has full power to execute and agree to obligations of this Agreement and to perform such Member's obligations hereunder;

(b)    that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest;

(c)    that there will not be any public market for the interests; and

(d)    that the execution and delivery of this Agreement and consummation of the transactions contemplated hereby do not breach or result in a default under any contract or agreement by which the Member is bound.

## ARTICLE V
## CAPITAL STRUCTURE AND UNIT ISSUANCE AND TRANSFERABILITY

5.1  Capital Structure Generally. The Company shall have the authority to issue an unlimited number of Units representing Equity or Non-Equity Units, whether or not any such Units may be limited or restricted, solely by way of example, with respect to voting on one or more Company matters or entitlement to the Company's profits or

CONFIDENTIAL
INFORMATION

C011301

capital upon allocation or distribution of the same; provided, however, that at all times relevant under the Act, if required, at least one (1) Unit (however designated in name) representing an equity interest in the Company's capital and profits and entitling the holder to general voting rights and the ability to receive the net assets of the Corporation upon dissolution, shall at all times be issued and remain outstanding prior to the Termination of the Company.

5.2     Initial Designation of Classes or Series of Units **[correct as appropriate]**. The Company hereby initially designates for issuance one (1) class or series of Units, to be known as "Voting Units", the respective rights, benefits, privileges and other attributes of which are listed on Schedule "C" (attached hereto and made a part hereof).

5.3     Additional Units of Existing Classes or Series/Designation of Additional Classes or Series of Units. Through resolution adopted in accordance with the manner prescribed herein, the Members shall hereinafter have the exclusive authority to issue any Unit(s) from any existing designation of Unit(s) set forth in Schedule "C" and/or to create for issuance or designate a new series or class of any Unit(s) or any other security of the Company, which, to the extent not inconsistent with any tax election currently in effect by the Company, may contain any of the following:

(a)     The number of Units which will constitute such series and the designation of such series;

(b)     The voting powers, full or limited, of such class or series or that such class or series shall have no voting power;

(c)     The rate of distributions or returns payable on such series, the time(s) when such will be payable, the preference to, or any relation to, the payment of such to any other class or series of Units;

(d)     Whether the Units of such class or series shall be redeemable and, if redeemable, whether such Units shall be redeemable at the option of the Company or the holder of such Units upon the happening of a specified event, the rate(s) or price(s) at which redemption shall take place with such adjustment as shall be provided and any other terms or conditions of any redemption; (v) Whether there shall be a sinking or similar fund for the redemption or purchase of Units and, if so, the terms and provisions which will govern such a fund;

(e)     The rights of the holders of Units to participate in the capital of the Company upon the liquidation, dissolution or any distribution of the assets or properties of the Company;

(f)     The rights, if any, of holders of the Units, to convert such Units into, or to exchange such Units for, Units or securities of any other class(es) or other series of the same or other class(es) of capital or financial interests of the Corporation, the price(s) or rate(s) of exchange with such adjustments as shall be provided at which such

18

CONFIDENTIAL
INFORMATION

C011302

shares shall be convertible or exchangeable, whether such rights of conversion or exchange shall be exercisable at the option of the holders of the Units or the Company or upon the happening of a specified event, and any other terms or conditions of such conversion or exchange; and

(g)    Any other preferences, powers and relative, participating, optional or other special rights, and qualifications, limitations or restrictions of such Units.

When designated, the rights, limitations, privileges and benefits shall be summarized and attached as a supplemental exhibit to Exhibit "C".

5.4    Issuance of Units. The Board shall determine when and for what consideration the Company shall issue Units pursuant to Section 5.5.

5.5    Preemptive Rights. In the event the Board determines to cause the Company to authorize and issue additional Units, pursuant to Section 8.11, the following shall apply:

(a)    The Board shall cause the Company to submit to all Members a written notice stating the number of additional Units desired to be issued, and the price, payment terms and other conditions of the proposed issue of additional Units.

(b)    Each Member shall have the right for a period of seven (7) days from date of such notice to agree (by written notice to the Company) to purchase on the terms and conditions set forth in the Company's written notice up to that number of Units which shall equal the result of the formula:

Number of Units owned by such purchasing Member, including any unvested shares, where the purchasing Member's total Units amount to the same percent of Units owned by the Member prior to the offering, which is the Member's "pro rata portion".

(c)    In the event any Member does not exercise his right to purchase his entire pro rata portion of the Units, each Member that has exercised such right shall have the right for an additional seven (7) days to agree (by written notice to the Company) to purchase all but not less than that number of the unpurchased Units which shall equal the result of the formula:

Number of Units owned by such Member exercising his rights under this subsection (c). The total unpurchased Units apportioned by the Number of Units owned by all Members exercising such rights.

(d)    If some or all of the Members agree to purchase any of the additional Units then the Company shall close the purchase upon the terms of the written notice within thirty-one (31) days after such first notice is given or at such other time and place as may be mutually agreed upon with the additional Units to be allocated among the

19

CONFIDENTIAL
INFORMATION

C011303

Members first to each of them up to the amount of their pro rata portion and any excess among the Members agreeing to purchase such excess in accordance with the commitments in their written notices tendered in accordance with this subsection 5.5.

(e)     The Company shall be entitled to issue and sell any additional Units not subscribed for and sold in accordance with this Section 5.5 so long as (i) the price, payment and other terms are not more favorable to the subscribers then those offered to the Members and (ii) purchaser agrees to be bound by all terms of this Agreement.

(f)     Additional Units available for issuance hereunder shall be rounded to the nearest whole Unit as determined by the Manager in its sole discretion. The Company shall not be required to issue fractional Units to give effect to the provisions of this Section 5.5.

(g)     For each issuance of any Units, the Company's books and records shall state the original value and nature of the contribution received by the Company and the number of Units received in return by each holder.

(h)     The Company may not issue any certificates of Units, but will, upon the written request of a Member or the owner or holder of any Unit, provide certified statements of Units owned or held, stating the number and nature shown on the Company's books and records as owned or held by the requestor as of the date that the statement is provided.

### ARTICLE VI
### CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

6.1     <u>Initial Capital Contributions of the Founding Members.</u> On or prior to the date of this Agreement, each of the Members has made a Capital Contribution to the Company in exchange for its respective Equity Units. No Member shall be obligated to contribute any more than the amount set forth on Schedule A unless agreed to in writing by all of the members.

6.2     <u>Capital Accounts.</u> A separate Capital Account shall be maintained at all times for each Member. Accordingly, without limiting the foregoing sentence, each Members Capital Account shall be

(a)     increased by (i) the amount of money contributed by such Member, (ii) the fair market value of property contributed by such Member (net of liabilities secured by such contributed property), (iii) allocations of Company income or gain (or items thereof) to such Member, pursuant to Section 7.10, and (iv) to the extent not already netted out under clause (b)(ii), the amount of any Company liabilities assumed by the Member or which are secured by any property distributed to such Member; and

20

CONFIDENTIAL
INFORMATION

C011304

(b)      decreased by (i) the amount of money distributed to such Member, (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to), (iii) allocations to such Member of Company loss or deduction (or items thereof), pursuant to Section 7.10, and (iv) to the extent not already netted out under clause (a)(ii), the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any Ownership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

6.3      <u>Capital Withdrawal Rights, Interest and Priority.</u>  Except as expressly provided in this Agreement, no Member shall be entitled to withdraw or reduce such Member's Capital Account or to receive any distributions from the Company, and no Member shall be entitled to demand or receive property other than cash in return for its Capital Contribution. No Member shall be entitled to receive or be credited with any interest on the balance in such Members Capital Account at any time.

Except as may be otherwise expressly provided herein, no Member shall have any priority over any other Member as to the return of the balance in such Members Capital Account.

6.4      <u>Loans and Advances by Members.</u> Any Member  may make a loan or advance funds in excess of the capital contribution of such Member, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the Company, and subject to applicable laws, has the same rights and obligations with respect to any such matter as a person who is not a member or manager on such amounts, at such times and on such terms and conditions as may be approved by an 80% Majority-In-Interest.  Loans or Advances by any Member to the Company shall not be considered as contributions to the capital of the Company and shall not in any respect increase such Member's interest in the Company.

6. 5      If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable, which date shall be no less than thirty (30) days after the notice has been given. The total additional Capital Contribution which the Manager may require the Members to contribute during the term of this Agreement shall not exceed $1 million ($1,000,000) in the aggregate. A Member's share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage Interest and the total additional Capital Contribution required. A Member's proportionate share shall be

CONFIDENTIAL
INFORMATION

C011305

payable in cash, by certified check, or by good personal or business check, subject to collection.

6.6    Except as provided in Section 6.5, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

6.7    If a Member fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the non-defaulting Members to pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Member, the defaulting Member's Percentage shall be reduced and the Percentage of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Percentage is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders. The Manager shall amend Section _____ herein accordingly.  This remedy is in addition to any other remedies allowed by law or by this Agreement

## ARTICLE VII
## DISTRIBUTIONS AND ALLOCATIONS

7.1    Distributions.

(a)    In the sole discretion of the Managers, the Company may, but is not required to, distribute some portion or the entire amount, if any, of Available Cash to Members as Distributions in accordance with their respective Percentage Interests.

(b)    Notwithstanding the foregoing, with respect to any calendar year in which the Company has taxable income, the Company shall make a Tax Payment Distribution to each Member for such calendar tax year on or before March 15 of the following year in an amount equal to the product of (i) the taxable income allocated to such Member for such calendar year under Section 7.10, multiplied by (ii) the highest U.S. federal individual income tax rate in effect for such calendar year, but only to the extent that such amount has not been previously distributed to the Members and not to exceed forty-five (45%) percent of the taxable income. The Tax Payment Distribution required in the preceding sentence shall apply only to the extent that each Members allocable share of the Company's total cumulative taxable income for Federal income tax purposes during the taxable years (or portions thereof) that such person was a Member exceeds such Member's allocable share of total cumulative taxable losses for all previous taxable years.

7.2    Minimum Tax Distribution. Until otherwise agreed to by a Majority-in-Interest of Members, the Company shall distribute annually to each Member an amount at least equal to thirty-five (35%) of taxable income to the Company as allocated to each such Member for such fiscal period (the "Tax Distributions").

CONFIDENTIAL
INFORMATION

C011306

7.3     Composite Income Tax Returns.  In the Manager's sole discretion, the Company may file composite income tax returns and pay income tax for and on behalf of Members eligible for inclusion in such composite return in states and cities of the United States of America or other tax jurisdictions (collectively "tax jurisdictions') where the Company incurs income tax.  Notwithstanding Section 7.1 (a), the aggregate amount of payments on behalf of a Member pursuant to this Section 7.1 (b) need not equal the Member's Percentage Interest of payments made pursuant to this Section 7.1 (b) on behalf of all Members. No payments need be made to or on behalf of any Member that is not eligible for inclusion in a composite return.

7.4     Distributions in Kind.  In the Manager's sole discretion, the Company may make any Distributions in cash or in kind provided however any Distribution of assets in kind must be made pro-rata among all Members in proportion to their respective Percentage Interests.

7.5     Distributions Upon Dissociation.  In the Manager's sole discretion, upon the Dissociation of a Member, the Company may either:

(a)     pay or distribute to the terminated Member within a reasonable time (not to exceed one year from such termination) the fair value of the terminated Member's Ownership Interests owned at the date of such termination reduced by the aggregate amount of indebtedness, if any, of the Member to the Company ("Member Indebtedness') or

(b)     provide to the Member within such time period a statement of such fair value amount ("Termination Value") confirming that the terminated Member shall participate in all subsequent Distributions to Members on a pro rata basis in accordance with the terminated Member's pre-termination Percentage Interest, until the aggregate amount of all post-termination Distributions shall equal the Termination Value less any unpaid Member Indebtedness.

7.6     Liquidation Distributions. Liquidation Proceeds shall be distributed in the following order of priority:

(a)     To the payment of debts and liabilities of the Company (including to Members to the extent otherwise permitted by law) and the expenses of liquidation; then

(b)     To the setting up of such reserves as the Managers or, in case of incapacity, withdrawal or unavailability of the Managers, as the Person required or authorized by law to wind up the Company's affairs may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company, provided that any such reserves shall be paid over by such Person to an independent escrow agent, to be held by such agent or its successor for such period as such Person shall deem advisable for the purpose of applying such reserves to the

CONFIDENTIAL
INFORMATION

C011307

payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided; then the remainder to the Members in accordance with and to the extent of their respective Capital Account balances after taking into account the allocation of all Income or Loss pursuant to this Agreement for the fiscal year(s) in which the Company is liquidated.

7.7     Income, Losses and Distributive Shares of Tax Items. The Company's net income or net loss, as the case may be, for each fiscal year of the Company, as determined in accordance with such method of accounting as may be adopted for the Company pursuant to Article IX , Accounting and Bank Accounts, hereof, shall be allocated to the Members for both financial accounting and income tax purposes as set forth in this Section 7.7 except as otherwise provided for herein or unless all Members agree otherwise.

7.8     Withholding of Distributions. Notwithstanding any other provision of this Agreement, the Manager (or any Person required or authorized by law to wind up the Company's affairs) may suspend, reduce or otherwise restrict Distributions of Available Cash and Liquidation Proceeds when, in its sole opinion, such action is in the best interests of the Company but in no event shall the Manager withhold Tax Payment Distributions required under Section 7.1 (b).

7.9     No Priority. Except as may be otherwise expressly provided herein, no Member shall have priority over any other Member as to Company income, gain, loss, credits and deductions or distributions.

7.10     Allocation of Income, Loss and Credits. Income, Profit or Loss and Credits for each fiscal year shall be allocated among the Members in accordance with their respective Percentage Interests. To the extent there is a change in the respective Percentage Interests of the Members during the year, Income, Loss and Credits shall be allocated among the pre-adjustment and post-adjustment periods as provided in Section 7.12.

7.11     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Sections 1.7041 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5), or 1.704-1 (b)(2)(ii)(d)(6) that results in such Member having a negative Capital Account balance and such Member either is not obligated to restore the deficit balance in his Capital Account or is obligated to restore only a limited dollar amount of such deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate to the extent required by the Treasury Regulation, the negative Capital Account balance of such Member as quickly as possible, provided that an allocation pursuant to this Section shall be made if any only to the extent that such Member would have negative Capital Account balance after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.1 were not in the Agreement.

24

CONFIDENTIAL
INFORMATION

C011308

7.12   General Allocation Provisions. Except as otherwise provided in this Agreement, all items that are components of net income or net loss shall be divided among the Members in the same proportions as they share such net income or net loss, as the case may be, for the year. For purposes of determining the Income, Loss or any other items for any period, Income, Loss or any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

7.13   Other Matters Relating to Capital.

(a)   No Member shall be entitled to withdraw any part of his Capital Contribution, except in connection with such Member's resignation as a Member in accordance with this Agreement or the liquidation of the Company.  Except as otherwise specifically provided in Section _____, no Member shall be entitled to appraisal right with respect to his Interest, including without limitation, in connection with any amendment to this Agreement, any merger or consolidation in which the Company is a constituent party or the sale of all or substantially all of the Company's assets.

(b)   No Member shall be liable for the return of any other Member's Capital Contribution; any such return of capital shall be made solely from the assets of the Company available therefore.

(c)   No interest shall accrue for the benefit of, or be paid to, any Member on any contribution to the capital of the Company.

(d)   An Interest is personal property.  A Member has no right to, interest in, or claim against any specific asset of the Company by reason of such Member's Interest.

### ARTICLE VIII
### MANAGEMENT AND OPERATION

8.1   Management of the Company.

(a)   Except as otherwise expressly provided in this Agreement or by applicable law, the Manager shall have the exclusive right, power and authority to manage the Business, assets, operation and affairs of the Company, with all rights and powers and the full authority necessary, desirable or convenience to administer and operate the same for Company purposes, to incur, perform, satisfy and compromise all manner of obligations on behalf of the Company, and to make all decisions and do all things necessary or desirable in connection therewith.

(b)   Notwithstanding the provisions of Section (a) hereof, without the consent of a majority of the Members, the Manager shall not cause or permit the Company to:

CONFIDENTIAL
INFORMATION

C011309

(i)      issue any additional Interests or rights to acquire an Interest, other than as provided herein;

(ii)      adopt, amend, restate or revoke the Certificate of Formation of the Company or this Agreement;

(iii)      dissolve, liquidate or wind up the Business of the Company or its affairs;

(iv)      sell, exchange, lease, mortgage, pledge or otherwise transfer or encumber all or substantially all of the assets of the Company;

(v)      merge or consolidate with or into another Person, enter into any business combination, partnership or joint venture with another Person, or acquire or dispose of all or any interest in any other Person or business;

(vi)      engage in any business other than the Business, or in any activity not consistent with the Company's purpose;

(vii)      create, incur, assume or otherwise become liable with respect to any obligation for borrowed money (including a guarantee of, or contingent liability for, the indebtedness or other obligations of any Person), or issue any bonds, debentures, notes or other evidences of indebtedness, if as a result thereof the total principal amount of such obligations at any time outstanding would exceed $100,000, other than in the ordinary course of the Company's Business;

(viii)      enter into any transaction or series of related transactions involved capital expenditures, including lease commitments or other expenditures, of a total value in excess of $150,000, other than in the ordinary course of the Company's Business;

(ix)      take any action that would cause the Company to be treated as an association taxable as a corporation for federal income tax purposes;

(x)      authorize or enter into or amend any agreement, commitment or other transaction, or any series of related agreements, commitments or other transactions between the Company and any Member, Manager or an Affiliate of a Member or Manager, other than those agreement authorized by the Members;

(xi)      commence, join in or settle any claim, action, suit or proceeding by, against or involving the Company which may materially affect the operations of the Company;

(xii)      confess a judgment against the Company; or

CONFIDENTIAL
INFORMATION

C011310

(xiii)   take any other action which requires the consent or determination of the Executive Committee as set forth elsewhere in this Agreement.

(c)   (i)   Cameron Winklevoss, Howard WInklevoss and Maria Antonelli, jointly and severally, shall act as the initial Managers and together shall form the Board of Managers. A Manager shall cease to be a Manager if and only if (A) the Manager ceases to be a Member for any reason, including, without limitation, the Manager dies or if the Manager is an entity, the Manager is dissolved or liquidated, (B) the entry of a judgment by a court of competent jurisdiction adjudicating the Manager to be incompetent to manage the Manager's personal property, or (C) the Manager resigns as a Manager, upon written notice to the Members.

(ii)   In addition, if the Manager is an individual, the Manager shall cease to serve as Manager for any period during which the Manager is Disabled. During such period, Tyler Winklevoss shall act as successor Manager, if still a Member. The Manager shall be considered "Disabled" if by reason of the Manager's physical or mental incapacity the Manager is unable to perform the Manager's material duties under this Agreement for a period of ninety (90) consecutive days or for one hundred twenty (120) days in any one hundred eighty (180) day period.

(iii)   If the Manager ceases to be the Manager for any reason, the Person selected by the Executive Committee shall be the successor Manager.

(d)   The Manager shall (i) perform its services in such capacity diligently and faithfully for the benefit of the Company, (ii) perform such services in accordance with all applicable policies and practices of the Company, and (iii) devote such portion of its business time and attention to the Business and the operations and affairs of the Company as the Manager deems necessary or advisable to carry out its duties hereunder; provided, however, that the Company and the Members acknowledge that the initial Manager and its employees and agents have significant other business commitments that may require a substantial portion of their time and attention.

8.2   Management Reports.   The Manager shall provide reports at least annually to the Members at such time and in such manner as the Manager may reasonably determine. The Manager shall provide all Members with those information returns required by the Code and the laws of the State of Delaware or any other state having jurisdiction over the Company.

8.3   Number, Tenure and Qualifications.   The Company shall initially have one (1) Manager. The number of Managers of the company shall be fixed from time to time by the affirmative vote of Members holding a Majority-in-Interest but in no instance shall there be less than one Manager. Each Manager shall hold office until such Manager resigns pursuant to Section 8.4 or is removed pursuant to Section 8.5. Managers shall be

27

C011311

appointed by the affirmative vote of Members holding a Majority-in-Interest. Managers need not be residents of the State of Delaware or Members of the Company.

8.4    Resignation. Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member.

8.5    Removal. A Manager may be removed with or without cause at any time by the affirmative vote of Members holding an 80% Majority-in-Interest. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

8.6    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote of Members holding at least a Majority-in-Interest (determined without regard to any Units owned by a Manager who was removed pursuant to Section 8.5 during the preceding twenty-four month period). Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of Members holding at least a Majority-in-Interest.

8.7    No Management by Members. Except as otherwise provided herein, no Member will take part in the day-to-day management, or the operation or control, of the business and affairs of the Company. Except and only to the extent expressly provided for in this Agreement or as delegated by the Board of Managers, no Person other than the Board of Managers will be an agent of the Company or have any right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

8.8    Reliance by Third Parties. Any Person dealing with the Company or the Board of Managers may rely upon a certificate signed by the Manager as to:

(a)    the identity of the members of the Board of Managers, any officer of the Company or any Member;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Board of Managers or any officer of the Company or in any other manner germane to the affairs of the Company;

(c)    the Persons who are authorized to execute and deliver any agreement or document on behalf of the Company; or

(d)    any act or failure to act by the Company, or as to any other matter whatsoever involving the Company.

28

CONFIDENTIAL
INFORMATION

C011312

8.9    Major Actions. Notwithstanding anything to the contrary provided in this Agreement, the Company may engage in a Major Action only with any vote or consent by the Members as required herein or by law. Each of the following shall be deemed to be a *"Major Action"*:

(a)    Any dissolution, winding up or liquidation of the Company;

(b)    Any grant of a security interest on behalf of the Company in any of the Company's assets or properties;

(c)    Any guarantee by the Company of the obligations of another Person;

(d)    Any loans contracted on behalf of the Company and evidence of indebtedness issued in its name.

(e)    The setting on an initial basis, annual basis or periodic basis of the salary, bonus or other form of compensation to be paid by the Company to any employee, officer or consultant of the Company;

(f)    The initial public offering ("IPO") of the Company;

(g)    Any appointment or removal of any Manager or any increase or decrease in the authorized size of the Board;

(h)    Any increase or decrease in the authorized or designated number of Units, or any admission of new Members or determination of the Capital Contribution required from, or the number or type of Units to be issued to, such new Members;

(i)    Any agreement by the Company or its Members regarding an asset transfer or acquisition;

(j)    Any action that results in the payment or declaration of a dividend on any Units;

(k)    Any creation of or sale or issuance of additional Units for the purpose of raising additional capital or for any other lawful purpose;

(l)    Any action to cause or permit the Company (i) to be a party to a merger, consolidation, share exchange, interest exchange or any other transaction authorized by or subject to the provisions of Section 18-209 of the Delaware Act, or (ii) to convert into a corporation or any other type of entity pursuant to the provisions of the Delaware Act; and

(m)    A restructuring or reorganization of the Company.

29

CONFIDENTIAL
INFORMATION

C011313

8.10    <u>Reimbursements</u>.    The Company shall reimburse the officers of the Company and the Board of Managers, including the Managers, for all reasonable out-of-pocket expenses incurred by the officers of the Company and the Board of Managers, including the Managers, on behalf of the Company. Any policy adopted by the Board of Managers as to which expenses may be reimbursed to the officers of the Company and the Board of Managers, including the Managers, and the amount of such expenses, shall be conclusive. Such reimbursement shall be treated as an expense of the Company and shall not be deemed to constitute a distribution to any Member in respect of its Member Interest.

8.11    <u>Transactions with Affiliates</u>. No contract or transaction between the Company and its Manager or between the Company and any other Limited Liability Company, partnership, association, or other organization in which one or more of its Managers are Managers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Manager is present at or participates in the meeting of the Managers or committee thereof which authorizes the contract or transaction, or solely because their votes are counted for such purpose, if:

(a)    the material facts of his relationship or interest and as to the contract or transaction are disclosed or are known to the Managers or the committee, and the Manager or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Managers, even though the disinterested Managers be less than a quorum; or

(b)    the material facts as to his relationship, interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Members; or

(c)    the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Managers, or a committee thereof, or the Members; or

(d)    interested Managers may be counted in determining the presence of a quorum at a meeting of the Managers or of a committee which authorizes the contract or transaction.

8.12    <u>Amendments</u>. Any amendments to this Agreement shall be adopted and be effective as an amendment hereto only if approved in writing by the Members holding a Majority-in-Interest then outstanding; <u>provided</u>, <u>however</u>, that no amendment shall be made, and any such purported amendment shall be void and ineffective, to the extent the result thereof would be to cause the Company to be treated as anything other than a partnership for purposes of United States federal income taxation; <u>provided further</u>, <u>however</u>, that the revision of <u>Schedule A</u> hereto as necessary to accurately reflect the names, addresses and number and type of Units owned by each Member (including the addition of any new Member or Withdrawal of any Member pursuant to the terms of this

30

CONFIDENTIAL
INFORMATION

C011314

Agreement), as each may change from time to time in accordance with the terms of this Agreement, may be made by the Board of Managers acting alone and shall not require the approval of any Member.

8.13    Meetings of the Members.

(a)    Meetings of the Members may be called at any time by the Board of Managers. Notice of any meeting, including the date, time and location, shall be given to all Members not less than three (3) days or more than thirty (30) days prior to the date of such meeting. Each Member may authorize any Person to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact.

(b)    Except as otherwise provided by law, Members who hold a majority of the Equity Units then outstanding shall constitute a quorum at all meetings of the Members.

(c)    Unless otherwise provided by law or by this Agreement, all questions shall be decided by an affirmative vote of the Members who hold a majority of the Units then outstanding present in person at the meeting and entitled to vote on the question.

(d)    Any action required to or which may be taken at a meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent, or consents in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted.

(e)    Any Members may participate in a meeting of the Members by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time, and participation by such means shall constitute presence in person at a meeting.

8.14    Action of Members. All references in this Agreement to consents, approvals, decisions, actions or other exercise of rights collectively by "Members" shall be effective and bind the Company if taken by the affirmative vote or consent of a Majority-In-Interest, except where a larger vote is expressly required by the laws of the State of Delaware or this Agreement.

8.15    Action of Managers. All references in this Agreement to consents, approvals, decisions, actions or other exercise of rights by the Managers shall be effective and bind the Company if taken by the Managers, if one Person shall be the Manager or pursuant to the affirmative vote or consent of a majority of Persons then in office as Managers without regard to whether there are any vacancies. Not withstanding the

CONFIDENTIAL
INFORMATION

C011315

preceding, the Managers must agree to all such action by majority decision amongst the then active Managers.

8.16    Other Business Ventures. Any Member may engage in or possess an interest in other business ventures of every nature and description with the Company, independently or with others, except as provided otherwise in Article XIV. Neither the Company nor any Member shall have any right by virtue of this Agreement in or to such other business ventures or to the income or profits derived there from.

8.17    Separateness Covenants.

A.    In order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the following provisions:

(i)    It shall establish and maintain an office through which its business shall be conducted separate and apart from that of any of its affiliates and shall allocate fairly and reasonably any overhead for shared office space.

(ii)    It shall maintain separate records, books and accounts from those of any affiliate or any other person.

(iii)    It shall not commingle funds or assets with those of any affiliate or any other person.

(iv)    It shall conduct its business and hold its assets in its own name.

(v)    It shall maintain financial statements, accounting statements and prepare tax returns separate from any affiliate or any other person.

(vi)    It shall pay any liabilities out of its own funds, including salaries of any employees, not funds of any affiliate, and maintain a sufficient number of employees in light of its contemplated business operations.

(vii)    It shall maintain adequate capital in light of its contemplated business operations.

(viii)    It shall maintain an arm's length relationship with any affiliate.

(ix)    It shall not assume or guarantee or become obligated for the debts of any other entity, including any affiliate, or hold out its credit as being available to satisfy the obligations of others.

32

CONFIDENTIAL
INFORMATION

C011316

(x)    It shall not have any of its obligations guaranteed by any member or affiliate, except the guarantor of the mortgage loan.

(xi)    It shall not pledge its assets for the benefit of any other person or entity or make an advance or loan to any person or entity, including any affiliate.

(xii)    It shall not acquire obligations or securities of its Members, members or shareholders or any affiliate.

(xiii)    It shall use stationery, invoices and checks separate from any affiliate or any other person.

(xiv)    It shall hold itself out as an entity separate and distinct from any affiliate and not as a division, department or part of any other person or entity.

(xv)    It shall not identify its members or any affiliates as a division or part of it.

(xvi)    It shall correct any known misunderstanding regarding its separate identity.

(xvii)    It shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity.

(xviii)    It shall not share a common logo with any affiliate or any other person.

(xix)    It shall not acquire or own any material assets other than the Property and such incidental personal property as may be necessary for the operation of the Property.

(xx)    It shall maintain its books, records, resolutions and agreements as official records.

(xxi)    It shall hold regular meetings, as appropriate, to conduct its business and observe all Limited Liability Company level formalities and record keeping.

## ARTICLE IX
## ACCOUNTING, BANK ACCOUNTS AND TAX MATTERS

9.1    Fiscal Year and Accounting Method. The fiscal year and taxable year of the Company shall end on December 31 of each year, unless a different year is required

33

CONFIDENTIAL
INFORMATION

C011317

by the Code, or changed by the Managers after the first calendar year of operation. The Company shall use the accrual method of accounting unless and until changed by the Managers.

9.2    Books and Records. At all times during the existence of the Company, the Company shall cause to be maintained full and accurate books of account, which shall reflect all Company transactions and be appropriate and adequate for the Company's business. The books and records of the Company shall be maintained at the principal office of the Company either within or without the State of Delaware. Each Member (or such Member's designated representative) shall have the right during ordinary business hours and upon reasonable notice to inspect and copy (at such Member's own expense) all books and records of the Company.

9.3    Financial Reports.

(a)    Within sixty (60) days after the end of each fiscal year, a balance sheet of the Company as of the end of such year and related financial statements for the year then ended, which need not be audited, shall be prepared in accordance with generally accepted accounting principles and delivered to each Member. Outside accountants, based on a compilation of the Company's books and records, will prepare the financial statements.

(b)    Within ninety (90) days after the end of each fiscal year, all information with respect to the Company necessary for the Members' federal and state income tax returns and a copy of the Company federal income tax return shall be delivered to each member.

(c)    The Managers shall have the power to hire such accountants as they deem necessary or desirable.

9.4    Bank Accounts. The Managers shall be authorized to set up bank accounts as in their sole discretion are deemed necessary and are authorized to execute any banking resolutions provided by the institution in which the accounts are being set up. All funds of the Company shall be deposited in a separate bank, money market or similar accounts approved by the Managers and in the Company's name. Only the Managers shall make withdrawals from these accounts or other individuals authorized to do so by the Managers under accepted accounting principles and practices.

9.5    Reserves. The Managers shall have the authority to establish, maintain and expend such Reserves to provide for working capital, for future maintenance, repair or replacement of Company Property, for acquisition of additional technologies or interests therein, for debt service for future investments and for such other purposes as the Managers may deem necessary or advisable.

9.6    Tax Returns and Elections. The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements

CONFIDENTIAL
INFORMATION

C011318

required by applicable law. The Company shall claim all deductions and make such elections for federal or state income tax purposes which the Managers reasonably believe will produce the most favorable tax results for the Members.

9.7    Tax Matters Member.

(a)    The Members shall, if necessary for the partnership-level determination rules of Code Sections 6221 through 6234 to apply to the Company, cause the Company to make and keep in effect an election under Code Section 6231(a)(1)(B)(ii), which election shall be effective beginning with the first taxable year of the Company, to have the provisions of Sections 6221 through 6234 of the Code apply to the Company and its Members. A Member designated by the Board shall serve as the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code (such Member, acting in such capacity, the "Tax Matters Member"), and such Member shall serve as Tax Matters Member of the Company until his successor is duly designated by the Board. The Tax Matters Member shall not take any action that may be taken by a "tax matters partner" under Code Section 6221 through 6234 unless (i) it has first given the other Members written notice of the contemplated action at least ten (10) business days prior to the applicable due date of such action and (ii) it has received the written consent of holders of a Majority-in-Interest to such contemplated action. The Tax Matters Member shall not bind any Member to a settlement agreement without first obtaining the written consent of such Member. The Tax Matters Member shall file or cause to be filed the Company's income tax returns on a timely basis. The Tax Matters Member shall be Cameron Winklevoss.

(b)    The Tax Matters Member shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail a copy of such notice to each Member. The Tax Matters Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code. The Tax Matters Member shall promptly (and in any event within ten (10) days) forward to each other Member copies of all significant written communications it may receive in such capacity.

(c)    The Tax Matters Member shall be indemnified by the Company with respect to any action taken by him in his capacity as Tax Matters Member by applying, *mutatis mutandis*, the provisions of Article XIII.

9.8    Section 754 Elections. The Board of Managers, upon the written request of any Member, shall direct the Tax Matters Member to make (and the Tax Matters Member shall make), on behalf of the Company, an election under §754 of the Code, so as to adjust the basis of Company property in the case of a distribution of property within the meaning of §734 of the Code, and in the case of a transfer of a Company interest within the meaning of §743 of the Code. Each Member shall, upon request of the Tax Matters Member, supply the information necessary to give effect to such election. Subject to

35

CONFIDENTIAL
INFORMATION

Section 9.9, the Tax Matters Member shall make all other elections in respect of Taxes solely as directed by the Board.

9.9    Taxation of Company. The Company shall be treated as a partnership for U.S. federal income tax purposes.

9.10    Tax Withholding. Notwithstanding any other provision of this Agreement, the Managers are authorized to take any action that the Managers determines to be necessary or appropriate to cause the Company to comply with any withholding requirements established under any federal, state or local tax law, including, without limitation, withholding on any distribution to any Member.

## ARTICLE X
## TRANSFERS OF INTERESTS

10.1    General Restrictions. No Member may transfer all or any part of such Member's Interest, except (i) as provided in this Agreement, or (ii) with the unanimous written consent of all Members. Any purported Transfer of a Unit in violation of the terms of this Agreement shall be null and void and of no effect. A Permitted Transfer as defined in Section 10.3 shall be effective as of the date specified in the instruments relating thereto. Any transferee desiring to make a further transfer shall become subject to all of the provisions of this Article 10 to the same extent and in the same manner as any Member desiring to make any Transfer.

10.2    Special Restrictions. Founding Members and employees may transfer all or part of such Membership Interest under the same provisions as other Members, but will be further restricted as outlined in this Section 10.2. Members holding Units issued as Founding Members or vested Incentive Units granted to individual employees may only transfer up to twenty (20) percent of this interest each calendar year. After the first full year of operation, this allocation will carry over from year to year. Requests for the transfer of more than the accrued allocation of a Founding Member or an employee's vested interest requires the approval of an 80% majority of the Board of Managers. This restriction will be released should the Company be restructured through an IPO, Merger or Sale of the Business.

10.3    Transfer of Membership Interest Only; Permitted Transfers. Each Member shall have the right to Transfer by a written instrument all or a portion of its Membership Interest in one or more of its Units in minimum increments designated by the Manager (but not to substitute the Assignee as a Substitute Member in his place, except in accordance with Section 10.4); provided however (i) the Transfer would not result in the "termination" of the Company pursuant to Section 708 of the Code, (ii) the Member has first complied with the provisions of Section 10.4 (however no such compliance is required in case of a Permitted Transfer as set forth below) and (iii) the transferor or transferee has paid all reasonable expenses of the Company in connection with the transfer of such Membership Interest. Each Member shall be entitled to transfer

CONFIDENTIAL
INFORMATION

C011320

('Permitted Transfer") its Membership Interest to one or more individuals included in the Member's immediate Family or to a trust for such Family Individuals without first complying with Section 10.5.

10.4    Assignees and Substitute Members. No Assignee of all or part of a Member's Interest (including without limitation an Assignee in a Permitted Transfer) shall become a Substitute Member in place of the Assignor unless and until:

(a)    the Assignor (if living) has stated such intention in the instrument of assignment;

(b)    the Board and a Majority-in-Interest have approved the assignment;

(c)    the Assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement;

(d)    the Assignee has provided the Company or its counsel evidence satisfactory to such counsel that federal and state securities laws applicable to such transfer have been satisfied;

(e)    the Assignor or Assignee has paid all reasonable expenses of the Company in connection with the admission of the transferee as a Substitute Member; and

(f)    the provisions of Section 10.5 shall have been complied with (except with respect to a Permitted Transfer).

Upon satisfaction of all of the foregoing conditions with respect to a particular transferee, the Managers shall cause Schedule A to this Agreement to be amended to reflect the admission of the assignee as a Member.

10.5    Effect of Transfer of Economic Interest; Effect of Admission as a Substitute Member. Any assignee or other transferee of a Membership Interest shall only be entitled to receive, to the extent of the Membership Interest assigned or transferred to him, the Distributions to which the transferor would be entitled.  Unless and until admitted as a Substitute Member pursuant to Section 10.3, an assignee or other transferee of a Membership Interest shall not be entitled to exercise any rights of a Member in the Company, including the right to vote, grant approvals or give consents with respect to such Membership Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records.  An Assignee or other transferee of a membership Interest who has also become a Substitute Member in accordance with Section 10.3 has, to the extent of the Membership Interest transferred to him, all the rights and powers of the Person for whom he is substituted and is subject to the restrictions and liabilities of a Member under this Agreement and the Act.

37

CONFIDENTIAL
INFORMATION

10.6     Right of First Refusal. If at any time a Member ("Selling Member") desires to transfer, in accordance with Section 10.2, all or any part of his Membership Interest (the "Subject Interest') to a third party the following shall apply:

(a)     The Selling Member shall submit to the other Members (the "Other Members") a written notice stating the Percentage Interest of the Subject Interest desired to be sold or conveyed, the price, payment and other terms and conditions of transfer to the third party (the "Offer").

(b)     Each Other Member shall have the right for fifteen (15) days from the receipt of notice of the Offer to agree (by written notice to the Managing Members) to purchase on the terms and conditions set forth in the Offer a pro-rata portion of the Subject Interest in the proportion that the Percentage Interest of such Other Member bears to the Percentage Interests of all Other Members.

(c)     In the event any Other Member does not exercise his right to purchase his portion of the Subject Interest, each Other Member who has exercised such right shall have the right for an additional fifteen (15) days to agree (by written notice to the Managing Members) to purchase all but not less than his pro rata portion of the un-purchased Subject Interest in the proportion that such Other Members Percentage Interest bears to the Percentage Interests of all Other Members exercising the right.

(d)     If some or all of the Other Members agree in the aggregate to purchase all (but not less than all) of the Subject Interest, then the Selling Member and such Other Members shall close the purchase upon the terms and conditions of the Offer within sixty (60) days after the Offer is first submitted to the Other Members or at such other time and place as may be mutually agreed upon, with the Subject Interest to be allocated among such Other Members first to each of them up to the amount of their pro rata portion and any excess among those Other Members agreeing to purchase more than their pro rata portion in accordance with their percentage interests as a proportion of all percentage interest of those agreeing to purchase any excess.

(e)     If the Other Members do not agree to purchase all of the Subject Interests within the two fifteen (15) day time periods set out above, the Company shall have the right for fifteen (15) days to purchase any un-purchased portion of the Subject Interest (or all of the Subject Interests if no Member shall have exercised its rights hereunder).  If the Other Members and the Company do not agree to purchase all of the Subject Interests within the time periods provided for herein, then the Selling Member shall have the right to consummate the sale or conveyance of all of the Selling Member's Interest in and to the Subject Interest so long as (i) the price, payment and other terms are at least as favorable to the Selling Member as those set forth in the Offer, (ii) the Board and a Majority-in-Interest have approved the sale, such approval shall not be unreasonably withheld and (iii) the closing occurs on or before the date set forth in the Offer but not later than one hundred and eighty (180) days from the date the Offer was first submitted to the Other Members.

CONFIDENTIAL
INFORMATION

C011322

(f)    Any purchaser desiring to make a further sale or conveyance of any part of the Subject Interest shall be subject to this Section 10.5.

(g)    The provisions of this Section do not apply to a Permitted Transfer, but the Managers may hold any other Transfers in abeyance for up to one hundred and eighty (180) days during a time period in which the Company is conducting a Capital Raise, Private Offering or an IPO on behalf of the Company.

10.7    Involuntary Transfers.    In the event of an Involuntary Transfer, the Company and/or the Members as the case may be, shall have the option to give written notice to the affected Member, or his legal representative (so notifying him that the Company and/or remaining eligible Members intend to exercise their option to purchase all of such Member's Common Interest for a purchase price (the "Adjusted Appraised Value") equal to the product of (i) a fraction, the numerator of which is the affected Member's Percentage Interest and the denominator of which is the aggregate of the Percentage Interests held by all of the Members (including that of the affected Member), multiplied by (ii) the Appraised Value of the Company and further multiplied by .65 to account for lack of a public market for the Membership Interest, the minority nature of the Membership Interest and the lack of voting control such Membership Interest represents.

10.8    Purchase Option of Involuntary Transfer.    The Company shall have the option for a period of thirty (30) days from the date of delivery of notice of the Appraised Value to elect to exercise its option to purchase all or a portion of the Membership Interest of the affected Member at the Adjusted Appraised Value. If the Company does not exercise its option to purchase within the thirty (30) day period, or if the Company has waived in writing its right to exercise its purchase option, the Company shall notify in writing the affected Member, or his representative(s), and the remaining Members, as the case maybe, that the Company has not exercised its option to purchase and any such Membership Interest shall then be subject to the same option by the remaining eligible Members, for a period of thirty (30) days after expiration of the Company's right as aforesaid, to purchase a proportionate share of such Membership Interest at the Adjusted Appraised Value, if any Member entitled to purchase a Membership Interest falls to exercise his option to purchase within the initial Member option period, the other Members may purchase the Membership Interest not so purchased in proportions calculated herein within five (5) days of the expiration of this option period.

10.9    Bring-Along Rights.

(a)    If Members owning a majority of the Percentages determine to sell all or substantially all of the Interests in the Company to an unrelated purchaser pursuant to a bona fide offer, all the Members (and their Permitted Transferee) shall sell a proportionate amount of their Interests to the purchaser on the same terms and conditions (determined on the basis of the amount that would be distributable to the Members upon a liquidation of the Company).

CONFIDENTIAL
INFORMATION

C011323

(b)     If Members (the "Seller") determine to Transfer in one or more related transactions a portion of their Interests having a majority of the aggregate Percentage to an unrelated Person pursuant to a bona fide offer, the Sellers shall provide the other Members (the "Remaining Members") with at least twenty (20) days prior written notice of the Transfer, together with a copy of the offer and a description of the terms, including the price for the Interest proposed to be Transferred (the "Notice"). Each Remaining Member shall have the right, by delivery to the Sellers sending the Notice of written notice within such twenty (20) day period, to Transfer a portion of the Remaining Member's Interest equal to the same proportion (the "Proportion") as the proportion of the Sellers' Interests being Transferred to the unrelated Person on terms and conditions consistent with the Transfer by the Sellers. The purchase price for such Interest of a Remaining Member shall be the Proportion of the amount which the Remaining Member would receive upon a liquidation of the Company if the Sellers received the purchase price offered for their Interests divided by such Proportion in such liquidation.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.1    <u>Events Causing Dissolution.</u> The Company shall be dissolved upon the first to occur of the following events:

(a)     The expiration of the term of the Company, if any, as may be set forth in the certificate of formation.

(b)     The unanimous written consent of all Members.

(c)     Upon the occurrence of any event which legally terminates the continued operation of the Company, unless the Membership of the Company resolves to take the necessary remedial action in order to then legally continue operations by the consent of the Members owning a Majority-In-Interest or more of the Membership Interests, who then may elect new Managers to replace and take on the same authority as the prior Managers within ninety (90) days following the occurrence of any such event.

(d)     Except as otherwise agreed upon in this Agreement, any other event causing a dissolution of the Company under the provisions of the Act.

11.2    <u>Effect of Dissolution.</u> Except as otherwise provided in this Agreement, upon the dissolution of the Company, the Managers shall take such actions as may be required pursuant to the Act and shall proceed to wind up, liquidate and terminate the business and affairs of the Company. In connection with such winding up, the Manager shall have the authority to liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining a fair value therefore, to apply and distribute the proceeds of such liquidation and any remaining assets in accordance with the provisions of Section 12.3, and to do any and all

CONFIDENTIAL
INFORMATION

C011324

acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

11.3    Application of Proceeds. Upon dissolution and liquidation of the Company, the assets of the Company shall be applied and distributed in the order of priority set forth in Section 7.6.

11.4    Certificate of Dissolution. Upon completion of winding up the Company, a Certificate of Dissolution shall be delivered to the secretary of state for filing. The Certificate of Dissolution shall set forth the information required by the Act.

## ARTICLE XII
## INDEMNIFICATION

12.1    Liability.

(a)    Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    Each Member's liability for the debts and obligations of the Company shall be limited as set forth in applicable law.

12.2    Exculpation.

(a)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence, willful misconduct or material violation of this Agreement.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

12.3    Duties and Liabilities of Covered Persons. To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating

41

CONFIDENTIAL
INFORMATION

C011325

thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for his good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of the Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

12.4    Indemnification. To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions or material violation of this Agreement; provided, however, that any indemnity under this Section 13.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof. The Company may, from time to time, enter into separate indemnity agreements with any of the Covered Persons or certain other parties.

12.5    Expenses. To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time (within thirty (30) days following receipt of an invoice therefor), be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 14.4 hereof.

12.6    Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Board of Managers shall deem reasonable, on behalf of Covered Persons and such other Persons as the Board of Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. The Board of Managers and the Company may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.5 hereof and containing such other procedures regarding indemnification as are appropriate.

## ARTICLE XIII
## RESTRICTIVE COVENANTS

42

CONFIDENTIAL
INFORMATION

C011326

13.1    Non-Competition.  During the period that the Member is associated with Company and for a period of one (1) year after Dissociation (the "Protective Period"), each Member covenants to the Company and each other Member that the Member will not, directly or indirectly, as an owner, proprietor, partner, member, joint venturer, shareholder, lender, consultant, advisor, agent, manager, principal, trustee, officer, director, employee, or in any capacity whatsoever engage in, become financially interested in, be employed by, render advise to, or have any connection with, any activity that competes with the Business of the Company within the United States; provided, however, that nothing contained herein this Section 13.1 shall prohibit any Member from owning less than a 5% passive interest in any activity that would otherwise qualify as competing with the Business of the Company. Notwithstanding anything contained in this Section 13.1, any conduct or activity undertaken by any Member that would otherwise constitute competing with the Business of the Company hereunder may be waived by the Company upon the affirmative vote or written consent of the Management Committee in accordance with the manner prescribed hereunder.

13.2    Non-Solicitation.  In addition, each Member covenants to the Company and each other Member for the duration of the Protective Period that the Member will not individually or on behalf of any other person, directly or indirectly, attempt to contact, solicit, divert, appropriate, or hire away from the Company, any existing or past customer, supplier, employee, Manager or Member.

13.3    Confidentiality.

(a)    Each Member recognizes and acknowledges that:

(i)    in order to enable the Company to effectively run its business, a Member may come into possession of or acquire knowledge about or regarding any Trade Secrets or Confidential Information or create work-product that incorporates either or both of the same; and

(ii)    the success and goodwill of the Company depend upon, among other things, all persons associated with the Company (including, without limitation, Members, Managers and employees) keeping confidential and protecting all Trade Secrets and Confidential Information, and therefore all Trade Secrets and Confidential Information represent legitimate business concerns and interests of the Company.

(b)    Each Member hereby covenants and agrees that now and forever, except as directed by the Company or by reason of court order, subpoena, law, rule, or regulation, with respect to any:

(i)    Trade Secrets, at any time during the Protective Period and forever thereafter, or

43

CONFIDENTIAL
INFORMATION

C011327

(ii)     Confidential Information, at any time during the Protective Period and for two (2) years thereafter,

no Member shall disclose any Trade Secrets to any person who is not associated with the Company and who has not executed this Agreement or a provision similar to this Section, or make any use thereof, or permit any person to examine and/or make copies of any documents which contain or are derived from Trade Secrets or Confidential Information, whether or not prepared by such Member, or otherwise coming into such Member's possession or control, without the prior written permission of the Company, which consent may be withheld in the Company's sole and absolute discretion.

(c)     Each Member agrees that upon request by the Company, or upon the occurrence of any event of Dissociation, such Member shall turn over to the Company all documents, papers or other material in the Member's possession or under the Member's control which may contain, or be derived from, Trade Secrets or Confidential Information, together with all documents, notes or other work product, which are connected with, or derived from the Member's services to the Company, whether or not such material is, as of the date hereof, in the Member's possession.

13.4     Company Intellectual Property.  For the duration of the Protective Period and forever thereafter, each Member hereby expressly acknowledges, covenants and agrees to the following:

(a)     All Intellectual Property created individually or jointly with any other person, arising out of a Member's relationship with, or activities conducted on behalf of, the Company shall be the sole and exclusive property of the Company and all rights in such Intellectual Property shall be exclusively owned by the Company. Accordingly, each Member hereby waives any personal proprietary interest in any such Intellectual Property.  Each Member shall promptly disclose to the Company on a truthful, complete, and accurate basis, without request of the Company, any and all Intellectual Property created, designed, invented, or authored by such Member.

(b)     Upon the request of the Company and at the Company's expense, each Member shall execute all papers necessary thereto, including assignments of copyrights and copyright registrations and applications; inventions, patent applications and patents, Trade Secrets and other Confidential Information; and trademarks, service marks, trade names, and domain names, and to render assistance in the protection, prosecution, enforcement, or defense thereof;

(c)     Any and all copyrighted works of authorship created or authored individually or jointly with any other person, arising out of a Member's relationship with or activities conducted on behalf of the Company, shall constitute a "work made for hire" (as that term is defined under the federal copyright laws) and, as such, any and all copyrights covering such works of authorship shall be the sole and exclusive property of

44

CONFIDENTIAL
INFORMATION

C011328

the Company (and, to the extent that such works of authorship do not qualify as works made for hire under applicable law, the copyrights therein shall be deemed assigned to the Company by such Member); and

(d)    Upon Dissociation, each Member shall promptly deliver to the Company all originals and copies of drawings, records, reports, notes, correspondence, photographs, blueprints, maps, computer data, electronic documents and files, maps, and any other recorded, written, or printed matter under his control relating to any inventions and discoveries referred to herein and shall return all property of the Company such as equipment, specimens, samples, models, and representations.

13.5    Member Intellectual Property. Each Member hereby acknowledges and represents that to the extent he contributed to the concept, design, development, execution, and/or operation of the website that was originally to be known as Harvard Connection, and/or to the the website that became known as ConnectU.com, either before or after the incorporation of the Company, it is each Member's intent that all rights, title, and interest, including all rights in Intellectual Property covering such contributions, shall be exclusively owned by the Company. Accordingly, each Member, on his own behalf and on behalf of the unincorprated proprietorship known as Harvard Connection and the unincorporated proprietorship known as ConnectU, hereby irrevocably transfers, assigns, releases, and quitclaims to the Company, nunc pro tunc to the date of incorporation of the Company, all right, title, and interest in and to (1) all Intellectual Property covering the ideas, designs, computer programs, graphical user interfaces, documents, and other contributions made by each Member to the website that was originally to be known as Harvard Connection, and to the the website that became known as ConnectU.com, (2) all tangible and intangible assets constituting or related to such websites, including any goodwill associated with such websites, (3) the websites themselves, (4) the underlying computer programs, (5) the rights to sue and recover damages for the past, present, or future infringement or violation of such rights, **(6) to the extent permitted by applicable law, all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known or referred to as "moral rights" (collectively "Moral Rights"), except that to the extent that a Member retains any such Moral Rights under applicable law, such Member hereby waives such Moral Rights and consents to any action consistent with the terms of this Agreement with respect to such Moral Rights,** and (7) any other rights of each Member needed by the Company to conduct its business and to pursue any claims against any third parties relating to such websites and/or the business of the Company.

13.6    Reasonableness of Equitable Remedies.    Each Member expressly acknowledges and agrees that any breach by any Member of any provision contained in this Article will cause irreparable injury to the Company for which money damages alone may be inadequate, and therefore, in addition to any recovery by the Company (or any one of Affiliates) in the event of any Member's breach of any of these provisions, equitable remedies are also appropriate and should be granted to the Company to prohibit and prevent conduct which would constitute a violation of the Member's obligations

CONFIDENTIAL
INFORMATION

C011329

hereunder, which may necessarily include the right of the Company (or any one of its Affiliates) to preliminary injunctive relief without the necessity of posting a bond.

### ARTICLE XIV
### GENERAL PROVISIONS

14.1    Entire Agreement; Future Amendment. This Agreement, the Exhibits and Schedules hereto, and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.    Except as may otherwise be expressly provided herein, this Agreement shall not be amended in any manner except by written consent duly executed by holders of eighty percent (80%) of the Ownership Interests.

14.2    Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition..

14.3    Specific Enforcement. Unless otherwise provided to the contrary herein, all breaches of this Agreement are subject to specific enforment, without prejudice to the right to seek damages or other remedies.

14.4    Enforcement Costs.    If the Company resorts to litigation to remedy a breach of this Agreement by a Member or a former Member and the Company prevails in the litigation, in addition to any other remedies available to the Company under this Agreement or by law, the Company may collect its reasonable attorney fees and costs and other costs and expenses of litigation.

14.5    No Third Party Beneficiaries.    None of the provisions of this Agreement shall be for the benefit of or enforceable by any Person (including any creditor of the Company) other than the parties hereto and their respective heirs, executors, administrators, personal or legal representatives, successors, and permitted assigns.

14.6    Further Action.    The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

14.7    Severability. In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

CONFIDENTIAL
INFORMATION

C011330

14.8    Binding Effect. Subject to the restrictions on the disposition of Interests herein contained, the provisions of this Agreement shall be binding upon, and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns and any other person claiming a right or benefit under or covered by this Agreement.

14.9    Headings. The headings of the Sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof.

14.10    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

14.11    Governing Law.   This Agreement shall be an agreement under seal governed by and interpreted and construed in accordance with the internal laws of the State of Delaware, without reference to principles of conflicts or choices of laws.

14.12    Notices.  Any notice, demand, request or report required or permitted to be given or made to a Member or a Manager under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail, return receipt requested, or by a reputable courier service to the Member or the Manager at the address described below.   Notices and other communications provided for herein shall be in writing and shall be delivered or sent as herein provided to the Members at their respective addresses set forth on Schedule A hereto and to the Managers at the addresses provided to the Company and maintained by the Secretary.  A Member may at any time or from time to time designate, by notice to the Company, another address in lieu of the address specified herein or in any previous designation pursuant to this sentence.  Any notice to the Company shall be deemed given if received by the Board at the principal office of the Company.

14.13    Assignability. This Agreement or any of its rights, interests or obligations hereunder shall not be assignable by any party hereto except as otherwise expressly provided hereunder.

14.14    Pronouns and Plurals.  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

14.15    Advice of Counsel. Each person signing this Agreement understands that this Agreement contains legally binding provisions; has been advised to seek independent counsel and has had the opportunity to consult with her lawyer of her or her own choice; and has either consulted such a lawyer or knowingly decided not to consult a lawyer.

CONFIDENTIAL
INFORMATION

C011331

*[remainder of page intentionally left blank - counterpart signature pages follow]*

48

CONFIDENTIAL
INFORMATION

C011332

IN WITNESS WHEREOF, the following Founding Members of this Company hereto confirms receipt and acceptance of the terms and conditions of this Agreement, which is to be duly executed as of the effective date of the Company's incorporation:


_____        _____
Cameron Winklevoss                                (Date)


_____        _____
Tyler Winklevoss                                  (Date)


_____        _____
Howard Winklevoss                                 (Date)


_____        _____
Divya Narendra                                    (Date)


**[SIGNATURE PAGE TO OPERATING AGREEMENT]**

CONFIDENTIAL
INFORMATION

C011333

IN WITNESS WHEREOF, the following Founding Members of this Company hereto confirms receipt and acceptance of the terms and conditions of this Agreement, which is to be duly executed as of the effective date of the Company's incorporation:


_____          8/05/05
Cameron Winklevoss                   (Date)

_____          08/05/05
Tyler Winklevoss                     (Date)

_____          8/05/05
Howard Winklevoss                    (Date)

_____          8/05/2005
Divya Narendra                       (Date)


**[SIGNATURE PAGE TO OPERATING AGREEMENT]**

49

CONFIDENTIAL
INFORMATION

C011334

Schedule A

| Member | Equity Units | Percentage Interest | Initial Capital Account* |
|---|---|---|---|
| Cameron Winklevoss | 47 | 47% | $ 47.00 |
| Tyler Winklevoss | 47 | 47% | $ 47.00 |
| Howard Winklevoss | 1 | 1% | $  1.00 |
| Divya Narendra | 5 | 5% | $  5.00 |
| | 100 units | 100% | $100.00 |

*The initial capital account of each Member does not reflect additional contributions made on or after the formation of the Company and/or profits or losses incurred on or after the formation of the Company.

50

CONFIDENTIAL
INFORMATION

C011335